UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA, )<br>)<br>)<br>Plaintiff, ) Civil Action No. 05-10112 JLT<br>)<br>v. )<br>)<br>THE COMMONWEALTH OF )<br>MASSACHUSETTS, *et al.* )<br>)<br>)<br>Defendants. )<br>_____) | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AS TO DEFENDANTS' COUNTERCLAIM**

COMES NOW the Plaintiff, the United States of America, by and through its undersigned counsel, and moves this Court to enter summary judgment in favor of Plaintiff pursuant to Fed. R. Civ. P. 56 as to the Counterclaim set forth in the First Amended Complaints of Defendant the Commonwealth of Massachusetts (Docket Entry No. 16) and Intervenor-Defendant the Coalition for Buzzards Bay (Docket Entry No. 20), for the reasons set forth in the accompanying Memorandum of Law.

Pursuant to Local Rule 7.1(a)(2), undersigned counsel conferred by telephone with counsel for Defendants on May 11, 2005, and with counsel for Intervenor-Defendant on May 13, 2005. Counsel for those parties represented to undersigned counsel that those parties would oppose this Motion.

//
//
//
//
//
//
//

DATED this 23d day of May, 2005.

                                                Respectfully Submitted,

| | |
|---|---|
| RADM John E. Crowley<br>Judge Advocate General | PETER D. KEISLER<br>Assistant Attorney General |
| CAPT William D. Baumgartner<br>Robert W. Bruce<br>Andrew J. Turner<br>Attorneys<br>U.S. Coast Guard | MICHAEL SULLIVAN<br>United States Attorney<br>MARK T. QUINLIVAN<br>Assistant United States Attorney |
| OF COUNSEL | **/s/ Steven Y. Bressler**<br>ARTHUR R. GOLDBERG D.C.B. 180661<br>STEVEN Y. BRESSLER D.C.B. 482492<br>Attorneys, Civil Division<br>United States Department of Justice<br>P.O. Box 833<br>Washington, D.C. 20044<br>Telephone (202) 514-4781<br>Facsimile (202) 318-7609<br>Steven.Bressler@USDOJ.gov |

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) Civil Action No. 05-10112 JLT <br> ) <br> v. ) <br> ) <br> THE COMMONWEALTH OF ) <br> MASSACHUSETTS, et al. ) <br> ) <br> Defendants. ) <br> _____) | |

**DECLARATION OF W. DOUGLAS RABE**

I, W. DOUGLAS RABE, a civilian employee of the United States Coast Guard, make the following declaration pursuant to 28 U.S.C. § 1746.

1. I am currently employed as Chief of the Investigations Division within the Coast Guard Office of Investigations and Analysis, under the Assistant Commandant for Marine Safety, Security and Environmental Protection. I also supervise the program manager for Coast Guard marine safety drug and alcohol testing programs, including the rulemaking to implement the alcohol testing requirements of Public Law 105-383, Title III, § 304(d)(1), codified at 46 U.S.C. § 2303a ("the rulemaking"). The facts contained in this declaration are based on my review of Coast Guard records pertaining to the rulemaking and knowledge gained in my official capacity.

2. For many years the Coast Guard has required marine employers to conduct alcohol testing of their seamen employees following a serious marine incident ("SMI"), pursuant to regulations at 46 C.F.R. Subpart 4.06. On November 13, 1998, 46 U.S.C. § 2303a was enacted. That statute directs the Coast Guard to establish "procedures" to ensure that alcohol

testing occurs within two hours after an SMI, unless testing is prevented by safety concerns directly related to the SMI. The statute does not set a deadline for establishment of these procedures, nor does it specify how the Coast Guard should establish them.

3.  From the enactment of the statute, establishment of the procedures required by section 2303a has been a priority for the Coast Guard, but one among a number of important regulatory and non-regulatory priorities. The Office of Investigations and Analysis was given the responsibility to establish the procedures required by section 2303a. Since enactment of section 2303a, I have supervised the project managers assigned to this project.

4.  Following the usual Coast Guard process for rulemaking, a project team was assembled to prepare a Regulatory Workplan ("the Workplan") and study the appropriate means of implementing section 2303a. The Coast Guard decided to follow a two-step process for establishment of the required procedures: the Coast Guard would quickly issue guidance in the form of a policy letter from the Coast Guard Commandant's Office of Investigations and Analysis giving immediate effect to the provisions of section 2303a and, at the same time, would proceed with notice and comment rulemaking to amend 46 C.F.R. Subpart 4.06. The Office of Investigations and Analysis was also directed to develop those regulations.

5.  The policy letter was issued on February 11, 1999. A true and correct copy of the policy letter is attached hereto as Exhibit A. The letter was directed to all Coast Guard marine safety and inspection offices and other Coast Guard commands and districts. It brought to their attention the provisions of section 2303a, and it requested that they ensure alcohol testing be conducted in accordance with section 2303a whenever possible.

6.  During most of 1999, work on the section 2303a project was suspended when

-2-

members of the project team were diverted from that rulemaking to a higher-priority regulatory project to revise the Department of Transportation ("DOT") drug and alcohol testing regulations in 49 C.F.R. Part 40. A Notice of Proposed Rulemaking for 49 C.F.R. Part 40 was published on December 9, 1999.

7. Pursuant to the Coast Guard rulemaking process, the Regulatory Workplan for the section 2303a rulemaking project was submitted to the Coast Guard Marine Safety Council for approval, and to be placed on the Coast Guard's rulemaking docket, in April 2000. In June 2000, the Regulatory Workplan was approved by the Chairman of the Marine Safety Council, and the project was placed on the Coast Guard's rulemaking docket.

8. Preparation of the Regulatory Workplan involved the complex question of how to best ensure that alcohol testing is conducted within two hours of an SMI while protecting the safety of all involved. An initial determination was made that safely ensuring alcohol testing within two hours of an SMI would likely require carriage of alcohol testing equipment on the great majority of vessels subject to the testing requirements of 46 C.F.R. Subpart 4.06. Accordingly, the Coast Guard began a study of the available alcohol testing equipment and the economic impact of requiring many vessels to carry such equipment. The project team also conducted a preliminary regulatory assessment which addressed cost impact, impact on small businesses, information collection burden, environmental impacts, and federalism implications.

9. The original Workplan projected that a Notice of Proposed Rulemaking ("NPRM") would be published about January 2001. The original Workplan schedule took account of the fact that there was a limited pool of Coast Guard personnel with the subject matter expertise required to work successfully on a regulation establishing alcohol testing procedures,

and that these people also had to work on other, higher-priority regulatory projects.

10.    The project team consisted of a Project Manager, Regulation Development Manager, Project Counsel, Project Editor, and Project Analyst.

11.    Early in 2000, work on the project was suspended when members of the project team were again diverted to the higher-priority regulatory project to revise the DOT drug and alcohol testing regulations in 49 C.F.R. part 40, and to conform the Coast Guard chemical testing procedures in 46 C.F.R. Part 16 with the substantial changes to the drug testing protocols in 49 C.F.R. Part 40. The project team resumed work on the section 2303a requirements about August 2001. At that point, projected publication of the NPRM was rescheduled to January 2002.

12.    As a result of the terrorist attacks against the United States on September 11, 2001, passage of the Maritime Transportation Security Act of 2002, Public Law 107-295, 166 Stat. 2064 (November 25, 2002) ("MTSA"), the creation of the Department of Homeland Security, and the transition of the Coast Guard from the Department of Transportation to the Department of Homeland Security, almost all Coast Guard regulatory development and analysis resources were directed to development of maritime security regulations from early 2002 through late 2003. In the MTSA, Congress mandated stringent deadlines, including a requirement that temporary regulations implementing the port security section of the act be issued "as soon as practicable" without regard to Administrative Procedure Act notice and rulemaking procedures. However, the MTSA provided that any such temporary rules would expire within one year of enactment of the MTSA unless earlier superseded by a final rule. See 46 U.S.C. § 70101 note. In order to meet the need for enhanced maritime security regulations after September 11, 2001, nearly all other ongoing rulemakings were delayed, including the implementation of the section

2303a requirements.

13.    The NPRM under section 2303a was published on February 28, 2003.  68 Fed. Reg. 9622 (Feb. 28, 2003).

14.    The initial comment period for the proposed rule was 120 days. Id. A second comment period was opened in August 2003, in response to requests for a public meeting on the proposed rule.  68 Fed. Feg. 50992 (Aug. 25, 2003).  The public meeting was scheduled for September 19, 2003, see id., but it was cancelled because federal government offices in the Washington, D.C. metropolitan area were closed that day due to Hurricane Isabel.  68 Fed. Reg. 60073 (Oct. 21, 2003).  The public meeting was not rescheduled as only a few people had registered to attend the meeting.  Id.  Instead, a third comment period was opened from October 21, 2003 to November 20, 2003.  Id.

15.    The Coast Guard has received and considered 121 comment letters, ranging from one to six pages in length.  The complete rulemaking docket, Docket No. 8773, is available for public viewing on the internet at dms.dot.gov/search via a search for that docket number.  The docket includes the NPRM, the 121 comment letters, and a 32-page 2002 draft regulatory analysis of the proposed rule.

16.    From 2001 to the present, the Coast Guard and its project team assigned to rulemaking under section 2303a have also been working on numerous other rulemaking projects of importance to the public.  In 2001, the section 2303a rulemaking project was prioritized as number 21 of 67 Coast Guard regulatory projects; in 2002, it was prioritized as number 34 of 75 projects; in 2003, it was prioritized as number 33 of 76 projects; in 2004, it was prioritized as 30 of 67 projects; and in 2005 it is prioritized as 38 of 99 projects.

17. As of today, the Coast Guard has analyzed the 121 comment letters received and prepared responses. A final regulatory analysis has been drafted, and the final rule will shortly enter clearance within Coast Guard Headquarters, after which it will be submitted to the Department of Homeland Security, and then the Office of Management and Budget for review, including any review necessary under Executive Order 12866, 58 Fed. Reg. 51735 (Sept. 30, 1993), prior to publication as a Final Rule in the Federal Register. I anticipate that the final rule will enter Coast Guard Headquarters clearance within the next few months.

18. While I cannot know exactly how long each of these steps toward final publication will take, and intervening events could again divert the resources of the Coast Guard and the United States to competing tasks of a higher priority, I estimate, based on my prior experience with complex and significant rulemakings of this nature, that the final regulations could be published before the end of 2005.

19. I believe that the United States Coast Guard is doing everything it can, consistent with its competing responsibilities, available resources, the public interest, sound regulatory practice, and the United States' commitment to safe and timely drug and alcohol testing following an SMI, to publish its final rule under section 2303a as quickly as possible.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 19th day of May, 2005 at Washington, D.C.

*W. Douglas Rabe*
W. DOUGLAS RABE
Chief, Investigations Division
Office of Investigations & Analysis
United States Coast Guard

# Exhibit 1 to Declaration of W. Douglas Rabe



| U.S. Department of Transportation  United States Coast Guard | Commandant United States Coast Guard | 2100 Second Street, S.W. Washington, DC 20593-0001 Staff Symbol: G-MOA Phone: (202) 267-1430 FAX: (202) 267-1416 | 16732  G-MOA Policy ltr 1-99  FEB 11, 1999 |

From: Commandant (G-MOA)
To: Distribution
Subj: POST CASUALTY CHEMICAL TESTING FOLLOWING A SERIOUS MARINE INCIDENT
Ref:
(a)  COMDT (G-MO) msg 252004Z MAR 97
(b)  G-MMI Policy letter 6-92
(c)  Marine Safety Manual, Volume V, Chapter 2 (COMDINST M16000.10)

1. The purpose of this letter is to reiterate post casualty chemical testing requirements after a serious marine incident involving the operation of any commercial vessel in U.S. waters or a U.S. commercial vessel anywhere. This policy guidance was distributed by reference (a). Reference (b) is cancelled.

2. The Coast Guard Authorization Act of 1996 established a civil penalty for failure to comply with the drug and alcohol testing requirements (46 USC 2115). This penalty enables realistic enforcement of the serious marine incident drug and alcohol testing requirements in areas where our enforcement abilities were previously lacking.

3. Persons directly involved in a serious marine incident involving the operation of any commercial vessel on U.S. waters or a U.S. commercial vessel anywhere should be tested for evidence of drug and alcohol use. This includes testing of crewmembers on foreign vessels in U.S. waters and on U. S. commercial fishing vessels of any gross tonnage, whether federally documented or state numbered.

4. Each OCMI/COTP, upon notice that a serious marine incident has occurred, should immediately direct the involved marine employers to ensure that drug and alcohol testing is conducted. Each OCMI/COTP should conduct alcohol breath tests anytime there is concern that proper alcohol testing would not otherwise be accomplished. A marine violation case should be processed whenever a marine employer fails to comply with the serious marine incident drug and alcohol testing requirements after being directed to do so by the OCMI/COTP.

5. Section 304 of the Coast Guard Authorization Act of 1998 requires us to establish procedures to ensure that alcohol testing is conducted no later than 2 hours after a serious marine incident occurs. Although implementation of those procedures will require new regulations, OCMI/COTP's are requested to ensure that alcohol tests are conducted within this timeframe whenever possible. This information will be incorporated into the next change to Volume V of reference (c). Questions or concerns with this policy should be directed to LT Williams at (202) 267-1430.

                                                    Signed
                                                    James D. Spitzer
                                                    By direction

Distribution:

All Marine Safety/Inspection Offices
All Activity Commands
All District (m) Offices
Commandant (NMC)
Commandant (MOC)
RTC Yorktown (mss)

Prevention Through People

Marine Safety and Environmental Protection
USCG Homepage
Webmaster
Disclaimer
Created  9/24/98
Updated  11/20/2002 14:12:31