# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 05-10112 JLT |
| | ) |
| v. | ) |
| | ) |
| THE COMMONWEALTH OF | ) |
| MASSACHUSETTS, *et al.*, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION FOR JUDGMENT ON THE PLEADINGS

RADM John E. Crowley
Judge Advocate General

CAPT William D. Baumgartner
Robert W. Bruce
Andrew J. Turner
Attorneys
U.S. Coast Guard

OF COUNSEL

PETER D. KEISLER
Assistant Attorney General

MICHAEL SULLIVAN
United States Attorney
MARK T. QUINLIVAN
Assistant United States Attorney

ARTHUR R. GOLDBERG D.C.B. 180661
STEVEN Y. BRESSLER D.C.B. 482492
Attorneys, Civil Division
United States Department of Justice
P.O. Box 833
Washington, D.C. 20044
Telephone (202) 514-4781
Facsimile (202) 318-7609
Steven.Bressler@USDOJ.gov

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

I.      Factual Background ................................................................................... 2

II.     Statutory and Regulatory Background ...................................................... 3

        A.      The Domestic Statutory and Regulatory Scheme ...................... 3

                1.      The PWSA ...................................................................... 3

                2.      Additional, Relevant Maritime Statutes ....................... 5

        B.      International law ......................................................................... 6

ARGUMENT

        This Court Should Enter Judgment on the Pleadings in Favor of the United
        States on All Claims ............................................................................... 8

I.      Standard of Review .................................................................................. 8

        A.      Rule 12(c) .................................................................................. 8

        B.      Federal Preemption of State Laws ............................................ 8

                1.      General Preemption Analysis ....................................... 8

                2.      Preemption Analysis Under Federal Tanker Laws ....... 10

                        a.      Field Preemption Under PWSA Title II ........... 12

                        b.      Conflict Preemption Under PWSA Title I ......... 13

II.     The Disputed Portions of the Tanker Act are Preempted by Federal Law ....... 14

        A.      The Commonwealth's Maritime Personnel and Manning
                Requirements are Preempted by Federal Law ......................... 14

B.      The Commonwealth's Drug and Alcohol Testing Requirements
        are Preempted by Federal Law ................................................................ 16

C.      The Commonwealth's Tank Vessel Design Requirement is
        Preempted by Federal Law ..................................................................... 17

D.      The Commonwealth's Attempt to Regulate Tanker Design,
        Operation, Equipping and Reporting Via a Massive Financial
        Assurance Bond Requirement is Preempted by Federal Law ............................ 18

        1.      Tank vessel design, operation and equipping .......................................... 19

        2.      Reporting Requirements .................................................................. 20

        3.      Other Indirect Regulation Via the Financial Assurance
                Requirement .................................................................................. 21

E.      The Commonwealth's Tug Escort Requirements Conflict With,
        and are Preempted by, Federal Law ........................................................... 22

F.      The Commonwealth's Mandatory Vessel Routing Scheme
        Conflicts With, and is Preempted By, Federal Law ........................................ 23

G.      The Commonwealth's Compulsory State Pilotage Requirement
        is Expressly Preempted by Federal Law ..................................................... 25

CONCLUSION ........................................................................................... 28

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

American Auto. Mfrs. Ass'n v. Massachusetts Dept. of Environmental Protection,
163 F.3d 74 (1st Cir. 1998) ........................................................... 10, 14

Boyle v. United Technologies Corp., 487 U.S. 500 (1988) ........................................ 11

Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691 (1984) ........................................ 9

Charleston & Western Carolina R. Co. v. Varnville Furniture Co.,
237 U.S. 597 (1915) .................................................................. 25

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,
467 U.S. 837 (1984) .................................................................. 14

City of Boston v. Harris, 619 F.2d 87 (1st Cir. 1980) ........................................... 12

City of New York v. F.C.C., 486 U.S. 57 (1988) ................................................ 9

City of St. Louis v. Western Union Tel. Co., 148 U.S. 92 (1893) ................................ 19

Conley v. Gibson, 355 U.S. 41 (1957) ........................................................ 8

Consolidated Cigar Corp. v. Reilly, 218 F.3d 30 (1st Cir. 2000) ................................ 11

Crosby v. National Foreign Trade Council, 530 U.S. 363 (2000) ................................. 25

English v. General Elec. Co., 496 U.S. 72 (1990) ............................................. 25

Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141 (1982) ....................... 10

Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132 (1963) ............................ 9

Gade v. National Solid Wastes Mgmt. Ass'n, 505 U.S. 88 (1992) ................................ 9

Geier v. American Honda Motor Co., 529 U.S. 861 (2000) ....................................... 14

Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1 (1824) ............................................... 12

Grafton & Upton R.R. Co. v. Town of Milford, 337 F. Supp. 2d 233
(D. Mass. 2004) ..................................................................... 19

Hines v. Davidowitz, 312 U.S. 52 (1941) ............................................................ 9, 25

Huus v. New York & Porto Rico S.S. Co., 182 U.S. 392 (1901) .............................. 26

Ingersoll-Rand Co. v. McClendon, 498 U.S. 133 (1990) ............................................ 9

Interport Pilots Agency, Inc. v. Sammis, 14 F.3d 133 (2d Cir. 1994) ...................... 26

Jones v. Rath Packing Co., 430 U.S. 519 (1977) .................................................... 9, 12

Maryland v. Louisiana, 451 U.S. 725 (1981) ....................................................... 18, 19

Nat'l Home Equity Mortgage Assoc. v. Office of Thrift Supervision,
     373 F.3d 1355 (D.C. Cir. 2004) ..................................................................... 14

National Foreign Trade Council v. Natsios, 181 F.3d 38 (1st Cir. 1999),
     aff'd, 530 U.S. 363 (2000) ........................................................................ 11, 18

Phillip Morris, Inc. v. Harshbarger, 122 F.3d 58 (1st Cir. 1997) ........................ 10, 25

Ray v. Atlantic Richfield Co., 435 U.S. 151 (1978) ............................................ passim

Rice v. Santa Fe Elevator Company, 331 U.S. 218 (1947) ............................. 9, 10, 11

Rivera-Gomez v. Adolfo de Castro, 843 F.2d 631 (1st Cir.1988) .............................. 8

Santiago de Castro v. Morales Medina, 943 F.2d 129 (1st Cir.1991) ........................ 8

Sinnot v. Davenport, 63 U.S. (22 How.) 227 (1859) ................................................ 12

Smith v. Turner ("The Passenger Cases"), 48 U.S. (7 How.) 283 (1849) ............. 19, 21

Sullivan v. City of Augusta, 310 F. Supp. 2d 348 (D. Me. 2004) ............................. 19

The Roanoke, 189 U.S. 185 (1903) ......................................................................... 18

United Parcel Service, Inc. v. Flores-Galarza, 318 F.3d 323 (1st Cir. 2003) ............ 11

United States v. Belmont, 301 U.S. 324 (1937) ....................................................... 10

United States v. Locke, 529 U.S. 89 (2000) ....................................................... passim

Wood v. Amerada Hess Corp., 845 F. Supp. 130 (S.D.N.Y. 1994) .......................... 26

## STATUTES

33 U.S.C. §§ 1221-1232 ................................................................................ 4

33 U.S.C. § 1222(2) ...................................................................................... 4

33 U.S.C. § 1223 ............................................................................... 22, 23, 25

33 U.S.C. § 1224(a)(3) ................................................................................ 24

33 U.S.C. § 1228 ........................................................................................... 5

33 U.S.C. § 1228(a)(5) ................................................................................. 5

33 U.S.C. § 1230 ......................................................................................... 15

33 U.S.C. § 1231 ......................................................................................... 22

33 U.S.C. § 1901(a)(9) ................................................................................. 4

33 U.S.C. §§ 1901-1915 ............................................................................... 7

33 U.S.C. § 2718(a) .................................................................................... 21

46 U.S.C. § 2101 ....................................................................................... 2, 4

46 U.S.C. §§ 2101, et seq. ........................................................................... 6

46 U.S.C. § 2101(34) ................................................................................... 4

46 U.S.C. § 2103 ........................................................................................... 5

46 U.S.C. § 2303a .................................................................................. 16, 17

46 U.S.C. §§ 3201-3205 ............................................................................... 7

46 U.S.C. § 3301, et seq. ......................................................................... 5, 27

46 U.S.C. §§ 3301, 3702, 3710 & 3714 ....................................................... 26

46 U.S.C. §§ 3301, 3301(10) ...................................................................... 27

46 U.S.C. § 3303(a) ................................................................................... 3, 6

46 U.S.C. §§ 3702, 3710 & 3714 ................................................................ 27

46 U.S.C. § 3703(a) ................................................................................ passim

46 U.S.C. § 3703(a)(4) ............................................................................... 15

46 U.S.C. § 3703(b) ................................................................................... 20

46 U.S.C. § 3703(c) ................................................................................... 13

46 U.S.C. § 3703a ..................................................................................... 18

46 U.S.C. § 3711(a) ................................................................................ 4, 5

46 U.S.C. § 3717(a)(4) ............................................................................... 21

46 U.S.C. § 6101 ....................................................................................... 21

46 U.S.C. § 8501 ....................................................................................... 26

46 U.S.C. § 8501(d) ................................................................................... 27

46 U.S.C. § 8502 ....................................................................................... 27

46 U.S.C. §§ 9101, 9102 ............................................................................. 5

46 U.S.C. § 9101(a) .................................................................................... 5

Pub. L. No. 74-765, 49 Stat. 1889 ............................................................. 3

Pub. L. No. 92-340, 86 Stat. 427 ............................................................... 3

Pub. L. No. 95-474, 92 Stat. 1471 ............................................................. 3

Pub. L. No. 96-478, 94 Stat. 2297 ............................................................. 3

Pub. L. No. 101-380, 104 Stat. 484 ........................................................... 3

Pub. L. 105-383 § 311 ........................................................................... 22, 23

Pub. L. No. 107-296 §§ 888(b) & (c), 116 Stat. 2135 ............................... 4

Tanker Act, 2004 Mass. Acts 251 (Aug. 4, 2004), as amended by 2004
    Mass. Acts 457 § 1 (Dec. 30, 2004) .............................................. passim

## RULES AND REGULATIONS

33 C.F.R. § 3.05-1(b) ........................................................................................ 22

33 C.F.R. §§ 151.15, 151.26(b)(3), 153.203, 155.1035(b), 164.61 ............... 21

33 C.F.R. § 164.13(c) ....................................................................................... 15

33 C.F.R. § 165.100 ...................................................................................... 2, 22

33 C.F.R. § 165.100(d) ..................................................................................... 23

33 C.F.R. § 165.100(d)(1) ................................................................................ 23

33 C.F.R. § 165.100(d)(1)(i) ............................................................................ 22

46 C.F.R. § 4.03-2 ............................................................................................ 17

46 C.F.R. §§ 4.05-1 .......................................................................................... 21

46 C.F.R. § 12.20 ............................................................................................. 15

60 Fed. Reg. 24767 (1995) ................................................................................ 6

63 Fed. Reg. 71,764 ......................................................................................... 24

65 Fed. Reg. 12,944 .................................................................................... 23, 24

66 Fed. Reg. 17,156 (March 29, 2001) ........................................................... 23

68 Fed. Reg. 9622 (Feb. 28, 2003) .................................................................. 17

69 Fed. Reg. 62427 (October 26, 2004) .................................................. 23, 24, 25

69 Fed. Reg. 62428-29 (October 26, 2004) .............................................. 23, 24

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 8

Fed. R. Civ. P. 12(c) .......................................................................................... 8

## LEGISLATIVE MATERIAL

95th Cong., 2d Sess. 6-9 (1978) ................................................. 6

Executive Order No. 12,234, 3 C.F.R. 277 (1981) ................................................. 6

H.R. Rep. No. 95-1384 ................................................. 6

H.R. Rep. No. 2962, 74th Cong., 2d Sess. 2 (1936) ................................................. 12

Supremacy Clause, U.S. Const. Art. VI, Cl. 2 ................................................. 9, 14

## TREATIES AND INTERNATIONAL CONVENTIONS

Convention on the International Regulations for Preventing Collisions at Sea,
    28 U.S.T. 3459 (entered into force July 15, 1977); United Nations Convention
    on the Law of the Sea (UNCLOS), Dec. 10, 1982, U.N. Div. for Ocean Affairs
    & Law of the Sea Office of Legal Affairs, U.N. Sales No. E.97.v.10 (1997) ................... 7

Convention on the Territorial Sea and the Contiguous Zone, Geneva, Apr. 29, 1958,
    15 U.S.T. 1606, art. 15(1); UNCLOS, § 3, arts. 17, 21(2), 24(1)(a), 25(2) ................... 15

Guidelines on Implementation of the International Safety Management Code
    by Administrators, Nov. 23, 1995, Res. A.788(19), Int'l Maritime Org.,
    Doc. Sales No. IMO-117E (1995) ................................................. 7

International Convention on Standards of Training, Certification and
    Watchkeeping for Seafarers (STCW), July 7, 1978, Int'l Maritime Org.,
    Doc. Sales No. IMO-945E (1996) ................................................. 6

International Convention for the Safety of Life at Sea (SOLAS Convention),
    Nov. 1, 1974, 32 U.S.T. 47 (entered into force May 25, 1980), as amended,
    and the Protocol of 1978 relating to SOLAS, Feb. 17, 1978, 32 U.S.T. 5577,
    as amended through July 1, 1997, Int'l Maritime Org., Doc. Sales
    No. IMO-110E (1997) ................................................. 6

International Management Code for the Safe Operation of Ships and for
    Pollution Prevention (ISM Code), Nov. 4, 1993, Res. A.741(18), Int'l
    Maritime Org., Doc. Sales No. IMO-186E (1994) ................................................. 7

International Convention for the Prevention of Pollution from Ships, Nov. 2, 1973,
    Int'l Maritime Org., Doc. Sales No. IMO-520E (1997), as amended by the
    Protocol of 1978 relating to the International Convention for the Prevention of
    Pollution from Ships, Feb. 17, 1978 (MARPOL 73/78), Int'l Maritime Org.,
    Doc. Sales No. IMO-520E (1997) ................................................. 7

Resolutions of the Conference of Contracting Governments to the International
   Convention for the Safety of Life at Sea, May 24, 1994, Int'l Maritime Org.,
   Doc. Sales No. IMO-110E (1997) ................................................................... 7

Seafarers' Training, Certification and Watchkeeping Code, July 7, 1995,
   Int'l Maritime Org., Doc. Sales No. IMO-945E (1996) ........................................ 6

Vienna Convention on the Law of Treaties (May 23, 1969), arts. 27, 29, 1155,
   U.N.T.S. 331, 8 I.L.M. 679 ........................................................................ 10

## MISCELLANEOUS

2 THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 13-2 (4th ed. 2004) .................. 26

6A BENEDICT ON ADMIRALTY, Doc. No. 9.38 (7th ed. 1987) .................................... 6

19 Weekly Comp. Pres. Doc. 383 (Mar. 10, 1983) ........................................... 7

Christopher P. Mooradian, "Protecting 'Sovereign Rights': The Case For Increased Coastal
   State Jurisdiction Over Vessel-Source Pollution In The Exclusive
   Economic Zone," 82 B.U. L. Rev. 767, 773 n.25 (June 2002) .............................. 7

Craig H. Allen, "Federalism in the Era of International Standards,"
   29 J. Mar. L. & Comm. 335 (1998) ...................................................... 6

RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES,
   (1987) ........................................................................... 7, 10

## INTRODUCTION

Defendant the Commonwealth of Massachusetts has enacted An Act Relative to Oil Spill Prevention and Response in Buzzards Bay and Other Harbors and Bays of the Commonwealth, 2004 Mass. Acts 251 (Aug. 4, 2004), as amended by 2004 Mass. Acts 457 § 1 (Dec. 30, 2004) ("Tanker Act" or "Mass. Act").  That legislation purports to regulate, among other things, various aspects of oil tanker design, operation, navigation, and manning, as part of an express effort to reduce the likelihood of future oil spills in the waters of the Commonwealth.  The United States shares the Commonwealth's concern for protection of its waters and the environment generally.  But certain portions of the Tanker Act, however well-intentioned, will hinder the federal government's efforts to promote safe maritime practices and to protect our environment here and abroad:  the Act interferes with the United States' ability to speak with one voice to other nations and to positively influence the international maritime regulatory regime.  Parts of the Tanker Act also contradict the expert determinations of the Coast Guard as to the best way to regulate maritime affairs while protecting our coast.  While, again, the Commonwealth's effort may be well-intentioned, under our Constitution, the federal judgment on these matters is supreme.

Congress and the Supreme Court have repeatedly recognized that state laws on the subjects Massachusetts now purports to regulate are void.  In Ray v. Atlantic Richfield Co., 435 U.S. 151 (1978), the Court reviewed federal laws dating to the beginning of the Republic and concluded that a state law similar to that at issue here could not stand.  Five years ago in United States v. Locke, 529 U.S. 89 (2000), the Court reaffirmed and strengthened the Ray analysis to invalidate another set of state tanker laws.  Those cases are dispositive:  under Ray and Locke, all the provisions of the Massachusetts Tanker Act named in the United States' Complaint and discussed below are preempted by federal law, and they are null and void under the Supremacy Clause of the U.S. Constitution.  Some of those provisions are preempted because they are expressly forbidden by federal law; others are void because they purport to regulate in fields, such as the design or the manning of vessels, that are committed solely to federal discretion; and,

-1-

finally, other provisions of the Tanker Act which might be valid if there were no federal law on the subject are also void because there is preemptive federal law. Accordingly, this Court should grant the United States' motion for judgment on the pleadings, declare the disputed provisions of the Tanker Act void, and permanently enjoin the Commonwealth and the other defendants from enforcing them.

## BACKGROUND

### I.   Factual Background

In 2004, the Commonwealth of Massachusetts enacted the Tanker Act, 2004 Mass. Acts 251 (Aug. 4, 2004), as amended by 2004 Mass. Acts 457 § 1 (Dec. 30, 2004). The Tanker Act, inter alia, authorizes Massachusetts officials to board and inspect vessels to investigate oil spills; creates a vessel traffic system through consultation or negotiation with the Coast Guard; and creates an Oil Spill Prevention and Response Fund via the levying of maritime fees. See 2004 Mass. Acts 251. The United States does not contend that any of these provisions are constitutionally infirm, they are not subjects of this litigation, and the United States does not dispute the Commonwealth's position that they are severable from the disputed portions of the Act. See Commonwealth's First Amended Answer ¶ 38. Other provisions, however, conflict with federal law, are expressly forbidden by federal law, and/or seek to regulate areas committed to federal discretion. These include provisions that would affect design, construction, training and equipment requirements on tugboats; tug escort[1] requirements; crew drug and alcohol testing requirements; manning requirements on tugs and tows carrying oil; a design restriction prohibiting single-hulled vessels; indirect regulation of vessel design, equipping and contents; and a requirement that vessels take on Massachusetts-licensed pilots. 2004 Mass. Acts 251 (Aug. 5, 2004), as amended by 2004 Mass. Acts 457 § 1 (Dec. 30, 2004). The Commonwealth

---

[1] A tug escort is an escort or assist tug "of sufficient capability to promptly push or tow [a] tank [vessel] away from danger" if necessary. See 33 C.F.R. § 165.100. A tank vessel is a vessel that "carries[] oil or hazardous material in bulk as cargo or cargo residue." 46 U.S.C. § 2101.

has issued guidance stating that compliance with the Act is now required. <u>See</u> Commonwealth's First Amended Answer ¶ 31.

## II.    Statutory and Regulatory Background

The Mass. Tanker Act purports to regulate matters that are largely covered by a dense, interlocking web of international and domestic law.

### A.    The Domestic Statutory and Regulatory Scheme

In general, Congress and the Coast Guard have regulated design, construction, equipment, manning, navigation and operation of tank vessels under the Tank Vessel Act of 1936, Pub. L. No. 74-765, 49 Stat. 1889, the Ports and Waterways Safety Act of 1972, Pub. L. No. 92-340, 86 Stat. 427, as amended by the Port and Tanker Safety Act of 1978, Pub. L. No. 95-474, 92 Stat. 1471, (together, the "PWSA"), the Act to Prevent Pollution from Ships, Pub. L. No. 96-478, 94 Stat. 2297, and the Oil Pollution Act of 1990 ("OPA"), Pub. L. No. 101-380, 104 Stat. 484. (These statutes have been codified throughout Titles 33 and 46 of the U.S. Code.)   Most critical to analysis of the Tanker Act is the PWSA.

### 1.    The PWSA

The Supreme Court has twice conclusively held that the PWSA has preemptive effect over state laws.  Specifically, PWSA Title II "field-preempts" *all* state regulation of the subjects it covers, without need for direct conflict, while Coast Guard regulations (or decisions not to regulate) of a subject under PWSA Title I preempt state laws on that subject.  <u>Locke</u>, 529 U.S. at 110-11; <u>Ray</u>, 435 U.S. at 171-72.

Title II of the PWSA, codified throughout Title 46 of the U.S. Code, governs, <u>inter</u> <u>alia</u>, "the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning" of tank vessels "that may be necessary for increased protection against hazards to life and property, for navigation and vessel safety, and for enhanced protection of the marine environment." 46 U.S.C. § 3703(a).  <u>Cf.</u> 46 U.S.C. § 3306(a) (a nearly identical statute applying to non-tank vessels).  Congress has mandated that the Secretary of Homeland

-3-

Security[2] ("the Secretary"), promulgate regulations to enforce PWSA Title II.  Id. at § 3703(a).

He "may prescribe regulations that exceed standards set internationally."  Id.

Title I of the PWSA, codified at 33 U.S.C. §§ 1221-1232, governs navigation and

waterways management, such as vessel traffic services, ship routing, and tug escort requirements.

See Locke, 529 U.S. at 109-10, and Ray, 435 U.S. at 171-72.  Under the authority of PWSA Title

I, the Coast Guard has promulgated regulations establishing specified "limited . . . regulated

navigation areas[,]" with regulations designed to address local conditions where needed.  See 33

C.F.R. Part 165.  The Coast Guard has promulgated such regulations for all navigable waters off

the Massachusetts coast.  Id. § 165.100; see also id. § 3.05-1(b) (defining the First Coast Guard

District, which includes Massachusetts waters).  These Coast Guard regulations require, inter

alia, that vessels towing oil tank barges[3] in Massachusetts be accompanied by a tug escort unless

they meet certain requirements.  See id. § 165.100(d)(1).  The regulations also prohibit tank

barges in certain waters.  Id. § 165.100(d)(4).  In addition, the Coast Guard requires certain calls

on specified radio frequencies during approaches to specific points within Buzzards Bay, among

other locations.  Id.

Both Titles of the PWSA contain provisions regulating foreign flag vessels in United

States waters.  Under PWSA Title II, a foreign flag tank vessel can operate in U.S. waters only if

it receives a certificate of compliance from the Secretary, which indicates that the vessel has been

examined and is in compliance with U.S. laws and regulations applicable to tank vessels.  See 46

---

[2]        Authority over and responsibility for maritime regulation formerly belonged to the
Secretary of Transportation, just as the Coast Guard was formerly part of the Department of
Transportation.  The Homeland Security Act of 2002 specifically transferred Coast Guard
authorities to the Department of Homeland Security.  See Pub. L. No. 107-296 §§ 888(b) & (c),
116 Stat. 2135.  See also, e.g., 46 U.S.C. § 2101(34) (defining "Secretary" in general definition
section of 46 U.S.C. Subtitle II as secretary of the department housing the Coast Guard); 33
U.S.C. § 1222(2) (same definition of "Secretary" in 33 U.S.C. Chapter 25, Ports and Waterways
Safety); 33 U.S.C. § 1901(a)(9) (same definition of "Secretary" in the Act to Prevent Pollution
from Ships).

[3] A barge is a non-self-propelled vessel; a "tank barge" is a barge that carries oil or
hazardous material as cargo.  See 46 U.S.C. § 2101.

-4-

U.S.C. § 3711(a).  In order to determine compliance, Congress has provided that the Secretary "may accept any part of a certificate, endorsement, or document, issued by the government of a foreign country under a treaty, convention, or other international agreement to which the United States is a party, as a basis for issuing a certificate of compliance" with federal regulatory standards.  Id.  The Secretary also periodically evaluates the manning, training, qualification, and watchkeeping requirements of foreign flag countries to ascertain whether those countries have and enforce standards that are equivalent to international standards accepted by the United States. See 33 U.S.C. § 1228(a)(5); 46 U.S.C. § 9101(a).  Generally, the Coast Guard prevents vessels from nations that fail to meet those standards from entering United States waters.  See 33 U.S.C. § 1228.

### 2.       Additional, Relevant Maritime Statutes

Congress has assigned to the Secretary the duty to impose on tank vessels of the United States standards for vessel manning, training, and watchkeeping, and to require equivalent standards for foreign vessels.  46 U.S.C. §§ 9101 and 9102.  Congress has also assigned to the Secretary responsibility for "general superintendence over the merchant marine of the United States," see 46 U.S.C. § 2103, and the obligation to regulate United States flag tank vessels operating globally, consistent with the responsibilities of flag nations under international law. Under 46 U.S.C. §§ 8501 & 8502, Congress has required that certain vessels carry federally-licensed pilots, see § 8502, while prohibiting states from requiring that those vessels take on a state-licensed pilot, see § 8501.

Congress has mandated that the Coast Guard inspect all tank vessels (as well as certain non-tank vessels), foreign or U.S. flag, for compliance with safety and environmental protection standards.  See 46 U.S.C. § 3301, et seq.  To the extent that a foreign country has inspection standards similar to those of the United States,[4] the inspection will ensure that the condition of

---

[4]  A country is considered to have inspection laws similar to those of the United States if that nation is a party to SOLAS, the International Convention for the Safety of Life at Sea.  Id.

the vessel is as stated in the certificate of inspection issued by the foreign flag government. 46 U.S.C. § 3303(a).

   B.    **International law**

   In their regulation of domestic and foreign-flagged vessels, Congress, the Secretary and the Coast Guard are guided in considerable part by an international regulatory system in which the United States has played a pivotal role. See, e.g., H.R. Rep. No. 95-1384, Pt. 1, 95th Cong., 2d Sess. 6-9 (1978) (reprinted in 1978 U.S.C.C.A.N. 3270, 3274-77). Accordingly, much of the Secretary's maritime regulatory activity is designed to implement international treaty provisions and to keep the United States in compliance with the complex and often-changing international regime. See, e.g., 60 Fed. Reg. 24767 (1995) ("The Coast Guard is modifying its regulations on navigational safety and marine engineering to harmonize them with the International Convention for the Safety of Life at Sea."). In addition, the United States plays a leading role in developing comprehensive, practicable, and effective international regulations applicable to vessels throughout the world through its participation in international organizations such as the International Maritime Organization ("IMO"). See Craig H. Allen, "Federalism in the Era of International Standards," 29 J. Mar. L. & Comm. 335 (1998) (discussing United States' contributions to the IMO).

   The complex international maritime regulatory system is defined by a series of international treaties and conventions.[5] These various conventions establish an enforcement

---

[5]    See, e.g., International Convention on Standards of Training, Certification and Watchkeeping for Seafarers (STCW), July 7, 1978, Int'l Maritime Org., Doc. Sales No. IMO-945E (1996) (entered into force Apr. 28, 1984) (reprinted in 6A BENEDICT ON ADMIRALTY, Doc. No. 9.38 (7th ed. 1987)), as amended by the Seafarers' Training, Certification and Watchkeeping Code, July 7, 1995, Int'l Maritime Org., Doc. Sales No. IMO-945E (1996), which is implemented domestically by the Coast Guard pursuant to 46 U.S.C. §§ 2101, et seq.; International Convention for the Safety of Life at Sea (SOLAS Convention), Nov. 1, 1974, 32 U.S.T. 47 (entered into force May 25, 1980), as amended, and the Protocol of 1978 relating to SOLAS, Feb. 17, 1978, 32 U.S.T. 5577, as amended through July 1, 1997, Int'l Maritime Org., Doc. Sales No. IMO-110E (1997), which is implemented by the Coast Guard pursuant to Executive Order No. 12,234, 3 C.F.R. 277 (1981); International Management Code for the Safe Operation of Ships and for Pollution Prevention (ISM Code), Nov. 4, 1993, Res. A.741(18), Int'l Maritime Org., Doc. Sales No. IMO-186E (1994); see also Resolutions of the Conference of Contracting

regime that is premised on recognized principles of international law outlining the roles and interests of all nations in protecting their interests. The regime depends on reciprocity among nations: all parties are assured of a ship's compliance with international standards when a ship is certified by the government of its flag nation. That certification is respected by other party nations (including the U.S.) to permit vessels with such certificates to enter the ports of parties and, thus, to allow for the uninterrupted flow of maritime traffic. The United States has a vested interest in ensuring that all vessels that transit its waters, including foreign flag vessels, comply with comprehensive safety and environmental protection standards. See Locke, 529 U.S. at 94 (discussing the United States' interests). It is of particular importance to the United States that these conventions include provisions authorizing nations to protect the safety and environment of their ports and waters.[6]

---

Governments to the International Convention for the Safety of Life at Sea, May 24, 1994, Int'l Maritime Org., Doc. Sales No. IMO-110E (1997) (entered into force July 1, 1998) (making ISM Code mandatory), and Guidelines on Implementation of the International Safety Management Code by Administrators, Nov. 23, 1995, Res. A.788(19), Int'l Maritime Org., Doc. Sales No. IMO-117E (1995) (to assist in uniform implementation by administrators), acceded to by the United States in 1995, and implemented by the Coast Guard pursuant to 46 U.S.C. §§ 3201-3205 (Supp. II 1996); International Convention for the Prevention of Pollution from Ships, Nov. 2, 1973, Int'l Maritime Org., Doc. Sales No. IMO-520E (1997), as amended by the Protocol of 1978 relating to the International Convention for the Prevention of Pollution from Ships, Feb. 17, 1978 (MARPOL 73/78), Int'l Maritime Org., Doc. Sales No. IMO-520E (1997), implemented by the Coast Guard pursuant to 33 U.S.C. §§ 1901-1915; Convention on the International Regulations for Preventing Collisions at Sea, 28 U.S.T. 3459 (entered into force July 15, 1977); United Nations Convention on the Law of the Sea (UNCLOS), Dec. 10, 1982, U.N. Div. for Ocean Affairs & Law of the Sea Office of Legal Affairs, U.N. Sales No. E.97.v.10 (1997) (not ratified by the United States, but recognized by the United States to reflect customary international law to which the United States adheres, see 19 Weekly Comp. Pres. Doc. 383 (Mar. 10, 1983)).

    [6] The United States is a port state whose ports receive cargo, including oil, on foreign-flagged vessels; a flag state, responsible for developing standards and regulations for ships flying the U.S. flag; and a coastal state, meaning foreign flag vessels sometimes navigate through U.S. coastal waters without entering U.S. ports. See, e.g., Christopher P. Mooradian, "Protecting 'Sovereign Rights': The Case For Increased Coastal State Jurisdiction Over Vessel-Source Pollution In The Exclusive Economic Zone," 82 B.U. L. Rev. 767, 773 n.25 (June 2002) (citing to treaties defining "port state," "flag state," and "coastal state."); see also generally RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES, Part V (1987).

**ARGUMENT**

**This Court Should Enter Judgment on the Pleadings in Favor of the United States on All Claims**

I.    **Standard of Review**

A.    **Rule 12(c)**

A court should award judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure when it appears beyond doubt that the movant is entitled to prevail as a matter of law. Rivera-Gomez v. Adolfo de Castro, 843 F.2d 631, 635 (1st Cir.1988). In essence, the standard of review for such a motion is the same as the standard for a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6). See Fed. R. Civ. P. 12(c); accord Rivera-Gomez, 843 F.2d 631, 635. Courts must accept all of the non-movant's well-pleaded facts as true, giving the non-movant the benefit of all reasonable inferences that may be drawn therefrom. Santiago de Castro v. Morales Medina, 943 F.2d 129, 130 (1st Cir.1991); see also Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Courts need not accept, however, the non-movant's bare conclusions of law, sweeping and unwarranted averments of fact, or legal conclusions cast as factual allegations. Id. In this action, the Court should grant judgment on the pleadings for the United States because any factual issues are limited and well-settled, compare the United States' Complaint (Docket Entry No. 1) with Defendants' First Amended Answer (Docket Entry No. 16), and because 2004 Mass. Acts chapter 251 § 2 (tank vessel design, operation, equipping, and reporting), § 11 (establishing new M.G.L. 21M §§ 1 and 6 (tug escorts); § 3 (alcohol and drug testing); § 4 (manning and watchstanding); § 5, as amended by 2004 Mass. Acts chapter 457 § 1 (vessel routing); and, § 7 (tanker design)), and §§ 16 and 17 (compulsory pilotage) are invalid, null, and void pursuant to federal law and the Supremacy Clause of the U.S. Constitution.

B.    **Federal Preemption of State Laws**

1.    **General Preemption Analysis**

Under our federal system of government, "The Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made,

under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. Art. VI.

State law is invalid under the Supremacy Clause in several circumstances.  See generally Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 698-99 (1984) (discussing types of preemption).[7]  First, Congress can expressly provide that the states are forbidden from regulating a certain area.  City of New York v. FCC, 486 U.S. 57, 65-66 (1988); Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977); Rice v. Santa Fe Elevator Company, 331 U.S. 218, 232-37 (1947) (Warehouse Act).  In the absence of such an express statement, preemption may be implied from the structure and purpose of federal law.  See Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990).

The Supreme Court has identified "field" and "conflict" preemption as two types of implied preemption.  Id.  Congress can field preempt state action by occupying a regulatory field so pervasively that there is no room for state action, Rice v. Santa Fe Elevator Company, 331 U.S. 218, 230 (1947), or by otherwise dominating the field, Hines v. Davidowitz, 312 U.S. 52, 66 (1941).  And, even where Congress has not expressly preempted state law or occupied the field, a state law must yield when there is a conflict between federal and state law.  See Gade v. National Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 103 (1992) ("A state law . . . is pre-empted if it interferes with the methods by which the federal statute was designed to reach [its] goal"); Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963) (compliance with both state and federal law impossible); Hines, 312 U.S. at 67 (state law stands as an obstacle to the accomplishment of the full federal purpose).

Federal agencies acting within the bounds of their authority, no less than Congress acting directly, can preempt state laws.  See, e.g., Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 699

---

[7] As discussed below, all three types of preemption operate against different portions of the Mass. Act.

-9-

(1984) ("'Federal regulations have no less preemptive effect than federal statutes.'") (citations omitted); Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 154 (1982) (same); American Auto. Mfrs. Ass'n v. Massachusetts Dept. of Environmental Protection, 163 F.3d 74, 86 n.14 (1st Cir. 1998) (same).

## 2.    Preemption Analysis Under Federal Tanker Laws

The law regarding federal preemption of state maritime laws, including those regulating tank vessels and their navigation, is clear. In 1978, the Supreme Court explained in Ray that PWSA Title II preempts *any* state regulation of the subjects it covers, whereas Coast Guard regulations under PWSA Title I (or a Coast Guard determination that there should be no regulation of a particular subject) preempt state rules on the same subject.[8] The Court completely affirmed those principles with its 2000 holding in Locke.

As an initial matter, there is no presumption of non-preemption in this case concerning maritime law as there would be in an area where states traditionally retain broad police powers and involving "state or local regulation of matters related to health and safety." See, e.g., Rice, 331 U.S. at 230; Phillip Morris, Inc. v. Harshbarger, 122 F. 3d 58, 68 (1st Cir. 1997). That "'assumption' of non-preemption is *not* triggered when the State regulates in an area where there

---

[8]    In Ray, the Supreme Court also noted that in passing the PWSA, "Congress expressed a preference for international action and expressly anticipated that foreign vessels would or could be considered sufficiently safe for certification by the Secretary if they satisfied the requirements arrived at by treaty or convention." 435 U.S. at 167-68. Thus, to the extent an international agreement creates a standard that is embodied in Coast Guard regulations or is formally recognized by the United States as applicable, that standard will also preempt a contrary state law. This is consistent with principles of international law as recognized by the United States, under which an international treaty or agreement is binding on all political subdivisions of the ratifying nation, and a party would not be excused from compliance because of the actions of a political subdivision. See United States v. Belmont, 301 U.S. 324, 331 (1937) ("In respect of all international negotiations and compacts, and in respect of our foreign relations generally, state lines disappear. As to such purposes the State of New York does not exist."); Vienna Convention on the Law of Treaties (May 23, 1969), arts. 27, 29, 1155, U.N.T.S. 331, 8 I.L.M. 679; RESTATEMENT (THIRD) OF THE LAW OF FOREIGN RELATIONS OF THE UNITED STATES (1987), Pt. III, introd. note at 144-45 (noting that the Vienna Convention, although not ratified by the United States, is generally considered to be consistent with current treaty law and practice as recognized in the United States.).

-10-

has been a history of significant federal presence." Locke, 529 U.S. at 108. The Mass. Tanker Act regulates in such an area. Id.; Consolidated Cigar Corp. v. Reilly, 218 F.3d 30, 38-39 (1st Cir. 2000) (citing Locke; discussing "the historically pervasive federal regulation of fields such as maritime commerce" in which there is no presumption against preemption). Indeed, when a question of preemption arises in "an area of uniquely federal interest, [a] conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates 'in a field which the States have traditionally occupied'." Boyle v. United Technologies Corp., 487 U.S. 500, 507 (1988), quoting Rice, 331 U.S. at 230. Accordingly, "[p]reemption will be more easily found where states legislate in areas traditionally reserved to the federal government, and in particular where [as here] state laws touch on foreign affairs." National Foreign Trade Council v. Natsios, 181 F.3d 38, 73 (1st Cir. 1999), aff'd 530 U.S. 363 (2000). See also United Parcel Service, Inc. v. Flores-Galarza, 318 F.3d 323, 336 (1st Cir. 2003) (citing Locke) ("Th[e] presumption [against preemption] only arises, however, if Congress legislates in a field traditionally occupied by the states. . . . No presumption against preemption is appropriate in this case because of Congress's significant . . . presence in the field . . . ."). So, as the Supreme Court held in Locke:

> [t]he state laws now in question bear upon national and international maritime commerce, and in this area there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers. Rather, we must ask whether the local laws in question are consistent with the federal statutory structure, which has as one of its objectives a uniformity of regulation for maritime commerce. No artificial presumption aids us in determining the scope of appropriate local regulation under the PWSA . . . .

529 U.S. 108. In this area of "historically pervasive federal regulation," Consolidated Cigar Corp., 218 F.3d at 38-39, the most relevant statutory provisions were enacted as parts of Titles I and II of the PWSA.

As discussed below, under Ray and Locke Title II of the PWSA preempts the field "regarding general tanker design, operation, and seaworthiness." Locke, 529 U.S. at 109. In addition, Coast Guard regulations promulgated under PWSA Title I, or Coast Guard determinations not to regulate a particular subject under that Title, preempt state rules on the

same subject.  Id. at 109-10.  When Congress has expressly preempted a state law, of course, a court need look no further to find the state rule preempted.  City of Boston v. Harris, 619 F.2d 87, 94 n.18 (1st Cir. 1980) ("an express preemption provision obviates the need to examine whether an actual conflict exists."), citing Jones v. Rath Packing Co., 430 U.S. 519, 530-31 (1977).

### a.  Field Preemption Under PWSA Title II

In Locke, 529 U.S. 89, following Ray, 435 U.S. 151, the Supreme Court held that Congress has occupied the regulatory field concerning, and that PWSA Title II impliedly preempts all state regulation of, "the 'design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning' of tanker vessels."  See 529 U.S. at 111, quoting PWSA Title II, 46 U.S.C. § 3703(a).  The Locke Court held that PWSA Title II mandates "*uniform, national* rules regarding" these subjects.  Locke, 529 U.S. at 109 (emphasis added).[9]  Congress has mandated uniformity in part because of the critical need for the United States to "speak with one voice" in the international community as it conducts its foreign affairs, without fear of embarrassment by individual states.  See Ray, 435 U.S. at 166.  See also THE FEDERALIST PAPERS 282 (Clinton Rossiter ed., 1961) (James Madison, in Federalist No. 44, noting the danger that "the Union be discredited and embroiled by the indiscretion of a single member").  The ability to "speak with one voice" enables the United States to better encourage nations generally to adopt an international regime that promotes environmental protection and safety throughout the world.  Ray, 435 U.S. at 166.

---

[9]    The PWSA was enacted against a background of federal  maritime regulation that "has been manifest since the beginning of our Republic and is now well established."  Locke, 529 U.S. at 99.  In 1789, the First Congress established a scheme of federal maritime registration and certification.  Act of Sept. 1, 1789, Ch. 11, § 1, 1 Stat. 55.  See also Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1 (1824) (federal license statute preempted state law); Sinnot v. Davenport, 63 U.S. (22 How.) 227 (1859) (same).  Congress enacted a series of other maritime statutes in the 19th Century.  See, e.g., 16 Stat. 440, 449-50.  With the Tank Vessel Act of 1936, 49 Stat. 1889, Congress ushered in the complex modern era of oil tanker regulation.  That Act was intended to establish "a reasonable and uniform set of rules and regulations concerning ship construction, equipping, operation, and manning . . . ."  H.R. Rep. No. 2962, 74th Cong., 2d Sess. 2 (1936) (quoted in part in Locke, 529 U.S. at 100, and Ray, 435 U.S. at 166).

Accordingly, in part in service to the uniformity of maritime law, Congress prohibited states from regulating in areas covered by Title II of the PWSA. Locke, 529 U.S. at 111. Congress also provided a mechanism by which the states are heard in the setting of federal policy. Specifically, the Secretary must consult with, and consider the views of "officials of State and local governments," and "representatives of environmental groups," as well as, inter alia, other federal agencies. 46 U.S.C. § 3703(c).

### b.     Conflict Preemption Under PWSA Title I

Under PWSA Title I, which regulates navigation and waterways management, the Supreme Court held in Locke that "Coast Guard regulations are to be given pre-emptive effect over conflicting state laws." 529 U.S. at 110. The "relevant inquiry for Title I pre-emption [is] whether the Coast Guard has promulgated its own requirement on the subject or has decided that no such requirement should be imposed at all." Id., citing Ray, 435 U.S. at 171-72. Therefore, "Congress, in Title I of the PWSA, preserved state authority to regulate the peculiarities of local waters [only] if there was no conflict with federal regulatory determinations[.]" Id.

A court considering a state regulation of areas governed by Title I of the PWSA, e.g., navigation and waterways management, must first ask whether the Coast Guard has issued regulations on the subject under its Title I authority, or has affirmatively decided there should be no regulations. If the Coast Guard has done either of those things, the inquiry must end because the state rule is preempted. If the Coast Guard has neither adopted regulations nor decided there should be none, however, then courts should determine whether the state rule is justified by, and directed to, "local circumstances and problems, such as water depth and narrowness, idiosyncratic to a particular port or waterway." Locke, 529 U.S. at 109, citing Ray, 435 U.S. at 171. "There is no pre-emption by operation of Title I itself if the state regulation is so directed *and* if the Coast Guard has not adopted regulations on the subject or determined that regulation is unnecessary or inappropriate." Locke, 529 U.S. at 109 (emphasis added).

-13-

**II.     The Disputed Portions of the Tanker Act are Preempted by Federal Law**

As discussed below, and following the Supreme Court's decisions in <u>Locke</u> and <u>Ray</u>,

2004 Mass. Acts chapter 251 § 2 (tank vessel design, operation, equipping, and reporting), § 11

(establishing new M.G.L. 21M, §§ 1 and 6 (tug escorts); § 3 (alcohol and drug testing); § 4

(manning and watchstanding); § 5, as amended by 2004 Mass. Acts chapter 457 § 1 (vessel

routing); and, § 7 (tanker design)), and §§ 16 and 17 (compulsory pilotage) purport to legislate in

areas committed to the sole discretion of plaintiff United States, are expressly forbidden by

federal law, conflict with federal law, and/or otherwise impede the accomplishment and

execution of the full purposes and objectives of federal law.  Some of these provisions are, <u>inter

alia</u>, field-preempted by PWSA Title II[10]; others are conflict-preempted under PWSA Title I; and

one is expressly preempted by statute.  These provisions of state law are, accordingly, invalid

under the Supremacy Clause, U.S. Const. Art. VI, Cl. 2.

**A.     The Commonwealth's Maritime Personnel and Manning Requirements are
         Preempted by Federal Law**

Congress has pervasively regulated maritime personnel requirements with PWSA Title II,

authorizing the Coast Guard to broadly regulate in the area and thereby preempting any state

regulation of maritime personnel requirements.  46 U.S.C. § 3703(a); <u>see also</u> <u>Locke</u>, 529 U.S. at

111. Yet, the Mass. Act at Section 11, creating M.G.L. 21M § 4, seeks to establish personnel

requirements including manning, watchstanding, and crew list requirements on tugboats, tows

---

[10]     There can be little question that the Massachusetts rules which the United States
identifies as field-preempted under PWSA Title II fall unambiguously within the ambit of that
Title of that statute.  <u>See infra</u>.  Should the Court discern any ambiguity as to whether certain
provisions fall under the preemptive ambit of PWSA Title II or Title I, however, the Court
should accord great weight to the views of the Department of Homeland Security and the Coast
Guard, which are charged with administering that statute.  <u>See</u> <u>American Auto Mfr's Ass'n v.
Massachusetts Department of Environmental Protection</u>, 163 F.3d 74, 86 n.14 (1st Cir. 1998)
("the EPA can determine the scope of the preemptive effect of [the Clean Air Act] and we would
accord substantial deference to that determination"); <u>see also</u> <u>Geier v. American Honda Motor
Co.</u>, 529 U.S. 861 (2000); <u>Nat'l Home Equity Mortgage Assoc. v. Office of Thrift Supervision</u>,
373 F.3d 1355 (D.C. Cir. 2004); <u>cf.</u> <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council,
Inc.</u>, 467 U.S. 837, 844 (1984) ("considerable weight should be accorded to an executive
department's construction of a statutory scheme it is entrusted to administer").

and single-hulled tank barges carrying oil in the Commonwealth's waters. The Act prescribes detailed minimum requirements for, among other things, manning tank barges. Id. These tank vessel manning requirements are in a field occupied by the Coast Guard under federal law, PWSA Title II.[11]  Title 46 U.S.C. § 3703(a) provides for regulation of, inter alia, "the manning of vessels and the duties, qualifications, and training of the officers and crew[.]"  46 U.S.C. § 3703(a)(4).  Therefore, the Massachusetts rules are null and void.

The Mass. Act sets out watchstanding and manning requirements for tows and single-hulled tank barges carrying 6,000 barrels or more. M.G.L. 21M § 4. For tows, i.e., non-self-propelled tankers under tow, the Act requires one navigation watch crew member (who must be a licensed deck officer or tow vessel operator), performing only watch duties, at all times; and three licensed tow officers or tow vessel operators on board at all times. M.G.L. 21M § 4(a). For tank barges that can accommodate personnel, the Act requires at least two personnel on board at all times, one of whom must be a certified tankerman under federal law, 46 C.F.R. § 12.20. M.G.L. 21M § 4(b).[12]

---

[11]    The Massachusetts vessel manning rules are also inconsistent with international law accepted by the United States regarding the right of innocent passage, which is critical to the free passage of U.S. military and civilian flag vessels at various places around the world. The right of innocent passage provides that a coastal nation's laws and regulations may not be applied to the design, construction, manning, or equipment of foreign vessels transiting in innocent passage through another nation's territorial sea unless they are giving effect to generally accepted international rules or standards, and that coastal nations may not impose requirements on foreign ships that have the practical effect of denying or impairing the right of innocent passage. See, e.g., Convention on the Territorial Sea and the Contiguous Zone, Geneva, Apr. 29, 1958, 15 U.S.T. 1606, art. 15(1); UNCLOS, § 3, arts. 17, 21(2), 24(1)(a), 25(2); 33 U.S.C. § 1230; 33 C.F.R. Pts. 160, 164. Although the right of innocent passage does not alter a coastal nation's right to impose regulations as a condition of port entry, such conditions must be consistent with that country's other international legal obligations.

[12]    The United States has regulated extensively in this area. The Commonwealth has disregarded not only the United States' exclusive right to such regulation, but also the substance of the federal rules, as the Mass. Act manning requirements conflict with federal law. For example, 46 C.F.R. Part 15 comprehensively regulates manning, watchstanding and lookouts on commercial vessels generally, and on tank vessels and tugs specifically. See also, e.g., 33 C.F.R. § 164.13(c) ("Navigation underway: tankers") (requiring tankers to navigate with at least 2 licensed deck officers on watch on bridge, one of whom may be a pilot; where a pilot is required because autopilot cannot be used, the second crewman must be licensed and assigned as master, mate, or officer in charge of navigational watch).

-15-

As the Supreme Court held in <u>Locke</u>, "only the Federal Government may regulate the '. . . operation, . . . personnel qualification, and manning' of tanker vessels."  <u>Locke</u>, 529 U.S. at 111 (quoting 46 U.S.C. § 3703(a)).  Indeed, the <u>Locke</u> court invalidated a Washington State requirement, similar to the requirements of M.G.L. 21M § 4, that tank vessels have a navigation watch consisting of "at least two licensed deck officers, a helmsman, and a lookout."  <u>Locke</u>, 529 U.S. at 114.  Just as the Supreme Court held concerning the Washington State law, the Tanker Act requirements concerning navigation watchstanding and other manning while a tank vessel is in operation are "general operating requirement[s] and pre-empted as an attempt to regulate a tanker's 'operation' and 'manning' under 46 U.S.C. § 3703(a)."  <u>Locke</u>, 529 U.S. at 114.

**B.    The Commonwealth's Drug and Alcohol Testing Requirements are Preempted by Federal Law**

Section 11 of the Mass. Act, <u>codified at</u> M.G.L. 21M § 3, establishes a two-hour drug and alcohol testing requirement for mariners, and requires owners and operators of tank vessels to conduct such testing after a serious marine incident, to carry onboard adequate equipment for such tests, and to ensure that vessel crew are not under the influence of drugs or alcohol. "The State's attempted rule is a 'personnel qualification' pre-empted by 3703(a) of [PWSA] Title II." <u>Locke</u>, 529 U.S. at 113 (discussing English language proficiency requirement); <u>see also id.</u> at 119 (appendix describing drug and alcohol testing as personnel policy).  The requirement that testing equipment be carried onboard is an "equipping" requirement, also field preempted by 46 U.S.C. § 3703(a).  <u>Id.</u> at 110.  This state effort to regulate in fields committed to federal discretion is, accordingly, preempted.  <u>Id.</u> at 113.

We can find further evidence (if any is needed) that M.G.L. 21M § 3 is field preempted under federal law because "there is a[] federal statute . . . on the subject." <u>Locke</u>, 529 U.S. at 113.  Title 46 U.S.C. § 2303a provides for drug and alcohol testing of mariners.  The Coast Guard already provides for drug and alcohol testing via 33 C.F.R. Part 95 and 46 C.F.R. Parts 4

-16-

& 16, promulgated pursuant to the authority of PWSA Title II.  See Locke, 529 U.S. 112.  These federal regulations require drug and alcohol tests after an oil spill, but do not specify a time requirement; the Mass. Act would require drug and alcohol testing within two hours of a serious marine incident, including an oil spill.[13]  Compare 46 C.F.R. Part 4 with M.G.L. 21M § 3. See also 46 C.F.R. § 4.03-2 (defining "serious marine incident").  Indeed, the Tanker Act references the federal regulatory provisions, though it conflicts with them by requiring testing within two hours of an incident.  The Commonwealth's attempt to buttress the federal requirements is improper:  "[t]he [federal] statute may not be supplemented by laws enacted by the States without compromising the uniformity the federal rule itself achieves."  Locke, 529 U.S. at 114.

## C.    The Commonwealth's Tank Vessel Design Requirement is Preempted by Federal Law

Section 11 of the Mass. Act, codified at M.G.L. 21M § 7, prohibits vessels that are not in compliance with federal requirements for double hulls from docking, loading, or unloading in Massachusetts.  This provision is an attempt to impose a concurrent state regulation in the area of tank vessel design, which the Supreme Court has twice held is committed solely to federal discretion under PWSA Title II.  Locke, 529 U.S. at 111 (tanker design and construction rules are "within a field reserved for federal regulation"); Ray, 435 U.S. at 165 ("Enforcement of the state requirements would at least frustrate what seems to us to be the evident congressional intention to establish a uniform federal regime controlling the design of oil tankers."); see also 46 U.S.C. § 3703(a).

---

[13]    The Coast Guard has proposed a two-hour drug testing rule at 68 Fed. Reg. 9622 (Feb. 28, 2003) similar to the Massachusetts rule, but allowing drug testing to take place up to 32 hours after a spill, and alcohol testing up to eight hours after a spill, to ensure such testing does not interfere with immediate response to a marine accident.  See also 46 U.S.C. § 2303a (directing the Secretary to establish such procedures).  The Mass. Act requires drug and alcohol testing within two hours of a spill, without exception.  2004 Mass. Acts chapter 251 § 11.  Title 46 U.S.C. § 2303a and the proposed federal rules thereunder are discussed in more detail in the United States' memorandum in support of its motion for summary judgment on the Defendants' counterclaim, filed this same date.

-17-

The state's vessel design requirement interferes with Congress' uniform federal scheme of regulation and enforcement of tanker design standards.[14]  It is, accordingly, preempted by federal law, and is null and void.  Locke, 529 U.S. at 111; Ray, 435 U.S. at 165; Maryland v. Louisiana, 451 U.S. 725, 746 (1981) ("the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject").

> **D.**    **The Commonwealth's Attempt to Regulate Tanker Design, Operation, Equipping and Reporting Via a Massive Financial Assurance Bond Requirement is Preempted by Federal Law**

Section 2 of the Mass. Act, codified at M.G.L. 21 § 50C, seeks to regulate, inter alia, tank vessel design, operation, equipping, and reporting.  The Act requires most vessels carrying oil to post a $1 billion financial assurance bond.[15]  M.G.L. 21 § 50C(b).  The amount of the bond may be lowered (presumably as low as zero), however, if the Commonwealth, acting through defendant Department of Environmental Protection, so chooses based on an examination of

---

[14]    The Mass. Act provision is similar in effect to 46 U.S.C. § 3703a, a portion of PWSA Title II which prohibits single-hulled oil tankers of certain sizes, in certain conditions, and following a certain schedule.  Under the PWSA Title II field preemption analysis, however, the fact that this portion of the Commonwealth's overlapping legal regime is similar to federal law does not save it.  Locke, 529 U.S. at 115 ("It is not always a sufficient answer to a claim of pre-emption to say that state rules supplement, or even mirror, federal requirements.").  The "appropriate inquiry still remains whether the purposes and objectives of the federal statutes, including the intent to establish a workable, uniform system, are consistent with concurrent state regulation."  Locke, 529 U.S. at 115.  They are not:  supplementation of PWSA Title II by state laws compromises the United States' ability to speak with one voice to foreign nations, and to foreign and domestic flag vessels, by forcing those parties (who should have to turn only to federal law for an authoritative statement of the requirements and enforcement procedures to which they are subject) to also consult state law and enforcement procedures.  Thus, as the Locke court held, Title II of the PWSA "may not be supplemented by laws enacted by the States without compromising the uniformity the federal rule itself achieves."  Id. at 114.  Congress' goal in preempting the field was "to establish a uniform *federal* regime controlling the design of oil tankers."  Ray, 435 U.S. at 165 (emphasis added).  Accordingly, "Congress has left no room for state regulation."  Locke, 529 U.S. at 111; accord Natsios, 181 F.3d at 77.  Concurrent state regulation and/or enforcement schemes would also impose a heavy burden on the master of a domestic or foreign-flag tanker navigating through United States coastal waters, who is in a position "such that it is almost impossible for him to acquaint himself with the laws of each individual State he may visit."  The Roanoke, 189 U.S. 185, 195 (1903).  Cf. Natsios, 181 F.3d at 73-74.

[15]    Vessels carrying less than 6,000 barrels are required to post a $5 million, not $1 billion, bond.  M.G.L. 21 § 50C(b).

"criteria that includes, but is not limited to, the type and amount of [oil] transported by the vessel; the size and construction of the vessel, including whether the vessel is double hulled; the safety record of the vessel or the vessel owner, the loss or accident history of the vessel or vessel owner involving maritime spills and the safety equipment used by the vessel."  M.G.L. 21 § 50C(d). Thus, the Commonwealth has conditioned the placement or removal of a massive financial burden on criteria of vessel design, operation, equipping, and reporting, id., and this provision is accordingly a regulation of those subjects.  See, e.g., Sullivan v. City of Augusta, 310 F. Supp. 2d 348, 355 (D. Me. 2004) (in First Amendment context, $10,000 bond assurance requirement for parade applicants that may be lowered at discretion of public official was regulation of parade content).  This indirect regulation is forbidden by the well-established doctrine that "a state cannot do that indirectly which she is forbidden by the constitution to do directly."  City of St. Louis v. Western Union Tel. Co., 148 U.S. 92, 106 (1893), quoting Smith v. Turner ("The Passenger Cases"), 48 U.S. (7 How.) 283, 458 (1849).  See also Grafton & Upton R.R. Co. v. Town of Milford, 337 F.Supp. 2d 233, 238 (D. Mass. 2004) ("a state 'cannot regulate indirectly . . . what it cannot regulate directly")  To the extent this provision purports to regulate indirectly in areas preempted by federal law, it is null and void.  See Locke, 529 U.S. at 111, 115-16; City of St. Louis, 148 U.S. at 106.

### 1.    Tank vessel design, operation and equipping

Much of M.G.L. 21 § 50C seeks to indirectly regulate matters that fall within the Congressionally preempted field of PWSA Title II.  Those matters include "the size and construction of the vessel, including whether the vessel is double hulled."  Id.  As discussed supra, vessel construction and design may be regulated "only by the Federal Government." Locke, 529 U.S. at 111, citing 46 U.S.C. § 3703(a).  The Commonwealth also seeks to indirectly regulate "the safety equipment used by the vessel."  M.G.L. 21 § 50C(d).  Again, "equipping" of tanker vessels may be regulated solely by the United States, and the Commonwealth's indirect regulation is therefore preempted.  Locke, 529 U.S. at 111, citing 46 U.S.C. § 3703(a).  In

-19-

addition, M.G.L. 21 § 50C indirectly regulates the type of cargo a tank vessel carries.[16]  Under

the exclusive maritime regulatory scheme of PWSA Title II, Congress has directed the Secretary

to consider the type of cargo carried in tank vessels as he promulgates the United States'

preemptive regime.  46 U.S.C. § 3703(b); see also 46 C.F.R. Pt. 150 (regulating compatibility of

cargoes).  The Commonwealth's indirect regulation of tank vessel contents is impermissible

under the federal scheme of tank vessel regulation; "[t]he Supremacy Clause dictates that the

federal judgment that a vessel is safe to navigate United States waters prevails over the contrary

state judgment."  Ray, 435 U.S. at 165.

### 2.    Reporting Requirements

In Locke, the Supreme Court invalidated a vessel reporting requirement indistinguishable

from that which the Commonwealth purports to impose here.  The Commonwealth seeks to

obtain (via conditioning of removal of a significant financial burden) reporting of matters

including "the safety record of the vessel or the vessel owner, [and] the loss or accident history of

the vessel or vessel owner involving maritime spills."  M.G.L. 21 § 50C(d).  Similarly, in Locke

Washington State had required reporting of "incidents," "defined as a 'collision,' 'allision,' 'near-

miss incident,' 'marine casualty' of listed kinds, 'accidental or intentional grounding,' 'failure of

the propulsion or primary steering systems,' 'failure of a component or control system,' 'fire,

flood, or other incident that affects the vessel's seaworthiness,' and 'spills of oil'."  Locke, 529

U.S. at 114-15, citing W.A.C. § 317-21-130 (1999).   The Court's holding in Locke is

controlling: "Congress intended that the Coast Guard regulations be the *sole source* of a vessel's

reporting obligations with respect to the matters covered by the challenged state statute . . . .

*Congress did not intend its reporting obligations to be cumulative to those enacted by each*

*political subdivision* whose jurisdiction a vessel enters."  529 U.S. at 115-16 (emphasis added).[17]

---

[16]     The provision contemplates "cargo of oil, hazardous material, or hazardous
waste[.]"  M.G.L. 21 § 50C(a).

[17]     By statute, Congress mandated that the Coast Guard "shall prescribe regulations
on the marine casualties to be reported and the manner of reporting," and listed the types of

This provision is "a significant burden in terms of cost and the risk of innocent noncompliance [and] . . . it affects a vessel operator's out-of-state obligations and conduct, where a State's jurisdiction and authority are most in doubt."[18]  Id. at 116.  The Commonwealth's attempt to penalize vessels that do not submit to its reporting requirements under M.G.L. 21 § 50C(d) cannot stand in light of the comprehensive federal maritime reporting regime, and is preempted. See id.

### 3.    Other Indirect Regulation Via the Financial Assurance Requirement

The Mass. Act is deliberately vague as to how (in addition to the prohibited criteria described above) the Commonwealth may use its unfettered discretion to indirectly regulate tankers via the financial assurance bond requirement.  M.G.L. 21 § 50C(d).  The United States does not ask this Court, at this time, to invalidate any hypothetical uses of the provision; rather, the Court should declare that the Commonwealth cannot condition placement or removal of the bond requirement upon any areas within the field of PWSA Title II, or in conflict with any Coast Guard regulations promulgated under PWSA Title I, or in conflict with a Coast Guard decision that there should be no such regulations.[19]  See generally Locke, 529 U.S. 89.

---

casualties the Coast Guard's regulations must cover.  46 U.S.C. § 6101; see also 46 U.S.C. § 3717(a)(4) (requiring the Secretary of Homeland Security to "establish a marine safety information system" to include reporting on "the history of marine casualties and serious repair problems of the vessel"); Locke, 529 U.S. at 115-16 (citing §§ 3717(a)(4) and 6101); id. at 113. Pursuant to Congress's command, the Coast Guard has promulgated extensive marine safety reporting regulations.  See, e.g., 33 C.F.R. §§ 151.15, 151.26(b)(3), 153.203, 155.1035(b), 164.61; id., Pt. 173, Subpt. C; 46 C.F.R. §§ 4.05-1 to 4.05-10, 35.15-1.  Various international agreements also contain requirements for event reporting. See MARPOL 73/78, Art. 8; id. Protocol I; IMO Res. A.851(20); SOLAS Convention, Annex, Ch. V, Reg. 8-1.

[18]    Again ignoring the lessons of Locke, the Commonwealth seeks to impose reporting of incidents "regardless of where in the world they might have occurred."  529 U.S. at 115.

[19]    The Commonwealth is free to enact liability requirements insuring itself against the effects of oil pollution.  See 33 U.S.C. § 2718(a).  But the Commonwealth cannot use such requirements to indirectly regulate that which it cannot regulate directly, i.e., subjects within the preemptive field of the PWSA.  Locke, 529 U.S. at 104-07 (discussing, inter alia, 33 U.S.C. § 2718); The Passenger Cases, 48 U.S. at 458.

### E.    The Commonwealth's Tug Escort Requirements Conflict With, and are Preempted by, Federal Law

Section 11 of the Mass. Act, codified at M.G.L. 21M § 6, requires that tank barges carrying 6000 barrels or more of oil and traveling in Massachusetts waters including, inter alia, Buzzards Bay, Vineyard sound and Mt. Hope Bay, must be accompanied by a tug escort.  This provision purports to regulate a subject that is already governed by federal rules under PWSA Title I, which, for example, would not require a tug escort for a single-hull tank barge carrying up to 10,000 barrels of oil if it is towed by certain qualifying vessels.  See 33 C.F.R. § 165.100 (regulating navigable waters within the First Coast Guard District, including Massachusetts); id. § 165.100(d)(1)(i) (establishing tug escort requirements for single-hull tank barges in Massachusetts waters); see also 33 U.S.C. §§ 1223, 1231 (providing authority for 33 C.F.R. Part 165); 33 C.F.R. § 3.05-1(b) (defining First Coast Guard District).  "The relevant inquiry under Title I with respect to the State's power to impose a tug-escort rule is . . . whether the Secretary has either promulgated his own tug requirement for [local] tanker navigation or has decided that no such requirement should be imposed at all."  Ray, 435 U.S. at 171-72.  Here, the United States, through the Coast Guard, *has* set tug escort requirements (indeed, conflicting requirements) for the waters of Massachusetts, see 33 C.F.R. § 165.100(d)(1)(i), and so the state law must yield.[20]  Locke, 529 U.S. at 111, citing Ray, 435 U.S. at 171-72.

---

[20]    Indeed, Congress may have occupied the field of regulations concerning oil "towing vessel and barge safety for the waters of the Northeast" by directing that the Secretary "shall promulgate regulations" on those subjects. Pub. L. 105-383 § 311(b)(1)(A).  The Supreme Court found that Title II of the PWSA occupies the field and preempts any state regulation in the areas it covers because it "mandated federal rules on the subjects or matters there specified, demanding uniformity."  Locke, 529 U.S. at 110-11 (citing Ray, 435 U.S. at 168).  Similarly, Congress "mandated federal rules" on tug, tow and barge safety in waters of the Northeast in 1998, see Pub. L. 105-383 § 311(b)(1)(A); promulgation of those supreme, federal rules is required of the Secretary (as with rules under PWSA Title II that occupy the field).  The rules are not discretionary (as are those rules under PWSA Title I that are preemptive only when in conflict with state laws).  The Court need not reach this matter, however, since the Commonwealth's tug escort requirement is in direct conflict with federal rules for Massachusetts waters.

The federal rule represents the Coast Guard's reasoned conclusion as to the necessary requirements in local waters in Massachusetts and the Northeast.  See Pub. L. 105-383 § 311 (directing the Secretary to promulgate "regulations for towing vessel and barge safety for the waters of the Northeast"); 33 C.F.R. § 165.100(d)(1) (regulating navigable waters in the Northeast).  These "Coast Guard . . . regulations on the subject" preempt the conflicting state law. Locke, 529 U.S. at 109.[21]

### F.    The Commonwealth's Mandatory Vessel Routing Scheme Conflicts With, and is Preempted By, Federal Law

Under PWSA Title I, Congress has authorized the federal government to prescribe vessel operating requirements, including, inter alia, by "establishing vessel traffic routing schemes."  33 U.S.C. § 1223; id. § 1223(a)(4)(B).  The United States, acting through its agency the National Oceanic and Atmospheric Administration ("NOAA") and through the Coast Guard, has identified on the NOAA navigational charts for Buzzards Bay a recommended route for vessels to use in transiting Buzzards Bay.  See 69 Fed. Reg. 62427, 62428-29 (October 26, 2004).  The NOAA Buzzards Bay navigational charts, NOAA navigational charts 13218 and 13230, each include a statement that certain vessels, including tugs and barges, are requested to follow the recommended route *at the master's discretion,* but specifying that the route is *not mandatory.*[22]

---

[21]    On October 26, 2004, the Coast Guard issued an Advanced Notice of Proposed Rulemaking "to require additional navigation safety measures within Buzzards Bay, including tug escorts . . . ."  69 Fed. Reg. 62427 (October 26, 2004).  The proposed regulation would require that all laden tank barges be accompanied by tug escorts.  Id. at 62429.  This would go beyond current federal regulation, discussed supra, which does not require tugboat escorts of barges carrying 10,000 barrels or fewer of oil under certain circumstances.  33 C.F.R. § 165.100(d).  It would also go beyond requirements of the Mass. Act, which requires only that those barges carrying 6,000 or more barrels of oil in Buzzards Bay must be accompanied by a tugboat escort.  2004 Mass. Acts ch. 251 § 11.  Therefore, if the Coast Guard promulgates the tugboat escort requirement for Buzzards Bay that it is considering, it would not do nothing to save the preempted Mass. Act tug escort provision:  there would remain a conflict between federal and state law on the subject, and the state law would remain preempted and void. See Locke, 529 U.S. at 111, citing Ray, 435 U.S. at 171-72.

[22]    Indeed, these routes are not internationally recognized, nor have they been adopted as mandatory by the United States. See 69 Fed. Reg. 62427, 62428-29.  Compare, e.g., 66 Fed. Reg. 17,156 (March 29, 2001) (announcing that NOAA will seek international recognition, via the IMO, of a vessel routing scheme off the coast of Washington State); 65 Fed.

Id. The Coast Guard has neither identified nor designated any other routes through Buzzards Bay. Id. Thus, the Coast Guard has determined that these routes are appropriately *recommended* to mariners, but *not required*. That this is the Coast Guard's current finding is clear from the Coast Guard's request for public comment on whether it should instead require that the identified route be followed. See 69 Fed. Reg. 62427, 62428-29; compare 65 Fed. Reg. 12944 (March 10, 2000) (final rule establishing mandatory Delaware Bay Approach Traffic Separation Scheme). This federal decision followed the Coast Guard's detailed assessment of local conditions in the waters of the Northeast, including Buzzards Bay. See, e.g., 69 Fed. Reg. 62427-29 (discussing Coast Guard studies of and efforts to protect Buzzards Bay); 63 Fed. Reg. 71,764 (Dec. 30, 1998) (discussing the Coast Guard's development, with other stakeholders, of a "Regional Risk Assessment of Petroleum Transportation on the Waters of the Northeast United States"). This is, accordingly, another situation where the Coast Guard has made an affirmative judgment concerning the appropriate response to local conditions. See Locke, 529 U.S. at 109. Indeed, Congress explicitly directed the Coast Guard to make judgments concerning "local conditions" when providing for vessel routing schemes. 33 U.S.C. § 1224(a)(3). Any conflicting state law is, accordingly, preempted pursuant to the Supremacy Clause. Locke, 529 U.S. at 109.

The Tanker Act, however, ignores the federal decision by *requiring* that tank vessels operating in Massachusetts waters travel within the federally recommended vessel route appearing on NOAA charts for Buzzards Bay, or any other recommended vessel routes designated by the Coast Guard. 2004 Mass. Acts 457 § 1, codified at M.G.L. 21M § 5.[23] This mandatory vessel routing requirement is in direct conflict with the Coast Guard's reasoned

---

Reg. 12,944 (establishing mandatory vessel routing scheme in Delaware Bay).

[23]    As originally passed, the Mass. Act required route provision had no effect: it required tank vessels to operate only within routes designated by the Coast Guard *if such routes were designated*. 2004 Mass. Acts ch. 251 § 11, codified as M.G.L. 21M § 5 (Aug. 4, 2004). As discussed above, the Coast Guard has designated no such routes. On December 30, 2004, the Commonwealth amended M.G.L. 21M § 5 to require that tank vessels follow the Coast Guard's recommended route. 2004 Mass. Acts 457 § 1, codified as M.G.L. 21M § 5 (Dec. 30, 2004).

judgment that a ship's master should have the discretion to deviate from the recommended route as appropriate.  By charting a course between the extremes of taking *no* vessel routing measures in Buzzards Bay, on the one hand, and establishing a *required* route, on the other, the Coast Guard made a "deliberate effort 'to steer a middle path'." Crosby v. National Foreign Trade Council, 530 U.S. 363, 378 (2000), quoting Hines, 312 U.S. at 73.  Conversely, by requiring that the federally recommended route be followed without regard for the exercise of discretion by a ship's master, "[t]he State has set a different course, and its statute conflicts with federal law[.]" Crosby, 530 U.S. at 378.  With that contradiction of federal law, the Massachusetts vessel routing provision "run[s] counter to an exercise of federal authority[,]" and is preempted.[24]   Locke, 529 U.S. at 109; see also 33 U.S.C. § 1223.  It is of no moment that the Mass. Act merely goes further along the same path as federal law by requiring what the Coast Guard has recommended. "When Congress has taken the particular subject-matter in hand coincidence is as ineffective as opposition, and a state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go." Charleston & Western Carolina R. Co. v. Varnville Furniture Co., 237 U.S. 597, 604 (1915) (Holmes, J.), quoted in Locke, 529 U.S. at 115.

### G.    The Commonwealth's Compulsory State Pilotage Requirement is Expressly Preempted by Federal Law

"Although Congress need not employ express preemption language to communicate [intent to preempt state laws], when Congress so chooses, [a court's] task in divining [Congressional] intent with respect to the issue at hand may be 'an easy one'." Phillip Morris, Inc., 122 F.3d at 67, quoting English v. General Elec. Co., 496 U.S. 72, 79 (1990) (additional citation omitted).  The Court is confronted with such a task here:  federal law expressly preempts

---

[24]    The Coast Guard has invited public comment on formally designating the recommended route identified on NOAA navigational charts 13218 and 13230 as a required route for certain vessels.  69 Fed. Reg. 62427.  Such a designation would require only that tank barges under tow (not all tank vessels) use the routes.  Id.  The Mass. Act, however, requires that all tank vessels use these routes, see M.G.L. 21M § 5, so this provision would remain preempted even if the Coast Guard makes the contemplated designation.  See Locke, 529 U.S. at 111, citing Ray, 435 U.S. at 171-72.

sections 16 and 17 of the Mass. Act, amending M.G.L. 103 §§ 21, 28.  Those provisions of the Mass. Act require that vessels in coastwise trade carrying oil or other hazardous material or waste as cargo be piloted by Massachusetts-licensed pilots.  ("Coastwise" vessels are "American flag vessels sailing between American ports."  Interport Pilots Agency, Inc. v. Sammis, 14 F.3d 133, 136 (2d Cir. 1994); see also Ray, 435 U.S. at 158 n.7.)  Congress expressly preempted such state compulsory pilotage laws with 46 U.S.C. § 8501, which provides that a state "may not adopt a regulation that requires a coastwise vessel to take a pilot licensed or authorized by the laws of a State if the vessel is [a Coast Guard-inspected vessel].  Any regulation or provision violating this section is void."  Indeed, Massachusetts' provision is virtually identical to a state pilotage requirement that the Supreme Court held preempted in Ray, 435 U.S. at 158-59.  See also generally 2 THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 13-2 (4th ed. 2004) ("The effect of [the federal] statutory scheme is to broadly preempt state authority to regulate pilotage of vessels engaged in the domestic or coastwise trade. . . .  States may not require a coastwise vessel to take a state licensed or authorized pilot.").  As discussed below, under 46 U.S.C. §§ 3301, 3702, 3710 & 3714, all tank and tow vessels covered by this provision of the Mass. Act are inspected by the Coast Guard.  Thus, "[i]n [this] limited realm in which Congress has claimed federal jurisdiction over pilots, the states are preempted from taking action."  Wood v. Amerada Hess Corp., 845 F. Supp. 130, 133 (S.D.N.Y. 1994); see also Interport Pilots Agency, Inc. v. Sammis, 14 F.3d 133, 136 (2d Cir. 1994) ("Congress has preempted state regulation of pilotage" with respect to coastwise vessels," i.e., the class of vessels regulated by the pilotage provision of the Mass. Act); Huus v. New York & Porto Rico S.S. Co., 182 U.S. 392 (1901) (discussing predecessor statutes).

With 46 U.S.C. § 8501, Congress has "give[n] the Federal Government exclusive authority to regulate pilots on enrolled [i.e., 'coastwise'] vessels and . . . preclude[d] a State from imposing its own pilotage requirements upon them."  Ray, 435 U.S. at 159 (discussing predecessor statute and citing cases).  Under that federal statute, a:

-26-

> State may not adopt a regulation that requires a coastwise vessel to take a pilot licensed or authorized by the laws of a State if the vessel is
>
>     (1) propelled by machinery and subject to inspection under Part B of this subtitle; or
>
>     (2) is subject to inspection under Chapter 37 of this title.
>
>       Any regulation or provision violating this section is void.

46 U.S.C. § 8501(d). The Mass. Act, however, requires all U.S. vessels carrying oil, hazardous material or hazardous waste in bulk as cargo (including coastwise vessels) to employ state-licensed pilots in certain state waters. 2004 Mass. Acts chapter 251 §§ 16, 17, codified at M.G.L. 103 § 21. Vessels that are covered by § 8501(d)(1) – i.e., vessels "propelled by machinery and subject to inspection under Part B of this subtitle" – are identified in 46 U.S.C. § 3301, which is in Part B of Title 46, subtitle II ("this subtitle"). That statute notes that "tank vessels" and "towing vessels" are "subject to [Coast Guard] inspection under this part." 46 U.S.C. §§ 3301, 3301(10) ("tank vessels"), 3301(15) ("towing vessels"). Accordingly, all tank and towing vessels "propelled by machinery" fall within the ambit of § 8501(d)(1). Tank vessels that are not "propelled by machinery," i.e., tank vessels such as barges that are not self-propelled, fall within the ambit of § 8501(d)(2) because they are subject to inspection under Chapter 37 of Title 46. See 46 U.S.C. §§ 3702, 3710 & 3714. Thus, as they apply to coastwise vessels, M.G.L. 103 §§ 21 & 28 are expressly preempted by federal law. See also 46 U.S.C. § 8502 (providing federal pilotage requirements for certain vessels, including domestic enrolled vessels in coastwise trade).

## CONCLUSION

For the foregoing reasons, the Court should grant the United States' motion for judgment on the pleadings, declare the disputed provisions of the Tanker Act null and void, and permanently enjoin the Commonwealth, Governor Mitt Romney, the Massachusetts Department of Environmental Protection, and Commissioner Robert W. Golledge, Jr. from enforcing them.

DATED this 23d day of May, 2005.

Respectfully Submitted,

RADM John E. Crowley                      PETER D. KEISLER
Judge Advocate General                    Assistant Attorney General

CAPT William D. Baumgartner               MICHAEL SULLIVAN
Robert W. Bruce                           United States Attorney
Andrew J. Turner                          MARK T. QUINLIVAN
Attorneys                                 Assistant United States Attorney
U.S. Coast Guard

OF COUNSEL

                                       **/s/ Steven Y. Bressler**
                                        ARTHUR R. GOLDBERG D.C.B. 180661
                                        STEVEN Y. BRESSLER D.C.B. 482492
                                        Attorneys, Civil Division
                                        United States Department of Justice
                                        P.O. Box 833
                                        Washington, D.C. 20044
                                        Telephone (202) 514-4781
                                        Facsimile (202) 318-7609
                                        Steven.Bressler@USDOJ.gov