# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 05-10112 JLT |
| | ) |
| v. | ) |
| | ) |
| THE COMMONWEALTH OF | ) |
| MASSACHUSETTS, *et al.* | ) |
| | ) |
| | ) |
| Defendants, and | ) |
| | ) |
| THE COALITION FOR BUZZARDS BAY, | ) |
| | ) |
| Intervenor-Defendant | ) |
| | ) |
| THE AMERICAN WATERWAYS OPERATORS, | ) |
| INTERNATIONAL ASSOCIATION OF | ) |
| INDEPENDENT TANK VESSEL OWNERS, | ) |
| CHAMBER OF SHIPPING OF AMERICA, and | ) |
| BIMCO, | ) |
| | ) |
| Intervenor-Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) |
| MITT ROMNEY, Governor of Massachusetts, and | ) |
| ROBERT W. GOLLEDGE, JR., Commissioner of | ) |
| the Massachusetts Department of Environmental | ) |
| Protection, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM IN SUPPORT OF THE INTERVENOR-PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... ii

I.    BACKGROUND ...........................................................................................1

II.   IDENTIFICATION OF CHALLENGED STATE STATUTES .........................2

     A.    State Pilotage Requirements ...................................................2

     B.    State Drug and Alcohol Testing Requirements............................2

     C.    State Manning, Personnel Qualifications and Watchstanding
          Requirements ...................................................................3

     D.    State Prohibitions on Single Hull Operations ............................3

     E.    State Vessel Routing Requirements............................................4

     F.    State Financial Penalties/Incentives for Vessel Design Features................4

     G.    State Tug Escort Requirements..................................................5

III.  ARGUMENT ...............................................................................................6

     A    Rule 12(c) of the Federal Rules of Civil Procedure Permits
          Disposition Of This Matter Without Additional Proceedings ....................6

     B.    Federal Statutes and Regulations Governing Tank Vessel
          Safety and Marine Environmental Protection ................................6

     C.    Controlling Preemption Principles.............................................8

     D.    Federal Law Expressly Forbids Requiring State Pilots on
          Coastwide Vessels ............................................................11

     E.    Title I PWSA Preemption Analysis Nullifies State Tug Escort
          and Vessel Routing Requirements ............................................11

IV.   CONCLUSION...............................................................................................14

## TABLE OF AUTHORITIES

**CASES**                                                                          **PAGE(S)**

*Cooley v. Board of Wardens of the Port of Philadelphia*, 59 U.S. 299 (1852)...........................13

*Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978)......................................................9, 11, 12, 13

*Rivera-Gomez v. Adolfo de Castro*, 843 F.2d 631, 635 (1st Cir. 1988)...........................................6

*United States v. Locke*, 529 U.S. 89 (2000) ........................................................................9, 10, 13

*Wade v. Life Ins. Co. of N. America*, 245 F.Supp.2d 182 (D.Me. 2003) ........................................6

## STATUTES

33 U.S.C. §§ 1221-32 ...........................................................................................................4, 5, 7

33 U.S.C. § 1223....................................................................................................................12

46 U.S.C. § 3703(a) ...............................................................................................................3, 7

46 U.S.C. § 8501....................................................................................................................2, 8, 11

46 U.S.C. § 8502....................................................................................................................8

46 U.S.C. §§ 1901-1902 .......................................................................................................8

Pub. L. No.  92-340, 86 Stat. 427 .........................................................................................7

Pub. L. No.  95-474, 92 Stat. 1471 .......................................................................................7

Pub. L. No.  96-478, 94 Stat. 2297 .......................................................................................7

Pub. L. No.  101-380, 104 Stat. 484 .....................................................................................7

Pub. L. No.  105-383 § 311(b)(1)(A)....................................................................................12

Rev. Stat. § 4417a, ch. 729, 49 Stat. 1889 ...........................................................................7

2004 Mass. Acts 251 (Aug. 4, 2004), as amended by 2004

Mass. Acts 457 § 1 (Dec. 30, 2004)....................................................................................1

2004 Mass. Acts chapter 251 § 2
    establishing new Massachusetts General Laws chapter 21 § 50C ............................................4
2004 Mass. Acts chapter 251 § 11,
    establishing new Massachusetts General Laws chapter 21M § 3 ............................................3

2004 Mass. Acts chapter 251 § 11
    establishing new Massachusetts General Laws chapter 21M § 4(b) and (c) ............................3

2004 Mass. Acts chapter 251 § 11
    establishing new Massachusetts General Laws chapter 21M § 6 ............................................5

2004 Mass. Acts chapter 251 § 11
    establishing new Massachusetts General Laws chapter 21M § 7 ............................................7

2004 Mass. Acts chapter 251§ § 16 and 17
    amending Massachusetts General Laws chapter 103 §§ 21 and 28 .......................................2

2004 Mass. Acts chapter 457 § 1
    amending new Massachusetts General Laws chapter 21M § 5................................................4

## **RULES AND REGULATIONS**

33 C.F.R. Part 161................................................................................................................13

33 C.F.R. Part 162................................................................................................................13

33 C.F.R. Part 165............................................................................................................7, 13

33 C.F.R. § 165.100..........................................................................................................8, 13

33 C.F.R. § 165.100(d) ..........................................................................................................8

33 C.F.R. § 165.100(d)(1)......................................................................................................5

## **FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 12(c) .........................................................................................................2, 6

## **LEGISLATIVE MATERIAL**

Admiralty Clause, U.S. Const. Art. III, § 2, cl. 1, 2 ........................................................9

Commerce Clause, U.S. Const. Art I, § 8, cl. 3 .............................................................9

H.R. Rep. No. 338, 98th Cong., 1st Sess. 136-13,
    reprinted in 1983 U.S.C.C.A.N.at 948-49, 97 Stat. 500 ..........................................7

Supremacy Clause, U.S. Const. Art. VI...........................................................................8

## I.     BACKGROUND

On August 4, 2004, Massachusetts Governor Mitt Romney signed into law "An Act Relative to Oil Spill Prevention and Response in Buzzards Bay and Other Harbors and Bays of the Commonwealth" 2004 Mass. Acts 251 (Aug. 4, 2004), as amended by 2004 Mass. Acts 457 (Dec. 30, 2004) ("Oil Spill Act").  The General Court of the Commonwealth of Massachusetts enacted this statute despite clear and direct warnings from the United States Coast Guard and the affected maritime industry that much of the Oil Spill Act unlawfully usurped clear and extensive federal authority in the field of vessel safety and marine environmental protection.

Plaintiff, the United States of America ("United States" or "U.S."), has filed a complaint seeking a declaration concerning the unlawfulness of significant portions of the statute and seeking to have enforcement of those provisions of the statute permanently enjoined.  The Commonwealth answered that complaint on March 22, 2005.  On March 8, 2005, The American Waterways Operators ("AWO"), the International Association of Independent Tanker Owners ("Intertanko"), the Chamber of Shipping of America ("Chamber"), and BIMCO (together, the "Maritime Intervenors"), filed a Motion for Leave to Intervene and a Complaint in Intervention. These intervenors are four of the world's major shipping trade associations whose members are directly affected by the imposition of the Oil Spill Act.  Each of the intervenor associations has members who operate tank vessels that carry oil and petroleum-based products in the interstate and foreign commerce of the United States.  The movements of these vessels bring them from time to time into the ports and waters of the Commonwealth of Massachusetts ("the Commonwealth" or "Massachusetts").  The Court entered an order granting the Maritime Intervenors' request for leave to intervene on May 4, 2005.  The Commonwealth filed an Answer to the Maritime Group's Complaint in Intervention on May 25, 2005.

By this motion, the Maritime Intervenors now seek judgment on the pleadings, as contemplated by Rule 12(c) of the Federal Rules of Civil Procedure.  This motion rests on the same grounds as does a similar motion filed by the United States on May 23, 2005, and seeks similar disposition of the intervention complaint.  Plaintiff Intervenors endorse and adopt the assertions, arguments and reasoning of the United States in the May 23, 2005 motion and ask that they be extended to disposition of the Complaint in Intervention filed by the Carrier Groups.  The Complaint and Answer, the relevant provisions of the Constitution of the United States, federal statutes and regulations, and the text of the Massachusetts Oil Spill Act make clear that there are no material issues of fact between the parties that affect the correct disposition of the issues before the court.  Maritime Intervenors and the plaintiff, the United States of America, are entitled to judgment as a matter of law.  Fed. R. Civ. P. 12(c).

## II.    IDENTIFICATION OF CHALLENGED STATE STATUTES

The provisions of the Massachusetts Oil Spill Act which the Maritime Intervenors seek to have declared unlawful and permanently enjoined are:

A.    State Pilotage Requirements:[1]  Massachusetts purports to require tank vessels, including U.S. Coastwise vessels, to employ state licensed pilots in specified waters.  The Maritime Groups submit that this provision, to the extent that it is being applied to U.S. coastwise vessels operated by members of the Maritime Group or others, is a nullity by operation of the express language of 46 U.S.C. § 8501.

B.    State Drug and Alcohol Testing Requirements:[2]  Massachusetts purports to

---

[1]    2004 Mass. Acts chapter 251 §§ 16 and 17, amending Massachusetts General Laws chapter 103 §§ 21 and 28.

[2]    2004 Mass. Acts chapter 251 § 11, establishing new Massachusetts General Laws chapter 21M § 3.

require chemical tests for evidence of alcohol or drug use to be taken within two hours from all

persons directly involved in a serious marine incident and that adequate equipment be carried on

board to perform such tests and preserve related evidence.  Maritime Intervenors submit that this

provision of Massachusetts law is invalid because it invades field-preempted subject matters of

vessel equipping and personnel qualifications and areas presently subject to direct regulation by

the United States Coast Guard.

        C.      State Manning, Personnel Qualifications and Watchstanding Requirements:[3]

Massachusetts purports to require inclusion in certain tank vessel crews of at least one licensed

deck officer or tow vessel operator to serve exclusively as a lookout with no concurrent duties,

and a total of at least three licensed officers or tow vessel operators.  For single hull oil tank

barges equipped to accommodate personnel on board, carrying 6,000 or more barrels of oil, and

underway, anchored, or moored in Buzzards Bay, the Oil Spill Act requires at least two crew

members, one of whom must be a certified tankerman.  Maritime Intervenors submit that this

provision is invalid  because it attempts to regulate activities squarely falling in the exclusively

federal subject matters enumerated in Title II of the Ports and Waterways Safety Act ("PWSA"),

as amended (specifically, the manning and personnel qualifications elements of 46 U.S.C. §

3703(a)) and United States Coast Guard regulations lawfully issued pursuant to the mandates of

PWSA and other federal statutes.

        D.      State Prohibitions on Single Hull Operations:[4]  Massachusetts purports to prohibit

certain single hull vessels from docking, loading, or unloading cargoes in Massachusetts.  While

---

[3]     2004 Mass. Acts chapter 251 § 11, establishing new Massachusetts General Laws chapter 21M § 4(a), (b) and (c).

[4]     2004 Mass. Acts chapter 251 § 11, establishing new Massachusetts General Laws chapter 21M § 7.

this provision is couched in language that suggests congruence with federal requirements, by asserting regulatory authority in this area, the Commonwealth has invaded the preempted area of tank vessel design and construction, an area solely within the authority of the federal government under Title II of PWSA. Maritime Intervenors submit that the Commonwealth may not lawfully assign itself co-equal authority to police and enforce federal standards concerning tank vessel design and construction.

      E.    <u>State Vessel Routing Requirements</u>:[5] Massachusetts purports to require tank vessels operating in Massachusetts waters to navigate and operate within the recommended vessel routes appearing on NOAA charts for Buzzards Bay, or any other recommended vessel routes designated by the Coast Guard. The Maritime Intervenors submit that this provision is invalid because it conflicts with determinations of the United States Coast Guard that identify recommended routes but leave to the discretion of vessel masters the determination of whether the route should be followed. By substituting its judgment for the judgment of the federal government on the issue of mandatory adherence to vessel routing schemes, the Commonwealth has acted in a manner that is forbidden under Title I of PWSA and that violates the Constitution by operation of the Supremacy Clause.

      F.    <u>State Financial Penalties/Incentives for Vessel Design Features</u>:[6] Massachusetts purports to require vessels carrying 6,000 or more barrels of oil in Massachusetts waters provide a one billion dollar ($1,000,000,000) financial assurance certificate to the Commonwealth, but the amount of the certificate may be lowered by defendant's Department of Environmental Protection ("DEP") if DEP determines that the vessel has adequate safety equipment on board.

---

[5]      2004 Mass. Acts chapter 457 § 1, amending new Massachusetts General Laws chapter 21M § 5.

[6]      2004 Mass. Acts chapter 251 § 2, establishing new Massachusetts General Laws chapter 21 § 50C.

4

Maritime Intervenors submit that this provision of the statute unlawfully attempts to set tank vessel construction, design and equipping standards that are within the preempted subject matters of Title II PWSA.

       G.      <u>State Tug Escort Requirements</u>:[7]  Massachusetts purports to require non-self-propelled tank vessels carrying 6,000 or more barrels of oil and entering or transiting specified Massachusetts coastal waters to be accompanied by a tugboat escort.  This element of the Oil Spill Act specifies design requirements for tug escorts (propeller, horsepower, and firefighting equipment) and authorizes regulations to establish equipment and personnel standards for tug escorts.  Maritime Intervenors submit that this provision is invalid because it attempts to assert state regulatory powers in a field clearly occupied by federal action pursuant to both the above-cited mandatory provisions of Title II PWSA (*e.g.*, vessel design, manning and personnel qualification requirements) and the discretionary provisions of Title I of PWSA (33 U.S.C §§ 1221-1232) as implemented by the United States Coast Guard.  33 C.F.R. §  165.100(d)(1).

Each of these provisions of Massachusetts law invades fields of activity well within the express, enumerated constitutional powers of the federal government of the United States.  Each must give way to federal plenary authority over the primary activity of vessels in the interstate and foreign commerce of the Nation.[8]

---

[7]      2004 Mass. Acts chapter 251 § 11, establishing new Massachusetts General Laws chapter 21M §§ 1 and 6.

[8]      In addition to provisions of the Oil Spill Act challenged by the Maritime Intervenors, the United States has sought injunctive relief with regard to incident reporting requirements and the Commonwealth's attempts to use financial assurance requirements to promote or deter certain operational or physical standards for vessels that, if attempted through direct mandates or proscriptions, would be constitutionally invalid.  The Maritime Intervenors concur in the constitutional analysis of the United States on these points, but have nothing to add to the discussion of these issues presented at pages 20-21 of the May 23, 2005 Motion for Judgment on the Pleadings.

## III.   ARGUMENT

A.   Rule 12(c) of the Federal Rules of Civil Procedure Permits Disposition Of This Matter Without Additional Proceedings

This action between the United States, Maritime Intervenors and Massachusetts is susceptible of resolution under Rule 12(c) of the Federal Rules of Civil Procedure.  The complaints of the United States and the Maritime Intervenors, when read against Massachusetts' answers to those complaints, reveal no disputed facts or allegations that require evidentiary development as a predicate to disposition of the controlling legal issues.  For purposes of Rule 12(c) motion practice, the Court and the parties are obliged to "accept all of the nonmovant's well-pleaded factual averments as true . . ." *Rivera-Gomez v. De* Castro, 843 F.2d 631, 635 (1st Cir. 1988).  However, "[a] dismissal on the pleadings is appropriate when the petitioner presents no material issue of fact to be resolved and the moving party is clearly entitled to judgment as a matter of law." *Wade v. Life Ins. Co. of N. America*, 245 F.Supp.2d 182 (D. Me. 2003), *citing Lefebvre v. Commissioner,* 830 F.2d 417, 419 (1st Cir. 1987).   The essence of both the U.S. and the Maritime Intervenor complaints is that the Oil Spill Act provisions challenged here are invalid by operation of the Supremacy Clause and the well-settled preemptive nature of the controlling federal statutes, without reference to any external factual issues that might be advanced by defendants.

B.   Federal Statutes and Regulations Governing Tank Vessel Safety and Marine Environmental Protection

The operation, design, and manning requirements of vessels carrying oil in the interstate and international commerce of the United States are governed by a vast array of federal technical requirements that arise from international treaty commitments of the United States, statutes of the United States duly enacted by the Congress, and regulations promulgated by the United States

Coast Guard pursuant to direct statutory commands from Congress.  Key statutory elements of

this federal scheme are the Port and Waterways Safety Act of 1972 ("PWSA") (Pub. L. No. 92-

340, 86 Stat. 427),  the Port and Tanker Safety Act of 1978 (Pub. L. No. 95-474, 92 Stat. 1471),

the Act to Prevent Pollution from Ships (Pub. L. No. 96-478, 94 Stat. 2297), and the Oil

Pollution Act of 1990 ("OPA"), Pub L. No. 101-380, 104 Stat. 484.  These statutes, taken

collectively, describe an extensive federal presence in the field of tank vessel design,

construction, operations, personnel qualifications, and manning.[9]

Under the Port and Waterways Safety Act, Congress has mandated that the Secretary of

the Department in which the United States Coast Guard resides promulgate regulations

governing "the design, construction, alteration, repair, maintenance, operation, equipping,

personnel qualification and manning" of tank vessels such as those that are subject to the

requirements of the Massachusetts Tanker Act.  46 U.S.C. § 3703(a).  In a separate title of the

PWSA, the United States Coast Guard is given discretionary authority to promulgate regulations

governing the physical operation and movement of vessels through the waters of the United

States, including navigable waters within the three-mile limit that fall, for some purposes, within

the jurisdiction of individual states of the United States.  33 U.S.C. §§ 1221-1232.  The United

States Coast Guard has exercised this authority to promulgate regulations in various coastal areas

of the United States in order to address particular navigational hazards that exist in these areas.

33 C.F.R. Part 165.  These regulations include specific regulations governing navigable waters

---

[9]        The summary in the text of maritime statutes upon which the Maritime Intervenors rely, reflects, in fact, a
small but sufficient and preemptive central core of marine safety and environmental statutes that define the federal scope
of regulation of tank vessels. The federal presence in this area is sweeping and traditional.  Federal inspections
laws intended to prevent boiler explosions were enacted in 1838 and expanded in 1852, 1864, and 1871.  H.R. Rep.
No. 338, 98th Cong., 1st Sess. 136-137, *reprinted in* 1983 U.S.C.C.A.N. at 948-949, 97 Stat. 500.  The first federal
statute to address tank vessel safety in isolation (as opposed to safety requirements for all types of vessels) was the
Tank Vessel Act of 1936.  Rev. Stat.  §  4417a, ch. 729, 49 Stat.1889, codified as amended at 46 U.S.C.§ 391a).  The
PWSA extensively enlarge these requirements when it was enacted in 1972.

adjacent to Massachusetts. 33 C.F.R. § 165.100. Current Coast Guard regulations that affect tank vessel movements in Massachusetts waters include escort requirements, radio frequency assignments, and restrictions on the movements of certain types of vessels. 33 C.F.R. § 165.100(d).

In addition to these provisions of federal law, the United States Coast Guard has been entrusted by the Congress with wide ranging authority to establish standards for manning, training and watch-keeping aboard both U.S.-flag and foreign-flag tank vessels. 46 U.S.C. §§ 9101-9102. As is further relevant to this challenge to the Oil Spill Act, federal statutory provisions preemptively govern pilotage requirements in U.S. waters. Congress requires certain vessels to carry federally licensed pilots (46 U.S.C. § 8502) and expressly prohibits individual states from imposing requirements for state licensed pilots. 46 U.S.C. § 8501. That statute states bluntly that individual states "may not adopt a regulation that requires a coastwise vessel authorized by citizenship requirements of other statutes to trade between U.S. ports] to take a pilot licensed or authorized by the laws of a State . . ." The Massachusetts Oil Spill Act directly defies this express federal statutory ban on requiring state pilotage for coastwise vessels.

C.    <u>Controlling Preemption Principles</u>

Article VI of the Constitution describes that document "And the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States. . ." as "the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI. While the Supremacy Clause is but one of

several sources of potential preemption of errant state or local initiatives in the marine safety field,[10] its role is well developed and readily understood.  Two decisions of the Supreme Court of the United States, both originating in efforts by the State of Washington to insert itself into exclusively federal maritime regulatory matters, delineate the principles that constrain state and local actions in the marine safety and environmental protection area.  *United States v. Locke,* 529 U.S. 89 (2000) ("*Locke*") and *Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978) ("*Ray*"). These two cases, cogently briefed by the United States in its May 23 Motion, swept aside state actions that attempted to usurp federal judgments concerning tank vessel design, construction, operations, equipping, personnel qualifications, and manning of federally regulated tank vessels. A unanimous Court bluntly stated that "Congress has left no room for state regulation of these matters." *Locke*, 529 U.S. at 111.  The Commonwealth's Oil Spill Act treads irrevocably within this forbidden realm. The actions of its officials have left the United States and the affected vessel operators with no recourse but to this Court to vindicate the prerogatives of the United States and to protect vessels, cargoes and crews against the threats to their safety and the marine environment by the imposition of unlawful and potentially confusing requirements interposed by a state government in a heavily regulated federal system.  *Locke* reiterates the core principle of *Ray* by reminding state regulators that "[T]he Supremacy Clause dictates that the federal judgment that a vessel is safe to navigate United States waters prevail over the contrary state judgment." *Locke* at 111, quoting *Ray*, 435 U.S. at 165.  Massachusetts, with the enactment of

---

[10]    Other sources of preemption are the Commerce Clause (U.S. Const. Art. I, § 8, cl. 3, the Admiralty Clause (U.S. Const. art. III, § 2, cl. 1; and the plenary power of the Executive Branch of the federal government to make treaties subject to the advice and consent of the Senate (U.S. const. art. II § 2, cl. 2).  While these sources of preemption may have application in the current matter, Maritime Intervenors here rely primarily on the Supremacy Clause and U.S. Supreme Court jurisprudence (*Ray v. Atlantic Richfield* and *U.S. v. Locke*, *supra*) that specifically apply Supremacy Clause analysis to state attempts to enter the arena of regulation of tank vessel design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning of vessels subject to federal statutes.

9

its Oil Spill Act, has attempted to arrogate to itself the authority to render "contrary" judgments to those carefully fashioned by the federal government concerning the best approaches to ensuring tank vessel safety and protection of the marine environment. *Locke* and *Ray* render frivolous any effort by the state to justify this constitutional affront to federal authority. Massachusetts can point to no exception under the Constitution that permits it special status in this regard.

The holdings of *Locke* and *Ray* compel prompt and permanent injunction of Massachusetts Oil Spill Act provisions that address crew qualifications (including drug and alcohol testing), watchstanding (manning) practices, operational requirements, on-board equipment requirements, navigation practices, and vessel design and construction standards. The United States also correctly notes in its May 23 Motion (at 20) that the Supreme Court in *Locke* invalidated a Washington State marine casualty reporting requirement similar to one asserted by Massachusetts at M.G.L. 21 § 50C(d). While Massachusetts has imposed this requirement conditionally as an incentive to avoid financial obligations that would otherwise apply, the Supreme Court has noted that "Congress intended that the Coast Guard regulations be the sole source of a vessel's reporting obligations. . . ." and "did not intend its reporting obligations to be cumulative to those enacted by each political subdivision a vessel enters." *Locke,* 529 U.S. at 115-116. May 23 Motion at 20.

D.     Federal Law Expressly Forbids Requiring State Pilots on Coastwise Vessels

The Commonwealth's pilotage requirement, to the extent it applies to coastwise vessels, is expressly forbidden by federal statute.[11] 46 U.S.C. § 8501. This Court thus confronts a situation not present in *Locke* in which a state has not only strayed into previously litigated prohibitions against the field-preempted elements of the federal Ports and Waterways Safety Act, but has also defied a clear statutory command that a state "may not adopt a regulation that requires a coastwise vessel to take a pilot licensed or authorized by the laws of a State." Here, the intent of Congress to preempt state action is overt and unequivocal.

E.     Title I PWSA Preemption Analysis Nullifies State Tug Escort and Vessel Routing Requirements

All but two elements of the Massachusetts Oil Spill Act are readily dispatched under the field preemption holdings of *Locke* and *Ray*. However, requirements concerning tug escorts and vessel routes appear to fall more comfortably in the conflict preemption analysis applied by Supreme Court under Title I of PWSA. In *Ray,* the Supreme Court distinguished sharply between the overtly preemptive nature of the mandatory ("the Secretary shall. . .") provisions of Title II PWSA and the discretionary nature ("the Secretary may . . .") of the traffic management elements of Title I PWSA. *Ray* at 171-172. While the subject matters of Title II PWSA are definitionally preemptive, tug escorts and related traffic management provisions must be

---

[11]     Coastwise vessels are U.S.-flag vessels that meet citizenship and other federal requirements for trade between U.S. ports. While not all members of the Maritime Intervenor organizations are engaged in coastwise trades, and hence are subject to state pilotage requirements (for example, many of the vessels represented by the Maritime Intervenors are either foreign-flag vessels or are U.S. flag vessels operating in foreign trades who were lawfully subject to state pilotage requirements even before the enactment of the Massachusetts Oil Spill Act), virtually all the tug -and -barge traffic serving or transiting Massachusetts waters is coastwise-eligible tonnage not otherwise subject to state pilotage requirements except by assertion of that requirement in the challenged state statute.

examined to determine whether the federal government has established a presence in the field.[12]

Although *Ray* did not expressly address the sort of vessel routing mandates that Massachusetts

here seeks to assert, Title I PWSA makes express reference to "vessel routing schemes."  33

U.S.C. § 1223.

In *Ray*, a challenged Washington State tug escort requirement was upheld in the absence

of federal regulations on the point.  *Ray* at 172-173.  The *Ray* Court acknowledged that "It may

be that rules will be forthcoming that will pre-empt the State's present tug-escort rule, but until

that occurs, the State's requirement need not give way under the Supremacy Clause."  *Ray,* 435

U.S. at 172.  Thus, in Title I matters, where states and local governments confront a federal

vacuum and where considerations arising from peculiarities of local waters that call for special

precautionary measures" may be in play, states and localities have some latitude to act without

awaiting federal action.

The implication of distinctions between Title I and Title II PWSA analysis is that the

Massachusetts tug escort and vessel routing requirements cannot be resolved by simple reference

to the subject matters of the state law.   Because Title I PWSA permits, but does not mandate,

federal action in areas relating to traffic management, the Supreme Court has permitted states to

deal with traffic management issues, if they so choose, up to the point at which the federal

---

[12]      In 1998, using mandatory terms, Congress directed that the Coast Guard "shall promulgate regulations" addressing "towing vessel and barge safety for the waters of the Northeast."  Pub.L. 105-383 § 311 (b)(1)(A).  This statute provides a basis for distinguishing *Ray*'s 1978 categorization of tug escorts as Title I PWSA subject matters and the review by this court of similar measures.  The same result - a finding of federal preemption requiring withdrawal of the asserted state authority - follows from either analysis.

government asserts its discretionary authority.[13]  The "relevant inquiry for Title I preemption" has been described by the Supreme Court as "whether the Coast Guard has promulgated its own requirement on the subject or has decided that no such requirement should be imposed at all." *Locke,* 529 U.S. at 109, citing to *Ray*, 435 U.S. at 171-172.

The Title I PWSA preemption analysis as it applies to Massachusetts law governing tug escorts and vessel routes is controlled by an extensive Coast Guard record of acting in these arenas.  The Coast Guard, at 33 C.F.R. § 165.100, has imposed differential tug escort requirements for towed tank vessels in New England waters.  The federal approach to this subject has been to exempt from tug escort requirements tank barges of up to 10,000 barrel capacity if the towing vessel meets certain criteria.   The Coast Guard's regulatory judgment, as reflected in the cited regulations, differs from that of the Commonwealth.  The latter authority must step aside in the face of lawful federal action.

Similarly, the Coast Guard has exercised its lawful authority to recommend routes for vessels transiting certain Massachusetts waters that are subject to vessel routing provisions of the

---

[13]      This indulgence for state action prior to federal intervention reflects an awareness that traffic management issues are sometimes affected by "the peculiarities of local waters that call for special precautionary measures."  435 U.S. at 171.  This phrase is one that has roots in *Cooley v. Board of Wardens of the Port of* Philadelphia, 59 U.S. 299 (1852).  Although *Locke* and *Ray* allude to such conditions, their impact on preemption analysis is minimal unless there is a vacuum of federal discretionary activity.  In testimony supporting the challenged state legislation, it was suggested that positing the existence of "peculiarities of local waters that require special precautionary measures" might justify state action even in field preempted Title II PWSA subject matters.  If raised here, such an argument will require reference back to the context of *Ray*'s discussion of state action where no federal action had occurred.  *Ray,* 435 U.S. 151 at 171.  In any event, it should not be assumed that Coast Guard actions under Title I are devoid of local content.  The Coast Guard has promulgated extensive "site-specific" navigational requirements. For example, 33 C.F.R. Part 161 sets forth operating requirements for New York, Louisville, Houston/Galveston, Berwick Bay, St. Mary's River, San Francisco, Puget Sound, and Prince William Sound.  The Coast Guard has promulgated special operating regulations for over 40 U.S. waterways (33 C.F.R. Part 162) and regulated navigation and limited access areas for approximately 100 geographic areas, including the waters of Massachusetts and other New England states (33 C.F.R. Part 165).  We note the significant level of local detail in federal regulations in anticipation of efforts by the Commonwealth to justify its constitutional incursions by arguing that local variations somehow dilute the pervasive preemptive impact of federal marine safety and environmental protection programs.

Oil Spill Act.  Massachusetts attempts to overturn the Coast Guard decision by purporting to make mandatory the federal recommended routes.

In both of these elements of Massachusetts legislation where it can be contended that the discretionary nature of Title I PWSA may leave state authorities with some degree of freedom to establish standards and requirements in the absence of federal activity, there has been significant and conflicting federal activity over a period of several years.  While the Commonwealth may have ideas of vessel safety that diverge from those of the lawful federal authority charged with regulation of vessel traffic routes, Massachusetts is no more free than the State of Washington or any other non-federal unit of government in the United States to shoulder aside federal judgments lawfully made.  Coast Guard review of vessel safety and marine environmental protection is an ongoing process.  The Commonwealth, rather than grasping at federal authority, should participate actively in the discussion and development of meaningful federal standards.

## IV.    CONCLUSION

By invading an area of federal supremacy, the Commonwealth unlawfully has imposed safety and environmental risks as well as direct economic costs on plaintiffs in the form of increased crew costs, fees for escort tug services and pilotage fees, all of which are incompatible with controlling federal law and regulations and none of which can be recovered from the Commonwealth.  The Commonwealth, by legislating in an area so densely occupied by federal requirements, degrades a complex and extensive safety and environmental protection system that relies for its efficacy on uniformity of application between the states of the Union and between the United States and other maritime nations of the world

Massachusetts statutory requirements affecting the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification and manning of tank vessels are

preempted by operation of the Supremacy Clause and federal statutes. Massachusetts statutory requirements addressing tug escort and vessel route requirements are preempted by the establishment of federal standards in these subject matters. Massachusetts requirements that coastwise vessels take pilots in Massachusetts waters are expressly forbidden by federal statute.

The American Waterways Operators, the International Association of Independent Tanker Owners (INTERTANKO), the Chamber of Shipping of America, and BIMCO respectfully move the Court, for reasons stated here and in the May 23 motion and memoranda of the United States of America, to issue an order declaring all of the identified provisions of Massachusetts law to be violative of the federal/state relationships contemplated by the Constitution. We also seek entry of an order enjoining all future enforcement of these state provisions.

Respectfully submitted,

| | |
|---|---|
| C. Jonathan Benner | /s/ Andrew J. Hachey |
| Sean T. Connaughton | George J. Skelly (BBO #546797) |
| David E. Benz | Andrew J. Hachey (BBO #567183) |
| TROUTMAN SANDERS LLP | NIXON PEABODY LLP |
| 401 9TH Street, NW., Suite 1000 | 100 Summer Street |
| Washington, DC  20004 | Boston, MA  02110 |
| Tel:  (202) 274-2880 | Tel:  (617) 345-1000 |
| Fax: (202) 654-5647 | Fax: (617) 345-1300 |

*Of Counsel*

*Attorneys for The American Waterways Operators, International Association of Independent Tanker Owners, Chamber of Shipping of America, and BIMCO*

Dated:  June 23, 2005