UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES OF AMERICA, *et al.*,      )
                                        )
                    Plaintiff,          )
                                        )
    v.                                  )          Civil Action No. 05-10112-JLT
                                        )
COMMONWEALTH OF                          )
MASSACHUSETTS, *et al.*,                 )
                                        )
                    Defendants.         )
_____)

**STATE DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF ITS
CROSS-MOTION FOR SUMMARY JUDGMENT**

THOMAS F. REILLY
ATTORNEY GENERAL

Nora Chorover, BBO# 547352
Pierce O. Cray, BBO# 104630
Assistant Attorneys General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
nora.chorover@ago.state.ma.us
pierce.cray@ago.state.ma.us

Dated:  July 12, 2005

# TABLE OF CONTENTS

I.     RELEVANT BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.     Federal Regulation of Post-Accident Alcohol Testing . . . . . . . . . . . . . . . . . . . . 2

    B.     The Buzzards Bay Oil Spill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.     The Massachusetts Oil Spill Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.     THE COMMONWEALTH IS ENTITLED TO SUMMARY JUDGMENT
        BECAUSE THE COAST GUARD'S NEARLY SEVEN YEAR DELAY IS
        UNREASONABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.     The Coast Guard Has Not Satisfied its Express Statutory Duty to Establish
            Procedures that Ensure Alcohol Testing Within Two Hours of a Serious
            Marine Casualty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        2.     The Statutory Language Indeed Requires the Coast Guard to Adopt a Final
            Rule, Which it Has Not Done . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        3.     Alternatively, Having Commenced a Rulemaking Process to Implement
            the Statute, the Coast Guard is Obligated to Finalize It With Reasonable
            Dispatch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        4.     The Coast Guard's Delay is Facially Unreasonable . . . . . . . . . . . . . . . . 11

        5.     The Circumstances Surrounding the Present Rulemaking Magnify the
            Seriousness of the Coast Guard's Extended Delay . . . . . . . . . . . . . . . . 14

    B.     PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE IT
        HAS NOT DEMONSTRATED THE ABSENCE OF ANY DISPUTED
        MATERIAL FACT CONCERNING THE REASONABLENESS OF ITS
        PROTRACTED DELAY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## TABLE OF AUTHORITIES

**CASES**                                                                                   **Pages**

Action Alliance of Senior Citizens v. Heckler,
789 F.2d 931 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Air Line Pilots Ass'n Intl. v. Civil Aeronautics Bd.,
750 F.2d 81 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

American Rivers and Idaho Rivers United,
372 F.3d 413 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

American Hosp. Ass'n v. Bowen, 834 F.2d 1037 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . 10

Berkovitz v. Home Box Office, Inc., 89 F.3d 24, 29-30 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . 16

Carmona v. Toledo, 215 F.3d 124 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Cobell v. Norton, 240 F.3d 1081 (D.C. Cir 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Cutler v. Hayes, 818 F.2d 879 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13, 15

Fund for Animals v. Norton, 294 F. Supp. 2d 92 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . 11, 12

In re: Bluewater Network, 234 F.3d 1305 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14

In Re: International Chemical Workers Union,
958 F.2d 1144 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

In Re: Monroe Communications Corp., 840 F.2d 942 (D.C. Cir.1988) . . . . . . . . . . . . . . . . . 6, 15

Mashpee Wampanoag Tribal Council, Inc. v. Norton,
336 F.3d 1094 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

MCI Telecommunications Corp. v. F.C.C., 627 F.2d 322 (D.C. Cir. 1980) . . . . . . . . . . . . . . . 11

Midwest Gas Users Ass'n v. F.E.R.C., 833 F.2d 341, 359 (D.C. Cir. 1987) . . . . . . . . . . . . . . 11

Muwekma Tribe v. Babbitt, 133 F. Supp. 2d 30 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . 12

National Organization of Veterans' Advocates, Inc. v.

Secretary of Veterans' Affairs, 260 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 10

Norton v. So. Utah Wilderness Alliance, 124 S.Ct. 2372 (2004) . . . . . . . . . . . . . . . . . . . . . . . 8

Oil, Chemical & Atomic Workers Int'l v. Zegeer, 768 F.2d 1480 (D.C. Cir. 1985) . . . . . . . . . 11

Potomac Electric Power, 702 F.2d 1026 (D.C. Cir 1983) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Pub. Citizen Health Research Group v. Auchter, 70 F.2d 1150 (D.C. Cir. 1983) . . . . . . . . . . . 12

Public Citizen Health Research Group v. Brock, 823 F.2d 626 (D.C. Cir. 1987) . . . . . . . . . . . 12

Public Citizen Health Research Group v. Commissioner,
724 F.Supp. 1013 (D.D.C. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Telecommunications Research and Action Center v.
Federal Communications Comm'n, 750 F.2d 70 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . 13, 15

United Steelworkers of Am. v. Rubber Mfrs. Ass'n,
783 F.2d 1117 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Williams v. Hanover Housing Authority, 871 F.Supp. 527 (D. Mass.1994) . . . . . . . . . . . . . . . 10

## STATUTES

5 U.S.C. § 553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5 U.S.C. § 555(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

5 U.S. C. § 706(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

46 U.S.C. § 2303a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Oil Pollution Act of 1990, § 4110 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

2004 Mass. Acts 251 (Aug. 4, 2004, as amended by
2004 Mass. Acts 457, § 1 (Dec. 30, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Mass. G.L. c. 21M, § 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 15

## RULES AND REGULATIONS

46 C.F.R. § 4.06-20(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9

46 C.F.R. § 4.06-20(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9

46 CFR § 4.06 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

68 Fed. Reg. 9622 (Feb. 28, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9

67 Fed. Reg. 58515 (Sept. 17, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

69 Fed. Reg. 62427 (Oct. 26, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 26(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

Fed. R. Civ. P. 26(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

Fed. R. Civ. Pro. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed. R. Civ. Pro. 56(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16, 17

## OTHER AUTHORITIES

1 Pierce, Adm Law Treatise 342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

105 S. Rpt. 246 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**STATE DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

The Coast Guard Authorization Act of 1998 requires the agency to establish certain procedures for alcohol testing following a serious marine casualty.  46 U.S.C. § 2303a  Almost seven years have passed since passage of this legislation, with no final rule yet issued.  This delay is facially unreasonable, and the circumstances surrounding it support a finding that the Coast Guard violated the Administrative Procedure Act.  The seriousness of the Coast Guard's delay is magnified by the public protection nature of the regulation at issue and the agency's own efforts to nullify an analogous state alcohol testing provision.  While the Coast Guard now states that it *"could"* finalize a rule by the end of 2005, it does not commit to do so.  If left unrectified, the Coast Guard's position threatens to create a regulatory "no-man's land" of unabated risk.

The Court should therefore deny Plaintiff's Motion for Summary Judgment as to Defendants' Counterclaim, allow the State Defendants' Cross-Motion, and require the Coast Guard to fulfill its statutory duty by a date certain.  In the alternative, the Court should either

-1-

deny plaintiff's motion or continue it pursuant to Fed. Rule Civ. Pro. 56(f) because the State

defendants have not had adequate opportunity to discover facts essential to oppose it.

## I.    RELEVANT BACKGROUND

### A.    Federal Regulation of Post-Accident Alcohol Testing

Unhappy with the failure of the Coast Guard and marine employers to conduct alcohol

testing following serious marine casualties, Congress in 1998 set forth its own alcohol testing

requirements and directed the Coast Guard to implement them.  *See* Pub. L. No. 105-383, Title

III, § 304(d)(1), 112 Stat. 3419, *codified as* 46 U.S.C. § 2303a.  This legislation followed

publication of a May 5, 1998 Special Investigation Report ("Report") by the National

Transportation Safety Board ("Safety Board").  Declaration of Richard Packard dated July 11,

2005 ("Packard Declaration") ¶ 2, Exh. 1 (attaching relevant excerpts of Report).  The Report

evaluated post-accident testing for drugs and alcohol in the marine industry[1] and concluded that

existing Coast Guard regulations were inadequate.  *Id*. at 49, 55.   In the Report, the Safety

Board stated that alcohol testing is time sensitive because the body rapidly eliminates alcohol (at

an average rate of about .015 to 0.18 percent by weight per hour), *id.* at 33, n. 28, and that testing

accordingly should occur within two hours of a serious marine incident.  *Id.* at 49, 55.  The

Report also recognized that effective post-accident testing is crucial for evaluating accident

causes, as well as for creating a "deterrent to the use of alcohol . . . by personnel performing

safety-sensitive duties, such as watchstanding."  *Id.* at 43.  Citing numerous incidents where

---

[1]        The Report dealt specifically with a September 27, 1996 accident in which a
Liberian tankship collided with a bridge in Portland, Maine, releasing 4,000 barrels of oil into
Portland's harbor, as well as with the broader issues of drug and alcohol testing in the marine
industry.  *Id*. at v.

post-accident alcohol testing was not properly conducted, *id.* at 25-28, the Report faulted the Coast Guard for failing to "adequately address the industry-wide problem of post accident alcohol and drug testing." *Id.* at 42.

Coast Guard regulations in effect at that time, which continue in place through this day, do not require testing to be performed within two hours. Instead, they allow specimens to be "collected as soon as practicable following the occurrence of a serious marine incident." 46 C.F.R. § 4.06-20(c). The regulations do not even require alcohol test kits to be kept on board vessels, as long as the kits "can otherwise be readily obtained within 24 hours from the time of the occurrence of the serious marine incident." *Id.* § 4.06-20(b). Needless to say, alcohol testing 24 hours after an incident is of little if any use. *See* Packard Decl. ¶ 2, Exh. 1 at 33, n. 28. Thus, the Senate Committee on Commerce, Science and Transportation concluded that "compliance with [current Coast Guard] requirement[s] is inadequate." *105 S. Rpt. 246* at 14 (1998).

Following the Report's publication, Congress enacted 1998 legislation specifying that the Coast Guard "*shall establish* procedures to ensure that after a serious marine casualty occurs, alcohol testing of crew members or other persons responsible for the operation or other safety-sensitive functions of the vessel or vessels involved in such casualty is conducted *no later than two hours* after the casualty occurs." 46 U.S.C. § 2303a(a)(emphasis added). Only where such testing cannot be completed within that time because of safety concerns directly related to the casualty may the testing be delayed, and in no event may it occur more than 8 hours after the casualty. *Id.* § 2303a(b).

-3-

Almost seven years have now passed since Congress directed the Coast Guard to require meaningful alcohol tests following serious marine casualties, and the agency has not yet complied with the statutory mandate.  In 2002, the National Transportation Safety Board reiterated the importance of the Coast Guard's rulemaking by declaring that effective post-accident alcohol testing is the marine-related safety regulation that is "Most Wanted" to reduce marine transportation accidents and save lives.  National Transportation Safety Board ("NTSB") *Most Wanted Transportation Safety Improvements 2004-2005:  Critical Changes Needed to Reduce Transportation Accidents and Save Lives (Brochure"),* attached as Exh. 2 to Packard Decl.; NTSB, *Memorandum:  Most Wanted Transportation Safety Improvements -  Federal Issues ("Memorandum"),* attached as Exh. 3 to Packard Decl.  Although the agency issued a proposed rule more than two years ago that would require such testing, 68 Fed. Reg. 9622 (Feb. 28, 2003), it has yet to issue a final rule, and states only that "final regulations *could* be published before the end of 2005."  Rabe Decl. ¶ 18 (emphasis added).  At least part of the Coast Guard's delay seems to have stemmed from the agency's concern about the "cost impact" of the testing requirement on the shipping industry (because compliance with the two-hour rule "would likely require carriage of alcohol testing equipment on the great majority of vessels"), Declaration of W. Douglas Rabe, ¶ 8, even though cost impact on the shipping industry appears no where in the underlying statute as a relevant consideration.  46 U.S.C. § 2303a.[2]

---

[2]     The absence of cost as a qualifying factor is not surprising given the timing of Section 2303a's enactment immediately after the Report, which had severely criticized the industry's existing (and perhaps cost-driven) inadequate testing procedures.  Packard Decl., Exh. 1 at 25-28, 42.  Section 2303a is a mandate to require testing *regardless* of cost.

-4-

This is not the first time that the Coast Guard has ignored a clear Congressional mandate to take action to reduce the likelihood of environmentally devastating oil spills. The agency was thus eleven years late in complying with an explicit legislative directive meant to help prevent another spill like the 1989 incident involving the Exxon Valdez. Section 4110 of the Oil Pollution Act of 1990,[3] requires the Coast Guard to establish minimum compliance standards and use requirements for oil pressure monitoring devices on oil transportation vessels. These tank level and pressure monitoring devises (or "TLPMs") alert the crew when drops in the oil level occur, and thus help to avert catastrophic leaks. Despite statutory language requiring the regulations to be in place by August 1991, the agency failed to pursue rulemaking, in "blatant violation of the statute." *In re: Bluewater Network,* 234 F.3d 1305, 1307 (D.C. Cir. 2000). It took a citizen lawsuit and a court order before the agency finally promulgated its rule in September 2002, eleven years late. 67 Fed. Reg. 180, 58515-58524 (Sept. 17, 2002); *see Bluewater Network*, 234 F.3d 1305.

The Coast Guard is also moving too slowly on rulemaking to require tug escorts and navigation routes in Buzzards Bay. In September 2003, experts convened by the Coast Guard suggested that these measures would reduce the risk of further oil spills in Buzzards Bay. *See* Advance Notice of Proposed Rulemaking on Navigation and Waterways Management Improvements, Buzzards Bay, MA, 69 Fed. Reg. 206, 62427, 62428 (October 26, 2004). Rear Admiral V.S. Crea indeed assured members of the Congressional Delegation in October 2003 that the Coast Guard would take appropriate action to implement these measures, and "expedite

---

[3]    Pub. L. No. 101-380, 104 Stat. 484 (1990)

them through the regulatory process if appropriate."  October 31, 2003 Letter from V.S. Crea,

Rear Admiral, U.S. Coast Guard to the Honorable Edward M. Kennedy, the Honorable John F.

Kerry, the Honorable Willam D. Delahunt, the Honorable James P. McGovern and Honorable

Barney Frank (attached to Packard Decl. as Exhibit 5).  Despite these assurances, the agency has

yet even to formally propose a rule addressing these measures.  Almost one year ago it issued an

"Advanced Notice of Proposed Rulemaking" inviting comment, but has not taken further

regulatory action.  As the D.C. Circuit recognizes, an advanced notice of proposed rulemaking is

"the least responsive course short of inaction."  *In re: Monroe Communications Corporation*,

840 F.2d 942, 946 (D.C. Cir. 1988).  Given its past history, there is good reason to expect that

the Coast Guard will unreasonably delay finalizing rules on these important safety measures as

well.

### B.     The Buzzards Bay Oil Spill

The scenic coastline of Buzzards Bay includes sandy beaches, productive shellfish beds,

and valuable wetlands and habitat, all of which justified its designation as an Estuary of National

Significance in 1985.  Packard Decl. ¶ 5.  On the afternoon of April 27, 2003, however, the

Evening Tide, a tugboat operated by Bouchard Transportation Co., approached Buzzards Bay

towing a barge containing four million gallons of thick No. 6 fuel oil.  *Id*. ¶ 6.   With no one at

the helm, the tug veered a quarter mile to the left of the green buoy that marks the entrance to

Buzzards Bay and its barge struck an underwater ledge.  *Id*. ¶ 7.  The vessels then traveled no

less than 15 miles after the accident, creating a 10-mile long slick.  *Id*. ¶ 8.  In all, an estimated

98,000 gallons of oil spilled from the 12-foot by 2-foot gash in the second starboard

compartment of the barge.  *Id*. ¶ 9.  In the ensuing days, unsettled weather, choppy seas, and

ever-changing winds brought portions of the slick to every municipality around Buzzards Bay, with new oil landing ashore each day for more than a week. *Id*. ¶ 10. Hundreds of birds – loons, cormorants, endangered roseate terns, many of them arriving for nesting season – perished, and shellfish beds closed for months. *Id*. ¶ 11.

After the spill, there was intense concern expressed by members of the public and members of the Massachusetts Legislature regarding the adequacy of Coast Guard procedures related to the spill. For example, the Standard Times reported on July 1, 2003 that local officials were frustrated with the fact that alcohol tests were not performed on the tugboat crew until a full 18 hours after the incident. Packard Decl. ¶ 13, Exh. 6 (Standard Times, *Drug, alcohol test delay frustrates local officials* (July 1, 2003).

Bouchard Transportation Company has since pled guilty to federal criminal charges and been fined $10 million by the United States as a result of the spill. Packard Decl. ¶ 12.

### C.    The Massachusetts Oil Spill Act

On August 4, 2004, in the wake of the Bouchard spill, the Commonwealth enacted the Oil Spill Act, at least in part to fill the regulatory vacuum left by the Coast Guard's failure to regulate oil transportation in Massachusetts waters appropriately. 2004 Mass. Acts 251 (Aug. 4, 2004, as amended by 2004 Mass. Acts 457, § 1 (Dec. 30, 2004)). The Act requires, among other things, alcohol testing within the time periods set forth in 46 U.S.C. § 2303a. Mass. G.L. c. 21M, § 3.

Instead of fulfilling its obligation to adopt a final regulation complying with the Congressional mandate, the Coast Guard is now seeking, through this lawsuit, to nullify the

alcohol testing provision of the Oil Spill Act. This effort, if successful, will eliminate the only existing protection from the Coast Guard's continuing inaction.

## II.    ARGUMENT

### A.    THE COMMONWEALTH IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE COAST GUARD'S NEARLY SEVEN YEAR DELAY IS UNREASONABLE.

#### 1.    The Coast Guard Has Not Satisfied its Express Statutory Duty to Establish Procedures that Ensure Alcohol Testing Within Two Hours of a Serious Marine Casualty.

Congress has explicitly required the Coast Guard to "establish procedures to ensure" two-hour post-accident testing for alcohol. 46 U.S.C. § 2303a(a)(Coast Guard "shall establish procedures to ensure"). The United States indeed concedes that the Coast Guard "is required to 'establish procedures'" in this regard.[4] Plaintiff's Summary Judgment Memo at 11, n.12 (quoting statute).

There can be no serious dispute that the Coast Guard has yet to satisfy its explicit obligation to "establish procedures." Plaintiff argues half-heartedly that the Coast Guard satisfied its mandatory duty under the statute when it issued an internal February 11, 1999 Policy Guidance on post-accident chemical testing. *See* Plaintiff's Summary Judgment Memo at 11, citing Exhibit 1 to Rabe Declaration ("Policy Guidance"). This contention is inconsistent with the agency's own statement in that very Policy Guidance that "implementation of [the statutorily

---

[4]Plaintiff's reliance on *Norton v. Southern Utah Wilderness Alliance ("SUWA")*, 124 S.Ct. 2373 (2004) is therefore misplaced. *See* Plaintiff's Summary Judgment Memorandum at 6, 11. The Commonwealth in this case, unlike the plaintiff in SUWA, asserts that the Coast Guard failed to take a *discrete* action (establishment of procedures to ensure post-accident alcohol testing within 2 hours) that it is *required to take* (*see* 46 U.S.C. § 2303a).

mandated] procedures *will require new regulations*." *Id.* (emphasis added).  The Policy

Guidance is merely an internal interpretive memorandum from the Coast Guard Commandant's

Office of Investigations and Analysis to Coast Guard offices, commands and districts.  It has no

binding effect on regulated entities actually navigating the waterways.  *See* 1 Richard J. Pierce

Jr., *Administrative Law Treatise* 342 ("Pierce Treatise"), 324-25.  It does not even require

adherence to the two-hour testing requirements set forth in the Coast Guard Authorization Act.

It instead merely asks the recipients to "ensure that alcohol tests are conducted within this

timeframe *whenever possible*."   Policy Guidance, Rabe Decl., Exh. 1.  Its terms do not – and are

not intended to – "ensure" that the required testing procedures are followed, as the statute

explicitly requires.  46 U.S.C. § 2303a(a).

Even if worded differently, the Policy Guidance would not satisfy the Coast Guard's

statutory mandate, because it cannot supersede the agency's existing regulations, which allow

testing procedures that the Coast Guard acknowledges are inconsistent with the statute.[5]  46

C.F.R. §§ 4.06-20(b)-(c).  As this Court has recognized, guidance documents do not have the

---

[5]        As the agency acknowledged in its February 28, 2003 Notice of Proposed
Rulemaking:

> The current regulations . . . require marine employers to take all practicable steps after a
> serious marine incident (SMI) to ensure that chemical testing is conducted.  The
> regulations do not specify a time requirement for completing the tests for alcohol or for
> dangerous drugs following an SMI.  Without a specified timeframe to conduct alcohol or
> drug testing after an SMI, in some instances tests were not conducted, and in other
> instances tests were not completed soon enough for the results to provide a determination
> of whether alcohol was present in an individual's system at the time the SMI occurred.

68 Fed. Reg. 40, 9622 (Feb. 28, 2003); *see* 46 C.F.R. § 4.06.

force of law and do not trump substantive agency regulations. *Williams v. Hanover Housing Authority*, 871 F.Supp. 527, 532 n.4 (D. Mass.1994)(Young, J.).

### 2.    The Statutory Language Indeed Requires the Coast Guard to Adopt a Final Rule, Which it Has Not Done.

Congress' inclusion of the word "ensure" in the statutory provision[6] makes clear that it intended the procedures for alcohol testing to be binding on regulated entities in a manner which generally requires notice and comment rulemaking pursuant to the Administrative Procedure Act. 5 U.S.C. § 553. *See* Pierce Treatise at 324-25 ("a legislative rule . . . binds members of the public," while "interpretive rules are not binding . . . on members of the public"); *see also National Organization of Veterans' Advocates, Inc. v. Secretary of Veterans' Affairs*, 260 F.3d 1365, 1375 (Fed. Cir. 2001); *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044-45 (D.C. Cir. 1987). Moreover, since current Coast Guard regulations conflict with the statute, the statutory requirement to "establish procedures" for two-hour testing is, in that context, a statutory requirement to amend those regulations. *See* Pierce Treatise at 342 ("Since the prior legislative rule has the force of law, it can only be amended by another rule that has the force of law"). While Congress has thus mandated promulgation of a regulation, it is undisputed that the Coast Guard has not yet done so. Rabe Decl. ¶ 18.

_____

[6]The Coast Guard "shall establish procedures to ensure . . . ." 46 U.S.C. § 2303a(a).

-10-

3.    **Alternatively, Having Commenced a Rulemaking Process to Implement the Statute, the Coast Guard is Obligated to Finalize It With Reasonable Dispatch.**

The Administrative Procedure Act imposes a separate mandatory duty on an agency to avoid "unreasonable delay" of ongoing rulemaking.  5 U.S.C. §§ 555(b), 706(1).  Once an agency determines to promulgate a regulation, it becomes bound by the APA to proceed with "with reasonable dispatch."  *Cutler v. Hayes*, 818 F.2d 879, 895 (D.C. Cir. 1987); *Public Citizen Health Research Group v. Comm'r of Food and Drug Administration,* 724 F.Supp. 1013, 1019-20 (D.D.C. 1989); *see also Oil, Chemical & Atomic Workers Int'l v. Zegeer,* 768 F.2d 1480, 1485 (D.C. Cir. 1985) .

The United States concedes here that the Coast Guard decided in late 1998 or early 1999 to implement Congress's testing mandate through notice and comment rulemaking.  Memorandum of United States in Support of Motion for Summary Judgment on Counterclaim ("US Summary Judgment Memorandum") at 3;  Rabe Decl. ¶ 4.   As discussed below, the nearly seven year delay in issuing a final rule on alcohol testing is manifestly *un*reasonable and violates the APA.

4.    **The Coast Guard's Delay is Facially Unreasonable.**

In evaluating agency delay, courts follow a "rule of reason."  *Potomac Electric Power*, 702 F.2d 1026, 1034 (D.C. Cir. 1983).  While the APA does not set clear temporal boundaries defining "unreasonable delay," the nearly seven year delay that has occurred "smacks of unreasonableness on its face."  *Fund for Animals v. Norton,* 294 F. Supp. 2d 92, 113 (D.D.C. 2003)(citation omitted).  This is because "a reasonable time for an agency decision could encompass 'months, occasionally a year or two, but not several years or a decade.'" *Midwest*

-11-

*Gas Users Ass'n v. F.E.R.C.,* 833 F.2d 341, 359 (D.C. Cir. 1987)(quoting *MCI*

*Telecommunications Corp. v. F.C.C.,* 627 F.2d 322, 340 (D.C. Cir. 1980). In *American Rivers*

*and Idaho Rivers United,* the D.C. Circuit in fact concluded that a six-year delay was

unreasonable. 372 F.3d 413, 419 (D.C. Cir. 2004). The same Court also called into question

similar delays in other cases. *See, e.g., Public Citizen Health Research Group v. Brock,* 823

F.2d 626, 629 (D.C. Cir. 1987)(six-year delay "tread[ed] at the very lip of the abyss of

unreasonable delay."); *Air Line Pilots Ass'n Intl. v. Civil Aeronautics Bd.*, 750 F.2d 81, 86 (D.C.

Cir. 1984); *Pub. Citizen Health Research Group v. Auchter,* 702 F.2d 1150, 1157-59 (D.C. Cir.

1983)(per curiam)(three-year delay unreasonable); *MCI Telecommunications Corp. v. FCC,* 627

F.2d at 324-25 (four-year delay unreasonable); *see also Fund for Animals*, 294 F. Supp. 2d at

113 (five-year delay unreasonable). Extensive or repeated delays are thus "unacceptable and

will not justify the pace of action." *Muwekma Tribe v. Babbitt,* 133 F. Supp. 2d 30, 36 (D.D.C.

2000) (citations omitted). This is so because such delay creates uncertainty, may undermines

the statutory scheme, and "saps the public confidence in an agency's ability to discharge its

responsibilities." *Cutler v. Hayes*, 818 F.2d at 896-97 n. 151, *quoting Potomac Electric Power*

*Co. v. ICC,* 702 F.2d at 1034.

     The present rulemaking does not involve issues so complex as to justify an effort

spanning over almost seven years. Indeed, the matters involved here are much simpler than

those involved in many other rulemakings. Of the 118 different comments submitted in response

to the Coast Guard's February 28, 2003 Notice of Proposed Rulemaking on post-accident

alcohol testing, 113 are from industry, and 91 of those comments complain of direct or indirect

costs associated with the proposed rule. *See Department of Transportation Docket No. 8773 at:*

*dms.dot.gov/search*.  The comments do not address complex issues.  *Id.*  Most of the comments

argue against requiring testing equipment to be present on board individual vessels, advocating

for the less costly (and often far less timely) method of third party testing instead.  *Id.*

In short, the benefits of "agency expertise . . . will not be realized if the agency never

takes action."  *Telecommunications Research and Action Center v. Federal Communications*

*Comm'n,* 750 F.2d 70, 79 (D.C. Cir. 1984); *In Re: International Chemical Workers Union*, 958

F.2d 1144, 1149 (D.C. Cir. 1992).  While the Coast Guard is certainly entitled to some discretion

in carrying out its obligations, deference "does not require courts to turn a blind eye when

government officials fail to discharge their duties."  *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C.

Cir. 2001)(affirming finding that agency delay was unreasonable).   Moreover, there need be no

"impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably

delayed."  *TRAC,* 750 F.2d at 80 (citations omitted).  The Court should find that the uncontested

fact of the nearly seven year time period is *per se* an "unreasonable delay" within the meaning of

section 706(1) of the Administrative Procedure Act, and on that ground alone deny plaintiff's

Motion and allow the State defendants' Cross-Motion.[7]

---

[7]     The United States claims that the Commonwealth's counterclaim is moot to the
extent it addresses delays before the Coast Guard's issuance of a proposed rule in 2003.
However, no part of the Commonwealth's claim is in fact moot.  In evaluating agency delay,
courts traditionally examine agency action from the date "the agency came under a duty to act."
*Cobell v. Norton,* 240 F.3d at 1096 (citation omitted); *In re: International Chemical Workers*
*Union,* 958 F.2d at 1149; *Cutler v. Hayes*, 818 F.2d at 897.   Here, that would be the date of
Section 2303a's enactment in October 1998 (or under the Commonwealth's alternative theory in
Section II(A)(3), above, February 1999, the date that the Coast Guard decided to proceed by
rulemaking).  Unlike the complaint in *United Steelworkers of Am. v. Rubber Mfrs. Ass'n*, relied
on by plaintiff, the Commonwealth's counterclaim seeks declaratory or injunctive relief with
respect to the *final* rule*,* rather than the *proposed* rule.  783 F.2d 1117, 1120 (D.C. Cir.
1986)(petition for writ of mandamus sought, *inter alia*, order requiring agency to issue Notice of
Proposed Rulemaking within 30 days).  It is uncontested that no final rule has yet been issued.

-13-

> **5.    The Circumstances Surrounding the Present Rulemaking Magnify the Seriousness of the Coast Guard's Extended Delay.**

Undisputed facts regarding the context that the Coast Guard's delay arises in confirm its unreasonableness.  Agency delay is thus less tolerable when public health or welfare is at stake than when the rulemaking affects purely economic interests.  *In re Bluewater Network,* 234 F.3d at 1315 (finding unreasonable Coast Guard's delay in implementing Oil Pollution Act of 1990).  Here, as in *Bluewater Network*, the Coast Guard's failure to take action is interfering with the public protection purposes of federal oil spill legislation.   Without adequate alcohol testing, the risk of serious marine incidents, including those resulting in oil spills, is much greater.  Packard Decl. ¶¶ 3, 4, Exhs. 2, 3.   The NTSB has accordingly made this rule-making its "Most-Wanted" marine related regulatory action to prevent serious marine incidents and save lives.  *Id.*  The two-hour alcohol testing requirement will deter crew members or other persons responsible for the operation or other safety sensitive functions on marine vessels from consuming alcohol on the job, thereby helping to prevent those who drink on duty from endangering public safety and welfare.  Packard Decl. ¶ 2, Exh.1 at 43.  It also will give the Coast Guard and other regulators valuable information to evaluate the role that alcohol plays in causing serious marine incidents.  *Id.*  This crucial data is currently lacking.

The failure of the Coast Guard to ensure adequate testing has thus impaired its ability to prevent recurrence of events like the devastating Buzzards Bay Oil Spill of 2003.  In light of the

---

Nor is the other case relied on by plaintiff for this argument on point.  *Action Alliance of Senior Citizens v. Heckler* does not involve a proposed rule at all.  There, the court explicitly recognized that the agency had taken all administrative steps within its authority, and was not withholding any action.  789 F.2d 931, 943 (D.C. Cir. 1986).  This is not the case here.

-14-

unreasonableness of the Coast Guard's extended delay to date, there is little reason to hope that the agency will finalize the rule by the end of this year. *See* Rabe Decl. ¶ 18 (stating only that rule "could" be finalized by end of 2005). Moreover, the Coast Guard concedes that this rulemaking is of relatively low priority, and that other projects considered to be of higher priority may delay a final rule even further. Rabe Decl. ¶¶ 16, 18.[8] The Coast Guard's concurrent efforts to nullify the Commonwealth's Oil Spill Act through the Complaint in this action exacerbate the delay's unreasonableness and threaten to create a regulatory no-man's-land of unabated risk. The Oil Spill Act was enacted in part to fill in the regulatory gap left by the Coast Guard's inaction, and it contains a provision consistent with the underlying federal statutory requirement for alcohol testing. Mass. G.L. c. 21M, § 3. As the District of Columbia Circuit has stated, the lack of "alternative means of eliminating or reducing the hazard necessarily adds to unreasonableness of a delay." *Cutler v. Hayes*, 818 F.2d at 898. In this case, the Coast Guard *itself* seeks to squash the only effective alternative means of addressing the

---

[8]     If the Court is persuaded that the Coast Guard's tentative attempts to promulgate a final rule by the end of 2005 (as described in the Rabe Declaration) makes judicial relief unnecessary, then it should retain jurisdiction and scrutinize additional unnecessary slippage of the schedule. Implicit in the courts' authority to "compel agency action unreasonably delayed" is the discretion to determine how soon the agency must act. *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003). Even when a court is unable to conclude that the then-accrued delay has been unreasonable, "it may nevertheless retain jurisdiction over the case in order to monitor the agency's assurances that it is proceeding as diligently as possible with the resources available to it." *Id.; see also TRAC* 750 F.2d at 80. Such retention is especially practicable where, as here, the agency has indicated that "the steps remaining are relatively routine . . . ." *In re: Monroe Communications Corp.,* 840 F.2d at 947, and the agency has conspicuously failed to commit to any definitive date for completing its action. *See* Rabe Decl. ¶ 18.

problem: the Oil Spill Act's alcohol testing provision. The Court should not allow the Coast

Guard to avoid its statutory obligation through preemptive litigation.

   **B.     PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE
            IT HAS NOT DEMONSTRATED THE ABSENCE OF ANY DISPUTED
            MATERIAL FACT CONCERNING THE REASONABLENESS OF ITS
            PROTRACTED DELAY.**

   In a summary judgment motion, the movant bears the burden of "informing the district

court of the basis for its motion, and identifying those portions of the [record] which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S.

317 (1986). Summary judgment should not be granted if there is a genuine issue of material fact

for trial. Fed. R. Civ. Pro. 56(c). If the party opposing the motion establishes that it has not had

an adequate opportunity to conduct discovery to present facts essential to justify its opposition,

the Court may deny the motion or grant a continuance to permit discovery to be taken. *See* Fed.

R. Civ. Pro. 56(f).

   Plaintiff's factual assertions, even if true, as a matter of law are inadequate to justify an

almost seven year delay in promulgating a mandatory and crucially needed regulation. *See*

sections A(1) through A(5), above. The State defendants are accordingly entitled to summary

judgment on their Counterclaim. Even if the Court concludes that the State defendants are not

entitled to summary judgment, however, plaintiff's own for summary judgment should be denied

because the Commonwealth has not had an opportunity to conduct discovery and is unable to

adduce sufficient facts to oppose the motion. *See* Fed. R. Civ. Pro. 56(f); *Carmona v. Toledo*,

215 F.3d 124, 132-33, 135-36 (1st Cir. 2000); *Berkovitz v. Home Box Office, Inc.*, 89 F.3d 24, 29-

30 (1st Cir. 1996). No scheduling conference has yet been held in this case, which is still quite

new, and no Rule 26(f) conference has accordingly occurred. Under Rule 26(d), the parties are

-16-

of course precluded from seeking discovery from any source before the 26(f) conference.  Fed.

R. Civ. P. 26(d).

   If the Court were to deny the State defendants' Cross-Motion for Summary Judgment,

discovery would then be necessary on several issues related to the reasonableness of the Coast

Guard's delay.  The Coast Guard offers the lengthy Rabe Declaration to support its position that

no unreasonable delay has occurred.   Mr. Rabe's allegations raise a number of questions that the

Commonwealth would need to explore through interrogatories, requests for production of

documents, and/or depositions.  Having submitted the Rabe Declaration and made numerous

factual arguments on the basis of it, *see* Plaintiff's Summary Judgment Memorandum at 2-5, the

Coast Guard would be hard pressed now to deny the relevance of the matters it has put into play

(assuming of course, that the Court rejects to *per se* theory underlying the State defendants'

Cross-Motion).  The following is an itemization, included in the accompanying July 11, 2005

Rule 56(f) Affidavit of Nora J. Chorover, of some of the Coast Guard's factual allegations and

the questions they raise for discovery:

> Coast Guard Allegation:  Guidance Letter.  The Coast Guard issued a policy letter to all
> Coast Guard marine safety inspection offices and other commands, bringing to their
> attention the provisions of section 2303a and requesting that they ensure alcohol testing
> be conducted in accordance with section 2303a whenever possible.  Rabe Decl. ¶¶ 4-5.

> > Questions Raised:  What efforts have the Coast Guard offices, commands, and
> > districts made in response to the Guidance?  What has happened as a result of any
> > of these efforts?  What effect have these efforts had on the timing of alcohol
> > testing following a serious marine casualty since the policy letter?

> Coast Guard Allegation:  Complexity of Issues.  The regulatory process at issue here
> involves complex questions.  Rabe Decl. ¶ 8.

> > Questions Raised:  What were the complex issues involved?  What were the
> > qualifications needed to address them?  How much time was needed to address
> > them?  Did these issues include costs?

-17-

<u>Coast Guard Allegation:  Limited Personnel</u>.  Only a limited pool of Coast Guard personnel had the required subject matter expertise to work on the rule.  Rabe Decl. ¶ 9.

> <u>Questions Raised</u>:  What was the subject matter expertise?  Who on staff had the necessary expertise?  What was their availability for the task?

<u>Coast Guard Allegation:  Higher Priority Project</u>.  Work was suspended on the regulation during most of the period from early 1999 through August 2001 because the limited number of personnel qualified to work on the rule were required to work on another, higher-priority regulatory project.  Rabe Decl.  ¶¶ 6, 11.

> <u>Questions Raised</u>:  What was the other project?  Why was it a higher priority?  What was the work plan for its development?  What skills were needed for it?  What time was needed for its completion?  What would the effect on this other project have been if the two rulemakings had proceeded concurrently?

<u>Coast Guard Allegation:  Extensive Comments Submitted</u>.  The Coast Guard received 121 comment letters on the proposed rule, ranging from one to six pages in length.  Rabe Decl. ¶ 15.

> <u>Questions Raised</u>:  How much work was involved in responding to comments?  How many of the letters repeated the same comments as other letters submitted on the proposed rule?  How does the time required for responses to these comments compare to the time required for responses to comments in other Coast Guard rule-making proceedings?

<u>Coast Guard Allegation:  This Rulemaking Has Lower Priority</u>.  The priority of this rulemaking was low relative to other regulatory projects from 2001 to the present.  Rabe Decl. ¶16.

> <u>Questions Raised</u>:  What were the other rulemaking projects that were given higher priority during the years mentioned?  How were the rulemaking projects given their priorities?  Why did the priority of this rulemaking decline in 2005?  What effect does the prioritization have on the timing of the rulemaking?  Which of the other rulemaking projects were Congressionally mandated?

<u>Coast Guard Allegation:  The Final Rule Will Be Published as Quickly as Possible</u>.  The Coast Guard is doing "everything it can," consistent with regulatory realities and priorities, to publish its final rule as quickly as possible.  A final rule "could" be published by end of 2005.  Rabe Decl. ¶¶ 18-19.

> <u>Questions Raised</u>:  What additional actions are necessary before a final rule can be issued?  Who is responsible for those actions?  How much time will each of these actions take?  What competing priorities may interfere with these actions?

-18-

In addition to the questions raised by Mr. Rabe's affidavit, there are other facts relevant to the Coast Guard's delay that the Commonwealth would pursue in discovery, if necessary, as developed in more detail in the Chorover Affidavit.  For example, the Commonwealth would seek information on what occasioned the 16+ month delay since promulgation of the proposed rule, including information on the extent to which the delay was caused by industry objection to costs of the testing.  In addition, the Commonwealth would pursue discovery on how other regulatory projects would have been affected if personnel had not been diverted away from this rulemaking project.

## III.     CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion for Summary Judgment as to the Counterclaim, and grant summary judgment for the State defendants on the Counterclaim.  In the alternative, the Court should either deny plaintiff's motion or continue it because the State defendants have not had adequate opportunity to conduct discovery.

Respectfully submitted,
 */s/ Nora J. Chorover*

THOMAS F. REILLY
ATTORNEY GENERAL

Nora Chorover, BBO# 547352
Pierce O. Cray, BBO# 104630
Assistant Attorneys General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
nora.chorover@ago.state.ma.us
pierce.cray@ago.state.ma.us

Dated:  July 12, 2005