UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.*, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiff, | | |
| v. | | Civil Action No. 05-10112-JLT |
| COMMONWEALTH OF MASSACHUSETTS, *et al.*, | | |
| Defendants. | | |

**AFFIDAVIT OF NORA J. CHOROVER
PURSUANT TO FEDERAL RULE 56(f)**

I, Nora J. Chorover, depose and state as follows:

1.  I am admitted to the bars of the Supreme Judicial Court of Massachusetts, the United States District Court for the District of Massachusetts, and other jurisdictions. I am an Assistant Attorney General for the Commonwealth of Massachusetts, and am one of the attorneys representing the State defendants in this action. I submit this affidavit based upon personal knowledge, pursuant to Federal Rule of Civil Procedure 56(f).

2.  This case was filed by the United States on January 18, 2005. The Commonwealth filed its Answer on March 22, 2005, and filed an Amended Answer and Counterclaim on April 11, 2005.

3.  No scheduling conference has yet been held in this case, and no Rule 26(f) conference has accordingly occurred.

4.  The Commonwealth has not yet sought discovery on issues related to its Counterclaim because Rule 26(d) of the Federal Rules of Civil Procedure preclude the parties from seeking discovery from any source before the 26(f) conference.

5.  If the Court does not agree that the Commonwealth is entitled to Summary Judgment on the Commonwealth's Counterclaim, then the Commonwealth plans to conduct discovery on several issues related to the reasonableness of the Coast Guard's delay.

6.  The Coast Guard offers the lengthy Rabe Declaration to support its position that no unreasonable delay has occurred. Mr. Rabe's allegations raise a number of questions that the Commonwealth would like to explore through interrogatories, requests for production of documents, and/or depositions.

7.  The following is an itemization of some of the Coast Guard's factual allegations and the questions they raise for discovery:

> <u>Coast Guard Allegation: Guidance Letter</u>. The Coast Guard issued a policy letter to all Coast Guard marine safety inspection offices and other commands, bringing to their attention the provisions of section 2303a and requesting that they ensure alcohol testing be conducted in accordance with section 2303a whenever possible. Rabe Decl. ¶¶ 4-5.
>
>> <u>Questions Raised</u>: What efforts have the Coast Guard offices, commands, and districts made in response to the Guidance? What has happened as a result of any of these efforts? What effect have these efforts had on the timing of alcohol testing following a serious marine casualty since the policy letter?
>
> <u>Coast Guard Allegation: Complexity of Issues</u>. The regulatory process at issue here involves complex questions. Rabe Decl. ¶ 8.
>
>> <u>Questions Raised</u>: What were the complex issues involved? What were the qualifications needed to address them? How much time was needed to address them? Did these issues include costs?
>
> <u>Coast Guard Allegation: Limited Personnel</u>. Only a limited pool of Coast Guard personnel had the required subject matter expertise to work on the rule. Rabe Decl. ¶ 9.
>
>> <u>Questions Raised</u>: What was the subject matter expertise? Who on staff had the necessary expertise? What was their availability for the task?
>
> <u>Coast Guard Allegation: Higher Priority Project</u>. Work was suspended on the regulation during most of the period from early 1999 through August 2001 because the limited number of personnel qualified to work on the rule were required to work on another, higher-priority regulatory project. Rabe Decl. ¶¶ 6, 11.

> Questions Raised: What was the other project? Why was it a higher priority? What was the work plan for its development? What skills were needed for it? What time was needed for its completion? What would the effect on this other project have been if the two rulemakings had proceeded concurrently?

Coast Guard Allegation: Extensive Comments Submitted. The Coast Guard received 121 comment letters on the proposed rule, ranging from one to six pages in length. Rabe Decl. ¶ 15.

> Questions Raised: How much work was involved in responding to comments? How many of the letters repeated the same comments as other letters submitted on the proposed rule? How does the time required for responses to these comments compare to the time required for responses to comments in other Coast Guard rule-making proceedings?

Coast Guard Allegation: This Rulemaking Has Lower Priority. The priority of this rulemaking was low relative to other regulatory projects from 2001 to the present. Rabe Decl. ¶16.

> Questions Raised: What were the other rulemaking projects that were given higher priority during the years mentioned? How were the rulemaking projects given their priorities? Why did the priority of this rulemaking decline in 2005? What effect does the prioritization have on the timing of the rulemaking? Which of the other rulemaking projects were Congressionally mandated?

Coast Guard Allegation: The Final Rule Will Be Published as Quickly as Possible. The Coast Guard is doing "everything it can," consistent with regulatory realities and priorities, to publish its final rule as quickly as possible. A final rule "could" be published by end of 2005. Rabe Decl. ¶¶ 18-19.

> Questions Raised: What additional actions are necessary before a final rule can be issued? Who is responsible for those actions? How much time will each of these actions take? What competing priorities may interfere with these actions?

8. In addition to questions raised by Mr. Rabe's affidavit, there are other facts relevant to the Coast Guard's delay that the Commonwealth plans to pursue in discovery should the Court deny the Commonwealth's Motion for Summary Judgment. For example, the Commonwealth will seek information on what occasioned the 16+ month delay since promulgation of the proposed rule, including information on the extent to which the delay was caused by industry

objection to costs of the testing. In addition, the Commonwealth will pursue discovery on how other regulatory projects would have been affected if personnel had not been diverted away from this rulemaking project.

I declare under penalties of perjury that the foregoing is true and correct

Executed on July 11, 2005

                              */s/ Nora J. Chorover*
                              Nora J. Chorover

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.*, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiff, | | |
| v. | | Civil Action No. 05-10112-JLT |
| COMMONWEALTH OF MASSACHUSETTS, *et al.*, | | |
| Defendants. | | |

**STATE DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE AND STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, the State defendants hereby submit their response to the United States' Statement of Material Facts as to Which There Is No Genuine Dispute and Statement of Additional Material Facts Not in Dispute.

**Response to the United States' Statement of Undisputed Facts**

*1a. The United States has long required marine employers to conduct drug and alcohol testing of their seamen employees following a serious marine incident ("SMI"), as defined at 46 C.F.R. § 4.03-2, pursuant to Coast Guard regulations at 46 C.F.R. Subpart 4.06. See Declaration of W. Douglas Rabe ("Rabe Decl.") ¶ 2.*

Response:   The promulgation of the regulation is undisputed. Any implication that its provisions are effective is disputed. *See* Declaration of Richard Packard dated July 11, 2005 ("Packard Declaration") ¶ __, Exh. 1 at 49, 55 (National Transportation Safety Board Report concluding that existing Coast Guard regulations inadequate).

*1b. On November 13, 1998, Congress passed a statute related to such testing. See Pub. L. 105-383, Title III, § 304(d)(1), 112 Stat. 3419, codified as 46 U.S.C. § 2303a. That statute directs the Coast Guard to "establish procedures to ensure" that alcohol testing occurs within two hours after an SMI unless testing is prevented by safety concerns directly related to the SMI. 46 U.S.C. § 2303a.*

>Response:   The contents of a statute are a matter of law rather than fact. The State defendants' arguments regarding § 2303a are set forth in their Memorandum.

*1c. Congress neither set a deadline for establishment of the necessary procedures, nor specified how they should be established. Id.*

>Response:   The contents of a statute are a matter of law rather than fact. The State defendants' arguments regarding § 2303a are set forth in their Memorandum. As the State defendants argue in section II(A)(2) of their Memorandum, Congress required that the Coast Guard establish a regulation.

*2. Within three months of the enactment of § 2303a, as an interim step giving effect to the provision, the Coast Guard Commandant's Office of Investigations and Analysis informed all Coast Guard marine safety and inspection offices and other Coast Guard commands and districts of the contents of the § 2303a and asked them to ensure that alcohol testing be conducted in accordance with the statute 2303a whenever possible. See Exhibit A to Rabe Decl.; see also Rabe Decl. ¶¶ 4, 5.*

>Response:   Undisputed to the extent of the letter's existence. The State defendants dispute, as a legal matter, that this letter gives "effect to" 46 U.S.C. " 2303a, because it does not satisfy the requirements of the statute for the reasons set forth in Section II(A)(2) of the State defendants' Memorandum. Moreover, the State defendants have been unable to conduct discovery regarding the remaining facts asserted in ¶ 2 and are therefore currently unable to determine whether they dispute the facts contained in ¶ 2.

*3. Also immediately following enactment of the statute, and following usual Coast Guard practices, the Coast Guard assembled a team to prepare a Regulatory Workplan ("the Workplan") for studying the relevant issues and determining the best means of permanently implementing § 2303a via notice and comment rulemaking. Rabe Decl. ¶ 4.*

>  Response:    The State defendants have been unable to conduct discovery regarding the facts asserted in ¶ 3 and are therefore currently unable to determine whether they dispute the facts contained in ¶ 3.  *See* Fed. R. Civ. P. 56(f).

*4. The Coast Guard studied the issues involved and developed a Regulatory Workplan during 1999 and early 2000, although the Coast Guard's limited resources were also required for a higher-priority drug and alcohol testing rulemaking project.  Id. ¶ 6.  The Workplan was then submitted to the Coast Guard Marine Safety Council for approval in April 2000; it was approved in June 2000, and place on the Coast Guard's rulemaking docket.  Id. ¶ 7.*

>  Response:    The State defendants have been unable to conduct discovery regarding the facts asserted in ¶ 4, and are therefore currently unable to determine whether they dispute the facts contained in ¶ 4.  *See* Fed. R. Civ. P. 56(f).

*5. The Coast Guard also determined that safely ensuring alcohol testing within two hours of an SMI would likely require carriage of alcohol testing equipment on the great majority of vessels subject to the testing requirements of 46 C.F.R. Subpart 4.06.  Rabe Decl. ¶ 8.  Accordingly, the Coast Guard began studying the complex issues involved in ensuring alcohol testing of a crew within two hours of a serious marine casualty no matter where it occurs, including the available alcohol testing equipment, cost impact of requirements that such equipment be carried onboard, impact on small businesses, information collection burden, environmental impacts, and any federalism implications.  Id.*

>  Response:    The State defendants have been unable to conduct discovery regarding the facts asserted in ¶ 5, and are therefore currently unable to determine whether they dispute the facts contained in ¶ 5.  See Fed. R. Civ. P. 56(f).

*6. The Coast Guard assigned a project team of a Project Manager, Regulation Development Manager, Project Counsel, Project Editor, and Project Analyst to the § 2303a rulemaking project. Id. ¶ 10.  These Coast Guard employees were drawn from the limited pool of personnel with the necessary expertise.  Id. ¶ 9.*

 Response: The State defendants have been unable to conduct discovery regarding the facts asserted in ¶ 6, and are therefore currently unable to determine whether they dispute the facts contained in ¶ 6.  See Fed. R. Civ. P. 56(f).

7.  *The regulatory project team staff also worked concurrently on other, higher-priority regulatory projects.  Id. ¶¶ 12, 16.*

 Response: The State defendants have been unable to conduct discovery regarding the facts asserted in ¶ 7, and are therefore currently unable to determine whether they dispute the facts contained in ¶ 7.  See Fed. R. Civ. P. 56(f).

8a. *At the direction of Congress the Coast Guard devoted substantial resources to develop enhanced maritime security regulations in 2002 and 2003.  Id. ¶ 12.  Accordingly, the § 2303a rulemaking project went from a ranking of 21st out of 67 Coast Guard regulatory projects in early 2001, to 33rd out of 76 such projects by early 2003.  Id. ¶ 16.*

 Response: The State defendants have been unable to conduct discovery regarding the facts asserted in ¶ 8a, and are therefore currently unable to determine whether they dispute the facts contained in ¶ 8a.  See Fed. R. Civ. P. 56(f).

8b. *During that time, the Department of Homeland Security was also created, see Pub. L. No. 107-296, 116 Stat. 2135, and the Coast Guard was transferred out of the Department of Transportation and into the Department of Homeland Security.  See id. at § § 888(b) & (c).*

 Response: The State defendants do not dispute that the Department of Homeland Security was created on November 25, 2002 and that the Coast Guard was transferred out of the Department of Transportation and into the Department of Homeland Security.  See Fed. R. Civ. P. 56(f).

8c. *Nonetheless, the § 2303a rulemaking team developed a proposed rule, and the Coast Guard published a Notice of Proposed Rulemaking in the Federal Register on February 28, 2003.  68 Fed. Reg. 9622 (Feb. 28, 2003); Rabe Decl. ¶ 13.*

Response:    The State defendants do not dispute that a Notice of Proposed Rulemaking was published on February 28, 2003.  *See* Fed. R. Civ. P. 56(f).

*9a. The initial comment period for the proposed rule was 120 days. 68 Fed. Reg. 9622.*

Response:    Undisputed.

*9b. In August 2003, responding in part to requests for a public meeting on the proposed rule, the Coast Guard opened a second comment period and scheduled a public meeting. 68 Fed. Reg. 50992 (Aug. 25, 2003).*

Response:    The State defendants do not dispute that in August 2003 the Coast Guard opened a second comment period.  The State defendants have been unable to conduct discovery regarding the remaining facts asserted in ¶ 9b, and are therefore currently unable to determine whether they dispute the remaining facts contained in ¶ 9b.  *See* Fed. R. Civ. P. 56(f).

*9c. The public meeting was scheduled for September 19, 2003, <u>see id</u>., but it was cancelled because federal government office in the Washington D.C. metropolitan area were closed that day due to Hurricane Isabel. 68 Fed. Reg. 60073 (Oct. 21, 2003).*

Response:    Undisputed.

*9d. The public meeting was not rescheduled as only a few people had registered to attend, but a third comment period was held from October 21, 2003 to November 20, 2003. <u>Id</u>.*

Response:    The State defendants do not dispute that the public meeting was not rescheduled or that a third comment period was held from October 21, 2003 to November 20, 2003.  The State defendants have been unable to conduct discovery regarding the

–5–

remaining facts asserted in ¶ 9d, and are therefore currently unable to determine whether they dispute the remaining facts contained in ¶ 9d. *See* Fed. R. Civ. P. 56(f).

*10a. The Coast Guard received 121 comment letters on the proposed rule, ranging from one to six pages in length. Rabe Decl. ¶ 15.*

> <u>Response</u>:   Disputed as to the number of comment letters. The State defendants contend that the 118 different comment letters are available for public viewing on the internet at dms.dot.gov/search, and that the remaining two comment letters available on the web site are duplicate copies. Undisputed as to the length of the comment letters available on the web site.

*10b. The complete rulemaking docket, Docket No. 8773, is available for public viewing on the internet at dms.dot.gov/search via a search for that docket number. The docket includes the NPRM, the 120 comment letters, and a 32-page 2002 draft regulatory analysis of the proposed rule.*

> <u>Response</u>:   The State defendants contend that there are 118 separate comment letters available for public viewing on the web site and that the remaining two comment letters available on the web site are duplicate copies. The state defendants do not dispute that the NPRM and the draft regulatory analysis of the proposed rule are also available for public viewing at the web site. The State defendants note, however, that the Rabe Declaration appears to contain inconsistent statements regarding the number of comment letters received. Because the State defendants have been unable to conduct discovery regarding the remaining facts asserted in ¶ 10b, The State defendants is currently unable to determine whether they dispute the remaining facts contained in ¶ 10b. *See* Fed. R. Civ. P. 56(f).

*11. The Coast Guard has now analyzed the 121 comments received and prepared responses. Id. ¶ 17. The project team has also prepared the final rule, which it is expected will shortly*

*enter clearance within Coast Guard headquarters, after which it will be submitted to the Department of Homeland Security, and then the Office of Management and Budget for review, including any necessary review pursuant to Executive Order 12291, prior to publication as a Final Rule in the Federal Register. Id. The final rule is expected to be cleared by Coast Guard command within the next few months. Id.*

>   Response:   The State defendants have been unable to conduct discovery regarding the remaining facts asserted in ¶ 11, and are therefore currently unable to determine whether they dispute the facts contained in ¶ 11. See Fed. R. Civ. P. 56(f). The State defendants note, however, that the Rabe Declaration appears to contain inconsistent statements regarding the number of comment letters received, and that only 118 separate comment letters publicly available on the web site provided, with the remaining two comment letters available on the web site being duplicate copies.

*12. In his declaration filed this date, W. Douglas Rabe, Chief of the Investigations Division within the Coast Guard Office of Investigations and Analysis, under the Assistant Commandant for Marine Safety, Security and Environmental Protection, stated that it is reasonable to expect that final regulations under § 2303a will be published before the end of 2005. See id. ¶ 18.*

>   Response:   The State defendants do not dispute the filing of the Rabe Declaration. The State defendants do dispute the United States' characterization of paragraph 18 of the Rabe Declaration. The Rabe Declaration does not state that "it is reasonable to expect that final regulations under § 2303a will be published before the end of 2005." Rather, the Rabe Declaration at ¶ 18 states as follows: "While I cannot know exactly how long each of these steps toward final publication will take, and intervening events could again divert the resources of the Coast Guard and the United States to competing tasks of a higher priority, *I estimate*, based on my prior experience with complex and

–7–

significant rulemakings of this nature, that the final regulations *could be published* before the end of 2005." (emphasis added).

**Statement of Additional Material Facts Not in Dispute**

1. Timely post-accident testing of alcohol is critically needed to reduce marine transportation accidents and save lives. Packard Affidavit, ¶ 3, Exh. 2 (National Transportation Safety Board ("NTSB") *Most Wanted Transportation Safety Improvements 2004-2005: Critical Changes Needed to Reduce Transportation Accidents and Save Lives ("Brochure")*; Packard Affidavit, ¶ 4, Exh. 3 (NTSB, *Memorandum: Most Wanted Transportation Safety Improvements - Federal Issues ("Memorandum")*.

     i. Timely post-accident testing is crucial for evaluating accident causes, as well as for creating a "deterrent to the use of alcohol . . . by personnel performing safety-sensitive duties, such as watchstanding." Packard Decl., ¶ 2, Exh. 1 (NTSB, *Special Investigation Report: Postaccident Testing for Alcohol and Other Drugs in the Marine Industry and the Ramming of the Portland-South Portland (Million Dollar) Bridge at Portland Maine, by the Liberian Tankship Julie N on September 27, 1996,* (May 5, 1998)(the "Report"), page 43.

     ii. Alcohol testing is time sensitive because the body rapidly eliminates alcohol (at an average rate of about .015 to 0.18 percent by weight per hour). Packard Decl., ¶ 2, Exh. 1 (Report) at 33, n. 28.

–8–

    iii.     To accurately determine whether alcohol played a role in causing a serious marine incident, alcohol testing should occur within two hours of the incident. Packard Decl., ¶ 2, Exh. 1 (Report) at 49, 55.

1. Alcohol testing 24 hours after a serious marine incident is of little if any use in evaluating whether alcohol played a role in causing the incident. Packard Decl., ¶ 2, Exh. 1 (Report) at 33, n.28, 49, 55.

2. The Coast Guard has failed to "adequately address the industry-wide problem of post-accident alcohol and drug testing." Packard Decl., ¶ 2, Exh. 1 (Report) at 42.

3. Issuance of a final rule by the Coast Guard to "strengthen and clarify regulations to require that drug and alcohol testing be conducted quickly after serious marine accidents" is critically needed to reduce marine transportation accidents and save lives. Packard Decl., ¶ 3, Exh. 2 (Brochure).

    a. The Coast Guard was eleven years late in complying with an explicit legislative directive meant to help prevent another spill like the 1989 incident involving the Exxon Valdez. *See In re: Bluewater Network,* 234 F.3d 1305 (D.C. Cir. 2000).

       Respectfully submitted,

       THOMAS F. REILLY
       ATTORNEY GENERAL

         */s/ Nora J. Chorover*
       Nora Chorover, BBO # 547352
       Pierce O. Cray, BBO # 104630
       Assistant Attorneys General
       One Ashburton Place, 18th Floor
       Boston, MA 02108
       (617) 727-2200
       nora.chorover@ago.state.ma.us
       pierce.cray@ago.state.ma.us

Dated:   July 12, 2005