UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————
)
UNITED STATES OF AMERICA, *et al.,*    )
)
    Plaintiff,    )
)
 v.    )    Civil Action No. 05-10112-JLT
)
COMMONWEALTH OF    )
MASSACHUSETTS, *et al.*,    )
)
    Defendants.    )
———————————————————)

## <u>DECLARATION OF RICHARD PACKARD</u>

I, Richard Packard, declare as follows:

1.  I am the Emergency Response Section Chief at the Southeast Regional office of the Massachusetts Department of Environmental Protection (MADEP), Lakeville, Massachusetts.  I have been the Emergency Response Section Chief for 12 years.   During the response to the April 27, 2003 Bouchard 120 barge oil spill into Buzzards Bay I served as the alternate State On-Scene Coordinator.  As such I acted as the back-up to Robert Donovan, who represented Massachusetts interests in the joint agency response to the Bouchard 120 oil spill.  I have personal knowledge of the facts set forth in this Declaration.

2.  Attached to this Declaration as Exhibit 1 are true and correct excerpts from of May 5, 1998 Special Investigation Report ("Report") by the National Transportation Safety Board ("Safety Board"), which I obtained online from the following internet site:

<u>http://www.ntsb.gov/Publictn/1998/SIR9802.pdf</u>

3.  Attached to this Declaration as Exhibit 2 is a true and correct copy of the National Transportation Safety Board's Brochure entitled *Most Wanted Transportation Safety Improvements, 2004-2005:  Critical changes needed to reduce transportation accidents and save*

*lives.* I obtained the brochure online from the following internet site:

http://www.ntsb.gov/Recs/brochures/MostWanted_2004_05.pdf

4.      Attached to this Declaration as Exhibit 3 is a true and correct copy of a National Transportation Safety Board Memorandum, available on the agency's web site, which discusses the critical need for the Coast Guard to adopt a Final Rule implementing 46 U.S.C. 2303a. I obtained the memorandum online from the following internet site:

http://www.ntsb.gov/Recs/mostwanted/marine_drug_test.htm

5.      The scenic coastline of Buzzards Bay includes sandy beaches, productive shellfish beds, and valuable wetlands and habitat, all of which justified its designation as an Estuary of National Significance in 1985.

6.      On the afternoon of April 27, 2003, the Evening Tide, a tugboat operated by Bouchard Transportation Co., approached Buzzards Bay towing a barge containing four million gallons of thick No. 6 fuel oil.

7.      Attached hereto as Exhibit 6 is a true and correct copy of a Department of Justice Press Release showing that, with no one at the wheel, the tug veered a quarter mile to the left of the green buoy that marks the entrance to Buzzards Bay and struck an underwater ledge. I obtained the Press Release online from the following internet site:

http://64.233.179.104/search?q=cache:CS3hTY8oGvsJ:www.usdoj.gov/usao/ma/presspage/Nov 2004/Bouchard-plea-sentencing.htm+buzzards+bouchard+helm&hl=en&start=1

8.      The vessel then traveled no less than 15 miles after the accident, creating a 10-mile long slick.

9.      In all, an estimated 98,000 gallons of oil spilled from the 12-foot by 2-foot gash in the second starboard compartment of the barge.

10.      In the ensuing days, unsettled weather, choppy seas, and ever-changing winds brought portions of the slick to every municipality around Buzzards Bay, with new oil landing

-2-

each day for more than a week.

11.    Hundreds of birds -- loons, cormorants, and endangered roseate terns, many of them arriving for nesting season -- perished, and shellfish beds closed for months.

12.    Bouchard Transportation Company has since pled guilty to federal criminal charges and been fined $10 million as a result of the spill

13.    After the spill, there was intense concern expressed by members of the public and members of the Massachusetts Legislature regarding the adequacy of Coast Guard procedures related to the spill. For example, the Standard Times reported on July 1, 2003 that local officials were frustrated with the fact that alcohol tests were not performed on the tugboat crew until a full 18 hours after the incident. A copy of this article from the Standard Times is attached hereto as Exhibit 4.

14    Attached hereto as Exhibit 5 is a true and correct copy of an October 31, 2003 letter from Coast Guard Rear Admiral V.S. Crea assuring members of the Massachusetts Congressional Delegation that the Coast Guard would take appropriate action to implement the most effective regulatory strategies, and "expedite them through the regulatory process if appropriate."


I declare under penalty of perjury under the laws of the United States that I have personal knowledge of the facts set forth in this declaration and that the foregoing is true and correct. Executed this 12th day of July, 2005 at Lakeville, Massachusetts.

Richard Packard

EXHIBIT 1

PB98-917003
NTSB/SIR-98/02

# NATIONAL TRANSPORTATION SAFETY BOARD

## WASHINGTON, D.C. 20594

# SPECIAL INVESTIGATION REPORT

POSTACCIDENT TESTING FOR ALCOHOL AND
OTHER DRUGS IN THE MARINE INDUSTRY AND
THE RAMMING OF THE PORTLAND-SOUTH
PORTLAND (MILLION DOLLAR) BRIDGE AT
PORTLAND, MAINE, BY THE LIBERIAN TANKSHIP
*JULIE N* ON SEPTEMBER 27,1996



6773A

# EXECUTIVE SUMMARY

The 560-foot-long Liberian tankship *Julie N,* carrying a cargo of heating oil, collided with the south bascule pier of the Portland-South Portland (Million Dollar) Bridge in Portland, Maine, about 1105 on September 27, 1996. The vessel had passed between the piers of the new Portland-South Portland bridge (Casco Bay Bridge) and was en route to the Rolling Mills terminal about 1.2 miles beyond the Million Dollar Bridge. The vessel was under the direction of a State-licensed docking master (pilot). After the collision, the pilot stated that as the vessel approached the bridge, he had issued three orders for port rudder to swing the bow to the left and then intended to order the rudder to hard starboard and to increase the engine speed from slow to half ahead to stop the swing and align the vessel for passage through the drawspan. However, the pilot inadvertently ordered the rudder to hard port instead of hard starboard. He recognized his error within seconds and ordered the rudder to hard starboard; given the narrowness of the bridge span, however, the shifting of the rudder occurred too late to avoid the collision.

There were no injuries, but the collision resulted in a 33-foot-long hole in the vessel's hull beneath the waterline. About 4,000 barrels of oil spilled into the harbor. The vessel sustained about $660,000 in damage, and the cost for cleanup of the oil was approximately $43 million. Repairs to the Million Dollar Bridge were about $232,000.

After the accident, the pilot reported to a clinic for postaccident testing. However, he did not have his breath or blood tested for alcohol. The urine specimen collected for drug testing indicated that no drugs were present. The pilot stated that he was unaware that postaccident testing required a test of breath or blood for alcohol and that urine collection was solely for drug testing.

Over the course of 28 major accident investigations, the National Transportation Safety Board has observed confusion and a lack of understanding on the part of marine employers and employees regarding postaccident testing requirements and responsibilities. In many of these accidents, including that involving the *Julie N,* the Safety Board has been unable to definitively rule out alcohol or drug use as a causal factor because of serious deficiencies in the testing process.

Because of the continuing problems encountered in conducting postaccident testing for alcohol and drugs, this report contains additional sections devoted to the discussion and analysis of postaccident testing.

The National Transportation Safety Board determines that the probable cause of the collision with the Portland-South Portland (Million Dollar) Bridge was the pilot's inadvertent order port (left) rudder instead of starboard (right) rudder. Contributing to the accident was the narrow horizontal clearance of the bridge drawspan, which afforded little leeway for human error. Contributing to the severity of the damage to the vessel and to the amount of oil spilled was a corner of the bridge pier that was not adequately shielded by the timber fender system.

The safety issues discussed in this report include:

- Postaccident testing for alcohol and other drugs, and

- Port safety.

As a result of its investigation, the Safety Board made recommendations addressing these issues to the U.S. Coast Guard, Maine Department of Transportation, Federal Highway Administration, and American Association of State Highway and Transportation Officials.

condition and seeking to minimize the outflow of oil" following the accident.

***Accidents Involving Postaccident Testing Issues***—The Safety Board has investigated a number of accidents where postaccident testing for alcohol and other drugs was not conducted properly. In many marine accidents investigated by the Safety Board, considerable time was required to collect breath or blood for alcohol testing or samples were never collected, as illustrated in table 1.

In some cases, marine employers failed to conduct postaccident testing because of their lack of understanding of the testing requirements set forth in Coast Guard regulations. For instance, the pilot of the *Julie N and his tugboat company reportedly believed* that urine was the sole specimen required and that it was tested for alcohol as well as drugs. In many instances, the Coast Guard had to initiate the postaccident testing process through informing or reminding the marine employer that the responsibility for testing resides with the employer and by providing information about how and where to obtain the services of a testing firm and or how to obtain the needed equipment.

Postaccident drinking can affect sample results and has been a factor in some accidents. In one case involving an explosion and fire on a tankship[19] that had been undergoing welding repairs, it was necessary for the crew to abandon the vessel. Upon arrival ashore, some crewmembers began consuming alcohol at a local bar. No regulation currently prohibits postaccident drinking. In this accident, it was also necessary for the Coast Guard to explain to the marine employer's representative that testing

is the responsibility of the marine employer and to provide information about obtaining the services of a testing agency.

Other investigations have been impeded because crewmembers or pilots were not available for testing, such as in the *Jupiter/Buffalo* accident, in which many crewmembers had gone ashore without being tested. On one occasion, most of the crew of an oceangoing ship was transported out of the country and consequently never available to investigators.[20] (For more information on the *Jupiter/Buffalo* accident and other accidents involving postaccident testing issues, see table 1.)

## Postaccident Testing Regulations and Programs

***Coast Guard Regulations***—Coast Guard regulations governing postaccident testing for alcohol and "dangerous drugs"[21] (marijuana, cocaine, opiates, phencyclidines (PCPs); and amphetamines) are found at 33 CFR 95 (*Operating a Vessel While Intoxicated*) and 46 CFR 4.06 (*Mandatory Chemical Testing Following Serious Marine Incidents Involving Vessels in Commercial Service*). Regulations for testing for dangerous drugs in the workplace for personnel on board U.S. commercial vessels are at 46 CFR 16. (See appendix B for these regulations.)

---

[19]*Marine Accident Report—Investigation of the Explosion and Fire on Board the U.S. Tankship* Omi Charger *at Galveston, Texas, on October 9, 1993* (NTSB/MAR-94/04).

[20]*Marine Accident Report—Investigation of the Fire on Board the Cypriot Bulk Carrier* Protector Alpha *at Kalama, Washington, on February 14, 1982* (NTSB-MAR-83-01).

[21]The term "dangerous drug" is used in the report to be consistent with terminology used in Coast Guard regulations at 46 CFR 4.06 and 46 CFR 16. The basis for the term "dangerous drug" is found at 46 U.S.C. 7702 (c)(2), which states: "...The Secretary shall require the testing of the holder of a license, certificate of registry, or merchant mariner's document for use of alcohol and dangerous drugs in violation of law or Federal regulations. The testing may include preemployment (with respect to dangerous drugs only), periodic, random, reasonable cause, and postaccident testing." In some parts of this report, the word "drug" may be used for brevity and means these five drugs.

26

**Table 1—Time elapsed before postaccident testing performed and types of testing performed after major marine accidents investigated by the Safety Board**

| Vessel | Breath/blood testing (hours) | Urine testing (hours) | Remarks |
|---|---|---|---|
| *Exxon Valdez* March 24, 1989 | —/10.5 | 10.5 | ▪ Testing delayed because of time necessary Coast Guard investigators to arrive at the scene and the several hours it took to locate a collector. ▪ Alcohol was a causal factor. |
| *World Prodigy* June 23, 1989 | —/22 | 22 | None. |
| *Aleutian Enterprise* March 22, 1990 | —·/—·· | 42 | ▪ Remote location. Lack of knowledge by the marine employer about postaccident testing. Urine specimen from master tested negative. |
| *Shinousa/ Chandy N Hellespont Faith* July 28, 1990 | —/— | 8 | ▪ Coast Guard investigators on board soon after accident to interview crews observed no evidence of intoxication or drug use. Pilot of *Shinousa* gave urine specimen in about 8 hours. All other urine collected over 24 hours later. |
| *Mandan* August 15, 1990 | 5.5/— | 5.5 | ▪ Pilot and master tested. ▪ Test results were negative for alcohol and drugs. |
| *Jupiter/Buffalo* September 16, 1990 | —/— | Unknown/9.5 | ▪ Coast Guard investigators reminded *Buffalo* of need for alcohol and drug testing about 6 hours after accident. Some crewmembers had gone ashore already; thus, no alcohol testing attempted of *Buffalo* crew. No one thought to test *Jupiter* injured that were hospitalized. Deceased *Jupiter* crewman tested negative for drugs. |
| *Sea King* January 11, 1991 | —/— | — | ▪ Owner refused to test. Lack of authority at time to impose penalty against the owner for failure to test. Master rescued by Coast Guard soon after accident. ▪ Unknown whether alcohol or drugs involved. |
| *Queen Elizabeth 2* August 7, 1992 | —/39 | 16–39 | ▪ Remote location. Marine employer's instructions were to cooperate with Coast Guard in postaccident testing. ▪ Test results were negative for drugs. |
| *Fremont/ Juraj Dalmatinac* December 21, 1992 | —/— —/— | 18 14–16 | None. |

| Vessel | Breath/blood testing (hours) | Urine testing (hours) | Remarks |
|---|---|---|---|
| *Chris* May 28, 1993 | —/7–7.5 | 7–7.5 | • Coast Guard on scene a few minutes after the accident. |
| *Yorktown Clipper* August 18, 1993 | —/— | 18.5 | • Remote location. |
| *Mauvilla* September 22, 1993 | —/— | 8 | • Remote location. |
| *Omi Charger* October 9, 1993 | —/— | 5–18 | • Postaccident drinking. Lack of knowledge by marine employer. Testing initiated by Coast Guard by informing marine employer of need for testing and how to obtain testing assistance. |
| *Noordam/ Mount Ymitos* November 6, 1993 | 7/— Yes/— | 7–26 29–30 | • No authority to conduct testing of foreign vessels in international waters. However, watchstanders volunteered for testing. |
| *El Toro* December 5, 1993 | —/3–6 | — | • Test results were negative for alcohol and drugs. |
| *All Alaskan* July 24, 1994 | —/— | 28 | • Master not tested. Master boarded Coast Guard cutter about 3 hours after fire started but was not tested during the 3 days on board. Health clinic closed; thus, urine collection of crew delayed until next day. |
| *Seal Island* October 8, 1994 | —/— | — | • In port at St. Croix, Virgin Islands. Lack of knowledge by the marine employer of testing requirements. |
| *Alaska Spirit* May 27, 1995 | —/Postmortem | Not applicable | None. |
| *Royal Majesty* June 10, 1995 | —/25–28 | 25–28 | • No authority to conduct testing of foreign vessel in international waters. Remote location. Crew volunteered to be tested. |
| *Star Princess* June 23, 1995 | Pilot 4/— Crew 8.5/— | 4 8.5 | • Test results were negative for alcohol and drugs (pilot). |
| *Scandia* January 19, 1996 | 9/— | 15.7 | • Remote location. Crew fighting fire and attempting to salvage barge. Coast Guard performed breath testing of crew for alcohol. • Test results were negative for alcohol and drugs. |
| *Universe Explorer* July 27, 1996 | —/— | 34 | None. |

28

| Vessel | Breath/blood testing (hours) | Urine testing (hours) | Remarks |
|---|---|---|---|
| *Julie N* September 27, 1996 | Pilot   —/— Crew   3–7/— | 3 3–7 | ▪ Lack of knowledge by the marine employer. ▪ Test results of pilot were negative for drugs. ▪ Breath testing of *Julie N* crew delayed by technicians who elected to collect urine specimens first. ▪ Test results were negative for alcohol and drugs. |
| *Dave Blackburn* October 23, 1996 | 9/— | 9 | None. |
| *Sundowner* December 7, 1996 | —/16–17 | 16–17 | ▪ No breath testing conducted because owner reported to Coast Guard that he had permitted the crew to engage in    postaccident drinking. Testing consortium under contract not open after hours and on weekends, thus delaying specimen collection. ▪ Unknown whether alcohol or drugs involved. |
| *Bright Field* December 7, 1996 | Pilot   1.5/— Crew   6.5–8.5/— | 1.5 6.5–8.5 | ▪ Coast Guard on board soon after accident; reminded owner of need for testing. Directly involved personnel were tested last. ▪ Test results were negative for alcohol and drugs. |
| *Cowslip/ Evergrade* May 14, 1997 | *Cowslip*   —/8.6–10 Pilot   —/— *Evergrade*   —/17.5–18.5 | 8.6–10 12.7 17.5–18.5 | ▪ *Cowslip* is a Coast Guard cutter. |
| *Alaska 1/ Hanjin Barcelona* February 11, 1998 | 6/ —/— | 6 — | ▪ Saliva collected instead of breath for alcohol testing. ▪ No authority to test crew of *Hanjin Barcelona* because ship was a foreign vessel in international waters. ▪ Unknown whether alcohol or drugs involved. |

important because alcohol is eliminated rapidly from the body.[28]

ALDIST 179/94 requires Coast Guard *investigators to alert marine employers of* "their responsibility" for postaccident testing. The directive clearly states that Coast Guard personnel shall not provide urine collection material or perform as collection site personnel. The directive does allow appropriately qualified Coast Guard personnel or other local law enforcement personnel to conduct breath testing for alcohol if such testing would be more timely than the testing arranged by the marine employer or if there is any concern that testing would not otherwise be accomplished.

***Drug and Alcohol Program Inspector***—In 1995, the Coast Guard created the Drug and Alcohol Program Inspector (DAPI) program to educate U.S. commercial vessel owners and operators and pilot associations about the Coast Guard's drug testing program requirements (preemployment, periodic, random, serious marine incident, and reasonable cause testing) and related recordkeeping and reporting.

The program is now staffed by 11 inspectors, 1 for each Coast Guard District and 1 at Coast Guard headquarters. Currently, all are commissioned officers. The DAPIs visit companies to review records and explain the regulations. *Discrepancies noted are normally* provided to the operator in writing and followed up as necessary to ensure that compliance is

carried out. One function of the DAPI is to assist small operators in joining together to participate in a consortium.[29] The DAPIs also inspect testing clinics where specimens are *taken to ensure such activities meet Coast Guard* criteria.

While the DAPIs are primarily concerned with informing U.S. operating companies about their drug testing responsibilities under the regulations, they are available to provide technical advice on the Coast Guard drug and alcohol testing regulations to other Coast Guard personnel, and to respond to any inquiries from the public, including foreign operators whose vessels call at U.S. ports.

***Marine Safety Office, Portland, Maine***— Additional guidance on drug and alcohol testing following a serious marine incident for Coast Guard investigating officers and field office personnel of the Portland, Maine, Inspection Zone/Captain of the Port Zone (COTP),[30] can be found in Commanding Officer Instruction 16722.2. (See appendix C.) The instruction summarizes postaccident testing requirements and provides necessary information for marine employers, such as contact information for postaccident testing firms and for Coast Guard stations in the COTP Portland area.

***Coast Guard Enforcement of Intoxication Regulations***—The Coast Guard's "Boating While Intoxicated" (BWI) program was established in 1989 to curb operation of recreational vessels by intoxicated

---

[28]Alcohol is eliminated quickly from the body at an average rate of about .015 to .018 percent by weight per hour. *In an 8-hour period, as much as .12 to .14 percent can* be eliminated from the bloodstream. Cocaine is eliminated very quickly from the blood (in as little as 2 hours), although metabolites of the drug remain in the body much longer. Many other drugs, including over-the-counter and prescription medications, are eliminated much more slowly; a number of drugs with central nervous system effects can be detected in the blood and urine for days or weeks following ingestion.

[29]A consortium is usually formed by an independent firm that will contract with vessel owners or operators to conduct the testing required by Coast Guard regulations (46 CFR 16 and 46 CFR 4.06) and to perform other services required by the regulations, including acquiring the services of a certified laboratory to perform the testing and of a medical review officer to review test results. For random testing, a consortium combines the marine employees of all vessel owners or operators into a single group or pool.

[30]Coastal area from the Massachusetts-New Hampshire border to the Canadian border (see 33 CFR 3.05-15).

42

belief that urine is the sole specimen required for postaccident testing. Also, the Safety Board has observed in its marine investigations that where any attempt to conduct postaccident testing for alcohol and other drugs is made, it is usual for only urine specimens to be collected, and that breath testing is rarely accomplished. If breath testing is done, it nearly always is conducted too late to achieve meaningful results.

It is possible that the requirement for U.S. companies and vessels to conduct urine collection for the required preemployment, periodic, and random drug testing may inadvertently cause marine employers to believe that urine is the sole specimen needed. Because there are no requirements for random alcohol testing on U.S. and most foreign vessels, mariners and shipping companies are unlikely to be familiar with alcohol testing and may never experience breath or blood testing for alcohol unless involved in a marine accident. In this accident, the secretary at the pilot's tugboat company was accustomed to making appointments for random testing, the type of testing normally done by the testing clinic.

The pilot knew that the secretary for the tugboat company was aware of the accident, and he stated that he believed the secretary understood that he was to be tested because of his involvement in the accident. Hence, he believed that the secretary knew the purpose of the testing and had communicated the proper instructions to the testing clinic. The pilot stated that when he was asked to sign a form provided by the receptionist (which had the box for random testing checked) certifying that the sample was his, he merely signed without reading or questioning it as he considered that signing was simply a required step in the process. Again, this appears to be a likely action by someone who had not adequately informed himself about postaccident testing requirements in the Coast Guard regulations, an obligation of a licensed officer. This was not an isolated example of unfamiliarity with postaccident testing requirements. The continuing, lack of understanding of these regulations over their nearly 10 years of existence suggests that past

efforts by the Coast Guard to educate the marine industry about postaccident testing have not achieved the desired results. The Safety Board concludes that the pilot was not tested for alcohol because of the failure of the Coast Guard to adequately address the industry-wide problem of postaccident alcohol and drug testing.

The operator of the *Julie N* had a contract with a firm specializing in toxicology testing. The *Julie N* operator informed the contractor a few minutes after the accident and directed the contractor to test all personnel on board the *Julie N*. About 1330, some 2½ hours after the accident, which included a few minutes wait on the pier, two technicians were escorted on board to start the testing. The technicians elected to collect urine specimens first and conduct breath testing later. Thus, breath testing did not commence until about 1620, more than 5 hours after the accident, and was not completed until nearly 1800. Moreover, the master, the crewmember most directly involved in the accident, was among the last to be tested. In this case, the vessel operator had made a proper effort to be prepared by having a testing firm under contract and by notifying that firm in a timely manner to begin the testing. However, the decision by the testing technicians to delay breath testing until the urine specimens were collected greatly diminished the possibility of detecting alcohol. Nothing in the regulations stated or indicated that testing for alcohol should be conducted first and urine specimen collection should be conducted afterwards; hence, the testing technicians did not violate any regulations. This demonstrates that despite preparations by the vessel operator and timely orders to the testing contractor to conduct the testing, it is possible to conduct less than adequate testing and not be in violation of the regulations. Consequently, the Safety Board concludes that Coast Guard regulations for postaccident testing do not communicate clearly that alcohol testing is more time-sensitive and should be conducted as early as possible and before collecting urine specimens. The Safety Board believes that the Coast Guard should incorporate language into the postaccident testing

regulations that clearly states alcohol testing is more time-sensitive and therefore should be conducted ahead of drug testing.

In this case, an accident investigator in the Coast Guard MSO called the tugboat company and the operator of the *Julie N* to remind both companies that post-serious-marine-incident testing was needed. Both companies assured the Coast Guard caller that testing was already being arranged. The Coast Guard caller did not explain the requirements for such testing. The positive responses from the two companies that testing had already been arranged would not have suggested that the Coast Guard representative needed to provide further explanation. However, a brief explanation to the pilot's tugboat company that post-serious-marine-incident testing involved the testing of breath or blood as well as urine might have been sufficient to alert the testing clinic that the testing was for postaccident purposes.

***Coast Guard Role in Postaccident Testing***—Not since the *Exxon Valdez* accident in 1989, in which alcohol use was found to be a causal factor, has the Safety Board found alcohol or drug use to be a causal factor in any marine accident it has investigated. However, alcohol or other drugs could not be ruled out in numerous accidents investigated by the Safety Board, as indicated in table 1, because the postaccident testing was either not done or was delayed so long as to make the testing meaningless. An effective postaccident testing program is needed so that any use of alcohol or other drugs by any person in a safety-sensitive position can either be detected or scientifically eliminated as a causal factor. An effective program also may serve as a deterrent to the use of alcohol or dangerous drugs by personnel performing safety-sensitive duties, such as watchstanding. The *Julie N* and five subsequent accidents (see table 1) illustrate that postaccident testing is not yet a reliable process for examining the factors of probable cause or for accurately assessing influences on safety attributable to alcohol or drugs.

The regulations at 33 CFR 95 and 46 CFR 4.06 both place the responsibility for testing on the marine employer, but neither set of regulations contain any enforcement provisions that could be applied to the marine employer. Lacking enforcement, the Coast Guard had to rely upon education and persuasion to get marine employers to recognize and carry out their responsibilities under the regulations for postaccident testing. The Coast Guard's efforts to acquire compliance voluntarily have produced positive results, as evidenced by the fact that the MOC, the operator of the *Julie N*, had a standing contract for drug and alcohol testing and also had breath-testing devices and urine collection kits on its foreign vessels and had trained personnel on its vessels to use the equipment. Even in accidents involving foreign vessels in international waters near the United States, such as the *Noordam*, *Mount Ymitos*, and *Royal Majesty* accidents,[38] vessel crews voluntarily complied with Coast Guard requests that postaccident testing be conducted.

However, persuasion, which may be adequate in the case of conscientious marine employers, has its limitations. It appears that one of the missing factors in postaccident testing has been a lack of enforcement capability. The recently acquired authority in 46 U.S.C. 2115 to impose civil penalties on marine employers, as well as others, for failing to comply with the postaccident testing regulations is a valuable new tool for the Coast Guard. The fact that the Coast Guard now has this authority should be conveyed to all Coast Guard personnel involved in enforcing the postaccident testing regulations, to include providing guidance on how this authority should be used. The Coast Guard can convey information on this new authority in its ongoing educational efforts designed to inform marine

---

[38] For more information, see Marine Accident Reports—*Collision of the Netherlands Antilles Passenger Ship* Noordam *and the Maltese Bulk Carrier* Mount Ymitos *in the Gulf of Mexico, November 6, 1993* (NTSB/MAR-95/01) and *Grounding of the Panamanian Passenger Ship* Royal Majesty *on Rose and Crown Shoal Near Nantucket, Massachusetts, June 10, 1995* (NTSB/MAR-97/01).

Case 1:05-cv-10112-RCL   Document 37   Filed 07/12/2005   Page 14 of 35

explaining why testing for alcohol was not accomplished within 2 hours, in addition to a requirement to document why testing was not accomplished in 8 hours, when attempts to test would cease, offers a plan for timely postaccident alcohol testing and a means for the Coast Guard to improve oversight of such testing. The requirement for a written record of failure to test will emphasize to the marine employers that timely testing for alcohol is needed and is expected to raise the priority for testing in relation to other postaccident responsibilities and concerns. The information in the written record will enable the Coast Guard to ascertain how closely the various marine employers are complying, determine whether adjustments in the program are needed, and decide whether enforcement action is called for. Accordingly, the Safety Board concludes that adopting a requirement that marine employees be tested within 4 hours of an accident for drugs and within 2 hours of an accident for alcohol, with attempts to test for alcohol ceasing after 8 hours, and adopting a requirement for documenting testing delays or failures would result in more timely testing and facilitate effective oversight by the Coast Guard. Therefore, the Safety Board believes that the Coast Guard should establish a requirement that postaccident testing for drugs begin within 4 hours of a serious marine incident and postaccident testing for alcohol begin within 2 hours of a serious marine incident, with attempts to test ceasing for alcohol after 8 hours, and establish a requirement that the marine employer document any testing delays or failures.

***Need to Consolidate Postaccident Testing Regulations***—Some editing and rewriting of 46 CFR 4.06 would be sufficient to eliminate gaps and make the regulations easier to comprehend; a greater amount of changing would be necessary to make 33 CFR 95 more comprehensive for commercial vessels. Confusion regarding postaccident testing requirements and procedures will persist as long as two different sets of regulations exist on postaccident testing that say different things. To address this problem, two options appear feasible: (1) Rewrite and consolidate both sets of

regulations to make them identical, or (2) Locate the consolidated regulations solely in either Title 33 (33 CFR 95) or Title 46 (46 CFR 4.06).

Title 33, *Navigation and Navigable Waters,* covers numerous operational topics,[43] the majority of which pertain to all vessels transiting U.S. waters or visiting U.S. ports. For example, information and requirements concerning aids to navigation, vessel traffic service, navigation equipment and publications required for all vessels on U.S. waters, vessel equipment testing requirements before entering or departing U.S. ports, and oil spill equipment and pollution plans for all vessels transporting petroleum products to U.S. ports are all found in Title 33 of the regulations. Because the majority of the Title 33 regulations pertain to foreign vessels operating on U.S. waters, as well as U.S. vessels, Title 33 is a logical location for the regulations concerning *Operating a Vessel While Intoxicated* (33 CFR 95). Moreover, the standards for intoxication are guidance for safe navigation and are consistent with Title 33. The regulations at 33 CFR 95 establish alcohol intoxication standards for recreational vessel operators, and this is a logical location, considering that the regulations pertaining to marine parades and regattas and boating safety are all part of Title 33. Hence, Title 33 is a logical place in the Coast Guard regulations for commercial vessel operators and mariners, as well as the recreational boating public, to seek information on alcohol and drug abuse.

Unlike the regulations at Title 33, the Coast Guard regulations at Title 46 are almost exclusively concerned with U.S. commercial vessels and U.S. mariners and are directed at marine employers. The first part of Title 46, Subchapter A, *Procedures Applicable To The Public,* and Part 4 of Subchapter A, *Marine Casualties Investigations,* are widely recognized as applicable to foreign vessels that experience a marine accident on U.S. waters as well as to U.S.

---

[43] Of the 16 subchapters in Title 33 relating to Coast Guard functions, 12 are of interest to all vessels, including foreign vessels.

To provide uniformity, adopt the criteria for "serious marine incident" described at 46 CFR 4.03-2 as the criteria for initiating postaccident testing for commercial vessels in the regulations at 33 CFR 95 and in any future combined regulations. (M-98-78)

Establish a requirement that postaccident testing for drugs begin within 4 hours of a serious marine incident and postaccident testing for alcohol begin within 2 hours of a serious marine incident, with attempts to test for alcohol ceasing after 8 hours, and establish a requirement that the marine employer document any testing delays or failures. (M-98-79)

Expand the regulations at 33 CFR 95 to incorporate the provisions for postaccident testing currently found at 46 CFR 4.06 with a minimum of cross-referencing to other regulations, so that postaccident testing requirements are easy to read and comprehend and are found in one part of the regulations. (M-98-80)

Establish a provision in the postaccident testing regulations that prohibits mariners involved in an accident from consuming alcohol for 8 hours afterwards, or until breath or blood and urine specimens are collected, or until released by the Coast Guard. (M-98-81)

**--to the Maine Department of Transportation:**

Nominate a representative familiar with bridge design or bridge maintenance to participate on the Portland Port Safety Forum. (M-98-82)

**--to the Federal Highway Administration:**

Inform, in cooperation with the American Association of State Highway and Transportation Officials, State highway departments of the circumstances of this accident and recommend that the States evaluate the adequacy of fendering systems at bridge piers where the systems were not designed for the type and size of vessel currently using the waterway and may not be adequate to protect the bridge and take corrective action as necessary. (M-98-83)

**--to the American Association of State Highway and Transportation Officials (AASHTO):**

Inform, in cooperation with the Federal Highway Administration, State highway departments of the circumstances of this accident and recommend that the States evaluate the adequacy of fendering systems at bridge piers where the systems were not designed for the type and size of vessel currently using the waterway and may not be adequate to protect the bridge and take corrective action as necessary. (M-98-84)

EXHIBIT 2

## Actions needed by States

### HIGHWAY

#### Improve Child Occupant Protection

- Enact State laws requiring booster seats for young children.

#### Enact Primary Seat Belt Enforcement Laws

- Increase the number of people who wear seat belts through stronger enforcement laws.

#### Promote Youth Highway Safety

- Strengthen underage drinking and driving laws.
- Enact graduated driver licensing legislation.
- Prohibit nighttime driving by young novice drivers.
- Restrict the number of teen passengers traveling with young novice drivers.

#### Eliminate Hard Core Drinking Driving

- Enact State legislation and take other actions that are proven to reduce crashes involving those who repeatedly drink large amounts of alcohol and drive including:
- frequent, statewide sobriety checkpoints.
- legislation to create stricter sanctions for those arrested the first time with a high blood alcohol concentration (>or = 0.15 BAC).
- zero blood alcohol requirement for convicted DWI offenders when they get their license back.
- administrative rather than court-based license revocation for refusing to take or failing the sobriety test.
- vehicle sanctions for DWI offenders.
- eliminate plea-bargaining DWI offenses and programs that divert offenders and purge the offense record.
- retain DWI offense records (to identify and prosecute repeat offenders) for at least 10 years.
- develop and operate special sanction (court-based) programs for hard core DWI offenders.

#### Improve School Bus/Grade Crossing Safety

- Install stop signs at passive crossings.
- Prioritize for upgrade to lights and gates, crossings that school buses traverse that now only have warning signs.
- Install noise-reducing switches on new buses.
- Enhance bus driver training and evaluation.
- Include grade crossing questions on CDL exams.

### MARINE

#### Enhance Recreational Boating Safety

- Require mandatory education of boat operators.
- Require use of life jackets for children.
- Require safety instruction prior to personal watercraft rental.

*November 2004*

---



**NTSB**

**Transportation Safety Improvements**

*Critical changes needed to reduce transportation accidents and save lives.*

# NTSB

## AVIATION

**The Federal Aviation Administration should act to:**

**Reduce Dangers to Aircraft Flying in Icing Conditions**
- Use current research on freezing rain and large water droplets to revise the way aircraft are designed and approved for flight in icing conditions.
- Give flight crews accurate information to quickly recognize dangers of all types of icing and maintain airspeeds to avoid loss of aircraft control.

**Eliminate Flammable Fuel/Air Vapors in Fuel Tanks on Transport Category Aircraft**
- Modify procedures to reduce the potential for flammable fuel/air vapors in fuel tanks until permanent changes *can be implemented.*
- Implement design changes to eliminate the vulnerabilities of flammable fuel/air vapors in all transport category aircraft.

**Stop Runway Incursions/Ground Collisions of Aircraft**
- Give immediate warnings of probable collisions/incursions directly to flight crews in the cockpit.

**Improve Audio and Data Recorders/Require Video Recorders**
- Require cockpit voice recorders to retain at least 2 hours of audio.
- Require back-up power sources so cockpit voice recorders collect an extra 10 minutes of data when an aircraft's main power fails.
- Inspect and maintain data recorders yearly to make sure they operate properly.
- Install video recorders in cockpits to give investigators more information to solve complex accidents.

**Require Restraint Systems for Children Under Age 2**
- Require restraints for infants and small children during takeoff, landing, and in turbulent conditions to provide them the same protection as other airline passengers.

## RAILROAD

**The Federal Railroad Administration should act to:**

**Implement Positive Train Control Systems**
- Prevent train collisions and overspeed accidents by requiring automatic control systems to override mistakes by human operators.

**Improve Survivability of Recorders**
- Improve event recorder design survivability on new and rebuilt locomotives to protect data from fire and impact forces during train accidents.

## NTSB CLASSIFICATION



● ● ● Unacceptable response

● ● Acceptable response, progressing slowly

● Acceptable response, progressing in a timely manner

---

# Actions needed by Federal Agencies

## HIGHWAY

**The Federal Motor Carrier Safety Administration should act to:**

**Improve the Safety of Motor Carrier Operations**
- Prevent motor carriers from operating if they put vehicles with mechanical problems on the road or unqualified drivers behind the wheel.

**Prevent Medically-Unqualified Drivers from Operating Commercial Vehicles**
- Establish a comprehensive medical oversight program for interstate commercial drivers.
- Ensure that examiners are qualified and know what to look for.
- Track all medical certificate applications.
- Enhance oversight and enforcement of invalid certificates.
- Provide mechanisms for reporting medical conditions.

**The National Highway Traffic Safety Administration and U.S. DOT should act to:**

**Enhance Protection for Bus Passengers**
- Redesign motor coach window emergency exits so passengers can easily open them.
- Issue standards for stronger bus roofs and require them in new motor coaches.
- Devise new standards to protect motor coach passengers from being thrown out of their seats or ejected when a bus sustains a front, side, or rear impact or rolls over.

## MARINE

**The U.S. Coast Guard should act to:**

**Improve Drug and Alcohol Testing of Crews After Accidents**
- Strengthen and clarify regulations to require that drug and alcohol testing be conducted quickly after serious marine accidents.

## INTERMODAL

**The U.S. Department of Transportation, Federal Aviation Administration, U.S. Coast Guard and Pipeline and Hazardous Materials Safety Administration should act to:**

**Update Hours-of-Service Regulations in Aviation, Marine and Pipeline Industries**
- Set working hour limits for flight crews, aviation mechanics, pipeline controllers, mariners and other transportation operators, and provide predictable work and rest schedules based on current fatigue research, circadian rhythms, sleep and rest requirements.

**National Transportation Safety Board**
490 L'Enfant Plaza, SW • Washington, DC 20594
(202) 314-6000 • http://www.ntsb.gov

EXHIBIT 3

*Most Wanted*

*Transportation Safety*

*Improvements*

*Federal Issues*

# Marine

# Improve Drug and Alcohol Testing of Crews After Accidents

### Objective

• Strengthen and clarify regulations to require that drug and alcohol testing be conducted quickly after serious marine accidents.

### Importance

In accidents involving human error, the Safety Board must first determine whether toxicological issues can be excluded as causal to the accident.  If drugs and alcohol cannot be excluded, the Board may jeopardize its assessment of other critical issues, such as fatigue.  Therefore, post accident toxicological testing is extremely important to accident

investigations.  The potential effects of alcohol or drug use as a causal factor in major marine accidents frequently cannot be ruled out because testing is not done at all, or is often not done correctly and in a timely manner.  This is usually attributable to lack of knowledge of the testing requirements for alcohol, because Coast Guard regulations for postaccident alcohol and drug testing are unclear.  In the Board's special investigation and investigation reports, *Postaccident Testing for Alcohol and Other Drugs in the Marine Industry* and *the Ramming of the Portland-South Portland (Million Dollar) Bridge at Portland, Maine, by the Liberian Tankship Julie N on September 27, 1996*, the Board cited 27 additional cases since the *Exxon* Valdez oil spill in 1989 in which mandatory post-accident alcohol and drug testing were not properly completed after serious marine accidents.  The Board's recommendations, issued to the U.S. Coast Guard in May 1998, call for a series of improvements related to alcohol and drug testing.  (See safety recommendations section in this issue area.)

## Summary of Action

Congress, citing the Safety Board's special investigation report in its 1998 Coast Guard Authorization Act (PL 105-383), revised 46 *United States Code*, by adding a new section 2303–*Post Serious Marine Casualty Alcohol Testing.*  On February 28, 2003, the Coast Guard published an NPRM (USCG-2001-8773) proposing to amend 46 CFR Part 4, to change the drug and alcohol testing requirements for commercial vessels following a serious marine accident in accordance with the changes in PL105-383. *[2]*  In October 2003, the Coast Guard reopened the public comment period for the NPRM until November 20, 2003, because the public meeting to discuss the proposed changes scheduled for September 19, 2003, was cancelled because of Hurricane Isabel.  According to the Coast Guard, some 121 comments were received during the comment periods.  Although 6 years have elapsed since the Board's recommendations were issued and the Public Law enacted, it appears that the proposed changes in the NPRM will address most of the safety recommendations in this issue area if it becomes a final rule.  Expected publication date is now April 2005.

## Action(s) Remaining

Issuance of a final rule by the Coast Guard on alcohol and drug testing requirements for

commercial vessels following a serious marine accident.

**Safety Recommendations**

**M-98-71 (USCG)**

**Issued May 5, 1998**

**Added to the Most Wanted List: 2002**

**Status:  Open—Acceptable Response**

Incorporate language into the postaccident testing regulations that clearly states alcohol testing is more time•sensitive and therefore should be conducted ahead of drug testing.  (Source: *Postaccident Testing for Alcohol and Other Drugs in the Marine Industry and the Ramming of the Portland-South Portland (Million Dollar) Bridge at Portland, Maine, by the Liberian Tankship Julie N on September 27, 1996 [NTSB/SIR-98-02])*

**M-98-72 (USCG)**

**Issued May 5, 1998**

**Added to the Most Wanted List: 2002**

**Status:  Open—Acceptable Alternate Response**

Institute a task force that will evaluate deficiencies in past postaccident alcohol and drug testing performance and use "lessons learned" to implement a program that ensures testing is performed in a manner that will produce meaningful results.  (Source:    *Postaccident Testing for Alcohol and Other Drugs in the Marine Industry and the Ramming of the Portland-South Portland (Million Dollar) Bridge at Portland, Maine, by the Liberian Tankship Julie N on September 27, 1996 [NTSB/SIR-98-02])*

## M-98-73 (USCG)

## Issued May 5, 1998

## Added to the Most Wanted List: 2002

## Status:  Open—Acceptable Response

Implement a procedure for Coast Guard personnel to conduct breath testing of mariners who are involved in a serious marine incident, as defined by 46 CFR 4.03-2, when testing by the marine employer will not or cannot take place within 2 hours of the accident.  (Source: *Postaccident Testing for Alcohol and Other Drugs in the Marine Industry and the Ramming of the Portland-South Portland (Million Dollar) Bridge at Portland, Maine, by the Liberian Tankship Julie N on September 27, 1996 [NTSB/SIR-98-02])*

## M-98-75 (USCG)

## Issued May 5, 1998

## Added to the Most Wanted List: 2002

## Status:  Open—Acceptable Response

Establish a requirement in the postaccident testing regulations that foreign commercial vessels on the navigable waters of the United States, as well as U.S. oceangoing vessels, must have on board breath•testing devices capable of determining the presence of alcohol in a person's system and urine specimen collection and shipping kits.  (Source: *Postaccident Testing for Alcohol and Other Drugs in the Marine Industry and the Ramming of the Portland-South Portland (Million Dollar) Bridge at Portland, Maine, by the Liberian Tankship Julie N on September 27, 1996 [NTSB/SIR-98-02])*

## M-98-76 (USCG)

## Issued May 5, 1998

## Added to the Most Wanted List: 2002

**Status:  Open—Unacceptable Response**

Establish a requirement in the postaccident testing regulations that foreign vessels on the navigable waters of the United States and oceangoing U.S. vessels have a postaccident testing plan that identifies crewmembers who will conduct the testing; sets forth the qualifications for crewmembers assigned to conduct the testing; establishes procedures for the care of specimens, including chain of custody; lists the records to be prepared; and provides identification and addresses for testing laboratories that can process urine specimens or testing firms that may assist or conduct postaccident testing for vessels in U.S. ports.  (Source: *Postaccident Testing for Alcohol and Other Drugs in the Marine Industry and the Ramming of the Portland-South Portland (Million Dollar) Bridge at Portland, Maine, by the Liberian Tankship Julie N on September 27, 1996 [NTSB/SIR-98-02])*

**M-98-77 (USCG)**

**Issued May 5, 1998**

**Added to the Most Wanted List: 2002**

**Status:  Open—Acceptable Response**

Incorporate language into the postaccident testing regulations that clearly states that breath or blood specimens are for determining the presence of alcohol and that urine specimens are used to determine the presence of dangerous drugs.  (Source:    *Postaccident Testing for Alcohol and Other Drugs in the Marine Industry and the Ramming of the Portland-South Portland (Million Dollar) Bridge at Portland, Maine, by the Liberian Tankship Julie N on September 27, 1996 [NTSB/SIR-98-02])*

**M-98-79 (USCG)**

**Issued May 5, 1998**

**Added to the Most Wanted List: 2002**

**Status:  Open—Acceptable Response**

Establish a requirement that postaccident testing for drugs begin within 4 hours of a serious

marine incident and postaccident testing for alcohol begin within 2 hours of a serious marine incident, with attempts to test for alcohol ceasing after 8 hours, and establish a requirement that the marine employer document any testing delays or failures.  (Source:  *Postaccident Testing for Alcohol and Other Drugs in the Marine Industry and the Ramming of the Portland-South Portland (Million Dollar) Bridge at Portland, Maine, by the Liberian Tankship Julie N on September 27, 1996 [NTSB/SIR-98-02])*


**M-98-81 (USCG)**

**Issued May 5, 1998**

**Added to the Most Wanted List: 2002**

**Status:  Open—Acceptable Response**

Establish a provision in the postaccident testing regulations that prohibits mariners involved in an accident from consuming alcohol for 8 hours afterwards, or until breath or blood and urine specimens are collected, or until released by the Coast Guard.  (Source:  *Postaccident Testing for Alcohol and Other Drugs in the Marine Industry and the Ramming of the Portland-South Portland (Million Dollar) Bridge at Portland, Maine, by the Liberian Tankship Julie N on September 27, 1996 [NTSB/SIR-98-02])*


[2] The Safety Board provided written comments to the NRPM on June 30, 2003, consistent with its recommendations.


[Most Wanted Marine](#)

[Most Wanted Home](#)

[NTSB Home](#)

EXHIBIT 4



Presented By



Find a Car
Find a Job
Find a Home
Find a Business
Cashback Mall



**On the road to good health!**
**The new Southcoast Health Van**

Access to FREE health screenings & education and blood donation. Find out when the van will be in your neighborhood.

Acushnet
Dartmouth
Fairhaven
Fall River
Freetown
Lakeville
Marion
Mattapoisett
New Bedford
Rochester
Wareham
Westport

Top Stories
Headlines
Local News
World/Nation
State/Region
Living
Sports
Opinion

New Today
Announcements
Employment
Rentals
Real Estate
Boating
Miscellaneous
Financial
Service Directory
Transportation
Garage / Yard Sale

## Drug, alcohol test delay frustrates local officials

*By JENNETTE BARNES, Standard-Times staff writer*

SouthCoast officials reacted with anger and frustration yesterday in the wake of the latest revelations surrounding the April 27 oil spill in Buzzards Bay.

"This new development is very disturbing," said Rep. John F. Quinn, D-Dartmouth, commenting on reports that drug and alcohol tests were not performed on the tugboat crew until 18 hours after the barge hit a submerged object.

"What else do we not know that went on during the critical hours after the leak started?" he asked.

In addition to the delayed tests for drugs and alcohol, officials have balked at Bouchard Transportation Co.'s changing estimates of how much oil was spilled, the question of how the barge could have run aground, and the crew's delay in reporting the spill to the Coast Guard.

"I had faith in the Coast Guard," said a disappointed state Sen. Mark C.W. Montigny. But he said the Coast Guard and Bouchard are "much too comfortable together in the cleanup.

"All this mushy love fest has done nothing to alter the concerns that I have and the public has," he said.

Federal law encourages the Coast Guard and the responsible party to work together. Bouchard has led the cleanup, contracted for the drug testing and made its own estimates of the gallons spilled, using the information to issue joint press releases with the Coast Guard.

"It's like letting drunk drivers get their own test and come to the station with the results," Sen. Montigny said.

He said the federal law should be changed, but expressed little hope that a change would happen, blaming ties between the Bush administration and the oil industry.

The state's response doesn't fare any better in his estimation.

"I trust the company on a 1-10 scale at about zero right now, and it's low single digits for (the Department of Environmental Management) and the Coast Guard at this point," he said. "But I hope they regain the confidence of the people I represent."

With the approval of the state budget yesterday, a legislative commission was created to examine the Bouchard oil spill in Buzzards Bay.

A criminal investigation by the U.S. Attorney General's office already is under way,

State Rep. Mark A. Howland agreed that Bouchard should have less of a

Full Headlines
Obituaries
Lottery
Crossword
Horoscopes
Back Editions
Special Reports
Police Logs
Building Permits

role in the investigation.

"It's a crime to let the responsible party be a party to dictating the terms of their own cleanup," he said. "The spill only gets reported if another boat reports it. That's a pretty bad system."

Rep. Howland said he and his wife, Bonnie A. Howland, volunteered for the cleanup and saw firsthand the "gloss" put on by Bouchard.

Bouchard spokeswoman Suzanne Tavani said the delay in alcohol testing happened because the testing company Bouchard hired refused to motor out to the barge at the "late hour" when the spill was contained.

"Our first duty was to respond to the spill, and we did that," she said. "We called the company, and they wouldn't go out."

The criminal investigation should answer any questions about the alcohol testing, U.S. Rep. Barney Frank said yesterday.

Coast Guard Capt. Mary Landry, who served as on-site coordinator for the cleanup, declined to comment on the alcohol testing. Once the federal probe began, she could be charged with obstruction of justice if she discussed the case, she said.

Samantha Martin, spokeswoman for the U.S. attorney's office, would not comment on the investigation or its timeline.

Public hearings of the legislative commission will begin soon, Rep. Quinn said.

Members of the House and Senate will sit on the commission, along with representatives of Gov. Mitt Romney's administration and the state attorney general's office.

This story appeared on Page A3 of The Standard-Times on July 1, 2003.



Learn more about New Bedford's History

 DISCUSS THIS STORY

 PRINT THIS PAGE

 EMAIL TO A FRIEND

MUFFLER & BRAKE SYSTEMS
Click here for
$3.00 off any oil
and filter change!

ALFERES REALTY
Click for our
New Website!

EXHIBIT 5

**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commander
First Coast Guard District

405 Atlantic Ave.
Boston, MA 02110-3334
Staff Symbol: (d)
Phone: 617-223-8480
FAX:   617-223-8115
Email:  vcrea@d1.uscg.mil

5730

OCT 3 1 2003

The Honorable Barney Frank
House of Representatives
2252 Rayburn H.O.B.
Washington, DC 20515-2104

Dear Representative Frank:

I would like to thank you and your colleagues, Senator Kennedy, Senator Kerry, Representative
Delahunt, and Representative McGovern for your letter of September 9, 2003, and for your
recommendations to strengthen the provisions regarding the Regulated Navigation Area (RNA)
that governs Buzzards Bay and the Cape Cod Canal. I agree that we must make every effort to
reduce the likelihood of future spills. Thus, I welcome your comments and recommendations to
mitigate the risks and would like to take this opportunity to address some of your concerns.
Several mechanisms are available to address mitigation strategies while the single-hull phaseout
timeline continues. I want to move forward with the implementation of the most effective
strategies and expedite them through the regulatory process if appropriate.

On September 9 & 10, 2003, the Coast Guard conducted a formal Ports and Waterways Safety
Assessment (PAWSA) for Buzzards Bay. The PAWSA process is a structured approach for
obtaining expert judgments on the level of waterway risk. The PAWSA identified issues that
coincide with your stated concerns and recommendations: assist tugs and moving traffic lanes
and anchorages further offshore. I will seek further definition and public comment on assist tugs
through the Federal Register. The North East Pilots' Association (NEPA) has drafted a proposal
for commercial traffic lanes. I will continue to work with them to move their proposal forward,
including an evaluation of designated commercial anchorages.

Your recommendation for tracking barges operating in Buzzards Bay with Automatic
Information System (AIS) has come at an opportune time. On July 1, 2003 the Coast Guard
published a notice in the Federal Register that requests comments from industry and the general
public for expansion of AIS carriage requirements for U.S. waters. I have forwarded this letter
to the docket (#USCG-2003-14878) for consideration, and I have enclosed that notice for your
information. The current interim rule for AIS will require towing vessels which use a Vessel
Traffic Service (VTS) to be equipped with AIS. This accounts for most towing vessels which
transit the Cape Cod Canal because they also operate in the New York VTS area. Through the
regulatory process, we will establish timelines for the mandatory carriage of AIS by various
categories of vessels. The Coast Guard also plans to expand, over time, its shoreside AIS
infrastructure to enable vessel tracking and improve navigation safety and collision avoidance in
areas such as Buzzards Bay. I will work to accelerate that capability in Buzzards Bay.

I note your concern regarding potential problems that may exist with the chart listings. My Aids
to Navigation Staff continually works with all partners to identify and eliminate these types of
situations. We have developed excellent rapport with all communities in the Buzzard's Bay area,
and I have asked my staff to reach out to your concerned Harbormasters so that we can expedite
corrections, if needed.



5730

OCT 3 1 2003

## Subj: RESPONSE TO REPRESENTATIVE FRANK'S INQUIRY OF SEPTEMBER 9, 2003, CONCERNING EXPANSION OF REGULATIONS OF BUZZARDS BAY RNA.

Again, I would like to thank you and your colleagues for your commitment to the environment. We look forward to working with you to further enhance the safety, security and protection of the marine environment in the Buzzard's Bay area. Please feel free to contact me directly at (617) 223-8480, or my Chief of Marine Safety, CAPT Mark VanHaverbeke, at (617) 223-8443. We would be pleased to respond to any further questions you or your staff may have.

Sincerely,

*V. S. Crea*

V. S. CREA
Rear Admiral, U. S. Coast Guard
Commander, First Coast Guard District

Enclosure:   Automatic Identification System; Expansion of Carriage Requirements for U.S. Waters, 68 Fed. Reg. 39,369 (2003)

Copy:   The Honorable Edward M. Kennedy
The Honorable John F. Kerry
The Honorable William D. Delahunt
The Honorable James P. McGovern
Commandant, U. S. Coast Guard (G-ICA)
Commander, Coast Guard Atlantic Area (Am)
Commanding Officer, Marine Safety Office Providence

2



EXHIBIT 6

This is **G o o g l e**'s text-only cache of http://www.usdoj.gov/usao/ma/presspage/Nov2004/Bouchard-plea-sentencing.htm as retrieved on Nov 24, 2004 17:41:58 GMT.

**G o o g l e**'s cache is the snapshot that we took of the page as we crawled the web.

The page may have changed since that time. Click here for the current page without highlighting.

Click here for the full cached page with images included.

To link to or bookmark this page, use the following url:

http://www.google.com/search?q=cache:CS3hTY8oGvsJ:www.usdoj.gov/usao/ma/presspage/Nov2004/Bouchard-plea-sentencing.htm+buzzards+bouchard+helm&start=1&hl=en&lr=&strip=1

*Google is not affiliated with the authors of this page nor responsible for its content.*

These search terms have been highlighted: buzzards bouchard helm

**United States Department of Justice**
*Michael J. Sullivan*
U.S. Attorney
District of Massachusetts

*United States Attorney's Office*
*John Joseph Moakley U.S. Courthouse*
*1 Courthouse Way, Suite 9200*
*Boston, MA 02210*
*Press Office: (617) 748-3139*

November 18, 2004

PRESS RELEASE

**BOUCHARD TRANSPORTATION CO. SENTENCED TO PAY
$10 MILLION FINE IN CONNECTION WITH THE BUZZARDS BAY OIL SPILL**

Boston, MA... United States Attorney Michael J. Sullivan; Thomas V. Skinner, Acting Assistant Administrator of the Environmental Protection Agency, Enforcement and Compliance Assurance; William Schenkelberg, Special Agent in Charge of the Northeast Region of the U.S. Coast Guard Investigative Services; and Thomas J. Healy, Special Agent in Charge of the U.S. Fish and Wildlife Service's Office of Law Enforcement, announced today that Chief U.S. Magistrate Judge Marianne B. Bowler sentenced BOUCHARD TRANSPORTATION COMPANY ("BTC"), of Hicksville, New York, to pay a fine of $10 million and ordered BTC to comply with several remedial measures designed to prevent future spills. In her sentencing Order, the Court endorsed the U.S. Attorney's Office recommendation that $7 million of the fine be used for eligible wetlands conservation projects in the Buzzards Bay Watershed area of Southeastern Massachusetts.

"In imposing the highest ever fine in an oil spill case in New England, the Court today has raised the stakes for shippers who fail to take the necessary steps to prevent oil spills like that in Buzzards Bay," stated U.S. Attorney Sullivan. "The U.S. Attorney's Office is pleased that the Court adopted its recommendation that $7 million of the total fine be used for wetlands conservation projects in Southeastern Massachusetts - the region that bore the full brunt of the spill."

Prior to the sentencing Chief Magistrate Judge Bowler accepted BTC's guilty plea to an Information charging it with one count of violating the Clean Water Act by negligently causing the discharge of approximately 98,000 gallons of oil into Buzzards Bay on April 27, 2003, when the oil barge its tugboat was towing, traveled outside the clearly marked Buzzards Bay channel and struck rocky shoals lying at a depth of 22 feet. BTC negligently caused the oil spill because its employee, the mate in charge of the vessel, operated the tugboat in a negligent manner and because BTC allowed this individual to remain at the helm of one of its tugboats despite repeated concerns that were raised about his competency.

"The well known environmental risks associated with the shipment of oil and other hazardous substances on our waterways requires that mariners exercise the highest degree of caution through professional seamanship. Disregard for the safety of others as well as our natural resources needs to be taken very seriously," said Captain Mary Landry, Commanding Officer of the Providence Coast Guard Marine Safety Office who was also the Federal On Scene Coordinator for the spill response. "Certainly, the Coast Guard,

along with other federal and state agencies, have done so in this case, and are committed to preventing any similar incidents in the future. Successful criminal prosecution is one of the many vital components in furthering the Coast Guard's mission to promote safety on our waterways and to protect our nation's maritime environment."

BTC also pleaded guilty to one count of violating the Migratory Bird Treaty Act by killing protected bird species as a result of this oil spill. According to the Information, the April 2003 oil spill killed hundreds of federally protected birds, necessitated the closure of thousands of acres of shellfish beds in Buzzards Bay, and affected close to ninety miles of Massachusetts' beaches and coastline.

"This is one of the largest criminal fines to be imposed under the Migratory Bird Treaty Act. It is exceeded only by the penalty paid following the 1989 Exxon Valdez oil spill in Alaska," stated Thomas J. Healy, Special Agent in Charge of the Fish and Wildlife Service's Office of Law Enforcement for the Northeast.

"The ecosystems of places like Buzzards Bay are irreplaceable and must be protected," said Thomas V. Skinner, EPA's Acting Assistant Administrator for Enforcement and Compliance Assurance. "This prosecution sends a clear message that ship operators that violate the
law and pollute our waters will be vigorously prosecuted."

The Criminal Charges

The oil spill occurred during the afternoon of April 27, 2003, a bright and clear day. A BTC owned and operated tugboat, named the Evening Tide, was traveling en route from Philadelphia to Sandwich, Massachusetts. The Evening Tide was towing an unpowered barge loaded with over four million gallons of #6 oil, a thick, viscous and adhesive petroleum. All navigational, communications, and steering systems aboard the Evening Tide were in good working order. Navigational charts identifying all hazards in the area, which are published by the National Oceanic and Atmospheric Administration, were on-board the Evening Tide in paper and electronic form.

While traveling northwards, the Evening Tide veered off course as neared the first green buoy marking the beginning of Buzzards Bay channel. The Evening Tide and the barge traveled to the west of the first green buoy, the Information alleges, striking a series of rocks. The impact from the collision ripped a twelve foot hole in the bottom of the barge, rupturing one of the barge's ten separate tanks containing oil.

According to the Information, on the afternoon of April 27, 2003, the Mate was at the helm of the Evening Tide and was the person responsible for navigating and piloting the tugboat and barge during these hours. According to the Information, the Evening Tide Mate allowed the boat to drift off course and towards the rocks when he left the wheelhouse for an extended period of time to work at the stern of the tugboat. In leaving the wheelhouse unoccupied, the Evening Tide Mate violated the Evening Tide's "Watch Standing Orders" which stated that the Mate or Captain shall, "never leave the bridge unattended while underway."

The Information also alleged that the Evening Tide Mate did not monitor radio communications. As a result, the Information alleges, the Evening Tide Mate missed efforts by a vessel traveling behind the tugboat to warn the Evening Tide Mate that his boat was heading out of the clearly marked Buzzards Bay Channel.

According to the Information, BTC was on notice of complaints concerning the competency of the Evening Tide Mate. In particular, other captains who had worked with the Evening Tide Mate during his eight months with the company had raised questions with BTC's headquarters about whether the Evening Tide Mate was sufficiently qualified to be at the helm of a tugboat towing a barge loaded with oil.

Terms of Sentencing

Immediately following today's hearing, BTC presented a $9 million check to the Clerk of the Court. Seven million dollars of the fine proceeds will be deposited in the North American Wetlands Conservation Act Fund for BTC's violations of the Migratory Bird Treaty Act. This fund is used by the Department of the Interior to finance public-private partnerships aimed at carrying out long term conservation projects that provide and enhance habitat for the migratory birds, fish and wildlife which depend on these fragile areas for their survival. In its sentencing Order, the Court endorsed the government's recommendation that the money ought to be spent in the Buzzards Bay Watershed, the area directly affected by the spill. The other $2 million will be directed toward the Oil Spill

Liability Trust Fund for BTC's violations of the Clean Water Act. The Oil Spill Liability Trust Fund is administered by the U.S. Coast Guard and used to pay clean up costs and damage claims for oil spills in which the responsible party is unknown.

BTC will also be placed on probation for a period of three years. The final $1 million portion of the criminal fine will be suspended and will be imposed only if BTC fails to comply with the conditions of probation. The conditions of probation imposed through the plea agreement include several remedial measures designed to prevent this type of oil spill from occurring again.

The investigation is being conducted by the Environmental Protection Agency's Criminal Investigation Division, the U.S. Coast Guard Investigative Services, and the U.S. Fish and Wildlife Service's Office of Law Enforcement. The U.S. Attorney would also like to recognize the U.S. Secret Service and the Massachusetts Environmental Police for their assistance to investigators on the case. This case is being prosecuted by Assistant U.S. Attorneys Jonathan F. Mitchell and Nadine Pellegrini, along with the Environmental Protection Agency's Senior Criminal Enforcement Counsel, Peter Kenyon. The federal investigation also received substantial assistance from Assistant Attorney General Paul Molloy of the Massachusetts Attorney General's Environmental Crimes Strike Force.

Press Contact: Samantha Martin, (617) 748-3139