UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
)
THE UNITED STATES OF AMERICA,    )
)
Plaintiff,    )
v.    )
)
THE COMMONWEALTH OF    )
MASSACHUSETTS, et al.    )    Civil Action No. 05-10112 JLT
)
Defendants,   and   )
)
THE COALITION FOR BUZZARDS BAY,    )
)
Intervenor-Defendant )
_____)
)
THE AMERICAN WATERWAYS OPERATORS, )
et al.    )
Intervenor-Plaintiff    )
v.    )
)
MITT ROMNEY, Governor of Massachusetts, et al. )
)
Defendants    )
_____)

**MEMORANDUM OF THE COALITION FOR BUZZARDS BAY IN OPPOSITION TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT
OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Authorities ..............................................................................................................ii

Introduction ........................................................................................................................1

Factual Background ............................................................................................................1

Legal Framework ...............................................................................................................5

Argument ...........................................................................................................................7

    I.    The Coast Guard's Delay is Unreasonable ...............................................................7

        A.    The Coast Guard Has Failed to Act for Seven Years.....................................7

        B.    The Coast Guard's Delay Undermines Congress' Statutory Scheme .........11

        C.    The Coast Guard's Delay Harms Extremely Important Interests ...............13

            1.    Congress Enacted 46 U.S.C. § 2303a to Protect Important Interests.......13

            2.    The Coast Guard's Half-Measure Does Not Render Its Delay Less Egregious .......14

        D.    The Coast Guard's Excuses Do Not Justify Its Unreasonable Delay or Prevent the Court from Ordering Compliance .........................................................................16

    II.    Alternatively, The Parties Should Be Permitted To Conduct Discovery on Disputed Issues of Fact .................................................................................................................17

Conclusion........................................................................................................................19

# TABLE OF AUTHORITIES

## Cases

Action Alliance of Senior Citizens v. Heckler, 789 F.2d 931 (D.C. Cir. 1986) ............................9

In re American Rivers and Idaho Rivers United,
    372 F.3d 413 (D.C. Cir. 2004)...................................................................................................7

Antone v. Block, 661 F.2d 230, (D.C. Cir. 1981) ..........................................................................9

In re Bluewater Network and Ocean Advocates, 234 F.3d 1305 (D.C. Cir. 2000)........................8

Carmona v. Toledo, 215 F.3d 124 (1st Cir. 2000) ......................................................................19

Cutler v. Hayes, 818 F.2d 879 (D.C. Cir. 1987)....................................................... 5, 6, 11, 16

In re International Chemical Workers Union, 958 F.2d 1144 (D.C. Cir. 1992) .......................6, 8

MCI Telecommunications Corp. v. F.C.C., 627 F.2d 322 (D.C. Cir. 1980)..............................7, 8

Midwest Gas Users Ass'n v. F.E.R.C., 833 F.2d 341 (D.C. Cir. 1987) .......................................7

NRDC  v. Fox, 93 F. Supp. 2d 531 (S.D.N.Y. 2000) ................................................................11

NRDC v. Patterson, 2004 U.S. Dist. LEXIS 22499 (E.D. Cal. 2004).........................................11

Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55 (2004) ..........................................11

Public Citizen Health Research Group v. Auchter, 702 F.2d 1150 (D.C. Cir. 1983)....................8

Public Citizen Health Research Group v. Brock, 823 F.2d 626 (D.C. Cir. 1987) .......................8

Puerto Rico Sun Oil Co. v. U.S. Envtl. Prot. Agency, 8 F.3d 73 (1st Cir. 1993)...........................5

St. Lawrence Seaway Pilots Ass'n v. Collins, 362 F. Supp. 2d 59 (D.C. Cir. 2005)....................8

Telecommunications Research and Action Center v. FCC,
    750 F2d 70 (D.C. Cir. 1984)......................................................................................... 6, 8, 12

United Steelworkers of America v. Rubber Manufacturers Association,
    783 F. 2d 1117 (D.C. Cir. 1986)...............................................................................................10

## Statutes and Regulations

46 U.S.C. § 2303a......................................................................................................... passim

5 U.S.C. § 555(b).............................................................................................................................5

5 U.S.C. § 706(1)................................................................................................................. 1, 5, 11

M.G.L. c. 21M § 3 .........................................................................................................................13

M.G.L. c. 21M, § 3 ..........................................................................................................................5

An Act Relative to Oil Spill Prevention and Response in Buzzards Bay and Other Harbors and
    Bays of the Commonwealth, 2004 Mass. Acts 251 (Aug. 4, 2004),
    as amended by 2004 Mass. Acts 457 § 1 (Dec. 30, 2004) .....................................................5

Coast Guard Authorization Act of 1998,
    Pub. Law 105-383, Title III, § 304(d), 112 Stat. 3411 (1998) ..................................................2

33 C.F.R. § 95.020(b) ......................................................................................................................4

46 C.F.R. § 4.06-20(b) .....................................................................................................................2

## INTRODUCTION

The United States Coast Guard has delayed for nearly seven years in acting upon a clear and unequivocal Congressional instruction to ensure that alcohol testing of crew members is conducted within two hours of a serious marine incident ("SMI"). Rather than condone the Coast Guard's long delay, this Court should impose upon the Coast Guard a specific schedule for complying with Congress' mandate. Seven years is patently too long to wait for the promulgation of regulations that "ensure that after a serious marine casualty occurs, alcohol testing of crew members…is conducted no later than two hours after the casualty occurs." 46 U.S.C. § 2303a.

Given the extreme length of the delay and the threat continued delay poses to public safety and the environment, it is appropriate for this Court to exercise its authority under 5 U.S.C. § 706(1) to compel the Coast Guard to fulfill at last its statutory duty. At a minimum, this Court should retain jurisdiction to ensure that the Coast Guard moves towards the promulgation of a final rule by the end of 2005. In the alternative, this Court should provide The Coalition for Buzzard's Bay ("The Coalition") with sufficient time to conduct discovery on the issues raised by the United States, as such discovery is likely to establish facts essential to The Coalition's opposition and, given the infancy of this case, could not reasonably have been conducted sooner.

## FACTUAL BACKGROUND

In 1998, acting in response to "the failure of the Coast Guard to adequately address the industry-wide problem of postaccident alcohol and drug testing," Statement of Additional Material Facts ("SAMF")[1] at ¶ 3, Congress ordered the Coast Guard to "establish procedures to

---

[1] The Statement of Material Facts may be found beginning at Page 7 of the Response Of The Coalition For Buzzards Bay to the United States' Statement of Material Facts as to Which There Is No Genuine Dispute and Statement of Additional Material Facts, filed herewith.

ensure that after a serious marine casualty occurs, alcohol testing of crew members…is conducted no later than two hours after the casualty occurs." Coast Guard Authorization Act of 1998 (the "Act"), Pub. Law 105-383, Title III, § 304(d), 112 Stat. 3411, 3419-3420 (1998) (codified at 46 U.S.C. § 2303a). Congress enacted 46 U.S.C. § 2303a in the wake of an SMI in which, on September 27, 1996, an oil tanker named the *Julie N* spilled 4,000 gallons of oil into the Fore River near Casco Bay after it collided with the south bascule pier of the Portland-South Portland (Million Dollar) Bridge in Portland, Maine. SAMF at ¶ 1. The pilot of the vessel was not tested for alcohol after the incident. SAMF at ¶ 2. The National Transportation Safety Board ("NTSB") concluded that "the pilot was not tested for alcohol because of the failure of the Coast Guard to adequately address the industry-wide problem of postaccident alcohol and drug testing." SAMF at ¶ 3. The NTSB report also described approximately twenty seven other cases since 1989 in which mandatory post-accident alcohol testing was either not conducted or was conducted long after the occurrence of an SMI. SAMF at ¶ 4.

It was this incident, as well as the "approximately 27 other cases since the Exxon Valdez oil spill in 1989 in which mandatory post-accident alcohol and drug testing was not properly completed after serious marine incidents," that led the Senate Committee on Commerce, Science, and Transportation (the "Committee") to conclude that "compliance with [current Coast Guard] requirement[s] is inadequate." SAMF at ¶ 5. The Coast Guard regulations in force at the time (which due to the Coast Guard's continued delay, have not yet been strengthened) required testing "as soon as possible following the occurrence of a serious marine incident." 46 C.F.R. § 4.06-20(b). In justifying its determination that testing should be required to be conducted within two hours of an SMI, the Committee stressed that the "window of opportunity to conduct

[alcohol] tests is short," and noted that "[f]ederal rules for accidents involving most of the other transportation modes," require alcohol testing within two hours.  SAMF at ¶ 6.

More than four years after its enactment, the Coast Guard published a Notice of Proposed Rulemaking under 46 U.S.C. § 2303a.  SAMF at ¶ 12.  The proposed rule would require marine employers to have certain alcohol-testing devices on board vessels in order to facilitate compliance with the two hour testing requirement.  SAMF at ¶ 13.  The Coast Guard anticipated that the proposed rule would serve as a deterrent from crew members using alcohol while on board a commercial vessel and would provide more accurate information regarding the role alcohol plays in serious marine incidents.  SAMF at ¶ 15.  The proposed rule anticipated that a final rule would become effective in the year 2003.  SAMF at ¶ 20.  Since the publication of the proposed rule, the NTSB, recognizing the extreme importance of post accident toxicological testing, included issuance of a final rule by the Coast Guard on its list of "Most Wanted Safety Transportation Improvements."  SAMF at ¶ 21.  Now, more than two years since the proposed regulation was published and nearly seven years since Congress directed the Coast Guard to act, the Coast Guard has yet to promulgate a final rule to fulfill that Congressional mandate.

During this long period of delay, marine incidents have occurred, following which alcohol testing has been conducted so far outside of the statutorily prescribed time period as to make the results virtually worthless.  One particularly salient reminder of the Coast Guard's failure came shortly after the publication of the proposed rule when the Bouchard Barge-120 released an estimated 98,000 gallons of thick, viscous and adhesive No. 6 fuel oil into Buzzards Bay (the "Bouchard-120 Oil Spill").  On the afternoon of April 27, 2003, the Bouchard Barge-120, loaded with more than four million gallons of No. 6 fuel oil, traveled outside of the well-marked Buzzards Bay channel and struck a submerged object, creating a twelve-foot rupture in

its hull and releasing tens of thousands of gallons of oil into Buzzards Bay.  SAMF at ¶ 22.  The

Bouchard-120 fuel oil fouled approximately 93 miles of the Bay's shoreline, closing countless

public and private beaches and contaminating waterfront property.  SAMF at ¶ 23.  The oil spill

also caused the deaths of approximately 450 birds including protected roseate terns and piping

plovers, as well as, loons, scoters, mergansers, oyster catchers and eiders.  SAMF at ¶ 24.  In

addition, the spill contaminated and forced the closure of thousands of acres of shellfish beds,

some of which remain closed today.  SAMF at ¶ 25.  The damage the spill caused to the Bay's

natural resources had a significant economic impact on certain sectors of the public, including a

number of The Coalition's members.  SAMF at ¶ 26.  The spill triggered a costly cleanup effort

that continues to this day.  SAMF at ¶ 27.  Yet it was reported that it was not until *eighteen* hours

after that alcohol testing of the crew members of the Bouchard-120 and its tow, the Evening

Tide, was conducted.  SAMF at ¶ 28.  Because of the long delay in testing and because alcohol is

eliminated quickly from the body such that, in an 8-hour period, as much as .12 to .14 percent

can be eliminated from the bloodstream,[2]  SAMF at ¶ 30, the alcohol tests conducted after the

Bouchard-120 Oil Spill were of little to no value.  It is thus currently unknown whether alcohol

was a contributing factor in the Bouchard-120 Oil Spill.  SAMF at ¶ 29.  Such incidents

demonstrate that, despite the steps the Coast Guard purports to have taken, including the "interim

step" of "asking" officials to follow the new statutory requirements and the publication of a

proposed rule, the Coast Guard is failing to satisfy Congress' mandate and should not be allowed

to continue its delay.

Following the Bouchard-120 Oil Spill, the Commonwealth of Massachusetts decided that

action was necessary to ensure alcohol testing would be conducted promptly after an SMI.  The

---

[2] Current regulations forbid the operation of a large vessel with a blood alcohol count of .04 or greater.  33 C.F.R. § 95.020(b).

Commonwealth enacted An Act Relative to Oil Spill Prevention and Response in Buzzards Bay and Other Harbors and Bays of the Commonwealth, 2004 Mass. Acts 251 (Aug. 4, 2004), as amended by 2004 Mass. Acts 457 § 1 (Dec. 30, 2004) (the "Oil Spill Prevention Act").  The Oil Spill Prevention Act requires, *inter alia*, alcohol testing in accordance with 46 U.S.C. § 2303a. M.G.L. c. 21M, § 3.  Rather than finalizing the alcohol testing regulations mandated by Congress, the Coast Guard has focused its energy on rendering unenforceable several provisions of the Oil Spill Prevention Act, including M.G.L. c. 21M, § 3.  Although the Coast Guard indicates that it "could" promulgate a final regulation by the end of 2005, given the inordinate amount of time it has taken to date and its apparent failure to recognize the importance of Congress' mandate, it is uncertain how long vessels traveling in the waters of the Commonwealth will continue be able to avoid the strictures Congress established in 46 U.S.C. § 2303a should the United States prevail.

## LEGAL FRAMEWORK

The Administrative Procedure Act ("APA") requires agencies to "within a reasonable time . . . proceed to conclude a matter presented to it."  5 U.S.C. § 555(b)  In order to enforce this requirement, the APA authorizes courts to "compel agency action unlawfully denied or unreasonably delayed." 5 U.S.C. § 706(1).  Although executive agencies are entitled to deference in how they implement their statutorily-required duties, "[t]he agency's discretion is not unbounded . . . since the consequences of dilatoriness may be great."  Cutler v. Hayes, 818 F.2d 879, 896 (D.C. Cir. 1987).  "Courts have adequate power to assure that flexibility does not become an excuse for permanent inaction."  Puerto Rico Sun Oil Co. v. U.S. Envtl. Prot. Agency, 8 F.3d 73, 80 (1st Cir. 1993).  Although in some cases an agency may be granted discretion as to the manner in which it will implement its statutory duties, once an agency

decides to proceed through rulemaking, the agency must pursue its course with "reasonable dispatch." Cutler, 818 F.2d at 895 ("Once FDA elected to respond to its legislative directive by establishing the OTC drug review program, the APA imposed an obligation to proceed with reasonable dispatch.").

In determining whether agency action has been "unreasonably delayed," a court should assess a number of factors. First, "the court should ascertain the length of time that has elapsed since the agency came under a duty to act." Cutler, 818 F.2d at 897. Second, the court should judge the reasonableness of the delay in the context of the statute authorizing the agency action. In re International Chemical Workers Union, 958 F.2d 1144, 1149 (D.C. Cir. 1992). Third, the court must examine the consequences of the agency's delay. Cutler, 818 F.2d at 898. Finally, the court should take into account "any plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources." Id. These justifications should always be weighted against the potential harm, however, and they "become less persuasive as delay progresses." Id. In considering the potential harm of agency delay, a "[l]ack of alternative means of eliminating or reducing the hazard necessarily adds to unreasonableness of a delay." Id. In this case, an examination of the outlined factors requires a finding by this Court that the Coast Guard has unreasonably delayed in responding to Congress' mandate.[3]

---

[3] While the United States elects in its Memorandum to outline and apply the six factors announced in Telecommunications Research and Action Center ("TRAC") v. FCC, 750 F2d 70 (D.C. Cir. 1984), its acknowledges that those factors have legitimately been narrowed to the four factors outlined above in subsequent court decisions. (See Memorandum in Support of the United States' Motion for Summary Judgment ("U.S. Memo.") at 9, n9) (citing In re International Chemical Workers Union).

**ARGUMENT**

The Coast Guard's failure for over seven years to implement the requirements of 46 U.S.C. § 2303a is patently unreasonable. Accordingly, this Court can and should use its authority under 5 U.S.C. § 706(1) to ensure that the Coast Guard acts promptly to prevent the economic and environmental harm and loss of life that are the direct results of that agency's continued delay and lassitude. This Court should deny the United States' Motion for Summary Judgment and require the Coast Guard to promptly fulfill Congress' mandate. Alternatively, the Court should deny the Unites States' Motion pursuant to Rule 56(f) and provide The Coalition with sufficient time to conduct discovery.[4]

## I.    The Coast Guard's Delay is Unreasonable

### A.    The Coast Guard Has Failed to Act for Seven Years

In 1998, nearly seven years ago, Congress mandated that the Coast Guard ensure that alcohol testing be conducted within two hours. Despite that clear mandate, to date no final rule has issued. As one court has noted, "[a] reasonable time for an agency decision could encompass months, occasionally a year or two, but not several years or a decade." Midwest Gas Users Ass'n v. F.E.R.C., 833 F.2d 341, 359 (D.C. Cir. 1987) (citing MCI Telecommunications Corp. v. F.C.C., 627 F.2d 322, 340 (D.C. Cir. 1980)). In this case, a seven year delay is simply too long to be reasonable.

Courts routinely hold that delays shorter than seven years are unreasonable. For example, the court in In re American Rivers and Idaho Rivers United, 372 F.3d 413 (D.C. Cir. 2004) found the Federal Energy Regulatory Commission's ("FERC") six year delay in

---

[4] The Coalition also incorporates the arguments of the Commonwealth of Massachusetts in its filings in response to the United States Motion for Summary Judgment of the same date.

responding to plaintiffs' petition to formally consult with the National Marine Fisheries Service ("NMFS") regarding FERC regulatory authority over certain hydropower operations to be "nothing less than egregious." *Id.* at 419. Similarly, in <u>Public Citizen Health Research Group v. Brock</u>, 823 F.2d 626 (D.C. Cir. 1987) the court held that a five year delay in the promulgation of a short-term exposure limit for the toxin ethylene oxide "treads at the very lip of the abyss of unreasonable delay" and ordered the Occupational Safety and Health Administration ("OSHA") to adhere to a particular schedule for completion of the regulatory process, despite the fact that delay was due, at least in part, to the refusal of another agency - the Office of Management and Budget ("OMB") - to approve earlier proposed regulations. <u>See also TRAC</u>, 750 F.2d 70 (five year delay warrants court retention of jurisdiction); <u>In re International Chemical Workers Union</u>, 958 F.2d 1144 (finding that six year regulatory delay since plaintiffs filed request with OSHA to promulgate standard for cadmium exposure is unreasonable and ordering publication of final rule by date proposed by agency); <u>Public Citizen Health Research Group v. Auchter</u>, 702 F.2d 1150 (D.C. Cir. 1983) (three year delay unreasonable); <u>MCI Telecommunications Corp.</u> , 627 F.2d 322  (four year delay is unreasonable). Here, the Coast Guard's seven year delay in responding to Congress' clear command is both egregious and unreasonable.[5]

The United States, evidently grasping the inordinately long period of time that has passed since the Coast Guard first came under this duty, attempts to deflect attention from that seven

---

[5] The Coalition notes that this is not the first instance in recent history in which the Coast Guard has been forced to defend its failure  to act in a timely manner.  Indeed, in 2000 the Court of Appeals for the District of Columbia Circuit found that the Coast Guard had unreasonably delayed in promulgating regulations establishing minimum compliance standards and use requirements for tank level and pressure monitoring devices.  <u>See In re Bluewater Network and Ocean Advocates</u>, 234 F.3d 1305 (D.C. Cir. 2000).  In 2005 the same court determined that it should retain jurisdiction over a claim that the Coast Guard had unreasonably delayed in reviewing and recalculating pilotage rates for the Great Lakes to ensure that "delay does not move into the realm of unreasonableness," after a four year delay.  <u>See St. Lawrence Seaway Pilots Ass'n v. Collins</u>, 362 F. Supp. 2d 59 (D.C. Cir. 2005), *vacated following completion of rulemaking by* 2005 U.S. Dist. LEXIS 8852 (D.D.C. 2005).  The Coast Guard's delay in this case is but a further example of the inability of the Coast Guard to proceed in a timely manner without court action.

year delay and focus instead on a two and one-half year period of delay by pointing to a drug and

alcohol testing rule proposed in 2003. (U.S. Memo. at 7). As a factual matter, the publication of

the proposed rule has done nothing to reduce the harm caused by the Coast Guard's delay. Nor

does the law bear out the United States' argument that the publication of a proposed rule in 2003,

"eradicated" harm caused by the Coast Guard's delay. (U.S. Memo. at 8). As relevant case law

makes clear, when considering a claim of agency delay, a court may calculate the delay from the

moment the agency was first required to act.[6] Contrary to the United States' arguments, the

cases it cites do not reflect a general principle that a non-final agency action will moot a claim

that final agency action has been unreasonably delayed. Action Alliance of Senior Citizens v.

Heckler, 789 F.2d 931 (D.C. Cir. 1986), and Antone v. Block, 661 F.2d 230 (D.C. Cir. 1981),

two of cases cited by the United States to support this notion, stand only for the proposition that

*once the delay has been remedied* an agency should not be "punished" for past delay by being

forced into an overly hasty implementation schedule.[7] Such cases are inapposite as here the

United States does not and cannot argue that the Coast Guard's delay has already been remedied.

Rather, the United States contends that it is possible, though by no means certain, that the delay

---

[6] For example, in In re International Chemical Workers Union, 958 F.2d at 1150, the D.C. Circuit, in the course of compelling OSHA to promulgate final rule, noted that a delay of six years was "so egregious as to demand the court's intervention to enforce as a deadline a termination date." 958 F.2d at 1148. The court did not "restart the clock" with the notice of proposed rulemaking, but rather calculated the delay from the moment the agency was first required to act. In Public Citizen Health Research Group v. FDA, 724 F. Supp. 1013 (D.D.C. 1989), the court noted that despite the publication of a proposed regulation and later issuance of a reproposed regulation, it did "*not* view the issue as being moot," 724 F. Supp. at 1020, and noted that the agency's delay of seven years since the time it obtained knowledge of the need for regulation was "wholly unreasonable and unacceptable." *Id.* at 1021. The court thus required FDA to complete the regulatory process by a date certain, despite the fact that the agency anticipated completing the process before the end of the year. *Id.* at 1022.

[7] In Action Alliance , the court refused to compel agency action because there was no action to compel–the Secretary of Health and Human Services had already approved, either finally or conditionally, all of the relevant regulations. 789 F.2d at 943 ("HHS has offered uncontradicted evidence to show that since the filing of this suit, the Secretary has approved all pending regulations and requested submission of the remainder . . . Currently, the Secretary is not withholding any action."). Similarly, in Antone, 661 F.2d at 234-5 the agency had already issued a *final* regulation, and the only question that remained was the reasonableness of the implementation schedule contained in that final regulation.

will finally be remedied by the end of 2005.  The Coast Guard's pace to date warrants

skepticism.[8]

The final case cited by the United States to support this notion, United Steelworkers of

America v. Rubber Manufacturers Association, 783 F. 2d 1117 (D.C. Cir. 1986), is inapposite as

in that case plaintiffs sought to require OSHA "to issue a NOPR within 30 days of the court's

decision."  The agency issued a notice of proposed rulemaking prior to oral argument, which

"mooted petitioners' claims *to the extent they were based upon that delay*." Id. at 1120 (italics

added).  The court refused to impose upon the agency the schedule for completion of the

rulemaking proposed by petitioners because the agency had itself devised and submitted to the

court a "facially reasonable" proposed schedule, and the court could not "say *in advance* that the

amount of time the agency contemplates taking to reach a final determination will constitute

unreasonable delay," as OSHA could not know, prior to the comment period, "how many

comments it will receive or the nature of those comments." Id.  In this case, unlike in United

Steelworkers, The Coalition seeks relief not simply with respect to the delay in issuance of a

proposed rule, but also with respect to the delay in promulgation of the *final* rule.  Therefore the

United States' argument that the publication of the proposed rule "mooted" The Coalition's

claim must fail.  Moreover, in this case, the Coast Guard completed the last of three public

comment periods almost two years ago, and it knows exactly how many comments it has

received.  (U.S. Memo at 9.).  Therefore, in the present case, unlike United Steelworkers, there is

no uncertainty which would prevent the court from setting a reasonable deadline for completion

of the rulemaking.

---

[8] The Coalition notes that while the Coast Guard's proposed rule anticipated that a final rule would become effective in the year 2003, SAMF at ¶ 20, and a 2003 article reported that the regulations would be enacted in later 2004, SAMF ¶ 28, final regulations have yet to issue.

**B.    The Coast Guard's Delay Undermines Congress' Statutory Scheme**

In considering the reasonableness of the delay, the Court should consider the legislative

mandate in the statute, the degree of discretion given the agency by Congress and "the extent to

which delay may be undermining the statutory scheme, either by frustrating the statutory goal or

by creating a situation in which the agency is 'losing its ability to effectively regulate'".  Cutler,

818 F.2d at 897-898.  Here, recognizing the importance of prompt alcohol testing in preventing

incidents, Congress assigned the Coast Guard a clear duty to ensure that alcohol testing occurs

within two hours of an SMI.  Even if the Coast Guard had discretion in how to implement that

duty,[9] once it decided to proceed through the rulemaking process it was bound to complete that

process with reasonable dispatch.[10]  See Cutler, 818 F.2d at 895. The absence of a deadline for

completion of this duty is not fatal to The Coalition's claim.  See NRDC  v. Fox, 93 F. Supp. 2d

531, 543 (S.D.N.Y. 2000) ("An agency action may be deemed "unreasonably delayed" where the

governing statute does not require action by a date certain, whereas an action is "unlawfully

withheld" when an agency fails to meet a clear deadline prescribed by Congress.").[11]  Although a

deadline can be helpful in determining a reasonable time table for promulgation of a rule, any

---

[9] Plaintiff cites Norton v. Southern Utah Wilderness Alliance ("SUWA"), 542 U.S. 55 (2004) for the proposition
that because the Coast Guard was given flexibility in deciding how to implement the 46 U.S.C. § 2303a, there is
no discrete action that the agency can be compelled to perform under 5 U.S.C. § 706(1).  (U.S. Memo. at n.12).
However, SUWA simply held that a court cannot compel compliance with a broad discretionary duty to "continue to
manage WSA's . . . in a manner so as not to impair the suitability of such areas for preservation as wilderness.".
The broad discretion at issue in SUWA is quite distinct from the clear and specific command from Congress to
ensure that alcohol testing occurs within two hours after an SMI.  In addition, subsequent cases have not given
SUWA such a broad interpretation.  See NRDC v. Patterson, 2004 U.S. Dist. LEXIS 22499 (E.D. Cal. 2004)
(holding that a statutory mandate to "reestablish and maintain" historic fisheries was specific enough to qualify as a
discrete action under SUWA).

[10] The United States indicates in its Memorandum that immediately following enactment of the statute, the Coast
Guard began working towards implementing 46 U.S.C. § 2303a via notice and comment rulemaking.

[11]See also TRAC, 750 F. 2d 70 (retaining jurisdiction after five year delay despite lack of deadline); In re
International Chemical Workers Union, 958 F. 2d 1144 (imposing deadline for completion despite absence of
specific statutory deadline).

"other indication of the speed with which [Congress] expects the agency to proceed" also provides "content for this rule of reason." TRAC, 750 F.2d at 80. The legislative history of 46 U.S.C. § 2303a states that, "the Committee does not believe that this requirement imposes a significant burden on the Coast Guard," SAMF at ¶ 11, suggesting that Congress did not intend a lengthy seven year delay in implementing the statute.

In addition, the Act contained an entire statutory scheme to prevent serious marine accidents resulting from the operation of marine vessels while under the influence of alcohol. This scheme included increased civil penalties for failure to comply with alcohol testing requirements and operating a vessel while under the influence of alcohol. SAMF at ¶ 9. Through these increased monetary penalties, Congress hoped to "provide a stronger disincentive to the operation of a vessel while intoxicated." SAMF at ¶ 10. Increased penalties for failure to perform alcohol testing will not have meaningful results where adequate requirements do not exist to ensure that the testing to be conducted is effective. Similarly, an effective testing scheme is necessary to provide evidence that individuals operated a vessel while under the influence of alcohol and should therefore be assessed penalties. Indeed, the NTSB recognized the extreme importance prompt testing has for accident investigations when it placed the promulgation of final Coast Guard regulations on its most wanted list. SAMF at ¶ 21. Actual compliance with the two hour testing requirement is necessary to produce the disincentive Congress hoped to create through the Act. The Coast Guard has itself acknowledged the disincentive the two hour testing requirement will provide. SAMF at ¶ 15. Because imposition of such penalties is directly tied to effective alcohol testing, the Coast Guard's failure to require effective testing renders the additional provisions of the Act useless.

### C.    The Coast Guard's Delay Harms Extremely Important Interests

#### 1.    Congress Enacted 46 U.S.C. § 2303a to Protect Important Interests

In enacting 46 U.S.C. § 2303a, Congress recognized the important impact that requiring prompt alcohol testing would have in preventing further threats to public safety and the environment. When vessels are operated by crew members under the influence of alcohol, there is a risk not only of severe economic and environmental damage similar to that caused by the Buzzard Bay Oil Spill, but also of loss of human life. Indeed, the legislative history related to 46 U.S.C. § 2303a indicates that Congress enacted the provision due, at least in part, to its concerns regarding the unnecessary toll alcohol-related marine incidents take on human lives. SAMF at ¶ 7. It was for this reason that Congress also increased monetary penalties for failure to comply with testing requirements and operation of a vessel while under the influence of alcohol, so as to provide "stronger disincentives" for those behaviors. SAMF at ¶ 10. When crew members are not routinely tested for alcohol promptly after an SMI, there is little deterrent to consuming alcohol while operating a vessel. While the economic and environmental damage the Coast Guard's delay may cause are sufficient to warrant judicial intervention, this Court should set an even lower bar for intervention here as human lives are at risk. See Cutler, 818 F.2d at 898.[12]

---

[12] In addition, the Coast Guard's actions in this particular case make intervention to put a stop to its delay even more crucial. Courts have noted that a "lack of alternative means for eliminating or reducing the hazard necessarily adds to unreasonableness of a delay." Cutler, 818 F. 2d at 898. In this case, the United States attempts to limit the authority of the Commonwealth to protect the health and welfare of its citizens by arguing that M.G.L. c. 21M § 3 is invalid because Congress has instructed the Coast Guard to regulate alcohol testing to the exclusion of the Commonwealth. However, while Congress has instructed the Coast Guard to ensure that alcohol testing is conducted within two hours of a serious marine incident, the Coast Guard has not acted. The United States thus asks this Court not only to sanction the Coast Guard's long delay in promulgating regulations, but also to strike the only effective regulation currently in place.

**2.   The Coast Guard's Half-Measure Does Not Render Its Delay Less Egregious**

The Coast Guard attempts to diminish the consequences of its delay by pointing to the "status quo," as though the status quo should be sufficient to satisfy this Court until the Coast Guard exhausts its list of excuses and finally focuses on ensuring timely alcohol testing.  The Coast Guard thus states that the current testing regulations and the "interim" step of "asking" all personnel to ensure alcohol testing is conducted within the 46 U.S.C. § 2303a time limits will merely be "bolstered" by the regulations the Coast Guard may "soon" issue.  (U.S. Memo. at 11).  However, it is precisely because the "status quo" is so clearly insufficient that the Coast Guard must be required to act promptly.

The failure of the existing regime is well-documented.  The Coast Guard itself admits its current regulations are inadequate.  See SAMF at ¶ 14 ("Without a specified time requirement to conduct alcohol or drug testing after an SMI, in some instances tests were not conducted, and in others instances tests were not completed soon enough for the results to provide a determination of whether alcohol was present in an individual's system at the time the SMI occurred.").  The Committee has so found.  See SAMF at ¶ 5 (concluding that "compliance with [current Coast Guard] requirement[s] is inadequate.")  And the NTSB concurs.  SAMF at ¶ 3 (finding that pilot had not been tested for alcohol because of the "failure of the Coast Guard to adequately address the industry-wide problem of postaccident alcohol and drug testing.").  Thus, there can be no serious debate that the current regulations do not suffice.

The United States argues, unconvincingly, that, as a result of the "interim steps" the Coast Guard has taken, there is "a diminished gap between [the] status quo and what will follow once a final rule is published."  (U.S. Memo. at 12).  The United States further argues that by taking the interim step of "asking all relevant Coast Guard personnel to ensure that alcohol

testing is conducted within the 46 U.S.C. § 2303a time limits," the Coast Guard has done "all that the statute . . . requires." (U.S. Memo. at 11). Such arguments, however, are called directly into question by the United States' and the Coast Guard's own admissions regarding the necessity for the rule. In the same memorandum in which it argues that the Coast Guard has done all that is required, the United States notes that, "[t]he Coast Guard . . . determined that safely ensuring alcohol testing within two hours of an SMI would likely require carriage of alcohol testing equipment on the great majority of vessels subject to the testing requirements of 46 C.F.R. Subpart 4.06." (U.S. Memo. at 3). In addition, in the preamble to its notice of proposed rulemaking, the Coast Guard states that "a regulatory requirement to conduct testing within the statutory timeframes cannot, by itself, ensure that alcohol testing after an SMI will be done within 2 hours." <u>SAMF</u> at ¶ 13. The United States cannot honestly believe both that the Coast Guard has fulfilled its statutory duty by merely "asking" its personnel to ensure compliance with the statute "whenever possible," (U.S. Memo. at 3), and that the Coast Guard needs to promulgate regulations requiring the carriage of alcohol testing equipment in order to fulfill its statutory duty. By its and the Coast Guard's own statements, the United States concedes that the Coast Guard's non-enforceable "policy instruction" does not *ensure* that alcohol testing will occur within two hours after an SMI.

Finally, there is practical evidence which indicates that the Coast Guard's "interim step" is insufficient to ensure compliance with the Act. As noted above it was reported that, in April of 2003, with the Coast Guard's "interim step" already long in effect, no crew member involved in the Bouchard-120 Oil Spill was tested for alcohol until approximately 18 hours after the spill that dumped 98,000 gallons of heavy, viscous No. 6 oil into the waters of Buzzard's Bay. <u>SAMF</u> at ¶ 28. At this stage in the proceeding, the United States has not proffered, nor has The

Coalition been able to locate, any evidence which indicates that the eighteen hour delay in alcohol testing following the Bouchard-120 Oil Spill was anything out of the ordinary.

> **D.    The Coast Guard's Excuses Do Not Justify Its Unreasonable Delay or Prevent the Court from Ordering Compliance**

In addition to attempting to diminish the importance of the promulgation of final regulations by pointing to its "interim step," the United States sets forth a laundry list of excuses for the Coast Guard's seven year delay.  The United States cites to limited resources, shifting priorities, complexity of issues, and agency restructuring, as justifications for its seven year delay.  While The Coalition is sympathetic to the Coast Guard's limitations, such limitations cannot justify the seven year delay that has beset the agency in this case.  See Cutler, at 898 (justifications for agency delay "become less persuasive as delay progresses.").  Moreover, a court order requiring compliance with Congress' mandate would likely solve many of the problems.  In addition, while the United States cites to such justifications, it has put not put forth, nor have the Commonwealth or The Coalition yet been able to discover, evidence supporting such claims.  If the United States intends to rely on such justifications to support the claim that its delay is not unreasonable, this Court should permit discovery of the facts supporting these claims.

While at this stage in the proceeding, prior to obtaining discovery, The Coalition is unable to comment on the particulars of the Coast Guard's resources or priorities, a review of the publicly available information related to the rulemaking indicates that despite the Coast Guard's assertions regarding the complexity of the issues involved, the issues are not so complex as to justify such a lengthy delay.  The Draft Regulatory Analysis for the proposed rule concludes that while the proposed rule will affect approximately 180,800 vessels, the per-vessel cost will be minimal.  SAMF at ¶ 16.  According to Coast Guard estimates, 90% of affected vessels will

incur initial costs of only approximately $185, followed by yearly costs of approximately $35 for training.  <u>SAMF</u> at ¶ 17.  The remaining 10% of affected vessels will opt to purchase more expensive equipment, incurring slightly higher costs.  <u>SAMF</u> at ¶ 17.  In fact, the "saliva alcohol screening devices" that the Coast Guard expects most vessels will elect to carry under the regulation cost between approximately $2 and $7 per stick.  <u>SAMF</u> at ¶ 18.  As to the proposed regulation's impacts on small businesses, information collection burdens, environmental impacts and federalism concerns, the Coast Guard had determined by at least the end of 2002 that such impacts, burdens or concerns were minimal if they existed at all.  <u>SAMF</u> at ¶ 19.  Further, while the Coast Guard received approximately 120 comments on the proposed rule, most of which reflect what appears to be a fairly consistent viewpoint of the affected industry in opposition to the proposed rule, the Coast Guard has had access to this relatively small number of comments for more than *eighteen months*.  In these eighteen months it has failed to make any discernable further progress towards finalization of the rulemaking process.  The Coast Guard has continued to operate at a snail's pace in working towards a final rule.

## II.    Alternatively, The Parties Should Be Permitted To Conduct Discovery on Disputed Issues of Fact

The Coalition believes that it is entitled to summary judgment because the Coast Guard has unreasonably delayed satisfying Congress's clear mandate.  However, in the event that the Court disagrees, the Coalition suggests that the Court should not enter judgment in favor of the Plaintiffs without first affording the Coalition an opportunity to conduct discovery.  The Coalition was not joined as a party to this action until April, 2005, and amended its Answer to assert this counterclaim on May 11, 2005, just two months ago.  Thus, the case is in its infancy,

and there has been no discovery.[13]   In this case, to the extent that the information currently

available is not sufficient to prove the point, discovery is necessary on issues related to the

reasonableness of the Coast Guard's delay.  The Coast Guard offers the Rabe Declaration to

support its position that it has not unreasonably delayed, yet The Coalition has had no

opportunity for discovery regarding the basis for the statements made in the Rabe Declaration.[14]

The Rabe Declaration raises a number of questions on which The Coalition would like

discovery, including but not limited to the following:

> The Coast Guard Guidance Letter:  The Coast Guard issued a policy letter to all Coast
> Guard marine safety inspection offices and other commands, bringing to their attention
> the provisions of section 2303a and requesting that they ensure alcohol testing be
> conducted in accordance with section 2303a whenever possible. Rabe Decl. ¶¶ 4-5.
>
>> Questions Raised:  What efforts have the Coast Guard offices,
>> commands, and districts made in response to the Guidance? What
>> has happened as a result of any of these efforts? What effect have
>> these efforts had on the timing of alcohol testing following a
>> serious marine casualty since the policy letter?
>
> The Complexity of Issues:  The regulatory process at issue here involves complex
> questions. Rabe Decl. ¶ 8.
>
>> Questions Raised:  What were the complex issues involved in the
>> Rulemaking? What were the qualifications needed to address
>> them? How much time was needed to address them? Did these
>> issues include costs?
>
> Suspension of Project.  Work was suspended on the regulation during most of the period
> from early 1999 through August 2001 because the limited number of personnel qualified
> to work on the rule were required to work on another, higher-priority regulatory project.
> Rabe Decl. ¶¶ 6, 11.

---

[13] No Rule 16 conference has yet been scheduled, and no Rule 26(f) conference has occurred.

[14] The Coalition disputes or has no basis for admitting or disputing several facts asserted by the United States to
justify the Coast Guard's long delay.  See Response Of The Coalition For Buzzards Bay to the United States'
Statement of Material Facts as to Which There Is No Genuine Dispute and Statement of Additional Material Facts

> Questions Raised: What was the other project? Why was it a
> higher priority? What was the work plan for its development?
> What skills were needed for it? What time was needed for its
> completion? What would the effect on this other project have been
> if the two rulemakings had proceeded concurrently?

Priority of Rulemaking: The priority of this rulemaking was low relative to other
regulatory projects from 2001 to the present. Rabe Decl. ¶16.

> Questions Raised: What were the other rulemaking projects that
> were given higher priority during the years mentioned? How were
> the rulemaking projects given their priorities? Why did the priority
> of this rulemaking decline in 2005? What effect does the
> prioritization have on the timing of the rulemaking? Which of the
> other rulemaking projects were Congressionally mandated?

Schedule for Final Rule: The Coast Guard is doing "everything it can," consistent with
regulatory realities and priorities, to publish its final rule as quickly as possible. A final
rule may be published by end of 2005. Rabe Decl. ¶¶ 18-19.

> Questions Raised: What additional actions are necessary before a
> final rule can be issued? Who is responsible for those actions?
> How much time will each of these actions take? What competing
> priorities may interfere with these actions? On what does the
> Coast Guard base its estimate that the rule may be published by the
> end of 2005?

As further described in the Affidavit of Jonathan M. Ettinger in Support of The Coalition For

Buzzards Bay's Opposition to the United States' Motion for Summary Judgment at ¶¶ 12-19,

filed herewith, should the Court not allow the Coalition's motion for summary judgment, The

Coalition should be allowed an opportunity to pursue discovery on these and other matters to

bolster its opposition.  See Fed. R. Civ. P. 56(f); Carmona v. Toledo, 215 F.3d 124 (1st Cir.

2000).

## CONCLUSION

For the foregoing reasons, the Coalition for Buzzard's Bay respectfully requests that the

Court deny Plaintiff's Motion for Summary Judgment and allow The Coalition's Cross-Motion

for Summary Judgment.  In the alternative, The Coalition requests that, pursuant to Rule 56(f),

the Court deny the United States' Motion and permit discovery on the issues raised.

By its attorneys,


/s/ Jonathan M. Ettinger
Jonathan M. Ettinger (BBO #552136)
Elisabeth M. DeLisle (BBO # 658067)
Foley Hoag **LLP**
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA  02210
(617) 832-1000
jettinger@foleyhoag.com


Dated: July 12, 2005