UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE COMMONWEALTH OF<br>MASSACHUSETTS, et al.<br><br>Defendants, and<br><br>THE COALITION FOR BUZZARDS BAY,<br><br>Intervenor-Defendant<br>_____<br><br>THE AMERICAN WATERWAYS OPERATORS,<br>et al.<br>Intervenor-Plaintiff<br>v.<br><br>MITT ROMNEY, Governor of Massachusetts, et al.<br><br>Defendants | Civil Action No. 05-10112 JLT |

**RESPONSE OF THE COALITION FOR BUZZARDS BAY TO THE UNITED STATES'
STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE
DISPUTE AND STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, The Coalition for Buzzards Bay hereby submits its Response to the United States' Statement of Material Facts as to Which There Is No Genuine Dispute and its Statement of Additional Undisputed Facts.

**Response to the United States' Statement of Undisputed Facts**

*1a. The United States has long required marine employers to conduct drug and alcohol testing of their seamen employees following a serious marine incident ("SMI"), as defined at 46 C.F.R. § 4.03-2, pursuant to Coast Guard regulations at 46 C.F.R. Subpart 4.06.  See Declaration of W. Douglas Rabe ("Rabe Decl.") ¶ 2.*

B3057055.2

  <u>Response</u>:  The Coalition does not dispute the existence of the regulations contained in 46 C.F.R. Subpart 4.06. However, The Coalition does dispute any implication that the regulations are effective.

*1b. On November 13, 1998, Congress passed a statute related to such testing. <u>See</u> Pub. L. 105-383, Title III, § 304(d)(1), 112 Stat. 3419, <u>codified</u> as 46 U.S.C. § 2303a. That statute directs the Coast Guard to "establish procedures to ensure" that alcohol testing occurs within two hours after an SMI unless testing is prevented by safety concerns directly related to the SMI. 46 U.S.C. § 2303a.*

  <u>Response</u>:  Undisputed.

*1c. Congress neither set a deadline for establishment of the necessary procedures, nor specified how they should be established. <u>Id</u>.*

  <u>Response</u>:  The Coalition disputes that the means by which necessary procedures should be established has not been specified.

*2. Within three months of the enactment of § 2303a, as an interim step giving effect to the provision, the Coast Guard Commandant's Office of Investigations and Analysis informed all Coast Guard marine safety and inspection offices and other Coast Guard commands and districts of the contents of the § 2303a and asked them to ensure that alcohol testing be conducted in accordance with the statute 2303a whenever possible. <u>See</u> Exhibit A to Rabe Decl.; <u>see also</u> Rabe Decl. ¶¶ 4, 5.*

  <u>Response</u>:  The Coalition does not dispute the existence of G-MOA Policy ltr 1-99, dated Feb. 11, 1999, attached as Exhibit A to the Rabe Decl. The Coalition does dispute that this letter gives "effect to" 46 U.S.C. § 2303a. Because The Coalition has been unable to conduct discovery regarding the remaining facts asserted in ¶ 2, The Coalition is currently unable to determine whether it disputes the remaining facts contained in ¶ 2. Further, The Coalition notes that G-MOA Policy ltr 1-99 references additional documents which, while they appear to be relevant, have not been produced to The Coalition and therefore the contents of which are not known.

*3. Also immediately following enactment of the statute, and following usual Coast Guard practices, the Coast Guard assembled a team to prepare a Regulatory Workplan ("the Workplan") for studying the relevant issues and determining the best means of permanently implementing § 2303a via notice and comment rulemaking. Rabe Decl. ¶ 4.*

>Response:    Because The Coalition has been unable to conduct discovery regarding the facts asserted in ¶ 3, The Coalition is currently unable to determine whether it disputes the facts contained in ¶ 3.

*4. The Coast Guard studied the issues involved and developed a Regulatory Workplan during 1999 and early 2000, although the Coast Guard's limited resources were also required for a higher-priority drug and alcohol testing rulemaking project. Id. ¶ 6. The Workplan was then submitted to the Coast Guard Marine Safety Council for approval in April 2000; it was approved in June 2000, and place on the Coast Guard's rulemaking docket. Id. ¶ 7.*

>Response:    Because The Coalition has been unable to conduct discovery regarding the facts asserted in ¶ 4, The Coalition is currently unable to determine whether it disputes the facts contained in ¶ 4.

*5. The Coast Guard also determined that safely ensuring alcohol testing within two hours of an SMI would likely require carriage of alcohol testing equipment on the great majority of vessels subject to the testing requirements of 46 C.F.R. Subpart 4.06. Rabe Decl. ¶ 8. Accordingly, the Coast Guard began studying the complex issues involved in ensuring alcohol testing of a crew within two hours of a serious marine casualty no matter where it occurs, including the available alcohol testing equipment, cost impact of requirements that such equipment be carried onboard, impact on small businesses, information collection burden, environmental impacts, and any federalism implications. Id.*

>Response:    Because The Coalition has been unable to conduct discovery regarding the facts asserted in ¶ 5, The Coalition is currently unable to determine whether it disputes the facts contained in ¶ 5.

*6. The Coast Guard assigned a project team of a Project Manager, Regulation Development Manager, Project Counsel, Project Editor, and Project Analyst to the § 2303a rulemaking project. Id. ¶ 10. These Coast Guard employees were drawn from the limited pool of personnel with the necessary expertise. Id. ¶ 9.*

>Response:    Because The Coalition has been unable to conduct discovery regarding the facts asserted in ¶ 6, The Coalition is currently unable to determine whether it disputes the facts contained in ¶ 6.

7.  *The regulatory project team staff also worked concurrently on other, higher-priority regulatory projects.*  Id*. ¶¶ 12, 16.*

>   Response:    Because The Coalition has been unable to conduct discovery regarding the facts asserted in ¶ 7, The Coalition is currently unable to determine whether it disputes the facts contained in ¶ 7.

8a. *At the direction of Congress the Coast Guard devoted substantial resources to develop enhanced maritime security regulations in 2002 and 2003.  Id. ¶ 12.  Accordingly, the § 2303a rulemaking project went from a ranking of 21st out of 67 Coast Guard regulatory projects in early 2001, to 33rd out of 76 such projects by early 2003.*  Id*. ¶ 16.*

>   Response:    Because The Coalition has been unable to conduct discovery regarding the facts asserted in ¶ 8a, The Coalition is currently unable to determine whether it disputes the facts contained in ¶ 8a.

8b. *During that time, the Department of Homeland Security was also created, see Pub. L. No. 107-296, 116 Stat. 2135, and the Coast Guard was transferred out of the Department of Transportation and into the Department of Homeland Security.  See* id*. at § § 888(b) & (c).*

>   Response:    The Coalition does not dispute that the Department of Homeland Security was created and that the Coast Guard was transferred out of the Department of Transportation and into the Department of Homeland Security.

8c. *Nonetheless, the § 2303a rulemaking team developed a proposed rule, and the Coast Guard published a Notice of Proposed Rulemaking in the Federal Register on February 28, 2003.  68 Fed. Reg. 9622 (Feb. 28, 2003); Rabe Decl. ¶ 13.*

>   Response:    The Coalition does not dispute that a Notice of Proposed Rulemaking was published on February 28, 2003.

9a. *The initial comment period for the proposed rule was 120 days.  68 Fed. Reg. 9622.*

>   Response:    Undisputed.

9b. *In August 2003, responding in part to requests for a public meeting on the proposed rule, the Coast Guard opened a second comment period and scheduled a public meeting.  68 Fed. Reg. 50992 (Aug. 25, 2003).*

> Response:    The Coalition does not dispute that in August 2003 the Coast Guard opened a second comment period. Because The Coalition has been unable to conduct discovery regarding the remaining facts asserted in ¶ 9b, The Coalition is currently unable to determine whether it disputes the remaining facts contained in ¶ 9b.

9c. *The public meeting was scheduled for September 19, 2003, see id., but it was cancelled because federal government office in the Washington D.C. metropolitan area were closed that day due to Hurricane Isabel. 68 Fed. Reg. 60073 (Oct. 21, 2003).*

> Response:    Undisputed.

9d. *The public meeting was not rescheduled as only a few people had registered to attend, but a third comment period was held from October 21, 2003 to November 20, 2003. Id.*

> Response:    The Coalition does not dispute that the public meeting was not rescheduled or that a third comment period was held from October 21, 2003 to November 20, 2003. Because The Coalition has been unable to conduct discovery regarding the remaining facts asserted in ¶ 9d, The Coalition is currently unable to determine whether it disputes the remaining facts contained in ¶ 9d.

10a. *The Coast Guard received 121 comment letters on the proposed rule, ranging from one to six pages in length. Rabe Decl. ¶ 15.*

> Response:    Because The Coalition has been unable to conduct discovery regarding the remaining facts asserted in ¶ 10a, The Coalition is currently unable to determine whether it disputes the facts contained in ¶ 10a. The Coalition notes, however, that the Rabe Declaration appears to contain inconsistent statements regarding the number of comment letters received.

10b. *The complete rulemaking docket, Docket No. 8773, is available for public viewing on the internet at dms.dot.gov/search via a search for that docket number. The docket includes the NPRM, the 120 comment letters, and a 32-page 2002 draft regulatory analysis of the proposed rule.*

<blockquote>

Response:     The Coalition does not dispute that the NPRM, approximately 120 comment letters and the draft regulatory analysis of the proposed rule are available for public viewing on the internet at dms.dot.gov/search.  The Coalition notes, however, that the Rabe Declaration appears to contain inconsistent statements regarding the number of comment letters received.  Because The Coalition has been unable to conduct discovery regarding the remaining facts asserted in ¶ 10b, The Coalition is currently unable to determine whether it disputes the remaining facts contained in ¶ 10b.

</blockquote>

*11. The Coast Guard has now analyzed the 121 comments received and prepared responses. Id. ¶ 17.  The project team has also prepared the final rule, which it is expected will shortly enter clearance within Coast Guard headquarters, after which it will be submitted to the Department of Homeland Security, and then the Office of Management and Budget for review, including any necessary review pursuant to Executive Order 12291, prior to publication as a Final Rule in the Federal Register.  Id.  The final rule is expected to be cleared by Coast Guard command within the next few months.  Id.*

<blockquote>

Response:     Because The Coalition has been unable to conduct discovery regarding the remaining facts asserted in ¶ 11, The Coalition is currently unable to determine whether it disputes the remaining facts contained in ¶ 11.  The Coalition notes, however, that the Rabe Declaration appears to contain inconsistent statements regarding the number of comment letters received.

</blockquote>

*12. In his declaration filed this date, W. Douglas Rabe, Chief of the Investigations Division within the Coast Guard Office of Investigations and Analysis, under the Assistant Commandant for Marine Safety, Security and Environmental Protection, stated that it is reasonable to expect that final regulations under § 2303a will be published before the end of 2005.  See id. ¶ 18.*

<blockquote>

Response:     The Coalition disputes that the United States' characterization of the Rabe Declaration.  The Rabe Declaration does not state that "it is reasonable to expect that final regulations under § 2303a will be published before the end of 2005."  Rather, the Rabe Declaration at ¶ 18 states as follows:  "While I cannot know exactly how long each

</blockquote>

of these steps toward final publication will take, and intervening events could again divert the resources of the Coast Guard and the United States to competing tasks of a higher priority, *I estimate*, based on my prior experience with complex and significant rulemakings of this nature, that the final regulations *could be published* before the end of 2005." (emphasis added)

### Statement of Additional Material Facts

1. On September 27, 1996 an oil tanker named the *Julie N* spilled 4,000 barrels of oil into the Fore River near Casco Bay after it collided with the south bascule pier of the Portland-South Portland (Million Dollar) Bridge in Portland, Maine. Affidavit of Jonathan M. Ettinger ("Ettinger Aff.") Exh. A, National Transportation Safety Board Special Investigation Report: Postaccident Testing for Alcohol and Other Drugs in the Marine Industry and the Ramming of the Portland-South Portland (Million Dollar) Bridge at Portland, Maine, by the Liberian Oil Tankship Julie N on September 27, 1996 (1998) (the "NTSB Investigation Report"), at v.

2. The pilot of the vessel was not tested for alcohol after the incident. Ettinger Aff. Exh. A, NTSB Investigation Report, at 23-25.

3. After investigating the *Julie N* incident, the National Transportation Safety Board ("NTSB") issued a report which found that "the pilot was not tested for alcohol because of the failure of the Coast Guard to adequately address the industry-wide problem of postaccident alcohol and drug testing." Ettinger Aff. Exh. A, NTSB Investigation Report, at 42.

4. The NTSB report also described approximately twenty seven other cases since 1989 in which mandatory post-accident alcohol testing was either not conducted or was

conducted until long after the occurrence of a serious marine incident.  Ettinger Aff. Exh. A, NTSB Investigation Report, at 26-28.

5.      This incident, as well as the "approximately 27 other cases since the Exxon Valdez oil spill in 1989 in which mandatory post-accident alcohol and drug testing was not properly completed after serious marine incidents," led the Senate Committee on Commerce, Science, and Transportation (the "Committee") to conclude that "compliance with [current Coast Guard] requirement[s] is inadequate."  Ettinger Aff. Exh. B, Report of the Committee on Commerce, Science and Transportation on S. 1259, S. Rpt. 105-246 (1998) (the "Committee Report") at 14.

6.      In justifying its determination that alcohol testing should be required to be conducted within two hours of a serious marine incident, the Committee stressed that the "window of opportunity to conduct [alcohol] tests is short," and noted that "[f]ederal rules for accidents involving most of the other transportation modes," require alcohol testing within two hours.  Ettinger Aff. Exh. B, Committee Report, at 14.

7.      The Committee noted that "hundreds of citizens die as a result of accidents involving vessels whose operators were intoxicated, and the number of such accidents has increased in recent years," and urged "the Coast Guard to devote serious attention to reducing substantially the number of such accidents in the future."  See Ettinger Aff. Exh. B, Committee Report, at 15.

8.      On November 13, 1998, Congress passed a statute related to alcohol testing.  *See* Coast Guard Authorization Act of 1998, Pub. L. 105-383, Title III, § 304(d)(1), 112 Stat. 3419 (codified as 46 U.S.C. § 2303a).  That statute directs the Coast Guard to "establish procedures to

ensure" that alcohol testing occurs within two hours after a serious marine incident ("SMI") unless testing is prevented by safety concerns directly related to the SMI. 46 U.S.C. § 2303a.

9. At the same time, Congress increased civil penalties for failure to comply with alcohol testing requirements and operating a vessel while under the influence of alcohol. *See* Pub. L. 105-383, Title III, § 304(b), 112 Stat. 3411, 3419 (codified at 46 U.S.C. § 2115); Pub. L. 105-383, Title III, § 304(c), 112 Stat. 3411, 3419 (codified at 46 U.S.C. § 2302(c)(1)).

10. Through these increased monetary penalties, Congress hoped to "provide a stronger disincentive to the operation of a vessel while intoxicated." Ettinger Aff. Exh. B, Committee Report, at 15.

11. The Committee report states that, "the Committee does not believe that this requirement imposes a significant burden on the Coast Guard." Ettinger Aff. Exh. B, Committee Report at 14.

12. A proposed rule was published in a Notice of Proposed Rulemaking in the Federal Register on February 28, 2003. Ettinger Aff. Exh. C, See Marine Casualties and Investigations; Chemical Testing Following Serious Marine Incidents, 68 Fed. Reg. 9622 (proposed Feb. 28, 2003) (to be codified at 46 C.F.R. pt. 4) (the "NPR").

13. The preamble to the proposed rule, which would require commercial vessels to carry testing devices onboard their vessels, states that "a regulatory requirement to conduct testing within the statutory timeframes cannot, by itself, ensure that alcohol testing after an SMI will be done within 2 hours." Ettinger Aff. Exh. C, NPR at 9623.

14. The preamble states that, "[w]ithout a specified time requirement to conduct alcohol or drug testing after an SMI, in some instances tests were not conducted, and in others instances tests were not completed soon enough for the results to provide a determination of

whether alcohol was present in an individual's system at the time the SMI occurred." Ettinger Aff. Exh. C, NPR at 9622.

15.     The Coast Guard anticipated that the timeframe and carriage requirements proposed in the rule would "serve as additional deterrents from crewmembers using alcohol and illegal drugs while working on board a commercial vessel," and would provide more accurate information regarding the role alcohol plays in serious marine incidents. See Ettinger Aff. Exh. D, Marine Casualties and Investigations; Chemical Testing Following Serious Marine Incidents: Draft Regulatory Analysis for Notice of Proposed Rulemaking, USCG-2001-8773 (Dec. 19, 2002) (the "Draft Analysis") at 1.

16.     The Draft Regulatory Analysis for the proposed rule projects that while the proposed rule will affect approximately 180,800 vessels, the per-vessel cost will be minimal. Ettinger Aff. Exh. D, Draft Analysis, at 7-10.

17.     According to Coast Guard estimates, 90% of affected vessels will incur initial costs of only approximately $185, followed by yearly costs of approximately $35 for training. The remaining 10% of affected vessels will opt to purchase more expensive equipment, incurring slightly higher costs. Ettinger Aff. Exh. D, Draft Analysis, at 8.

18.     The "saliva alcohol screening devices" that the Coast Guard expects most vessels will elect to carry under the regulation cost between approximately $2 and $7 per stick. Ettinger Aff. Exh. D, Draft Analysis, at 8.

19.     The Coast Guard determined that the proposed regulation's impacts on small businesses, information collection burdens, environmental impacts and federalism concerns were minimal if they existed at all. Ettinger Aff. Exh. D, Draft Analysis, at 12-15.

20. The proposed rule anticipated that a final rule would become effective in the year 2003. Ettinger Aff. Exh. D, Draft Analysis, at 5 (noting assumption in cost estimate that "[t]he rule would become effective in the year 2003.").

21. Since the publication of the proposed rule, the NTSB, recognizing the extreme importance of post accident toxicological testing, included issuance of a final rule by the Coast Guard on its list of "Most Wanted Safety Transportation Improvements." See Ettinger Aff. Exh. E.

22. On the afternoon of April 27, 2003, the Bouchard Barge-120, loaded with more than four million gallons of No. 6 fuel oil, traveled outside of the well-marked Buzzards Bay channel and struck a submerged object, creating a twelve-foot rupture in its hull and releasing tens of thousands of gallons of oil into Buzzards Bay. Ettinger Aff. Exh. F, United States v. Bouchard Transportation Company, Inc. Complaint (the "Criminal Complaint") at ¶¶ 29-32.

23. The Bouchard-120 fuel oil fouled approximately 93 miles of the Bay's shoreline, closing countless public and private beaches and contaminating waterfront property. Ettinger Aff. Exh. G, Affidavit of Mark Rasmussen (hereinafter "Rasmussen Aff."), at ¶ 6.

24. The oil spill also caused the deaths of approximately 450 birds including protected roseate terns and piping plovers, as well as, loons, scoters, mergansers, oyster catchers and eiders. See Ettinger Aff. Exh. H, Buzzards Bay Oil Spill in Massachusetts: A Cooperative Natural Resource Damage Assessment, NOAA (2003).

25. In addition, the spill contaminated and forced the closure of thousands of acres of shellfish beds, some of which remain closed today. Ettinger Aff. Exh. G, Rasmussen Aff. at ¶ 11.

26. The damage the spill caused to the Bay's natural resources had a significant economic impact on certain sectors of the public, including a number of The Coalition's members. Ettinger Aff. Exh. G, Rasmussen Aff. at ¶ 11.

27. The spill also triggered a costly cleanup effort that continues to this day. Ettinger Aff. Exh. G, Rasmussen Aff. at ¶ 13.

28. Despite a Coast Guard policy that "asks" its personnel to ensure, whenever possible, that alcohol testing is conducted within two hours of a serious marine incident, it was reported that it was not until *eighteen* hours after the devastating spill that alcohol testing of the crew members of the Bouchard-120 and its tow, the Evening Tide, was conducted. Ettinger Aff. Exh. G, Rasmussen Aff. at ¶ 7. Ettinger Aff. Exh. I, Close Ties Complicate Probe of Oil Spill, Boston Globe, June 29, 2003. It was also reported at the time that a that final regulations would be enacted in later 2004. Ettinger Aff. Exh. I, Close Ties Complicate Probe of Oil Spill.

29. It is thus currently unknown whether alcohol was a contributing factor in the Bouchard-120 Oil Spill. Ettinger Aff. Exh. G, Rasmussen Aff. at ¶ 8.

30. Alcohol is eliminated quickly from the body such that, in an 8-hour period, as much as .12 to .14 percent can be eliminated from the bloodstream. Ettinger Aff. Exh. A, NTSB Investigation Report, n.28.

By its attorneys,

/s/ Jonathan M. Ettinger
Jonathan M. Ettinger (BBO #552136)
Elisabeth M. DeLisle (BBO # 658067)
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA  02210
(617) 832-1000

jettinger@foleyhoag.com

Dated: July 12, 2005