UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                         )
UNITED STATES OF AMERICA, *et al.,*      )
                                                         )
                          Plaintiff,              )
                                                         )
     v.                                              )          Civil Action No. 05-10112-JLT
                                                         )
COMMONWEALTH OF                          )
MASSACHUSETTS, *et al.,*                     )
                                                         )
                          Defendants.          )
_____)

**STATE DEFENDANTS' CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTIONS FOR
<u>JUDGMENT ON THE PLEADINGS</u>**

Pursuant to Fed. R. Civ. P. 12(c), the State Defendants submit their consolidated

opposition to both Plaintiff's Motion for Judgment on the Pleadings ("Coast Guard  Motion")

and Intervenor-Plaintiffs' Motion for Judgment on the Pleadings ("Industry Motion").[1]

**I.     RELEVANT BACKGROUND**

The State Defendants address in Sections II-VII below the specific legal arguments

advanced in the Coast Guard and Industry Motions.  Given this suit's obvious public importance,

_____

[1]     The State Defendants are the Governor of Massachusetts and the Commissioner
of the Massachusetts Department of Environmental Protection, as named in both the Coast Guard
and the Industry Complaints, and the Commonwealth of Massachusetts and Massachusetts
Department of Environmental Protection, as additionally named in the Coast Guard Complaint.
*See* Complaint for Declaratory and Injunctive Relief ¶¶ 8-11; Intervenors' Complaint for
Declaratory and Injunctive Relief ¶¶ 11-12.  The Court previously has allowed the parties to file
supporting and opposing memoranda of up to 30 pages regarding the Coast Guard Motion.  *See*
May 17, 2005 Order allowing Docket No. 21 (Unopposed Motion for Leave to File Memoranda
of Law in Excess of 20 Pages).  The instant Consolidated Opposition responds to both the Coast
Guard Motion and the Industry Motion within that 30-page limit.

the State Defendants respond to the case at a more general level in this introductory section to

place it in proper context.[2]

"The maritime oil transport industry presents ever-present, all too real dangers of oil

spills from tanker ships, spills which could be catastrophes for the marine environment." *U.S. v.*

*Locke*, 529 U.S. 89, 94 (2000). As the Supreme Court has recognized, "[t]he size of these [oil

transport] vessels, the frequency of tanker operations, and the vast amount of oil transported by

vessels with but one or two layers of metal between the cargo and water present serious risks."

*Id*. at 96. The resulting history is not a happy one:

> [T]he supertanker *Torrey Canyon* spilled its cargo of 120,000 tons of crude oil off
> the coast of Cornwall, England, in 1967 . . . .
>
>        . . .
>
> In December 1984, . . . the tanker ARCO Anchorage grounded in Port Angeles
> [Washington] Harbor and spilled 239,000 gallons of Alaskan crude oil. The most
> notorious oil spill in recent times was in Prince William Sound, Alaska, where the
> grounding of the *Exxon Valdez* released more than 11 million gallons of crude oil
> and, like the *Torrey Canyon* spill before it, caused public officials intense concern
> over the threat of a spill.

*Id*. at 94, 96.

Congress reacted decisively to both the *Torrey Canyon* and the *Exxon Valdez* spills,

enacting the Port and Waterways Safety Act of 1972 ("PWSA") in response to the former, *see*

---

[2]        While any facts set forth in this Section I provide useful background, the State
Defendants do *not* rely upon them for resolution of either the Coast Guard Motion or the Industry
Motion, both of which proceed under Fed. R. Civ. P. 12(c) and accordingly are subject to the
usual stringent standards for a motion for judgment on the pleadings. *See*, *e.g.*, *McCord v.
Horace Mann Insurance Co.*, 390 F.3d 138, 141 (1st Cir. 2004) ("Judgment on the pleadings
under Rule 12(c) may not be entered unless it appears beyond a doubt that the nonmoving party
can prove no set of facts in support of her claim which would entitle her to relief"). As
previously noted, the State Defendants' specific legal arguments opposing the Coast Guard's and
Industry's Rule 12(c) Motions are those set forth in Sections II-VII below.

Pub. L. No. 95-474, 92 Stat. 427, and the Oil Pollution Act of 1990 ("OPA") as a result of the

latter, *see* Pub. L. No. 101-380, 104 Stat. 484. *See generally Locke*, 529 U.S. at 101; Section II

*infra*. While the Coast Guard is the principal federal agency regulating the maritime oil

transport industry, it unfortunately has not responded with the same vigor, even when specifically

directed to do so by Congress. The Court of Appeals for the District of Columbia Circuit thus

complained in 2000 that "[t]he Oil Pollution Act of 1990 is now more than ten years old, but the

Coast Guard, the enforcing agency, still has failed to promulgate regulations required by the

Act." *In Re Bluewater Network*, 234 F.3d 1305, 1307 (D.C. Cir. 2000). The Congressional

mandate being ignored in that case was a significant one: a requirement "to promulgate

regulations establishing minimum compliance standards and use requirements for tank level and

pressure monitoring . . . devices" for oil tankers, which would "continually monitor the volume

of oil contained in a tanker's hull and alert the crew to recognizable drops in the oil level, thereby

signaling a potential leak." *Id*. at 1307-08. While the Coast Guard appeared concerned that such

devices "'might not be economically feasible'" for the industry, *id*. at 1309 (quoting 62 Fed. Reg.

14, 828, 14,829 (March 28, 1997)), the Circuit Court had no patience for the agency's "blatant

violation of the Act":

> The statute indisputably commands the Coast Guard to establish some sort of
> compliance and use requirements by August 1991. There are no such standards or
> requirements, and the Coast Guard has disavowed any further action. . . .
>
>         . . .
>
> Mandamus . . . is an extraordinary remedy, reserved only for extraordinary
> circumstances. This is just such a circumstance. We are here faced with a clear

statutory mandate, a deadline nine years ignored, and an agency that has admitted
its continuing recalcitrance.

*Id*. at 1314, 1315, 1316.[3]

Despite this pointed criticism of its reluctance to enforce a spill-prevention statute, the
Coast Guard is now inordinately delaying implementation of another statutorily mandated
protective measure.  As set forth in more detail in State Defendants' July 12, 2005 Summary
Judgment Memorandum, Congress since 1998 has directed that the Coast Guard "shall establish
procedures to ensure that after a serious marine casualty occurs, alcohol testing of crew members
. . . of the vessel or vessels involved" generally "is conducted no later than 2 hours after the
casualty occurs."  Pub. L. No. 105-383, Title III, § 304(d)(1), 112 Stat. 3419 (1998), *codified as*
46 U.S.C. § 2303a.  Notwithstanding this unequivocal statutory command, and notwithstanding
the common-sense nature of a testing requirement, the Coast Guard again has yet to comply, this
time for more than six years after Congress has spoken.  As with its delay in *Bluewater*, the
Coast Guard at least in part seems interested in the possible "cost impact" of the mandated
measure on the maritime industry.  Declaration of W. Douglas Rabe (submitted by United States
in support of its Motion for Summary Judgment) ¶ 8.

---

[3]     A separate claim in *Bluewater* shows the Coast Guard to have been again
grudging in its implementation of the OPA.  Congress also had required the Coast Guard "to
initiate issuance of regulations to define waters, including Prince William Sound and two other
[specifically] named areas, over which single-hulled tankers must be escorted by at least two
towing vessels."  *Id*. at 1307.  The Coast Guard responded by adopting regulations that imposed
the cited requirement for the three specifically named "waters" but no others.  *Id*. at 1307, 1309-
10. While the *Bluewater* Court held that the applicable statute did not impose a "sufficiently clear
duty regarding 'other waters' to warrant mandamus relief," *id*., the case reveals the Coast Guard
again choosing to adopt a quite limited implementation of a Congressionally endorsed protective
measure.

In the midst of this delay, the dangers of an oil spill hit home for Massachusetts. As described in more detail at pages 6-7 of State Defendants' Summary Judgment Memorandum and in the various affidavits and declarations filed in conjunction with the parties' summary judgment cross-motions, a tug-barge combination operated by Bouchard Transportation Co. spilled an estimated 98,000 gallons of oil in Buzzards Bay on April 27, 2003, after failing to stay within the navigation channel. Declaration of Richard Packard ¶¶ 7-9, Exh. 6. This contaminated approximately 90 miles of shoreline, killed hundreds of birds, and closed shellfish beds for months. *Id.* ¶¶ 10-11; Affidavit of Mark Rasmussen (attached as Affidavit of Jon Ettinger as Exh. G) ¶ 6. Bouchard pled guilty to criminal charges for its role in the spill and paid a $ 10 million fine. Packard Decl. ¶ 12.[4]

Since the Bouchard spill, the Coast Guard has continued to delay promulgating a final alcohol-testing rule. The agency also has failed to take action, for almost nine months now, on other common-sense measures recommended by its own experts for the unique navigational risks posed by Buzzards Bay. On October 26, 2004, the Coast Guard published an "Advance Notice of Proposed Rulemaking" asking for comments on possible rules regarding tug escorts and navigation routes within Buzzards Bay. 69 Fed. Reg. 62,427, 62,428 (Oct. 26, 2004); *see also* Rasmussen Aff. ¶ 5 ("Buzzards Bay poses many risks to navigation" with "an average width of only 8 miles and a mean depth of only 36 feet," as well as "dangerous ledges, reefs, and currents"). The agency has taken no further regulatory action since then, despite having told

---

[4]     Alcohol testing of the crew reportedly did not occur until about 18 hours after the incident. Rasmussen Aff. ¶ 7. As a result, what role if any alcohol may have played in the oil spill is unknown. *Id.* ¶ 8.

members of the Massachusetts Congressional Delegation on October 31, 2004 that it would

"expedite the[ measures] through the regulatory process if appropriate."  Packard Decl. Exh. 5.

As with other oil spills, the Buzzards Bay incident prompted intense concern among

Massachusetts citizens and their public officials, which was heightened by a widely held

perception that the Coast Guard was not being sufficiently vigilant in trying to prevent such

mishaps.  *See* Ettinger Aff. Exh. I; Packard Decl. Exh. 4.  The Massachusetts Legislature

responded with a statute entitled, "Buzzards Bay and Other Commonwealth Harbors and Bays --

Oil Spill Prevention" ("Oil Spill Act").  Mass. St. 2004, c. 254.  This statute prescribes numerous

sensible measures aimed at preventing future environmental disasters such as the one that befell

Buzzards Bay.  For example, the Act requires alcohol testing within two hours after an incident --

*i.e.*, the same basic measure that Congress mandated almost seven years ago but that the Coast

Guard has yet to implement.  *Id.* § 11 (codified at Mass. G. L. c. 21M, § 3).  While some of the

Act's provisions apply throughout Massachusetts waters, *see*, *e.g.*, *id.*, others are limited to

particular areas with unique navigational challenges or environmental sensitivity, such as

Buzzards Bay, *see*, *e.g.*, Mass. G. L. c. 21M, §§ 4 (specific manning requirements for tow vessels

and tank barges in Buzzards Bay), 6 (tug escorts required for certain tank barges in waters

designated by Commonwealth's Secretary of Environmental Affairs as an "area of special

interest"); *see also id.* § 1 (defining "area of special interest").  Needless to say, the Legislature

enacted the Act not from any desire to provoke a conflict with the federal government but instead

from a wholly legitimate need to protect its citizenry, particularly given the Coast Guard's

laggard and at times seemingly indifferent response to these types of issues.  *See* Mass. Stat.

2004, c. 251 (introductory preamble to Act defines "its purpose" as being "to protect the unique

-6-

and sensitive waterways of the commonwealth"); *Bluewater*, 234 F.3d at 1314 (Coast Guard's refusal to implement mandated anti-spill measure constitutes "blatant violation of [the OPA]").

The Coast Guard's reaction to the Oil Spill Act reinforces this sense of studied detachment. Rather than accelerating prudent measures to prevent future spills (such as alcohol testing, tug escorts, or navigation routes), the agency instead has chosen to spend its resources in litigation attempting to invalidate the state law. It does so despite the fact that, as even it acknowledges, the Act is a "well-intentioned" "effort to reduce the likelihood of future oil spills in the waters of the Commonwealth." Memorandum in Support of the United States' Motion for Judgment on the Pleadings ("Coast Guard Memorandum") p. 1. The Coast Guard indeed has gone so far as to oppose the State Defendants' request for an additional week (through July 22) to file this Opposition, asserting that "'the United States has suffered and continues to suffer irreparable harm' as a result of the Commonwealth's enactment and continued enforcement of the unconstitutional provisions of state law." Plaintiff's Memorandum in Opposition to Defendants' Second Motion for Enlargement of Time p. 2 (quoting Complaint ¶ 32). The agency's evident concern for its sovereign dignity and insistence upon rapid briefing contrast markedly with its dilatory approach to Congress's alcohol-testing requirement. The Rabe Declaration, filed by the Coast Guard in support of its Motion for Summary Judgment, is in fact explicit that fulfilling the Congressional testing mandate is still not a high priority, Rabe Decl. ¶ 16, and only "could" be complied with by the end of 2005, *id*. ¶ 18. If allowed to prevail, the net result of the Coast Guard's contrasting approaches to the state statute and its own responsibilities would be a regulatory "no man's land" where neither federal nor state requirements are in effect.

The Industry's Memorandum in Support is also instructive.  While the Coast Guard to its credit recognizes that the Oil Spill Act is a "well-intentioned" preventative measure, Coast Guard Memorandum p. 1, the Industry's tone is far more dismissive, accusing the "errant" Commonwealth of "arrogating to itself" unavailable powers and asserting that the Supreme Court has "swept aside" other state actions in this area and "remind[ed] state regulators" of the Supremacy Clause.  Industry Memorandum pp. 9-10; *see also id*. at p. 14 (Commonwealth is "grasping at federal authority").  The Industry even goes so far as to suggest that the Oil Spill Act "impose[s] . . . environmental risks."  *Id*. at 14.  With all respect, the Industry has its assessment of "environmental risks" precisely backwards:   it is the Industry that is responsible for contaminating 90 miles of Massachusetts shore line here, just as it was the Industry that was responsible for spilling 11 million gallons of oil into Prince William Sound in the *Exxon Valdez* catastrophe.  The Industry's sorry history of oil spills is an unavoidable reality, making its opposition to the Commonwealth's effort to prevent future spills all the more regrettable.

## II.    APPLICABLE PREEMPTION PRINCIPLES

There is no dispute that two Supreme Court decisions establish the relevant standards for analyzing any claim of preemption in the oil spill area.  *Locke*,  529 U.S. at 89; *Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978).[5]  There also is no dispute that those decisions set forth several specific preemption principles that are directly applicable here.  First, 46 U.S.C. § 8501

---

[5]      As a result, the more general preemption doctrine discussed at pages 8-10 of the Coast Guard Memorandum is relevant only as background.  While the State Defendants agree with much of the Coast Guard's description of these broader preemption principles, particularly at the level of generality stated, they are not directly controlling here, and the Court accordingly need not reach any differences that the parties may have regarding them.

-8-

contains an *express* preemption provision that governs when a state can require a vessel entering

its waters to use a state-licensed navigational pilot. *Ray*, 435 U.S. at 158-60 (discussing similar

predecessor statute).[6]  Second, Title II of the PWSA effects a a variety of *field* preemption -- *i.e.*,

it creates an area where "the scope of [the] statute indicates that Congress intended federal law to

occupy a field exclusively." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002).[7]  As a result,

Title II supersedes certain state laws addressing the subjects that 46 U.S.C. § 3703(a) requires the

Coast Guard to regulate (specifically, the "design, construction, alteration, repair, maintenance,

operation, equipping, personnel qualification, and manning of [certain] vessels"). *Locke*, 529

U.S. at 101, 110-11, 112; *Ray*, 435 U.S. at 161-68.   Third, a strain of *conflict* preemption can

arise under Title I of the PWSA when the Coast Guard has exercised its discretionary authority

under 33 U.S.C. § 1223(a)(1) regarding, in the Supreme Court's summary description, "measures

for controlling vessel traffic or for protecting navigation and the marine environment." *Locke*,

529 U.S. at 101; *see generally id*. at 109-10; *Ray*, 435 U.S. at 171-72.[8]  As regards these Title I

subjects, the articulated standard for conflict preemption is (1) whether the challenged state

---

[6]     Express preemption occurs when a federal statute's preemptive effect is "'explicitly stated in the statute's language.'" *Cipollone v. Ligget Group, Inc.*, 505 U.S. 504, 516 (1992) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)).  It differs from implied preemption, which arises in certain limited instances where Congress's preemptive intent is not expressly set forth in the statute itself.  *See id*.; *see also* fns. 7-8 *infra*.

[7]     Field preemption is one of the two principal types of implied preemption.  *See id*.

[8]     Conflict preemption is the other form of implied preemption, arising when the state law actually conflicts with federal law, which the Supreme Court has generally defined as occurring "when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *Locke*, 529 U.S. at 109 (quoting *California v. ARC America Corp.*, 490 U.S. 93, 100-01 (1989)).

regulation is "directed to local circumstances and problems . . . idiosyncratic to a particular port or waterway" and (2) whether the "Coast Guard has [either] adopted regulations on the subject or determined that regulation is unnecessary or inappropriate." *Locke*, 529 U.S. at 109; *accord Ray*, 435 U.S. at 171-72.

While the parties may be in agreement regarding these aspects of *Ray* and *Locke*, both the United States and the Industry significantly overstate the decisions' preemptive reach. One would never glean from the Industry's Memorandum, for example, that *Ray* actually *upheld* substantial portions of the challenged Washington statute. *Compare* Industry Memorandum p. 9 ("These two cases . . . swept aside state actions that attempted to usurp federal judgments") *with Ray*, 435 U.S. at 160, 169-73, 179-80. The Coast Guard's Memorandum similarly fails to note *Locke's* recognition that "the PWSA does preserve . . . the historic role of States to regulate local ports and waters under appropriate circumstances" and that "[i]t is fundamental in our federal structure that States have vast residual powers." *Locke*, 529 U.S. at 108-09.

Three aspects of *Ray* and *Locke* are particularly relevant here:

1.      While there is "some overlapping coverage between the two titles [I and II] of the PWSA," the Supreme Court has specifically "declined to resolve every question by the greater pre-emptive force of Title II" field preemption. *Locke*, 529 U.S. at 111. Instead, the Court in *Ray* looked to the "purposes" or "ends" of the challenged state law -- specifically, whether the "federal law addressed . . . the object also sought to be achieved by the challenged state regulation" -- in determining whether Title I or Title II preemption principles applied. *Ray*, 435 U.S. at 164-65. As a result, a state law aimed at regulating vessel design would be governed by Title II's field preemption principles, while a law that "is in reality based on water depth in [a

particular s]ound or on other local peculiarities . . . would appear to be within the scope of Title

I." *Id*. at 175. *Locke* similarly recognizes that "Title I allows state rules *directed to* local

circumstances and problems, such as water depth and narrowness, idiosyncratic to a particular

port or waterway." *Locke*, 529 U.S. at 109 (emphasis added). Although the decision goes on to

list several "[u]seful inquiries" in determining whether Title I or Title II principles control, *id*. at

112, the most emphasized factor in the *Locke* Court's actual rulings as to which Title applied was

whether the particular state provisions were directed to specific local waters or instead were more

broadly applicable. *Compare id*. at 114 (invalidating on Title II field preemption grounds

measure that "is not tied to the peculiarities of Puget Sound" and instead "applies throughout

Washington's waters and at all times") *with id*. at 116 (other measures that "are of limited

extraterritorial effect and [are] necessary to address the peculiarities of Puget Sound" may fall

within Title I); *see also id*. at 113 (invalidating two additional measures that, respectively, "d[id]

not address matters unique to the waters of Puget Sound" and were "not limited to governing

local traffic or local peculiarities").[9]

      2.     In those instances where Title I conflict preemption principles control, the critical

inquiry under the Supreme Court's standard becomes whether the "Coast Guard has [either]

adopted regulations on *the subject* or determined that regulation is unnecessary or inappropriate."

---

      [9]     This approach is consistent with the settled principle, reaffirmed in *Ray*, that "vessels must conform to 'reasonable, nondiscriminatory conservation and environmental measures . . .' imposed by a State." *Ray*, 435 U.S. at 164 (quoting *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 277 (1977)). As a result, the fact that state air pollution laws "hav[e] other purposes" than regulating ship design and safety is sufficient to exempt them from Title II field preemption scrutiny. *Id*. State legislation directed to the unique features of particular local waterways has a similarly separate purpose and should fall outside of Title II as well.

*Locke*, 529 U.S. at 109 (emphasis added).[10]  Significantly, *Ray* defined the relevant "subject" quite narrowly, looking to whether the Coast Guard has acted (or purposefully declined to act) at the level of specificity of the particular body of water at issue (rather than acted more generally with respect to a wide range of waters).  *Ray* thus found Title I conflict preemption when the Coast Guard had adopted a "local navigation rule with respect to Rosario Strait," explaining that "it appears sufficiently clear that federal authorities . . . have determined whether and in what circumstances tanker size is to limit navigation *in Puget Sound*."  *Ray*, 435 U.S. at 174-75 (emphasis added); *accord id*. at 170-71 (describing preemptive Coast Guard regulations as adopted specifically for Puget Sound), 178 ("In the case of Puget Sound, the [Coast Guard] has exercised [its] authority").  *Ray* conversely declined to find Title I preemption in the tug-escort context where the Coast Guard had failed either to "promulgate[ its] own tug requirement for Puget Sound or . . . decide[ ] that no such requirement should be imposed at all."  *Id*. at 171-72.[11]

       3.     *Ray* also rejected a broad theory of Title II field preemption that would have invalidated any state law that could be portrayed as an "*indirect* attempt to regulate the design and equipment of tankers."  *Ray*, 435 U.S. at 172-73 & n. 25, 179-80 (emphasis added).

---

[10]     As described in the immediately preceding paragraph of the principal text, the main factor that triggers the applicability of Title I (rather than Title II) preemption analysis in the first instance is whether the challenged state law is "directed to local circumstances and problems . . . idiosyncratic to a particular port or waterway."  *Id*.  When that prerequisite is satisfied and Title I analysis accordingly applies, the focus shifts from the purpose of the state law to whether the *Coast Guard* "has adopted regulations on the subject or determined that regulation is unnecessary or inappropriate."  *Id*.

[11]     Assessing the Coast Guard's actions at this rather fine level of specificity thus requires a symmetry between the federal law and the state law allegedly preempted – *i.e.*, a state law that is directed at a unique waterway will be preempted only by a federal law that is similarly focused on that particular waterway.

Specifically, and as developed in more detail in Section III below, a state ordinarily may create design-based exceptions to a general requirement as long as the general requirement standing by itself (*i.e.*, without the exceptions) would withstand a preemption challenge. *Id.* While this aspect of *Ray* has obvious relevance to the "indirect-regulation" preemption claim that both the Coast Guard and the Industry press regarding the Oil Spill Act's bond requirement, *see* Coast Guard Complaint ¶ 24; Industry Complaint ¶ 25; Mass. G.L. c. 21, § 50C, any discussion of it is conspicuously absent from their briefs. *See* Coast Guard Memorandum pp. 18-21; Industry Memorandum pp. 4-4, 8-10.

With all this being said, the State Defendants recognize that under *Ray* and *Locke* preemption does have a broad sweep in some areas, such that legal arguments in defense of a few of the challenged provisions in the Oil Spill Act are not readily apparent, at least at present.[12] While this result may be necessary as a matter of law, it is thoroughly unacceptable as a matter of public policy. In its challenge to the Act, the Industry shows little concern for the real-world impact of a major oil spill, such as the damage inflicted on 90 miles of Buzzards Bay shoreline. Even more dismaying is the Coast Guard's eagerness to assert its evidently cherished sovereignty at the same time that it places no particular priority on taking common-sense steps to prevent future spills. *See* Rabe Decl. ¶ 18 (implementing 1998 Congressional command for two-hour

---

[12]      This Memorandum accordingly does not respond to Sections IIC and IIF of the Coast Guard's Memorandum, as well as to that portion of Section IIB that addresses equipping requirements and that portion of Section IIG that addresses coastwise tank vessels. Under *Nat'l Rev. Corp. v. Violet*, 807 F.2d 285, 288 (1ˢᵗ Cir. 1986), "[a]n attorney general can have no authority" "to stipulate that an act of the legislature is unconstitutional," and the State Defendants make no such stipulation with respect to any aspect of the Oil Spill Act. The State Defendants also adopt and incorporate by reference any colorable arguments made by the intervenor-defendant Coalition for Buzzards Bay in defense of any portion of the Act.

post-spill alcohol testing still ranks as only "38[th] of 99 projects" in 2005). The residents of Southeastern Massachusetts are citizens of the United States as well as of Massachusetts, and many of them strongly believe that their federal government is not adequately protecting them in this area.

III.   **THE SUPREME COURT HAS ALREADY REJECTED THE "INDIRECT REGULATION" CLAIM MADE WITH RESPECT TO THE BOND REQUIREMENT'S STATUTORY EXCEPTIONS.**

The Coast Guard devotes its longest argument to an attack upon one aspect of the Oil Spill Act's bond requirement, arguing that statutory *exceptions* to the general requirement constitute "indirect regulation" in areas covered by Title II field preemption and hence are invalid. Coast Guard Memorandum pp. 18-21. The provisions of the requirement are not in dispute. "Any vessel . . . in or entering upon the waters of the commonwealth for the purpose of transporting, discharging or receiving a cargo of oil" must present a "certificate of financial assurance" to the Commonwealth's Department of Environmental Protection "in the amount of at least $ 1 [billion]" if it has a capacity of 6,000 barrels or more and "in the amount of at least $ 5 [million]" if its capacity is less than 6,000 barrels. Mass. G.L. c. 21, § 50C(a)-(b).[13] This general requirement is subject to discretionary exceptions in the judgment of the Department:

> (d)     The [D]epartment may allow financial assurance in a lower amount based upon criteria that includes, but is not limited to, the type and amount of the above cargo transported by the vessel; the size and construction of the vessel, including whether the vessel is double hulled; the safety record of the vessel or the vessel

---

[13]     The "certificate of financial assurance" may be demonstrated "by evidence of insurance, surety, bond, letter of credit, qualifications as a self-insurer or any combination thereof." *Id*. § 50C(c). The bonding requirement also applies to vessels carrying "hazardous material or hazardous waste." *Id*. § 50C(a).

-14-

owner, the loss or accident history of the vessel or vessel owner involving maritime spills and the safety equipment used by the vessel. . . .

*Id*. § 50C(d).

The Commonwealth's general authority to impose a bond is clear, and the Coast Guard concedes as much. 33 U.S.C. § 2718(a); Coast Guard Memorandum p. 21 n. 19.[14]  The Coast Guard's primary argument is instead that the discretionary exceptions for "the size and construction of the vessel" and "the safety equipment used by the vessel," Mass. G.L. c. 21, § 50C(d), are attempts "to indirectly regulate matters that fall within the Congressionally preempted field of PWSA Title II." Coast Guard Memorandum pp. 19-20.  As authority for its claim that these two exceptions constitute "indirect regulation" of vessel design and equipment, the agency cites District Court decisions addressing eminent domain and the First Amendment,[15] as well as two Supreme Court cases from the 1800's.[16]  *Id*. p. 19.  The Coast Guard neglects to mention, however, how the Supreme Court has much more recently handled such a claim in the context of Title II preemption itself.  *Ray*, 435 U.S. at 172-73 & n. 25, 179-80.  In *Ray*, the State of Washington imposed a tug-escort requirement on oil tankers weighing more than 40,000 tons that passed through Puget Sound, but exempted ships otherwise subject to the requirement if they

---

[14]        The Coast Guard accordingly does not seek invalidation of the general bond requirement itself, instead requesting to strike only the allegedly impermissible exceptions.  *Id*. While the Industry is more ambiguous about what it challenges, *see* Industry Memorandum pp. 4-5 & n. 8, 10, the legitimacy of a bond requirement *per se* is again clear.  33 U.S.C. § 2718(a).

[15]        *Grafton & Upton RR Co. v. Town of Milford*, 337 F. Supp. 2d 233, 238 (D. Mass. 2004) (eminent domain); *Sullivan v. City of Augusta*, 310 F. Supp. 2d 348, 355 (D. Me. 2004) (First Amendment).

[16]        *City of St. Louis v. Western Union Tel. Co.*, 148 U.S. 92, 106 (1893); *Smith v. Turner*, 48 U.S. (7 How.) 283, 458 (1849).

met certain design standards. *Id*. at 169, 173 n. 24. After finding that the tug-escort requirement

was itself constitutional, *id*. at 171-72, the Supreme Court then held that the existence of design-

based exceptions did not alter that result:

> Nor for constitutional purposes does it make substantial difference that under the
> Tanker Law those vessels that satisfy the State's design requirements are in effect
> exempted from the tug-escort requirement. Given the validity of a general rule
> prescribing tug escorts for all tankers, Washington is also privileged, insofar as
> the Supremacy Clause is concerned, to waive the rule for tankers having specified
> design characteristics.

*Id*. at 172-73. In the course of its ruling, the *Ray* Court specifically rejected the "assertion that

the tug-escort provision, which is an alternative to the design requirements of the Tanker Law,

will exert pressure on tanker owners to comply with the design standards and hence is an indirect

method of achieving what they submit is beyond state power under Title II." *Id*. at 173 n. 25;

*accord id*. at 179 ("[w]e have previously rejected th[e] claim" that the tug escort requirement "is

an indirect attempt to regulate the design and equipment of tankers").

    *Ray*'s holding controls the present case. The plaintiffs here make precisely the same

claim rejected in *Ray*: that the design-based exceptions to the Commonwealth's bond

requirement constitute "indirect regulation" of vessel design and equipment that is subject to

field preemption under Title II. *Compare* US Memorandum pp. 19-20 *with Ray*, 435 U.S. at

172-73. Just as the Supreme Court rejected this claim in *Ray*, this Court must similarly deny it

here. The state's bond requirement is itself indisputably constitutional, 33 U.S.C. § 2718(a), and

*Ray* clearly establishes the general authority to create design-based exceptions to it. *Ray*, 435

U.S. at 172-73.

Dicta in *Ray* does appear to leave room for a future claim that an otherwise constitutional general requirement is so financially onerous that the existence of design-based exception to it could rise to the level of design regulation. *Ray*, 435 U.S. at 173 n. 25, 179; *see also id.* at 180. The Supreme Court thus found it relevant that the cost to the industry of complying with Washington's general tug-escort requirement was less than the cost of refitting vessels to satisfy the design standards contained in the statute's exceptions. *Id.* at 173 n. 25. Whatever implications this footnote may have for future cases, it has no bearing on the present one, where neither the Coast Guard nor the Industry has made any allegation that the cost of adhering to the bond requirement would exceed the expense of refitting a company's vessels in accordance with any design-based exception. *See* Coast Guard Complaint ¶ 24; Industry Complaint ¶ 25.[17]

The Coast Guard and the Industry also make a separate claim that the possibility of additional exceptions for "the safety record of the vessel or the vessel owner" and "the loss or accident history of the vessel or vessel owner involving maritime spills," Mass. G.L. c. 21, § 50C(d), constitute an indirect "reporting requirement" that is also subject to Title II field preemption. Coast Guard Memorandum pp. 20-21; Industry Memorandum p. 8 n. 4, 10. This claim fails under *Ray* for the same reasons that the challenge to the statute's supposed indirect

---

[17]     The Coast Guard's Memorandum refers to the bond requirement's financial burden as, alternatively, "massive" and "significant," but at no point compares it to the cost of any design alteration. U.S. Memorandum pp. 19, 20. The Industry's Memorandum makes no characterizations of the cost impact of the bond requirement at all, despite the fact that it obviously is in the best position to know. Industry Memorandum pp. 4-5. In any event, there are no allegations that the Department of Environmental Protection has yet promulgated any formal regulations or guidelines specifying which design or equipment characteristics would allow a reduction of the bond's amount, thereby making a challenge to the statute wholly conjectural.

-17-

"design regulation" does.[18]   In addition, it has the further flaw that the safety-record/accident-history exceptions do not constitute a "reporting requirement" at all.  Nothing in the state statute says that the relevant information has to be reported by a ship owner itself; the Department has full discretion to consider any other available source of data on a vessel or company.[19]   The plaintiffs are thus assuming that Section 50C must be applied in one particular manner, an assumption that is squarely at odds with the stringent standard governing facial challenges.  *See*, *e.g.*, *Abdullah v. Com'r of Ins*., 84 F.3d 18, 20 (1st Cir. 1996) (on a facial claim "plaintiffs would have to show that no set of circumstances exist under which the statute could be validly applied").  All of the field-preemption challenges to the bond requirement's exceptions therefore plainly must fail.

## IV.    THE LOCALIZED NATURE OF THE OIL SPILL ACT'S MANNING REQUIREMENTS PRECLUDES A TITLE II FIELD PREEMPTION CLAIM.

Field preemption also does not exist for the Oil Spill Act's manning requirements.  Those provisions by their terms are all limited to Buzzards Bay and do not apply throughout the Commonwealth.  Mass. G.L. c. 21M, § 4.[20]  Given their localized nature, they should be analyzed

---

[18]    The same fate necessarily befalls the Coast Guard's final claim regarding unspecified "other indirect regulation" that it fears may be lurking in the bond requirement.  *See* Coast Guard Memorandum p. 21.

[19]    The present case stands in sharp contrast to *Locke*, 529 U.S. at 114-16, where the Supreme Court held that Washington regulations that explicitly required self-reporting by vessel owners were subject to field preemption.

[20]    For example, Section 4(a) provides that "[t]he navigation watch on all tow vessels transiting Buzzards Bay and carrying 6,000 or more barrels of oil shall consist of at least 1 licensed deck officer or tow vessel operator, who shall serve exclusively as a lookout with no other concurrent duties."  *Id*. § 4(a).  Section 4(b) similarly states that "[c]rew requirements for tank barges shall consist of 2 personnel, 1 of whom shall be a certified tanker-man under 46 CFR

under principles of Title I conflict preemption, rather than Title II field preemption.  As

explained in Section II above, a state law that "is in reality based on water depth in [a particular

s]ound or on other local peculiarities . . . would appear to be within the scope of Title I."  *Ray*,

435 U.S. at 175; *accord Locke*, 529 U.S. at 109 ("Title I allows state rules directed to local

circumstances and problems, such as water depth and narrowness, idiosyncratic to a particular

port or waterway").  Consistent with this distinction between localized and nonlocalized laws,

*Locke* held that Washington's navigation watch requirement was subject to Title II field

preemption precisely because it was not restricted to specific waters:

> The general watch requirement is not tied to the peculiarities of Puget Sound; it
> applies throughout Washington's waters and at all times.  It is a general operating
> requirement and is pre-empted as an attempt to regulate a tanker's "operation" and
> "manning" under 46 U.S.C. § 3703(a).

*Locke*, 529 U.S. at 114.  Here, in contrast, the Commonwealth's manning requirements *are* "tied

to the peculiarities of" Buzzards Bay.  Mass. G.L. c. 21M, § 4.  They accordingly should not be

subject to field preemption under *Ray* and *Locke*.

     In addition to the foregoing considerations, that portion of the manning requirements that

extends to tugboats[21] falls outside of Title II field preemption for a further reason as well:  Title II

does not in fact apply to towing vessels.  The operative provision in Title II that the Supreme

Court has relied upon for field preemption states that "[t]he Secretary shall prescribe regulations

for the design, construction, alteration, repair, maintenance, operation, equipping, personnel

---

subpart 12.20 who shall be on the tank barge at all times when the tank barge is underway,
anchored or moored in the waters of Buzzards Bay . . . ."  *Id*. § 4(b).

[21]    Section 4(a) of Chapter 21M sets forth several manning requirements with respect
to "tow vessels."  Mass. G.L. c. 21M, § 4(a).

qualification and manning of *vessels to which this chapter applies*."  46 U.S.C.

§ 3703(a)(emphasis added); *see generally Locke*, 529 U.S. at 112-14.  Section 3703 is in Chapter

37 of Title 46, and the immediately preceding section in Chapter 37 specifies that "this chapter

applies to a tank vessel."  46 U.S.C. § 3702(a).  The definitional section of Title 46 in turn

provides separate definitions for "tank vessel" and "towing vessel," using language that makes

clear that one phrase does not include the other.  46 U.S.C. §§ 2101(39)-(40).[22]  Because tugboats

obviously constitutes "towing vessels" rather than "tank vessels," Title II by its terms does not

apply to them, and state tugboat regulations are not subject to Title II field preemption for this

additional reason as well.[23]

## V.  THE OIL SPILL ACT'S TWO-HOUR DRUG AND ALCOHOL TESTING REQUIREMENT DOES NOT CONSTITUTE A "PERSONNEL QUALIFICATION" FOR TITLE II FIELD PREEMPTION PURPOSES.

Both the Coast Guard and the Industry also assert that the Oil Spill Act's two-hour drug

and alcohol testing requirement is a "personnel qualification" within the meaning of 46 U.S.C.

---

[22]     Section 2101(39) thus defines "tank vessel" in pertinent part as "a vessel that is constructed or adapted to carry, or that carries, oil or hazardous material in bulk *as cargo or cargo residue*."  46 U.S.C. § 2101(39) (emphasis added).  In contrast, Section 2101(40) defines "towing vessel" as "a commercial vessel engaged in or intending to engage in the service of pulling, pushing, or hauling along side, or any combination of pulling, pushing, or hauling along side."  46 U.S.C. § 2101(40).

[23]     Both the Coast Guard and the Industry seek to invalidate the manning requirements on field preemption grounds.  Coast Guard Memorandum pp. 14-16; Industry Memorandum pp. 8-10.  While a footnote in the Coast Guard's Memorandum also references "conflict[s]" between state and federal manning requirements, Coast Guard Memorandum p. 15 n. 12, the agency does not specifically argue for a ruling of conflict preemption, *id.*, and any issues regarding conflict preemption for the manning requirements need not and should not be reached in the context of the current Motions.  A similar result should obtain for the Coast Guard's footnote reference to the "right of innocent passage," which indeed does not mention either field or conflict preemption at all.  *Id.* p. 15 n. 11.

-20-

§ 3703(a) and hence falls subject to Title II field preemption. Coast Guard Memorandum p. 16; Industry Memorandum p. 10. This argument does not comport with the usual meaning of the phrase "personnel qualification," which ordinarily refers to *pre-hiring* requirements that dictate the composition of a vessel's crew. The former Washington rule that crew members be able to speak English, invalidated by *Locke* as a "personnel qualification," serves as a perfect example of just such a pre-hiring criterion. *Locke*, 529 U.S. at 113. In sharp contrast, the two-hour testing rule challenged here has nothing to do with either hiring guidelines or pre-hire requirements. It instead applies only *after* an oil spill has occurred:

> [C]hemical tests for evidence of alcohol or drug use shall be taken from all persons directly involved in a serious marine incident as defined in 46 CFR 4.03-4 as soon as practicable, but not more than 2 hours, after any such incident occurs which involves the vessel, with such tests performed in such a manner as to ensure best achievable accuracy and a demonstrable connection between each tested person and the corresponding test results . . . .

Mass. G.L. c. 21M, § 3. This post-incident requirement does not constitute a "personnel qualification" within any reasonable meaning of the phrase.

The Coast Guard also has the audacity to cite 46 U.S.C. § 2303a – *i.e.*, the long-ignored 1998 statute commanding the Coast Guard to "establish procedures to ensure" two-hour post-spill testing – as a further ground for field preemption of the Commonwealth's two-hour rule. Coast Guard Memorandum pp. 16-17. However, field preemption at its core is a question of inferred Congressional intent, *see*, *e.g.*, *Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1200 (9th Cir. 2005), and where Congress has directed an agency to assume responsibilities in a certain field it cannot reasonably be inferred that Congress wants to preclude concurrent state regulation when the agency has not heeded its command and taken action (*i.e.*, where Congress

-21-

contemplates subsequent administrative action a field is not "occupied" for field preemption purposes until the relevant federal agency has in fact occupied it).  A contrary rule would allow administrative sloth to create a period of no governmental oversight at all, either state or federal, which would be directly contrary to Congress's intent that the relevant private activity in fact be regulated.  In practical terms, the current Massachusetts testing rule indeed comes much closer to effectuating Congress's intent in enacting Section 2303a's two-hour rule than the Coast Guard's extended delay does, since Congress wanted a two-hour requirement, and at least in Massachusetts vessels are now in fact subject to one.  Section 2303a thus also cannot support a field preemption challenge to the two-hour testing requirement.

## VI.   THE COAST GUARD HAS NOT ACTED AT THE LEVEL OF SPECIFICITY NECESSARY FOR CONFLICT PREEMPTION OF THE OIL SPILL ACT'S TUG-ESCORT REQUIREMENT.

Neither the Coast Guard nor the Industry asks the Court to rule that the Oil Spill Act's tug-escort requirement is subject to Title II field preemption.  Coast Guard Memorandum pp. 22-23; Industry Memorandum p. 11.  Their reticence is well taken, because tug escorts do not appear within the listed items in 46 U.S.C. § 3703(a) that determine the potential reach of Title II, *see Locke*, 529 U.S. at 101, 112,  and the Supreme Court indeed has specified that "a requirement that a vessel take on a tug escort when entering a particular body of water is not the type of regulation that demands a uniform national rule."  *Ray*, 435 U.S. at 179.

Both plaintiffs instead contend that the Commonwealth's tug-escort provision is subject to Title I conflict preemption.  Coast Guard Memorandum pp. 22-23; Industry Memorandum pp. 11-14.  As discussed in Section II above, the standard here is whether the "Coast Guard has

-22-

[either] adopted regulations on the subject or determined that regulation is unnecessary or inappropriate," *Locke*, 529 U.S. at 109, with "the subject" being defined quite narrowly. *Ray*, 435 U.S. at 170-71, 174-75, 178. The inquiry accordingly should be whether the Coast Guard had adopted a "local navigation rule," *id.* at 174, at the level of specificity of the state law sought to be preempted. *Id.* at 174-75 (describing issue as whether the "federal authorities . . . have determined whether and in what circumstances tanker size is to limit navigation in Puget Sound"); *accord id.* at 170-71, 178; *see generally* Section II *supra*.

The plaintiffs cannot satisfy that standard here. The Commonwealth's tug-escort requirement is location-specific rather than statewide in its coverage:

> [N]o tank vessel carrying 6,000 or more barrels of oil shall enter or transit any *area of special interest* within the waters of the commonwealth unless the tank vessel is accompanied by a tugboat escort.

Mass. G.L. c. 21M, § 6(a) (emphasis added); *see also id.* § 1 (defining "area of special interest" as Buzzards Bay, Vineyard Sound, and Mount Hope Bay, as well as other particular local waters if found by the Massachusetts Secretary of Environmental Affairs to meet certain criteria). Under *Ray*, the issue accordingly becomes whether the Coast Guard has regulated at the same level of detail – *i.e.*, whether it has a regulation specifically promulgated for Buzzards Bay (or for Vineyard Sound or Mount Hope Bay), just as in *Ray* it did have one exclusively for Puget Sound. *Ray*, 435 U.S. at 170-71, 174-75, 178. The allegedly preemptive Coast Guard regulation cited by the plaintiffs, 33 C.F.R. § 165.100(d)(1)(i), does not approach this level of particularity. It instead prescribes a blanket tug-escort rule for the entire First Coast Guard District, *id.* § 165.100, a region that includes not just Massachusetts but also several other states, *id.* § 3.05-1(b) (defining First Coast Guard District to stretch along the Atlantic Coast from a point in

Maine to a point in New Jersey).  This falls far short of the exactitude needed under *Ray*, and the

conflict-preemption challenge to the tug-escort requirement accordingly cannot prevail.

## VII.    THE PLAINTIFFS WRONGLY CLAIM THAT THE OIL SPILL ACT'S PILOTING REQUIREMENT FOR COASTWISE TUGBOATS IS EXPRESSLY PREEMPTED.

The Coast Guard and the United States also challenge the Oil Spill Act's mandate that all

vessels carrying oil or other hazardous material and entering certain Commonwealth waters

(including Buzzards Bay) employ a state-licensed pilot.  Mass. G.L. c. 103, § 21.  As noted in

Section II above, all parties agree that the express preemption provisions of 46 U.S. § 8501

govern this claim.  *See* Coast Guard Memorandum pp. 25-27; Industry Memorandum p. 11.  The

parties also appear to be in agreement that Section 8501's preemption language does *not* apply to

"registered" vessels, a traditional industry term that refers to vessels "engaged in trade with

foreign countries."   *Ray*, 435 U.S. at 158 n. 7; *see* Coast Guard Memorandum pp. 25-27;

Industry Memorandum p. 11.  It would be hard to contend otherwise, because under *Ray* "it is . . .

clear that [States] are free to impose pilotage requirements on registered vessels entering and

leaving their ports."  *Ray*, 435 U.S. at 159 (construing similar predecessor statute).  Any ruling in

this matter should make Section 8501's inapplicability to registered vessels plain.

The plaintiffs instead limit their preemption claim to state pilotage requirements for

"coastwise" vessels, another traditional term referring to "American flag vessels sailing between

American ports."  *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 136 (2nd Cir. 1994); *see*

Coast Guard Memorandum pp. 25-27; Industry Memorandum p. 11.  This claim is in the least

overbroad, because Section 8501 does not apply to tugboats, whether coastwise or registered.

The statute provides:

> (d)      A State may not adopt a regulation or provision that requires a coastwise vessel to take a pilot licensed or authorized by the laws of a State if the vessel –
>
> > (1)      is propelled by machinery and subject to inspection under part B of this subtitle; or
> >
> > (2)      is subject to inspection under chapter 37 of this title.

46 U.S.C. § 8501(d).  For the reasons set forth in Section IV above, tugboats are "not subject to inspection under chapter 37 of this title," *see* 46 U.S.C. §§ 2101(39)-(40), 3702(a), and Subsection (d)(2) therefore cannot trigger Section 8501(d)'s applicability.  In addition, tugs are not currently "subject to inspection under part B of this subtitle" within the meaning of Subsection (d)(1) either, and they thereby fall outside of this alternative criterion for triggering Section 8501(d) as well.  While Congress did add language in 2004 extending Part B's potential reach to tugs and authorizing the Coast Guard to inspect them,[24] the Coast Guard once again has yet to implement Congress's initiative and promulgate regulations for tugboat inspections.  *See* 46 C.F.R. §§ 2.01-7(a) (tank vessels inspected while motorized towing vessels not yet inspected). In these circumstances, Section 8501(d)'s preemption provisions should not be construed to extend to tugs unless and until the Coast Guard takes meaningful action under Part B regarding them.  Such a construction would serve to spur Coast Guard action and better effectuate Congress's desire for actual Part B inspections of this important class of vessels.

---

[24]      *See* Coast Guard and Maritime Transportation Act of 2004, Pub. L. No. 108-293, § 415, 118 Stat. 1028, 1047 (Aug. 9, 2003) (amending 46 U.S.C. § 3301 to add new Subsection 15).

## VIII.  CONCLUSION

For the foregoing reasons, the State Defendants respectfully request that the Court deny Plaintiffs' Motion For Judgment on the Pleadings and Intervenor-Plaintiffs' Motion for Judgment on the Pleadings.

### <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Local Rule 7.1(D), the State Defendants respectfully request the opportunity to be heard in oral argument in opposition to the Coast Guard and Industry Motions.

By their attorneys,

ATTORNEY GENERAL
THOMAS F. REILLY


/s/ Pierce O. Cray
Pierce O. Cray, BBO # 104630
Nora Chorover, BBO # 547352
Assistant Attorneys General
One Ashburton Place
Boston, MA 02108
(617) 727-2200
pierce.cray@ago.state.ma.us
nora.chorover@ago.state.ma.us

Date:   July 15, 2005