UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                  )
THE UNITED STATES OF AMERICA,          )
                                                  )
                        Plaintiff,                )
            v.                                    )
                                                  )
THE COMMONWEALTH OF                    )
MASSACHUSETTS, et al.                       )        Civil Action No. 05-10112 JLT
                                                  )
                        Defendants,    and       )
                                                  )
THE COALITION FOR BUZZARDS BAY,   )
                                                  )
                        Intervenor-Defendant )
_____)
                                                  )
THE AMERICAN WATERWAYS OPERATORS, )
et al.                                            )
                        Intervenor-Plaintiff     )
            v.                                    )
                                                  )
MITT ROMNEY, Governor of Massachusetts, et al. )
                                                  )
                        Defendants               )
_____)

**MEMORANDUM OF THE COALITION FOR BUZZARDS BAY IN OPPOSITION TO
THE MOTIONS FOR JUDGMENT ON THE PLEADINGS[1]**

_____

[1] This memorandum is submitted in opposition to the motions for judgment on the pleadings filed by the United States and The Intervenor-Plaintiffs.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 2

ARGUMENT ......................................................................................................... 5

    This Court Should Deny Plaintiffs' Motions Because Plaintiffs Are Not Entitled To
    Prevail As a Matter of Law ............................................................................... 5

    I.    Standard of Review under 12(c) ............................................................. 5

    II.   Courts Have Long Acknowledged that States May Regulate Maritime
        Commerce ............................................................................................ 6

    III.  The Challenged Provisions of The Oil Spill Prevention Act Are Not
        Preempted By Federal Law ..................................................................... 8

        A.   The Commonwealth's Financial Assurance Provision Is
           Wholly Permitted  Under the Oil Pollution Act of 1990 .............. 8

        B.   The Commonwealth's Maritime Personnel and Manning
           Provisions Do  Not Conflict With Federal Law .......................... 10

        C.   The Commonwealth's Requirement that Tug Escorts Be Used
           in Areas of  Special Interest Is a Permitted Local Rule ............... 13

           i.    Compliance With Both Federal and State Regulations
               Is Not Impossible .......................................................... 14

           ii.   The State Provision Does Not Stand As An Obstacle
               To Congress' Objectives ................................................. 18

        D.   The Commonwealth's Pilotage Provision is Not Preempted
           Because it  Applies to Tow Vessels, Which are Not Inspected .... 19

        E.   The Commonwealth's Prohibition on the Docking of Vessels
           Not In  Compliance with the OPA Phase-Out Schedule Is Not
           Prohibited By Federal Law ....................................................... 23

        F.   The Commonwealth's Alcohol Testing Provision is Not
           Preempted .............................................................................. 24

        G.   The Commonwealth's Mandatory Vessel Routing Scheme Is
           Not In Conflict  with Federal Law .............................................. 26

CONCLUSION ..................................................................................................... 27

# TABLE OF AUTHORITIES

## Cases

Askew v. American Waterways Operators, Inc., 411 U.S. 325 (1973) .....................................7, 9

Ballard Shipping Co. v. Beach Shellfish, 32 F.3d 623 (1st Cir. 1994)............................................7

Barber v. Hawaii, 42 F.3d 1185 (9th Cir. 1994)............................................................................24

Beveridge v. Lewis, 939 F.2d 859 (9th Cir. 1991) ..................................................................24, 27

California v. ARC America Corp., 490 U.S. 93 (1989)..................................................................14

Chevron U.S.A., Inc. v. Hammond, 726 F.2d 483 (9th Cir. 1994) .........................................8, 14

Class v. Commonwealth of Puerto Rico, 309 F. Supp. 2d 235 (D. P.R. 2004).............................2

Cooley v. Board of Wardens of Port of Philadelphia, 53 U.S. 299 (1851).............................7, 20

Doucette v. San Diego Unified Port District, 1997 U.S. App. LEXIS 28476
     (9th Cir. 1997) .........................................................................................................................24

Douglas v. Seacoast Products, Inc., 431 U.S. 265 (1977) .............................................................6

Florida Lime and Avocado Growers, Inc. v. Paul, 373 U.S. 132 (1963)................................8, 15

George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,
     554 F.2d 551 (2nd Cir. 1977) ..................................................................................................6

Geupel v. Benson, 704 F. Supp. 312 (D. Mass. 1989) ...................................................................2

H.P. Welch Co. v. New Hampshire, 306 U.S. 79 (1939).............................................................22

Hines v. Davidowitz, 312 U.S. 52 (1941)...............................................................................8, 18

Huron Portland Cement Co. v. Detroit, 362 U.S. 440 (1960)........................................................6

Jackson v. Marine Exploration Co., 583 F.2d 1336 (5th Cir. 1978) ...........................................20

Kelly v. Washington, 302 U.S. 1 (1937)........................................................................................7

LCM Enterprises, Inc. v. Town of Dartmouth, 14 F.3d 675 (1st Cir. 1994) ...............................18

Manchester v. Massachusetts, 139 U.S. 240 (1891).......................................................................6

Massachusetts Ass'n of HMO's v. Ruthardt, 194 F.3d 176 (1st Cir. 1999)................................22

Medtronic, Inc. v. Lohr, 518 U.S. 470 (1996).............................................................................23

Nelson v. University of Maine System, 914 F. Supp. 643 (D. Me. 1996)....................................6

Ray v. Atlantic Ritchfield Co., 435 U.S. 151 (1978).............................................................. passim

Rivera-Gomez v. Adolfo de Castro, 843 F.2d 631 (1st Cir. 1988) ...............................................6

Seagram & Sons v. Hosteller, 384 U.S. 35 (1966) ........................................................................8

Smith v. Maryland, 59 U.S. 71  (1855)...........................................................................................6

The James Gray v. The John Frasier, 62 U.S. 184 (1858) ...........................................................24

United States v. Locke, 529 U.S. 89 (2000)...................................................................... passim

Warner v. Dunlap, 532 F. 2d 767 (1st Cir. 1976).......................................................................20

## Statutes

33 U.S.C. § 1223............................................................................................................................8

33 U.S.C. § 1223(a)(4).................................................................................................................26

33 U.S.C. § 2704(c)(1).................................................................................................................26

33 U.S.C. § 2718(c) ..................................................................................................................9, 25

33 U.S.C. §§ 2701-2761................................................................................................................8

46 U.S.C. § 2101..........................................................................................................................11

46 U.S.C. § 2303a........................................................................................................................26

46 U.S.C. § 3301.....................................................................................................................21, 22

46 U.S.C. § 3306..........................................................................................................................21

46 U.S.C. § 3309..........................................................................................................................22

46 U.S.C. § 3703.............................................................................................................8, 11, 23

46 U.S.C. § 3703(a) ....................................................................................................... 11, 23

46 U.S.C. § 8501 ................................................................................................................... 20

M.G.L. 21M § 3 ..................................................................................................................... 25

M.G.L. 21M § 4 ..................................................................................................................... 10

M.G.L. 21M § 5 ..................................................................................................................... 26

M.G.L. 21M § 6 ..................................................................................................................... 13

M.G.L. 21M § 7 ..................................................................................................................... 23

M.G.L. 21 § 50C ..................................................................................................................... 9

M.G.L. 103 § 21 ..................................................................................................................... 20

An Act Relative to Oil Spill Prevention and Response in Buzzards Bay and Other Harbors and
    Bays of the Commonwealth, 2004 Mass. Acts 251 (Aug. 4, 2004), as amended by 2004 Mass.
    Acts 457 § 1 (Dec. 30, 2004) ....................................................................................................... 5

Public Law 105-383 ..................................................................................................................... 17

## Regulations

33 C.F.R. Part 164 ..................................................................................................................... 11

33 C.F.R. § 165.100 ............................................................................................................. 14, 15

46 C.F.R. § 2.01-7A ..................................................................................................................... 22

## Other Authorities

2004 Mass. Legis. Serv. 989 (West) ....................................................................................................... 5

70 Fed. Reg. 5691 (Feb. 3, 2005) ....................................................................................................... 21

Navigation and Waterways Management Improvements, Buzzards Bay, MA,
    69 Fed. Reg. 62427 (Oct. 26, 2004) ....................................................................................... 3, 4, 27

S. Rep. No. 98-56 (1983), *reprinted in* 1983 U.S.C.C.A.N. 924 ................................................. 22

## INTRODUCTION

In this suit, the United States of America ("United States" or "Plaintiff") and the Intervenor-Plaintiffs[2] (collectively, "Plaintiffs") ask this Court to invalidate currently enforced state legislation vital to the protection of Buzzards Bay and other sensitive waters of the Commonwealth from oil spills. In its place, Plaintiffs seek to leave a regulatory vacuum, plotting a course for a recurrence of the disastrous April 2003 Bouchard-120 Oil Spill in which 98,000 gallons of oil spilled into Buzzards Bay (the "Bouchard-120 Oil Spill"). Fortunately, their efforts founder upon the Supreme Court decisions in Ray v. Atlantic Ritchfield Co., 435 U.S. 151 (1978) and United States v. Locke, 529 U.S. 89 (2000). These precedents reaffirmed the longstanding view that a state is free to regulate its ports and waterways where the regulations are based on "the peculiarities of the local waters that call for special precautionary measures," Ray, 435 U.S. 151,and where, as here, the Coast Guard has failed to regulate the subject. These holdings, coupled with the Oil Pollution Act of 1990 ("OPA"), which preserves the states' right "to impose additional liability or requirements . . . relating to the discharge, or substantial threat of a discharge, or oil", and other precedent make plain that the regulations at issue are not preempted by federal law. More importantly, at this very early stage of the proceedings, entering judgment would be inappropriate. There are many factual issues to be developed, and a Rule 12(c) motion is simply unfounded.

---

[2] The Intervenor-Plaintiffs are the American Waterways Operators, International Association of Independent Tank Vessel Owners, Chamber of Shipping of America and BIMCO (hereinafter "Intervenor-Plaintiffs" or "AWO").

## BACKGROUND[3]

On the afternoon of April 27, 2003, the single-hulled Bouchard Barge-120 (the "Bouchard-120"), loaded with more than four million gallons of heavy, thick and adhesive No. 6 fuel oil, was being pulled towards the entrance to Buzzards Bay Channel by a tugboat named the Evening Tide.  See Criminal Complaint, United States v. Bouchard Transportation Company, Inc., ¶¶ 10 & 12. [4]  Instead of approaching the Buzzards Bay Channel at the center of the channel, where water depths range between 42 and 63 feet, the Evening Tide approached the channel at the extreme left-hand side of the channel, where water depths are much shallower. Criminal Complaint ¶ 25.  Despite attempts by another vessel to communicate with the Evening Tide over the radio to warn that it was approaching an area where rocky reefs lie close to the surface, no one on the Evening Tide responded promptly to those attempts to communicate. Criminal Complaint ¶ 26.  While the Evening Tide was traveling approximately ¼ of a mile to the west of the buoy marking the Buzzards Bay Channel, the Bouchard-120 struck a rock outcropping located twenty-two feet below the surface.  Criminal Complaint ¶ 29-30.

The impact of the barge striking the rocks tore a twelve-foot long gash in the vicinity of the #2 tank on starboard side of the vessel.  Criminal Complaint ¶ 31.  As a result of the

---

[3] The Coalition provides this Court with a limited factual background of the case.  The Coalition however does not rely upon these facts for resolution of the Plaintiffs' motions, which proceed under Fed. R. Civ. P. 12(c) and are accordingly subject to the usual standards for a motion for judgment on the pleadings.  The Coalition specifically does not seek to convert the Plaintiffs' motions to motions for summary judgment, which conversion should be disfavored at this stage of the proceeding as the case is in its infancy and The Coalition has been limited in obtaining evidence through discovery.  Class v. Commonwealth of Puerto Rico, 309 F. Supp. 2d 235, 237 (D. P.R. 2004).

[4] A copy of the Criminal Complaint filed by the United States against Bouchard Transportation Company, Inc., is attached as Exhibit F to the Affidavit of Jonathan M. Ettinger in Support of The Opposition of The Coalition For Buzzards Bay To The United States' Motion For Summary Judgment and In Support of Its Cross-Motion For Summary Judgment ("Ettinger Aff."), filed July 12, 2005.  Although the facts presented herein are for background purposes, The Coalition notes that, should the Court determine that reliance on the Criminal Complaint is, in fact, warranted, the Court may take judicial notice of the Criminal Complaint without converting the motion into one pursuant to Rule 56.  See Geupel v. Benson, 704 F. Supp. 312, 313 (D. Mass. 1989) (court may rely on any facts of which the court will take judicial notice in deciding Rule 12(c) motion).

collision, up to 98,000 gallons of heavy, viscous No. 6 oil was spilled into the waters of the Bay (the "Bouchard-120 Oil Spill"). <u>Criminal Complaint</u> ¶ 32. The Bouchard-120 oil fouled approximately 90 miles of the Bay's beaches and coastline. <u>Criminal Complaint</u> ¶ 34. More than 450 birds of various species, including loons, eiders, scoters, ducks, mergansers and swans, were killed when they came into contact with the oil. <u>Criminal Complaint</u> at 33. Only a small number of birds that came into contact with the oil were rehabilitated and returned to the wild. <u>Id</u>. The oil spill also contaminated and forced the closure of thousands of acres of shellfish beds for several months. <u>Criminal Complaint</u> ¶ 34. The long-term impact of the Bouchard-120 Oil Spill on marine life, bird populations and the overall ecology of the Bay will not be known for several years. <u>Criminal Complaint</u> ¶ 5.

The Bouchard-120 Oil Spill and the damage it caused were tragic, but given the long history of oil spills in Buzzards Bay, the occurrence was not entirely unexpected. Since 1969, Buzzards Bay has been the site of numerous documented marine casualties, including, among others: the 1969 grounding of the tank barge Florida which resulted in the spill of approximately 175,000 gallons of No. 2 fuel oil; the 1977 grounding of the tank barge Bouchard which resulted in the spill of approximately 81,000 gallons of No. 2 fuel oil; the 1986 grounding of the tank barge ST-85 which resulted in the spill of approximately 119,000 gallons of gasoline; the 1999 grounding of the tug Marie J. Turecamo and an asphalt-laden barge; and, the 1999 grounding of the tug Mary Turecamo and a barge carrying 4.7 million gallons of No. 6 fuel oil. <u>See</u> Navigation and Waterways Management Improvements, Buzzards Bay, MA, 69 Fed. Reg. 62427, 62428 (Oct. 26, 2004).

This long history of marine incidents is explained, at least in part, by factors such as the unique characteristics of Buzzards Bay which make navigation exceedingly difficult, the large

- 3 -

volume of petroleum products transported through the Bay each year, and the types of vessels on which petroleum products are transported through the Bay. At 28 miles long, with an average width of only 8 miles and a mean depth of only 36 feet, Buzzards Bay poses many risks to navigation. Affidavit of Mark Rasmussen ("Rasmussen Aff.") ¶ 5.[5] Both ends of the Bay are marked with dangerous ledges, reefs and currents. Id. Despite these dangers, an estimated 2 billion gallons of oil is transported through Buzzards Bay each year. Id. In 2002 close to 10,000 commercial vessels and over 1200 tank barge transited Buzzards Bay. 69 Fed. Reg. at 62428. An estimated 80% of the tank barges were single hull vessels. Id.

The sheer number of marine incidents that have occurred and the volume of oil that has entered the Bay as result is particularly alarming when one considers the ecological and economic significance and unique characteristics of Buzzards Bay. Buzzards Bay was designated by the United States Congress in 1985 as an "Estuary of National Significance," one of only five estuaries in the United States so designated. 69 Fed. Reg. at 62428. The Bay was further designated by the United States Environmental Protection Agency as a "No Discharge Area" in 2000 and has been designated as an Ocean Sanctuary by the Commonwealth. Rasmussen Aff. ¶ 4. The Bay is home to a variety of threatened and endangered species, including the piping plover and tiger beetle, as well as approximately half of the remaining global population of the endangered roseate tern. Id. Buzzards Bay is also home to some of the Commonwealth's most productive shellfish beds. 69 Fed. Reg. at 62428. Because of the great ecological significance of Buzzards Bay, the consequences of future oil spills could be dire.

Perhaps the most tragic aspect of the Bouchard-120 Oil Spill is that it likely could have been prevented. Less than a year after the Bouchard-120 Oil Spill, the United States Department

---

[5] The Affidavit of Mark Rasmussen is attached as Exhibit G to the Ettinger Aff.

of Justice brought a criminal complaint against the Bouchard Transportation Company, Inc. ("BTC"), citing a number of errors committed by the crew, see generally Criminal Complaint. Such errors might not have occurred or had such tragic consequences had additional safeguards been in place.

In August 2004, the Massachusetts legislature enacted the provisions of An Act Relative to Oil Spill Prevention and Response in Buzzards Bay and Other Harbors and Bays of the Commonwealth, 2004 Mass. Acts 251 (Aug. 4, 2004), as amended by 2004 Mass. Acts 457 § 1 (Dec. 30, 2004) (the "Oil Spill Prevention Act"), in order to protect Buzzards Bay and other sensitive waters of the Commonwealth from oil spills. The Oil Spill Prevention Act significantly reformed existing requirements. Due to its overwhelming importance, the Oil Spill Prevention Act was made immediately effective. See 2004 Mass. Legis. Serv. 989 (West) ("Whereas, The deferred operation of this act would tend to defeat its purpose, which is to protect the unique and sensitive waterways of the commonwealth, therefore it is hereby declared to be an emergency law, necessary for immediate preservation of the public convenience.").

In the face of these facts, the United States and Intervenor-Plaintiffs have filed suit to invalidate the Oil Spill Prevention Act and now seek to have the case resolved while it is still in its infancy, before the factual record can be adequately developed. Plaintiffs' motions should be denied.

## ARGUMENT

**This Court Should Deny Plaintiffs' Motions Because Plaintiffs Are Not Entitled To Prevail As a Matter of Law**

### I.     Standard of Review under 12(c)

This Court should deny Plaintiffs' motions because it is not beyond doubt that The Coalition can prove no set of facts that would entitle it to prevail. Rivera-Gomez v. Adolfo de

Castro, 843 F.2d 631, 635 (1st Cir. 1988) (citing George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp., 554 F.2d 551, 553 (2nd Cir. 1977)).  Given the strength of The Coalition's arguments and the fact that, "[p]ublic policy, affording each litigant a full and fair hearing on the merits, warrants against imprudent use of [a 12(c)] this motion,"  Nelson v. University of Maine System, 914 F. Supp. 643, 647 (D. Me. 1996), judgment on the pleadings is simply not warranted in this case.

## II.    Courts Have Long Acknowledged that States May Regulate Maritime Commerce

In Locke, the Supreme Court acknowledged the broad sphere in which states may regulate maritime commerce, holding that "[t]itle I of the PWSA allows a State to regulate its ports and waterways, so long as the regulation is based on 'the peculiarities of local waters that call for special precautionary measures' . . . [and] allows State rules directed to local circumstances and problems, such as water depth and narrowness, idiosyncratic to a particular port or waterway."  Locke, 529 U.S. at 109.   In so doing, the Court noted the "important role for States and localities in the regulation of the Nation's waterways and ports."  Locke, 529 U.S. at 109.

The Locke Court's holding follows a large body of case law affording states an important role in regulating particular aspects of maritime commerce.  For example, the Supreme Court has long held that states may impose "reasonable, nondiscriminatory conservation and environmental protection measures" on enrolled and registered vessels.  Douglas v. Seacoast Products, Inc., 431 U.S. 265, 277 (1977), (citing Smith v. Maryland, 59 U.S. 71  (1855)).  See also Manchester v. Massachusetts, 139 U.S. 240 (1891); Huron Portland Cement Co. v. Detroit, 362 U.S. 440 (1960).  Similarly, states have long imposed certain local pilotage requirements on vessels traveling in state waters.  See Cooley v. Board of Wardens of Port of Philadelphia, 53 U.S. 299

(1851). See also Kelly v. Washington, 302 U.S. 1 (1937) (permitting local safety inspections of certain vessels).

That both state and federal authorities may regulate maritime commerce is fully consistent with this nation's federal structure, in which states have vast residual powers which, "unless constrained or displaced by the existence of federal authority or by proper federal enactments, are often exercised in concurrence with those of the national government." Locke, 529 U.S. at 109. The permissibility of state regulation is also consistent with the strong interests of the states in protecting their local waters from pollution. As the Court of Appeals for the First Circuit has noted, "[n]o one can doubt that the state's interest in avoiding pollution in its navigable waters and on its shores, and in redressing injury to its citizens from such pollution, is a weighty one." Ballard Shipping Co. v. Beach Shellfish, 32 F.3d 623, 629 (1st Cir. 1994). See also Askew v. American Waterways Operators, Inc., 411 U.S. 325, 328-329 (1973) (oil spillage is "an insidious form of pollution of vast concern to every coastal city or port and to all the estuaries on which the life of the ocean and the lives of the coastal people are greatly dependent.").

Plaintiffs attempt to diminish the important interests of the Commonwealth by focusing almost exclusively on the federal interest in maritime commerce and suggesting that this Court should assume broadly that because the Coast Guard has a large role in regulating maritime commerce, it should have the *only* role in such regulation. However, in Locke the Court *did not* announce the existence of a presumption in favor of a finding of federal preemption, finding instead that "[n]o artificial presumption aids us in determining the scope of appropriate local regulation under the [Ports and Waterways Safety Act ("PWSA")], which . . . does preserve, in Title I of that Act, the historic role of the States to regulate local ports and waters under

appropriate circumstances." Locke, 529 U.S. at 109-110. State regulation based on the peculiarities of the particular waterways is permitted so "long as the Coast Guard has not adopted regulations on the subject or determined that regulation is unnecessary or inappropriate."[6] In addition, where a state regulation falls within the "overlapping coverage" of Titles I and II of PWSA, a court should not apply the "greater pre-emptive force of Title II,"[7] but rather should consider "whether the rule is justified by conditions unique to a particular port or waterway." [8] Locke, 529 U.S. at 112. Thus, this Court should not, as Plaintiffs urge, presume the invalidity of the Oil Spill Prevention Act. Rather, this Court should examine each of the challenged provisions and determine that they survive under Locke.

## III.   The Challenged Provisions of The Oil Spill Prevention Act Are Not Preempted By Federal Law

### A.   The Commonwealth's Financial Assurance Provision Is Wholly Permitted Under the Oil Pollution Act of 1990

The savings clause of the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701-2761, ("OPA") makes clear that a state may impose additional liability or requirements relating to the discharge or threat of discharge of oil in order to insure itself against the effects of pollution. See 33

---

[6] A state law falling within the scope of Title I of PWSA, 33 U.S.C. § 1223, is reviewed under conflict preemption analysis and therefore is void to the extent that it actually conflicts with a valid federal authority. Ray, 435 U.S. at 158. A conflict will be found "where compliance with both federal and state regulations is a physical impossibility", Florida Lime and Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143 (1963), or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67 (1941). In determining whether an actual conflict exists, a court should be guided by a "reluctance to entertain hypothetical conflicts because 'in this as in other areas of coincident federal and state regulation, the teaching of this Court's decisions . . . enjoins seeking out conflicts between state and federal regulation where none clearly exists." Chevron U.S.A., Inc. v. Hammond, 726 F.2d 483, 499 (9th Cir. 1994) (quoting Seagram & Sons v. Hosteller, 384 U.S. 35, 45 (1966)).

[7] Under Title II of PWSA, 46 U.S.C. § 3703, field preemption principles apply. Locke, 529 U.S. at 111.

[8] A court may also consider a number of other factors in order to determine whether Title I analysis is appropriate, including whether the rule: is justified by conditions unique to a particular port or waterway; will be of limited extraterritorial effect; poses a minimal risk of innocent noncompliance; does not affect vessel operations outside the jurisdiction; does not require adjustment of systemic aspects of the vessel; and, does not impose a substantial burden on the vessel' operation within the local jurisdiction itself. Id. at 112.

U.S.C. § 2718(c) ("Nothing in this Act . . . shall in any way affect, or be construed to affect, the authority of . . . any State . . . (1) to impose additional liability or requirements . . . relating to the discharge, or substantial threat of a discharge, or oil.").[9]  Thus, the requirement in the Oil Spill Prevention Act, M.G.L. 21 § 50C, that vessels carrying oil in Massachusetts' waters must provide a certificate of financial assurance (the "Financial Assurance Provision") is permitted under OPA.[10]  In fact, the Plaintiffs do not, and cannot argue, that this provision is preempted. Rather, they make the rather astounding argument that the Commonwealth may not reduce the amount of that lawful financial assurance requirement based on whether the vessel's design, operating, equipping, and reporting features are likely to reduce the risk of an oil spill, the sole reason being that the United States has not itself chosen to mandate those features.  This argument must be rejected as the Supreme Court has squarely held to the contrary.

In Ray, the Supreme Court held that Washington state was permitted to use a vessel's compliance with vessel design requirements, which were themselves preempted by Title II, as a justification for exemption from a state tug escort requirement.  See Ray, 435 U.S. at 173 ("Given the validity of the general rule prescribing tug escorts for all tankers, Washington is also privileged, in so far as the Supremacy Clause is concerned, to waive the rule for tankers having specified design characteristics.").  Thus, according to Ray, the Financial Assurance Provision is

---

[9] Indeed, even prior to the enactment of OPA, the Supreme Court upheld the ability of a state to impose financial assurance requirements on owners and operators of vessels transporting oil to and from oil terminal facilities.  See Askew v. Florida, 411 U.S. 325 (1973) (upholding a Florida statute requiring owners and operators of oil terminal facilities and vessels traveling to or from such facilities to establish evidence of financial responsibility by insurance or a surety bond).

[10] The United States' Memorandum ("U.S. Memo.") incorrectly characterizes the Financial Assurance Provision as a "Massive Financial Assurance Bond." (U.S. Memo at 18).  In fact, the requirement can be satisfied through evidence of insurance, surety bond, letter of credit, qualifications as a self-insurer or any combination thereof or through any other evidence of financial assurance approved by the Commissioner.  M.G.L. c.21 § 50C(c). Furthermore, the Financial Assurance Provision actually permits the industry to pool resources and cooperate by "obtaining individually or jointly by the vessel, its owner or agent, its charterer, or by the owner or operator of the terminal at which the vessel discharges or receives its cargo."  M.G.L. 21 § 50C(b).  The United States' characterization of the Financial Assurance Provision is misleading and incorrect.

not preempted.  As the Commonwealth is entitled to require that all vessels carrying oil within its waters provide it with a certificate of financial assurance, so is it entitled to allow reductions in the amount of such a requirement where it determines that the full amount of financial assurance is not necessary.

It must also be noted that the only *requirement* the Financial Assurance Provision imposes is just that – that a vessel obtain a certificate of financial assurance.  A vessel is *not required* to implement any vessel design, operating, equipping or reporting practices.  The adoption of such practices is purely *optional* and the Commonwealth has therefore not attempted to regulate such practices.  Whether the potential for a reduction in the amount of financial assurance a vessel must provide will exert pressure on vessel owners to adopt certain vessel design, operating, equipping and reporting practices is a question of fact that cannot be answered at this point in the proceedings.  See Ray, 435 U.S. at 173, n.25 (comparing cost compliance with tug escort requirement with cost of implementing design standards, and concluding that due to high costs of the latter, design standards would not be implemented).  Plaintiffs have presented no evidence that vessel owners will adopt different practices as a result of the Financial Assurance Provision.[11]

### B.    The Commonwealth's Maritime Personnel and Manning Provisions Do Not Conflict With Federal Law

Under the plain language of Title II and the Supreme Court's analysis in Locke, Section 11 of the Oil Spill Prevention Act, codified at M.G.L. 21M § 4, requiring a navigation watch on certain types of vessels while underway, anchored or moored in the waters of Buzzards Bay (the "Watch Provision"), is not preempted under Title II but rather falls well within the state's

---

[11]  In fact, The Coalition is aware of, and expects to present at a future stage of the proceeding, evidence indicating that the Financial Assurance Provision will have little to no practical effect on the behavior of commercial vessel owners.

preserved authority under Title I, "to regulate the peculiarities of local waters if there [is] no

conflict with federal regulatory determinations." Locke, 529 U.S. at 110.  Thus Plaintiffs'

assertion that the Watch Provision is preempted by Title II of PWSA[12] must fail.

As an initial matter, Title II of PWSA provides that the Coast Guard shall prescribe

regulations regarding the "design, construction, alteration, repair, maintenance, operation,

equipping, personnel qualification, and manning of *vessels to which this chapter applies*."  As

indicated in 46 U.S.C. § 3703(a), the chapter applies only to *tank vessels*, defined as:

> a vessel that is constructed or adapted to carry, or that carries, oil
> or hazardous material in bulk as cargo or cargo residue, and that –
> (a) is a vessel of the United States; (b) operates on the navigable
> waters of the United States; or (c) transfers oil or hazardous
> material in a port or place subject to the jurisdiction of the United
> States.

46 U.S.C. § 2101(39).  Because towing vessels are not constructed or adapted to carry, and do

not carry oil or hazardous material, but rather are "commercial vessel[s] engaged in or intending

to engage in the service of pulling, pushing, or hauling along side, or any combination of pulling,

pushing, or hauling along side," 46 U.S.C. § 2101(40), field preemption under Title II does not

---

[12] While the Plaintiffs' preemption arguments are clearly based on field preemption under Title II of PWSA, they also vaguely reference additional authorities without arguing that these authorities present separate sources of preemption.  To the extent Plaintiffs do intend to rely on these authorities, The Coalition notes that an analysis of the preemptive force of such authorities requires a fact-specific inquiry, making resolution on the pleadings inappropriate.  For example, the United States cites to 33 C.F.R. Part 164 (United States Complaint, ¶ 26) as a source of preemption.  However, the majority of 33 C.F.R. Part 164's requirements apply only to self-propelled vessels weighing more than 1600 gross tons.  Because barges are not self-propelled, they are not regulated under Part 164, and thus the Watch Provision is not preempted as to barges.  In addition, The Coalition expects, after an opportunity for discovery, to be able to present evidence which shows that Part 164's manning and watch provisions do not apply to the vast majority of towing vessels transiting Buzzards Bay, and thus the Watch Provision is not preempted as to those vessels.  The United States also references the "right of innocent passage", as defined in the CTSCZ and UNCLOS.  (U.S. Memo. at 15, n.11).  However, the United States has not even ratified UNCLOS, which superseded much of CTSCZ, and therefore it is not legally binding.  In addition, whether the Watch Provision gives "effect to generally accepted international rules or standards" or has the effect of "denying or impairing the right of innocent passage" are questions which require additional factual development to answer.

apply to state regulation of towing vessels.  Therefore, Plaintiffs' claims based on Title II of PWSA clearly fail as to the Watch Provision's application to towing vessels.

A slightly more nuanced analysis must be applied to review the validity of the Watch Provision as applied to tank barges, yet the result is the same.  Plaintiffs correctly note that the Locke Court found that a Washington state requirement that tank vessels have a navigation watch, which requirement applied to tanker vessels traveling at any time in any of the waters throughout the state, was preempted under Title II of PWSA.  However, Plaintiffs fail to note that the Locke Court refused, on the record before it, to strike down a more limited manning requirement that applied in times of "restricted visibility."  See Locke, 529 U.S. at 116 (remanding watch requirement in times of restricted visibility to Court of Appeals to consider whether such requirement falls within Title I of PWSA).  Thus, under Locke, a limited navigation watch requirement which, like the Watch Provision, is based on the peculiarities of a particular waterbody, can be reviewed through the lens of Title I conflict preemption analysis.

As noted in Section II, supra, the Locke Court noted that where the coverage of Title I and Title II of PWSA overlaps, a court should "decline to resolve every question by the greater pre-emptive force of Title II."  Id. at 111.  Instead, a court should inquire as to whether the rule is justified by local conditions to determine whether analysis under Title I is appropriate.  Id. at 112.  In addition, a court may consider a number of other relevant factors, see n.8, supra, Id. at 112.[13]  The Watch Provision is clearly justified by the unique conditions of Buzzards Bay , specifically does not require adjustment of systemic aspects of the vessel, see M.G.L. 21M § 4(b) (crew requirements do not apply where tank barge is not equipped to accommodate personnel on

---

[13] It should be noted, in response to n.10 of U.S. Memo., that, in listing the above considerations, the Locke Court did not indicate that deference to the agency's determination regarding whether a challenged state regulation should be subject to analysis under Title I or Title II of PWSA was appropriate.

board), has a limited extraterritorial effect and imposes a minimal burden on the vessel's operation within the local jurisdiction.[14]  However, these factual issues cannot be adequately presented at this stage of the proceeding and, accordingly, Plaintiffs motions should be denied .

### C.     The Commonwealth's Requirement that Tug Escorts Be Used in Areas of Special Interest Is a Permitted Local Rule

In asking this Court to invalidate additional portions of Section 11 of the Oil Spill Prevention Act, codified at M.G.L. 21M § 6, which require tank vessels carrying 6000 or more barrels of oil through areas of special interest to be escorted by a tug (the "Tug Escort Provision"), Plaintiffs seek to render unenforceable a provision which the Coast Guard itself believes may be necessary to prevent additional oil spills in Buzzards Bay.  Indeed, in October, 2004, only a few months after the Commonwealth enacted the Tug Escort Provision, the Coast Guard initiated a rulemaking process on the subject by requesting public comment on whether a federal regulation requiring the use of tug escorts in Buzzards Bay would be appropriate.  The Plaintiffs thus seek to create a regulatory vacuum where a reasonable state regulation falling well within the Commonwealth's traditional authority currently exists.  In arguing for this result, Plaintiffs attempt to demonstrate the existence of a conflict where none exists.  Plaintiffs' motions must therefore be denied as to the Tug Escort Provision.

Plaintiffs concede, as they must in light of the Supreme Court's decision in Ray, that a tug escort requirement falls within the scope of Title I of PWSA.  See Ray, 435 U.S. at 171 (a tug-escort provision is "akin to an operating rule arising from the peculiarities of local waters

---

[14] The Watch Provision's limited extraterritorial effect and minimal burden within Buzzards Bay will be proven, inter alia¸ by evidence that, since the Oil Spill Prevention Act was enacted in August, 2004, towing vessels and tank barges traveling through Buzzards Bay have been required and able to comply with this provision of the Act.  While representatives of the industry groups subject to the regulation have intervened in the current suit as Intervenor-Plaintiffs, after nearly an entire year of being forced to comply with the requirement, they have not sought to immediately enjoin its enforcement.  The United States has offered no contradictory evidence.  Further development of the factual record through discovery would assist the Court in determining that review under Title I is appropriate, and therefore judgment on the pleadings is not appropriate.

that call for special precautionary measures.")  Under Title I, the appropriate inquiry is thus one

of conflict preemption, "which occurs 'when compliance with both state and federal law is

impossible,' or when the state law 'stands as an obstacle to the accomplishment and execution of

the full purposes and objective of Congress.'"  Locke, 529 U.S. at 109 (citing California v. ARC

America Corp., 490 U.S. 93, 100-101 (1988)).  Plaintiffs assert that the Tug Escort Provision

conflicts with, and is therefore preempted by, Coast Guard regulations at 33 C.F.R. § 165.100.

However, this Court need not, and therefore should not, find that a conflict exists between the

Commonwealth's and the Coast Guard's requirements.

    The Coast Guard regulation to which Plaintiffs cite does describe *a circumstance* in

which a tug-escort is required in the waters of the First Coast Guard District - where a single-

hulled barge transporting oil is being towed by a single screw tug.  However, there is no

indication in 33 C.F.R. 165.100 (the "First District RNA") that it is meant to describe *the only*

*circumstance* in which a tug-escort may be required within the waters comprising the First Coast

Guard District.  In fact, neither the United States nor the Intervenor-Defendants have shown that

compliance with both requirements is impossible, or that the Tug Escort Provision stands as an

obstacle to federal goals.  Therefore, at this stage of the proceedings, this Court should not reach

to find that a conflict exists.  See Chevron, 726 F.2d at 499 ("We must be guided by the Court's

reluctance to entertain hypothetical conflicts because 'in this as in other areas of coincident

federal and state regulation, the teaching of this Court's decisions . . . enjoins seeking out

conflicts between state and federal regulation where none clearly exists.'")

    i.    Compliance With Both Federal and State Regulations Is Not Impossible

    The First District RNA, which was promulgated on December 30, 1998, provides that

"each single-hull tank barge, unless being towed by a primary towing vessel with twin-screw

propulsion and with a separate system for power to each screw, must be accompanied by an

escort or assist tug". 33 C.F.R. § 165.100. The First District RNA describes but a single circumstance in which a tug escort must be used in the waters of the First Coast Guard District, an area which spans the entire northeast coast of the country, from the Canadian border south to New Jersey. The First District RNA does not provide any indication that the use of a tug-escort is not appropriate or permitted under additional sets of circumstances.

As indicated above, the Tug Escort Provision provides that "[e]ffective January 1, 2005, no tank vessel carrying 6,000 or more barrels of oil shall enter or transit any area of special interest within the waters of the commonwealth unless the tank vessel is accompanied by a tugboat escort." M.G.L. 21M § 6(a). This provision is a limited requirement that applies only in certain areas in which the Commonwealth has determined, based on the peculiarities of the particular waterbodies, additional protection from oil spills is required. The only vessels on which the Tug Escort Provision imposes an additional temporary, minimal burden are vessels being towed by double-screw tugs and double-hull vessels being towed by single-screw tugs. Such vessels pick up a tug escort upon entering the area of special interest and leave the tug escort upon exiting such waters. In so doing, these vessels remain in compliance with the First District RNA as well. Thus the Tug Escort Provision presents no barrier to compliance with the requirements of the First District RNA. Cf. Florida Lime and Avocado Growers, 373 U.S. at 142-143 (describing situation in which compliance with state law renders compliance with federal law impossible).

In addition, the federal and state regulations differ, as they are meant to, in the breadth with which they regulate. The First District RNA broadly regulates the use of single-screw tugs in the entire First Coast Guard District, which spans from the northern-most point of Maine to the southern-most point of New Jersey. The Tug Escort Provision, on the other hand, deals with

vessels traveling in limited local areas.  There is no indication that the First District RNA was meant to displace the traditional authority of the states in regulating navigation within their borders based on the peculiarities of the particular waterbody.  See Locke, 529 U.S. at 109 (noting the "important role for States and localities in the regulation of the Nation's waterways and ports . . . It is fundamental in our federal structure that states have vast residual powers.") The Commonwealth has validly chosen to exercise this traditional authority through the Tug Escort Provision, and this Court should be hesitant to invalidate such exercise based on Plaintiffs' unsupported contentions of preemption.

Indeed, the passage of Ray to which the United States cites supports the idea that a tug escort requirement will be upheld where it imposes a *local* requirement.  In Ray the Court stated that, "[t]he relevant inquiry under Title I with respect to the State's power to impose a tug-escort rule is thus whether the Secretary has either promulgated his own tug requirement *for Puget Sound tanker navigation* or has decided that no such requirement should be imposed at all." Ray, 435 U.S. at 171-172.  The Ray Court thus looked to whether the Secretary had promulgated a regulation *for the local waterbody* or determined that no such regulation was necessary.

Here, the peculiarities of Buzzards Bay cry out for local regulation to address conditions unique to the Bay.  The only regulation that has been promulgated by the Coast Guard is a *regional, not a local* requirement.  The Plaintiffs cannot argue that by creating a single regulation dealing with but a single set of circumstances related to navigation the Coast Guard has preempted throughout the region all traditional local authority to regulate navigation in local ports based on the peculiarities of particular waterbodies.  The acceptance of such an argument

- 16 -

would eviscerate the traditional state authority recognized by the Supreme Court in both <u>Ray</u> and <u>Locke</u>.[15]

Nor have Plaintiffs pleaded that, in promulgating the First District RNA, the Coast Guard made a determination that no additional navigational requirements should be imposed for Buzzards Bay or other areas of local concern.[16]  Indeed, the Coast Guard's recent publication in the Federal Register of an Advanced Notice of Proposed Rulemaking (the "ANPR"), 69 Fed. Reg. 62427, calls into doubt any claim that, in promulgating the First District RNA, the Coast Guard promulgated all necessary requirements relating to tug escorts and barge safety.  That the Coast Guard is currently requesting comment on whether tug escorts should be mandated for vessels traveling through Buzzards Bay evidences that the Coast Guard has not made a determination that such a requirement is not necessary.  The ANPR in fact, shows that the Coast Guard is currently considering a requirement similar in many respects to the Tug Escort Provision.  Until the Coast Guard promulgates a regulation on the subject or determines that no such requirement is necessary, the United States cannot support its claim that the Tug Escort Provision is preempted.[17]

---

[15] The Coalition intends to present evidence that the subject of the Coast Guard's regulation – single-screw tugs – have become so obsolete that the escort requirement imposed by the First District RNA has no practical effect, making the Plaintiffs' attempts to invalidate the Tug Escort Provision even more egregious.

[16] Indeed, The Coalition expects to present evidence that, a federal report, the findings of which formed the basis for the First District RNA, considered only two types of tug-escort requirements – a general tug escort requirement, which would have required tug escorts for all vessels traveling within the waters of the First District, and the requirement, ultimately adopted by the Coast Guard in the First District RNA, that single-screw tugs towing single-hulled tank barges be required to use an escort tug.  Through this evidence the Coalition will show that the Coast Guard did not consider and reject as unnecessary or unreasonable the imposition of additional tug escort requirements for particular waterbodies within the district where such requirements are based on local concerns

[17] Nor does the United States' citation to the mandatory language contained in Public Law 105-383 help its claim that Congress intended for Coast Guard regulation to preempt the entire area.  Section 311(b)(1)(A) of Public Law 105-383, which was enacted on November 13, 1998, provided that no later than December 31, 1998, "the Secretary shall promulgate regulations for towing vessels and barges in the Northeast."  However, nothing in Section 311 indicates that Congress intended for the Secretary's regulations to be the exclusive source for the regulation of tow vessel and barge regulation for the entire area.  Section 311(b)(1)(B)(i) provides that "the regulations promulgated under this paragraph shall give full consideration to each of the recommendations  for regulations contained in the

Because the Tug Escort Provision deals with an entirely different set of circumstances, it presents no bar to enforcement of the federal regulations. As the state and federal regulations can coexist, and, as discussed below, the Tug Escort Provision does not interfere with the Coast Guard's regulations, the requirement must be upheld. See LCM Enterprises, Inc. v. Town of Dartmouth, 14 F.3d 675, 684 (1st Cir. 1994) ("The fact that federal law has implemented boater use fees does not, by itself, present a conflict with local fees of the same nature where there is no reason to believe that the two fees cannot coincide or that the local fee interferes in some way with the federal one. Appellants provide no basis for finding such interference. Consequently, we find no federal preemption of Dartmouth's use fee.")

ii.    The State Provision Does Not Stand As An Obstacle To Congress' Objectives

Just as the United States has failed to show an actual conflict between the state requirement and the federal requirement, it has also failed to show that the existence and enforcement of the Tug Escort Provision "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines, 312 U.S. at 67. As the Supreme Court made clear in Ray and Locke, in enacting Title I and Title II of PWSA, Congress intended to preclude state regulation of certain areas of maritime commerce and at the same time preserve the rights of states to exercise their traditional authority in other areas to regulate based on the local conditions. The Tug Escort Provision is a valid exercise of the Commonwealth's traditional authority to regulate regarding navigation of local waterways. Thus, rather than

---

report entitled "Regional Risk Assessment of Petroleum Transportation in the Waters of the Northeast United States" . . . and the Secretary shall provide a detailed explanation if any recommendation is not adopted." As noted above, The Coalition expects to present evidence that the report on which the First District RNA is based considered only two types of tug-escort requirements. As Congress instructed the Coast Guard to consider the recommendations contained in the report, and the report neither considered nor rejected local regulation, Congress cannot be said to have precluded the states within the First District from utilizing their traditional authority to regulate navigation based on the peculiarities of the local waterways.

standing as an obstacle to Congress' objectives, the Tug Escort Provision furthers Congress'

objectives in promulgating Title I of the PWSA.

As the Supreme Court recognized in <u>Ray</u> and <u>Locke</u> that Congress intended to preserve

the "important role for States and localities in the regulation of the Nation's waterways and

ports," by permitting the states to regulate based on the peculiarities of particular waterways, it

cannot be argued that the Tug Escort Provision disrupts a Congressional intent to establish a

"workable, uniform system." That Congress intended to preserve the traditional role of the states

indicates that certain areas of maritime commerce were not intended to be uniform throughout

the nation, or even throughout the region. That the Tug Escort Provision imposes a minimal

additional requirement on certain vessels traveling in certain areas of the Commonwealth's

waters does not act to disrupt any uniform federal scheme. <u>See Ray</u>, 435 U.S. at 180 (1978)

("The provision as we view it, however, does no more than require the use of tug escorts within

Puget Sound, a requirement with insignificant international consequences.")

The Commonwealth's decision to require tug-escorts in certain waters within

Massachusetts – waters including Buzzards Bay – is a reasonable exercise of the "traditional

authority of the States and localities to regulate some matters of local concern." <u>Locke</u>, 529 U.S.

at 104. As the Tug Escort Provision does not present an actual conflict with the First District

RNA or stand as an obstacle to the accomplishment of Congressional objectives, it does not

conflict with, and is therefore not preempted by, the Coast Guard regulation. This Court should

therefore deny Plaintiffs' motion for judgment regarding this provision of the Oil Spill

Prevention Act.

### D.     The Commonwealth's Pilotage Provision is Not Preempted Because it Applies to Tow Vessels, Which are Not Inspected

- 19 -

M.G.L. 103 § 21, which requires, *inter alia*, all vessels "carrying oil, hazardous material or hazardous waste in bulk as cargo in or entering upon areas of special interest" to take a local pilot (the "Pilotage Provision") is not preempted by federal law. The power of a state to impose local pilotage requirements on vessels navigating within the state's waterways has long been recognized. See Cooley v. Board of Wardens of the Port of Philadelphia, 53 U.S. 299 (1852) (upholding state requirement that a vessel which refuses or neglects to take on a local pilot pay one half of the regular amount of pilotage to state fund). Congress initially determined to leave regulation for the most part to the states in legislation enacted in 1789, which now reads "[e]xcept as otherwise provided in this subtitle, pilots in the bays, rivers, harbors and ports of the United States shall be regulated only in conformity with the laws of the States." 46 U.S.C. § 8501(a).[18] The rationale is obvious: "[b]y permitting states to regulate local pilotage Congress sought to protect vessels from 'invisible hazards' that may be present in a state's waters until the ship can be guided to the open sea." Warner v. Dunlap, 532 F. 2d 767, 772 (1st Cir. 1976). See also Jackson v. Marine Exploration Co., 583 F.2d 1336, 1339 (5th Cir. 1978) ("No matter how competent the master of a ship is at open sea, he cannot be expected to be familiar with the local navigation hazards of each harbor and river that he encounters . . . Accordingly, it has long been the practice of vessels to employ, for each port they enter and leave, a local pilot intimately familiar with the waters of that port to board and guide them through those waters").[19]

      In fact, Congress has spoken directly to this issue:

---

[18] While Congress has limited the foregoing's application to vessels engaged in the coastwise trade, it has not limited its application to registered vessels, and therefore "the states have authority over the pilotage of all American vessels sailing under register, that is, engaged in foreign trade, and all foreign flag vessels (jointly, "registered vessels")." That the Commonwealth's Pilotage Provision, should be upheld as it relates to registered vessels is not and cannot be contested by Plaintiffs.

[19] Indeed, as evidence of the reasonableness of local pilotage requirements, The Coalition expects to show that, as part of its plea agreement in relation to the Bouchard-120 Oil Spill, BTC is required to take on a local pilot for any trip in which one of its tugs is traveling with a barge through Buzzards Bay.

A State may not adopt a regulation or provision that requires a coastwise vessel to take a pilot licensed or authorized by the laws of a State if the vessel -- (1) is propelled by machinery and subject to inspection under Part B of this subtitle; or (2) is subject to inspection under chapter 37 of this title.  46 U.S.C. § 8501(d)

Thus, if a vessel is not inspected under one of the referenced sections, state pilotage requirements may be imposed.  The Coalition intends to present evidence that towing vessels are not inspected and thus are not within the scope of chapter 37.   Accordingly, the Pilotage Provision is not preempted as it applies to towing vessels.

The United States argues that all "tow vessels . . . are inspected by the Coast Guard." (U.S. Memo. at 26).  This statement is patently false.  While towing vessels were recently added to the list of vessels to be inspected, 46 U.S.C. § 3301, the Coast Guard has not yet implemented regulations for the inspection of those vessels.  Indeed, the Coast Guard only recently requested public comments regarding the form such regulations should take.  See Inspection of Towing Vessels, 70 Fed. Reg. 5691 (Feb. 3, 2005).[20]

Congress' inclusion of towing vessels on a list of vessel types to be inspected should not, without implementing regulations and actual inspection by the Coast Guard, preempt the Pilotage Provision as the entire statutory scheme established in Chapter 33 recognizes the need for the Coast Guard to establish, through regulation, a system for *actual* inspection.  See, e.g., 46 U.S.C. § 3306 ("To carry out this part and to secure the safety of individuals and property on board vessels subject to inspection, the Secretary shall prescribe necessary regulations to ensure the proper execution of, and to carry out, this part"); 46 U.S.C. § 3309 ("When an inspection under section 3307 of this title has been made and a vessel has been found to be in compliance

---

[20] The Coalition expects to present, at a later stage in this proceeding, evidence indicating that the Coast Guard determined, in a published guidance document, that towing vessels remain uninspected vessels until regulations for inspecting those vessels are promulgated.  Given the Coast Guard's delay in promulgating regulations in other areas, as described with more particularity in the Memorandum of The Coalition for Buzzards Bay in Opposition to the United States' Motion for Summary Judgment,  filed with this Court on July 12, 2005, there is not telling when these regulations will be finalized.

with the requirements of law and regulations, a certificate of inspection, in a form prescribed by the Secretary, shall be issued to the vessel.")  The inspection status of a particular type of vessel depends on whether that type of vessel is *actually* inspected.  See S. Rep. No. 98-56 (1983), *reprinted in* 1983 U.S.C.C.A.N. 924 ("[u]nder the present law, a vessel's inspection status must be determined by examining a table appearing at [46 C.F.R. § 2.01-7A]").[21]  This Court should thus find that the Pilotage Provision is not preempted unless and until the Coast Guard adopts regulations for actual inspection of towboats.  See Massachusetts Ass'n of HMO's v. Ruthardt, 194 F.3d 176, 183 (1st Cir. 1999) (finding that "state standards in the three enumerated [i.e. expressly preempted] areas are not expressly preempted unless and until the Secretary triggers preemption by promulgating regulations.").  See also H.P. Welch Co. v. New Hampshire, 306 U.S. 79, 83-84 (1939) (state limits on continuous driving not preempted under federal Motor Safety Act during interval between passage of that act and promulgation of Interstate Commerce Commission regulations governing subject).

In asking this Court to invalidate the Pilotage Provision prior to the inspection of towing vessels, Plaintiffs once again seek to invalidate a currently enforced regulation and leave in its place a void.  It is inconceivable that Congress intended this result when, motivated by concern regarding the large number of accidents in which towing vessels have been involved, it added towing vessels to the list of vessels subject to inspection.  Indeed, the Coalition expects to be able to present evidence that, in including towing vessels within the scope of 46 U.S.C. § 3301, Congress intended to increase the safety requirements imposed upon towing vessels.  Striking the Pilotage Provision would result in the opposite occurring - an effective safety requirement being stricken to be replaced with a regulatory void for a five year period.  This Court should therefore

---

[21] Indeed, the table appearing at 46 C.F.R. § 2.01-7A in the July 7, 2005 indicates that motorized towing vessels are not currently "inspected vessels" as envisioned by 46 U.S.C. § 3301.

uphold the Pilotage Provision until such time as the Coast Guard promulgates regulations to give

effect to Congress' clear intent.  See Medtronic, Inc. v. Lohr, 518 U.S. 470, 486 (1996) (relevant

in a preemption analysis "is the 'structure and purpose of the statute as a whole,' as revealed not

only in the text, but through the reviewing court's reasoned understanding of the way in which

Congress intended the statute and its surrounding regulatory scheme to affect business,

consumers, and the law.").

>    **E.    The Commonwealth's Prohibition on the Docking of Vessels Not In
>    Compliance with the OPA Phase-Out Schedule Is Not Prohibited By Federal Law**

The portion of the Oil Spill Prevention Act, codified at M.G.L. 21M § 7, which prohibits

from docking, loading or unloading in the Commonwealth those vessels not in compliance with

the phase-out schedule for single-hull vessels established in OPA, see 46 U.S.C. § 3703(a)

(establishing single-hull phase-out schedules), (the "Docking Provision") is not preempted under

Title II of PWSA.  Contrary to Plaintiff's characterization, the Docking Provision does not

constitute a "tank vessel design requirement."  The tank vessel design requirements to which

Plaintiff refers fall within the scope of Title II of PWSA, and have been established by Congress

and the Coast Guard in the phase-out schedule for single-hull vessels under OPA.  The

Commonwealth's Docking Provision is entirely consistent with the tank vessel design

requirements established under federal law and does nothing to disrupt the federal scheme.

Rather than imposing a vessel design requirement, the Docking Provision regulates local

docking and mooring practices.[22]  The regulation of such practices is a traditional matter of local

concern.  See The James Gray v. The John Frasier, 62 U.S. 184, 187 (1858) ("And the local

authorities have a right to prescribe at what wharf a vessel may lie, and how long she may

---

[22] The Docking Provision does not prevent a vessel not in compliance with the phase-out schedule from transiting
the waters of the Commonwealth.

remain there").  See also Barber v. Hawaii, 42 F.3d 1185, 1193 (9th Cir. 1994) (noting the Supreme Court's "longstanding recognition that anchorage and mooring rules are best left to the states"); Beveridge v. Lewis, 939 F.2d 859, 864 (9th Cir. 1991) ("there is no reason to believe that Congress intended to occupy the field in the area of mooring . . . It might even be said that localities retain greater autonomy in this area.."); Doucette v. San Diego Unified Port District, 1997 U.S. App. LEXIS 28476, *4 (9th Cir. 1997) ("Anchorage and mooring is not a federally sensitive subject area".).  Thus, the Docking Provision falls within the scope of Title I, rather than Title II, of PWSA and must be analyzed under conflict, rather than field, preemption principles.  As Plaintiffs have cited only to Title II as the source of preemption, their motion for judgment on the pleadings must fail regarding the Docking Provision.

While Plaintiffs make much of the United States' ability "to speak with one voice to foreign nations," (United States Memo. at n.14), the Supreme Court's decisions in Ray and Locke, and their recognition of the "important role []States and localities [play] in the regulation of the Nation's waterways and ports,"  Locke, 529 U.S. at 109, make clear that the United States may not "speak with one voice" regarding all aspects of maritime commerce, and that in certain instances foreign and domestic flag vessels may indeed be required to consult state law and enforcement procedures.  As with local tug-escort requirements and local pilotage requirements, vessels may properly be required to consult state law regarding docking and wharfing requirements, because such requirements are within the power of the states to regulate unless and until the Coast Guard elects to regulate the subject.  As the United States has failed to point to any contrary federal authority, this Court should deny Plaintiffs' motion with respect to the Docking Provision.

**F.    The Commonwealth's Alcohol Testing Provision is Not Preempted**

M.G.L. 21M § 3, which requires, *inter alia*, drug and alcohol testing to be conducted within two hours of a serious marine incident (the "Testing Provision"), does not, as Plaintiffs assert, constitute a "personnel qualification" preempted under Title II of PWSA. The concept of a "personnel qualification" is typically understood to go to whether an individual possesses certain skills or competencies and is therefore "qualified" for a particular type of employment.[23] The two hour testing requirement does not speak to whether an individual is qualified for employment, but is rather an investigative tool to determine the cause of and assign liability for serious marine incidents after they occur.

Indeed, the Testing Provision is fundamental to the Commonwealth's ability to impose additional liabilities and requirements in the event of a discharge or substantial threat of discharge of oil, and is therefore authorized under the savings clause of OPA, which preserves the authority of states to impose "additional liability or requirements . . . relating the discharge, or *substantial threat of a discharge*, of oil." 33 U.S.C. § 2718(c). Although the <u>Locke</u> Court held that "Congress intended to preserve state laws of a scope similar to the matters contained in Title I of OPA, not all state laws similar to the matters covered by the whole of OPA or to the whole subject of maritime oil transport," a finding that the Testing Provision falls within the savings clause is consistent with <u>Locke</u> and does not require an overly broad interpretation of the savings clause. The limitations on liability imposed under OPA (which can, per the savings clause, be expanded upon by state law) contain an exception where an incident is the result of gross negligence or willful misconduct. 33 U.S.C. § 2704(c)(1). Operating a vessel while intoxicated constitutes "gross negligence" or "willful misconduct," and without adequate alcohol

---

[23] The English language requirement invalidated under <u>Locke</u> is an example of type of requirement that constitutes a "personnel qualification."

testing such conduct would be impossible for the Commonwealth to prove.[24]  Because the

Testing Provision is essential to evidencing liability for discharge or substantial threat of a

discharge, it can be upheld under OPA.[25]

### G.    The Commonwealth's Mandatory Vessel Routing Scheme Is Not In Conflict with Federal Law

The Supreme Court recognized in <u>Ray</u> and <u>Locke</u> that Congress intended to preserve the

"important role for States and localities in the regulation of the Nation's waterways and ports,"

by permitting the states to regulate based on the peculiarities of particular waterways.  While

Congress authorized the federal government to establish vessel traffic routing schemes, Congress

did not *require* the Coast Guard to establish such schemes.  <u>See</u> 33 U.S.C. § 1223(a)(4)

(providing that the Secretary "*may* control vessel traffic").  Here, the Coast Guard has not acted

to establish a vessel traffic routing scheme, and the Commonwealth is therefore free, in the

absence of such a contradictory federal action, to establish a scheme to control vessel traffic

based on the peculiarities of a particular waterbody.

In challenging the validity of M.G.L. 21M § 5 (the "Route Provision"), Plaintiffs have

failed to cite to any actual Coast Guard determination that mandatory vessel routes are not

necessary for Buzzards Bay, and therefore have failed to demonstrate a conflict.  Plaintiffs point

only to a disclaimer on a chart, published not by the Coast Guard but rather by NOAA, to

---

[24]Because the carriage of equipment ensures that the two hour testing requirement will be met, it, by extension, is also authorized.

[25] In addition, the Testing Provision is consistent with 46 U.S.C. § 2303a, which contains a mandate from Congress that alcohol testing be conducted within two hours following a serious marine incident ("SMI").  Fulfillment of this mandate by the Coast Guard has been delayed for seven years.  The failure of the Coast Guard to enforce the requirements of 46 U.S.C. § 2303a is the subject of a counterclaim against the United States asserted by The Coalition and the Commonwealth.  The Coalition refers the Court to its Opposition to the United States' Motion for Summary Judgment for further discussion of the Coast Guard's failure to timely promulgate regulations to implement 46 U.S.C. § 2303a.  The Coalition does take the time to note here that it is greatly troubled by the Coast Guard's audacity in trying to invalidate the Testing Provision when the very reason for the Commonwealth's enactment of the Testing Provision was that agency's lassitude in implementing a requirement deemed necessary by Congress.

support the proposition that because the routes are described as recommended, the Route

Provision is preempted.  However, these allegations are insufficient to show a conflict.  Plaintiffs

have not pleaded that the Coast Guard made a determination that mandatory vessel routes are not

necessary in Buzzards Bay, nor have they pointed to evidence regarding the Coast Guard's

consideration of the use of a mandatory vessel route prior to the release of the map or of the

formality with which the recommended route was developed.  In fact, the Coast Guard is

*currently considering* requiring vessels to travel in these routes, as evidenced by the ANPR.  See

69 Fed. Reg. at 62429 (requesting comment on potential impacts of requirement that tank barges

under tow use route).  The Coast Guard's current consideration of required vessel routes in

Buzzards Bay calls into question whether the Coast Guard has made a meaningful determination

that the vessel routes should be recommended rather than required.[26]

## CONCLUSION

The Oil Spill Prevention Act contains provisions essential for the protection of the waters

of Buzzards Bay.  In enacting these provisions, the Commonwealth acted within its traditional

state authority to enact legislation falling within the scope of Title I or permitted under the

savings clause of OPA.  Plaintiffs seek to strike these provisions and leave in their place a

complete absence of adequate regulation, setting the stage for another tragedy similar to the

Bouchard-120 Oil Spill.  Yet Plaintiffs have not demonstrated that the challenged provisions are

preempted by federal law and that they are thus entitled to prevail as a matter of law.  This Court

---

[26] Indeed, in its Memorandum, the United States argues that because the ANPR would only require tank barges under tow to use the vessel routes, the Vessel Routing Provision would be preempted even if the Coast Guard designates the routes required as proposed in the ANPR.  However, the United States should not be permitted to rely on what might be effected though a future rulemaking which is currently only in its preliminary state to claim that the state law is currently preempted.  See Beveridge, 939 F.2d at 863 ("We must be guided by the Court's reluctance to entertain hypothetical conflicts because "in this as in other areas of coincident federal and state regulation, the teaching of this Court's decisions . . . enjoins seeking out conflicts between state and federal regulation where none clearly exists.")

should therefore deny Plaintiffs' motions for judgment on the pleadings.  The challenged

provisions of the Oil Spill Prevention Act represent permissible exercises of the

Commonwealth's traditional authority to regulate in the area of maritime commerce and should

therefore be upheld against Plaintiffs' challenges.

By its attorneys,


/s/ Jonathan M. Ettinger
Jonathan M. Ettinger (BBO #552136)
Elisabeth M. DeLisle (BBO # 658067)
Foley Hoag **LLP**
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA  02210
(617) 832-1000
jettinger@foleyhoag.com

Dated: July 15, 2005