# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 05-10112 JLT |
| | ) | |
| v. | ) | |
| | ) | |
| THE COMMONWEALTH OF | ) | |
| MASSACHUSETTS, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## UNOPPOSED MOTION FOR LEAVE TO FILE REPLY MEMORANDUM

Plaintiff the United States of America respectfully requests that the Court grant it leave to file a reply memorandum in support of its Motions for Judgment on the Pleadings.  In support thereof, Plaintiff states as follows:

1.      The United States filed this civil action on January 18, 2005, to declare invalid and to permanently enjoin portions of legislation signed into law on August 4, 2004, by defendant the Honorable Mitt Romney, governor of defendant the Commonwealth of Massachusetts, known as An Act Relative to Oil Spill Prevention and Response in Buzzards Bay and Other Harbors and Bays of the Commonwealth, 2004 Mass. Acts 251, as amended by 2004 Mass. Acts 457 § 1 (December 30, 2004) ("Tanker Law").  The United States alleges that certain provisions of the Tanker Law legislate in areas committed to the sole discretion of plaintiff United States, are expressly forbidden by federal law, conflict with federal law, and/or otherwise impede the accomplishment and execution of the full purposes and objectives of federal law. The United States alleges that these provisions of state law are, accordingly, preempted by

federal law and invalid under the Supremacy Clause of the United States Constitution, Article VI, Clause 2. Accordingly, the United States seeks declaratory and injunctive relief.

2.     On May 23, 2005, Plaintiff filed a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). On July 15, 2005, Defendants and Intervenor-Defendant each responded in opposition to the United States' motion, and in opposition to a Rule 12(c) motion filed by Intervenor-Plaintiffs.

3.     Plaintiff now requests that it be granted leave to file the attached proposed Reply Memorandum of Law in further support of its Motion for Judgment on the Pleadings, which Plaintiff believes will be helpful to the Court in deciding the issues presented by the pending Rule 12(c) motions.

4.     On August 2, 2005, Pierce O. Cray, Esq., lead counsel for Defendants, informed undersigned counsel on behalf of Defendants as well as Intervenor-Defendant that those parties do not oppose this motion, nor will they oppose a similar motion by Intervenor-Plaintiffs for leave to file a reply memorandum. Counsel for Intervenor-Plaintiffs, C. Jonathan Benner, Esq., has informed undersigned counsel that Intervenor-Plaintiffs assent to this motion.

WHEREFORE, with good cause having been shown, Plaintiff respectfully requests that this Court grant the Plaintiff leave to file a reply memorandum of law in further support of its Rule 12(c) motion. Plaintiff also notes that, should Defendants and/or Intervenor-Defendant seek leave to file a sur-reply on or before August 26, 2005 addressing the issues raised in Plaintiff's reply memorandum, Plaintiff will not oppose such leave. Counsel for Intervenor-Plaintiffs has

informed undersigned counsel that Intervenor-Plaintiffs similarly will not oppose a sur-reply by

Defendants and Intervenor-Defendants.

DATED this 5th day of August, 2005.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

MICHAEL SULLIVAN

United States Attorney
MARK T. QUINLIVAN
Assistant United States Attorney

 **/s/ Steven Y. Bressler**
ARTHUR R. GOLDBERG D.C.B. 180661
STEVEN Y. BRESSLER D.C.B. 482492
Attorneys, Civil Division
United States Department of Justice
P.O. Box 833
Washington, D.C. 20044
Telephone (202) 514-4781
Facsimile (202) 318-7609
Steven.Bressler@USDOJ.gov

Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 05-10112 JLT |
| | ) | |
| v. | ) | |
| | ) | |
| THE COMMONWEALTH OF | ) | |
| MASSACHUSETTS, *et al.* | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## [PROPOSED] MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE UNITED STATES' MOTION FOR JUDGMENT ON THE PLEADINGS AS TO ITS CLAIMS

PETER D. KEISLER
Assistant Attorney General

MICHAEL SULLIVAN
United States Attorney
MARK T. QUINLIVAN
Assistant United States Attorney

ARTHUR R. GOLDBERG D.C.B. 180661
STEVEN Y. BRESSLER D.C. B. 482492
Attorneys, Civil Division
United States Department of Justice
P.O. Box 833
Washington, D.C. 20044
Telephone (202) 514-4781
Facsimile (202) 318-7609
Steven.Bressler@USDOJ.gov

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 2

I.     Preemption of State Laws Under the PWSA ................................................ 2

II.    The Commonwealth's Maritime Personnel and Manning Requirements are Preempted by Federal Law .......................................................................... 3

       A.    The Commonwealth's Crew Manning Regulation Falls Well Within the Field-Preempted Category of "Manning" in, and is Preempted By, PWSA Title II ........................................................................... 4

       B.    The Preemptive Field of PWSA Title II Includes the Commonwealth's Manning Regulation as Applied to, Inter Alia, Tugboats Carrying Oil ................. 9

III.   The Commonwealth's Double-Hull Design Requirement is Preempted by PWSA Title II ............................................................................................ 10

IV.   The Commonwealth's Tug Escort Provision is Preempted by the Federal Tug Escort Provision Covering Massachusetts Waters .................................... 12

V.    The Commonwealth's Attempt to Indirectly Regulate in Field-Preempted Areas is Invalid ........................................................................................ 16

VI.   The Commonwealth's Compulsory State Pilotage Requirement is Expressly Preempted by Federal Law ........................................................ 18

CONCLUSION ..................................................................................................... 20

## **TABLE OF AUTHORITIES**

**CASES**                                                                    **PAGE(S)**

Ballard Shipping Co. v. Beach Shellfish, 32 F.3d 623 (1st Cir. 1994) ...................................... 18

Caron v. United States, 524 U.S. 308 (1998) ......................................................................... 9, 13

Collins v. Marina-Martinez, 894 F.2d 474 (1st Cir. 1990) ........................................................... 1

Chao v. Mallard Bay Drilling, Inc., 534 U.S. 235 (2002) .......................................................... 19

City of St. Louis v. Western Union Tel. Co., 148 U.S. 92 (1893) ............................................... 16

Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141 (1982) ....................................... 6

Foster v. Davenport, 63 U.S. (22 How.) 244 (1859) .............................................................. 9, 12

Free v. Bland, 369 U.S. 663 (1962) ............................................................................................ 3

Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1 (1824) ....................................................................... 6

Harman v. City of Chicago, 147 U.S. 396 (1893) ................................................................. 6, 12

Interport Pilots Agency, Inc. v. Sammis, 14 F.3d 133 (2d Cir. 1994) ....................................... 18

National R.R. Passenger Corp. v. Boston & Maine Corp., 112 S. Ct. 1394
     (1992) ............................................................................................................................... 7

Pedraza v. Shell Oil Co., 942 F.2d 48 (1st Cir. 1991) .............................................................. 17

Ray v. Atlantic Richfield Co., 435 U.S. 151 (1978) .......................................................... passim

Richardson v. United States, 526 U.S. 813 (1999) ..................................................................... 7

Sinnot v. Davenport, 63 U.S. (22 How.) 227 (1859) ............................................................ 6, 12

Smiley v. Citibank (South Dakota), N. A., 517 U.S. 735 (1996) ............................................... 15

Sprietsma v. Mercury Marine, 537 U.S. 51 (2002) ................................................................... 17

U.S. v. Locke, 216 F.3d 880 (9th Cir. 2000), remanded by 529 U.S. 89 ............................ passim

United States v. Granderson, 114 S. Ct. 1259 (1994) ......................................................... 9, 13

United States v. Locke, 529 U.S. 89 (2000) ..................................................................... passim

**STATUTES**

33 U.S.C. § 1223 ..................................................................................................................  5

33 U.S.C. § 2701-2761 ....................................................................................................... 16

33 U.S.C. § 2718 ................................................................................................................. 17

46 U.S.C. § 2101 ......................................................................................................... 9, 10, 19

46 U.S.C. § 2301 ................................................................................................................. 12

46 U.S.C. § 3301 ................................................................................................................. 19

46 U.S.C. § 3703 ......................................................................................................... passim

46 U.S.C. § 3306(a) ............................................................................................................ 10

46 U.S.C. § 8101 ..................................................................................................................  7

46 U.S.C. § 8501 ........................................................................................................... 18, 19

46 U.S.C. § 8904 ....................................................................................................... 10, 17, 18

Ports and Waterways Safety Act of 1972, Pub. L. No. 92-340, 86 Stat. 424, as
    amended by the Port and Tanker Safety Act of 1978, Pub. L. No. 95-474,
    92 Stat. 1471 ......................................................................................................... passim

Pub. L. 105-383 § 311 ......................................................................................................... 14

**RULES AND REGULATIONS**

33 C.F.R. § 165.100(d)(1)(I) ...................................................................................... 12, 14, 15

46 C.F.R. § 15.610 .............................................................................................................. 19

63 Fed. Reg. 71764, 71765 ............................................................................................. 14, 15

63 Fed. Reg. 71770 ................................................................................................... 15


**LEGISLATIVE MATERIAL**

H.R. Rep. No. 563, 92d Cong., 1st Sess. 15 (1971) ...................................................... 5


**MISCELLANEOUS**

2 THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 13-2 (4th ed. 2004) .................. 18

# INTRODUCTION

This case presents clear issues of law for resolution by the Court: whether certain provisions of Massachusetts state law regulating oil tankers are preempted by federal law and null and void under the United States Constitution.  As all parties agree, this action is largely controlled by the U.S. Supreme Court's holdings in <u>Ray v. Atlantic Richfield Co.</u>, 435 U.S. 151 (1978), and five years ago in <u>United States v. Locke</u>, 529 U.S. 89 (2000), each of which reviewed federal laws dating to the beginning of the Republic and concluded that state laws similar to those at issue here could not stand under federal law, and in particular under the Ports and Waterways Safety Act of 1972, Pub. L. No. 92-340, 86 Stat. 424, as amended by the Port and Tanker Safety Act of 1978, Pub. L. No. 95-474, 92 Stat. 1471, (together, the "PWSA").  On that legal landscape, the defendants face a daunting challenge; recognizing this, Defendants the Commonwealth of Massachusetts, <u>et al.</u> ("State Defs."), have abandoned any defense of many of the Massachusetts provisions under challenge.  <u>See</u> State Mem. at 13 n.12.[1]

To the extent Defendants do respond to the United States' narrowly drawn claims, they often rely upon strident rhetoric concerning matters that are wholly irrelevant to those claims, let alone the issues presented by the instant Rule 12(c) motion for judgment on the pleadings.  For example, it is unclear how the purportedly "useful background" with which the State Defendants open their brief, <u>see</u> State Mem. at 2 n.2 & 1-8, is useful at all since, by the State Defendants' own admission, their factual claims are irrelevant to resolution under Rule 12(c).  <u>See</u> <u>also</u> Intervenor-Defendant's Memorandum ("CBB Mem.") 2 n.3 & 2-5.  Defendants' political attacks

---

[1]     <u>Cf.</u> <u>Collins v. Marina-Martinez</u>, 894 F.2d 474, 481 n.9 (1st Cir. 1990) ("[I]ssues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

upon the U.S. Coast Guard and the Intervenor-Plaintiffs are similarly irrelevant to the clear,

applicable law.  When Defendants finally address the law in their memoranda, many of their

arguments are foreclosed solely by the law as previously set forth in the United States' opening

memorandum ("U.S. Mem.").[2]  The United States therefore relies primarily on that memorandum

and responds herein only to those among Defendants' arguments where further briefing may

assist the Court.

**ARGUMENT**

**I.     Preemption of State Laws Under the PWSA**

In its opening memorandum, the United States set forth the applicable principles of

federal preemption of state laws pursuant to the Supremacy Clause.  See U.S. Mem. 8-13.  As

discussed infra, Defendants seek to greatly broaden a state's limited authority under Locke, Ray

and the PWSA.  The Court should reject Defendants' grasping attempt to write new law and,

instead, should follow the clear holdings of the Supreme Court.  Those include that Congress has

prohibited states from regulating in areas covered by Title II of the PWSA, Locke, 529 U.S. at

111, but provided a mechanism by which the states' views are heard and considered by the

Secretary of Homeland Security ("the Secretary") as he sets federal policy, see 46 U.S.C.

§ 3703(c).  See also Locke, 529 U.S. at 117 ("it is, in large measure, for Congress and the Coast

Guard to confront whether their regulatory scheme, which demands a high degree of uniformity,

is adequate.   States, as well as environmental groups and local port authorities, will participate in

the process.")  Under PWSA Title I, "Congress . . . preserved state authority to regulate the

---

[2]        The United States is aware that various parties have sought leave of court to file
amicus curiae briefs, although none of those parties consulted the United States as required by
LR 7.1.  Should the Court choose to consider those memoranda, any relevant arguments raised
therein are adequately addressed in the United States' opening brief.

peculiarities of local waters [only] if there was no conflict with federal regulatory determinations[.]" Id. at 110.  "There is no pre-emption by operation of Title I itself if the state regulation is so directed *and* if the Coast Guard has not adopted regulations on the subject or determined that regulation is unnecessary or inappropriate."  Id. at 109 (emphasis added).

The United States does not dispute that "the PWSA . . . does preserve, in Title I of that Act, the historic role of the States to regulate local ports and waters *under appropriate circumstances*," Locke, 529 U.S. at 108-09 (emphasis added).  Nor does it dispute that the individual states share the United States' interest in protection of our waters, and that there is an "important role for States and localities in the regulation of the Nation's waterways and ports." Id. at 109.  That is why (though "one would never glean" this from Defendants' papers, State Mem. 10) the United States narrowly seeks to enjoin only certain provisions of the Commonwealth's new Tanker Law while leaving much of it intact.  U.S. Mem. 2; Compl.  As to those provisions named in the United States' Complaint and discussed in our previous memorandum, under our Constitution, the federal judgment on these matters is supreme.  See Free v. Bland, 369 U.S. 663, 666 (1962) ("The relative importance to the State of its own law is not material . . . for the Framers of our Constitution provided that the federal law must prevail.").

## II.     The Commonwealth's Maritime Personnel and Manning Requirements are Preempted by Federal Law

The "manning" of tank vessels is specifically enumerated in Title II of the PWSA, 46 U.S.C. § 3703(a), as one of the "subjects" where *Congress has left no room for state regulation*." Locke, 529 U.S. at 111 (emphasis added).  Notwithstanding this unsubtle pronouncement of the Supreme Court and the clear language of Congress, however, Defendants argue that there *is* room for the Commonwealth's regulation in this field-preempted area because

its rule, codified at M.G.L. 21M § 4, is "localized."  State Mem. 18.  This argument finds no

support in <u>Locke</u> or <u>Ray</u> but, rather, stretches dicta of the <u>Locke</u> opinion beyond recognition.

Contrary to Defendants' memoranda, the Court should accept the plain language of Congress and

the Supreme Court that pursuant to Title II of the PWSA, "only the Federal Government may

regulate the '. . . manning' of tanker vessels."  <u>Locke</u>, 529 U.S. at 111, <u>quoting</u> 46 U.S.C. §

3703(a).  The Court should also reject Defendants' alternative argument that tow vessels carrying

large tanks of oil are somehow exempt from PWSA Title II.

> **A.    The Commonwealth's Crew Manning Regulation Falls Well Within the Field-Preempted Category of "Manning" in, and is Preempted By, PWSA Title II**

Defendants claim an exception to preemption by operation of PWSA Title II whenever a

regulation is limited to certain waters within a jurisdiction.  <u>See</u>, <u>e.g.</u>, State Mem. 18-19; CBB

Mem. 12.  If this exception were, indeed, applied to preemption under Title II, it would permit a

patchwork of local regulations in Title II categories and, thus, would swallow the rule that

"Congress, in Title II of the PWSA, mandated federal rules on the subjects or matters there

specified, *demanding uniformity*."  <u>Locke</u>, 529 U.S. at 110 (emphasis added).   Fortunately, there

is no such vast exception because the states' entitlement to regulate with respect to "local

peculiarities" exists only under PWSA Title I, *not* Title II.[3]

As noted <u>supra</u>, "Title II of the PWSA covers 'design, construction, alteration, repair,

maintenance, operation, equipping, personnel qualification, and manning' of tanker vessels.

Congress has left no room for state regulation of these matters."  <u>Locke</u>, 529 U.S. at 111, <u>quoting</u>

---

[3]    Even under Title I, states' authority is limited by federal authority in this area of uniquely federal concern:  "Congress, in Title I of the PWSA, preserved state authority to regulate the peculiarities of local waters [only] if there was no conflict with federal regulatory determinations[.]"  <u>Locke</u>, 529 U.S. at 110.

46 U.S.C. § 3703(a). Title I of the PWSA, however, as amended by the PTSA, addresses "Vessel Operating Requirements." See 92 Stat. 1472; 33 U.S.C. § 1223 (caption). The subjects addressed in that Title pertain to "operations" in the sense of *navigating* the vessel – i.e., the types of traffic safety rules noted in <u>Ray</u>. <u>See</u> 435 U.S. at 161 & n.9. As we have explained (<u>see</u> U.S. Mem. 13), a federal regulation issued pursuant to Title I (or a Coast Guard determination that there should be no requirement at all on a subject) ousts a state rule on the same subject, whereas, absent such a federal rule or decision, a state rule is valid only if it is justified by, and directed to, "local circumstances and problems, such as water depth and narrowness, idiosyncratic to a particular port or waterway." <u>Locke</u>, 529 U.S. at 109, <u>citing</u> <u>Ray</u>, 435 U.S. at 171; <u>see also</u> <u>Ray</u>, 435 U.S. at 171-172 (the "relevant inquiry" under Title I is "whether the Secretary has either promulgated his own . . . requirement . . . or has decided that no such requirement should be imposed at all"); <u>id.</u> at 174 (<u>quoting</u> H.R. Rep. No. 563, 92d Cong., 1st Sess. 15 (1971) (Title I revised to "make it absolutely clear that the Coast Guard regulation of vessels preempts state action in the field"). It is rules under Title I (*not* II) that, as the Supreme Court stated (and State Defs. quoted), "allow[] state rules directed to local circumstances and problems, such as water depth and narrowness, idiosyncratic to a particular port or waterway." <u>Locke</u>, 529 U.S. at 109, <u>quoted in</u> State Mem. 19 (in parenthetical). The states have no residual powers to regulate subjects such as vessel manning that are field preempted under Title II. <u>Id.</u> at 111.

Defendants attempt to escape this point of law by claiming that the Commonwealth's vessel manning rules at M.G.L. 21M § 4 are *not* in an area covered by PWSA Title II, even though Title II specifically includes "manning" within its scope. 46 U.S.C. § 3703(a). In support, they point to dicta in <u>Locke</u> that discusses how a Court should determine whether a state

rule is covered by Title I or II of the PWSA *when it is in an area where those Titles overlap*.  See Locke, 529 U.S. at 111-12 (noting "[t]he existence of some overlapping coverage between the two titles of the PWSA *may* make it difficult to determine whether a pre-emption question is controlled by conflict pre-emption principles, applicable generally to Title I, or by field pre-emption rules, applicable generally to Title II." (emphasis added)).  Defendants have not argued, nor can they show, that manning requirements are an area where the Titles overlap; indeed, they have not pointed to any authority in which a state regulation of tank vessel manning was held to fall within the conflict-preemptive ambit of PWSA Title I rather than the preempted field of Title II.  Accord Locke, 529 U.S. at 111 ("the field of pre-emption established by § 3703(a) cannot be limited to tanker 'design' and 'construction,' terms which cannot be read in isolation from the other subjects [such as manning] found in that section.").[4]

As the Locke Court noted, the pertinent "terms used in § 3703(a) are quite broad."  529 U.S. at 112.  When (unlike here) this leads to any ambiguity as to whether a rule falls under PWSA Title I conflict preemption or Title II field preemption, however, the Court should accord great weight to the views of the Department of Homeland Security and the Coast Guard, which

---

[4]     Nor would it be relevant if the Commonwealth claimed its rules have some "other purpose" than tanker regulation.  Contra State Mem. 11 n.9, 12 n.10.  A State's reasons for adopting such measures are irrelevant under the Supremacy Clause.  See, e.g., Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982). The Supreme Court has long rejected similar police-power rationales for state regulation of vessels.  See, e.g., Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 53 (1824) (rejecting argument that state's regulation is "nothing more than [regulation of] property . . . subject to the control of the sovereign power"); Sinnot v. Davenport, 63 U.S. (22 How.) 227, 242 (1859) (rejecting argument that state police power permits vessel licensing requirement where federal license rule exists); Harmon v. City of Chicago, 147 U.S. 396, 408-09 (1893) (rejecting city's contention that license fee was justified to fund deepening of Chicago River).

are charged with administering the PWSA.[5]  See U.S. Mem. 14 n.10 (citing cases).  But this

Court need not even apply such deference, since there is no ambiguity as to operation of Title II

on the Commonwealth's tank vessel manning provision.

In determining whether a state provision should be analyzed under PWSA Title I or Title

II, the Supreme Court first stated that "it will be useful to consider the type of *regulations the*

*Secretary has actually promulgated* under the section, as well as the section's *list of specific types*

*of regulation that must be included*."  Locke, 529 U.S. at 112 (emphasis added).   It makes

perfect sense that the first factors to which the Court would turn would be the actions of the

Executive and the words of Congress:  "[w]hen interpreting a statute, we look first to the

language."  Richardson v. United States, 526 U.S. 813, 818 (1999).  The language of the PWSA

statute, as well as the Secretary's regulations in force, provide further dispositive evidence (if any

is needed) that "manning" is a Title II category.  As cited in our earlier memorandum, the

Secretary has promulgated extensive vessel manning regulations (indeed, regulations that conflict

with the Commonwealth's) in, e.g., 46 C.F.R. Part 15.  See U.S. Mem. 15 n.12.  Congress has

also listed requirements concerning "the manning of vessels and the duties, qualifications, and

training of the officers and crew" in PWSA Title II, at 46 U.S.C. § 3703(a)(4), among those that

*must* be promulgated by the Secretary.  See also 46 U.S.C. § 8101 (instructing the Secretary as to

manning requirements for certain vessels); id. § 8904 (same).

---

[5]     Intervenor-Defendant notes in its brief, as if it is of some moment, that "the Locke
Court did not indicate that deference to the agency's determination regarding whether a
challenged state regulation should be subject to analysis under Title I or Title II of the PWSA
was appropriate."  CBB Mem. 12 n.13.  But, of course, the Supreme Court did not need to so
indicate in Locke:  "Judicial deference to reasonable interpretations by an agency of a statute that
it administers is a dominant, well-settled principle of federal law." National R.R. Passenger Corp.
v. Boston & Maine Corp., 112 S. Ct. 1394, 1401 (1992).

Locke goes on to note that "useful inquiries" to help a Court determine, *when there is a question*, whether a rule falls under Title I or Title II of the PWSA "include whether the rule is justified by conditions unique to a particular port or waterway." 529 U.S. at 112.[6]   But again, there is no such question here:  M.G.L. 21M § 4 is a vessel manning regulation "pre-empted as an attempt to regulate a tanker's 'operation' and 'manning' under 46 U.S.C. § 3703(a)." Locke, 529 U.S. at 114.[7]

---

[6]      The Locke Court also notes that:

a regulation within the State's residual powers will often be of limited extraterritorial effect, not requiring the tanker to modify its primary conduct outside the specific body of water purported to justify the local rule. . . .   Local rules not pre-empted under Title II of the PWSA pose a minimal risk of innocent noncompliance, do not affect vessel operations outside the jurisdiction, do not require adjustment of systemic aspects of the vessel, and do not impose a substantial burden on the vessel's operation within the local jurisdiction itself.

Locke, 529 U.S. at 112.  The Commonwealth's manning requirements would clearly "affect vessel operations outside the jurisdiction" since a vessel leaving Canada for Massachusetts would have to have its crew assembled from the beginning of the voyage; in the alternative, if the vessel paused before entering the relevant Massachusetts waters to have extra, local crew ferried onboard, it would be "a substantial burden on the vessel's operation within the local jurisdiction itself." Id.

[7]      Intervenor-Defendant also relies on what the Locke Court did *not* do, claiming that by remanding consideration of a Washington State watch requirement during times of limited visibility to the Court of Appeals, the Supreme Court was holding that "a limited navigation watch requirement . . . can be reviewed through the lens of a Title I conflict preemption analysis." CBB Mem. 12.  As an initial matter, the Supreme Court's remand of certain issues to the lower courts for consideration consistent with the Supreme Court's holding is not, in itself, a part of that holding.  Moreover, it is not clear that a Washington rule effective only in times of restricted visibility is relevant to adjudication of a Massachusetts rule purportedly in effect at all times.  Finally, Intervenor-Defendant fails to note that, on remand, the State of Washington wisely did not pursue its defense of the watch provision, but instead conceded defeat and sought to dismiss the case.  See Intertanko v. Locke, 216 F.3d 880 (9th Cir. 2000), remanded by 529 U.S. 89.

**B.    The Preemptive Field of PWSA Title II Includes the Commonwealth's Manning Regulation as Applied to, Inter Alia, Tugboats Carrying Oil**

The Defendants both argue that tugboats are not covered by PWSA Title II.  See State Mem. 19-20; CBB Mem. 11-12.  It is true, of course, that tugboats carrying only non-hazardous material *not covered by* the PWSA are *not subject to* the PWSA, but that is irrelevant.  The pertinent question is whether the tugboat portion of a tug/barge combination moving, e.g., 90,000 gallons of oil is, or should be, exempt from the safeguards for oil transportation that Congress enacted in PWSA Title II.  They are not, and Defendants' contrary argument is absurd. Cf. Caron v. United States, 524 U.S. 308, 315 (1998) (declining to read statute such that it would yield a "bizarre" result contrary to a likely and rational congressional policy); United States v. Granderson, 114 S. Ct. 1259, 1264 n.5 (1994) (courts should disfavor a statutory interpretation that "leads to an absurd result").  It is also unsupported by the statute, under which a "tank vessel" may include either, e.g., a self-propelled "tanker" or a combination of a non-self-propelled "barge" and a "towing vessel."  46 U.S.C. §§ 2101(2),(38),(39),(40).  See also Foster v. Davenport, 63 U.S. (22 How.) 244, 246 (1859) ("character of the navigation and business in which [towboat] was employed cannot be distinguished from that" of "the vessels it towed. ").

The state vessel manning rule at issue does not apply to tugboats at all times but, rather, only when they are "carrying 6,000 or more barrels of oil[.]"  M.G.L. 21M § 4(a).  A tugboat that is "carrying" such a quantity of oil as cargo is a "tank vessel" under the PWSA: it is "carr[ying] oil or hazardous material in bulk as cargo or cargo residue . . . ."  46 U.S.C. § 2101(39).  That this "carrying" may be accomplished by "towing, whether by pushing or pulling, a tank barge carrying 6,000 or more barrels of oil,"  M.G.L. 21M § 4(a), does not change the fact that the tugboat is, as part of a tug/barge combination, carrying a large quantity of oil.  Yet Defendants

argue that the statutory definition of "tank vessel" cannot include a tugboat (even when that

tugboat is carrying oil) because there is a separate definition for a "towing vessel."  See State

Mem. 20 n.22 (citing 46 U.S.C. § 2101(40)); CBB Mem. 11 (same).  This cursory claim is

unavailing:  there is no reason that a "towing vessel," meaning a vessel "pulling, pushing, or

hauling along side, or any combination [thereof,]" see 46 U.S.C. § 2101(40), would not be

included in the above-cited definition of "tank vessel."  The definitions of the PWSA at § 2101

are clearly not mutually exclusive: there are also separate definitions of "barge," "tanker," and

even "vessel," id. §§ 2101(2),(38),(45), and Defendants surely do not dispute that a barge (the

other half of a tug/barge combination) is included in the definition of "tank vessel," or that all of

the above are "vessels."

        In short, any towing vessel subject to M.G.L. 21M § 4(a) is, by definition, a vessel

"carrying 6,000 or more barrels of oil," id., and is, therefore, a "tank vessel" subject to PWSA

Title II and to that Title's preemptive reach.[8]  See 46 U.S.C. § 3703(a).

## III.    The Commonwealth's Double-Hull Design Requirement is Preempted by PWSA Title II

        The Commonwealth makes no argument in support of its rule, codified at M.G.L. 21M

§ 7, prohibiting vessels that are not in compliance with federal requirements for double hulls

from docking, loading, or unloading in Massachusetts.  As explained in the United States' initial

memorandum, the provision is an attempt to impose a concurrent state regulation in the area of

tank vessel design, which the Supreme Court has twice held is committed solely to federal

---

        [8]      When tow vessels are not carrying oil and, therefore, are not acting as tank
vessels, they are subject to the field-preemptive reach of 46 U.S.C. § 3306(a), as well as an
extensive and exclusive federal licensing regime.  See, e.g., 46 U.S.C. § 8904 (requiring and
authorizing the Secretary to establish manning requirements for towing vessels); 46 C.F.R. Parts
D&E.

discretion under PWSA Title II.  <u>Locke</u>, 529 U.S. at 111 (tanker design rules are "within a field reserved for federal regulation"); <u>Ray</u>, 435 U.S. at 165 (discussing the "uniform federal regime controlling the design of oil tankers"); <u>see also</u> 46 U.S.C. § 3703(a).

But Intervenor-Defendant, notwithstanding the Supreme Court's clear pronouncements on this matter, raises a tenuous argument in support of M.G.L. 21M § 7.  In essence, the CBB claims that the rule is not (directly) a design requirement but a regulation of "local docking and mooring practices."  CBB Mem. 23.  Be that as it may, the rule is preempted regardless.  The prohibition on any vessel with certain design characteristics from docking, loading or unloading anywhere in the Commonwealth "is similar to or indistinguishable from a design requirement which Title II reserves to the federal regime."[9]  <u>Ray</u>, 435 U.S. at 175.  Simply put, referring to the rule as a "docking" or "mooring" requirement does not alter the reality that the rule directly regulates the design of any vessel, wherever in the world it may begin its voyage, whose commerce brings it to Massachusetts.  Therefore, "[e]nforcement of the state requirements would at least frustrate . . . the evident congressional intention to establish a uniform federal regime controlling the design of oil tankers."  <u>Ray</u>, 435 U.S. at 165.[10]  <u>See also</u> U.S. Mem. 18 n.14.

---

[9]     Further, the CBB can raise no claim here that this rule is somehow justified because it is localized since it applies statewide without exception.  M.G.L. 21M § 7.

[10]     The governing "statutory pattern shows that Congress, insofar as design characteristics are concerned, has entrusted to the Secretary the duty of determining which oil tankers are sufficiently safe to be allowed to proceed in the navigable waters of the United States."  <u>Ray</u>, 435 U.S. at 163.  "Congress did not anticipate that a vessel . . . holding a Secretary's permit, or its equivalent, to carry the relevant cargo would nevertheless be barred by state law from *operating* in the navigable waters of the United States."  <u>Id.</u> at 164 (emphasis added).  Rather, "Congress expressed a preference for international action and expressly anticipated that foreign vessels would or could be considered sufficiently safe for certification by the Secretary if they satisfied the requirements arrived at by treaty or convention."  <u>Id.</u> at 167-68.  Indeed, with regard to foreign *and* domestic coastwise vessels, a federal license authorizing

(continued...)

## IV.    The Commonwealth's Tug Escort Provision is Preempted by the Federal Tug Escort Provision Covering Massachusetts Waters

As explained in the U.S. Mem., the Commonwealth's tug escort requirement at M.G.L. 21M § 6 conflicts with the "Coast Guard . . . regulations on the subject" and, accordingly, the state law must yield.  Locke, 529 U.S. at 109.  "The relevant inquiry under Title I with respect to the State's power to impose a tug-escort rule is . . . whether the Secretary has either promulgated his own tug requirement for [local] tanker navigation or has decided that no such requirement should be imposed at all."  Ray, 435 U.S. at 171-72.  There is no dispute that the Secretary, through the Coast Guard, has promulgated a tug escort requirement for the waters of Massachusetts.  See 33 C.F.R. § 165.100(d)(1)(I).  In another novel, but utterly unfounded argument, the Commonwealth apparently concedes that the federal rule conflicts with the state law, but claims the local Coast Guard regulations are not local enough.  State Mem. 12 n.11, 22-24.  Intervenor-Defendant joins this creative argument, but also goes so far as to claim that there is no underlying preemptive conflict.  Defendants are incorrect.

The Commonwealth claims, without any pretense of support in law, that under Title I of the PWSA "a state law that is directed at a unique waterway will be preempted only by a federal law that is similarly focused on that particular waterway."  State Mem. 12 n.11 (including no

---

[10](...continued)
vessel operations (such as a certificate of inspection granted under 46 U.S.C. § 2301) cannot be interfered with, added to, or subtracted from, by state law, and federal laws and regulations governing vessels oust competing state laws.  See Sinnot, 63 U.S. (22 How.) at 242 (federal license contains the "only guards and restraints which Congress has seen fit to annex to the privileges of ships and vessels engaged in the coasting trade"); Foster, 63 U.S. (22 How.) 244 (following Sinnot to invalidate state lightering requirement); Harmon, 147 U.S. 396, 406-07 (1893) (overturning requirement that coastwise vessel hold city license as "equivalent to declaring that such vessels shall not enjoy the privileges conferred by the United States, except upon the conditions imposed by the city").

citations).  The Commonwealth presumably provides no authority for its footnote because there

is none, and it runs contrary to the plain language of <u>Locke</u> and <u>Ray</u>.[11]  (Indeed, Defendants do

not cite to <u>Locke</u> at all in support of their new rule of thumb.)  As the Supreme Court held in

<u>Locke</u>, "<u>Ray</u> . . . recognized that, even in the context of a regulation related to local waters, a

federal official with an overview of all possible ramifications of a particular requirement might

be in the best position to balance all the competing interests."  <u>Locke</u>, 529 U.S. at 110, <u>citing</u>

<u>Ray</u>, 435 U.S. at 177.  Accordingly, "<u>Ray</u> defined the relevant inquiry for Title I pre-emption as

whether the Coast Guard has promulgated its own requirement on the subject or has decided that

no such requirement should be imposed at all."  <u>Id.</u>, <u>citing</u> <u>Ray</u>, 435 U.S. at 171-72, 178.

Nowhere in <u>Ray</u> or <u>Locke</u> did the Supreme Court articulate anything approaching the

Defendants' proposed requirement of specificity.

That no court has ever articulated the rule of conflict preemption under PWSA Title I as

Defendants would like is not surprising, since their argument would, again, lead to absurd results.

<u>Cf.</u> <u>Caron</u>, 524 U.S. at 315; <u>Granderson</u>, 114 S. Ct. at 1264 n.5.  By Defendants' logic, a federal

rule directed specifically at Buzzards' Bay would not have the"fine level of specificity," State

Mem. 12 n.11, necessary to oust a state rule directed at the eastern portion of Buzzards' Bay, or,

for that matter, a rule directed at Buzzards' Bay except the 20 yards closest to shore on its sides.

This Court should apply PWSA Title I preemption as articulated by the Supreme Court and

---

[11]    In other portions of their brief, State Defs. do cite portions of <u>Ray</u> referring to
federal regulations of Puget Sound as preempting Washington State regulations of Puget Sound,
as does the CBB.  None of those citations support the Defendants' articulation of a new rule
requiring the Coast Guard to specify every single body of water a federal regulation under PWSA
covers.

declare null and void M.G.L. 21M § 6 because it conflicts with the federal rule for tug escorts in

northeastern waters, including those of Massachusetts, at 33 C.F.R. § 165.100(d)(1)(I).

The United States explained that conflict between the state and federal rules in its

previous memorandum.  U.S. Mem. 22-23.  The specific differences aside, it is enough under

Locke and Ray merely that the Massachusetts rule differs from the federal rule, compromising

the regional uniformity that the Coast Guard and Congress sought to achieve in the Northeast.

See Pub. L. 105-383 § 311(b)(1)(A) (directing the Secretary to promulgate "regulations for

towing vessel and barge safety for the waters of the Northeast"); 33 C.F.R. § 165.100(d)(1); Ray,

435 U.S. at 175-76 (discussing Congressional intent that regulations pursuant to PWSA Title I

achieve consistency).  As the Coast Guard stated when promulgating the federal rule, it was

intended to displace various state proposals:  "The states' differing legislative initiatives might

result in inconsistent regulation of the industry.  The several operating conditions codified in this

rule will reduce the risks to the marine environment posed by tank barges transporting oil in the

region without" any confusing inconsistency, and while avoiding the costs and burdens that

would result from a patchwork of state rules.  63 Fed. Reg. 71764, 71765 (December 30, 1998)

(preamble to final rule establishing First Coast Guard District Regulated Navigation Area).[12]  But

---

[12]    Intervenor-Defendant denigrates the United States' critical need to often speak with one voice in maritime affairs, and claims the United States does not understand the important role played by local authorities in maritime regulation and environmental protection. CBB Mem. 24; contra Ray, 435 U.S. at 165-66.  Intervenor-Defendant is incorrect; as noted supra, states do, indeed, maintain significant residual police powers in this area: that is why the United States has sought with this litigation to invalidate not the entire Tanker Law, but only those portions which threaten the United States' ability to effectively regulate the maritime commerce of the nation while effectively negotiating with other nations.  See U.S. Mem. 2.

the Massachusetts rule seeks to enshrine precisely the sort of inconsistent regulation that the Coast Guard has determined is best avoided.

Indeed, the Coast Guard made explicit its intent to preempt state tug escort laws when it promulgated the federal local rule.  At the time, the only state tug escort law in the Northeast was contained in the Rhode Island Tank Vessel Safety Act, 46 R.I.G.L. § 12.6.  Accordingly, the Coast Guard stated unequivocally and "[s]pecifically" that "the rules on positive control for barges [33 C.F.R. §165.100(d)(1)] will preempt 46 R. I. G. L. §12.6-8(a)(3) on the same subject." 63 Fed. Reg. 71770.   Had M.G.L. 21M § 6 been in place, the Coast Guard would have made a corresponding statement, but it could not since "[n]o other states within the regulated navigation area ha[d] enacted" a similar requirement.  63 Fed. Reg. 71770.

The federal rule represents the Coast Guard's reasoned conclusion as to the necessary requirements in local waters in Massachusetts and the Northeast.[13]  U.S. Mem. 23.  Its regional approach is the result of the Coast Guard's careful study of the issues involved after hearing from all stakeholders, including the Commonwealth.  See generally 63 Fed. Reg. 71764 (discussing development of 33 C.F.R. § 165.100(d)(1)).  In crafting its rules, the Coast Guard balanced the need to avoid "inconsistent regulation," id. at 71765, with its recognition that "due to the unique environment of the region . . . positive control of barges," i.e., tug escort requirements, "and voyage planning should [not] be addressed by national rulemaking," id. at 71766.   In short, the Coast Guard's local tug escort requirement covering Massachusetts was crafted by "federal

---

[13]      Intervenor-Defendant argues "[t]hat the Coast Guard is currently requesting comment on whether tug escorts should be mandated for vessels traveling through Buzzards Bay evidences that the Coast Guard has not made a [current] determination that" its regional rule presently in force is exclusive.  CBB Mem. 17.  This is specious; "change is not invalidating." See Smiley v. Citibank (South Dakota), N. A., 517 U.S. 735, 742 (1996).

official[s] with an overview of all possible ramifications of a particular requirement . . . in the

best position to balance all the competing interests."  Locke, 529 U.S. at 110, citing Ray, 435

U.S. at 177.  These "Coast Guard . . . regulations on the subject" preempt the conflicting state

law.  Locke, 529 U.S. at 109.

## V.    The Commonwealth's Attempt to Indirectly Regulate in Field-Preempted Areas is Invalid

The Tanker Law requires most vessels carrying oil to post a $1 billion financial assurance

bond, M.G.L. 21 § 50C(b), and the United States has no quarrel with this general requirement.

However, the state rule affords state officials unfettered discretion to lower the requirement if

and however they choose based on an examination of criteria including vessel design, operation,

equipping, and reporting.  Id. § 50C(d).  Thus, the Commonwealth has conditioned the placement

or removal of a financial burden on criteria of vessel design, operation, equipping, and reporting,

id., and this provision is accordingly a regulation of those subjects.  U.S. Mem. 19.

Defendants apparently do not dispute that, as a matter of law, the provision indirectly

regulates those subjects; nor that as a general matter "a state cannot do that indirectly which she

is forbidden by the constitution to do directly," City of St. Louis v. Western Union Tel. Co., 148

U.S. 92, 106 (1893) (citation omitted).  And, as explained in our previous memorandum, vessel

design, operation, equipping, and reporting are all committed to exclusive federal discretion

under the Supremacy Clause.  U.S. Mem. 19-21.  Nonetheless, Defendants rely on an inapposite

portion of Ray and on the Oil Pollution Act of 1990, 33 U.S.C. § 2701-2761 ("OPA"), to argue

that the Commonwealth may impose indirect regulation on these field-preempted categories.  But

OPA itself and the Supreme Court's holding in Locke belie any suggestion that such indirect

regulation is authorized by Ray, or otherwise somehow acceptable.

-16-

The Commonwealth's authority to enact its financial assurance requirement stems from the "savings clause" of OPA, 33 U.S.C. § 2718.  U.S. Mem. 21 n.19.  But Defendants cannot rely on that provision to justify indirect regulation in field-preempted areas.  Contra State Mem. 15; CBB Mem. 8-9.  As the Locke Court held, § 2718 provides limited authority for a state to impose *liability* requirements "relating to the discharge, or substantial threat of discharge, of oil."  Locke, 529 U.S. at 106.  But the OPA savings clause "indicates no intent to allow States to impose wide-ranging regulation of the at-sea operation of tankers."  Id.  Thus, while the Commonwealth is free to enact laws which "establish liability rules and financial requirements relating to oil spills," it cannot "impos[e] substantive regulation of a vessel's primary conduct" indirectly through the guise of such an insurance regime.  Id. at 105.  Yet, the Commonwealth seeks precisely to indirectly regulate tank vessel design, operation, equipping, and reporting.  M.G.L. 21 § 50C.[14]

Ray held that,"[g]iven the validity of a general rule prescribing tug escorts for all tankers, [the state] is also privileged, insofar as the Supremacy Clause is concerned, to waive the rule for tankers having specified design characteristics."  Ray, 435 U.S. at 173.  But the waiver examined in Ray is not analogous to the Commonwealth's unfettered discretion to lower its bond requirement here.  The Commonwealth's authority to require a bond is authorized by OPA; under Locke, OPA specifically does *not* alter the broad preemptive reach of PWSA Title II, and so it does not justify any state regulation beyond that which directly insures itself against liability, i.e.,

---

[14]      Accord Sprietsma v. Mercury Marine, 537 U.S. 51, 70 (2002) (Federal Boat Safety Act permits common law tort claims for *damages* but "preempts the field on boating standards and regulations"); Pedraza v. Shell Oil Co., 942 F.2d 48, 52-53 (1st Cir. 1991) (Occupational Safety and Health Act savings clause permits "enforcement in the workplace of private rights and remedies traditionally afforded by state laws of general application," but "preempts unapproved assertions of state jurisdiction in the *development and enforcement of standards* relating to occupational health and safety issues in competition with federal standards." (emphasis added)).

the general financial assurance requirement absent intrusions (disguised as exceptions) into provinces of exclusive federal authority.[15]

## VI.    The Commonwealth's Compulsory State Pilotage Requirement is Expressly Preempted by Federal Law

As the United States explained in its previous memorandum, federal law expressly preempts sections 16 and 17 of the Commonwealth's Tanker Law, amending M.G.L. 103 §§ 21, 28. U.S. Mem. 25-27. Those provisions require that certain vessels in coastwise[16] trade be piloted by Massachusetts-licensed pilots. Congress expressly preempted such state compulsory pilotage laws with 46 U.S.C. § 8501, by which "a state may not adopt a regulation that requires a coastwise vessel to take a pilot licensed or authorized by the laws of a State if the vessel is [subject to Coast Guard inspection]." Despite this express and unambiguous preemption statute, Defendants argue that the state pilotage requirement may still be applied to *tugboats* in the coastwise trade.[17] This position finds no support in law.

---

[15]        In contrast, the Rhode Island Compensation Act appears to be a proper exercise of a state's OPA authority. See R.I.G.L. §§ 46-12.3-2, 46-12.3-3. That Act "provides generally that owners or operators of seagoing vessels may be held liable for harms arising from negligence of the owner, operator or agents or from the violation of Rhode Island pilotage and water pollution laws." Ballard Shipping Co. v. Beach Shellfish, 32 F.3d 623 (1st Cir. 1994). Thus, "the [Compensation Act] is concerned with the liability imposed for conduct that is already unlawful" rather than the "primary conduct" of ships or sailors. Id. at 629. Here, the Commonwealth's financial assurance regime seeks to indirectly regulate "primary conduct" that is in the exclusive federal domain.

[16]        "Coastwise" vessels are "American flag vessels sailing between American ports." Interport Pilots Agency, Inc. v. Sammis, 14 F.3d 133, 136 (2d Cir. 1994); see also Ray, 435 U.S. at 158 n.7.

[17]        The State Defs. abandoned any defense of the state rule as it applies to all other coastwise vessels. State Mem. 13 n.12, 24-25. Intervenor-Defendant is, again, more strident and less precise in its arguments, CBB Mem. 20-23, but the fact remains that states are expressly preempted from requiring coastwise vessels to take on a state-licensed pilot. U.S. Mem. 25-27, citing, inter alia, 2 THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 13-2 (4th ed.

(continued...)

In essence, Defendants argue that tugboats are not covered by the express preemption language of § 8501(d)(1), which includes vessels that are, inter alia, "propelled by machinery and subject to inspection under part B of this subtitle," because (they claim) tugboats are not "subject to inspection" at all.   But 46 U.S.C. § 3301, which is in Part B of Title 46, subtitle II ("this subtitle"), *specifically* states that "towing vessels" are "subject to inspection under this part."  46 U.S.C. §§ 3301(15).  For the purposes of § 8501(d)(1), that is dispositive.[18]  See 46 U.S.C. § 2101(43);  Chao v. Mallard Bay Drilling, Inc., 534 U.S. 235, 242-43 (2002) (in 46 U.S.C. § 3301, "Congress has listed [the] types of vessels that are 'subject to inspection' . . . . In contrast, 46 U.S.C. § 2101(43) defines an 'uninspected vessel' as 'a vessel not subject to inspection under section 3301 . . .'.").

---

[17](...continued)
2004) ("The effect of [the federal] statutory scheme is to broadly preempt state authority to regulate pilotage of vessels engaged in the domestic or coastwise trade. . . .  States may not require a coastwise vessel to take a state licensed or authorized pilot.").

[18]     Congress's express preemption statute at 46 U.S.C. § 8501 (of which it was, of course, aware when it recently added tugboats to the list of vessels "subject to inspection" in § 3301) controls, and it refers specifically to § 3301, *not* to regulations promulgated thereunder. It is therefore irrelevant to this analysis that the Coast Guard has not yet completed a new regulation moving the federal pilotage requirements for towing vessels from 46 C.F.R. Part E ("Manning Requirements; Uninspected Vessels") to Part D ("Manning Requirements; Inspected Vessels"), pusuant to a recent statute.  Moreover, there is hardly any "regulatory 'no man's land'" at issue, State Mem. 7, since tugboats are (and will remain) required to employ a federally licensed pilot.  See 46 C.F.R. § 15.610 (including federal pilotage requirement for tugboats).

**CONCLUSION**

For the foregoing reasons, as well as those in the United States' opening memorandum,

the Court should grant the United States' Motion for Judgment on the Pleadings as to its claims.

DATED this 5th day of August, 2005.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

MICHAEL SULLIVAN
United States Attorney
MARK T. QUINLIVAN
Assistant United States Attorney

 **/s/ Steven Y. Bressler**
ARTHUR R. GOLDBERG D.C.B. 180661
STEVEN Y. BRESSLER D.C.B. 482492
Attorneys, Civil Division
United States Department of Justice
P.O. Box 833
Washington, D.C. 20044
Telephone (202) 514-4781
Facsimile (202) 318-7609
Steven.Bressler@USDOJ.gov

Attorneys for the United States of America