UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                  )
UNITED STATES OF AMERICA, *et al.,*               )
                                                  )
                        Plaintiff,                )
                                                  )
    v.                                            )        Civil Action No. 05-10112-JLT
                                                  )
COMMONWEALTH OF                                   )
MASSACHUSETTS, *et al.,*                          )
                                                  )
                        Defendants.               )
_____)

**[PROPOSED] STATE DEFENDANTS' CONSOLIDATED
SURREPLY MEMORANDUM REGARDING
PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE PLEADINGS**

The State Defendants are responding simultaneously to both the Memorandum of Law in

Further Support of the United States' Motion for Judgment on the Pleadings as to Its Claims

("Coast Guard Reply") and the Reply Memorandum of Plaintiff Intervenors to Opposition

Submissions of Defendants ("Industry Reply").   Since the State Defendants filed their

Opposition Memorandum, the Coast Guard has announced its long overdue completion of a

"draft final rule" on the alcohol testing issue.  Venckus Decl. ¶¶ 2-3.  However, that draft still

must be reviewed by other agencies, with no clear date for final promulgation yet in sight.  *Id.*

The Coast Guard also has continued to take no visible action at all on its apparently dormant

proposed rulemaking regarding tug escorts and required vessel routes for Buzzards Bay.  *See* 69

Fed. Reg. 62427.  The agency's focus thus remains trying to invalidate the Commonwealth's

environmental protection laws, rather than implementing meaningful protective measures of its

own.

The disutility of such an approach has not gone unnoticed.  In a decision rejecting

preemption challenges to New York navigation laws under the PWSA, Judge Weinstein opined:

> Practical considerations also favor upholding the state statutes against a claim of
> preemption.  Plaintiffs in effect are asking the federal courts to tell New York that
> it may not, in the exercise of its police powers, plan against the desecration of its
> waters and coasts that would otherwise surely result from the high volume of
> barge traffic on the state's waterways.  Plaintiffs would instead have the state rely
> entirely on distant and overextended officials in Washington, D.C. for basic
> environmental protection.

*Berman Enterprises, Inc. v. Jorling*, 793 F. Supp. 408, 416-17 (E.D.N.Y. 1992), *aff'd* 3 F.3d 602

(2nd Cir. 1993).  The concerns expressed in *Berman* apply with full force here.[1]  For the reasons

set forth below and in the State Defendants' Opposition, the Court should deny the Coast

Guard's and Industry's Motions for Judgment on the Pleadings.[2]

## I.    THE COAST GUARD'S "INDIRECT REGULATION" ARGUMENT FLIES IN THE FACE OF *RAY.*

The Coast Guard continues to press its "indirect design regulation" claim against the

discretionary exception to the Oil Spill Act's bond requirement, on the ground that exceptions to

---

[1]    The Industry asserts that "federal efforts to regulate marine safety and environmental protection are subject to nullification or dilution by" the Commonwealth's Oil Spill Act.  Industry Reply p. 4.  Nothing could be farther from the truth.  The Act does not "nullify" or "dilute" the federal measures' protective effects; it instead enhances and supplements them.  While the additional state measures may raise the Industry's compliance costs, they heighten rather than lower the public's protection from harm.

[2]    Neither the Coast Guard Reply nor the Industry Reply provides any substantive response to the State Defendants' specific arguments defending the Oil Spill Act's drug and alcohol testing provisions.  *See* State Defendants' Opposition Memorandum pp. 21-22.  In particular, neither disputes the point that a post-incident testing requirement does not constitute a preempting "personnel qualification" within any reasonable reading of that phrase.  *See id.* pp. 20-21.  The Court therefore should treat the point as conceded.

the bond can be granted for reasons of vessel design. Coast Guard Reply pp. 16-18.[3] The

agency specifically asserts that (1) the bond requirement's immunity from preemption stems

from the "savings clause" of the Oil Pollution Act of 1990[4] and (2) the Supreme Court has

limited the state laws "saved" by that clause to those regarding financial liability (and not

expanded them to include those addressing vessel design). *Id*. p. 16-18 (citing *U.S. v. Locke*, 529

U.S. 89 (2000)). The Coast Guard's argument might have some force if the law challenged here

were a positive requirement -- *i.e.*, a law affirmatively requiring a ship to have a certain design.

However, the statute's actual requirement is the posting of a bond, and the contested design

language appears only as an *exception* to that requirement. Mass. G.L. c. 21, §§ 50C(a)-(b).

Consistent with its status as an exception, the design language imposes no obligation on anyone

to do anything. Neither *Locke* nor any of the other decisions cited by the Coast Guard address

the preemption status of such a statutory exception, and they are simply inapposite here.[5]

---

[3]     In contrast, the Coast Guard provides no further argument about its separate "indirect *reporting* requirement" claim. *Compare* Coast Guard Initial Memorandum pp. 20-21 *and* State Defendants' Initial Memorandum pp. 17-18 *with* Coast Guard Reply Memorandum pp. 16-18. The agency thus does not respond to the State Defendants' argument that the bond statute says nothing about self-reporting at all. *See id.* In addition, as regards the "indirect design requirement" claim, neither the Coast Guard nor the Industry contends that the cost of complying with the bond requirement would exceed the expense of redesigning ships to fall within the statute's exception. *See* State Defendants' Opposition Memorandum p. 17. As a result, the "comparative cost" issue suggested by *dicta* in *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 173 n. 25, 179 (1978), has no bearing on this case.

[4]     The savings clause appears at 33 U.S.C. § 2718. The Supreme Court has separately upheld a state's ability to enact oil spill financial responsibility requirements against a preemption claim based on another federal statute, *Askew v. Amer. Waterways Operators, Inc.*, 411 U.S. 325 (1973), and the savings clause reconfirms that result in the OPA/PWSA context.

[5]     *Pedraza v. Shell Oil Co.*, 942 F.2d 48, 52-53 (1st Cir. 1991) thus addresses preemption of a state "standard[ ]" that "requires" certain behavior, rather than preemption of an exception to that requirement. *Sprietsma v. Mercury Marine*, 537 U.S. 51, 70 (2002) similarly has nothing to do with a statutory exception.

The case that does address an exception's preemption status is *Ray v. Atlantic Richfield Co.,* 435 U.S. 151 (1978). As detailed at pp. 15-16 of State Defendants' Opposition, *Ray* directly supports the general principle that as long as a statute's affirmative requirement is not itself subject to preemption, the fact that an exception to the requirement might touch upon a generally preempted field -- even the field of vessel design -- does not invalidate either the requirement or the exception. *Id.* at 172-73 & n. 25, 179-80.[6] As with the statutory exception at issue in *Ray*, the plaintiffs are arguing that the Commonwealth is attempting to employ "an indirect method of achieving what the[ plaintiffs] submit is beyond state power under Title II." *Id.* at 173 n. 25. The Supreme Court explicitly "d[id] not agree with [that] assertion," *id.*, and it is similarly unavailing here.[7]

---

[6]     As the Ninth Circuit alternatively characterized *Ray*, "impos[ing] different conditions on vessels not meeting preferred design criteria" was "held permissible." *Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483, 500 (9th Cir. 1984); *see also* 1 L. Tribe, *American Constitutional Law* § 6-29, at 1185-86 (3rd ed. 2000) (recognizing breadth of *Ray*'s ruling).

[7]     The Coast Guard notes that *Ray* did not involve the OPA savings clause, implying that it makes a difference that the affirmative requirement in that case was free from preemption under general Title I preemption principles, while it is the OPA's savings clause that immunizes the affirmative requirement here. Coast Guard Reply pp. 17-18. However, nothing in *Ray* turned on the specific reason why the affirmative requirement underlying the design-based exception was itself immune from preemption, and the fact that the particular reason here happens to be the savings clause is wholly beside the point.

## II.  THE OIL SPILL ACT'S TUGBOAT MANNING PROVISIONS ARE NOT PREEMPTED BY TITLE II OF THE PWSA BECAUSE TITLE II DOES NOT COVER TUGBOATS.

The State Defendants have argued that the Oil Spill Act's manning provisions for "towing vessels" (*i.e.*, tugboats)[8] are not subject to Title II field preemption for the threshold reason that Title II does not in fact apply to "towing vessels."  State Defendants Opposition pp. 19-20.  The Coast Guard disagrees, asserting that "towing vessels" can qualify as "tank vessels," which without question are subject to Title II.  Coast Guard Reply pp. 9-10.  This position cannot be squared with the statute's text, for three separate reasons.

First, the plain language of Title II's definition of "tank vessel" does not encompass tugboats.  That definition provides in full:

> (39) "tank vessel" means a vessel that is constructed or adapted to carry, or that carries, oil or hazardous material *in bulk as cargo or cargo residue*, and that--
>
> (A) is a vessel of the United States;
>
> (B) operates on the navigable waters of the United States; or
>
> (C) transfers oil or hazardous material in a port or place subject to the jurisdiction of the United States.

46 U.S.C. § 2101(39) (emphasis added).  As the emphasized language makes clear, a ship must "carr[y] oil . . . in bulk as cargo or cargo residue" to qualify as a "tank vessel" under Title II.  However, a tugboat does not carry anything "in bulk as cargo or cargo residue"; the essence of its role is instead to be *free* of cargo and to provide towing services to other, larger vessels (such as tank vessels) that do carry it.  *See, e.g.*, *American Heritage Dictionary* 1302 (2nd College ed. 1991) (defining "tugboat" as "[a] powerful small boat designed for towing larger vessels").

---

[8]      Mass. G.L. c. 21M, § 4(a).

The Coast Guard's "tank vessel" argument thus conflicts with the plain language of that phrase's statutory definition.[9]

Second, Title II separately (and immediately thereafter) defines "towing vessel":

(40) "towing vessel" means a commercial vessel engaged in or intending to engage in the service of pulling, pushing, or hauling along side, or any combination of pulling, pushing, or hauling along side.

46 U.S.C. § 2101(40). The fact that Congress created a separate definition for "towing vessels" reinforces the conclusion that they do not also qualify as "tank vessels" for purposes of Title II. *See Bailey v. U.S.*, 516 U.S. 137, 146 (1995) ("We assume that Congress used two terms because it intended each term to a particular, nonsuperfluous meaning"); *U.S. v. Maria*, 186 F.3d 65, 71 (2nd Cir. 1999) ("As a general mater, the use of different words within the same statutory context strongly suggests that different meanings were intended"). This is particularly true where the text of the "tank vessel" definition contains no explicit or implicit reference to "towing vessel." *See* 46 U.S.C. § 2101(39).[10]

Third, in a separate Chapter of Title 46, Congress deemed it necessary in 2004 to amend a statute and add an explicit reference to "towing vessels," even though the amended law already

---

[9]        The fact that the Oil Spill Act -- *i.e.*, the *state* law -- references "tow vessels" as "carrying oil" does not help the Coast Guard's argument. *See* Coast Guard Reply pp. 9-10 (quoting Mass. G.L. c. 21M, § 4(a)). Even if one were to assume that the text of a state statute plays any role in the construction of a federal one, the state provision says nothing about tug boats carrying oil "in bulk as cargo or cargo residue," which is the key component of the federal definition. Carrying cargo in bulk is precisely what tug boats do not do, and the plain language of Section 2101(39) excludes them from its scope.

[10]       In contrast, Title II's definition of "tanker" explicitly incorporates "tank vessel" within it. *Id*. § 2101(38) (defining "tanker" as "a self-propelled *tank vessel* constructed or adapted primarily to carry oil or hazardous material in bulk in the cargo spaces [emphasis added]"). While Title II's carefully constructed set of definitions thus on occasion has one term incorporate term another, Congress is explicit as to when this occurs. *See id*. §§ 2101(1)-(48).

included a reference to "tank vessels." Pub. L. No. 108-293, § 415 (amending 46 U.S.C.

§ 3301). The previously quoted definitions in 46 U.S.C. § 2101 apply equally to both the statute

underlying Title II field preemption in Chapter 37 of Title 46, 46 U.S.C. § 3703(a),[11] and the

separate list of vessels "subject to inspection" by the Coast Guard under Chapter 33, 46 U.S.C.

§ 3301. The latter list of vessels "subject to inspection" had long included "tank vessels," 46

U.S.C. § 3301(10), but it did not extend to "towing vessels" until Congress amended the list to

add that specific phrase in 2004. Pub. L. No. 108-293, § 415 (adding new Subsection (15)).[12]

Needless to say, there would have been no need for the 2004 amendment adding "towing

vessels" if the preexisting statutory category of "tank vessels" already encompassed them, and

"tank vessels" plainly do not include "towing vessels" for purposes of Chapter 33. *See, e.g.*, *City

of Roseville v. Norton*, 348 F.3d 1020, 1028 (D.C. Cir. 2003) ("It is generally presumed the

Congress does not intend to enact surplusage"). Because the same statutory definitions apply to

Chapter 37 and its preemption provision, *see* 46 U.S.C. § 2101, a similar conclusion must apply

to the "tank vessel" language there as well.[13] *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990)

---

[11]     Section 3703 is in Chapter 37 of Title 46, and the immediately preceding section in Chapter 37 specifies that "this chapter applies to a tank vessel," but makes no similar reference to "towing vessel." 46 U.S.C. § 3702(a).

[12]     The Coast Guard itself recognizes this, since its regulations for inspections under Chapter 33 did not (and, regrettably, still do not) cover motorized towing vessels. 46 C.F.R. § 2.01-7(a).

[13]     Congress did *not* simultaneously amend Chapter 37 in 2004 to add "towing vessels" to its scope, *see* Pub. L. No. 108-293, § 415, a differential treatment that should be deemed purposeful. *See, e.g.*, *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452 (2002) ("[I]t is a general rule of statutory construction that when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion"). It should be noted that the Coast Guard itself both ascribes significance to the 2004 addition of "towing vessels" to Section 3301 and recognizes that such vessels had not previously been subject to

(citing the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning"). Title II field preemption is thus categorically inapplicable to "towing vessels."

### III. THE OIL SPILL ACT'S REMAINING MANNING PROVISIONS ARE ALSO NOT SUBJECT TO TITLE II FIELD PREEMPTION.

Both the Coast Guard and the Industry characterize the supposed Title II field preemption of the Oil Spill Act's tank vessel manning provisions, Mass. G.L. c. 21M, § 4(c), as simply stated and ineluctably applied. Coast Guard Reply p. 4 ("the Court should accept the plain language of Congress and Supreme Court"); Industry Reply p. 5 (citing a supposedly "well-settled general rule"). The issue in reality is considerably more complex, as demonstrated by the five pages that the Coast Guard is compelled to devote to it. Coast Guard Reply pp. 3-8. The agency indeed advances at least four separate arguments, *id.*, none of which is persuasive.

The Coast Guard initially asserts a blanket rule that any state law that attempts to regulate the "manning" of a tank vessel is automatically preempted under Title II. Coast Guard Reply pp. 3-5. However, the Supreme Court has specifically recognized that "overlap" exists between the field preemption provisions of Title II and the conflict preemption provisions of Title I, which necessarily means that there are some state laws that implicate preemption principles

---

inspection under that statute (even though the law had covered "tank vessels"). Coast Guard Reply Memorandum p. 19 n. 18   It is therefore hard to see how the Coast Guard can simultaneously call it "absurd" for the State Defendants to argue that "tank vessels" do not include "towing vessels" for purposes of Chapter 37 as well. *See id.*

under both Titles.  *Locke*, 529 U.S. at 111-12; *see also Ray*, 435 U.S. at 161.[14]    The Supreme

Court also has explicitly declined to give priority to Title II's analysis in such an event:

> The existence of some overlapping coverage between the two titles of the PWSA may make it difficult to determine whether a pre-emption question is controlled by conflict pre-emption principles, applicable generally to Title I, or by field pre-emption principles, applicable generally to Title II.  The *Ray* Court acknowledged the difficulty, but declined to resolve every question by the greater pre-emptive force of Title II.  We follow the same approach, and conflict pre-emption under Title I will be applicable in some, although not all, cases.

*Locke*, 529 U.S. at 111-12.[15]    As *Ray* and *Locke* thus make clear, the Supreme Court has adopted

a flexible, balanced approach to preemption analysis in this area, rather than the Coast Guard's

rigid rule of Title II field preemption in all instances.  The Supreme Court's case-specific

approach makes sense given the backdrop of earlier decisions specifically rejecting preemption

challenges to environmental protection statutes in the maritime context.  *Douglas v. Seacoast*

*Products, Inc.*, 431 U.S. 265, 277 (1977); *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440

(1960).

Perhaps recognizing *Locke's* rejection of a rule that "Title II always wins" in the event of

an overlap between Titles I and II, the Coast Guard next maintains that no overlap exists here

because the Oil Spill Act's tank vessel manning provisions are not in fact within the reach of

Title I.  Coast Guard Reply pp. 5-6.  However, the statute underlying Title I preemption

_____

[14]    The State Defendants thus do not claim that the Commonwealth's tank vessel manning rules lie wholly outside of Title II.  *See* Coast Guard Reply p. 5.  Those rules instead fall within the "overlap" between the two Titles, potentially implicating both.

[15]    The *Locke* Court accordingly remanded a Washington watch requirement "necessary to address the peculiarities of Puget Sound" -- *i.e.*, a localized manning rule similar to the one challenged here -- for consideration of whether it was "preempted under Title I conflict preemption or Title II field preemption." *Id*. at 116.

expressly expressly authorizes the Coast Guard to promulgate rules for vessel "operating requirements," a broad phrase that readily encompasses specific manning requirements for particular local waters (here Buzzards Bay). 33 U.S.C. § 1223(a)(1). Title I's "Statement of Policy" section is indeed explicit that one of the Title's goals is to "insure that vessels operating in the navigable waters of the United States shall comply with all applicable standards and requirements for . . . manning." *Id.* § 1221(c)(3). This provides a clear textual basis for including localized "manning" provisions within the areas of potential Coast Guard rulemaking authorized by Title I, with the result that they are subject to its preemption analysis.[16]

The Coast Guard compounds matters by misconstruing the Supreme Court's test for determining whether Title I or Title II controls in the event of an overlap. Coast Guard Reply pp. 6 n. 4, 7-8. In particular, the agency erroneously denigrates the important role that the purpose of the contested state law -- in the Supreme Court's words, "the object . . . sought to be achieved by the challenged state regulation," *Ray*, 435 U.S. at 164 -- plays in the analysis. *Compare* Coast Guard Reply pp. 6 n. 4, 7-8 *with* State Defendants' Opposition pp. 10-11

---

[16]    The Coast Guard asserts that the State Defendants "have not pointed to any authority in which a state regulation of tank vessel manning was held to fall within the conflict-preemptive ambit of PWSA Title I." Coast Guard Reply p. 6. To the extent that the Coast Guard is referring to judicial decisions, it too has not cited to any case holding that such manning provisions fall *outside* of Title I' "ambit." In addition, *Locke*'s remand of a navigation watch law to determine whether it was "preempted under Title I . . . or Title II," while not a formal holding, certainly suggests that manning provisions fall within the Title I/Title II "overlap." *Locke*, 529 U.S. at 116; *see* fn. 15 *supra*. Moreover, the actual language of the United States Code is the most direct indicia of statutory coverage, and both Title I and Title II make explicit reference to "manning" provisions. 33 U.S.C. § 1221(c)(3) (Title I); 46 U.S.C. § 3703(a) (Title II).

-10-

(detailing *Ray*'s and *Locke*'s focus on the purpose of the local provision).[17]   The emphasis in

*Ray* and *Locke* on the state law's "object" was not mere happenstance; it instead directly

followed from the Court's approach in an earlier maritime preemption challenge to local

environmental protection laws.  *Huron Portland Cement*, 362 U.S. at 445 (comparing the

"purpose of the federal inspection statutes" with the "aim of the Detroit ordinance"); *see also*

Industry Reply p. 8 n. 10 (admitting that "[t]he *Huron* Court reasoned that the Detroit ordinance

and the federal boiler inspection statute had two entirely different purposes," which "spared the

Detroit ordinance").  As both Judge Weinstein and Professor Tribe have recognized, *Ray* is in

fact a very "pro-state" decision:

> Contrary to plaintiffs' view, *Ray* indicates how far the Supreme Court is willing
> to go to allow local regulation of oil tanker activity.  *See* L. Tribe, *American
> Constitutional Law* § 6-26, at 487 (2d ed. 1988) ("[T]he basic teaching of the
> [*Ray*] decision is that state pressure to act in derogation of a federal statutory
> scheme is not to be inferred lightly").

*Berman*, 793 F.Supp. at 415.  *Locke* expressly "follow[ed] the same approach," *Locke*, 529 U.S.

at 111, and the Court should disregard the Coast Guard's attempt to redefine it.

Finally, the Coast Guard attempts to patch over the defects in its position by insisting that

the Court "should accord great weight to [its] views" on the proper construction of the PWSA.

Coast Guard Reply pp. 6-7.  However, the Supreme Court has already construed the pertinent

statutes twice, *Ray*, 435 U.S. at 151; *Locke*, 529 U.S. at 111-12, and what is at issue here is the

---

[17]     The cases that the Coast Guard cites in this regard, *see* Coast Guard Reply p. 6 n. 4, all hold that a state law's purpose cannot shield it from preemption *when preemption is otherwise required*, no matter how important that purpose may be to the state.  The decisions say nothing about how to choose between two alternative types of preemption analysis to determine whether preemption exists in the first place, which is the issue presented here.  *Ray* and *Locke* are the cases that provide the standard for resolving that question, and they place substantial emphasis on the state law's purpose.  State Defendants' Opposition pp. 10-11.

proper application of the *Court's* standard for determining whether Title I or Title II preemption

principles control.  The Coast Guard's views accordingly deserve no special weight, as it is

settled that a court is "not obligated to defer to an agency's interpretation of Supreme Court

precedent under *Chevron*[18]or any other principle."  *New York New York LLC v. NLRB*, 313

F.3d 585, 590 (D.C. Cir. 2002) (quoting *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1341

(D.C. Cir. 2002)).

     In reality, the *Ray/Locke* standard is a very fact-intensive one, as demonstrated by

*Locke*'s remand of a preemption challenge to Washington's localized navigation watch rule with

the admonition that "resolution . . . would benefit from the development of a full record by all

interested parties."  *Locke*, 529 U.S. at 117.  If Washington's Puget Sound-specific manning

provision thus warranted remand for fact development, *id*. at 116-17, then so does the

Commonwealth's Buzzards Bay-specific statute.  The intervenor Coalition for Buzzards Bay

("Coalition") has in fact outlined evidence that it anticipates presenting on this point.  Coalition

Opposition p. 13 n. 14; *see also* State Defendants Opposition p. 13 n. 12 (adopting Coalition's

proffer and incorporating it by reference).  Consideration of this evidence is particularly

appropriate where the plaintiffs have mounted facial challenges to the Oil Spill Act, *see* Coast

Guard Complaint ¶¶ 1, 3, 35, 37; Industry Complaint ¶¶ 1, 3, 36, 38, and therefore "must

establish that no set of circumstances exists under which the [Oil Spill] Act would be valid."

*United States v. Salerno*, 481 U.S. 739, 745 (1987); *accord Anderson v. Edwards*, 514 U.S. 143,

155 n. 6 (1995); *Reno v. Flores*, 507 U.S. 292, 301 (1993).   The Court should deny the Motions

---

[18]    *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

for Judgment on the Pleadings and allow the challenge to the tank vessel manning provisions to

proceed to discovery and trial.

## IV.    THE OIL SPILL ACT'S LOCALIZED TUG ESCORT PROVISIONS ARE NOT SUBJECT TO TITLE I CONFLICT PREEMPTION, BECAUSE THERE IS NO SIMILARLY LOCALIZED FEDERAL REGULATION FOR THEM TO CONFLICT WITH.

The Coast Guard claims that no authority supports the State Defendants' position that for

purposes of Title I conflict preemption "a state law that is directed at a unique waterway will be

preempted only by a federal law that is similarly focused on that particular waterway." Coast

Guard Reply pp. 12-13 (quoting State Defendants' Opposition p. 12 n. 11); *accord* Industry

Reply p. 7.[19]  However, the State Defendants discussed at some length the specific language in

*Ray* that underlies their position.  State Defendants' Opposition pp. 11-12, 22-23 (quoting from

*Ray*, 435 U.S. at 170-71, 174-75, 178); *see generally* 1 L. Tribe, *American Constitutional Law*

§ 6-29, at 1185-86 (3rd ed. 2000) (characterizing *Ray*'s "basic teaching" as favorable to state

sovereignty).[20]  While the Coast Guard makes the peremptory assertion that "[n]one of those

citations [to *Ray*] support the Defendants' articulation of a new rule," Coast Guard Reply p. 13

---

[19]    Neither the Coast Guard nor the Industry maintains that their Title I claims could prevail under this rule; they instead assert that it is not in fact Title I's conflict preemption standard.  Coast Guard Reply pp. 12-13; Industry Reply p. 7.  The Coast Guard also states, erroneously, that "the Commonwealth apparently concedes that the federal rule conflicts with the state law."  Coast Guard Reply p. 12.  In reality, the State Defendants' position is that no conflict exists where, as here, the state and federal laws are not at the same level of specificity.  *See* State Defendants' Opposition pp. 11-12, 22-23.

[20]    While *Locke* did not address this specific aspect of *Ray* (perhaps because it remanded rather than resolved the Title I conflict preemption claims before it), the case did speak approvingly and at length of *Ray*'s general approach to Title I conflict preemption, adding that "[i]t is fundamental in our federal structure that States have vast residual powers."  *Locke*, 529 U.S. at 108-10.

n. 11, it provides no actual explanation or reasoning as to why this is so. *Id*.  Bald, unsupported

conclusions do not suffice as argument, particularly when the goal is to invalidate a duly enacted

state statute. *Cf. Collins v. Marina-Martinez*, 894 F.2d 474, 481 n. 9 (1st Cir. 1990) ("[I]ssues

mentioned in a perfunctory manner, unaccompanied by some effort at developed argument, are

deemed waived").

   In addition to *Ray*, cases discussing general conflict preemption standards provide further

decisional support for the State Defendants' construction of Title I.  *Locke* is explicit that "[t]he

analysis under Title I . . . is one of conflict preemption," reiterating the familiar standard that

conflict preemption "occurs 'when compliance with both state and federal law is impossible, or

when the state law stands as an obstacle to the accomplishment and execution of the full

purposes and objective of Congress.'" *Locke*, 529 U.S. at 109 (quoting *California v. ARC

America Corp.*, 490 U.S. 93, 100-01 (1989)).  These traditional conflict preemption principles

necessarily underlie and inform any preemption analysis specific to Title I, and the State

Defendants' reading of *Ray* is far more congruent with them than the sweeping rule pressed by

the plaintiffs is.  Perhaps the best evidence of this is that the plaintiffs have failed to satisfy the

traditional standard itself:  the Coalition has provided detailed arguments as to why the plaintiffs

cannot show either that compliance with both state and federal tug escort provisions is

"impossible" or that the state rule stands as an "obstacle" to accomplishing Congressional

objectives, and the plaintiffs have not responded at all.  *Compare* Coalition Opposition pp. 14-19

*with* Coast Guard Reply pp. 12-16 *and* Industry Reply pp. 6-7.[21]   The plaintiffs thus are

---

[21]  The State Defendants adopted the Coalition's conflict preemption arguments and
incorporated them by reference.  State Defendants' Opposition p. 13 n. 12.

demanding a special and sweeping conflict preemption rule for the maritime context to make up for their inability to satisfy normal conflict preemption requirements.  Allowing such a result would run roughshod over "the historic role of the States to regulate local . . . waters under appropriate circumstances," *Locke*, 529 U.S. at 108-09 (discussing Title I), and the Court should not countenance it here.

The Coast Guard also contends that requiring a comparable level of specificity between the state rule and the allegedly conflicting federal one would lead to "absurd results."  Coast Guard Reply pp. 13-14.  However, the Coast Guard in all instances can respond to a specific state law that is not to its liking by promulgating a sufficiently particularized regulation that will preempt the state rule.  It is not "absurd" but instead respectful of "States['] . . . vast residual powers" "in our federal structure," *Locke*, 529 U.S. at 109, to require the Coast Guard to undertake such rulemaking when the need arises.  This would ensure that the agency actually reviews the particular local hazard at issue, such as Buzzards Bay's unique navigational challenges, and consciously determines to adopt a specific course with respect to it.  While the record in this case suggests that promulgating regulations can be a challenge for the Coast Guard, administrative inconvenience is not the same as absurdity.[22]

The Coast Guard finally observes that it stated, in the rulemaking for its regional tug escort regulation, that the regulation would preempt a preexisting Rhode Island tug escort

---

[22]     In the State Defendants' view, as well as apparently Judge Weinstein's, the truly absurd result is what would flow from the Coast Guard's unyielding position, with states losing the ability to protect their shores from environmental harm caused by a unique local hazard, no matter how reasonable a state's contemplated protective measure might be.  *Berman*, 793 F. Supp. 408, 416-17 (criticizing preemption rule that would require states to "rely entirely on distant and overextended officials in Washington, D.C. for basic environmental protection").

-15-

statute.  Coast Guard Reply p. 15 (citing 63 Fed. Reg. 71770).  However, the former Rhode

Island statute at issue imposed a *statewide* tug escort rule, and the Coast Guard's discussion of it

is beside the point.  1997 R.I. Pub. Laws c. 32, § 3 (enacting former R.I. Gen. Laws § 46-12.6-

8(a)(3)).  The pertinent question is whether the Coast Guard ever considered the preemption

status of a *localized* tug escort rule, such as the one imposed by the Oil Spill Act.  *See*, *e.g.*, *Ray*,

435 U.S. at 171-72 ("[t]he relevant inquiry under Title I . . . is . . . whether the Secretary has

either promulgated his own tug requirement *for Puget Sound tanker navigation* or has decided

that no such requirement should be imposed at all [emphasis added]").[23]  There is no evidence

that the agency did so, and the plaintiffs' conflict preemption challenge to the tug escort rule

plainly must fail.

## V.     NO PREEMPTION OF THE COMMONWEALTH'S PILOTING REQUIREMENTS FOR COASTWISE TUGBOATS CAN OCCUR UNTIL THE COAST GUARD ACTUALLY STARTS TO INSPECT THOSE VESSELS.

The plaintiffs strenuously object to the State Defendants' argument that coastwise

tugboats are not "subject to inspection" for purposes of 46 U.S.C. § 8501(d)(1) -- with the result

that state piloting requirements for those boats are not preempted by that same statute -- unless

and until the Coast Guard actually begins to inspect them.  Coast Guard Reply pp. 18-19;

Industry Reply pp. 9-10; *see* State Defendants' Opposition p. 25.  The plaintiffs proceed as if it

---

[23]     A statewide rule stands on a entirely different footing than a localized one, because it sets an across-the-board requirement without regard to specific local conditions, just as a regional or national rule would.  The record of the Coast Guard's rulemaking could support the inference that the agency determined that the appropriate geographic scope of a *general* tug escort standard was regional (rather than either statewide or national), but the record says nothing about whether it considered the relationship between such a general rule and truly localized requirements that address unique navigational hazards.  *See* 63 Fed. Reg. 71766, 71770.

were self-evident that "subject to inspection" necessarily means "authorized to be inspected by," rather than "actually inspected by." However, in a variety of statutory contexts courts have inferred that Congress would want to deny preemption and maintain the public protection benefits of a state law until the relevant federal agency has implemented protective measures of its own. *H.P. Welch Co. v. New Hampshire*, 306 U.S. 79, 84-85 (1939) ("In view of the efforts of governmental authorities everywhere to mitigate the destruction of life, limb and property resulting from the use of motor vehicles, it cannot be inferred that Congress intended to supersede any state measure prior to the taking effect of a federal measure found suitable to take its place"); *Mass. Ass'n of Health Maintenance Orgs. v. Ruthardt*, 194 F.3d 176, 183 (1st Cir. 1999) ("Perhaps Congress believed that to preempt state law before the Secretary made the Program's corpus complete would have been premature"); *cf. Chao v. Mallard Bay Drilling, Inc.*, 534 U.S. 235, 241 (2002) (in determining when OSHA's jurisdiction is superseded by a separate regulatory regime, "mere possession by another federal agency of unexercised authority to regulate certain working conditions is insufficient to displace OSHA's jurisdiction"). The Court should draw a similar inference here and deny preemption until the Coast Guard has actually started inspecting coastwise tugboats.[24]

---

[24]    While the Coast Guard observes that federally licensed pilots are currently available for such boats, Coast Guard Reply p. 19 n. 18, they have made no allegations that such pilots are as familiar with local conditions as state-licensed pilots are, *see id.*, and the matter is inappropriate for resolution without factual development. Moreover, the regulatory gap that needs to be filled is not just pilotage *per se* but also tugboat inspections that will help overall vessel safety. The Coast Guard itself has stressed the importance of its inspections for those ships that it currently does inspect, *see* Initial Coast Guard Memorandum pp. 4-6, and they obviously play an important role in protecting the public. Until similar inspections actually occur for coastwise tugs, the Court should be loath to reduce safety in another way by removing skilled local pilots from those vessels.

-17-

**VI.  THE COALITION FOR BUZZARDS BAY HAS IDENTIFIED A BASIS FOR REJECTING THE PREEMPTION CHALLENGE TO THE OIL SPILL ACT'S SINGLE-HULL DOCKING BAN.**

The Coast Guard asserts that the State Defendants have "abandoned any defense of" several specific claims or subclaims.  Coast Guard Reply p. 1 (citing State Defendants' Opposition p. 13 n. 12).  This is incorrect.  While the State Defendants frankly acknowledged that "legal arguments in defense of a few of the challenged provisions in the Oil Spill Act are not readily apparent, at least at present," they also refrained from "stipulati[ng] with respect to any aspect of the Oil Spill Act," and they specifically "adopt[ed] and incorporate[d] by reference any colorable arguments made by the [Coalition] in defense of any portion of the Act."  State Defendants' Opposition p. 13 & n. 12.  For example, the State Defendants have adopted (by operation of that same fn. 12 in their Opposition) the Coalition's argument that the Act's ban on the docking of certain single-hull vessels constitutes a mooring and docking regulation, which traditionally is viewed as local in nature and hence should be analyzed under Title I conflict preemption principles.  Coalition Opposition pp. 23-24; *see* Coast Guard Reply p. 11 (failing to cite authority that Title I is inapplicable).[25]  The State Defendants will continue to assert any legal arguments in defense of the Act that come to their attention, and they will similarly continue to adopt all colorable arguments that the Coalition makes, whether in its Surreply or otherwise.

---

[25]    The State Defendants also have adopted and incorporated by reference the Coalition's various arguments that many of the plaintiffs' claims warrant fact development and hence are inappropriate for judgment on the pleadings.  *See* Coalition Opposition pp. 1, 11 n. 12, 13 n. 14, 14, 17 n. 15 & n. 16, pp. 17-18 & n. 17, 20 n. 19, 21 & n. 20, 22.

-19-

## VII.    CONCLUSION

For the foregoing reasons, the State Defendants respectfully request that the Court deny

both Plaintiffs' Motion For Judgment on the Pleadings and Intervenor-Plaintiffs' Motion for

Judgment on the Pleadings.

By their attorneys,

ATTORNEY GENERAL
THOMAS F. REILLY


/s/ Pierce O. Cray
Pierce O. Cray, BBO # 104630
Nora Chorover, BBO # 547352
Assistant Attorneys General
One Ashburton Place
Boston, MA 02108
(617) 727-2200
pierce.cray@ago.state.ma.us
nora.chorover@ago.state.ma.us

Date:    August 26, 2005