UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA, )<br>)<br>)<br>                          Plaintiff, )<br>)<br>   v.                       )<br>)<br>THE COMMONWEALTH OF        )<br>MASSACHUSETTS, *et al.*          )<br>)<br>)<br>                          Defendants. )<br>_____) | Civil Action No. 05-10112 JLT |

**NOTICE OF PUBLIC RECORD**

Plaintiff, the United States of America, by and through undersigned counsel, files this Notice to inform the Court of a public record pertinent to resolution of the pending cross-motions for summary judgment as to Defendants' counterclaim in this action. See Docket Entry Nos. 23, 34, 39. With that counterclaim, Defendants asked the Court to order the United States Coast Guard to establish procedures for alcohol testing pursuant to 46 U.S.C. § 2303a. See id.; see also Docket Entry Nos. 16, 20.

As reflected in the December 22, 2005 Federal Register, the Coast Guard has now completed and published its Final Rule to implement the alcohol testing requirements of 46 U.S.C. § 2303a. See 75 Fed. Reg. 75954 (December 22, 2005) ("Marine Casualties and Investigations; Chemical Testing Following Serious Marine Incidents"), filed herewith.[1] The Federal Register publication includes, inter alia, a preamble that responds to public comments

---

[1] This December 2005 publication is consistent with the United States' earlier statements that the rule would be finalized in 2005. See Declaration of W. Douglas Rabe, filed with the United States' May 23, 2005 Motion for Summary Judgment as to Defendants' Counterclaim (Docket Entry No. 23), at ¶ 18; see also Declaration of Stefan Venckus, filed with the United States' July 26, 2005 Memorandum in Opposition to Defendants' Cross-Motions for Summary Judgment as to Defendants' Counterclaim (Docket Entry No. 48), at ¶¶ 2, 4.

and the text of the Final Rule itself, which amends 46 C.F.R. Part 4 and becomes effective on June 20, 2006. As described in the preamble, the Final Rule:

> revises Coast Guard requirements for alcohol testing after a serious marine incident to ensure that mariners or their employees involved in a serious marine incident are tested for alcohol use within 2 hours of the occurrence of the incident as required under the Coast Guard Authorization Act of 1998. This final rule also requires that most commercial vessels have alcohol testing devices on board, and authorizes the use of saliva as an acceptable specimen for alcohol testing. This rule also makes some minor procedural changes, including a 32-hour time limit for collecting specimens for drug testing following a serious marine incident.

75 Fed. Reg. 75954.

This public record did not exist until on or about December 22, 2005, and, therefore, could not have been included in the United States' previous filings regarding Defendants' counterclaim.

DATED this 22nd day of December, 2005.

    Respectfully Submitted,

    PETER D. KEISLER
    Assistant Attorney General

    MICHAEL SULLIVAN
    United States Attorney
    MARK T. QUINLIVAN
    Assistant United States Attorney

    /s/ **Steven Y. Bressler**
    ARTHUR R. GOLDBERG D.C.B. 180661
    STEVEN Y. BRESSLER D.C.B. 482492
    Attorneys, Civil Division
    United States Department of Justice
    P.O. Box 833
    Washington, D.C. 20044
    Telephone (202) 514-4781
    Facsimile (202) 318-7609
    Steven.Bressler@USDOJ.gov

    Counsel for the United States of America

**75954** Federal Register / Vol. 70, No. 245 / Thursday, December 22, 2005 / Rules and Regulations

(c) The Secretary will decide whether or not to revise a final decision contested by the petitioner(s) under this section after considering information and recommendations provided to the Secretary by the Director of NIOSH, the Board, and from the HHS administrative review conducted under paragraph (b) of this section. HHS will transmit a report of the decision to the petitioner(s).

(d) If the Secretary decides under paragraph (c) of this section to change a designation under § 83.17(a) of this part or a determination under § 83.16(c) of this part, the Secretary will transmit to Congress a report providing such change to the designation or determination, including an iteration of the relevant criteria, as specified under § 83.13(c), and a summary of the information and findings on which the decision is based. HHS will also publish a notice summarizing the decision in the **Federal Register**.

(e) A new designation of the Secretary under this section will take effect 30 calendar days after the date on which the report of the Secretary under paragraph (d) of this section is submitted to Congress, unless Congress takes an action that reverses or expedites the designation. Such new designations and related congressional actions will be further reported by the Secretary pursuant to paragraphs (d) and (e) of § 83.17.

Dated: September 13, 2005.

**Michael O. Leavitt,**
*Secretary, Department of Health and Human Services.*
[FR Doc. 05–24358 Filed 12–21–05; 8:45 am]
**BILLING CODE 4163–18–P**

---

**DEPARTMENT OF THE INTERIOR**

**Bureau of Land Management**

**43 CFR Part 3160**

**RIN 1004–AD80**

**Onshore Oil and Gas Operations; Correction**

**AGENCY:** Bureau of Land Management, Interior.
**ACTION:** Correcting amendment.

**SUMMARY:** This document contains a correcting amendment to a final rule reorganizing regulations of the Bureau of Land Management (BLM) relating to onshore oil and gas operations, which was published in the **Federal Register** of Friday, February 20, 1987 (52 FR 5384). The amendment corrects an error in a cross-reference.

**DATES:** Effective date December 22, 2005.

**FOR FURTHER INFORMATION CONTACT:** Ted Hudson, 202–452–5042. Individuals who use a telecommunications device for the deaf (TDD) may contact him individually through the Federal Information Relay Service at 1–800–877–8339, 24 hours a day, seven days a week.

**SUPPLEMENTARY INFORMATION:**

**Background**

The regulations that are the subject of this correcting amendment have been in effect for more than 20 years. They pertain specifically to onshore oil and gas operations programs, and particularly to the penalty provision for knowingly submitting false, misleading, or inaccurate reports or other information required by the regulations, taking oil or gas from a Federal or Indian lease without authority, or receiving such oil or gas knowing or having reason to know it was stolen or unlawfully diverted or removed from a Federal or Indian lease site.

**Need for Correction**

When a final rule redesignated and revised the pertinent sections in 1987, at 52 FR 5394, it created an error in a cross-reference. This error is misleading and needs clarification. The provision assigns a criminal penalty for an act for which a civil penalty is prescribed in another section, referring to that other section by number. However, the section and paragraph number stated, section 3163.4–1(b)(6), does not exist in the current regulations, having been redesignated as section 3163.2(f) in the 1987 rule. The 1987 rule failed to adjust the cross-reference, which now needs to be corrected to eliminate confusion.

**List of Subjects in 43 CFR Part 3160**

Government contracts; Indians—lands; Mineral royalties; Oil and gas exploration; Penalties, Public lands—mineral resources; Surety bonds.

■ Accordingly, 43 CFR part 3160 is corrected by making the following amendment:

**PART 3160—ONSHORE OIL AND GAS OPERATIONS**

■ 1. The authority citation for part 3160 continues to read as follows:

**Authority:** 25 U.S.C. 396d and 2107; 30 U.S.C. 189, 306, 359, and 1751; and 43 U.S.C. 1732(b), 1733, and 1740.

**Subpart 3163—Noncompliance, Assessments, and Penalties**

■ 2. Revise section 3163.3 to read as follows:

**§ 3163.3  Criminal penalties.**

Any person who commits an act for which a civil penalty is provided in § 3163.2(f) shall, upon conviction, be punished by a fine of not more than $50,000, or by imprisonment for not more than 2 years, or both.

Dated: December 7, 2005.

**Chad Calvert,**
*Acting Assistant Secretary of the Interior.*
[FR Doc. 05–24371 Filed 12–21–05; 8:45 am]
**BILLING CODE 4310–84–M**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Coast Guard**

**46 CFR Part 4**

**[USCG–2001–8773]**

**RIN 1625–AA27 (Formerly RIN 2115–AG07)**

**Marine Casualties and Investigations; Chemical Testing Following Serious Marine Incidents**

**AGENCY:** Coast Guard, DHS.
**ACTION:** Final rule.

**SUMMARY:** This final rule revises Coast Guard requirements for alcohol testing after a serious marine incident to ensure that mariners or their employees involved in a serious marine incident are tested for alcohol use within 2 hours of the occurrence of the incident as required under the Coast Guard Authorization Act of 1998. This final rule also requires that most commercial vessels have alcohol testing devices on board, and authorizes the use of saliva as an acceptable specimen for alcohol testing. This rule also makes some minor procedural changes, including a 32-hour time limit for collecting specimens for drug testing following a serious marine incident.

**DATES:** This final rule is effective June 20, 2006.

**ADDRESSES:** Comments and material received from the public, as well as documents mentioned in this preamble as being available in the docket, are part of docket USCG–2001–8773 and are available for inspection or copying at the Docket Management Facility, U.S. Department of Transportation, room PL–401, 400 Seventh Street SW., Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except

Federal holidays. You may also find this docket on the Internet at *http://dms.dot.gov.*

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this rule, call Robert Schoening, Coast Guard, telephone 202–267–0684. If you have questions on viewing the docket, call Renee V. Wright, Program Manager, Docket Operations, telephone 202–493–0402. This is not a toll-free call.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Background and Purpose
II. Regulatory History
III. Discussion of Comments and Changes
  A. Comments Beyond the Scope of This Rulemaking
  B. Comments Generally Supporting Rulemaking
  C. Who Conducts the Tests
  D. Requirement To Carry Alcohol-Testing Devices
  E. Lists of Conforming Products
  F. When the Tests Should Be Conducted
  G. Storage of Testing Devices
  H. Testing for the Presence of Alcohol
  I. Small Crew Testing and Self-Testing
  J. Comments on Regulatory Evaluation
  K. Discussion of Changes From NPRM
IV. Regulatory Analysis
  A. Regulatory Evaluation
  B. Small Entities
  C. Assistance for Small Entities
  D. Collection of Information
  E. Federalism
  F. Unfunded Mandates Reform Act
  G. Taking of Private Property
  H. Civil Justice Reform
  I. Protection of Children
  J. Indian Tribal Governments
  K. Energy Effects
  L. Technical Standards
  M. Environment

**I. Background and Purpose**

This final rule modifies Coast Guard regulations requiring testing for drug and alcohol use by persons involved in serious marine incidents (SMIs) to require that alcohol testing be conducted within 2 hours of a serious marine incident (SMI). This final rule also requires most commercial vessels to have alcohol testing devices on board and authorizes the testing of saliva as an acceptable specimen for alcohol testing. This rule also adds a 32-hour time limit for the collection of specimens for drug testing following a serious marine incident.

Coast Guard regulations (46 CFR part 4, subpart 4.06) currently require marine employers to take all practical steps after an SMI to have each individual engaged or employed on board a vessel in commercial service, who is directly involved in the incident, chemically tested for evidence of drug and alcohol use. "Commercial service" includes any type of trade or business involving the transportation of goods or individuals, except service performed by a combatant vessel. The regulations do not specify a time requirement following an SMI for collecting specimens for testing or completing the tests to determine the use of alcohol or dangerous drugs. The current regulations also limit testing to blood and breath specimens as the only acceptable specimens for alcohol testing.

In 1998, Congress passed the Coast Guard Appropriations Act of 1998 (the Act), Public Law 105–383, which revised Title 46, U.S. Code, by adding a new section 2303a, "Post serious marine casualty alcohol testing" (hereafter section 2303a). Section 2303a requires the Coast Guard to establish procedures to ensure that required alcohol testing is conducted no later than 2 hours after a serious marine casualty occurs.[1] If the alcohol testing cannot be conducted within that timeframe because of safety concerns directly related to the casualty, section 2303a requires the alcohol testing to be conducted as soon as the safety concerns have been adequately addressed to permit such testing, but no later than 8 hours after the incident occurs.

On February 28, 2003, the Coast Guard issued a notice of proposed rulemaking (NPRM) that proposed revisions to 46 CFR part 4 to implement the requirements of section 2303a. 68 FR 9622, *see also* 68 FR 50992 (Aug. 25, 2003), 68 FR 60073 (Oct. 21, 2003). The NPRM proposed that alcohol testing be conducted within 2 hours of an SMI, that commercial vessels be required to have alcohol-testing devices on board, and authorized saliva as an acceptable specimen for alcohol testing. The NPRM also proposed some minor procedural changes to part 4, including a 32-hour time limit for collecting drug test specimens following an SMI.

**II. Regulatory History**

On February 28, 2003, we published a notice of proposed rulemaking (NPRM) entitled "Marine Casualties and Investigations; Chemical Testing Following Serious Marine Incidents" in the **Federal Register** (68 FR 9622). The NPRM provided a 120-day comment period. In response to requests for a public meeting, the Coast Guard published a reopening of the comment period and a notice of public meeting on August 25, 2003 (68 FR 50992). This meeting was to be held on September 19, 2003 in Washington, DC. Hurricane Isabel forced the closure of all Federal Government offices in the Washington, DC, metropolitan area on September 19, 2003 and the public meeting was not held. As a result of the limited number of participants who had registered to attend the public meeting, the Coast Guard decided not to reschedule the meeting. Instead, on October 21, 2003, the Coast Guard published in the **Federal Register** (68 FR 60073), a reopening of the comment period until November 20, 2003 to allow submission of comments that might otherwise have been presented at the public meeting.

**III. Discussion of Comments and Changes**

During the comment period, the Coast Guard received 121 comments in response to the NPRM. Comments were submitted by maritime trade associations, large and small vessel marine employers, drug and alcohol testing service agents, manufacturers of alcohol-testing devices, and one Federal agency. The main issues discussed in the comments were the requirement to carry alcohol-testing devices, testing device storage, the costs of purchasing and maintaining the alcohol-testing device, and requests for exemptions based on size of crew and history of safety.

The comments are divided by category and discussed below.

*A. Comments Beyond the Scope of the Rulemaking*

The NPRM proposed that alcohol testing be conducted within 2 hours of an SMI, that commercial vessels be required to have alcohol-testing devices on board, and authorized saliva as an acceptable specimen for alcohol testing. The NPRM also proposed some minor procedural changes to part 4, including a 32-hour time limit for collecting drug test specimens following an SMI.

Many comments raised issues that are beyond the narrow scope of this rulemaking. Those comments raised issues about:

(1) The potential liability of marine employers if there is a false positive on an alcohol screening test, if a positive alcohol reading was due to an alternate source, such as mouthwash; or because the Alcohol Screening Devices (ASDs) are not as efficient as Evidential Breath Tests (EBTs);

(2) Whether the Coast Guard should require a "confirmation" test after the initial screening to verify the presence and level of alcohol;

(3) Whether the U.S. Coast Guard should adopt a flexible enforcement approach that takes into consideration

---

[1] For purposes of this rulemaking, "serious marine incident" or "SMI" means the same as "serious marine casualty" under section 2303a.

the reasonable and good faith efforts of vessel supervisors who are assigned specimen collection functions; and the safety and operational needs following a serious marine incident;

(4) Whether there should be a separate part to regulate the testing of human remains; and

(5) Whether the existing definition of an SMI in 46 CFR part 4, subpart 4.03, is vague and should be clarified.

These comments are beyond the narrow scope of this rulemaking, which is to implement the timing requirements of section 2302a by ensuring that marine employers conduct alcohol testing within 2 hours after an SMI. Although these comments are not discussed further in this preamble, they have been referred to the appropriate Coast Guard office for review and appropriate action separate from this rulemaking.

*B. Comments Generally Supporting the Rulemaking*

A few comments generally supported the proposed rule, stating that they fully support all testing of all operators when any accident happens or even when they appear to be operating any vessel unsafely. A comment from a manufacturer of an alcohol-testing device stated that the manufacturer supports this rule and believes that the technology exists to permit implementation of the proposed rule with confidence. The comment further stated that the manufacturer believes that the available technology will protect the individual tested with accurate results, as well as help to ensure public safety by providing timely information. The manufacturer also stated that the alcohol-testing devices include built-in quality control indicators to direct proper use and minimize environmental impact.

*C. Who Conducts the Tests*

We received 40 comments primarily from small passenger vessel operators and marine employer trade associations, including charterboat operator associations and other interested trade associations that addressed the question of who should be responsible for conducting the drug or alcohol tests after a SMI. Some of these comments stated that the Coast Guard should conduct the alcohol testing following an SMI. Also, 34 of those comments stated that Congress intended that the Coast Guard conduct alcohol testing after an SMI and that it is wrong to shift the testing requirement, and its costs, onto the individual marine employers. One marine employer stated that the Coast Guard, as the regulator, is in the best position to determine whether a test is necessary and whether the test should be administered at the site of a vessel boarding, seizure, or accident investigation, or be conducted ashore at a Coast Guard facility.

We disagree. Section 2303a requires the Coast Guard to establish procedures to ensure that alcohol testing is conducted within 2 hours after a serious marine casualty. It does not require the Coast Guard to conduct the testing. Under the current rule, the marine employer has the responsibility to ensure that the alcohol testing occurs. 46 CFR 4.06. We considered the option of using Coast Guard resources to ensure alcohol testing after a serious marine incident. However, the Coast Guard finds that this option is impracticable because it is not possible for Coast Guard personnel to reach the scene of all serious marine incidents within the 2 hours required by statute to conduct alcohol testing due to the nature and location of marine industry operations. The Coast Guard sometimes is not aware that a serious marine incident has occurred until a report of the incident is filed by the mariner as required under Coast Guard regulations. 46 CFR 4.06–60. Even if Coast Guard resources could be at the scene of all serious marine incidents in time to conduct alcohol testing with 2 hours of the incident, it would be impracticable to require Coast Guard units to respond to every incident to conduct required alcohol testing because it would impermissibly burden Coast Guard resources engaged in other functions critical to the Coast Guard's mission, such as homeland security, search and rescue, drug interdiction, migrant interdiction, marine safety, and environmental protection.

Although the responsibility to ensure proper alcohol testing continues to rest on the marine employer, this final rule allows the employer to choose the most cost effective equipment and procedures for his or her operational circumstances. This rule also allows a marine employer to use alcohol tests administered by Coast Guard, local law enforcement personnel, contractors, or other third parties as long as the test used meets the requirements of part 4. This rule will help to ensure that required alcohol testing can be conducted by the marine employers.

*D. Requirement To Carry Alcohol-Testing Devices*

We received many comments from marine employers and various trade associations suggesting the Coast Guard allow an exemption from the requirement to carry testing devices on board for commercial vessels that only travel a short distance from the shore. Many of the comments stated that these vessels could meet the 2-hour testing requirement by using shoreside testing facilities because the vessels are always within 2 hours of a facility. One comment suggested that vessels that could return to shore within 4 to 6 hours should be allowed to rely on shoreside testing facilities to meet the 2-hour testing requirement of this rule.

We agree that vessels that can reach a testing facility and conduct required alcohol testing within 2 hours of an SMI should have the option of doing so. The marine employer may use alcohol testing results from tests conducted by Coast Guard or local law enforcement personnel if the alcohol testing meets all of the requirements of this part. Therefore, we have modified the text of the final rule to relieve marine employers of the requirement to carry alcohol testing devices on board if they can receive testing from a shoreside testing facility within 2 hours of an SMI.

Section 2303a states that alcohol tests must be administered within 2 hours of the SMI. Thus, we do not agree that vessels that can return to shore within 4 to 6 hours should be allowed to rely on shoreside testing facilities to meet these requirements. Vessels that cannot return to shore and have testing conducted within 2 hours must carry alcohol testing devices onboard the vessels.

*E. Lists of Conforming Products*

Several comments from marine employers and alcohol testing device product manufacturers urged the Coast Guard to either publish a list of alcohol-testing devices that meet the requirements of this rule or adopt the National Highway Traffic Safety Administration's (NHTSA) Conforming Products List (CPL) of Evidential Breath Measurement Devices as the acceptable list of devices that meet the requirements of this rule.

The Coast Guard agrees that a list of acceptable testing devices would help marine employers comply with the requirements of this rule. Accordingly, the final rule requires that marine employers carry alcohol-testing devices listed on the most current versions of either the NHTSA Conforming Products Lists of Evidential Breath Measurement Devices or the NHTSA Conforming Products List of Alcohol Screening Devices. The current Conforming Products Lists were published in the **Federal Register** and are available on the Internet at the following locations: Conforming Products Lists of Evidential Breath Measurement Devices, at 69 FR 42237 (July 14, 2004) or *http://www.nhtsa.dot.gov/people/injury/*

*alcohol/ebtcpl040714FR.pdf* and Conforming Products List of Alcohol Screening Devices at 70 FR 72502 (December 5, 2005) or *http://a257.g.akamaitech.net/7/257/2422/01jan20051800/edocket.access.gpo.gov/2005/pdf/E5–6848.pdf.* These lists are also available in the docket for this rulemaking.

*F. When the Tests Should Be Conducted*

One comment asked if alcohol testing results are ''acceptable up to 8 hours following an SMI, why not require alcohol testing be conducted within 8 hours?''

Section 2303a requires that alcohol testing be conducted within 2 hours of an SMI, unless the testing can not be completed within that time due to safety concerns directly related to the casualty. If there are such safety concerns, then alcohol testing is to be conducted as soon as possible after the safety concerns have been addressed. Therefore, this rule requires testing within 2 hours after an SMI, unless precluded by safety concerns directly related to the incident, in which case the testing must be conducted as soon as the safety concerns are addressed, but not more than 8 hours after the incident.

*G. Storage of Testing Devices*

A few comments stated that some vessels would have difficulty storing the testing devices because of limited space on the vessel. Several other comments stated that storing the testing devices would be problematic because of ''hostile'' marine weather, which could lead to an inaccurate testing result.

We disagree. A review of the specifications from actual alcohol testing devices on the NHTSA CPL lists indicates that some of the devices are approximately the size of a credit card and others are slightly larger handheld devices. The smallest box, which contains 30 devices, is 10″ × 4.5″ × 7″ and weighs 2.0 lbs. A box of these proportions should not create a storage problem on a vessel. The acceptable temperatures for storage of the alcohol-testing devices ranged from 0–104 °F. The instructions for two of the testing devices stated that the housing for the device was weather resistant. There is no evidence that the testing devices are susceptible to ''hostile'' marine weather and we believe that the temperature ranges for the alcohol-testing devices are wide enough that weather will not lead to an inaccurate testing result.

*H. Testing for the Presence of Alcohol*

We received several comments stating that the testing devices permitted under this rule do not test the amount of alcohol in a person's system. Instead, they only test for the presence of alcohol in a person's system. Several of these comments also stated that such tests are inadmissible in court. Some of the comments stated that there could be disciplinary measures taken against mariners who test positive for the presence of alcohol without knowing the level of alcohol in their system.

The current alcohol testing regulations in 46 CFR part 4 require that each individual engaged or employed on board the vessel who is directly involved in the incident be chemically tested for evidence of drug and alcohol use. There is no requirement that the amount of alcohol in a mariner's system be determined after an SMI. This rule does not change that requirement. In this rule, we require that currently mandated alcohol testing to be conducted within 2 hours of an SMI. However, a marine employer may choose to use any device from the NHTSA Conforming Products Lists of Evidential Breath Measurement Devices, all of which measure the amount of alcohol in a person's system. This rule does not change how mariners are disciplined by the marine employer or by the Coast Guard.

*I. Small Crew Testing and Self-Testing*

Several comments stated that one to five person crews would be required to test each other, test family members, or self-test in the event of an SMI and that, in some instances, a crew member would be required to test the captain. Some comments questioned the integrity and reliability of the test results under these circumstances. A few comments suggested that crews smaller than 20 members and crews with a history of safety be exempt from this rule.

This rule does not change the current requirements for who should be chemically tested for alcohol use and who conducts the tests after an SMI. Section 4.06–1(b) requires that marine employers ''take all practicable steps to have each individual engaged or employed on board the vessel who is directly involved in the incident chemically tested for evidence of drug and alcohol use.'' Section 4.06–1(b) has been in effect since 1988 and is not revised by this rule. The statute requiring that alcohol testing be conducted within 2 hours of an SMI, 46 U.S.C. 2303a, does not provide for an exemption based on the size of the crew or the crew's safety history.

*J. Comments on Regulatory Evaluation*

Several comments stated that the cost of complying with these requirements would be excessive and would be burdensome on businesses.

We disagree. We expect marine employers will choose inexpensive saliva Alcohol Screening Devices (ASDs), thereby meeting the minimum requirements and costs to comply with this rule. The average price for saliva ASDs is $113 per package containing 25 to 30 testing devices. A package of testing devices can easily be separated into smaller quantities of testing devices to accommodate marine employers that own or operate more than one vessel, or to accommodate those marine employers that own or operate one vessel and may want to split the cost of one package. Our cost estimates are conservative (high) because we assume there will be one package of 25 to 30 saliva ASDs purchased for each vessel. We also assume there may be first-year and annual training costs associated with saliva ASDs devices, even though manufacturers and suppliers claim these tests can be properly completed within five minutes, which includes the time to read the instructions.

A few comments stated that our reported prices for testing devices and our compliance cost estimates were inaccurate.

We conducted market research of several testing devices to determine current prices and package quantities. We calculated the direct cost of this rule to industry by estimating the purchase cost of the devices, the training cost, and the cost of replacing the devices due to expiration. We used mariner wage rates to approximate the costs associated with testing device training, and we used wage data from the 2002 National Occupation Employment and Wage Statistics for Captains, Mates, and Pilots of Water Vessels published by the Bureau of Labor Statistics. Our 10-year cost estimate is the discounted present value total of the first-year implementation cost and the annual cost with and without testing device replacement.

Some comments about the cost of ASDs stated that the NPRM acknowledged that ''the cost of the less expensive ASDs could still be too expensive for the smallest commercial vessel operators and owners.''

These comments inaccurately quoted the NPRM, which actually stated ''the cost of the less expensive *breath* ASDs could still be too expensive for the smallest commercial vessel operators and owners.'' Saliva ASDs are less expensive than some breath ASDs and that is why Coast Guard will allow marine employers to use saliva ASDs. Including saliva ASDs provides a wider variety of alcohol-testing devices, which

gives marine employers more control over the cost of compliance.

One comment stated that third-party alcohol screening and testing facilities would be adversely impacted by these requirements and forced out of business.

This rule does not disallow third-party testing, provided the testing is conducted within 2 hours of an SMI, as required by section 2303a.

A few comments stated that the costs associated with this rule could adversely impact small businesses.

We disagree with the comments. We estimate that the percentage impact of annual cost on annual revenue for small businesses range from 0.00% to 0.45%, demonstrating the cost impacts of this rule are a small percentage of revenues for small businesses. Small businesses need only purchase inexpensive saliva ASDs to comply with the minimum requirements of this rule. The saliva ASDs do not require extensive training, and we expect the cost of these requirements will be insignificant for small businesses. A Final Regulatory Flexibility Analysis detailing the impacts on small businesses is available in the docket as part of the Regulatory Analysis indicated under **ADDRESSES**.

Some comments stated that the estimated number of small entities affected by this rulemaking is too low.

We have revised our estimates based on additional information from industry and additional data from the Coast Guard Office of Investigation and Analysis. See the following "Small Entity" section for more about the impacts on small businesses.

*K. Discussion of Changes From NPRM*

The regulatory text in this rule is slightly different from the Coast Guard to the final rule resulted from the comments:

(1) An exception to ensure alcohol testing is conducted within 2 hours of occurrence of the SMI; and

(2) A requirement that alcohol-testing devices used to meet the requirements of this regulation must be listed on one of the current NHTSA Conforming Products Lists.

We did not make any substantive changes to the proposed requirement to collect drug specimens within 32 hours of an SMI because we did not receive any comments on this provision.

**IV. Regulatory Analysis**

*A. Regulatory Evaluation*

Executive Order 12866, "Regulatory Planning and Review", 58 FR 51735, October 4, 1993, requires a determination whether a regulatory action is "significant" and therefore subject to review by the Office of Management and Budget (OMB) and subject to the requirements of the Executive Order. This rule has been identified as significant under Executive Order 12866 and has been reviewed by OMB and DHS.

The final Regulatory Analysis is available in the docket as indicated under **ADDRESSES**. A summary of the Regulatory Analysis is below.

Section 2303a of Title 46, U.S. Code, requires the Coast Guard to establish procedures to ensure alcohol testing is conducted within 2 hours of an SMI. This final rule will establish a requirement for all marine employers (vessel owners and operators) to have alcohol-testing devices readily available for use to meet the requirements for alcohol testing following an SMI.

This rule will require alcohol testing within 2 hours of an SMI, whereas the current regulation does not specify a time frame for testing. In order to comply with this final rule, marine employers will need to purchase and maintain alcohol-testing devices onboard the vessels they own and operate if they cannot reach a shoreside facility and conduct alcohol testing of their employees within 2 hours of an SMI. We have delayed the implementation of this rule by 180 days from the date of its publication in the **Federal Register**. We believe this will ensure that all marine employers subject to this new requirement will have enough time to purchase the testing devices and to train their employees how to use these devices.

This rule requires marine employers to select testing devices listed on the National Highway Traffic Safety Administration's (NHTSA) Conforming Products Lists (CPL). The CPLs list Evidential Breath Testing devices (EBTs) and Alcohol Screening Devices (ASDs). The purchase price of EBTs range from $490 to $8,453 per device, however, the purchase price of saliva ASDs average $113 per package of between 25 and 30 testing devices. The maintenance and training costs of EBTs are also much higher than the saliva ASDs.

For saliva ASD's, we estimate that training will take no more than 30 minutes. For the purposes of this analysis, we use mariner wage rates to approximate the cost associated for testing device training. We assume the wage rate to be $37 per hour based on the 2002 National Occupation Employment and Wage Statistics for Captains, Mates, and Pilots of Water Vessels published by the Bureau of Labor Statistics. We assume there will be training costs for five (four training, one trainer) mariners in the first year of implementation and training costs for three (two training, one trainer) mariners thereafter.

We expect marine employers will choose the less expensive saliva ASDs thereby meeting the minimum requirements to comply with this rule. If marine employers choose to purchase more expensive testing devices, then they are making a decision based on other business or operating factors, rather than this final rule. We conclude that industry need only purchase the less expensive saliva ASDs to comply with the minimum requirements of this rule.

This rule affects marine employers that own or operate approximately 183,400 commercial vessels. Of these vessels, approximately 2,600 vessels are already required to carry alcohol breath-testing devices in accordance with 46 CFR 4.06–20(a) and will not incur additional costs from this rule. Therefore, this rule will require marine employers of approximately 181,000 vessels to purchase devices, train employees how to use devices, and maintain or replace expired devices.

We calculated the direct cost of this rule to industry by estimating the purchase cost of the devices, the training cost, and the cost of replacing the devices due to expiration. The average first-year implementation cost per vessel for marine employers is $206 for the purchase of one package of saliva ASDs and initial training. The annual cost per vessel after the first-year implementation of the rule ranges from approximately $56 without testing device replacement to about $169 with testing device replacement. Based on manufacturer information, we expect marine employers to replace saliva ASDs every other year or approximately every 12 to 18 months.

We estimate the first-year implementation cost of this rule for marine employers to be $37 million ($113 for the device plus $93 for training cost multiplied by the total population of 181,000 vessels) to purchase testing devices and to provide initial training. The annual cost for marine employers after the implementation of the rule ranges from $10 million ($56 for training multiplied by the total population of 181,000) without testing device replacement, to about $31 million ($113 for the device plus $56 for training cost multiplied by the total population of 181,000 vessels) with testing device replacement.

*B. Small Entities*

Under the Regulatory Flexibility Act (5 U.S.C. 601–612), we have considered

whether this rule would have a significant economic impact on a substantial number of small entities. The term ''small entities'' comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000.

We used data from the Coast Guard's Office of Investigations and Analysis, the U.S. Census Bureau's data on companies in the marine transportation industry, and the Small Business Administration's (SBA) business size standards to determine the number of small entities affected by this rule. The SBA size standards are based on the North American Industry Classification System (NAICS) subsectors. We used the following NAICS subsectors:

• Deep Sea, Coastal, & Great Lakes water transportation (sub-sector 4831), 500 employees or less;
• Inland Water Transportation (sub-sector 4832), 500 employees or less;
• Scenic and Sightseeing Transportation (sub-sector 4872), annual revenue of $5,000,000 or less;
• Port and Harbor Operations (sub-sector 48831), annual revenue of $21,500,000 or less;
• Marine Cargo Handling (sub-sector 48832), annual revenue of $21,500,000 or less; and
• Navigational Services to Shipping (sub-sector 48833), annual revenue of $5,000,000 or less.

We estimate that this rule will impact over 13,000 small entities that will comply with this rule by selecting saliva ASDs. We estimate that the percentage impact of cost on revenue for these small entities range from 0.00% to 0.45%, demonstrating the cost impacts of this rule are a small percentage of revenues for these small entities. Therefore, the Coast Guard certifies under 5 U.S.C. 605(b) that this final rule will not have a significant economic impact on a substantial number of small entities. A Final Regulatory Flexibility Analysis explaining the analysis in more detail is available in the docket as part of the Regulatory Analysis indicated under **ADDRESSES**.

*C. Assistance for Small Entities*

Under section 213(a) of the Small Business Regulatory Enforcement Fairness Act of 1996 (Pub. L. 104–121), we offered to assist small entities in understanding the rule so that they could better evaluate its effects on them and participate in the rulemaking.

Small businesses may send comments on the actions of Federal employees who enforce, or otherwise determine compliance with, Federal regulations to the Small Business and Agriculture Regulatory Enforcement Ombudsman and the Regional Small Business Regulatory Fairness Boards. The Ombudsman evaluates these actions annually and rates each agency's responsiveness to small business. If you wish to comment on actions by employees of the Coast Guard, call 1–888–REG–FAIR (1–888–734–3247).

*D. Collection of Information*

This rule revises an existing collection of information under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3520). We received no comments related to the collection of information and no changes were made that affect this collection.

*Title:* Marine Casualty Information and Periodic Chemical, Drug, and Alcohol Testing on Commercial Vessel Personnel (OMB 1625–0001, formerly OMB 2115–0003).

*Summary of the Collection of Information:* This regulation requires marine employers to document the reason for delaying the alcohol test on form CG–2692B. The requirement to report this information is found in 46 CFR 4.06–3. We revised form CG–2692B accordingly to record the results of all types of alcohol testing (blood, breath, and saliva).

*Need for Information:* According to 46 U.S.C. 2303a, this regulation requires marine employers to document the reason for delaying the alcohol test on form CG–2692B if alcohol testing is not completed within the 2-hour timeframe. If the alcohol test is not completed within the 8-hour timeframe, the marine employer must document the reason for the further delay of alcohol testing on form CG–2692B.

*Use of Information:* The Coast Guard will use the information to document the results of alcohol tests after SMIs.

*Description of the Respondents:* Marine employers whose employees, passengers, or vessels are involved in SMIs.

*Number of Respondents:* Currently, the approved OMB collection, estimates that 5,703 respondents fill out an accident report. This rulemaking will not change the number of incidents or accidents that trigger a response; therefore the increase in respondents would be zero.

*Frequency of Response:* The frequency of response continues to be once per incident.

*Burden of Response:* The possible additional burden imposed by this rule is estimated to be so minimal that it does not merit changing the approved collection (a couple of additional minutes whenever documentation is needed). OMB approved, on previous submissions, the 1-hour burden of completing each form CG–2692B.

*Estimate of Total Annual Burden:* The currently approved annual burden is 5,703 hours. Because the possible additional burden imposed by this rule is estimated to be so minimal, it does not merit changing the approved annual burden.

As required by 44 U.S.C. 3507(d), we submitted a copy of this rule to the Office of Management and Budget (OMB) for its review of the collection of information. OMB has approved the revised collection. The section number is 46 CFR 4.06–3, and the corresponding approval number from OMB is OMB Control Number 1625–0001.

You are not required to respond to a collection of information unless it displays a currently valid OMB control number.

*E. Federalism*

A rule has implications for federalism under Executive Order 13132. Federalism, if it has a substantial direct effect on State or local governments and would either preempt State law or impose a substantial direct cost of compliance on them.

The law is well settled that States may not regulate in categories reserved for regulation by the Coast Guard. The law also well settled that all of the categories covered in 46 U.S.C. 3306, 3703, 7101, and 8101 (design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning of vessels), as well as the reporting of casualties and any other category in which Congress intended the Coast Guard to be the sole source of a vessel's obligations, are within the field foreclosed from regulation by the States. See *United States* v. *Locke* and *Intertanko* v. *Locke*, 529 U.S. 89, 120 S.Ct. 1135 (March 6, 2000). Rules on testing marine personnel for drugs and alcohol fall into the category of personnel qualification and rules on carrying alcohol-testing devices fall into the category of equipping. Because the States may not regulate within these categories, this rule does not raise new preemption issues under Executive Order 13132.

*F. Unfunded Mandates Reform Act*

The Unfunded Mandates Reform Act of 1995 (UMRA) (2 U.S.C. 1531–1538) requires Federal agencies to assess the effects of their discretionary regulatory actions. In particular, UMRA addresses actions that may result in the expenditure by a State, local, or tribal government, in the aggregate, or by the

private sector of $100,000,000 or more in any one year. Though this rule will not result in such an expenditure, we do discuss the effects of this rule elsewhere in this preamble.

*G. Taking of Private Property*

This rule will not affect a taking of private property or otherwise have taking implications under Executive Order 12630, Governmental Actions and Interference with Constitutionally Protected Property Rights.

*H. Civil Justice Reform*

This rule meets applicable standards in sections 3(a) and 3(b)(2) of Executive Order 12988, Civil Justice Reform, to minimize litigation, eliminate ambiguity, and reduce burden.

*I. Protection of Children*

We have analyzed this rule under Executive Order 13045, Protection of Children from Environmental Health Risks and Safety Risks. This rule is not an economically significant rule and does not create an environmental risk to health or risk to safety that may disproportionately affect children.

*J. Indian Tribal Governments*

This rule does not have tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it does not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

*K. Energy Effects*

We have analyzed this rule under Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use. Although this rulemaking has been determined to be a ''significant regulatory action'' under Executive Order 12866, we have determined that it is not a ''significant energy action'' under that order because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. The Administrator of the Office of Information and Regulatory Affairs has not designated it as a significant energy action. Therefore, it does not require a Statement of Energy Effects under Executive Order 13211.

*L. Technical Standards*

The National Technology Transfer and Advancement Act (NTTAA) (15 U.S.C. 272 note) directs agencies to use voluntary consensus standards in their regulatory activities unless the agency provides Congress, through the Office of Management and Budget, with an explanation of why using these standards would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (e.g., specifications of materials, performance, design, or operation; test methods; sampling procedures; and related management systems practices) that are developed or adopted by voluntary consensus standards bodies.

This rule does not use technical standards. Therefore, we did not consider the use of voluntary consensus standards.

*M. Environment*

We have analyzed this rule under Commandant Instruction M16475.1D, which guides the Coast Guard in complying with the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321–4370f), and have concluded that there are no factors in this case that would limit the use of a categorical exclusion under section 2.B.2 of the Instruction. Therefore, this rule is categorically excluded from further environmental documentation under figure 2–1, paragraph (34)(a) and (c) of the Instruction. This final rule establishes testing procedures which are administrative in nature and could be used in disciplining maritime personnel. An ''Environmental Analysis Check List'' and a ''Categorical Exclusion Determination'' are available in the docket where indicated under **ADDRESSES.**

**List of Subjects in 46 CFR Part 4**

Administrative practice and procedure, Alcohol abuse, Drug abuse, Drug testing, Investigations, Marine safety, National Transportation Safety Board, Reporting and recordkeeping requirements, Safety, Transportation.

**Regulatory Text**

■ For the reasons discussed in the preamble, the Coast Guard amends 46 CFR part 4 as follows:

**PART 4—MARINE CASUALTIES AND INVESTIGATIONS**

■ 1. The authority citation for part 4 is revised to read as follows:

**Authority:** 33 U.S.C. 1231; 43 U.S.C. 1333; 46 U.S.C. 2103, 2303a, 2306, 6101, 6301, and 6305; 50 U.S.C. 198; Department of Homeland Security Delegation No. 0170.1. Subpart 4.40 issued under 49 U.S.C. 1903(a)(1)(E).

■ 2. In § 4.06–1, in paragraph (b), at the end of the sentence, add the phrase ''as required in this part'' and revise paragraphs (c) and (d) to read as follows:

**§ 4.06–1   Responsibilities of the marine employer.**

\*   \*   \*   \*   \*

(c) The marine employer determines which individuals are directly involved in a serious marine incident (SMI). A law enforcement officer may determine that additional individuals are directly involved in the SMI. In these cases, the marine employer must take all practical steps to have these additional individuals tested according to this part.

(d) The requirements of this subpart do not prevent personnel who are required to be tested from performing duties in the aftermath of an SMI when their performance is necessary to respond to safety concerns directly related to the incident.

\*   \*   \*   \*   \*

■ 3. Add § 4.06–3 to read as follows:

**§ 4.06–3   Requirements for alcohol and drug testing following a serious marine incident.**

When a marine employer determines that a casualty or incident is, or is likely to become, an SMI, the marine employer must ensure that the following alcohol and drug testing is conducted:

(a) *Alcohol testing.* (1) Alcohol testing must be conducted on each individual engaged or employed on board the vessel who is directly involved in the SMI.

(i) The alcohol testing of each individual must be conducted within 2 hours of when the SMI occurred, unless precluded by safety concerns directly related to the incident.

(ii) If safety concerns directly related to the SMI prevent the alcohol testing from being conducted within 2 hours of the occurrence of the incident, then alcohol testing must be completed as soon as the safety concerns are addressed.

(iii) Alcohol testing is not required to be conducted more than 8 hours after the occurrence of the SMI.

(2) Alcohol-testing devices must be used according to the procedures specified by the manufacturer of the testing device and by this part.

(3) If the alcohol testing required in paragraphs (a)(1)(i) and (a)(1)(ii) of this section is not conducted, the marine employer must document on form CG–2692B the reason why the testing was not conducted.

(4) The marine employer may use alcohol-testing results from tests conducted by Coast Guard or local law enforcement personnel to satisfy the alcohol testing requirements of this part

only if the alcohol testing meets all of the requirements of this part.

(b) *Drug testing.* (1) Drug testing must be conducted on each individual engaged or employed on board the vessel who is directly involved in the SMI.

(i) The collection of drug-test specimens of each individual must be conducted within 32 hours of when the SMI occurred, unless precluded by safety concerns directly related to the incident.

(ii) If safety concerns directly related to the SMI prevent the collection of drug-test specimens from being conducted within 32 hours of the occurrence of the incident, then the collection of drug-test specimens must be conducted as soon as the safety concerns are addressed.

(2) If the drug-test specimens required in paragraphs (b)(1)(i) and (b)(1)(ii) of this section were not collected, the marine employer must document on form CG–2692B the reason why the specimens were not collected.

■ 4. Revise § 4.06–5 to read as follows:

### § 4.06–5 Responsibility of individuals directly involved in serious marine incidents.

(a) Any individual engaged or employed on board a vessel who is determined to be directly involved in an SMI must provide a blood, breath, saliva, or urine specimen for chemical testing when directed to do so by the marine employer or a law enforcement officer.

(b) If the individual refuses to provide a blood, breath, saliva, or urine specimen, this refusal must be noted on form CG–2692B and in the vessel's official log book, if a log book is required. The marine employer must remove the individual as soon as practical from duties that directly affect the safe operation of the vessel.

(c) Individuals subject to alcohol testing after an SMI are prohibited from consuming alcohol beverages for 8 hours following the occurrence of the SMI or until after the alcohol testing required by this part is completed.

(d) No individual may be compelled to provide specimens for alcohol and drug testing required by this part. However, refusal to provide specimens is a violation of this subpart and may subject the individual to suspension and revocation proceedings under part 5 of this chapter, a civil penalty, or both.

### § 4.06–10 [Removed]

■ 5. Remove § 4.06–10.

■ 6. Add § 4.06–15 to read as follows:

### § 4.06–15 Accessibility of chemical testing devices.

(a) *Alcohol testing.* (1) The marine employer must have a sufficient number of alcohol testing devices readily accessible on board the vessel to determine the presence of alcohol in the system of each individual who was directly involved in the SMI.

(2) All alcohol testing devices used to meet the requirements of this part must be currently listed on either the Conforming Products List (CPL) titled ''Modal Specifications for Devices To Measure Breath Alcohol'' or ''Conforming Products List of Screening Devices To Measure Alcohol in Bodily Fluids,'' which are published periodically in the **Federal Register** by National Highway Traffic Safety Administration (NHTSA).

(3) The alcohol testing devices need not be carried on board each vessel if obtaining the devices and conducting the required alcohol tests can be accomplished within 2 hours from the time of occurrence of the SMI.

(b) *Drug testing.* (1) The marine employer must have a sufficient number of urine-specimen collection and shipping kits meeting the requirements of 49 CFR part 40 that are readily accessible for use following SMIs.

(2) The specimen collection and shipping kits need not be carried on board each vessel if obtaining the kits and collecting the specimen can be completed within 32 hours from the time of the occurrence of the SMI.

■ 7. Revise § 4.06–20 to read as follows:

### § 4.06–20 Specimen collection requirements.

(a) *Alcohol testing.* (1) When conducting alcohol testing required in § 4.06–3(a), an individual determined under this part to be directly involved in the SMI must provide a specimen of their breath, blood, or saliva to the marine employer as required in this subpart.

(2) Collection of an individual's blood to comply with § 4.06–3(a) must be taken only by qualified medical personnel.

(3) Collection of an individual's saliva or breath to comply with § 4.06–3(a) must be taken only by personnel trained to operate the alcohol-testing device in use and must be conducted according to this subpart.

(b) *Drug testing.* (1) When conducting drug testing required in § 4.06–3(b), an individual determined under this part to be directly involved in the SMI must provide a specimen of their urine according to 46 CFR part 16 and 49 CFR part 40.

(2) Specimen collection and shipping kits used to conduct drug testing must be used according to 49 CFR part 40.

■ 8. Add § 4.06–70 to read as follows:

### § 4.06–70 Penalties.

Violation of this part is subject to the civil penalties set forth in 46 U.S.C. 2115.

Dated: December 15, 2005.

**Thomas H. Collins,**

*Admiral, U.S. Coast Guard Commandant.*

[FR Doc. 05–24375 Filed 12–21–05; 8:45 am]

**BILLING CODE 4910–15–P**

---

# DEPARTMENT OF TRANSPORTATION

## National Highway Traffic Safety Administration

### 49 CFR Part 571

[DOT Docket No. NHTSA–05–23407]

RIN 2127–AJ74

### Federal Motor Vehicle Safety Standards; Transmission Shift Position Sequence, Starter Interlock, and Transmission Braking Effect

**AGENCY:** National Highway Traffic Safety Administration (NHTSA), DOT.

**ACTION:** Final rule; response to petitions for reconsideration; delay of effective date.

---

**SUMMARY:** This document responds to petitions for reconsideration of a final rule published on July 1, 2005, which amended the Federal motor vehicle safety standard that includes starter interlock requirements. The final rule announced an effective date of December 28, 2005. NHTSA received petitions for reconsideration from General Motors (GM) requesting a delay in the effective date in the final rule, and a petition from International Truck and Engine Corporation (ITEC) requesting an amendment that addresses hybrid electric systems on trucks with a gross vehicle weight rating over 4,536 kg (10,000 pounds).

In this final rule, NHTSA grants both of these petitions, and is amending the standard accordingly.

**DATES:** The effective date of the rule amending 49 CFR 571.102 published at 70 FR 38040, July 1, 2005, is delayed until September 1, 2007. The final rule amending 49 CFR Section 571.102 published today is effective September 1, 2007.

Optional early compliance with these final rules is available as of December 22, 2005.