## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. **05 10112 JLT** |
| | ) |
| v. | ) |
| | ) |
| THE COMMONWEALTH OF | ) |
| MASSACHUSETTS; THE MASSACHUSETTS | ) |
| DEPARTMENT OF ENVIRONMENTAL | ) |
| PROTECTION; MITT ROMNEY, in his capacity | ) |
| as Governor of Massachusetts; and ROBERT W. | ) |
| GOLLEDGE, JR., in his capacity as Commissioner | ) |
| of the Massachusetts Department of Environmental | ) |
| Protection | ) |
| | ) |
| Defendants. | ) |
| | ) |

## SAVE THE BAY'S PROPOSED MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR LEAVE TO FILE AN AMICUS BRIEF IN OPPOSITION TO THE UNITED STATES' MOTION FOR JUDGEMENT ON THE PLEADINGS

S. Paul Ryan
670 Willett Avenue
East Providence, Rhode Island 02915
Tel: 401-437-0660
Fax: 401-437-0128

Karen Augeri Benson
Law Office of Alan A. Amaral
251 Bank Street
Fall River, Massachusetts 02720
Tel: 508-676-0011
Fax: 508-676-9908

Wendy A. Waller
Save The Bay – Narragansett Bay
100 Bayview Drive
Providence, Rhode Island 02905
Tel: 401-272-3540 x122
Fax: 401-273-7153

## Table of Contents

Page

Table of Authority ……………………………………………………………………………......i

Introduction ……………………………………………………………………………………1

Background ……………………………………………………………………………....................2

Argument ……………………………………………………………………………….............3

I.      State authority to regulate the peculiarities of local waters is preserved
        if there is no conflict with Federal regulatory determinations……………………......3

II.     There is no basis for Federal preemption when local regulations neither
        frustrate the purpose nor create actual conflict with Federal regulations…..............6

III.    A "proposed" Federal regulation may not preempt an existing State
        regulation .................................................................................................................8

IV.     Existing Federal Regulations are not adequately protecting State Resources…….9

IV.     Mount Hope Bay and the Taunton River represent unique and critical
        resources which are economically, biologically and ecologically valuable to
        the State of Rhode Island and the Commonwealth of Massachusetts…………...12

Conclusion ………………………………………………………………………………………15

## Table of Authorities

Cases

*Askew v. American Waterways Operators, Inc.*, 411 U.S. 325 (1973)……………………………6

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992)………………………………………...6, 7

*Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995)………………………………………….....7

*Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992)………………………………...8

*Horn v. Thoratec Corp.*, 376 F.3d, 163 (3rd Cir. 2004)………………………………………..8

*Huron Portland Cement Co. v. City of Detroit et. al*, 362 U.S 440 (1960)………………………6

*Lorillard Tobacco Co. et al. v. Reilly, Attorney General of Mass., et al.*,
533 U.S. 525 (2001)……………………………………………………………………………7

*Medtronic, Inc. v. Lora Lohr et vir.*, 518 U.S. 470 (1996)……………………………….…..6, 7

*Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978)………………………………………….....7

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947)………………………………………...6

*United States v. Locke*, 529 U.S. 89 (2000)…………………………………………………….4, 6

*Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597 (1991)…………………………………...…8

<u>Statutes</u>

33 U.S.C §1221…………………………………………………………………..…………..………3

33 U.S.C §1223(a)……………………..…………………………………………………..……..5

33 U.S.C. §2718(c)…………………………………………………………………………..………6

46 U.S.C. §2303a…………………………………………………………………………………4

46 USC §6101(a)(5)…………………………………………………………………………..……5

M.G.L. c. 131 s. 40 (Wetlands Protection Act)…………………………………………………..…11

Act Relative to Oil Spill Prevention and Response in Buzzards By and Other Harbors
and Bays of the Commonwealth, 2004 Mass. Acts 251 (Aug. 4, 2004), as amended by
2004 Mass. Acts 457 §1 (Dec. 30, 2004)…………………………………………………...…*passim*

<u>Rules and Regulations</u>

33 CFR 95.035…………………………………………………………………………………………9

33 CFR 95.050……………………………………………………………………………….…………9

314 CMR 4.03…………………………………………………………………………….…………..11

69 Fed. Reg. 62427 (October 26, 2004)……………………………………………………...……..9

Misc

Christopher P. Mooradian, *Protecting "Sovereign Rights": The Case for Increased Coastal State Jurisdiction Over Vessel-Source Pollution in the Exclusive Economic Zone*; 82 B.U. L. Review 767, 769 (2002)...................................................................................................10

Correspondence with Leona Roach, Executive Director, Massachusetts Marine Trades Association, 155 Edgewater Drive, Pembroke, MA 02359, LSRMarine@aol.com.....................14

Correspondence with Glenn Miller, Chief, Management Services, Rhode Island Department of Environmental Management, 235 Promenade Street, Providence, RI 02908, glenn.miller@dem.ri.gov.................................................................................................................14

Daniel Georgianna, The Massachusetts Marine Economy; University of Massachusetts Dartmouth, Center for Policy Analysis; Donahue Institute, 2000.....................................10

NOAA Damage Assessment and Restoration Program, Northeast Region; Case: North Cape Oil Spill, available at <http://www.darp.noaa.gov/northeast/north_cape/index.html>...............12

Taunton River Watershed Alliance: Know Your Watershed, available at <http://www.trwaonline.org/know.html>............................................................................13

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. **05 10112 JLT** |
| | ) |
| v. | ) |
| | ) |
| THE COMMONWEALTH OF | ) |
| MASSACHUSETTS; THE MASSACHUSETTS | ) |
| DEPARTMENT OF ENVIRONMENTAL | ) |
| PROTECTION; MITT ROMNEY, in his capacity | ) |
| as Governor of Massachusetts; and ROBERT W. | ) |
| GOLLEDGE, JR., in his capacity as Commissioner | ) |
| of the Massachusetts Department of Environmental | ) |
| Protection | ) |
| | ) |
| Defendants. | ) |
| | ) |

**SAVE THE BAY'S PROPOSED MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR LEAVE TO FILE AN AMICUS BRIEF IN OPPOSITION TO
THE UNITED STATES' MOTION FOR JUDGEMENT ON THE PLEADINGS**

**Introduction**

Save The Bay – Narragansett Bay (STB) is one of Rhode Island's largest non-

profit organizations with approximately 20,000 members and supporters. The purpose of

the organization is to ensure that the environmental quality of Narragansett Bay, and its

watershed, is restored and protected from the harmful effects of human activities now and

in the future.

Mount Hope Bay is a Valued Public Trust Resource and possesses unique

characteristics that distinguish it from other coves and embayments within Narragansett

1

Bay and the region. It is an integral part of the Narragansett Bay ecosystem, providing unique habitat conditions to a wide range of fish, birds, and wildlife species. Our members and supporters appreciate the aesthetic beauty, high quality of life and numerous recreational opportunities the Bay provides. In addition to swimming and boating, many of our members also fish recreationally.  Recent estimates, according to the National Marine Fisheries Service Marine Recreational Fisheries Statistics, include over 350,000 people who fish in Rhode Island waters and over 1 million in Massachusetts waters.[1]

Residents of Massachusetts and Rhode Island enjoy the aesthetic and recreational values of this valuable estuary. Mount Hope Bay is a resource, held in trust for the benefit of the public and governed by both State and Federal law.  However, due to the unique qualities of these waters, along with corresponding shoreline and habitat, Federal preemption of the Commonwealth of Massachusetts Act Relative to Oil Spill Prevention and Response in Buzzards Bay and Other Harbors and Bays of the Commonwealth, 2004 Mass. Acts 251 (Aug. 4, 2004), as amended by 2004 Mass. Acts 457 §1 (Dec. 30, 2004) ("Oil Spill Act") is not appropriate.

*Wherefore*, Save The Bay files the within Amicus Memorandum and requests this Honorable Court deny the United State's Motion for Judgment on the Pleadings.

## Background

In 2004, the Commonwealth of Massachusetts enacted the Oil Spill Act, 2004 Mass. Acts 251 (Aug. 4, 2004), as amended by 2004 Mass. Acts 457 §1 (Dec. 30, 2004). The Act, *inter alia,* authorizes Massachusetts officials to board and inspect vessels to

---

[1] NOAA Fisheries: Office of Science and Technology, Fisheries Statistics.  Marine Recreational Fisheries Statistics Survey Query Results, available at <http://www.st.nmfs.gov> (last visited July 7, 2005).

2

investigate oil spills; creates a vessel traffic system through consultation or negotiation with the Coast Guard; and creates an Oil Spill Prevention and Response Fund via the levying of maritime fees. See, 2004 Mass. Acts 251.

The Act also includes provisions that would affect design, construction, training and equipment requirements on tugboats; tug escort requirements; crew dug and alcohol testing requirements; manning requirements on tugs and tows carrying oil; a design restriction prohibiting single-hulled vessels; indirect regulation of vessel design, equipping and contents; and a requirement that vessels take on Massachusetts-licensed pilots. See, 2004 Mass. Acts 251 (Aug. 5, 2004), as amended by 2004 Mass. Act 457 §1 (Dec. 30, 2004).

#### Argument

### I.    State authority to regulate the peculiarities of local waters is preserved if there is no conflict with Federal regulatory determinations.

The Ports and Waterways Safety Act, 33 USC §1221 et seq., as amended by the Port and Tanker Safety Act of 1978 (together the "PWSA"), focuses on preventing accidental oil pollution through more stringent standards in ship design, construction and operation. The PWSA declares that navigation and vessel safety, protection of marine environment, and safety and security of United States ports and waterways are matters of major national importance, requiring adequate protective measures.

Under Title I of the PWSA, the Coast Guard is given broad powers to control the movement of vessels in ports and areas where hazardous conditions exist. The Coast Guard may establish and require compliance of vessel traffic control systems. Such controls include vessel routing plans, vessel size, speed limits, operating conditions and restricting operating in hazardous areas to vessels with particular characteristics and

3

capabilities necessary for safe operations. Denial of entry into United States ports is also authorized for vessels with histories of accidents or pollution incidents, inadequately trained crews and vessels that fail to meet traffic systems or design specifications. When considering whether State regulation is appropriate in areas governed by Title I of the PWSA, the Court must first look to whether the Coast Guard has issued regulations on the subject or after review decided there need not be any regulations. State authority to regulate the peculiarities of local waters is preserved if there is no conflict with Federal regulatory determinations. See, *United States v. Locke*, 529 U.S 89, 110 (2000). According to the Supreme Court, the State rule [may] be justified by, and directed to, "local circumstances and problems, such as water depth and narrowness, idiosyncratic to a particular port or waterway". *Id.* at 109.

Title II of the Act addresses bulk cargo vessels that carry oil or other inflammable or hazardous substances. The Secretary of Transportation was directed to establish additional rules and regulations for vessel design, construction, alteration, repair, maintenance and operation in order to prevent and/or mitigate damage to the marine environment. A special mandate addresses regulations to reduce possibilities of collisions and groundings and minimizing cargo losses after accidents.

In this case, it is possible for the vessels to comply with the Oil Spill Act. The State law clearly does not frustrate Federal regulations, but makes them stronger. For example, Section 11 of the Mass Act, *codified at* M.G.L. 21M §3, establishes a two-hour drug and alcohol testing requirement for mariners after a serious marine incident, which echoes the provisions contained in Title 46 U.S.C. §2303a. The Oil Spill Act references this Federal regulatory provision and is clearly not inconsistent.

4

STB understands the importance for a consistent Federal approach to such regulations as would affect commerce; however, when the Commonwealth enacted this law, it sought to protect valuable natural resources not being adequately protected by the existing Federal Regulatory scheme. The Massachusetts Declaration of Rights explicitly recognizes the rights of all citizens of the Commonwealth to have these resources preserved.

> 'The people shall have the right to clean air and water, freedom from excessive and unnecessary noise, and the natural, scenic, historic, and esthetic qualities of their environment; and the protection of the people in their right to the conservation, development and utilization of the agricultural, mineral, forest, water, air and other natural resources is hereby declared to be a public purpose.' See, MA Const. art. XCVII.

The Oil Spill Act protects the environmental resources of the Commonwealth of Massachusetts in a manner also not addressed in the Oil Pollution Act ("OPA") of 1990. The Federal regulation does not adequately protect Massachusetts environmental resources. Save the Bay does not dispute the authority of the Federal Government to enact measures to control vessel traffic. Save the Bay does note that under Title I of 33 USC §1223(a) the Coast Guard *may* enact measures for controlling vessel traffic or for protecting navigation and the marine environment, but is not required to do so. (Emphasis added) Further, Title I, captioned "Oil Pollution Liability, and Compensation" imposes liability for both removal costs and damages. Title IV instructs the Coast Guard to require *reporting* of marine casualties resulting in a significant harm to the environment. See, 46 USC 6101(a)(5) (1994). By incremental dates specified in the act, all covered tankers must have a double hull.

The saving clause of OPA permits states to impose liability or requirements relating to the discharge or substantial threats of a discharge of oil. See, 33 USC

5

§2718(c). The Supreme Court has upheld State laws imposing liability for pollution caused by oil spills. See, *Askew v. American Waterways Operators, Inc.*, 411 U.S. 325 (1973) (upholding the Constitutionality of a Florida oil pollution liability statute). Justice Douglas described oil spillage as "an insidious form of pollution of vast concern to every coastal city or port and to all the estuaries on which the life of the ocean and lives of the coastal people are greatly dependent". *Id.* at 328-9. The Court specifically states in *Locke* "Our view of OPA's saving clauses preserves this important role for the States". See, *Locke,* 529 U.S. at 106.

## II.  There is no basis for Federal preemption when local regulations neither frustrate the purpose nor create actual conflict with Federal regulations.

Our interpretation of the Federal statutes is informed by two presumptions iterated by the Supreme Court in *Medtronic, Inc. v. Lora Lohr et vir*, 518 U.S. 470 (1996). First, we address claims of preemption beginning with the presumption that Congress did not intend to supplant State law. *Id.* Where, as is the case here, the State regulates in an area where there is no history of significant Federal presence, *Locke*, 529 U.S. at 108, we assume that the "historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The Supreme Court expressed a State exercising its police power "may act in many areas of interstate commerce and maritime activities, concurrently with the Federal government." See, *Huron Portland Cement Co. v. City of Detroit et. al.*, 362 U.S 440, 442 (1960). Any understanding of a preemption statute's scope rests primarily on "a fair understanding of congressional purpose". *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992). This presumption against preemption, leads us to the principle that express preemption

6

statutory provisions should be given a narrow interpretation. *Id.*; *Cipollone*, 505 U.S. at 518.

Second, our analysis of the scope of the statute's preemption is guided by the Supreme Court's oft-stated comment that "the purpose of Congress is the ultimate touchstone in every preemption case." *Medtronic*, 518 U.S. at 485. "As a result, any understanding of the scope of a preemption statute must rest primarily on 'a fair understanding of congressional purpose.'" *Id.* at 485-86 (quoting *Cipollone*, 505 U.S. at 530) (emphasis omitted). State regulation of primary conduct in the maritime realm is not automatically forbidden. See, *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 179-180 (1978).

Also relevant to our interpretation of the scope of the instant statute's preemption are the "structure and purpose of the statute as a whole, as revealed not only in the text, but through [our] reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." Here, unlike *Lorillard Tobacco Co. et al. v. Reilly, Attorney General of Massachusetts, et al.*, 533 U.S. 525 (2001), no express preemption provision exists; therefore we must examine implied preemption.

Implied preemption can exist in either of two situations: (1) when Congress intended Federal law to occupy an entire field of law exclusively ("field preemption"), or (2) when State law actually conflicts with Federal law ("conflict preemption"). *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995). Conflict preemption can in turn be shown in two ways: (1) it is impossible for a party to comply with both Federal and

7

State requirements, or (2) the State law frustrates Congressional intent. *Horn v. Thoratec Corp.*, 376 F.3d, 163, 185 (3rd Cir. 2004).

The Supreme Court has also held that where no express preemption of State law exists, and Congress does not occupy the field, a State law shall yield when there is a conflict between Federal and State law. See, *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992).

Here, the Oil Spill Act does not conflict with either the PWSA or OPA. In 1991, the Supreme Court found no basis for Federal preemption where they could "discern no actual conflict either between FIFRA and the [local] ordinance ... or between FIFRA and local regulation generally." See, *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 614 (1991). It went on to also observe that,

> There is no indication that any coordination which the statute seeks to promote extends beyond the matters which it deals, or does so strongly enough to compel the conclusion that an independently enacted ordinance that falls outside the statute's reach frustrates its purpose. *Id*.

## III. A "proposed" Federal regulation may not preempt an existing State regulation.

The United States Coast Guard is not able to enforce existing environmental regulations. Since the enactment of the Department of Home Land Security Rules, the mandate of the Coast Guard has changed. As a result of the new mandate the Coast Guard is no longer promulgating environmental regulations and must focus on Home Land Security, safety, and fighting terrorism, protection of the environment is no longer a priority. Regulations for protecting the environment may be on the books, but since 9/11 they are being enforced largely by State Agencies.

The Plaintiff's argument asserts, in relevant part that, "if the Coast Guard promulgates the tugboat escort requirement for Buzzard's Bay that it is considering, it would not (sic) do nothing to save the preempted Mass. Act tug escort provision: there would remain a conflict between Federal and State law on the subject and the State law would remain preempted and void." Citations omitted. Plaintiff's Memo, page 23, fn 21.

A reading of the Federal Register summary, at 69 Fed. Reg. 62427 (October 26, 2004), indicates that the Coast Guard is *considering* amending the existing Regulated Navigation Area to require additional safety measures within Buzzard's Bay. The proposed amendments have not been enacted. Defendant submits that it would be practically impossible for a Federal "proposed" regulation to preempt an existing State one.

Similarly, in the area of Drug and Alcohol testing Plaintiff asserts that the "Coast Guard already provides for drug and alcohol testing via part 33 C.F.R. Part 9[5]"
That regulation provides for a law enforcement officer or marine employer to direct an individual to undergo a chemical test when reasonable cause exists. See, 33 CFR 95.035 and the 33 CFR 95.050. The latter section delegates responsibility for compliance to the marine employer, not the Coast Guard. As for the proposed Federal Rule for two-hour testing; the comment period closed two years ago, in June of 2003 and the proposed rule has yet to be enacted.

## IV. Existing Federal Regulations are not adequately protecting State resources.

The accidental or deliberate discharge of oil into coastal areas or ocean waters may have complex and devastating environmental and economic consequences. Fisheries, marine mammals, seabirds, and other forms of aquatic life are likely to be

9

destroyed or seriously damaged, impacting beach tourism and local fishing industries. Coastal businesses and their employees may be financially ruined by the economic losses associated with the loss of tourist trade from fouled beaches and a collapsed fishing industry. In 1997, the Massachusetts marine economy generated 81,808 jobs and nearly $1.9 billion in wage and salary earnings.[2]  During that same time period, recreational fishing and boating in the Commonwealth had an impressive economic impact of $425 million and $120 million respectively.[3]

The Commonwealth of Massachusetts has a vested interest in ensuring all vessels traveling in its waters comply with comprehensive environmental and safety protection standards. The efforts included in the Oil Spill Act, such as vessel design, manning and crew training requirements, are designed to reduce the likelihood of accidents as well as minimizing the environmental damage when such accidents do occur.[4]  Protection of the environment is a subject that the Commonwealth has traditionally regulated.

Massachusetts General Law Chapter 91, adopted in 1866, protects the public's interest in waterways of the Commonwealth. It ensures that public rights to fish, fowl and navigate are not unreasonably restricted and that unsafe or hazardous structures are repaired or removed. Other examples of where the Commonwealth has traditionally regulated and

---

[2]Daniel Georgianna, *The Massachusetts Marine Economy*; University of Massachusetts Dartmouth, Center for Policy Analysis; Donahue Institute, 2000. p. 1.
The marine economy includes commercial seafood, marine transportation, tourism and recreation, marine technology and education, and coastal construction and real estate.
[3] *Id.* at 25-26.
[4] Christopher P. Mooradian, *Protecting "Sovereign Rights": The Case for Increased Coastal State Jurisdiction Over Vessel-Source Pollution in the Exclusive Economic Zone*; 82 B.U. L. Review 767, 769 (2002).

not been deemed preempted by Federal law are Massachusetts Coastal Zone
Management[5], Public Trust[6], water designation[7] and wetlands regulation[8].

Existing Federal navigation regulations are not sufficient to protect Mount Hope
Bay and the Taunton River from oil spills from single hulled barges. Barges and other
tank vessels presently call at the Port of Fall River, and at the Brayton Point Power
Station in Somerset. All of these vessels must transit approximately 20 nautical miles of
the Narragansett Bay and Rhode Island waters before entering Massachusetts.

The specific route that tank vessels must pass to enter Mount Hope Bay and the
Taunton is unique in both its geography and in the natural resources it encompasses. It
includes numerous hazards to navigation including narrow, congested waterways, reefs,
rocky shoals, sandbars and other artificial structures including the Newport, Mount Hope,
Sakonnet, Braga, and Brightman Street bridges.

Local pilotage requirements help reduce the risk of spills and The United States
Coast Guard Marine Safety Office in Providence does an excellent job managing
commercial traffic through a Regulated Navigation Area, and in responding to casualties
within Narragansett Bay. Unfortunately, these efforts have not been effective in
preventing the types of major oil spills we have suffered in this region in recent years.

---

[5] Since the late 1970s, the Commonwealth has made a concerted effort to protect Designated Port Areas (DPAs) that can accommodate and tend to have historically accommodated maritime industries and uses, such as fishing or shipping. DPAs generally have certain features that make them able to accommodate maritime industries. Among these features are sufficiently deep channels, developed transportation links and utility services. There are 11 Designated Port Areas in Massachusetts that are governed by regulations, administered by Massachusetts Coastal Zone Management and the DEP Waterways Regulation Program that promotes water-dependent uses.

[6] Commonwealth tidelands are held in trust by the State for the public. They include all land seaward of mean low water. Private tidelands are considered the area between mean low and mean high tide. Even though they may be privately owned, private tidelands are subject to the Public Trust Doctrine, whereby the public retains the rights to fish, fowl and navigate in this so-called "intertidal zone."

[7] See, 314 CMR 4.03.

[8] See, MGL c. 131 s. 40 (Wetlands Protection Act)

11

In 1996, the single-hulled barge North Cape ran aground in Rhode Island Sound after fire disabled its tug. The grounded barge spilled an estimated 828,000 gallons of fuel oil, forming a sheen over 250 square miles of coastal waters.[9] The spill killed an estimated twelve million lobsters, more than 300 federally protected seabirds, and innumerable other marine animals devastating the environment and coastal economy.

In 1999 another barge (that was double-bottomed but was not double-sided) was punctured in a collision with its own tug resulting in an estimated 14,000 gallons spilled into Narragansett Bay. Luckily, in that case, a favorable wind pushed most of the oil onto a sea-walled shoreline. A quick, effective response by the Coast Guard and STB volunteers prevented that spill from causing serious long-term damage.

The Buzzard's Bay spill of 2003 is yet another example of a spill from a single-hulled barge that could have been prevented by either a double-hull or any of the other reasonable and practicable safety measures in the Massachusetts law.

Save The Bay fully supported and endorsed the recommendations of the 1997 Regional Risk Assessment Team or RRAT. This report culminated in an agreement between the American Waterways Operators, coastal States of USCG District 1 (from Maine to New Jersey).

## V.    Mount Hope Bay and the Taunton River represent unique and critical resources which are economically, biologically and ecologically valuable to the State of Rhode Island and the Commonwealth of Massachusetts.

Historically, the Mount Hope Bay/Taunton River watershed has been a biologically significant nursery area for many species of fish found throughout Narragansett Bay and Rhode Island Sound. This area is one of the main breeding

---

[9] NOAA Damage Assessment and Restoration Program, Northeast Region; Case: North Cape Oil Spill, available at <http://www.darp.noaa.gov/northeast/north_cape/index.html> (last visited July 14, 2005).

12

grounds for commercially harvested fish in Narragansett Bay. At one time Mount Hope Bay was one of the most productive estuaries in the northeast. [10] Narragansett Bay, as a whole, has one of the highest populations of anadromous fish such as alewives, herring and sturgeon. Mount Hope Bay is a shallow estuary with high freshwater input and is suitable for designation as essential fish habitat under the Federal Sustainable Fisheries Act. It is classified under both Rhode Island and Massachusetts law as "Class SA and SB waters" which are by definition suitable for swimming, recreational activities, shellfish harvesting, fishing, aquacultural uses and fish and wildlife habitat. See, 314 CMR 4.03. The area is particularly vulnerable to damage from oil spills because of the geography. It is narrow, with limited water exchange, trapping the oil and causing shallow portions of the Bay and River to be highly contaminated.

The Taunton and Mount Hope Bay are really part of the same body of water and form the northeast reach of Narragansett Bay. They are ecologically connected in addition to sharing the same Federal navigation channel.

The Taunton River in Southeast Massachusetts is a primary tributary to Narragansett Bay and is the last tidal and free-flowing river of its kind in the region. It flows over 40 miles without any dams and forms an estuary with Mount Hope Bay, the Sakonnet River, and Narragansett Bay's East Passage. It provides unique and varied habitat for more than 154 species of birds, 29 native fish species, and a diverse assemblage of largely undisturbed plant communities.[11] The river is home to 68 threatened and endangered species, including Atlantic and shortnosed sturgeon, river

---

[10] Brayton Point Permit Modification Hearing Memorandum dated July 2, 1976, citing testimony for Brayton Point Power provided by Dr. George Mathieson of Marine Research, Inc.
[11] Taunton River Watershed Alliance: Know Your Watershed, available at
<http://www.trwaonline.org/know.html> (last visited July 14, 2005).

13

otters, harbor seals, and bald eagles. It is an environmentally sensitive and ecologically valuable resource for many communities.

Save The Bay is a member of a committee formed to study the Taunton River as a potential candidate for designation as a Wild and Scenic River by the National Park Service. The Taunton River joins Mount Hope Bay at Brayton Point, and is considered part of the same ecological complex. The Taunton is perhaps the most diverse and intact coastal riverine ecosystem in all of southern New England. The Taunton is the only major coastal river in the region that is without a dam or obstruction over its entire length. The width of undisturbed river corridor along the upper Taunton and its primary tributaries ranges from approximately 2,000 feet to over one mile for approximately twenty-two meandering miles - an extraordinarily wild river in eastern Massachusetts. The river corridor's mix of large woodland areas (largely devoid of non-native species), vast tidal and non-tidal wetlands, and edge habitats, related to nearly 2,000 acres of prime agricultural land provides extraordinarily rich habitat diversity for a wide range of species.

In addition to its ecological value and diversity, Mount Hope Bay hosts a wide diversity of public uses. It supports a valuable recreational and commercial fishing industry, as well as direct-contact recreational activities such as sailing, powerboating, water-skiing, shellfishing, and other activities. In 2004, there were approximately 42,000 registered boats in Rhode Island[12] and 156,000 motorboats in Massachusetts[13]. Also

---

[12] This information was obtained through email correspondence with Glenn Miller, Chief, Management Services, Rhode Island Department of Environmental Management, 235 Promenade Street, Providence, RI 02908, glenn.miller@dem.ri.gov on July 12, 2005.

[13] According to the Massachusetts Office of Environmental Police, in 2004 there were approximately 156,000 vessels registered with the Commonwealth of MA. This figure does not include "muscle propelled" vessels e.g., canoes, kayaks, non motorized sailboats which are not statutorily required to be registered. It does however include personal water crafts (also known as PWCs). Also not included in the

14

contributing to the congestion are passenger ferries and commercial goods transport. The
many competing uses within a narrow channel with rocks and islands make navigation
difficult and hazardous.

The lands surrounding the Bay are becoming an increasingly attractive place to
live, with property values on the waterfront in Bristol County, Massachusetts and Rhode
Island are soaring. As a cultural and recreational resource, the Bay is one of the most
important in the region.

Federal preemption of The Commonwealth's regulations promulgated in the Oil
Spill Act is not appropriate given the unique peculiarities of the subject waters. Mount
Hope Bay and the Taunton River represent unique and critical resources which are
priceless, both economically and ecologically, requiring consistent and stronger
protection than the Federal regulations offer.

## Conclusion

For the foregoing reasons and such further and other argument as petitioners may
present at hearing, STB requests this Honorable Court deny the United State's Motion for
Judgment on the Pleadings.

---

state registration figures are those recreational vessels which are documented with the USCG.
Massachusetts Marine Trades Association estimates USCG documented vessels in MA to be approximately
an additional 30,000.   See also, http://www.mass.gov/dfwele/dle/elereg.htm.
This information was obtained through email correspondence with Leona Roach, Executive Director,
Massachusetts Marine Trades Association, 155 Edgewater Drive, Pembroke, MA 02359,
LSRMarine@aol.com on 7/13/05.

Respectfully submitted,

Save The Bay,
Amicus Curiae
By its attorneys,

S. Paul Ryan (BBO #436220)
670 Willett Avenue
East Providence, Rhode Island 02915
Tel: 401-437-0660
Fax: 401-437-0128

Wendy A. Waller (BBO #657208)
Save The Bay – Narragansett Bay
100 Bayview Drive
Providence, Rhode Island 02905
Tel: 401-272-3540 x122
Fax: 401-273-7153

Karen Augeri Benson (BBO #628469)
Law Office of Alan A. Amaral
251 Bank Street
Fall River, Massachusetts 02720
Tel: 508-676-0011
Fax: 508-676-9908

Dated: July 15, 2005

16