UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| AMERICAN WATERWAYS OPERATORS | * | |
| INTERNATIONAL ASSOCIATION OF | * | |
| INDEPENDENT TANK OWNERS, BIMCO, and | * | |
| CHAMBER OF SHIPPING OF AMERICA, | * | |
| | * | |
| Intervenor-Plaintiffs, | * | |
| | * | Civil Action No. 05-10112-JLT |
| v. | * | |
| | * | |
| COMMONWEALTH OF MASSACHUSETTS, | * | |
| MASSACHUSETTS DEPARTMENT OF | * | |
| ENVIRONMENTAL PROTECTION, | * | |
| GOVERNOR MITT ROMNEY, in his capacity | * | |
| as Governor of Massachusetts, ROBERT W. | * | |
| GOLLEDGE, JR., in his capacity as | * | |
| Commissioner of the Massachusetts | * | |
| Department of Environmental Protection, | * | |
| | * | |
| Defendants, | * | |
| | * | |
| COALITION FOR BUZZARDS BAY, | * | |
| | * | |
| Intervenor-Defendant. | * | |

MEMORANDUM

July 24, 2006

TAURO, J.

On April 27, 2003, the Bouchard Barge-120[1] collided with an outcropping of rocks,

spilling thousand of gallons of oil into the waters of Buzzards Bay.[2]  In response to the Bouchard

---

[1] The Bouchard Barge-120 is a tank barge equipped to carry oil.

[2] Buzzards Bay is located off the southeastern coast of Massachusetts adjacent to the westernmost portion of Cape Cod.

oil spill, the Massachusetts legislature passed a law entitled "An Act Relative to Oil Spill Prevention and Response in Buzzards Bay and Other Harbors and Bays of the Commonwealth" ("Oil Spill Prevention Act" or "OSPA").[3] The United States Government and the Intervenor-Plaintiffs[4] (collectively "Plaintiffs") challenge several provisions of the OSPA, alleging that the challenged provisions are preempted by federal law and are therefore unconstitutional. Plaintiffs, accordingly, seek a judgment declaring the challenged provisions of the OSPA invalid and a permanent injunction enjoining the Commonwealth of Massachusetts ("the Commonwealth" or "Massachusetts") from enforcing those provisions. The United States Government and the Intervenor-Plaintiffs have both moved for judgment on the pleadings. For the reasons set forth below, both the United States Government's Motion for Judgment on the Pleadings and the Intervenor-Plaintiffs' Motion for Judgment on the Pleadings are ALLOWED.

## Background

"The maritime oil transport industry presents ever-present, all too real dangers of oil spills from tanker ships, spills which could be catastrophes for the marine environment."[5] The Commonwealth of Massachusetts faces these dangers each day as numerous vessels transport oil through the Commonwealth's waterways. The Commonwealth's fears became a reality in 2003, when the abovementioned Bouchard Barge spilled about ninety-eight gallons of oil into Buzzards

---

[3] 2004 Mass. Acts 251 (Aug. 4, 2004), as amended by 2004 Mass. Acts 457 § 1 (Dec. 30, 2004).

[4] Intervenor-Plaintiffs are the American Waterways Operators, the International Association of Independent Tanker Owners, the Chamber of Shipping of America, and BIMCO. The Intervenor-Plaintiffs are four of the world's largest shipping trade associations.

[5] United States v. Locke, 529 U.S. 89, 94 (2000).

Bay.[6]  The Bouchard oil spill soiled approximately ninety miles of Buzzards Bay beaches and coastline, killed hundreds of birds and marine life, contaminated thousands of acres of shellfish beds, and seriously harmed the overall marine environment of the Bay.[7]

In August 2004, the Massachusetts legislature responded to the threat of future oil spills by passing the OSPA,[8] provisions of which are now in issue.  The OSPA created a vast scheme of rules and regulations governing vessels transporting oil in Massachusetts waters.  The Act, in relevant part, (1) prohibits vessels with certain design characteristics from docking, loading, or unloading in Massachusetts waters,[9] (2) sets forth manning and navigation watch requirements for towing vessels and tank barges,[10] (3) requires vessels carrying oil in certain Massachusetts waters to "take on and employ" a Massachusetts licensed pilot,[11] (4) requires tank vessel owners and operators to implement alcohol and drug testing policies and procedures, and to equip their vessels to carry out such testing,[12] (5) mandates tugboat escorts for tank vessels traveling in certain waters of the Commonwealth,[13] (6) requires tank vessels to follow mandatory vessel

---

[6] See Interv. Def.'s Mem. in Opp. to Pls.' Mot. for Summ. J., at 2-3.

[7] See id.

[8] See 2004 Mass. Acts 251 (Aug. 4, 2004), as amended by 2004 Mass. Acts 457 § 1 (Dec. 30, 2004).

[9] See Mass. Gen. Laws c. 21M, § 7.

[10] See id. § 4.

[11] See Mass. Gen. Laws c. 103, § 21.

[12] See Mass. Gen. Laws c. 21M, § 3.

[13] See id. § 6.

routes through Massachusetts waters,[14] and (7) requires any vessel carrying oil in Massachusetts waters to present a certificate of financial assurance to the Massachusetts Department of Environmental Protection.[15]

Plaintiffs challenge the above provisions of the OSPA on the grounds that each of them is preempted by federal law and/or federal regulations pertaining to maritime oil transportation. Plaintiffs point particularly to the preemptive effect of the Ports and Waterways Safety Act of 1972, as amended by the Port and Tanker Safety Act of 1978,[16] and the relevant regulations promulgated thereunder.  The Commonwealth of Massachusetts and the Coalition for Buzzards Bay (collectively "Defendants") oppose Plaintiffs' motion and defend the Commonwealth's power to enact and enforce the challenged provisions.

The issue at the heart of this matter is whether Congress, or the United States Coast Guard acting under its congressionally delegated authority, has either explicitly or implicitly prohibited the Commonwealth of Massachusetts from regulating the various aspects of tank vessel transportation with which the OSPA is concerned.[17]  The merits of the policies behind the relevant federal and state regulations are not at issue here.  In any case, such matters of policy are not for this court to decide.[18]

----

[14] See id. § 5.

[15] See Mass. Gen. Laws c. 21, § 50C.

[16] See 33 U.S.C. §§ 1221-1236; 46 U.S.C. §§ 3701-3719.

[17] See Ray v. Atl. Richfield Co., 435 U.S. 151, 157 (1978).

[18] See Nat'l Foreign Trade Council v. Baker, 26 F. Supp. 2d 287, 292 (D. Mass. 1998) (explaining that no matter how noble a state's interests and objectives, state rules cannot stand against concurrent or conflicting federal judgments).

## Discussion

### A.     Standard of Review

Plaintiffs bring the instant motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  "The standard for evaluating a Rule 12(c) motion for judgment on the pleadings is essentially the same as that for deciding a Rule 12(b)(6) motion [to dismiss]."[19]  The court "'must accept all of the nonmovant's well-pleaded factual averments as true, and draw all reasonable inferences in his favor.'"[20]  The court, in doing so, will award judgment on the pleadings only when it appears beyond doubt that the movants are entitled to prevail as a matter of law.[21]

### B.     General Federal Preemption Analysis

The United States Constitution creates a dual structure of government in which power is distributed to both the federal government and the various state governments.  This delicate and often controversial balance of power is commonly known as "federalism."[22]  One axiom of federalism is that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof[,] . . . shall be the supreme Law of the Land . . . any Thing in the Constitution

---

[19] Pasdon v. City of Peabody, 417 F.3d 225, 226 (1st Cir. 2005); see also Aventis Pharma Deutschland GMBH v. Cobalt Pharm., Inc., 355 F. Supp. 2d 586, 590-91 (D. Mass. 2005).

[20] Padson, 417 F.3d at 225 (citing Rivera-Gomez, 843 F.2d at 635).

[21] See Padson, 417 F.3d at 226 (citing Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988)); Aventis, 355 F. Supp. 2d at 591.

[22] See Black's Law Dictionary 627 (7th ed. 1999) (defining federalism as "[t]he relationship and distribution of power between the national and regional governments within a federal system of government").

or Laws of any State to the Contrary notwithstanding."[23]  In other words, "[a] fundamental

principle of the Constitution is that Congress has the power to preempt state law."[24]

Under the Supremacy Clause, federal action may preempt the enforcement of state laws in

three general circumstances.[25]  First, Congress may expressly preempt state action by the explicit

language of a federal enactment.[26]  Second, Congressional action may preempt state laws by

implication when the federal legislative scheme is so comprehensive and pervasive that it

manifests Congress' intention to occupy the entire field of regulation.[27]  In such a case, the

Supremacy Clause forecloses any state action in that field.[28]  This type of preemption is referred

to as "field preemption."[29]  The third area of preemption is known as "conflict preemption."[30]

Conflict preemption occurs when a state law conflicts with a federal determination on the same

---

[23] U.S. Const. art. VI, cl. 2.

[24] Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 371 (2000) (affirming the district court's holding that the Massachusetts "Burma Law" improperly invaded the federal government's exclusive power over foreign affairs).

[25] See, e.g., Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 540-41 (2001); Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 698-99 (1984).

[26] See Lorillard, 533 U.S. at 541 ("State action may be foreclosed by express language in a congressional enactment[.]"); Capital Cities, 467 U.S. at 699 (explaining that state action is preempted "when Congress, in enacting a federal statute, has expressed a clear intent to pre-empt state law").

[27] See Lorillard, 533 U.S. at 541 ("State action may be foreclosed by . . . implication from the depth and breadth of a congressional scheme that occupies the legislative field . . . ."); Capital Cities, 467 U.S. at 699 (citing Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)); see also Crosby, 530 U.S. at 372; Locke, 529 U.S. at 115.

[28] See Capital Cities, 467 U.S. at 699.

[29] See Crosby, 530 U.S. at 372 n.6.

[30] See id.; see also Lorillard, 533 U.S. at 541; Capital Cities, 467 U.S. at 699.

subject.[31]  A conflict exists "when compliance with both state and federal law is impossible," or

"when the state law 'stands as an obstacle to the accomplishment and execution of the full

purposes and objectives of Congress.'"[32]  What constitutes a sufficient obstacle is a matter for

judicial review of the substance of the federal statute, its purposes, and its intended effects.[33]

A federal agency, acting within the authority delegated to it by Congress, may similarly

preempt state and local action.[34]  A federal regulation, therefore, wields the preemptive strength

of a federal statute and, thus, may expressly or implicitly preempt state action.[35]

## C.    Federal Preemption Under the Ports and Waterways Safety Act

The preemptive effect of the Ports and Waterways Safety Act of 1972, as amended by the

Port and Tanker Safety Act of 1978, ("PWSA") is well developed.  The United States Supreme

Court has established a specific analytical structure for courts to utilize when evaluating state

---

[31] See Lorillard, 533 U.S. at 541 (citing Geier v. Am. Honda Motor Co., 529 U.S. 861, 869-74 (2000)); Crosby, 530 U.S. at 372 ("And even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute."); Capital Cities, 467 U.S. at 699.

[32] Capital Cities, 467 U.S. at 699 (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).

[33] See Crosby, 530 U.S. at 373 ("'For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed.  If the purpose of the act cannot otherwise be accomplished – if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect – the state law must yield to the regulation of Congress within the sphere of its delegated power.'" (quoting Savage v. Jones, 225 U.S. 501, 533 (1912))).

[34] See Capital Cities, 467 U.S. at 699 ("'Federal regulations have no less preemptive effect than federal statute.'" (quoting Fid. Fed. Sav. & Loan Ass'n. v. De la Cuesta, 458 U.S. 141, 153-54 (1982))); Am. Auto. Mfr. Ass'n v. Massachusetts Dep't of Envtl. Prot., 163 F.3d 74, 86 n.14 (1st Cir. 1998).

[35] See Capital Cities, 467 U.S. at 699; see also Locke, 529 U.S. at 109-10.

maritime laws challenged under the preemptive force of the PWSA.[36]

1.    **The Structure of the PWSA**

The PWSA consists of two titles, each of which regulate different, although somewhat overlapping, aspects of maritime oil tanker transportation.[37]  Title I deals generally with vessel traffic "in any port or place under the jurisdiction of the United States."[38]  Title I, more specifically, gives the United States Coast Guard[39] the authority to enact regulations "for controlling vessel traffic or for protecting navigation and the marine environment . . . ."[40]  Title I, however, does not require the Coast Guard to enact vessel traffic regulations.[41]  Rather, Title I gives the Coast Guard the discretionary authority to pass and enforce such regulations if it deems them necessary.[42]

Title II, on the other hand, expressly requires the Coast Guard to issue regulations regarding "the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning of [tank] vessels . . . ."[43]  Title II goes on to illustrate more

---

[36] See Locke, 529 U.S. at 94-117; Ray, 435 U.S. 151 (1978).

[37] See Locke, 529 U.S. at 101.

[38] 33 U.S.C. § 1223(a)(1); see Locke, 529 U.S. at 101.

[39] The PWSA speaks directly to the Secretary of Homeland Security, who has delegated his authority, under the PWSA, to the Coast Guard, which falls under the purview of the Department of Homeland Security.  Before the creation of the Department of Homeland Security, the Coast Guard operated under the Department of Transportation.

[40] Locke, 529 U.S. at 101 (citing 33 U.S.C. § 1223(a)(1)).

[41] Id.

[42] Id.

[43] 46 U.S.C. § 3703(a); see also Locke, 529 U.S. at 101.

specific areas in which the Coast Guard must act.[44]  These include "hulls,"[45] "equipment and appliances for life saving, fire protection, and prevention and mitigation of damage to the marine environment,"[46] and "the manning of vessels and the duties, qualifications, and training of the officers and crew."[47]

### 2.    Preemption Analysis Under the PWSA

The two titles of the PWSA preclude the enforcement of state laws under two different modes of analysis.[48]  Under Title II of the PWSA, the appropriate preemption analysis is one of field preemption.[49]  Title II dictates that "only the Federal government may regulate the 'design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning' of tanker vessels."[50]  Congress, therefore, "has left no room for state regulation of these matters."[51]  The proper inquiry under Title II is whether the state law at issue regulates in an area governed by Title II of the PWSA.[52]  If the state law intrudes into the comprehensive sphere of

---

[44] 46 U.S.C. §§ 3703(a)(1)-(7).

[45] Id. § 3703(a)(1).

[46] Id. § 3703(a)(3).

[47] Id. § 3703(a)(4).

[48] Locke, 529 U.S. at 101.

[49] Id. at 110-11; Ray, 435 U.S. at 168.

[50] Locke, 529 U.S. at 110-11; Ray, 435 U.S. at 168 ("Title II leaves no room for the States to impose different or stricter design requirements than those which Congress has enacted . . . .  A state law in this area . . . would frustrate the congressional desire of achieving uniform, international standards").

[51] Locke, 529 U.S. at 111.

[52] See id. at 110-11.

Title II it is preempted and unconstitutional.[53]  Title II field preemption analysis proceeds on the

rationale that Congress intended Title II of the PWSA to create a uniform national scheme of tank

vessel regulation.[54]  Congress, in enacting Title II of the PWSA, intended the United States "to

speak with one voice" on the matters covered therein.[55]

When, however, states attempt to regulate subjects covered under Title I, the proper

preemption analysis is one of conflict preemption.[56]  The relevant inquiry is whether (1) the Coast

Guard has (a) adopted regulations on the subject the State seeks to regulate or (b) determined

that regulation is unnecessary or inappropriate, and (2) the challenged State regulation is "directed

to local circumstances and problems . . . idiosyncratic to a particular port or waterway."[57]  Under

Title I, a State may enact rules directed at local waterway issues, but only if those rules do not

conflict with a federal determination on the subject.[58]

A conflict occurs "when compliance with both state and federal law is impossible, or when

state law stands as an obstacle to the accomplishment and execution of the full purposes and

---

[53] See id.

[54] Id. at 111 ("'[T]he Supremacy Clause dictates that the federal judgment that a vessel is safe to navigate United States waters prevail over the contrary state judgment.  Enforcement of the state requirements would at least frustrate what seems to us to be the evident congressional intention to establish a uniform federal regime controlling the design of oil tankers.'" (quoting Ray, 435 U.S. at 165)); Ray, 435 U.S. at 166-67.

[55] Ray, 435 U.S. at 166.

[56] See Locke, 529 U.S. at 109-10.

[57] Id. at 109; Ray, 435 U.S. at 171.

[58] See Locke, 529 U.S. at 109; Ray, 435 U.S. at 171.

objective[s] of Congress."[59]  State regulations that supplement or even mirror federal

requirements are not shielded from preemption.[60]  In such cases, "[t]he appropriate inquiry still

remains whether the purposes and objectives of the federal statutes, including the intent to

establish a workable, uniform system, are consistent with concurrent state regulation."[61]

    Title I preemption analysis rests, in part, on the recognition of the "important role for

States and localities in the regulation of the Nation's waterways and ports."[62]  The United States

Supreme Court, however, has explained that "even in the context of a regulation related to local

waters, a federal official with an overview of all possible ramifications of a particular requirement

might be in the best position to balance all the competing interests."[63]  As such, the Court has

twice held that States have authority under Title I to regulate the peculiarities of local waters *only*

in the absence of a conflicting federal regulatory determination.[64]

    The scope of the two titles of the PWSA may, in some cases, overlap, which "may make it

difficult to determine whether a pre-emption question is controlled by conflict pre-emption

principles, applicable generally to Title I, or by field pre-emption rules, applicable generally to

---

    [59] Locke, 529 U.S. at 109 (internal quotations and citations omitted).

    [60] Id. at 115.

    [61] Id. ("'When Congress has taken the particular subject-matter in hand coincidence is as ineffective as opposition and a state law is not to be declared a help because it attempts to go further than Congress has seen fit to go.'"  (quoting Charleston & W. Carolina R. Co. v. Varnville Furniture Co., 237 U.S. 597, 604 (1915) (Holmes, J.))).

    [62] Id. at 109 (citing Cooley v. Bd. of Wardens, 12 How. 299, 319 (U.S. 1852)).

    [63] Id. at 110 (citing Ray, 435 U.S. at 177).

    [64] Locke, 529 U.S. at 110; Ray, 435 U.S. at 168.

Title II."[65]  The terms used to define the scope of Title II are quite broad.[66]  The Supreme Court, however, has specifically "declined to resolve every question by the greater pre-emptive force of Title II."[67]  The Court, instead, has laid out useful considerations to guide courts in evaluating state laws that fall into the overlapping coverage of Titles I and II.[68]

First, in defining the scope of Title II, the Court instructed lower courts to consider Title II's list of required regulations and any regulations the Coast Guard has actually promulgated under Title II.[69]  The Court noted that "if the rule is justified by conditions unique to a particular port or waterway" it may fall under Title I and, thus, be subject to conflict preemption analysis.[70]  The Court also explained that state regulations with limited extraterritorial effect, local rules that present a minimal risk of innocent noncompliance, rules that "do not affect vessel operations outside the jurisdiction," rules that "do not require adjustment of systemic aspects of the vessel," and state rules that "do not impose a substantial burden on the vessel's operation within the local jurisdiction itself[,]" weigh in favor of Title I conflict preemption analysis.[71]  These "useful considerations," however, are relevant only when the state rule at issue actually falls within the

---

[65] Id.

[66] Id. at 112.

[67] Id. at 111.

[68] Id. at 112.

[69] Id.

[70] Id.

[71] Id.

area of overlapping coverage between Titles I and II.[72]

**D.    The Massachusetts Oil Spill Prevention Act**

    **1.    State Pilotage Requirement**

Plaintiffs first challenge Sections 16 and 17 of the OSPA.[73]  These provisions, in relevant part, require coastwise vessels[74] carrying oil, hazardous material, or other hazardous waste to "take on and employ" a Massachusetts-licensed pilot when traveling through certain Massachusetts waters.[75]  This state pilotage requirement applies to waters deemed  "areas of special interest," which include, but are not limited to, Buzzards Bay, Vineyard Sound, and Mount Hope Bay.[76]

The OSPA state pilotage requirement does not fall into the preemptive scope of either

---

[72] See id. at 111-12.

[73] See 2004 Mass. Acts. 251, §§ 16 & 17 (codified as amended at Mass. Gen. Laws c. 103, §§ 21 & 28).

[74] A "coastwise vessel" is an American flag vessel that travels between American ports. See Ray, 435 U.S. at 158 n.7; Interport Pilots Agency v. Sammis, 14 F.3d 133, 136 (2d Cir. 1994).

[75] Mass. Gen. Laws c. 103, § 21; see also id. § 28 (exempting all coastwise vessels not carrying oil, hazardous material, or hazardous waste from the compulsory pilotage requirement). The compulsory state pilotage provision also applies to "registered" vessels (American flag vessels engaged in foreign trade) and foreign vessels. Id. § 21.  Plaintiffs, however, do not challenge the Massachusetts state pilotage requirement as it applies to registered or foreign vessels.

[76] See Mass. Gen. Laws c. 21M, § 1 (defining "areas of special interest" as "any water of the commonwealth that is found by the secretary of environmental affairs to contain 1 or more immobile obstacles to navigation, abut or include areas of critical environmental concern, are designated as an estuary of national significance, abut or include habitat for endangered species, abut or include public recreation areas, support shell fishing, fin fishing or tourist industries or abut or include sensitive public safety areas.  Such waters shall include, but not be limited to, Buzzards bay, Vineyard sound and Mount Hope bay.").

13

Title I or Title II of the PWSA.  This rule, instead, falls under the express preemption language of

46 U.S.C. § 8501(d).  The United States Congress has spoken clearly regarding compulsory state

pilotage requirements, declaring that:

> A State may not adopt a regulation or provision that requires a coastwise vessel to
> take a pilot licensed or authorized by the laws of a State if the vessel – (1) is
> propelled by machinery and subject to inspection under Part B of this subtitle; or
> (2) is subject to inspection under chapter 37 of this title.[77]

> Any Regulation or Provision violating this section is void.[78]

Congress has expressly listed the types of vessels subject to inspection to include "tank vessels"[79]

and "towing vessels."[80]  Congress has also plainly stated that Chapter 37 applies to tank vessels,[81]

and that such tank vessels are subject to inspection under that chapter.[82]

A tank vessel is defined, in relevant part, as "a vessel that is constructed or adapted to

carry, or that carries, oil or other hazardous material in bulk as cargo or cargo residue . . . ."[83]

The definition of tank vessel implicitly includes both "tankers" and "tank barges."[84]  A tanker is "a

self-propelled tank vessel constructed or adapted primarily to carry oil or hazardous material in

---

[77] 46 U.S.C. § 8501(d).

[78] Id. § 8501(e).

[79] Id. § 3301(10).

[80] Id. § 3301(15).

[81] See id. § 3702(a).

[82] See id. §§ 3702, 3710, & 3714 (discussing the inspection of tank vessels, to which
Chapter 37 applies).

[83] Id. § 2101(39).

[84] See id. §§ 2101(2), (38), & (39).

bulk or in the cargo spaces."[85]  A tank barge, on the other hand, is a "non-self-propelled vessel"[86]

that is "constructed or adapted to carry, or that carries, oil or hazardous material in bulk as cargo

or cargo residue . . . ."[87]  Tank barges necessarily require towing vessels (also known as tugboats)

to travel.  A towing vessel is defined as "a commercial vessel engaged in or intending to engage in

the service of pulling, pushing, or hauling along side, or any combination of pulling, pushing, or

hauling along side."[88]

Tankers fall directly into the express preemption provisions of 46 U.S.C. § 8501(d)(1).

Tankers, by definition, are "propelled by machinery" and are, as tank vessels, "subject to

inspection" under the relevant portions of federal law.[89]  Tank barges, however, are not

"propelled by machinery" and, for express preemption purposes, must therefore fall under 46

U.S.C. § 8501(d)(2).  Congress prohibits a state from requiring a coastwise vessel to take on a

state licensed pilot if that vessel "is subject to inspection under chapter 37 of [Title 46 of the

United States Code]."[90]  Chapter 37 applies directly to tank vessels[91] and has detailed provisions

regarding the inspection of all such tank vessels.[92]  As a tank barge is a non-self-propelled tank

---

[85] Id. § 2101(38).

[86] Id. § 2101(2).

[87] Id. § 2101(39).

[88] Id. § 2101(40).

[89] See id. § 3301(10) (listing tank vessels as subject to inspection under Part B of Subtitle II of Title 46 United States Code).

[90] Id. § 8501(d)(2).

[91] See id. § 3702(a).

[92] See id. §§ 3710 & 3714.

vessel, the express preemption language of 46 U.S.C. § 8501(d)(2) applies to tank barges.

Towing vessels similarly fall within the scope of § 8501(d)'s express preemption provisions. Towing vessels are "propelled by machinery." Towing vessels, furthermore, are included on the list of vessels "subject to inspection" under the relevant federal law.[93] Defendants, however, attempt to deflect the preemptive strike of § 8501(d) by arguing that towing vessels do not fall within its scope because towing vessels are not actually inspected.

Defendants' argument runs contrary to the plain language of the federal statute and, therefore, must fail.[94] Whether towing vessels are actually inspected by the Coast Guard or whether the Coast Guard has promulgated regulations on the inspection of towing vessels is irrelevant. The congressional intent evident in the plain language of 46 U.S.C. § 8501(d)(1) is to preempt all state compulsory pilotage requirements on coastwise vessels "subject to inspection."[95] Towing vessels are explicitly subject to inspection.[96]

To the extent that they require coastwise vessels to take on a Massachusetts licensed pilot, sections 16 and 17 of the OSPA[97] are expressly preempted by federal law and are unconstitutional under the Supremacy Clause of the United States Constitution. The Commonwealth, accordingly, is permanently enjoined from enforcing Massachusetts General Laws Chapter 103, Section 21 as

---

[93] Id. § 3301(15).

[94] See Campbell v. Washington County Technical Coll., 219 F.3d 3, 6 (1st Cir. 2000) ("As in other cases involving statutory interpretation, we look first to the Act's plain language. Absent ambiguity, the inquiry ends with the text of the statute." (Internal citations omitted)).

[95] 46 U.S.C. § 8501(d)(2).

[96] See id. § 3301(15).

[97] See Mass. Gen. Laws c. 103, §§ 21 & 28.

16

it applies to all coastwise tank vessels (both tankers and tank barges) and towing vessels.[98]

### 2.    Personnel and Manning Requirements

Plaintiffs next challenge the portion of Section 11 of the OSPA which created Massachusetts General Laws Chapter 21M, Section 4.  This section establishes: (1) navigation watch requirements for all tow vessels transiting Buzzards Bay and carrying 6,000 or more barrels of oil,[99] (2) manning requirements on any tow vessel that is towing a tank barge carrying 6,000 of more barrels of oil in Buzzards Bay,[100] and (3) crew requirements for tank barges.[101]  This section does not apply to tank barges with a double hull design.[102]

### a.    Crew Requirement for Tank Barges

The OSPA requires that all tank barges "consist of 2 personnel, 1 of whom shall be a certified tanker-man under [federal regulations] who shall be on the tank barge at all times when the tank barge is underway, anchored, or moored in the waters of Buzzards bay."[103]  This provision falls directly into the field of Title II of the PWSA and is, therefore, preempted.  Title II gives the federal government the exclusive authority to regulate the "manning of vessels to which

---

[98] The constitutionality of Mass. Gen. Laws c. 103, § 21 as applied to foreign and registered vessels is not in issue here.  Plaintiffs have only challenged the State law to the extent it applies to coastwise vessels.

[99] Mass. Gen. Laws c. 21M, § 4(a).

[100] Id.

[101] Id. § 4(b).

[102] Id. § 4(c).

[103] Id. § 4(b).  Tank barges with double hulls, tank barges not equipped to accommodate personnel, and tank barges carrying less than 6,000 barrels of oil are exempt from these manning requirements. Id. § 4(a).

[Title II] applies."[104]  Title II applies directly to tank vessels,[105] which is defined to include tank barges.[106]  There is simply no room for individual States to regulate the manning of tank vessels.[107]  As this portion of the OSPA purports to establish manning requirements for tank barges, it is field preempted under Title II of the PWSA.

Defendants argue that the manning provisions of the OSPA are localized and tied to the peculiarities of Buzzards Bay and that, therefore, this provision falls under Title I or, at least, raises the issue of whether this provision properly falls under Title I or Title II.  Defendants, accordingly, argue that discovery or a more detailed analysis of the provisions is necessary.  Defendants' argument is misplaced.  There is no ambiguity as to whether manning requirements fall under Title I or Title II.  Nor do manning requirements fall within the overlapping coverage of Titles I and II, which may, in some cases, necessitate a more detailed analysis of the provision at issue.[108]  Manning requirements fall directly under the scope of Title II[109] and are not within the scope of Title I, which applies generally to vessel traffic.[110]

> **b.    <u>Navigation Watch and Manning Requirements for Tow Vessels</u>**

---

[104] 46 U.S.C. § 3703(a). Title II, in fact, orders the United States Coast Guard to promulgate regulations that specifically address "the manning of vessels and the duties, qualifications, and training of the officers and crew."  <u>Id.</u> § 3703(a)(4).

[105] <u>Id.</u> § 3702(a).

[106] <u>See</u> <u>id.</u> §§ 2101(2) & (39).

[107] <u>See</u> <u>Locke</u>, 529 U.S. at 111 ("Congress has left no room for state regulation on these matters.").

[108] <u>See</u> <u>id.</u> at 111-12.

[109] <u>See</u> 46 U.S.C. § 3703(a).

[110] <u>See</u> <u>Locke</u>, 529 U.S. at 101.

The OSPA also requires that "[t]he navigation watch on all tow vessels transiting Buzzards bay and carrying 6,000 or more barrel of oil shall consist of at least 1 licensed deck officer or tow vessel operator."[111]  This regulation requires that the watchman "serve exclusively as a lookout with no other concurrent duties."[112]  The provision further requires that "[t]hree licensed officers or tow vessel operators shall be on a tow vessel whenever the vessel is towing, whether by pushing or pulling, a tank barge carrying 6,000 or more barrels of oil in Buzzards Bay."[113]  In short, this provision of the OSPA directly regulates the operation, manning, personnel qualifications, and crew member duties of tow vessels engaged in the towing of tank barges carrying 6,000 barrels or more of oil.

Title II of the PWSA covers personnel qualifications, manning, and the duties of crew members aboard tank vessels.[114]  This section of the OSPA, therefore, falls directly into the field of subjects regulated by Title II of the PWSA.  Regulations on these matters  are committed to the sole discretion of the federal government.[115]

Defendants, however, argue that this provision is not preempted under Title II because Title II applies only to "tank vessels" and not to "tow vessels."  At a formalistic level, Defendants

----

[111] Mass. Gen. Laws c. 21M, § 4(a).

[112] Id.  This provision also requires that the navigation watch "be carried out on a watch station in a safe location which allows sight and hearing of all navigational hazards and the tow vessel operator[,]" and that "[t]he names of each navigation watch member shall be logged in the deck log as the member assumes duties."  Id.

[113] Id.

[114] See 46 U.S.C. § 3703(a).

[115] See Locke, 529 U.S. at 110-11.

19

are correct.  Title II does expressly apply to "tank vessels"[116] and it does not explicitly apply to "tow vessels."  Defendants' argument, however, fails.  A tow vessel that is pushing, pulling, or hauling a tank barge that is carrying oil is indistinguishable from the barge itself, and the combination of tow vessel and barge is in substance a "tank vessel."

A tank vessel is a "vessel that is constructed or adapted to carry, or that carries, oil or hazardous material in bulk as cargo or cargo residue . . . ."[117]  The tank vessel definition, as discussed above, includes both self-propelled tank vessels, known as tankers,[118] and non-self-propelled vessels, known as barges, that carry oil as cargo.[119]  A tank barge, by definition, requires a towing vessel to push, pull, or haul the vessel and its cargo through the water.  The towing vessel, therefore, serves as the engine that "carries" the oil from one destination to another.  Unlike self-propelled tankers, however, the engine that propels the tank barge is on a vessel separate from the oil.  This minor distinction, however, does not shield tow vessels that are part of a tow-barge combination from the scope of Title II.

The express policy underlying Title II of the PWSA is the need for "increased protection against hazards to life and property, for navigation and vessel safety, and for enhanced protection of the marine environment."[120]  The threat to these national interests is heavy with regard to tank vessels, which carry vast amounts of oil throughout the United States each day.  Defendants'

---

[116] See 46 U.S.C. § 3702(a).

[117] Id. § 2101(39).

[118] See id. § 2101(38).

[119] See id. §§ 2101(2) & (39).

[120] Id. § 2101(40).

interpretation of the definition of tank vessels runs counter to these objectives. Defendants' argument would give the federal government exclusive authority to regulate the manning and personnel on the non-self-propelled barge, but not on the towing vessel that controls where and how the oil is transported. The barge by itself does not pose a threat to the marine environment. The true threat is present only when the barge is combined with the necessary towing vessel, which controls, directs, and otherwise enables the barge, and the oil, to maneuver.

The towing vessel, although it does not physically carry the oil, is the crucial element of the tow-barge combination and, therefore, poses the most risk to the marine environment. Defendants' argument, furthermore, would give the Coast Guard exclusive jurisdiction to regulate one form of tank vessel, self-propelled tankers, but would grant concurrent jurisdiction with the states to regulate the driving force of the tow-tank barge combination. That result would make little practical sense and would hinder the Congressional goal of creating uniform national regulations for all tank vessels.

In short, towing vessels that are pushing, pulling, or hauling tank barges carrying oil or other hazardous materials are, as part of the tow-barge combination, "tank vessels" and are, thus, within the scope of Title II. The OSPA declares specific manning, personnel, and duty requirements for tank vessels, tank barges, and towing vessels. Under Title II preemption analysis, this portion of the OSPA is preempted and unconstitutional. The Commonwealth is permanently enjoined from enforcing Massachusetts General Laws Chapter 21M, Section 4.[121]

---

[121] Towing vessels, when considered alone, are subject to extensive federal regulation. See id. § 3306(a); Id. § 8904 (requiring and authorizing the Coast Guard to establish manning requirements for towing vessels). As this court finds that towing vessels, when part of a tow-tank barge combination, fall under the definition of "tank vessels" subject to Title II field preemption, the court does not make any finding as to the preemptive effect of these other federal statutes.

3.    **Tank Vessel Design Requirement**

Plaintiffs next challenge the portion of Section 11 of the OSPA which prohibits vessels not in compliance with federal design standards for double hulls from docking, loading, or unloading in Massachusetts.[122]  Tank vessel design requirements fall directly within the scope of Title II of the PWSA.[123]  State design regulations, therefore, are subject to field preemption analysis.[124] State regulations of tank vessel design, whether different, more stringent, or identical to federal rules on the subject, are facially unconstitutional.[125]

Defendants argue that this provision of the OSPA is not a tank vessel design requirement, but is instead a regulation of local docking and mooring practices.  Defendants contend, therefore, that the provision here in issue falls under Title I and does not interfere with the federal scheme of tank vessel design.

Defendants' argument is overly formalistic.  Simply labeling the provision as a local docking and mooring rule does not change its substantive effect.  The provision mandates direct

---

[122] See 2004 Mass. Acts 251, § 11(codified at Mass. Gen. Laws c. 21M, § 7).

[123] See 46 U.S.C. § 3703(a) (granting the Coast Guard the exclusive authority to "prescribe regulations for the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualifications, and manning of [tank] vessels"); Locke, 529 U.S. at 111 (discussing the field preemption effect of Title II on state regulations of tank vessel design); Ray, 435 U.S. at 165 ("Enforcement of the state requirements would at least frustrate what seems to us to be the evident congressional intention to establish a uniform federal regime controlling the design of oil tankers.").

[124] See Locke, 529 U.S. at 110-11; Ray, 435 U.S. at 163-67.

[125] Locke, 529 U.S. at 111 (explaining that under Title II "Congress has left no room for state regulation of these matters"); Ray, 435 U.S. at 165 ("[T]he Supremacy Clause dictates that the federal judgment that a vessel is safe to navigate United States waters prevail over the contrary state judgment.").

design requirements on all tank vessels that use or desire to use any Massachusetts port.  Tank vessel owners, therefore, must affirmatively design their vessels in accordance with Massachusetts law or completely forego conducting business in Massachusetts.  This provision is therefore a direct regulation of tank vessel design.

The OSPA tank vessel design requirements impermissibly intrude in a field of exclusive federal regulation.[126]  This portion of the OSPA is therefore preempted under Title II of the PWSA and unconstitutional.  The Commonwealth is permanently enjoined from enforcing Massachusetts General Laws Chapter 21M, Section 7.

### 4.    Drug and Alcohol Testing Provisions

Plaintiffs next challenge the portion of the OSPA which sets forth mandatory drug and alcohol testing policies and procedures.[127]  This provision requires that all owners or operators of tank vessels enact "policies, procedures and practices for alcohol and drug testing that comply with [federal regulations]."[128]  This section, furthermore, demands that alcohol and drug testing be conducted within two hours of a serious marine incident and directs owners and operators of tank vessels to ensure that their vessels have adequate equipment to quickly and accurately conduct such testing in the wake of a serious marine incident.[129]

---

[126] See Ray, 435 U.S. at 165 (invalidating as unconstitutional a Washington State design requirement that sought to exclude from Puget Sound all vessels, although Federally certified as having acceptable design characteristics, that did not satisfy the different and higher design requirements imposed by the State).

[127] See 2004 Mass. Acts 251, § 11(codified at Mass. Gen. Laws c. 21M, § 3).

[128] Mass. Gen. Laws c. 21M, § 3.

[129] Id.

23

The Supreme Court in <u>United States v. Locke</u> noted that in appropriate circumstances federal statutory provisions that govern specific aspects of maritime commerce (other than Title I or Title II) may have a preemptive effect on state regulations.[130]  The <u>Locke</u> Court, for example, considered a state law requiring vessels to provide Washington state with detailed reports of certain marine incidents.[131]  The Court found the state reporting requirement preempted, holding that "Congress intended that the Coast Guard regulations be the sole source of a vessel's reporting obligations with respect to the matters covered by the challenged state statute."[132]  The Court's holding rested on the language of the federal statute, similar to the mandatory language of Title II of the PWSA, which required that the Coast Guard "'shall prescribe regulations on the marine casualties to be reported and the manner of reporting.'"[133]

The alcohol and drug testing provisions of the OSPA face a similar federal statute.  Under 46 U.S.C. § 2303a, Congress affirmatively requires that the Coast Guard:

> [S]hall establish procedures to ensure that after a serious marine casualty occurs, alcohol testing of crew members or other persons responsible for the operation or other safety-sensitive functions of the vessel or vessels involved in such casualty is conducted no later than 2 hours after the casualty occurs, unless such testing cannot be completed within that time due to safety concerns directly related to the casualty.[134]

The language of this statute, like the federal reporting statute discussed in <u>Locke</u> and Title II of

---

[130] 529 U.S. at 114-15.

[131] <u>Id.</u>

[132] <u>Id.</u> at 115.

[133] <u>Id.</u> at 115-16 (citing 46 U.S.C. § 6101).

[134] 46 U.S.C. § 2303a.

the PWSA, indicates that Congress intended the Coast Guard regulations regarding chemical testing after serious marine incidents to stand as the exclusive source of a vessel's testing obligations. The Massachusetts testing requirements, furthermore, affect a vessel's out-of-state obligations and conduct by requiring the vessel operator to adequately equip the vessel and train his or her personnel in using that equipment.[135] This regulation, therefore, reaches to "where a State's jurisdiction and authority are most in doubt."[136]

The Coast Guard, moreover, has enacted conflicting alcohol and drug testing regulations pursuant to 46 U.S.C. § 2303a. The Coast Guard, in fact, enforces a detailed set of regulations regarding drug and alcohol policies, procedures, and testing.[137] Of special importance is a recently promulgated Coast Guard regulation which substantially amends the previous requirements for alcohol and drug testing following a serious marine incident.[138] This regulation requires that "mariners or their employees involved in a serious marine incident are tested for alcohol use within 2 hours of the occurrence of the incident" and that specimens for drug testing

---

[135] Cf. Locke, 529 U.S. at 116 (explaining that the Washington state reporting requirement inappropriately reached a tank vessel's conduct outside of the state's jurisdiction).

[136] Id.

[137] See 33 C.F.R. § 95 ("The purpose of this is to establish under the influence standards or a dangerous drug standards under 46 U.S.C. 2302 and to prescribe restrictions and responsibilities for personnel on vessels inspected, or subject to inspection, under Chapter 33 of Title 46 United States Code."); 46 C.F.R. § 4.06 (detailing federal requirements for "Mandatory Chemical Testing Following Serious Marine Incidents Involving Vessels in Commercial Service"); Id. § 16 (prescribing minimum federal standards, procedures, and policies for the chemical testing of merchant marine personnel).

[138] See Maine Casualties and Investigations; Chemical Testing Following Serious Marine Incidents, 70 Fed. Reg. 75,954 (Dec. 22, 2005) (to be codified at 46 C.F.R. pt. 4).

are collected within 32 hours of a serious marine incident.[139]  The Coast Guard regulations also require that vessel owners or operators equip their vessels with adequate devices to conduct alcohol and drug testing in accordance with the regulations.[140]  The Commonwealth's testing provision directly conflicts with Coast Guard regulations governing chemical testing, testing equipment, and other alcohol and drug policy standards and is therefore preempted.[141]

The OSPA alcohol and drug regulations also fail under Title II preemption analysis.  The Commonwealth's regulations purport to set equipping, operation, and personnel requirements on all tank vessels traveling within Massachusetts waters.  The regulation, more specifically, mandates that tank vessels carry the necessary equipment to conduct chemical testing, that the crew members are trained in using such equipment, and that vessels operate according to specific policies and procedures.  By purporting to regulate tank vessel equipment, crew training, and vessel operation, this portion of the OSPA intrudes into the federally exclusive fields governed by Title II of the PWSA.

Defendants argue that the Commonwealth's alcohol and drug testing provision is authorized under the saving clauses of the Oil Pollution Act of 1990 ("OPA"),[142] and is accordingly not preempted under any theory.  The OPA sets forth liability rules that are imposed

---

[139] See id. at 75954.

[140] Id. at 75961 (to be codified at 46 C.F.R. pt. 4.06-15).

[141] See Locke, 529 U.S. at 115 (explaining that just because a state statute mirrors federal requirements the state statute is not saved from preemption when concurrent state regulation is inconsistent with the federal Congress's goal of establishing "a workable, uniform system" on such subjects).

[142] See 33 U.S.C. § 2718.

on those responsible for oil spills.[143]  The so-called "saving clauses" of the OPA allow states to

impose "additional liability or requirements" with respect to the discharge or substantial threat of

discharge of oil within such state.[144]  Defendants in this case contend that the testing provision at

issue is fundamental to the Commonwealth's ability to impose additional liability or requirements

and is thus not preempted.

 The Supreme Court has made clear that the saving clauses of the OPA do not alter the

preemptive effect of the PWSA or of the regulations promulgated under it.[145]  The Court,

furthermore, has limited the scope of the saving clauses, explaining that "[t]he evident purpose of

the saving clauses is to preserve state laws which, rather than imposing substantive regulation of a

vessel's primary conduct, establish *liability rules* and *financial requirements* relating to oil

spills."[146]  The saving clauses, in other words, do not allow states "to impose additional unique

substantive regulation on the at-sea conduct of vessels."[147]

 The Commonwealth's alcohol and drug testing provision does not create after-the-fact

liability rules or financial requirements related to oil spills.  The provision, instead, regulates the

substantive conduct of tank vessels by mandating certain equipment, personnel requirements,

crew member duties, and the adherence to certain operating procedures and policies.  These all

require a tank vessel owner or operator to take some affirmative conduct before the vessel enters

---

[143] See Locke, 529 U.S. at 101-02.

[144] See 33 U.S.C. § 2718; Locke, 529 U.S. at 104-05.

[145] See Locke, 529 U.S. at 107.

[146] Id. at 106 (emphasis added).

[147] Id.

Massachusetts waters.  The Commonwealth's alcohol and drug testing provision, therefore, does not fall under the saving clauses of the OPA.  The provision is thus subject to the preemptive effect of the relevant federal statute and the PWSA.

For the reasons stated above, the drug and alcohol testing requirements of the OSPA are preempted and unconstitutional.  The Commonwealth of Massachusetts is therefore permanently enjoined from enforcing Massachusetts General Laws Chapter 21M, Section 3.

**5.      Tugboat Escort Provisions**

Plaintiffs next challenge the portion of the OSPA which enacted Massachusetts General Laws Chapter 21M, Section 6.[148]  This section requires all tank barges carrying 6,000 or more barrels of oil to have a tugboat escort when traveling in Massachusetts waters deemed "areas of special interest."[149]  These "areas of special interest" include, but are not limited to, Buzzards Bay, Vineyard Sound, and Mt. Hope Bay.[150]  Tugboat escort provisions are vessel traffic regulations and therefore are evaluated under Title I conflict preemption analysis.

As discussed above, under Title I preemption analysis the first question for this court is whether the Coast Guard has enacted its own regulations regarding tugboat escorts in Massachusetts waters or whether the Coast Guard has determined that no such requirement was

---

[148] See 2004 Mass. Acts 251, § 11 (codified at Mass. Gen. Laws c. 21M, § 6).

[149] Mass. Gen. Laws c. 21M, §§ 6 (a) & (b) ("[N]o tank vessel carrying 6,000 or more barrels of oil shall enter or transit any area of special interest within the waters of the commonwealth unless the tank vessel is accompanied by a tugboat escort . . . .  This section shall not apply to a self-propelled tank vessel.").

[150] See Mass. Gen. Laws c. 21M, § 1.

necessary.[151]  Only if the Coast Guard has not acted, or has not affirmatively chosen to take no

action, does this court move on to step two of the Title I analysis.[152]  Step two requires the court

to determine whether the Massachusetts tugboat escort rule is directed to local circumstances,

problems and concerns idiosyncratic to Massachusetts waters.[153]  In this case, the Coast Guard

has regulated on the challenged subject.  This court, therefore, need not advance beyond step one.

The Coast Guard has promulgated detailed regulations regarding tugboat escorts for tank

barges traveling in Massachusetts waters.  The Coast Guard requires that "each single-hull tank

barge, unless being towed by a primary towing vessel with twin-screw propulsion and with a

separate system for power to each screw, must be accompanied by an escort or assist tug . . . ."[154]

The Coast Guard regulations explicitly do not apply to double-hull tank barges.[155]  The OSPA, on

the other hand, requires tug escorts for *all* tank barges carrying 6,000 or more barrels of oil,

whether single-hulled or double-hulled and regardless of the characteristics of the towing vessel.

The Massachusetts regulation, in short, applies to certain tank barges which are exempt from

federal tug escort requirements.  The substantive requirements of the Coast Guard rule and the

Massachusetts rule therefore directly conflict.

The scope of the Coast Guard regulation is more expansive than that covered by the

OSPA's tug escort rule.  The Coast Guard rule applies to "[a]ll navigable waters of the United

---

[151] See Locke, 529 U.S. 109-10.

[152] See id.

[153] Id. at 109.

[154] 33 C.F.R. § 165.100(d)(1)(i).

[155] Id. § 165.100(d)(1)(ii).

States . . . within the geographic boundaries of the First Coast Guard District . . . ."[156]  The First

Coast Guard District extends from Maine to northern New Jersey and includes Maine, New

Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, most of New York, and the

New York-New Jersey-Pennsylvania border area.[157]  The OSPA's tug escort rule, on the other

hand, applies only to Massachusetts waters deemed "areas of special interest."[158]  All

Massachusetts waterways are included in the First Coast Guard District.  Tank barges traveling

through Massachusetts waters are thus simultaneously subject to both the conflicting Coast Guard

and State tug escort rules.  These tank barges cannot comply with both the state and federal

regulations.

      Defendants argue that the OSPA's tug escort provision does not conflict with any federal

regulation on the topic because the Coast Guard regulation is too broad in scope to conflict with

the Massachusetts rule.  Defendants, more specifically, argue that the Coast Guard's rules, which

cover the entire First Coast Guard District, do not satisfy the level of particularity necessary to

create a conflict with the Commonwealth's more localized regulations.

      While the Commonwealth's tug escort rule is limited to particular local waterways, that

does not save this provision from preemption.  The Coast Guard regulation applies to a regional

district that includes all Massachusetts waters.  Labeling the Commonwealth's rule as local does

not change the fact that it purports to regulate in an area and in particular waters that are already

governed by federal regulations, nor does the label change the fact that the substance of the Coast

---

[156] Id. § 165.100(a).

[157] Id. § 3.05-1(b).

[158] See Mass. Gen. Laws c. 21M, § 6.

Guard rule and the Massachusetts rule are in direct conflict.

The Supreme Court in <u>Locke</u> noted that "even in the context of a regulation related to local waters, a federal official with an overview of all possible ramifications of a particular requirement might be in the best position to balance all the competing interests."[159]  The Coast Guard regulation at issue here is an example of that balance.  In the field of national maritime commerce neighboring states are likely to have conflicting interests and ideas on how to regulate tank barges within their boundaries.  The Coast Guard, in assessing such competing interests, will necessarily pass rules broader than those which an individual state may promulgate.  The Coast Guard's tug escort regulation stands as an example of a rule crafted by federal officials with an overview of, and ability to balance, all the competing interests.[160]

The Coast Guard is currently considering a new proposed rule regarding tug escorts in Buzzards Bay.[161]  This fact, however, does not save the Commonwealth's tug escort provision from preemption.  The Coast Guard formally regulates tug escorts for the entire First Coast Guard District, which includes Buzzards Bay.  The Coast Guard certainly must have the freedom to reconsider its regulations without their losing relevance or preemptive effect.  After considering

---

[159] 529 U.S. at 110 (citing <u>Ray</u>, 435 U.S. at 177).

[160] <u>See</u> Regulated Navigation Area: Navigable Waters Within the First Coast Guard District, 63 Fed. Reg. 71764, 71765 (Dec. 30, 1998) ("The states' differing legislative initiatives might result in inconsistent regulation of the industry.  The several operating conditions codified in this rule will reduce the risks to the marine environment posed by tank barges transporting oil in the region without imposing undue economic burden on the industry.").  <u>See also</u> <u>id.</u> at 71764-71 (detailing the extensive research, review, comment collection, and analysis that resulted in the final Coast Guard rule).

[161] <u>See</u> Navigation and Waterways Management Improvements, Buzzards Bay, MA, 69 Fed. Reg. 62427 (Oct. 26, 2004).

a proposed rule, the Coast Guard could in fact reasonably determine that their current rule appropriately controls the field and that no new rule is necessary. The Coast Guard should not be punished for reconsidering its current requirements. The Coast Guard's current tug escort requirements, therefore, retain their preemptive force until such time as they are formally revised.

For the reasons stated above, the OSPA's tugboat escort provision directly conflicts with Coast Guard regulations on the same subject. Under Title I preemption analysis, the Commonwealth's tugboat escort provision is preempted and unconstitutional. The Commonwealth is therefore permanently enjoined from enforcing Massachusetts General Laws Chapter 21M, Section 6.

### 6.    **Mandatory Vessel Routing Requirement**

Plaintiff next challenges the portion of the OSPA that mandates that tank vessels follow certain vessel routes through Massachusetts waters.[162] The OSPA specifically requires all tank vessels "operating in the waters of the [C]ommonwealth . . . [to] travel only within a recommended vessel route designated by the United States Coast Guard," if the Coast Guard has recommended a route.[163] This provision further requires that all tank vessels operating in Buzzards Bay "travel only within the designated vessel route as appearing on the National Oceanic and Atmospheric Administration chart for Buzzards bay, or as designated by the United States Coast Guard . . . ."[164] Any tank vessel that deviates from the Commonwealth's mandatory

---

[162] See 2004 Mass. Acts 251, § 11, as amended 2004 Mass. Acts 457 § 1(codified at Mass. Gen. Laws c. 21M, § 5).

[163] Mass. Gen. Laws c. 21M, § 5.

[164] Id.

routes, unless special circumstances allow, are subject to a civil fine.[165]

The Commonwealth's mandatory vessel routing provision regulates vessel traffic and therefore falls under the coverage of Title I of the PWSA.[166]  The first question, accordingly, is whether the Coast Guard has promulgated regulations on vessel routes in Massachusetts waters or has otherwise determined that regulations are unnecessary or inappropriate.[167]  The Coast Guard, through the National Oceanic and Atmospheric Administration ("NOAA"), has identified a recommended route for vessels traveling through Buzzards Bay.[168]  Indeed, it is that recommended route that the OSPA seeks to make mandatory on all tank vessels.[169]  While the Coast Guard strongly recommends the identified route, it stops short of requiring all vessels to follow it.[170]  The Coast Guard, instead, leaves the decision to deviate from the recommended route up to the ship master's discretion.[171]

The Coast Guard's recommended route for Buzzards Bay grew out of a Coast Guard

---

[165] Id.

[166] See 33 U.S.C. § 1223.

[167] See Locke, 529 U.S. at 109-10.

[168] See Navigation and Waterways Management Improvements, Buzzards Bay, MA, 69 Fed. Reg. at 62429.  The recommended routes are currently included, at the Coast Guard's request, on all NOAA navigational charts for Buzzards Bay.

[169] See Mass. Gen. Laws c. 21M, § 5.

[170] See Navigation and Waterways Management Improvements, Buzzards Bay, MA, 69 Fed. Reg. at 62429 ("While not mandatory, deep draft commercial vessels (including tugs and barges) are requested to follow the Recommended Routes at the master's discretion.").

[171] See id.

sponsored Ports and Waterways Safety Assessment ("PAWSA") conducted in 2003.[172]  The

PAWSA brought together the Coast Guard with a cross-section of key Buzzards Bay users and

stakeholders to study ways in which to improve navigation safety in the bay and reduce the risk of

oil spills.[173]  The Coast Guard also received and considered a letter from members of the United

States Congressional delegation from Massachusetts, which asked the Coast Guard to consider

the implementation of recommended routes and other safety measures.[174]  After considering all of

this information, the Coast Guard made the affirmative judgment that a recommended, not

mandatory, vessel route is the preferred solution to the local hazards of Buzzards Bay.  The Coast

Guard, in other words, made the reasoned decision that a tank vessel's master should have the

discretion to deviate from the recommended route when necessary, without fear of civil or

criminal penalties.

The OSPA's mandatory vessel route provision directly conflicts with the Coast Guard

determination to make the route discretionary.  The Commonwealth's regulation cannot stand in

the face of the contrary federal rule and is therefore preempted under Title I of the PWSA and

unconstitutional.  The Commonwealth is permanently enjoined from enforcing Massachusetts

General Laws Chapter 21M, Section 5.

**7.    Certificate of Financial Assurance**

Plaintiffs' final challenge is aimed at the portion of the OSPA that enacted Massachusetts

---

[172] See id.

[173] See id.

[174] See id.

General Laws Chapter 21, Section 50C.[175]  This provision requires all tank vessels traveling in

Massachusetts waters to present a certificate of financial assurance to the Massachusetts

Department of Environmental Protection in the amount of at least one billion dollars.[176]  The

vessel must demonstrate this certificate of financial assurance with "evidence of insurance, surety

bond, letter of credit, qualifications as a self-insurer or any combination thereof or other evidence

of financial assurance approved by the commissioner."[177]  The Massachusetts Department of

Environmental Protection can lower the amount of financial assurance required based on criteria

that includes, but is not limited to:

> [T]he type and amount of the above cargo transported by the
> vessel; the size and construction of the vessel, including whether the
> vessel is double hulled; the safety record of the vessel or the vessel
> owner, the loss or accident history of the vessel or vessel owner
> involving maritime spills and the safety equipment used by the
> vessel.[178]

Plaintiffs do not challenge the validity of the financial assurance provision itself.  Indeed,

the Commonwealth's authority to enact this requirement is derived from the abovementioned

saving clauses of the Oil Pollution Act of 1990.[179]  Plaintiffs instead challenge the statutory

exception which grants the Massachusetts Department of Environmental Protection the authority

---

[175] See 2004 Mass. Acts 251, § 2 (codified at Mass. Gen. Laws c. 21, § 50C).

[176] Mass. Gen. Laws c. 21, § 50C.  For tank vessels with a carrying capacity of less than 6,000 barrels of oil, the vessel need only present a financial assurance certificate in the amount of five million dollars. Id. § 50C(b).

[177] Id. § 50C(c).

[178] Id. § 50C(d).

[179] See 33 U.S.C. § 2718 (granting individual states the authority to impose additional liability or additional requirements related to oil spills).

to lower, or to presumably even waive, the financial assurance requirements when a vessel meets certain criteria.  Plaintiffs argue that by conditioning the placement or removal of this heavy financial assurance bond requirement on criteria of tank vessel design, operation, equipping, and reporting, the Commonwealth's provision is an indirect regulation of those subjects.  These subjects, Plaintiffs argue further, reach into preempted fields and are therefore invalid.  Defendants oppose Plaintiffs arguments and rely on language from the Supreme Court's decision in Ray v. Atlantic Richfield Co..

The Supreme Court in Ray considered an indirect regulation argument.[180]  The regulation at issue in Ray required tug escorts for all tankers operating in Washington state waters.[181]  The Washington statute, however, exempted all tankers that satisfied the state's tank vessel design requirements from the escort requirement.[182]  The Court, after holding that Washington's tug escort rule was not preempted under Title I,[183] upheld the design based exception.[184]  The Court explained that "[g]iven the validity of a general rule prescribing tug escorts for all tankers, Washington is also privileged, insofar as the Supremacy Clause is concerned, to waive the rule for tankers having specified design characteristics."[185]  This language, although seemingly clear on its

---

[180] See 425 U.S. at 172-73.

[181] Id.

[182] Id.

[183] Id. at 172 ("It may be that rules will be forthcoming that will pre-empt the State's present tug-escort rule, but until that occurs, the State's requirement need not give way under the Supremacy Clause.").

[184] Id. at 173.

[185] Id.

face, does not tell the whole story. In a footnote directly following the Court's pronouncement, the Court expressly noted its disagreement with the argument "that the tug-escort provision . . . will exert pressure on tank owners to comply with the design standards and hence is an indirect method of achieving what . . . is beyond state power under Title II."[186] In support, the Court noted that the cost of compliance with the tug escort provision represented a very small fraction of the cost of complying with the State's design specifications.[187]

The Ray Court's language indicates that "regulation by exception" arguments should not fail simply because the primary rule is constitutionally valid. The Ray Court instead implies that courts should examine whether the rule, in practical effect, forces compliance with the so-called exceptions. If a regulation in effect compels such compliance and the exceptions invade preempted fields, those exceptions are unconstitutional.[188]

This court finds that the Commonwealth's one billion dollar financial assurance requirement imposes such an onerous financial obligation on a tank vessel owner that it in effect forces compliance with the statutory exception criteria. If a tank vessel owner cannot post evidence of financial assurance of at least one billion dollars, then that owner is forced to comply with the statutory exception criteria or refrain from conducting business in Massachusetts. The statutory criteria, in other words, operate as indirect regulations of the subjects to which those

---

[186] Id. at n.25.

[187] Id.

[188] Cf. City of St. Louis v. Western Union Tel. Co., 148 U.S. 92, 106 (1893) (Brown, J., dissenting) ("It is a just and well-settled doctrine established by this court that a state cannot do that indirectly which she is forbidden by the constitution to do directly." (Internal citation omitted)).

criteria pertain.

This court is further troubled by the vague and seemingly limitless criteria contained in the financial assurance regulation.[189]  This ambiguity leaves tank vessel owners without any clear guidance on how, or even if, they can lower the one billion dollar assurance requirement.  Tank vessel owners are left only with the expressly stated, albeit vague, criteria as possible means through which to reduce the amount of the required bond.  Those stated criteria are the vessel's cargo, the vessel's design, the vessel's safety record and accident history, and the safety equipment carried on board the vessel.[190]  Each of the above exception criteria are preempted.

The first exception criteria relevant to the lowering of the financial assurance requirement is "the type and amount of . . . cargo transported by the vessel."[191]  This indirect regulation seeks to proscribe rules for tank vessel operation, which falls into the field preempted by Title II of the PWSA.[192]  In Title II Congress specifically required the Coast Guard to "consider the types and grades of cargo permitted to be on board a tank vessel" when promulgating rules under Title II.[193]  By indirectly regulating the types and amount of cargo tank vessels may carry – which is fundamental to the operation of the tank vessels – the Commonwealth invades the field covered by Title II.

The next statutory criteria stated in the Commonwealth's financial assurance requirement

---

[189] See Mass. Gen. Laws c. 21, § 50C(d) (listing a non-exclusive exception criteria).

[190] See id.

[191] Id.

[192] See 46 U.S.C. § 3703(a).

[193] Id. § 3703(b).

is "the size and construction of the vessel, including whether the vessel is double hulled."[194]  The Coast Guard, under Title II, has exclusive authority over tank vessel design standards.[195]  Title II, furthermore, mandates that the Coast Guard promulgate rules regarding "superstructures" and "hulls."[196]  The Commonwealth does not have the authority to regulate tank vessel design.  The design exception criteria, therefore, is preempted under Title II.

The next statutory criteria relevant to the financial assurance requirement is the vessel's safety equipment.[197]  Under Title II, the Coast Guard alone has authority to prescribe rules regarding the equipping of tank vessels.[198]  Title II, more specifically, requires the Coast Guard to make rules concerning "equipment and appliances for lifesaving, fire protection, and prevention and mitigation of damage to the marine environment."[199]  The Commonwealth, accordingly, lacks the authority to directly or indirectly regulate the safety equipment on board tank vessels.  The Commonwealth's indirect regulation of safety equipment is therefore preempted.

The final statutory exception criteria is "the safety record of the vessel or the vessel owner, [and] the loss or accident history of the vessel or vessel owner involving maritime spills."[200]  This provision does not explicitly require a vessel or a vessel owner to report marine

---

[194] Mass. Gen. Laws c. 21, §50C(d).

[195] See 46 U.S.C. § 3703(a); Locke, 529 U.S. at 110-11; Ray, 435 U.S. at 163-68.

[196] 46 U.S.C. § 3703(a)(1).

[197] See Mass. Gen. Laws c. 21, § 50C(d).

[198] See 46 U.S.C. § 3703(a)(1); Locke, 529 U.S. at 110-11.

[199] 46 U.S.C. § 3703(a)(3).

[200] Mass. Gen. Laws c. 21, § 50C(d).

incidents, accidents, or its safety record.  In effect, however, this criteria does constitute a reporting requirement.  If a tank vessel owner or operator seeks to reduce the financial assurance requirement through this means, he or she necessarily must make a report to the Commonwealth's Department of Environmental Protection.  It is doubtful that the Department of Environmental Protection will independently seek to discover safety reports to help commercial tank vessels avoid the financial assurance rule.  Tank vessel owners, therefore, must affirmatively invoke the exception by filing a detailed report with the Massachusetts Department of Environmental Protection.

The Supreme Court in Locke held that under 46 U.S.C. § 6101 "Congress intended that the Coast Guard regulations be the sole source of a vessel's reporting obligations . . . ."[201]  The Court reasoned that Washington state's reporting requirement constitutes "a significant burden in terms of cost and the risk of innocent noncompliance . . . [and] affects a vessel operator's out-of-state obligations and conduct, where a State's jurisdiction and authority are most in doubt."[202]  The Court, accordingly, held the state reporting requirement preempted.[203]  The Locke Court's holding controls here.  The OSPA's indirect reporting requirement is therefore preempted.

The Commonwealth may not use the OSPA's financial assurance requirement to indirectly regulate tank vessels through the above-discussed exception criteria.  To the extent that the imposition of the financial assurance provision and the amount of such assurance are conditioned

---

[201] 529 U.S. at 115; see also 46 U.S.C. § 6101 (requiring that the Coast Guard prescribe regulations on marine incident reporting and listing specific kinds of incidents that the regulations must cover).

[202] Locke, 529 U.S. at 116.

[203] Id.

upon criteria otherwise preempted by Title II, Title I, or other federal law, the statute is

unconstitutional. The Commonwealth is therefore permanently enjoined from conditioning the

one billion dollar financial assurance requirement on criteria of tank vessel design, operation,

equipping, or reporting requirements.[204]

### Conclusion

For the reasons discussed above, both the United States' Motion for Judgment on the

Pleadings and the Intervenor-Plaintiffs' Motion for Judgment on the Pleadings are ALLOWED.

The challenged provisions of the Oil Spill Prevention Act are preempted, invalid, and

unconstitutional under the Supremacy Clause of the United States Constitution. The

Commonwealth of Massachusetts is therefore permanently enjoined from enforcing the challenged

statutes as detailed above.

AN ORDER WILL ISSUE.


     /s/ Joseph L. Tauro     
United States District Judge

---

[204] The court here does not enjoin all possible use of the discretionary statutory exemption to the financial assurance requirement. Nor will the court entertain hypothetical conditions which may violate the Supremacy Clause. The court holds merely that the above-discussed statutory exception criteria indirectly regulate in areas in which the Commonwealth of Massachusetts lacks the authority to so regulate and are therefore unconstitutional. Litigation over possible future exemption conditions that the Commonwealth may wish to impose must await a later time, if and when such issues become ripe for adjudication.