# United States Court of Appeals
## For the First Circuit

05-10112

No. 06-2361

UNITED STATES; AMERICAN WATERWAYS OPERATORS;
INTERNATIONAL ASSOCIATION OF INDEPENDENT TANKER OWNERS; BIMCO;
CHAMBER OF SHIPPING OF AMERICA,
Plaintiffs, Appellees,

v.

COMMONWEALTH OF MASSACHUSETTS; MASSACHUSETTS DEPARTMENT OF
ENVIRONMENTAL PROTECTION; DEVAL PATRICK, in his capacity as Governor of
Massachusetts; ARLEEN O'DONNELL, in her capacity as Acting Commissioner of the
Massachusetts Department of Environmental Protection,[1]
Defendants, Appellants,

COALITION FOR BUZZARDS BAY,
Defendant.

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT
IS A TRUE AND CORRECT COPY OF
THE ORIGINAL ON FILE IN MY OFFICE
AND IN MY LEGAL CUSTODY

FIRST CIRCUIT COURT OF APPEALS
BOSTON, MA
By: _____ Date 6/21/2007

No. 06-2362

UNITED STATES; AMERICAN WATERWAYS OPERATORS;
INTERNATIONAL ASSOCIATION OF INDEPENDENT TANKER OWNERS; BIMCO;
CHAMBER OF SHIPPING OF AMERICA,
Plaintiffs, Appellees,

v.

COMMONWEALTH OF MASSACHUSETTS; MASSACHUSETTS DEPARTMENT OF
ENVIRONMENTAL PROTECTION; DEVAL PATRICK, in his capacity as Governor of
Massachusetts; ARLEEN O'DONNELL, in her capacity as Acting Commissioner of the
Massachusetts Department of Environmental Protection,
Defendants,

COALITION FOR BUZZARDS BAY,
Defendant, Appellant.

---

[1]    Defendants Mitt Romney and Robert W. Golledge, Jr. (former Commissioner of the
Massachusetts Department of Environmental Protection) have been substituted with Deval Patrick
and Arleen O'Donnell (Acting Commissioner of the Massachusetts Department of Environmental
Protection) in both No. 06-2361 and No. 06-2362. See Fed. R. App. P. 43(c)(2).

## JUDGMENT

Entered: June 21, 2007

This cause came on to be heard on appeal from the United States District Court for the District of Massachusetts and was argued by counsel.

Upon consideration whereof, it is now here ordered, adjudged and decreed as follows: The district court's entry of judgment and the permanent injunction for the United States are vacated, and the matter is remanded for further proceedings consistent with the opinion issued this day.

No costs are awarded.

By the Court:

Richard Cushing Donovan, Clerk

[Certified copies to Hon. Joseph L. Tauro and Ms. Sarah Thornton, Clerk, United States District Court for the District of Massachusetts. Copies to Mr. Bressler, Mr. Stern, Ms. Klein, Mr. Hachey, Mr. Benner, Mr. Connaughton, Ms. Brunelli Balestrieri, Mr. Skelly, Mr. Cray, Mr. Ettinger, Mr. DeLisle, Ms. Waller, Mr. Ryan, Mr. Beauregard, Ms. Friedman, Mr. Ferester, Mr. Lockyer, Mr. Myers, Mr. Sanchez-Ramos, & Ms. Reid.]

# United States Court of Appeals
## For the First Circuit

No. 06-2361

UNITED STATES; AMERICAN WATERWAYS OPERATORS;
INTERNATIONAL ASSOCIATION OF INDEPENDENT TANKER OWNERS; BIMCO;
CHAMBER OF SHIPPING OF AMERICA,

Plaintiffs, Appellees,

v.

COMMONWEALTH OF MASSACHUSETTS; MASSACHUSETTS DEPARTMENT OF
ENVIRONMENTAL PROTECTION; DEVAL PATRICK, in his capacity as
Governor of Massachusetts; ARLEEN O'DONNELL, in her capacity as
Acting Commissioner of the Massachusetts Department of
Environmental Protection,*

Defendants, Appellants,

COALITION FOR BUZZARDS BAY,

Defendant.

No. 06-2362

UNITED STATES; AMERICAN WATERWAYS OPERATORS;
INTERNATIONAL ASSOCIATION OF INDEPENDENT TANKER OWNERS; BIMCO;
CHAMBER OF SHIPPING OF AMERICA,

Plaintiffs, Appellees,

v.

COMMONWEALTH OF MASSACHUSETTS; MASSACHUSETTS DEPARTMENT OF
ENVIRONMENTAL PROTECTION; DEVAL PATRICK, in his capacity as
Governor of Massachusetts; ARLEEN O'DONNELL, in her capacity as

---

*      Defendants Mitt Romney and Robert W. Golledge, Jr.
(former Commissioner of the Massachusetts Department of
Environmental Protection) have been substituted with Deval Patrick
and Arleen O'Donnell (Acting Commissioner of the Massachusetts
Department of Environmental Protection) in both No. 06-2361 and No.
06-2362.  See Fed. R. App. P. 43(c)(2).

Acting Commissioner of the Massachusetts Department of
Environmental Protection,

Defendants,

COALITION FOR BUZZARDS BAY,

Defendant, Appellant.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

_____

Before

Lynch, Circuit Judge,
Cyr, Senior Circuit Judge,
and Howard, Circuit Judge.

_____

Pierce O. Cray, Assistant Attorney General of the Commonwealth
of Massachusetts, with whom Thomas F. Reilly, Attorney General of
the Commonwealth of Massachusetts, was on brief, for appellants in
No. 06-2361.

Philip M. Ferester, Assistant Attorney General of the State of
Washington, Rob McKenna, Attorney General of the State of
Washington, Talis J. Colberg, Attorney General of the State of
Alaska, Bill Lockyer, Attorney General of the State of California,
G. Steven Rowe, Attorney General of the State of Maine, Hardy
Myers, Attorney General of the State of Oregon, Patrick Lynch,
Attorney General of the State of Rhode Island, and Roberto J.
Sánchez-Ramos, Secretary of Justice of the Commonwealth of Puerto
Rico, on brief for the States of Washington, Alaska, California,
Maine, Oregon, and Rhode Island, and the Commonwealth of Puerto
Rico, amici curiae in support of the Commonwealth of Massachusetts.

Jonathan M. Ettinger, with whom Elisabeth M. DeLisle and Foley
Hoag LLP were on brief, for appellant in No. 06-2362.

Philip N. Beauregard and Jane Medeiros Friedman on brief for
the Towns of Bourne, Fairhaven, Falmouth, Gosnold, Marion, and
Westport, and the City of New Bedford, amici curiae in support of
the Commonwealth of Massachusetts and the Coalition for Buzzards
Bay.

Susan M. Reid on brief for the Conservation Law Foundation,
amicus curiae in support of appellants.

Mark B. Stern, Attorney, Civil Division Appellate Staff, with
whom Alisa B. Klein, Attorney, Civil Division Appellate Staff,

Peter D. Keisler, Assistant Attorney General, Michael J. Sullivan, United States Attorney, and Jonathan F. Cohn, Deputy Assistant Attorney General, were on brief, for appellee United States.

          C. Jonathan Benner, with whom Jeffrey Orenstein and Troutman Sanders LLP were on brief, for appellees American Waterways Operators, International Association of Independent Tanker Owners, BIMCO, and Chamber of Shipping of America.

June 21, 2007

**LYNCH, Circuit Judge.** The states and the federal government have ongoing conflicts about the adequacy of federal laws protecting against maritime oil spills. Several states, including Massachusetts, have passed laws to protect particularly sensitive waterways. The framework for analyzing such conflicts derives from the several preemption analyses set forth in United States v. Locke, 529 U.S. 89 (2000), and Ray v. Atlantic Richfield Co., 435 U.S. 151 (1978). In short, depending on the nature of state and federal regulations, either field preemption, conflict preemption, or overlap analysis is used to determine whether state law impermissibly infringes on federal authority.

After a catastrophic oil spill in Buzzards Bay in 2003, the Commonwealth of Massachusetts enacted the Massachusetts Oil Spill Prevention Act (MOSPA). See 2004 Mass. Acts 920 (codified as amended primarily at Mass. Gen. Laws ch. 21, §§ 42, 50B-50E, and ch. 21M). MOSPA imposes requirements designed to reduce the risk of oil spills, and to ensure that adequate resources are available to remedy such spills.

The United States sued Massachusetts on January 18, 2005, seeking to enjoin the enforcement of several MOSPA provisions. The United States alleged that these provisions were preempted by the Ports and Waterways Safety Act of 1972, Pub L. No. 92-340, 86 Stat. 424, as amended by the Port and Tanker Safety Act of 1978, Pub. L. No. 95-474, 92 Stat. 1471 (collectively, the "PWSA"), and by

-4-

regulations promulgated thereunder by the Coast Guard.[1]   This allegation included a claim that MOSPA's financial assurance requirement, which requires certain vessels to post a bond to ensure their ability to respond financially to an oil spill, see Mass. Gen. Laws ch. 21, § 50C, was preempted by Title II of the PWSA, notwithstanding relevant savings clauses in the Oil Pollution Act of 1990 ("OPA"), Pub. L. No. 101-380, 104 Stat. 484, 505-06 (codified at 33 U.S.C. § 2718).  The United States did not assert violations of any treaties or claim that federal foreign affairs powers were at issue.[2]

The Commonwealth disputed each claim of preemption.  It argued that Congress had given the states leeway to regulate particularly sensitive local waterways, at least in the absence of an actual conflict with a federal statute or regulation.  In the state's view, there was no such conflict.

The district court, acting on the United States' motion for judgment on the pleadings, and thus without taking evidence, entered judgment for plaintiffs and permanently enjoined all of the

---

[1]   The PWSA is codified at 33 U.S.C. §§ 1221-32 and in scattered sections of 46 U.S.C.

[2]   The United States also presented no claim that Massachusetts had limited the rights of non-residents and aliens to utilize its waters.  Cf., e.g., Douglas v. Seacoast Prods., Inc., 431 U.S. 265, 283 (1977).  Nor did it assert that the Constitution's Admiralty Clause preempted the state statute.  Cf. Ballard Shipping Co. v. Beach Shellfish, 32 F.3d 623, 628-31 (1st Cir. 1994).

challenged provisions.[3]  United States v. Massachusetts, 440 F. Supp. 2d 24, 48 (D. Mass. 2006).

The Commonwealth's appeal challenges the injunction only insofar as it blocked three of MOSPA's provisions: an enhanced manning requirement for tank barges and tow vessels in Buzzards Bay, see Mass. Gen. Laws ch. 21M, § 4; a tug escort requirement for special interest waters, see id. § 6; and a requirement that certain vessels obtain a certificate of financial assurance, the amount of which can vary, see id. ch. 21, § 50C.

We vacate the entry of judgment and the permanent injunction for the United States, and we remand for further proceedings consistent with this opinion.  As we explain, the district court did not adhere to the analytical structure the Supreme Court has required to resolve federal-state conflicts in this area.  The district court acted prematurely.

---

[3]     Several industry groups -- the American Waterways Operators, the International Association of Independent Tanker Owners, the Chamber of Shipping of America, and BIMCO -- intervened on the side of the United States.  The Coalition for Buzzards Bay intervened on the side of the Commonwealth.  For ease of reference, we will simply refer to the lead parties, the United States and Massachusetts.

On appeal, three sets of amici have filed briefs in support of Massachusetts: the "state amici" (which include the states of Washington, Alaska, California, Maine, Oregon, and Rhode Island, and the Commonwealth of Puerto Rico), the "local government amici" (which include the towns of Bourne, Fairhaven, Falmouth, Gosnold, Marion, and Westport, and the city of New Bedford), and the Conservation Law Foundation.

## I.  FACTUAL BACKGROUND

Buzzards Bay is one of five recognized Estuaries of National Significance. See 69 Fed. Reg. 62,427, 62,428 (Oct. 26, 2004); see also 33 U.S.C. § 1330 (establishing a national estuary program). Massachusetts has designated the Bay as part of an "Ocean Sanctuary." Mass. Gen. Laws ch. 132A, § 13(c).

Buzzards Bay is characterized by unusually dangerous ledges, reefs, and currents. Most of the Bay is less than 50 feet deep, and the Bay is less than 8 miles wide. See B. Howes et al., Ecology of Buzzards Bay: An Estuarine Profile 7, 23-24 (U.S. Dep't of the Interior, Biological Report No. 33, 1996), available at http://cuadra.cr.usgs.gov/Techrpt/96-33.pdf. The Bay's Cape Cod Canal has unusually strong tidal currents, and it "represents a significant navigational challenge." Id. at 98.

Significant volumes of oil are transported through the Bay and Canal each year. In 2002, about 80% of the trips were made in single-hull barges. 71 Fed. Reg. 15,649, 15,650 (Mar. 29, 2006). In the state's view, the waters of Buzzards Bay are subject to a disproportionate and unnecessary risk of an oil spill. A Coast Guard-sponsored report has concluded that "the risk for oil or hazardous material discharge in Buzzards Bay is relatively high." Id.

There have already been several damaging spills in the Bay. In 1969, roughly 175,000 gallons of No. 2 fuel oil spilled

-7-

into the Bay after the barge <u>Florida</u> ran aground. <u>Id.</u> In 1974, a sizable amount of oil spilled from the <u>Bouchard No. 65</u>, inflicting significant damage on local marine life. Howes et al., <u>supra</u>, at 102-03. In 1977, there was yet another <u>Bouchard</u> spill, this one releasing 81,000 gallons of fuel oil into the water. 71 Fed. Reg. at 15,650. In 1986, the tank barge <u>ST-85</u> was grounded in the Bay, spilling 119,000 gallons of gasoline.[4] <u>Id.</u> In 1999, there was another grounding, this one involving a vessel carrying 4.7 million gallons of No. 6 fuel oil. <u>Id.</u>

Most recently, in April 2003 the barge <u>Bouchard-120</u> released an estimated 98,000 gallons of heavy fuel oil into the Bay, killing hundreds of birds, closing thousands of acres of shellfish beds, affecting over 90 miles of coastline, and generating significant clean-up costs.[5] Massachusetts responded by enacting MOSPA on August 4, 2004. 2004 Mass. Acts at 933.

---

[4]      In 1989, in nearby Narragansett Bay in Rhode Island, an oil tanker ran aground and spilled over 300,000 gallons of heating oil. The responsible individuals pled guilty in criminal proceedings under the Clean Water Act, <u>see</u> 33 U.S.C. § 1319(c), and they also agreed to pay fines, clean-up costs, and damages totaling over $9 million. <u>See</u> <u>Ballard Shipping</u>, 32 F.3d at 624.

[5]      The United States prosecuted the owner of the <u>Bouchard-120</u> under the federal Clean Water Act, 33 U.S.C. §§ 1319(c)(1), 1321(b)(3). The charge was negligent discharge of pollutant. The oil barge, being towed by a tug boat, traveled outside the Buzzards Bay channel and struck rocky shoals. The owner paid a fine of $10 million, $7 million of which went to wetlands conservation projects. The owner also pled guilty to violating the Migratory Bird Treaty Act, <u>see</u> 16 U.S.C. §§ 703, 707(a), as the spill had killed hundreds of federally protected birds.

-8-

## II. DESCRIPTION OF FEDERAL LAW

A.     Background

Federal regulation of maritime commerce has existed since the founding of the country. See Act of Sept. 1, 1789, ch. 11, § 1, 1 Stat. 55. Federal regulation specifically geared toward the transport of dangerous cargoes started with the Tank Vessel Act of 1936, Pub. L. No. 74-765, 49 Stat. 1889. See K. Brooks, California Oil Spill Laws in the Wake of United States v. Locke, 12 U.S.F. Mar. L.J. 227, 230 (1999-2000). Regulatory involvement increased after 1967, the year of a massive oil spill involving a supertanker off the coast of England. Indeed, Congress has since enacted more stringent legislation for oil tankers and more comprehensive remedies for oil spills.

The PWSA is a key component of this congressional response. It has two titles, both or which are at issue here, which we describe in greater detail later. Title I authorizes the Coast Guard to issue regulations on subjects within that title, although it does not so mandate. 33 U.S.C. § 1223(a). Title II works differently; it requires the Coast Guard to issue federal regulations governing subjects covered by that title. 46 U.S.C. § 3703(a).

Several states have enacted statutes and regulations designed to give still greater protection against oil spills. The Supreme Court's 1978 decision in Ray concerned such state laws.

-9-

Ray held that certain provisions of a Washington statute (concerning tanker design, tanker size, and pilotage requirements for enrolled vessels[6]) were preempted by federal law. 435 U.S. at 159-60, 168, 178. Ray did uphold Washington's limited tug escort requirement for Puget Sound against a preemption challenge. Id. at 173.

Despite the protections of the PWSA, in 1989 the supertanker Exxon Valdez ran aground in Alaska, causing the largest oil spill in United States history. The key congressional response was the 1990 enactment of OPA. OPA has nine titles, including provisions imposing liability on parties responsible for damages and other costs stemming from oil spills. See 33 U.S.C. § 2702. Two "savings clauses" in OPA's Title I expressly preserve and recognize state authority to impose additional liability requirements and penalties. Id. § 2718(a)(1), (c).

The scope of these savings clauses was at issue in Locke. On certiorari to the Supreme Court, the United States argued that several provisions of the Washington Administrative Code were preempted; the federal government stressed the foreign relations[7]

---

[6] Enrolled vessels are those "engaged in domestic or coastwide trade or used for fishing." Douglas, 431 U.S. at 273.

[7] The foreign governments of thirteen ocean-going nations expressed concerns about the state scheme through a diplomatic note sent to the United States; that note was provided to the district court. The note protested that because there were inconsistencies between state and federal regulations regarding tanker personnel, equipment, and operations, permitting Washington's rules to take

and international commerce aspects of the case. <u>Locke</u>, 529 U.S. at 102-03.

Locke governs this case. The distinctions that Locke drew are the subject of dispute among the parties here. Locke held that several provisions of Washington's regulations were preempted by federal law. <u>Id.</u> at 112-17. The Locke Court held that PWSA's Title II preempted three state regulations (requiring training for tanker crews, mandating English language proficiency, and imposing a general statewide navigation-watch requirement). <u>Id.</u> at 112-14. The Court also held that a fourth regulation (governing the reporting of marine casualties) was preempted by a different federal statute, 46 U.S.C. § 6101. <u>Id.</u> at 114-16.

Locke did not definitively rule on all of the regulations before it. Instead, the Court remanded the issue of whether certain regulations, such as the state's watch requirement in times

effect would result in uncertainty and confusion. <u>Locke</u>, 529 U.S. at 98.

Locke thus presented issues regarding the need for national uniformity for this country in the international community. <u>Id.</u> at 102-03; <u>cf.</u> <u>Crosby</u> v. <u>Nat'l Foreign Trade Council</u>, 530 U.S. 363, 373-74 (2000). The United States argued that various treaties preempted Washington's regulations, including the International Convention for the Safety of Life at Sea, 1974, 32 U.S.T. 47; the International Convention for Prevention of Pollution from Ships, 1973, S. Exec. Doc. C, 93-1, 12 I.L.M. 1319, as amended by 1978 Protocol, S. Exec. Doc. C, 96-1, 17 I.L.M. 546; and the International Convention of Standards of Training, Certification and Watchkeeping for Seafarers, with Annex, 1978 (STCW), S. Exec. Doc. EE 96-1, C.T.I.A. No. 7624. <u>Locke</u>, 529 U.S. 102-03. The Court did not reach the United States' arguments based on these treaties and international agreements. <u>Id.</u> at 103.

-11-

of restricted visibility, were of limited extraterritorial effect and were necessary to address the peculiarities of Puget Sound -- factors that would weigh in favor of a Title I conflict preemption analysis rather than a Title II field preemption analysis. Id. at 116-17.  The Court stated that the resolution of these matters would benefit from a full development of the record, noting that the United States did not enter the case until appeal. Id.

For our purposes, Locke established a number of significant rules. Locke held that OPA's savings clauses preserved only "state laws of a scope similar to the matters contained in Title I of OPA," id. at 105, and did not constitute a reversal of Ray's preemption rules as to Title I and Title II of the PWSA, id. at 105-07.  Rather, OPA only preserved state authority in the limited area of establishing liability rules and imposing financial requirements regarding oil spills.[8] Id. at 105.

Locke also rejected the use of general presumptions, either for or against preemption, and instead called for close analysis of the federal statutory structure. Locke expressly repudiated any notion, which might have survived Ray, that there is any presumption of non-preemption of state rules. Id. at 107-08. Locke pointed out that the federal interest in national and

---

[8]     Earlier, in Askew v. American Waterways Operators, Inc., 411 U.S. 325 (1973), the Court had sustained, against a maritime law preemption challenge, a state statute imposing strict liability for oil spills. Id. at 327-29.

international maritime commerce was one of the reasons cited in the Federalist Papers for adopting the Constitution, and the Court detailed the numerous federal statutes and treaties in the area. Id. at 99-103, 108. At the same time, however, Locke did not put in place the opposite presumption, a presumption favoring preemption. Rather, the validity of state regulation must be judged against the "federal statutory structure." Id. at 108. Indeed, "[n]o artificial presumption aids us in determining the scope of appropriate local regulation under the PWSA." Id.; see also P. Gudridge, Comment, United States v. Locke, 120 S. Ct. 1135, 94 Am. J. Int'l L. 745, 748 (2000).

Locke reinforced Ray's two-category approach to preemption: either field preemption or conflict preemption is to be used. Locke, 529 U.S. at 109-11. Locke also went further, recognizing that it would not always be clear which of the two models would apply. It added a new overlap analysis to resolve that question. See id. at 112.

Field preemption applies to state law on subjects which are within the province of Title II of the PWSA. Id. at 110-11. Other sources of federal maritime regulation may also preempt state law, even if the state law is consistent with federal law. Id. at 114-16.

By contrast, Locke held that conflict preemption applies to state regulations within the scope of Title I. Title I of the

-13-

PWSA does not expressly preserve state power (unlike OPA).  But
Title I also does not preempt with the same force as Title II.
Rather, state law in areas within the province of Title I are
subject to standard conflict preemption analysis, primarily the
model which the Court has utilized in Commerce Clause cases.  Id.
at 109-10; see also Bethlehem Steel Co. v. N.Y. State Labor
Relations Bd., 330 U.S. 767, 773-74 (1947) (discussing federal
preemption of state regulation in the Commerce Clause context).

Locke's conflict preemption analysis involves an initial
inquiry into whether federal authority has been exercised through
a regulation intended to displace state law, or by a federal
decision of the Coast Guard that there should be no regulation of
the subject in question.  529 U.S. at 109-10.  A conflict arises
"when compliance with both state and federal law is impossible, or
when the state law stands as an obstacle to the accomplishment and
execution of the full purposes and objective of Congress."  Id. at
109 (quoting California v. ARC Am. Corp., 490 U.S. 93, 100-101
(1989)) (internal quotation marks omitted).  "In this context,
Coast Guard regulations are to be given pre-emptive effect over
conflicting state laws."⁹  Id. at 109-10.

---

⁹      State laws can be preempted by federal regulations as
well as by federal statutes. City of New York v. FCC, 486 U.S. 57,
63-64 (1988); Hillsborough County v. Automated Med. Labs., Inc.,
471 U.S. 707, 713 (1985).  When the Coast Guard makes a
determination not to impose a regulation, this may amount to a
decision that no regulation at either the state or federal level is
appropriate. See Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n,

-14-

Overlap analysis applies when a state law falls within the overlapping coverage of Title I and Title II. We describe that overlap analysis below.

B.      Title I, Title II, and Overlap Analysis

The respective scopes of Title I and Title II play a crucial role in any preemption analysis under the PWSA. This necessitates a more detailed discussion of these provisions.

Congress has, by statute, occupied the field with respect to subject matters addressed in Title II of the PWSA.[10] The subject matter of Title II, "Vessels Carrying Certain Cargoes in Bulk," is generally defined at 46 U.S.C. § 3703(a):

> The Secretary shall prescribe regulations for
> the design, construction, alteration, repair,
> maintenance, operation, equipping, personnel
> qualification, and manning of vessels to which
> this chapter applies, that may be necessary
> for increased protection against hazards to

461 U.S. 375, 384 (1983); Ray, 435 U.S. at 171-72. However, a decision by the Coast Guard not to regulate in a field does not necessarily mean that the Coast Guard intended to preempt state law. See Sprietsma v. Mercury Marine, 537 U.S. 51, 65-67 (2002).

[10]    Other sources of federal maritime law may also preempt state regulation by occupying the field. This is true even if the state requirements are very similar to federal requirements. For example, Locke held that Washington's marine casualty reporting requirement was preempted, despite its similarity to federal requirements, because "Congress intended that the Coast Guard regulations [under 46 U.S.C. § 6101] be the sole source of a vessel's reporting obligations." 529 U.S. at 115. The state's reporting requirement created a significant burden in terms of costs, posed a risk of innocent non-compliance, and affected a vessel operator's out-of-state obligations and conduct -- factors which called into question the state's authority to regulate. Id. at 116.

-15-

> life and property, for navigation and vessel safety, and for enhanced protection of the marine environment.

Congress has required the Coast Guard to issue regulations under Title II, which "shall include requirements about . . . (3) equipment and appliances for . . . prevention and mitigation of damage to the marine environment; [and] (4) the manning of vessels and the duties, qualifications, and training of the officers and crew." 46 U.S.C. § 3703(a).

By contrast, conflict preemption is applied to state statutes and regulations concerning subject matters within Title I of the PWSA. See Locke, 529 U.S. at 109. The subject matter of Title I is defined by statute:

> Subject to the requirements of section 1224 of this title, the Secretary --
>
> (1) in any port or place under the jurisdiction of the United States, in the navigable waters of the United States, or in any area covered by an international agreement negotiated pursuant to section 1230 of this title, may construct, operate, maintain, improve, or expand vessel traffic services, consisting of measures for controlling or supervising vessel traffic or for protecting navigation and the marine environment and may include, but need not be limited to one or more of the following: reporting and operating requirements, surveillance and communications systems, routing systems, and fairways . . . .

33 U.S.C. § 1223(a). As the United States has stated, the subject matter of Title I is characterized generally by matters of local concern, and, absent issuance of federal regulations or a decision

-16-

not to allow state regulation under Title I, state regulation is not preempted in areas subject to that title.

Title I and Title II overlap in some instances. For example, both titles cover, in different contexts, "operating" requirements. See id. § 1223(a)(1) (Secretary may impose measures including, inter alia, "operating requirements"); id. § 1223(a)(4)(D) (Secretary may "restrict[] operation, in any hazardous area or under hazardous conditions, to vessels which have particular operating characteristics or capabilities which he considers necessary for safe operation under the circumstances"); 46 U.S.C. § 3703(a) (requiring Secretary to "prescribe regulations for the . . . operation . . . and manning of vessels to which this chapter applies"); see also Locke, 529 U.S. at 116 (remanding for consideration of whether a state navigation-watch requirement should be analyzed under Title I conflict preemption or Title II field preemption). Further, each title purports to have as one of its purposes the protection of the environment. See 33 U.S.C. § 1223(a)(1) (authorizing regulations on covered subjects "for protecting navigation and the marine environment"); 46 U.S.C. § 3703(a) (requiring regulations on covered subjects "that may be necessary . . . for enhanced protection of the marine environment").

As a result, Locke recognized that "[t]he existence of some overlapping coverage between the two titles of the PWSA may

-17-

make it difficult to determine whether a pre-emption question is controlled by conflict pre-emption principles, applicable generally to Title I, or by field pre-emption rules, applicable generally to Title II."  529 U.S. at 111.  In such instances of overlap, not every question will be resolved "by the greater pre-emptive force of Title II."  Id.  Rather, "conflict pre-emption under Title I will be applicable in some, although not all, cases."  Id. at 111-12.

In resolving preemption questions in cases of overlapping coverage, Locke instructs courts to consider these factors[11]:  (1) "the type of regulations the Secretary has actually promulgated under [Title II]";  (2) whether the regulation falls within the specific type listed in § 3703(a) as required to be promulgated; (3) whether the federal rule is "justified by conditions unique to a particular port or waterway" (e.g., a Title I regulation based on water depth in Puget Sound or other local peculiarities);  (4) whether the state regulation is "of limited extraterritorial effect, not requiring the tanker to modify its primary conduct outside the specific body of water purported to justify the local rule";  and (5) whether the state regulation is one that "pose[s] a minimal risk of innocent noncompliance, do[es] not affect vessel

---

[11]    These factors are drawn from themes identified in other Supreme Court cases.  "Whether federal [regulation] operates to preempt state regulation will ordinarily depend on the respective aims of the state and federal schemes."  L. Tribe, American Constitutional Law § 6-28, at 506-07 (2d ed. 1988).

operations outside the jurisdiction, do[es] not require adjustment
of systemic aspects of the vessel, and do[es] not impose a
substantial burden on the vessel's operation within the local
jurisdiction itself." Id. at 112.

In the same vein, Ray instructed federal courts
addressing such maritime environmental cases to look to the
respective purposes of the federal and state laws. 435 U.S. at
164-65. This "purpose" rule emerged from earlier Supreme Court
Commerce Clause cases such as Huron Portland Cement Co. v. City of
Detroit, 362 U.S. 440 (1960), and Kelly v. Washington, 302 U.S. 1
(1937).[12] Overlap analysis thus involves some identification of the
relative purposes and domains of Title I and Title II. See
Medtronic, Inc. v. Lohr, 518 U.S. 470, 484 (1996) (stressing the

_____

[12]     In Huron, the Court found that the state law at issue was
not preempted; in doing so the Court contrasted the purpose of
federal inspection laws, which sought "to insure the seagoing
safety of vessels subject to inspection," with the purpose of a
Detroit ordinance, which sought to eliminate air pollution "to
protect the health and enhance the cleanliness of the local
community." 362 U.S. at 445-46. In Kelly, the Court similarly
upheld state legislation concerning motor-driven tugs, and it
considered the state law's purpose of insuring safety and
determining seaworthiness. 302 U.S. at 8, 14-16.
         "[T]he principles developed [under Commerce Clause
preemption] are not limited to [that] context; essentially the same
techniques are used to determine the consequences for state action
of any exercise of a plenary federal authority." Tribe, supra,
§ 6-29, at 508. Nonetheless, there are some distinctions between
Commerce Clause preemption rules and maritime preemption rules.
See Am. Dredging Co. v. Miller, 510 U.S. 443, 452 n.3 (1994)
(distinguishing "negative Commerce Clause" jurisprudence, and
commenting that "[w]hatever might be the unifying theme of this
aspect of our admiralty jurisprudence, it assuredly is not . . .
the principle that the States may not impair maritime commerce").

-19-

need to identify the "domain" of the statutory clause said to preempt state law). Ray appeared to consider Title II to be concerned with matters that are properly subject to national rules, see 435 U.S. at 165-66 & n.15, while Title I is more concerned with rules "arising from the peculiarities of local waters that call for special precautionary measures,"[13] id. at 171.

Against this background, we turn to the preemption analysis of the specific MOSPA sections.

### III. VESSEL MANNING REQUIREMENTS FOR BUZZARDS BAY

The district court held that the two vessel manning requirements of Mass. Gen. Laws ch. 21M, § 4 -- for tank barges and for tow vessels in Buzzards Bay -- are field preempted because they are unambiguously covered by Title II, and not Title I.   The

---

[13]   As another commentator has noted:

> Whether preemption is to turn on an overlap of "subject," "object" or "purpose," or on interference with "federal superintendence of the field," is crucial to the analysis. Virtually every state regulation of merchant vessel safety can also be characterized as having a "pollution prevention" purpose. Thus, federal legislation on the subject of vessel construction, design, equipment, and manning . . ., but having, by the court's characterization, a purpose other than pollution prevention, would not occupy the field of pollution prevention addressed by the challenged state law.

C. Allen, Federalism in the Era of International Standards: Federal and State Government Regulation of Merchant Vessels in the United States (Part III), 30 J. Mar. L. & Com. 85, 94 (1999).

-20-

district court did not engage in the overlap analysis described in Locke. See Massachusetts, 440 F. Supp. 2d at 35-37. The United States did not seriously present argument to the district court that if Title I applied, federal regulations preempted the vessel manning requirements.

Subject to certain exceptions,[14] the state's manning provision for "tank barges" requires that crews consist of "2 personnel, 1 of whom shall be a certified tanker-man under [federal regulations] who shall be on the tank barge at all times." Mass. Gen. Laws ch. 21M, § 4(b). The manning provision for "tow vessels" towing 6000 or more barrels of oil requires (a) "at least 1 licensed deck officer or tow vessel operator, who shall serve exclusively as a lookout with no other concurrent duties," and (b) "three licensed officers or tow vessel operators." Id. § 4(a).

The parties raise different preemption arguments for section 4(b), the tank barge provision, and for section 4(a), the tow vessel provision.

A.      The Section 4(b) Tank Barge Manning Requirement in Buzzards Bay

Massachusetts argues that although section (4)(b)'s tank barge manning requirement could be encompassed by Title II, there is nonetheless overlap with Title I. Because of this overlap, the

---

[14]      Section 4(b) exempts barges that carry less than 6000 gallons of oil, as well as barges that are not equipped to carry personnel on board. Section 4(c) additionally exempts double-hulled barges from the requirements of section 4(b).

state contends that more facts needed to be developed, and so the issue should not have been resolved at the pleadings stage.

The United States disagrees, arguing that because "the manning of vessels" is listed in Title II,[15] see 46 U.S.C. § 3703(a)(4), all state manning regulations are field preempted by Title II and no overlap analysis is necessary. That contention overreaches. The position of the United States, which the district court accepted, is inconsistent with Locke's recognition that Title I and Title II can overlap. See 529 U.S. at 111.

While the district court was correct to begin with the text of the Title II, this should not have ended the inquiry. Title II of the PWSA addresses the "manning of vessels to which this chapter applies," 46 U.S.C. § 3703(a), and the chapter applies to "tank vessels," see id. § 3702(a). A tank vessel is in turn defined as

> a vessel that is constructed or adapted to carry, or that carries, oil or hazardous material in bulk as cargo or cargo residue, and that -- (A) is a vessel of the United States; (B) operates on the navigable waters of the United States; or (C) transfers oil or hazardous material in a port or place subject to the jurisdiction of the United States.

---

[15]   The Coast Guard has in fact promulgated regulations requiring tankers to "navigate with at least two licensed deck officers on watch . . ., one of whom may be a pilot. In waters where a pilot is required, the second officer . . . must be an individual licensed and assigned to the vessel as master, mate, or officer in charge of a navigational watch," separate from the pilot.   33 C.F.R. § 164.13(c).

Id. § 2101(39). Congress required the Coast Guard to promulgate regulations addressing "the manning of [tank] vessels and the duties, qualifications, and training of the officers and crew." Id. § 3703(a)(4).

Courts must also examine the text of Title I when analyzing the preemptive effect of the PWSA on particular state regulations. See Locke, 529 U.S. at 111-12. As the state points out, Title I gives the Secretary authority to promulgate regulations for protecting the marine environment, which may include "operating requirements." 33 U.S.C. § 1223(a)(1). Further, for areas the Secretary considers to be hazardous, the Secretary may establish "vessel operating conditions" and/or may restrict operations to "vessels which have particular operating characteristics or capabilities which he considers necessary for safe operation." Id. § 1223(a)(4)(C), (D). The state argues that its manning requirements are thus a type of operational requirement under Title I, for certain vessels in Buzzards Bay, and not a general manning requirement under Title II.

The United States responds that the phrase "operating requirements" is a term of art that refers only to navigational operations in a traffic safety system of the type expressly addressed in Title I of the PWSA. The general operation and manning of vessels, the United States says, are dealt with in Title II and are thus field preempted. See 46 U.S.C. § 3703(a).

-23-

As the state notes, however, Title I's Statement of Policy also refers to "manning": "The Congress finds and declares . . . that increased supervision of <u>vessel</u> . . . <u>operations</u> is necessary in order to . . . insure that vessels operating in the navigable waters of the United States shall comply with all applicable standards and requirements for vessel construction, equipment, <u>manning</u>, and operational procedures." 33 U.S.C. § 1221(c)(3) (emphases added). Analysis of the texts of Title I and Title II does not fully resolve the source of the potential preemption here. Nor does initial consideration of the purposes behind Title I and Title II resolve the matter. Both Titles are concerned with enhanced protection of the marine environment. <u>See</u> <u>Locke</u>, 529 U.S. at 110-11. As a result, that cannot itself be the distinguishing factor. Nor is it helpful to talk abstractly about the safety of vessels, which, depending on the particular regulations at issue, may be a Title I or a Title II concern.

The analysis becomes clearer when one considers <u>Locke</u>'s approach. The Court invalidated training requirements which applied statewide, controlled manning outside of state waters, and did not address "matters unique to the waters of Puget Sound." <u>Id.</u> at 113. The Court also invalidated an English language proficiency requirement for tanker crews that affected staffing decisions outside of state waters and was "not limited to governing local traffic or local peculiarities." <u>Id.</u> at 113-14. Further, the

-24-

Court invalidated as field preempted a statewide navigation-watch requirement. The Court noted that this was a general operation and manning requirement under Title II because "[t]he general watch requirement is not tied to the peculiarities of Puget Sound; it applies throughout Washington's waters and at all times." Id. at 114. Locke thus held that the state's general watch regulation -- requiring at least four specified personnel in state waters at all times -- was preempted by Title II as an attempt to regulate a tanker's "operation" and "manning" under 46 U.S.C. § 3703(a). Id.

However, at the same time, the Court remanded for performance of an overlap analysis to determine whether a narrower navigation-watch requirement, for times of restricted visibility, should be analyzed under Title I. In line with the Court's articulation of the method for differentiating between Title I and Title II concerns, the Court suggested that, on remand, consideration should be given to Washington's arguments that the narrower requirement was "of limited extraterritorial effect and necessary to address the peculiarities of Puget Sound." Id. at 116.

Relying on this aspect of Locke, the state suggests that any time a state regulation on a given topic is restricted to a particular local waterway, overlap analysis is required. This argument stretches too far and is inconsistent with the balance of Locke as well as Ray. Some topics are Title II topics, regardless

-25-

of limited geographic application, as the state has essentially conceded in not attempting to defend other sections of its statute. With regard to the manning requirement before us, however, the district court must undertake an overlap inquiry, including a full consideration of the various Locke factors. Further development of the record is in order to resolve this point.

The United States suggests to us that even if Title I conflict preemption analysis were used, various federal requirements in the area of manning, including regulations promulgated under Title I, suffice to preempt. See, e.g., 33 C.F.R. § 164.13(c). The argument has not been sufficiently made either before the district court or on appeal, and can be made on remand.

B.      The Section 4(a) Tow Vessel Manning Requirement in Buzzards Bay

We have concluded that the state's tank barge manning requirements for Buzzards Bay must be reconsidered under overlap analysis. For similar reasons, we also conclude that a remand is necessary on the state's tow vessel manning provisions.

The state nonetheless asks us to go farther. It points out that the text of Title II addresses "tank vessels," not "tow vessels," see 46 U.S.C. § 3702(a), and it contends that the two are not the same.[16] Accordingly, the state argues that section 4(a)

---

[16]      A "towing vessel" is "a commercial vessel engaged in or intending to engage in the service of pulling, pushing, or hauling

-26-

cannot be within the scope of Title II, and the provision's validity must instead be considered under Title I conflict preemption analysis.

The United States disagrees with this interpretation of the PWSA. It argues that although the PWSA expressly addresses "tank vessels," and not "tow vessels," that fact is immaterial. The definition of "tank vessel" includes any vessel that "carries . . . oil or hazardous material in bulk as cargo," and not just vessels that are "constructed or adapted to carry . . . oil or hazardous material in bulk as cargo." Id. § 2101(39). That definition, in the United States' view, can encompass a tug vessel when it pushes, pulls, or hauls a vessel containing oil or hazardous material (although the vessel would not be within the scope of the definition when it carries some other type of cargo). This interpretation is based on an argument that when a vessel carrying oil or other hazardous material is not self-propelled and requires a tug (as would be the case with a barge), the tug and the non-self-propelled vessel effectively become one vessel which "carries" the cargo.

The state responds that a 2004 amendment added "towing vessels" to the list of vessels covered by a separate chapter of Title 46 of the United States Code, but did not similarly add

---

along side, or any combination of pulling, pushing, or hauling along side." 46 U.S.C. § 2101(40).

-27-

"towing vessels" to the list of vessels covered by Title II of the
PWSA.  See Coast Guard and Maritime Transportation Act of 2004,
Pub. L. No. 108-293, § 415, 118 Stat. 1028, 1047 (codified at 46
U.S.C. § 3301(15)).  The amended section already applied to "tank
vessels."  46 U.S.C. § 3301(10).  The state argues that this means
the term "tank vessel" does not encompass towing vessels.

The district court held that although Title II does not
expressly use the term "tow vessels," this was a legally
insignificant distinction.  Massachusetts, 440 F. Supp. 2d at 36-
37.  The district court adopted the United States' argument that
"towing vessels that are pushing, pulling, or hauling tank barges
carrying oil or other hazardous materials are, as part of the
tow-barge combination, 'tank vessels' and are, thus, within the
scope of Title II."  Id. at 37.

The court explained that adoption of the state's proposed
distinction between tank vessels and tow vessels would undermine
important federal interests:

> The towing vessel, although it does not
> physically carry the oil, is the crucial
> element of the tow-barge combination and,
> therefore, poses the most risk to the marine
> environment.    Defendants'    argument,
> furthermore, would give the Coast Guard
> exclusive jurisdiction to regulate one form of
> tank vessel, self-propelled tankers, but would
> grant concurrent jurisdiction with the states
> to regulate the driving force of the tow-tank
> barge combination. That result would make
> little practical sense and would hinder the
> Congressional  goal  of  creating  uniform
> national regulations for all tank vessels.

Id. This led the court to hold that the matter was clearly within
Title II, and so section 4(a) was field preempted. Id.

Our resolution of this appeal does not require us to
determine if the state or the federal government has correctly
interpreted the meaning of 'tank vessel.' Even if the federal
government's interpretation is correct, our discussion in Part
III.A shows why overlap analysis would still be required before a
court could find preemption as a matter of law. That is sufficient
for us to reverse the district court's decision to grant judgment
on the pleadings, and to remand this issue.[17]

---

[17]   We call the parties' attention to 33 C.F.R. § 138.20.
Section 138.20 was not promulgated under Title II, but instead
under both OPA and the Comprehensive Environmental Response,
Compensation, and Liability Act (CERCLA). The regulation's
definition of "tank vessel" clearly excludes tow vessels:

> Tank vessel means a vessel (other than . . . a
> towing or pushing vessel (tug) simply because
> it has in its custody a tank barge) that is
> constructed or adapted to carry, or that
> carries, oil or liquid hazardous material in
> bulk as cargo or cargo residue, and that --
>
> (1) Is a vessel of the United States;
>
> (2) Operates on the navigable waters; or
>
> (3) Transfers oil or hazardous material in a
> place subject to the jurisdiction of the
> United States.

33 C.F.R. § 138.20(b). With the exception of the parenthetical
clause, this definition is nearly identical to the Title II
definition of "tank vessel" found at 46 U.S.C. § 2101(39). We
leave the significance, if any, of this textual difference to the
preemption analysis to the district court in the first instance.

## IV.  TUG ESCORT REQUIREMENTS

The United States argues that the state's tug escort provisions, Mass. Gen. Laws ch. 21M, § 6, are in conflict with regulations promulgated under Title I, see 33 C.F.R. § 165.100(d)(1). The asserted conflict is that the Coast Guard has made a preemptive choice in these regulations that tug escort requirements be set by the Coast Guard on a regional basis, covering all of the First Coast Guard District.[18]

The state tug escort statute has three key provisions. It applies only to "area[s] of special interest within the waters of the commonwealth," Mass. Gen. Laws ch. 21M, § 6(a), which include Buzzards Bay, Vineyard Sound, and Mount Hope Bay,[19] id. § 1. Further, the statute prohibits a tank vessel carrying 6000 or more barrels of oil from entering or transiting such waters unless the tank vessel is accompanied by a tugboat escort. Id. § 6(a). Finally, the section does not apply to a self-propelled tank vessel. Id. § 6(b).

---

[18]   The First Coast Guard District is comprised of Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, and parts of New York and New Jersey. 33 C.F.R. § 3.05-1(b).

[19]   The statute also permits the state Secretary of Environmental Affairs to expand the definition to include other waters which meet particular criteria. See Mass. Gen. Laws ch. 21M, § 1. Further, section 6(c) permits the state commissioner to promulgate certain regulations. This case is confined to the facial constitutionality of the cited statutory provisions. No state regulations are at issue here, nor are any bodies of water implicated other than the three specifically listed in the statute.

The United States makes two preliminary arguments that we quickly reject. First, the United States attempts to redefine what is meant by conflict preemption in the Title I context. It argues that once the Coast Guard promulgates regulations on a subject, that ends the matter; there is essentially no room for any further preemption analysis. For example, the United States argues that "State regulatory authority does not survive once the Secretary establishes federal regulations under Title I."[20]  The argument overreaches.[21]

---

[20]  The district court's decision could be read to have adopted the United States' position: "In this case, the Coast Guard has regulated on the challenged subject. This court, therefore, need not [delve further into the Title I analysis]." Massachusetts, 440 F. Supp. 2d at 42.

[21]  The United States relies primarily on Ray to argue that when the federal government adopts a regulation covering an area within the scope of Title I, state regulation on the same subject is preempted.  It is true that Ray stated that "[t]he relevant inquiry under Title I with respect to the State's power to impose a tug-escort rule is thus whether the Secretary has either promulgated his own tug requirement for [local] tanker navigation or has decided that no such requirement should be imposed at all." 435 U.S. at 171-72.  On this record, however, neither of those premises is demonstrated.

We also note that Title I has changed since Ray, another issue that should be addressed on remand.  At the time of the Ray decision, 33 U.S.C. § 1222(b) had provided: "Nothing contained in this chapter [referring to Title I of the PWSA] . . . prevent[s] a State or political subdivision thereof from prescribing for structures only higher safety equipment requirements or safety standards than those which may be prescribed pursuant to this chapter."  33 U.S.C. § 1222(b) (1976) (emphases added).  Ray reasoned that since § 1222(b) permitted states to impose higher safety standards only for "structures," this "impliedly forb[ade] higher state standards for vessels."  Ray, 435 U.S. at 174.  The Court thus held that "the State may not impose higher safety standards than those prescribed by the Secretary [limiting the size

-31-

As pointed out by the state amici, the position of the United States converts <u>Locke</u>'s Title I conflict preemption analysis into something resembling a field preemption analysis. The United States' argument largely destroys the distinction between the two preemption models set forth in <u>Locke</u>, 529 U.S. at 109-10, as discussed above.

Perhaps the United States means only that if the Coast Guard Title I regulations had expressly preempted the state statute, courts would view the matter under a different model. An agency's preemption judgment is "dispositive on the question of implicit intent to pre-empt unless either the agency's position is inconsistent with clearly expressed congressional intent, or subsequent developments reveal a change in that position." <u>Hillsborough County</u> v. <u>Automated Med. Labs., Inc.</u>, 471 U.S. 707, 714-15 (1985) (citation omitted). Nonetheless, judicial review of that judgment would still be available. See <u>City of New York</u> v. <u>FCC</u>, 486 U.S. 57, 63-64 (1988). A court would review whether the

_____

of vessels in Puget Sound]." <u>Id.</u> at 175.

The language pertaining to higher state safety standards no longer appears at § 1222. In 1978, Congress amended Title I, deleting any mention of state safety standards from § 1222, and instead adding a different provision to § 1225. Port and Tanker Safety Act of 1978, § 2, 92 Stat. at 1471-75. Section 1225, entitled "Waterfront safety," now provides: "Nothing contained in this <u>section</u>, with respect to <u>structures</u>, prohibits a State or political subdivision thereof from prescribing higher safety equipment requirements or safety standards than those which may be prescribed by [federal] regulations . . . ." 33 U.S.C. § 1225(b) (emphases added). Again, we leave the significance of this change to the district court on remand.

-32-

agency's decision to preempt constitutes "a reasonable accommodation of conflicting policies . . . committed to [its] care" and whether "it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." Id. at 64 (quoting United States v. Shimer, 367 U.S. 374, 383 (1961)) (internal quotation marks omitted); see also Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153-54 (1982). As we explain, the district court should engage in this review on remand.

The United States secondly suggests that Massachusetts' tug escort provisions are statutorily preempted by the Coast Guard Authorization Act of 1998 (CGAA), Pub. L. No. 105-383, 112 Stat. 3411, under which Congress, apparently frustrated that the Coast Guard had not acted under Title I as to waters in the Northeast, ordered the Coast Guard to do so. Section 311(b)(1)(A) of the CGAA provides that "[n]ot later than December 31, 1998, the [Coast Guard] shall promulgate regulations for towing vessel and barge safety for the waters of the Northeast." Id. at 3423 (emphasis added).

The statutory phrase is not an expression of intent by Congress that any such Coast Guard regulations -- regardless of scope, subject matter, or expression of intent to preempt -- would occupy the field. It is a command to the Coast Guard to promulgate

-33-

certain types of regulations, which it already had authority to do under Title I.

The pertinent federal regulations cover the whole of the First Coast Guard District, including Massachusetts. 33 C.F.R. § 165.100(d)(1)(i), (ii) (effective January 29, 1999); 63 Fed. Reg. 71,764, 71,771 (Dec. 30, 1998). The regulations require that single-hull tank barges, unless being towed by a twin-screw propulsion primary towing vessel (with separate power for each screw), must be accompanied by a tugboat escort.[22]   33 C.F.R. § 165.100(d)(1)(i). The federal regulations specifically exclude double-hull tank barges from the tug escort requirement.   Id. § 165.100(d)(1)(ii).

The United States argues that Massachusetts' tug escort provisions for sensitive waters are preempted because they are inconsistent with the Coast Guard's regulatory choice that the topic of tug escorts in Northeast waters be regulated on a regional basis. A federal agency's choice in favor of national or regional regulation is a ground for conflict preemption. See Locke, 529 U.S. at 109-10. Significantly, the United States has not argued on appeal that it would literally be impossible for ships to comply

---

[22]   The federal regulations delegate some authority to the "Captain of the Port" to grant exceptions to the tug escort rule. 33 C.F.R. § 165.100(d)(1)(iii).   In a different paragraph, the regulations also impose special enhanced radio communication requirements for some sensitive locations within Massachusetts' waters.   Id. § 165.100(d)(2).

-34-

with both the state statute and federal regulations concerning tug escorts.[23]

The state responds on two fronts. The first argument is that there is no conflict preemption here because the Coast Guard regulations do not impose a "local navigation rule," as does Mass. Gen. Laws ch. 21M, § 6. The state asserts that its law is valid if the Coast Guard has not adopted a rule regarding the particular waters addressed by the challenged state law. In essence, the state reads Ray to say that Title I conflict preemption requires an exact coincidence between the subject matters of the federal and state regulations. Ray says no such thing. Although Ray did express an interest in whether the Secretary had "promulgated his own tug requirement for Puget Sound," 435 U.S. at 171 (emphasis added), the Court did not hold that an exact coincidence in subject matter was required to find conflict preemption, id. at 171-72, 174-75.

Indeed, there was no federal regulation in Ray purporting to regulate the use of tug escorts specifically in Puget Sound, nor was there a federal regulation covering a broader area which

---

[23]    The district court did find such an impossibility, stating that "[t]ank barges traveling through Massachusetts waters . . . cannot comply with both the state and federal regulations." Massachusetts, 440 F. Supp. 2d at 42.  The state protests that there is no impossibility because nothing in the federal regulations prohibits taking on a tugboat escort.  The United States has neither relied on nor defended the district court's ruling, so we do not consider it.

included Puget Sound.[24]   Id. at 171-72.   Here, the federal regulations contain within their breadth the narrower group of waters which are the subject of state regulation. Crucially, the state's argument contains an assumption that federal regulation on a regional basis is disfavored, and that there is a presumption in favor of state regulation of local waters. Not so, as Locke makes clear. 529 U.S. at 108. As it is framed, the state's argument is untenable.

More generally, the state argues that the Coast Guard has not determined that 33 C.F.R. § 165.100(d)(1) preempts the state tug escort rule at issue. The initial question is whether the Coast Guard has expressed an intent to preempt Mass. Gen. Laws ch. 21M, § 6. The United States argues that it is obvious from the regulation and the Coast Guard's accompanying statements that such an intent has been expressed.

The law of preemption by agency regulation, as the state amici point out, requires a clear statement from the federal agency of its intention to preempt the state regulation at issue. The Supreme Court has held that "it is appropriate to expect an administrative regulation to declare any intention to pre-empt

---

[24]   The Court did comment that then-pending rulemaking "requir[ing] tug escorts for certain vessels operating in confined waters," if passed, had the potential to preempt the state's tug escort rule. Ray, 435 U.S. at 172 (emphasis added); see also 41 Fed. Reg. 18,770, 18,771 (May 6, 1976). Notably, the Court did not suggest that the federal rule would need to specify particular "confined waters" in order to preempt the state's tug escort rule.

state law with some specificity." Cal. Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 583 (1987) (citing Hillsborough County, 471 U.S. at 718). Like other federal agencies, the Coast Guard must, "[t]o the extent practicable and permitted by law," publish a federalism summary impact statement discussing "any regulation that has federalism implications and that preempts State law," after consultation with state and local officials. Exec. Order No. 13,132, § 6(c), 64 Fed. Reg. 43,255, 43,258 (Aug. 4, 1999). We apply this specificity requirement.

The relevant administrative record on this issue does not consist merely of the First Coast Guard District regulations, 33 C.F.R. § 165.100, and the attendant 1998 Federal Register statement, 63 Fed. Reg. 71,764. It also consists of two later Federal Register statements, issued in 2004 and 2006, which are more pertinently about a proposed tug escort rule for Buzzards Bay. The 1998 Federal Register statement[25] could not have addressed MOSPA

---

[25]   The Coast Guard made several points in its 1998 explanation of the regulations at 33 C.F.R. § 165.100. Specifically noting the environmental sensitivity of waters in the Northeast, including Massachusetts waters, it stated: "This rule takes a regional approach responsive to the particular risks inherent in the transportation of petroleum products on the waterways in the Northeastern United States." 63 Fed. Reg. at 71,765. The Coast Guard noted that several New England states were attempting to regulate tank barges transporting oil, and that "[t]he states' differing legislative initiatives might result in inconsistent regulation of the industry." Id. The Coast Guard also noted comments that the rules for positive control of barges should be national in scope, but it rejected that position in favor of regional regulation. Id. at 71,765-66. The 1998 explanation contains no explicit statement rejecting state regulation of

-37-

because MOSPA was not enacted until 2004.  But the Coast Guard was well aware of MOSPA when it issued its two later statements.

In October 2004, the Coast Guard gave advance notice of proposed rulemaking that would require tug escorts for tank barges transiting Buzzards Bay.  See 69 Fed. Reg. at 62,427.  The advance notice solicited comments on, inter alia, seven questions.  Id. at 62,429.  As to federalism concerns, the 2004 notice took the position that several undefined provisions of MOSPA were preempted by the rulings in Locke and Ray, and specifically that section 17 of MOSPA (codified at Mass. Gen. Laws ch. 103, § 28), concerning pilotage requirements for certain vessels engaged in the coastwise trade, was preempted by operation of law.  Id. at 62,429-30; see also 2004 Mass. Acts at 933.  It is noteworthy that although the Coast Guard in its 2004 notice was clearly aware of the enactment of MOSPA, its federalism statement did not comment on the preemption of the tug escort provision, Mass. Gen. Laws ch. 21M, § 6.  See 69 Fed. Reg. at 62,429-30.  If the only pertinent statements were those in 1998 and 2004, we would conclude that the

_____

particularized local waters.

Significantly, under the heading of "Federalism," the Coast Guard discussed whether its regulations would preempt certain provisions of Rhode Island law.  The Coast Guard concluded, inter alia, that its regulations would preempt Rhode Island law on positive control for barges, found at R.I. Gen. Laws § 46-12.6-8(a)(3) (repealed 2000).  63 Fed. Reg. at 71,770.  The Rhode Island law had statewide application and was not limited to specified local waters.  1997 R.I. Pub. Laws 217, 217-18.

-38-

Coast Guard had not clearly expressed an intent to preempt the state tug escort provisions.

What throws the matter in doubt is the most recent federalism statement from the Coast Guard. The parties and the district court did not focus on the 2006 statement. In March 2006, the Coast Guard issued a notice of proposed rulemaking for Buzzards Bay, 71 Fed. Reg. 15,649.[26] That notice, like the 2004 notice, states that section 17 of MOSPA is void by operation of law. Id. at 15,653. The 2006 notice also suggests that parts of section 11 of MOSPA -- which is codified at Mass. Gen. Laws ch. 21M, §§ 1-8, and so covers the relevant provision -- are preempted. The 2006 notice specifically mentions the tug escort requirements for vessels in Buzzards Bay (codified at Mass. Gen. Laws ch. 21M, § 6), and suggests, for the first time, that these requirements are

_____

[26]   The proposed amendments for the First Coast Guard District Regulated Navigation Area

> would require that all single-hull tank barges carrying 5000 or more barrels of oil or other hazardous material and being towed through Buzzards Bay, meet the following requirements: 1. Be accompanied by an escort tug between the west entrance to Buzzards Bay and the east end of the Cape Cod Canal.
> 2. Be accompanied by a federally licensed pilot, who may remain on the escort tug vessel, to monitor the navigation of the tug/barge, and to advise the master of the tug/barge accordingly.

71 Fed. Reg. at 15,652. The proposed amendments also sought to establish a "Vessel Movement Reporting System" within Buzzards Bay to monitor the movements of certain vessels. Id.

-39-

preempted. It does so not by expressing a direct intent to preempt, but by stating a conclusion that Locke and Ray operate to preempt Mass. Gen. Laws ch. 21M, § 6. 71 Fed. Reg. at 15,653. Further, the language suggesting that Mass. Gen. Laws ch. 21M, § 6 is preempted is not as explicit as that used to signal the preemption of section 17 of MOSPA. See 71 Fed. Reg. at 15,653.

Under these circumstances, the better course is to remand. The parties should have the opportunity to address, among any other issues, the questions of whether the Coast Guard sufficiently expressed a clear intent to preempt the state tug escort provisions in 2006, and whether, if so, the Coast Guard's position is clearly inconsistent with congressional intent. See Cal. Coastal Comm'n, 480 U.S. at 583; Hillsborough County, 471 U.S. at 714-15.

As was true in Ray, "[i]t may be that [federal] rules will be forthcoming that will pre-empt the State's present tug-escort rule . . . ." 435 U.S. at 172. For now, we remand and encourage the parties to take advantage of the federalism consultations between the Coast Guard and the Commonwealth of Massachusetts, which have already started. See 71 Fed. Reg. at 15,654; 69 Fed. Reg. at 62,430.

## V. THE STATE'S FINANCIAL ASSURANCE REQUIREMENT

The parties again disagree on the proper frame of analysis of the state's financial assurance statute and its

-40-

exception.  Nonetheless, the parties do agree that the analysis here is different from that of the other regulations at issue because Congress (through its enactment of OPA) has expressly saved the states' power to establish liability rules and related requirements.  See 33 U.S.C. § 2718.  Indeed, the Supreme Court has clarified that OPA did not preempt state power to "establish liability rules and financial requirements relating to oil spills." Locke, 529 U.S. at 105.

MOSPA's financial assurance requirement has two relevant parts, one of which is under attack, and the other of which is conceded not to be preempted (assuming it is severable).  In pertinent part, the state statute provides:

> (a) Any vessel, whether or not self-propelled, in or entering upon the waters of the commonwealth for the purpose of transporting, discharging or receiving a cargo of oil, hazardous material, or hazardous waste, shall be subject to the financial assurance requirements and penalty authority as provided in subsections (b) to (d), inclusive.
>
> (b) A certificate of financial assurance obtained individually or jointly by the vessel, its owner or agent, its charterer, or by the owner or operator of the terminal at which the vessel discharges or receives its cargo, shall be provided to the department in the amount of at least $1,000,000,000. Vessels with a capacity of less than 6,000 barrels shall present a certificate of financial assurance to the department of environmental protection in the amount of $5,000,000. A copy of the financial assurance shall be posted on the vessel.
>
> (c) . . . .

-41-

> (d) The department may allow financial
> assurance in a lower amount based upon
> criteria that includes, but is not limited to,
> the type and amount of the above cargo
> transported by the vessel; the size and
> construction of the vessel, including whether
> the vessel is double hulled; the safety record
> of the vessel or the vessel owner, the loss or
> accident history of the vessel or vessel owner
> involving maritime spills and the safety
> equipment used by the vessel. The financial
> assurance shall be in a form approved by the
> department.

Mass. Gen. Laws ch. 21, § 50C.

The United States concedes that, standing alone, the
provisions for the $1 billion and $5 million financial assurance
certificates (subsections (a) and (b)) are within the state's power
under OPA's savings clauses, 33 U.S.C. § 2718(a)(1), (c).[27] The
dispute is over section 50C(d), which provides that the state
Department of Environmental Protection may lower the amount of the
bond according to certain criteria, some of which are defined by
statute. The specified criteria include: "the type and amount of
cargo transported . . .; the size and construction of the vessel,
including whether the vessel is double hulled; the safety record of
the vessel or the vessel owner"; and the vessel's safety equipment.

---

[27] OPA's savings clauses refer only to liability
requirements related to the discharge of oil. However, MOSPA has
a broader scope, as its financial assurance provisions also apply
to vessels carrying hazardous materials. See Mass. Gen. Laws ch.
21, § 50C(a). The parties have not discussed this disconnect in
their briefs. Since the topic of hazardous materials has not been
addressed by the parties' briefs, we do not discuss it further.

Mass. Gen. Laws ch. 21, § 50C(d). The department is also given discretion to use other criteria. Id.

There are two relevant OPA savings clauses. The first,

33 U.S.C. § 2718(a)(1)(A), provides:

> Nothing in this Act . . . shall --
>
> (1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to --
>
> (A) the discharge of oil or other pollution by oil within such State . . . .

The second clause, 33 U.S.C. § 2718(c)(1), provides:

> Nothing in this Act . . . shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof --
>
> (1) to impose additional liability or additional requirements [relating to the discharge, or substantial threat of a discharge, of oil] . . . .

These clauses in OPA do not define "requirements." The clauses save state laws from preemption by OPA's Title I, but not from OPA's other titles, or from other federal statutes. Locke, 529 U.S. at 106.

The United States asserts that MOSPA is problematic because the exceptions in section 50C(d) encompass criteria at the core of PWSA's Title II.[28] Moreover, the state statute merely

---

[28] In support of its argument that section 50C(d) invades the province of Title II, the United States notes that Title II

-43-

provides that the criteria are to be administered by the state agency, and it offers no further guidance.

The United States asserts that the state may not regulate indirectly what it cannot regulate directly under Title II. The state and the Coalition acknowledge that an indirect regulation argument might survive Ray. Ray did consider such an indirect regulation theory, although there the theory did not concern a state financial assurance certification under OPA's savings clauses. See 435 U.S. at 173 & n.25 (inquiring whether a state's tug escort rule indirectly regulated primary conduct, and rejecting that possibility on the facts presented). Nonetheless, even assuming arguendo that some theory of impermissible indirect regulation is viable even in a savings clause case, the United States has not to date met its burden on its argument that the statute is not within the powers reserved to the states.

_____

specifically requires the Coast Guard to issue safety regulations that consider "the types and grades of cargo permitted to be on board a tank vessel." 46 U.S.C. § 3703(b). It also requires the Coast Guard to regulate tank vessel design standards, id. § 3703(a), mandates that the Coast Guard promulgate rules regarding "superstructures" and "hulls," id. § 3703(a)(1), requires the Coast Guard to prescribe rules regarding the equipping of tank vessels, id., and instructs the Coast Guard to issue rules concerning "equipment and appliances for lifesaving, fire protection, and prevention and mitigation of damage to the marine environment," id. § 3703(a)(3). The United States also points out that a different federal statute establishes reporting requirements. See id. § 6101 (requiring that the Coast Guard prescribe regulations on marine incident reporting and listing specific kinds of incidents that the regulations must cover).

In this case, the two sides take fundamentally different views of what constitutes impermissible indirect regulation. There is a lack of clarity regarding the exact nature of both the United States' claim and the state's defense. The issue can be viewed as a spectrum problem. On the one hand, there is the state's statutory choice to establish a financial assurance program, the cost of which may be reduced by criteria which are attuned to degree of risk. Such gradations are common to most insurance schemes. On the other hand, there is a federal fear that implementation of this scheme will lead to state regulation of primary conduct -- conduct that is exclusively under federal control pursuant to Title II.[29]

In the United States' view, MOSPA's impermissible indirect effect is inherent in the structure of its financial assurance provision. Because here, according to the United States, "the potential to influence primary conduct cannot be eliminated or even discounted," the statute is preempted as a matter of law. Under this theory, there is no need to present facts demonstrating

---

[29]     The state amici argue that there is no reason to assume that the state's scheme is a pretext to regulate Title II subjects, or to assume that the state has improper motives. However, the United States' objection is concerned with the potential effects of the scheme on primary conduct under Title II, regardless of motive. In any event, because there is insufficient evidence even of the statute's effects, we need not decide if improper motive is relevant to the preemption inquiry.

that the provision would impose an actual burden or impediment to federal Title II authority.

One might ask why, if the state may impose a $1 billion financial assurance requirement, a state may not also reduce the amount based on the objective criteria set forth in the statute -- criteria which appear, on their face, to be rationally related to the degree of the risk posed. After all, there would appear to be less risk of spillage from a double-hulled vessel. Similarly, a vessel's capacity would presumably be related to the amount of expected liability if a spill did occur. Tellingly, OPA itself has a federal financial assurance requirement; as recently amended by Congress, the statute requires differing amounts of financial assurance based on whether or not a vessel is single-hulled, based on whether or not the vessel is a "tank vessel," and based on the gross tonnage[30] of the vessel.  33 U.S.C. §§ 2704, 2716.

The United States responds that MOSPA's $1 billion requirement is effectively no more than a ceiling, and that in practice the amounts charged will vary depending on criteria that are exclusively under federal control under PWSA's Title II.  The United States argues that a state may never use criteria within

---

[30]    It appears that "gross tonnage" is a measure for a ship's internal capacity.    See Webster's Third New International Dictionary 2407 (1993); see also 46 C.F.R. § 69.9 ("Gross tonnage means a vessel's approximate volume.").

-46-

Title II to ground its decisions.[31]  That is because the state's
mechanism amounts to a financial incentive "for any design, cargo
or equipment changes that [state regulators] think appropriate."
We are doubtful that when Congress authorized the states to set
financial assurance requirements it at the same time meant per se
to preempt states from using graduated levels rationally related to
risk.  It is again worth observing that OPA itself imposes federal
financial assurance requirements that are not uniform for all
vessels.  Under the OPA regime, vessels over 300 gross tons with
oil on board, and certain other vessels of any size, are required
to provide evidence of financial responsibility sufficient to meet
OPA's liability maximums.  33 U.S.C. § 2716; see also id. § 2704
(setting forth liability maximums).  At the time OPA was enacted,
these maximums differed based on the vessel's gross tonnage, and
based on whether or not the vessel was a tank vessel.[32]  Pub. L. No.

---

[31]   Under the United States' theory, it would make no
difference if the state set a minimum amount for a bond and
ratcheted it up according to these defined criteria, or if the
state instead set a ceiling and ratcheted down.

[32]   A later amendment introduced even more gradations.  This
amendment significantly increased the size of the liability
maximums, and also adjusted the limits to take into account whether
or not a vessel is single hulled.  See Delaware River Protection
Act of 2006, Pub. L. No. 109-241, § 603, 120 Stat. 516, 553-54
(codified at 33 U.S.C. § 2704).  The amendment also required the
Coast Guard to report back to Congress, within 45 days of the
amendment's enactment, on the adequacy of the federal liability
limits.  Id.

   The Coast Guard has yet to revise its financial assurance
regulations to respond to this statutory amendment.  While it
"anticipate[s] initiating a rulemaking" to institute the changes,

-47-

101-380, § 1004(a), 104 Stat. at 491-92. In light of this, it is difficult to believe that Congress intended to preclude the states from similarly calibrating their financial assurance requirements to account for different vessel characteristics.

Moreover, we should not be quick to assume that Congress intended preemption here. One commentator has read Ray to mean that when a state provides for alternative courses of behavior, one preempted and one not, the overall state scheme is not preempted unless the state's requirements act to exert pressure on operators in preempted areas. See Tribe, supra, § 6-26, at 486-87. Ray considered and rejected such a claim on its facts, and in light of the Court's treatment of the issue, Professor Tribe has concluded that "the basic teaching of the [Ray] decision is that state pressure to act in derogation of a federal statutory scheme is not to be inferred lightly." Id. at 487.

That principle has even more force in our case. In OPA, Congress expressly preserved state power to require financial assurance. Ray's discussion of indirect regulation did not involve any such explicit congressional preservation. Moreover, Ray decided the indirect regulation issue on a detailed record replete with factual stipulations. 435 U.S. at 156, 173 & n.25. In this

71 Fed. Reg. 47,737, 47,738 (Aug. 18, 2006), it has told vessel operators that the prior requirements for submitting evidence of financial responsibility remain in effect until such rulemaking takes place, id.

context, we reject the United States' arguments that the existence of pressure to conform conduct can be decided here as a matter of law, and that the actual effects of the state statute are irrelevant.

As a fallback argument, the United States contends that it has established the existence of burdensome pressure, as MOSPA gives a state agency the authority to calibrate the assurance requirement on a case-by-case basis with only general guidance. It is not clear whether the United States means to argue that the state could constitutionally enact a financial assurance provision which, for example, allowed reductions according to a legislatively set schedule based on various design and other defined criteria.[33] Nor is it clear if the United States' position would permit a state to use regulations (rather than a statute) to enact such a provision, if these regulations reduced and cabined administrative discretion.

The district court took a different approach. It correctly held that the effect of the statute was relevant. It asked whether the practical effect of the $1 billion rule was to force vessels to seek reductions pursuant to the exemption scheme. Massachusetts, 440 F. Supp. 2d at 46. The court then decided, without hearing any evidence and on a motion for judgment on the

---

[33] The United States concedes that the state legislature "has substantial latitude to calibrate the bond requirement." But the full reach of this concession is not entirely clear.

pleadings, "that the Commonwealth's one billion dollar financial assurance requirement imposes such an onerous financial obligation on a tank vessel owner that it in effect forces compliance with the statutory exception criteria." Id.

As an initial matter, the $1 billion amount does not appear to be plainly unreasonable when measured against risk. The remedial costs of the Exxon Valdez spill in 1989 surpassed $2 billion (as measured in 1990 dollars). A. Rodriguez & P. Jaffe, The Oil Pollution Act of 1990, 15 Tul. Mar. L.J. 1, 16 (1990). In Buzzards Bay, while the clean-up costs from the 2003 spill were significantly lower, they were still sizable.[34]

Moreover, the record does not yet contain evidence about the requirements other states have set, industry usage and practice, or the costs of obtaining financial assurance. Nor have the parties even discussed or presented evidence about the requirements set by the federal government. While our own research on this last point has uncovered the federal rules, see 33 U.S.C. §§ 2704, 2716, those rules simply highlight the need for further

---

[34]    One estimate, offered by the Executive Director of the Buzzards Bay National Estuary Program, put those costs at $36 million, which was on top of the $10 million the vessel owners paid in criminal penalties. See J. Costa, Costs of the Bouchard No. 120 Oil Spill, http://www.buzzardsbay.org/oilspillcosts.htm (last updated Dec. 21, 2005); see also R. Mishra, Legal Technicality Derails $10M Redress for Oil Spill, Boston Globe, Sept. 15, 2004, at B2 (stating that $38 million had already been spent on clean-up). That spill involved "only" 98,000 gallons of oil. A larger spill, such as the 300,000 gallon spill that nearby Narragansett Bay saw in 1989, might be expected to impose far greater costs.

facts. Indeed, the federal requirements set a complicated formula based in part on a vessel's gross tonnage, and there is nothing in the record informing us about the gross tonnages of vessels that traverse Buzzards Bay.

Of course, even if the $1 billion amount were not in itself unreasonable, it is possible that such an amount would still place strong pressure on the industry to change its primary conduct. Yet there is simply no evidence on this point.

The district court also found it significant that there was a lack of notice to vessel owners about the specific criteria that the state would use in lowering the bond amount; this was the crux of its concern about the vagueness of the criteria and the untrammeled delegation to the state agency. See Massachusetts, 440 F. Supp. 2d at 46. Given its finding that the state system necessarily forced vessels into compliance with the exemptions, the court held that the exemption scheme necessarily undercut the certainty that federal regulation under Title II afforded the industry. Id.

The state characterizes the indirect regulation issue differently. It agrees with the district court that the analysis might turn on the practical effect of the $1 billion amount and the implemented exceptions. But it argues that there was no evidence of record to support the district court's conclusion. It also

-51-

points out that an offer of proof was made to the court of evidence that no real burden is posed by the exemptions to the statute.

The analysis presented thus far is insufficient to permit resolution of the matter on its merits. As the state has not yet exercised its administrative authority, it is unclear how it would choose to grant exceptions to the financial assurance requirement. We simply cannot yet say that MOSPA's section 50C(d) is incapable of any constitutional application. It may well be that the state will structure its decision making as to the exemption in a way that would frame the preemption question differently. It may even be that discussions between state and federal authorities would produce an agreed-upon scheme that adequately protects both state and federal interests. Given the absence of evidence at this stage, it is too early to know whether the state exception scheme would intrude impermissibly on the Coast Guard's exclusive authority under Title II.[35] On this record, the district court was

---

[35] Our conclusion, that a permanent injunction was premature, also encompasses the plaintiffs' claim that section 50C(d) is preempted insofar as it allows reductions based on a vessel's safety record. Plaintiffs have asserted that this part of the law is invalid because it interferes with exclusive Coast Guard reporting requirements. See 46 U.S.C. § 6101. The apparent assumption is that when a vessel applies for the exception, the state will necessarily require the vessel owner to describe past safety incidents. But this conclusion is too hasty. For example, the state agency could decide to simply look at the reports required to be filed under federal law.

not warranted in permanently enjoining any aspects of the financial assurance provision.[36]

Nonetheless, we do share the concerns of the United States that the state has yet to make a showing, by regulation or otherwise, explaining how it will utilize its discretion under section 50C(d). Since the state has not structured its exemption scheme, there is no operational scheme to enjoin. The state should make such a showing on remand; we leave it to the district court to consider the appropriateness of a preliminary injunction thereafter.

## VI. CONCLUSION

The questions here do not turn on whether the state or the federal regulations best protect Buzzards Bay and the sensitive waters of Massachusetts from oil spills, given the costs imposed by regulation. Making such determinations is not the role of a federal court.

---

[36]     Although there is some ambiguity, and the parties disagree on appeal, we conclude that the district court sub silentio held that the exception clause, section 50C(d), was severable from the rest of the statute. At the end of its opinion, the court stated that "[t]he Commonwealth is . . . permanently enjoined from conditioning the one billion dollar financial assurance requirement on criteria of tank vessel design, operation, equipping, or reporting requirements." Massachusetts, 440 F. Supp. 2d at 48.  The court further stated that it was not enjoining all possible uses of the discretionary exception -- just those in the specifically mentioned areas.  Id. at 48 n.204.  The district court's decision left clauses (a) through (c) fully in place.

Our question is whether the district court erred in concluding, as a matter of judgment on the pleadings, that the PWSA left no room for the state government to enact these state statutory provisions.   The district court erred in entering permanent injunctions, as well as in entering judgment for the United States, at this stage in the proceedings.

On remand, the parties should address the question of an interim agreement to stay MOSPA's provisions pendente lite.   In the absence of an agreement by the parties, we leave it to the district court to determine whether the United States can, under the proper analysis, meet its burden that the state should be preliminarily enjoined from enforcement of the relevant statutory sections.

No costs are awarded.

-54-