# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 05-10112 RCL |
| | ) | |
| v. | ) | |
| | ) | |
| THE COMMONWEALTH OF | ) | |
| MASSACHUSETTS, *et al.* | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

# MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES' MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION

PETER D. KEISLER
Assistant Attorney General

MICHAEL SULLIVAN
United States Attorney
MARK T. QUINLIVAN
Assistant United States Attorney

ARTHUR R. GOLDBERG D.C.B. 180661
STEVEN Y. BRESSLER D.C. B. 482492
Attorneys, Civil Division
United States Department of Justice
P.O. Box 833
Washington, D.C. 20044
Telephone (202) 514-4781
Facsimile (202) 318-7609
Steven.Bressler@USDOJ.gov

## TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 2

A.    Enactment of MOSPA and Earlier Proceedings ................................. 2

B.    The State vs. Federal Tug Escort Requirements ................................. 4

C.    The State vs. Federal Vessel Manning Requirements ....................... 5

ARGUMENT ......................................................................................................... 6

I.    Standard of Review ..................................................................................... 6

II.    The United States Is Overwhelmingly Likely To Succeed On The
      Merits Of This Case ............................................................................... 6

      A.    Standards Applicable To Federal Preemption Of State Laws .............. 6

      B.    The United States Has Properly And Expressly Preempted The
            Commonwealth's Tug Escort And Vessel Manning Rules ................... 8

      C.    The Commonwealth's Tug Escort And Vessel Manning Rules Are Also
            Preempted Because They Conflict With The Federal Regulatory Scheme ........ 14

III.    The Other Preliminary Injunction Factors Favor The United States .............................. 17

CONCLUSION .................................................................................................... 20

## INTRODUCTION

On August 30, 2007, the United States Coast Guard published in the Federal Register a final rule that expressly preempts certain provisions of Massachusetts law purporting to regulate vessels that transport oil.  The Coast Guard rule takes effect on November 28, but defendant the Commonwealth of Massachusetts has refused to delay enforcement of its conflicting rules despite the First Circuit's explicit urging of a stay *pendente lite*.

This case is now before the Court on remand, and the parties agree that it is controlled by the U.S. Supreme Court's holdings in Ray v. Atlantic Richfield Co., 435 U.S. 151 (1978), and United States v. Locke, 529 U.S. 89 (2000), each of which reviewed federal laws dating to the beginning of the Republic and concluded that state laws similar to those at issue here could not stand under federal law, and in particular under the Ports and Waterways Safety Act of 1972, Pub. L. No. 92-340, 86 Stat. 424, as amended by the Port and Tanker Safety Act of 1978, Pub. L. No. 95-474, 92 Stat. 1471, (together, the "PWSA").  With the PWSA, Congress also authorized the Coast Guard to issue regulations which may themselves preempt state law.  The Coast Guard's recent regulations issued under that authority entitle the United States to a preliminary and permanent injunction.

The United States previously moved for, and was granted, judgment on the pleadings and a permanent injunction as to every MOSPA provision the United States challenged.  The Commonwealth appealed this Court's judgment as to only three of those provisions, including rules that purport to regulate the manning of tank and tow vessels and when a tank vessel carrying a certain amount of oil must be accompanied by a tug escort in certain Massachusetts waters.  As to the provisions on appeal, the First Circuit remanded for further proceedings.  Two months later, however, the Coast Guard exercised its Congressionally vested authority to issue

pertinent regulations that expressly preempt, *inter alia*, the state's tug escort and vessel manning provisions.  Those Massachusetts provisions also conflict with the new federal rules.  Accordingly, under the Supremacy Clause of the Constitution and controlling precedent, the state tug escort and vessel manning rules cannot stand in the face of the Coast Guard's contrary judgment.

Moreover, absent an injunction in this Court the United States will be irreparably harmed by the Commonwealth's attempts to evade federal authority and enforce its different regulatory requirements even after the new federal rules take effect on November 28.  Enforcement of the state provisions will not only cause confusion on Massachusetts' waters; it will also irreparably damage the United States' ability to speak with a single and authoritative voice on maritime matters as it conducts its foreign affairs.

This Court should, accordingly, enter a preliminary and permanent injunction against enforcement of the Commonwealth's expressly preempted tug escort and vessel manning provisions.

## BACKGROUND

### A.    Enactment of MOSPA and Earlier Proceedings

In 2004, the Commonwealth of Massachusetts enacted MOSPA, 2004 Mass. Acts 251 (Aug. 4, 2004), as amended by 2004 Mass. Acts 457 § 1 (Dec. 30, 2004). MOSPA, <u>inter alia</u>, authorizes Massachusetts officials to board and inspect vessels to investigate oil spills; creates a vessel traffic system through consultation or negotiation with the Coast Guard; and creates an Oil Spill Prevention and Response Fund via the levying of maritime fees.  <u>See</u> 2004 Mass. Acts 251. The United States does not contend that any of these provisions are constitutionally infirm, they are not subjects of this litigation, and the United States does not dispute the Commonwealth's

position that they are severable from the disputed portions of the Act.  See Commonwealth's First Amended Answer ¶ 38.  Other provisions, however, conflict with federal law, are expressly forbidden by federal law, and/or seek to regulate areas committed to federal discretion.  These include provisions that would affect design, construction, training and equipment requirements on tugboats; tug escort[1] requirements; crew drug and alcohol testing requirements; manning requirements on tugs and tows carrying oil; a design restriction prohibiting single-hulled vessels; indirect regulation of vessel design, equipping and contents; and a requirement that vessels take on Massachusetts-licensed pilots.  2004 Mass. Acts 251 (Aug. 5, 2004), as amended by 2004 Mass. Acts 457 § 1 (Dec. 30, 2004).

Under the authority of Locke, Ray, and the PWSA, this Court (the Hon. Joseph L. Tauro) granted the United States' Motion for Judgment on the Pleadings and issued a permanent injunction against every MOSPA provision the United States had challenged.  See United States v. Massachusetts, 440 F. Supp. 2d 24 (D. Mass. 2006).  Defendants appealed that decision as to only three provisions of MOSPA; accordingly, the balance of the permanent injunction entered by this Court remains in effect.  On June 21, 2007, the Court of Appeals remanded the case to this Court for further development of the parties' arguments and/or the record as to the three provisions defendants had appealed.  United States v. Massachusetts, 493 F.3d 1 (1st Cir. 2007). The United States now seeks preliminary and permanent relief against the two of those three provisions that address tugboat escort and vessel manning requirements.[2]

_____

[1] A tug escort is an escort or assist tug "of sufficient capability to promptly push or tow [a] tank [vessel] away from danger" if necessary.  See 33 C.F.R. § 165.100.  A tank vessel is a vessel that "carries[] oil or hazardous material in bulk as cargo or cargo residue."  46 U.S.C. § 2101.

[2] The balance of the Commonwealth's appeal concerned this Court's injunction
(continued...)

**B.      The State vs. Federal Tug Escort Requirements**

One of the MOSPA provisions at issue on remand imposes tug escort requirements for

tank vessels:

> [N]o tank vessel carrying 6,000 or more barrels of oil shall enter or transit any area of
> special interest within the waters of the commonwealth unless the tank vessel is
> accompanied by a tugboat escort. . . . This section shall not apply to a self-propelled tank
> vessel.

M.G.L. c. 21M, § 6(a) & (b).  Federal regulations in place at the time of the First Circuit's

decision and through November 27, in contrast to the state statute, do not require a tug escort for

double-hull tank barges, 33 C.F.R. § 165.100(d)(1)(ii), or for single-hull tank barges carrying up

to 10,000 barrels of oil if they are towed by certain qualifying vessels.  Effective November 28,

2007, the Coast Guard has amended its rules for the First Coast Guard District, including

Massachusetts.  See "Final Rule: Regulated Navigation Area; Buzzards Bay, MA; Navigable

Waterways Within the First Coast Guard District," 72 Fed. Reg. 50052 (August 30, 2007).

Within the regulated navigation area that is the First Coast Guard District as of November 28, all

primary towing vessels towing tank barges carrying oil in bulk as cargo must be accompanied by

a tugboat escort or an assist tug *unless* the towing vessels meet specified propulsion requirements

---

[2](...continued)
against a provision that commits to the state Department of Environmental Protection unfettered
discretion to reduce the amount of an otherwise-required financial assurance bond.  M.G.L. 21
§ 50C(d).  The United States argued that the state's discretion could be used to indirectly regulate
areas that the state could not regulate directly.  The Court of Appeals noted that it "share[s] the
concerns of the United States that the state has yet to make a showing, by regulation or otherwise,
explaining how it will utilize its discretion under section 50C(d)."  Massachusetts, 493 F.3d at
25.  However, the Court of Appeals held that "[s]ince the state has not structured its exemption
scheme, there is no operational scheme to enjoin.  The state should make such a showing on
remand;  we leave it to the district court to consider the appropriateness of a preliminary
injunction *thereafter*."  Id.  (emphasis added).  Accordingly, and as contemplated by the First
Circuit, the United States awaits the state's showing before proceeding in this Court as to Section
50C(d).

or the tank barge is double hulled.  See id. at 50059, amending 33 C.F.R. § 165.100(d)(1)(ii).

For example, a double-hull tank barge transiting Buzzards Bay is exempt from the tugboat escort

requirement if it is being towed by a primary towing vessel with twin-screw propulsion and with

a separate system for power to each screw.  Id.  MOSPA does not recognize this exemption and

would require a tugboat escort for such a tank barge.

    In the August 30 Notice of Final Rule published in the Federal Register following a

comment period, and as discussed more fully below, the Coast Guard explained that the MOSPA

tug escort provision conflicts with the Coast Guard's "considered determination of the

appropriate level of regulation."  72 Fed. Reg. 50052, 50057.  The Coast Guard also included a

statement identifying and expressly preempting the MOSPA tug escort provision.  Id.

## C.     The State vs. Federal Vessel Manning Requirements

    The MOSPA provision at issue addressing vessel manning requires that "[t]he navigation

watch on all tow vessels transiting Buzzards Bay and carrying 6,000 or more barrels of oil shall

consist of at least 1 licensed deck officer or tow vessel operator."  M.G.L. c. 21M, § 4(a).  It

further requires that, for tank barges that can accommodate personnel, at least two personnel

must be on board at all times, one of whom must be a certified tankerman under federal law.

M.G.L. 21M § 4(b).  Federal regulations for the Northeast in effect at the time of the First

Circuit's decision through November 27, 2007 require tank vessels to navigate with at least two

licensed deck officers on watch, one of whom may be a pilot; when a pilot is required, the second

crewman must be licensed and assigned as master, mate, or officer in charge of navigational

watch.  See 33 C.F.R. § 164.13(c).  Under the Coast Guard's new rules for Buzzards Bay

effective November 28, a single hull tank barge transiting Buzzards Bay while carrying 5,000

barrels or more of oil or another hazardous material *must* be under the "direction and control" of

a federally licensed pilot in addition to normal crew of the vessel.  72 Fed. Reg. 50052, 50059,

amending 33 C.F.R. § 165.100(d)(1)(iii).  Such pilots "are required to embark, direct, and control

from the primary tug during transits of Buzzards Bay."  Id. [3]

In the August 30 Notice of Final Rule, the Coast Guard explained that the MOSPA vessel

manning provision conflicts with the Coast Guard's "considered determination of the appropriate

level of regulation."  72 Fed. Reg. 50052, 50057.  The Coast Guard also included a statement

identifying and expressly preempting the MOSPA vessel manning provision.  Id.

## ARGUMENT

### I.    Standard of Review

The Court should enter a preliminary injunction where, as here:  (1) the movant exhibits a

likelihood of success on the merits; (2) the movant will suffer irreparable injury absent an

---

[3]    The First Coast Guard District manning regulations are part of an extensive federal regulatory regime that establishes "uniform minimum requirements for the manning of vessels to…implement, interpret, or apply the specific statutory manning requirements in Title 46" which mandated the Coast Guard to prescribe standards for certain vessels, including tank vessels subject to regulation under Title 46, Chapter 37.  46 U.S.C. § 9102.   Thus, 46 C.F.R. Part 15, Subpart C, specifies the manning requirements for all vessels; 46 C.F.R. Part 15, Subpart D specifies the manning requirements for inspected vessels; and 46 C.F.R. Part 15, Subparts E and F specify the manning requirements for uninspected vessels and implement various international conventions which affect merchant marine personnel, and provide the means for establishing the same complement necessary for safe operation of vessels.   The regulations at 33 C.F.R. Part 164, issued pursuant to 33 U.S.C. §§ 1223, 1231 and 46 U.S.C. §§ 2103, 3703, 70114, and 70117 specify additional navigation watch and crew requirements for certain types of tankers.

Aside from the new, Buzzards Bay-specific regulations, the regulations in 46 C.F.R. Part 15 indicate the number of licensed and otherwise qualified persons that are required to be onboard a particular vessel.  For instance, a tank barge that is authorized by its Certificate of Inspection only for inland routes is not subject to a general pilotage requirement.  Tank barges also need not be manned unless the Coast Guard Officer in Charge of Marine Inspection ("OCMI") determines that such a requirement "is necessary for the protection of life and property and for the safe operation of the vessel."  46 C.F.R. § 31.15-5.  If the OCMI determines that the tank barge should be manned, then if the total crew complement is one or two, then one tankerman is required, whereas if the complement is more than two, then at least two tankermen are required.  46 C.F.R. § 15.860(e).

injunction; (3) the balance of harms favors the movant; and (4) the public interest will not be adversely affected by the injunction. See Suarez-Cestero v. Pagan-Rosa, 172 F.3d 102, 104 (1st Cir. 1999); TEC Eng'g Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 544 (1st Cir. 1996); Planned Parenthood League of Mass. v. Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981); Marcam Corp. v. Orchard, 885 F. Supp. 294, 296-97 (D. Mass. 1995). In this case, the Court should consolidate its preliminary injunction decision with the merits because it is beyond doubt that the United States is entitled to prevail on its arguments as a matter of law and no further development of the record is necessary. See Rivera-Gomez v. Adolfo de Castro, 843 F.2d 631, 635 (1st Cir.1988); FED. R. CIV. PROC. 65(a)(2).

## II. The United States Is Overwhelmingly Likely To Succeed On The Merits Of This Case.

### A. Standards Applicable To Federal Preemption Of State Laws

Under our federal system of government, "The Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI. Federal agencies acting within the bounds of their authority, as well as Congress acting directly, can preempt state laws. See, e.g., Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 699 (1984) ("'Federal regulations have no less preemptive effect than federal statutes.'") (citations omitted); Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 154 (1982) (same); U.S. v. Massachusetts, 493 F.3d at 8 n.9 (same); American Auto. Mfrs. Ass'n v. Massachusetts Dept. of Environmental Protection, 163 F.3d 74, 86 n.14 (1st Cir. 1998) (same).

State law is invalid under the Supremacy Clause in several circumstances.  See generally Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 698-99 (1984) (discussing types of preemption).   First, the federal government can expressly provide that the states are forbidden from regulating a certain area.  City of New York v. FCC, 486 U.S. 57, 65-66 (1988); Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977); Rice v. Santa Fe Elevator Company, 331 U.S. 218, 232-37 (1947).

Second, in the absence of such an express statement, preemption may be implied from the structure and purpose of federal law.  See Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990).

The Supreme Court has identified "field" and "conflict" preemption as two types of implied preemption.  Id.  Congress can field-preempt state action by occupying a regulatory field so pervasively that there is no room for state action, Rice v. Santa Fe Elevator Company, 331 U.S. 218, 230 (1947), or by otherwise dominating the field, Hines v. Davidowitz, 312 U.S. 52, 66 (1941).  And, even where Congress has not expressly preempted state law or occupied the field, a state law must yield when there is a conflict between federal and state law.  See Gade v. National Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 103 (1992) ("A state law . . . is pre-empted if it interferes with the methods by which the federal statute was designed to reach [its] goal"); Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963) (compliance with both state and federal law impossible); Hines, 312 U.S. at 67 (state law stands as an obstacle to the accomplishment of the full federal purpose); Massachusetts, 493 F.3d at 8 (same).

Title II of the PWSA unmistakably preempts the field "regarding general tanker design, operation, and seaworthiness."  Locke, 529 U.S. at 109; see also Massachusetts, 493 F.3d at 7-8. In addition, Coast Guard regulations promulgated under PWSA Title I, or Coast Guard

determinations that there should be no regulation of a particular subject under that Title, preempt state rules on the same subject.  Locke, 529 U.S. at 109-10; Massachusetts, 493 F.3d at 8.  When the federal government has expressly preempted a state law, a court's inquiry is much simpler: "an express preemption provision obviates the need to examine whether an actual conflict exists."  City of Boston v. Harris, 619 F.2d 87, 94 n.18 (1st Cir. 1980) (citing Jones v. Rath Packing Co., 430 U.S. 519, 530-31 (1977)).

      **B.**    **The United States Has Properly And Expressly Preempted The Commonwealth's Tug Escort And Vessel Manning Rules.**

In the preamble to its Final Rule published on August 30 and effective on November 28, the United States, through the Coast Guard, has expressly preempted M.G.L. c. 21M, §§ 4(a) & (b) (manning regulations), 6 (tugboat escort rule).  On this basis alone, the United States is entitled to the preliminary injunction and permanent declaratory and injunctive relief that it seeks in the instant motion.

"The relevant inquiry under Title I with respect to the State's power to impose a tug-escort rule is . . . whether the Secretary has either promulgated his own tug requirement for tanker navigation or has decided that no such requirement should be imposed at all."  Ray, 435 U.S. at 171-72; see Locke, 529 U.S. at 109.  In its August 30 Federal Register notice, the Coast Guard provided an abundantly "clear statement . . . of its intention to preempt the state regulation at issue."  See Massachusetts, 493 F.3d at 18.  The agency's preemption determination satisfies the applicable standards as enunciated by the Court of Appeals.

The First Circuit held that the Coast Guard's "preemption judgment is 'dispositive on the question of implicit intent to pre-empt unless either the agency's position is inconsistent with clearly expressed congressional intent, or subsequent developments reveal a change in that position.'"  Massachusetts, 493 F.3d at 16 (citing Hillsborough County v. Automated Med.

Labs., Inc., 471 U.S. 707, 714-15 (1985) (citation omitted)); cf. Capital Cities Cable, Inc., 467

U.S. at 699 ("'Federal regulations have no less preemptive effect than federal statutes.'").[4]   The

Coast Guard's statement here is clear and unequivocal:

> To the extent not otherwise already preempted, this rule is intended to, and does, preempt those provisions of [MOSPA] . . . regarding enhanced manning requirements for tank barges and tow vessels in Buzzards Bay, see Mass. Gen. Laws ch. 21M § 4, and tugboat escorts for certain waters, see id. § 6.

72 Fed. Reg. 50052, 50057.   Thus, the Commonwealth's tug escort requirement at M.G.L. 21M

§ 6 conflicts with the "Coast Guard . . . regulations on the subject," as well as the agency's

expressed intent, and so the state law must yield.   See Locke, 529 U.S. at 109.   Moreover, no

developments subsequent to August 30, 2007 have revealed any change in the agency's position.

    Nor is the Coast Guard's determination inconsistent with any "clearly expressed"

congressional intent.   At the outset, it is important to note that Congress need not specifically

confer preemptive authority on a federal agency for that agency's rules to have preemptive effect.

In City of New York v. FCC, 486 U.S. 57 (1988), for example, the Court explained that "a

narrow focus on Congress' intent to supersede state law is misdirected, for a pre-emptive

regulation's force does not depend on express congressional authorization to displace state law."

Id. at 64 (internal quotation marks and brackets omitted).   In identifying "the correct focus" of a

regulatory preemption inquiry, the Court left no doubt that "statutorily authorized regulations of

an agency will pre-empt any state or local law that conflicts with such regulations or frustrates

---

[4]      See also American Auto Mfr's Ass'n v. Massachusetts Department of Environmental Protection, 163 F.3d 74, 86 n.14 (1st Cir. 1998) ("the EPA can determine the scope of the preemptive effect of [the Clean Air Act] and we would accord substantial deference to that determination"); Geier v. American Honda Motor Co., 529 U.S. 861 (2000); Nat'l Home Equity Mortgage Assoc. v. Office of Thrift Supervision, 373 F.3d 1355 (D.C. Cir. 2004); cf. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984) ("considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer").

the purposes thereof." Id.; accord Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141,

154 (1982) ("A pre-emptive regulation's force does not depend on express congressional

authorization to displace state law.").

  The Coast Guard's regulations and determination here are authorized under the PWSA,

and are not contrary to any clear statement of congressional intent; moreover, Congress

expressed its intent that the Coast Guard have broad authority to issue regulations under the

PWSA.  The PWSA's predecessor, the Tank Vessel Act of 1936, 49 Stat. 1889, was intended to

establish "a reasonable and uniform set of rules and regulations concerning ship construction,

equipping, operation, and manning . . . ."  H.R. REP. NO. 2962, 74th Cong., 2d Sess. 2 (1936)

(quoted in part in Locke, 529 U.S. at 100, and Ray, 435 U.S. at 166).  In 1972 Congress revised

Title I of the PWSA to "make it absolutely clear that the Coast Guard regulation of vessels

preempts state action in the field."  Ray, 435 U.S. at 174 (quoting H.R. REP. NO. 563, 92d Cong.,

1st Sess. 15 (1971).  Similarly, when Congress amended the PWSA with the Port and Tanker

Safety Act, Pub. L. 95-474, in 1978, Congress stated that part of the "purpose of the legislation"

was to "provide the Secretary of the Department in which the Coast Guard is operating with

broader and more extensive authority, stated more explicitly, to address" problems such as "the

safety of all tank vessels, foreign and domestic, which transport and transfer oil or other

hazardous cargoes in ports or places subject to the jurisdiction of the United States" involving,

e.g., "the control and monitoring of vessels operating in offshore waters near our coastlines[,]"

"personnel qualifications" and "realistic manning standards for vessels using our ports."  H. REP.

NO. 95-1384, 95th Cong. 2d Sess., at 2, 1978 U.S.C.C.A.N. 3270, 3270-71.  Thus, 33 U.S.C.

§ 1231 (under PWSA Title I) and 46 U.S.C. § 3703 (under PWSA Title II, on which the United

States does not rely in this motion) confer broad authority on the Coast Guard, after "considering

the views" of the State and balancing competing considerations, to prescribe regulations for, <u>inter alia</u>, the operation, personnel qualification, and staffing of vessels involved in oil transport. Those provisions furnish ample authority for Coast Guard regulations that preempt state rules.

In addition, the Coast Guard's regulations governing the waters of the Northeast were originally issued pursuant to a congressional command that the Coast Guard "shall promulgate regulations" concerning "towing vessel and barge safety for the waters of the Northeast." <u>See</u> Pub. L. 105-383 § 311(b)(1)(A). Nothing in Congress's instruction that there be regional rules covering Massachusetts waters forbade the Coast Guard from issuing more local rules, or choosing not to do so, or preempting those of the Commonwealth. Indeed, as the Supreme Court held in <u>Locke,</u> "<u>Ray</u> . . . recognized that, even in the context of a regulation related to local waters, a federal official with an overview of all possible ramifications of a particular requirement might be in the best position to balance all the competing interests." <u>Locke,</u> 529 U.S. at 110, <u>citing Ray,</u> 435 U.S. at 177. To the extent the Commonwealth may frame its arguments in opposition to the United States' motion based on "an assumption that federal regulation on a regional basis is disfavored" under the PWSA, "and that there is a presumption in favor of state regulation of local waters" under PWSA Title I, <u>Locke</u> makes clear that this is "[n]ot so." <u>Massachusetts,</u> 493 F.3d at 18, citing <u>Locke,</u> 529 U.S. at 108. As the Court of Appeals held, such an argument by defendants "is untenable." <u>Id.</u>

As explained above, the Coast Guard's action here, taken after years of consideration and consultation,[5] is consistent with Congressional intent; in any event, it is certainly not inconsistent

---

[5]    <u>See</u> 72 Fed. Reg. 50052 (Notice of Final Rule for Buzzards Bay); 71 Fed. Reg. 15649 (March 2006) (Notice of Proposed Rulemaking for Buzzards Bay); 69 Fed. Reg. 62427 (October 26, 2004) (Advance Notice of Proposed Rulemaking for Buzzards Bay); <u>id.</u> at 62428 (describing extensive study of regional waters, including a Ports and Waterways Safety

(continued...)

with any relevant "clearly expressed congressional intent." See Massachusetts, 493 F.3d at 16 (citation omitted). And that is the critical question; it is not, as the Commonwealth may attempt to argue, whether what the Coast Guard's decision is the best one: "The questions here do not turn on whether the state or the federal regulations best protect Buzzards Bay and the sensitive waters of Massachusetts from oil spills, given the costs imposed by regulation. *Making such determinations is not the role of a federal court.*" Massachusetts, 493 F.3d at 25 (emphasis added); cf. Locke, 529 U.S. at 117 ("it is, in large measure, for Congress and the Coast Guard to confront whether their regulatory scheme, which demands a high degree of uniformity, is adequate. States, as well as environmental groups and local port authorities, will participate in the process."). Nor is it relevant that the Coast Guard could have made a different choice, or that it has done so concerning other waters in other regions; that is the nature of administrative discretion, and it is plainly within the Coast Guard's authority to preempt these rules.

As the Court of Appeals noted in June, before the Coast Guard's final rule was issued, "[i]t may be that [federal] rules will be forthcoming that will pre-empt the State's present" rules.

---

[5](...continued)
Assessment conducted following the April 2003 oil spill in Buzzards Bay and a previous Regional Risk Assessment Team that recommended the Coast Guard's regional rules); 63 Fed. Reg. 71764 (December 30, 1998) (Notice of Final Rule, "Regulated Navigation Area: Navigable Waters Within the First Coast Guard District," issued following notice and comment). The primarily regional approach the Coast Guard has adopted is the result of its careful study of the issues involved after hearing from all stakeholders, including the Commonwealth. See generally 63 Fed. Reg. 71764 (discussing development of 33 C.F.R. § 165.100(d)(1)). In crafting its rules, the Coast Guard balanced the need to avoid "inconsistent regulation," id. at 71765, with its recognition that "due to the unique environment of the region . . . positive control of barges," i.e., tug escort requirements, should be addressed on a regional basis. Id. at 71765-66. As discussed infra and in the preamble to the new rule, the Coast Guard has now determined the appropriate level of regulation particular to Buzzards Bay. In short, the Coast Guard's local tug escort requirement covering Massachusetts was crafted by "federal official[s] with an overview of all possible ramifications of a particular requirement . . . in the best position to balance all the competing interests." Locke, 529 U.S. at 110, citing Ray, 435 U.S. at 177. These "Coast Guard . . . regulations on the subject" preempt the state's law. Locke, 529 U.S. at 109.

Massachusetts, 493 F.3d at 20 (specifically addressing the state's tug escort rule), quoting Ray,

435 U.S. at 172.  That is precisely what has occurred.

### C.    The Commonwealth's Tug Escort And Vessel Manning Rules Are Also Preempted Because They Conflict With The Federal Regulatory Scheme.

The state's tug escort and vessel manning requirements are preempted due to conflict

with the Untied States' contrary determinations as well as the Coast Guard's express statement.

As an initial matter, much of the Court of Appeals' discussion of the manning provision

involved whether it is subject to "the greater pre-emptive force of [field preemption under

PWSA] Title II" or "conflict pre-emption under Title I."  See Massachusetts, 493 F.3d at 10

(quoting Locke, 529 U.S. at 111-12).  This Court need not reach the issue and conduct an

"overlap analysis" to determine which Title applies, however, because the question has been

obviated by publication of the Coast Guard's rule on August 30.  If Title II applies, the state's

rule is field preempted since that would mean the Commonwealth was attempting to act in a Title

II area, where "Congress has left no room for state regulation."  Locke, 529 U.S. at 111.  But

even assuming *arguendo* that Title I conflict preemption is the appropriate standard (as the

Commonwealth has argued), however, the state manning provision is nonetheless preempted.[6]

The tug escort provision, to which the parties agree Title I applies, is also conflict preempted.

A conflict between federal rules and state law may arise "'when the state law stands as an

obstacle to the accomplishment and execution of the full purposes and objective of Congress'" or

a federal agency exercising its authority.  See Massachusetts, 493 F.3d at 8 (quoting Locke, 529

U.S. at 109; additional citation omitted).   The "relevant inquiry for Title I pre-emption is

---

[6]    The Court of Appeals found that, previously, "[t]he United States did not seriously present argument to the district court that if Title I applied, federal regulations preempted the [state's] vessel manning requirements," Massachusetts, 493 F.3d at 11, but noted that this argument "can be made on remand."  Id. at 13.

whether the Coast Guard has promulgated its own requirement on the subject or has decided that no such requirement should be imposed at all." Locke, 529 U.S. at 110, citing Ray, 435 U.S. at 171-72, 178. Thus, under PWSA Title I, "Congress . . . preserved state authority to regulate the peculiarities of local waters [only] if there was no conflict with federal regulatory determinations[.]" Locke, 529 U.S. at 110.[7] Where a state regulation is directed to such peculiarities, it is still preempted under Title I itself when "the Coast Guard has . . . adopted regulations on the subject or determined that regulation is unnecessary or inappropriate." Id. at 109. Moreover, a "federal agency's choice in favor of national or regional regulation is a ground for conflict preemption." Id. at 17 (citing Locke, 529 U.S. at 109-10).

     Here, the Coast Guard has made a deliberate choice as to its tug escort and vessel manning rules for Massachusetts waters, including the level of appropriate regulation particular to certain waters such as Buzzards Bay. In particular, the Coast Guard made "affirmative decisions:"

> to require a federally licensed pilot in addition to the normal crew aboard a tug towing a single hull tank barge thorough Buzzard's Bay, but not to require any other modifications to the applicable manning requirements; and . . . to require an escort tug in addition to the primary tug, for all single hull tank barges transiting Buzzard's Bay, but not for other vessels; each represents a considered determination of the appropriate level of regulation to ensure navigation safety and environmental protection.

72 Fed. Reg. 50052, 50056-57. Thus, the Coast Guard has made it clear that a different level of

---

[7]    As the Court of Appeals noted, Congress amended PWSA Title I in 1978, subsequent to Ray. Massachusetts, 493 F.3d at 15 n.21. The 1978 statutory change does not, of course, alter the controlling analysis that the Supreme Court set forth in Locke more than 20 years later when it reaffirmed the principles of Ray, and upon which the United States relies.

regulation, such as that chosen by the Commonwealth, is in conflict with the Coast Guard's "considered determination." Id.[8]

As to tug escorts, in its responses to comments on the earlier proposed rule the Coast Guard explained why, in conflict with the state's tug escort rule, the new federal rule does not require tug escorts for double-hulled tank barges transiting Buzzards Bay:

> The majority of tank barge casualties in Buzzards Bay have been caused by groundings, and the bottom characteristics of the area are generally rocky. Double hulls provide sufficient protection against this type of casualty, and there has never been a major oil spill from a double hull tank barge grounding in Buzzards Bay. Therefore, the Coast Guard does not feel it is necessary to require tug escorts for double hull tank barges at this time. Additionally, the Coast Guard considers that, as adopted in this rule, its three-pronged approach to navigation safety ((1) Mandatory participation in a Vessel Movement Reporting System (VMRS); (2) a federally licensed pilot and (3) a tug escort for single hull tank barges) constitutes a redundant vessel accident and pollution prevention system that will provide a sufficient measure of safety for tank vessels transiting Buzzards Bay.

Id., 72 Fed. Reg. at 50054-55. The Commonwealth's rule requiring tug escorts for all tank barges (including double-hulled tank barges) carrying more than 6,000 gallons of oil, M.G.L. c. 21M, § 6(a) & (b), conflicts with the Coast Guard's affirmative decision that no such requirement is appropriate.

In addition, in its discussion of comments and changes to the rule the Coast Guard responded to two 2006 letters from Massachusetts legislators that "urged the Coast Guard to adopt navigation safety provisions for Buzzards Bay similar to those provided for" in the provisions of MOSPA that this Court had recently enjoined. 72 Fed. Reg. 50052, 50055. Among the provisions discussed were those regarding manning and tug escort requirements. Id. The Coast Guard responded that it had determined that "the provisions of this rule, along with

---

[8]    Indeed, the Coast Guard explicitly stated that it "has determined that any other non-Coast Guard schemes relating to vessel routing, manning, and tug escort requirements in Buzzards Bay are preempted." Id.

-16-

other currently existing Federal statutes and regulations, will sufficiently address each of the Representatives' concerns" for reasons including, in relevant part, that "Federal regulations at 46 C.F.R. 15 comprehensively regulate manning and watchstanding on tank vessels and tugs [and, in the waters of the Northeast], 33 C.F.R. 164.13(c) specifically requires tankers to have at least two licensed deck officers on watch on the bridge;" and that the Coast Guard's rule taking effect November 28, 2007 "requires escort tugs, in addition to the primary tug, for all single hull tank barges transiting Buzzards Bay."  Id.

The United States has narrowly sought by this civil action to enjoin only certain provisions of MOSPA while leaving much of it intact.  See Compl.; see also Massachusetts, 493 F.3d at 13 (noting "the state has essentially conceded in not attempting to defend other sections of its statute" that those other MOSPA provisions are invalid under federal law and the Supremacy Clause).  As to those provisions at issue now and preempted by the Coast Guard's recent rule, under our Constitution, the federal judgment on these matters is supreme.  See Free v. Bland, 369 U.S. 663, 666 (1962) ("The relative importance to the State of its own law is not material . . . for the Framers of our Constitution provided that the federal law must prevail.").

## III.    The Other Preliminary Injunction Factors Favor The United States.

The United States will suffer irreparable harm absent an injunction.  Moreover, this Court's entry of an injunction will also support the public interest as identified by Congress.

Unfortunately, as counsel for the Commonwealth stated at the October 15, 2007 status conference before the Court, the Commonwealth has refused the First Circuit's invitation "to stay MOSPA's provisions pendente lite."  Massachusetts, 493 F.3d at 25.  But it is critical that the United States be able to confidently "speak with one voice" in the international community as it

conducts its foreign affairs, including those pertaining to maritime rules,[9] without fear of

contradiction or embarrassment by individual states such as the Commonwealth.  See Ray, 435

U.S. at 166.  See also THE FEDERALIST PAPERS 282 (Clinton Rossiter ed., 1961) (James Madison,

in Federalist No. 44, noting the danger that "the Union be discredited and embroiled by the

indiscretion of a single member").  The ability to "speak with one voice" enables the United

States to better encourage nations generally to adopt an international regime that promotes

environmental protection and safety throughout the world.  Ray, 435 U.S. at 166.  But the

confusion that will ensue should the Commonwealth be permitted to enforce those provisions of

state law which the United States has said in no uncertain terms are preempted by the federal law

---

[9]    In their regulation of domestic and foreign-flagged vessels, Congress and the Coast Guard are guided in considerable part by an international regulatory system in which the United States has played a pivotal role.  See, e.g., H.R. REP. NO. 95-1384, Pt. 1, 95th Cong., 2d Sess. 6-9 (1978) (reprinted in 1978 U.S.C.C.A.N. 3270, 3274-77).  Accordingly, much of the Coast Guard's maritime regulatory activity is designed to implement international treaty provisions and to keep the United States in compliance with the complex and often-changing international regime.  See, e.g., 60 Fed. Reg. 24767 (1995) ("The Coast Guard is modifying its regulations on navigational safety and marine engineering to harmonize them with the International Convention for the Safety of Life at Sea.").  In addition, the United States plays a leading role in developing comprehensive, practicable, and effective international regulations applicable to vessels throughout the world through its participation in international organizations such as the International Maritime Organization ("IMO").  See Craig H. Allen, "Federalism in the Era of International Standards," 29 J. Mar. L. & Comm. 335 (1998) (discussing United States' contributions to the IMO).

These various conventions establish a regulatory regime that is premised on recognized principles of international law outlining the roles and interests of all nations in protecting their interests.  The regime depends on reciprocity among nations:  all parties are assured of a ship's compliance with international standards when a ship is certified by the government of its flag nation. That certification is respected by other party nations (including the U.S.) to permit vessels with such certificates to enter the ports of parties and, thus, to allow for the uninterrupted flow of maritime traffic. The United States has a vested interest in ensuring that all vessels that transit its waters, including foreign flag vessels, comply with comprehensive safety and environmental protection standards.  See Locke, 529 U.S. at 94 (discussing the United States' interests).  It is of particular importance to the United States that these conventions include provisions authorizing nations to protect the safety and environment of their ports and waters.  To negotiate effectively for such conventions, it is, of course, of utmost importance that the United States be empowered to, and be seen by other nations to be empowered to, speak on its own behalf.

-18-

effective November 28 would denigrate the authority of the United States and, thus, cause irreparable harm: that damage could not be repaired by an injunction issued sometime after November 28 unless the Commonwealth's tug escort and vessel manning provisions are stayed in the interim.

Such an injunction is also in the public interest because it in accord with Congress's decision to delegate full regulatory power over port and waterway safety to the Coast Guard. "Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when asked." See Tennessee Valley Auth. v. Hill, 437 U.S. 153, 194 (1978) (affirming injunction to enforce federal law). Here, as explained supra, Congress has vested the Coast Guard with the discretion and authority to preempt the state laws at issue and the Coast Guard has done so. See also Miller v. French, 530 U.S. 327, 336 (2000) (although it would "not lightly assume" that Congress intended to restrict the equitable powers of the federal courts, "where Congress has made its intent clear, '[courts] must give effect to that intent.'" (citation omitted)). Accordingly, just as this Court sitting in equity should not "ignore the judgment of Congress, deliberately expressed in legislation," see Virginian Railway Co. v. System Federation No. 40, 300 U.S. 515, 551 (1937), this Court should accept the duly authorized judgment of the United States as to the appropriate policy. By the same token, the balance of harms favors entry of an injunction. Again, just as the Court of Appeals noted, "[t]he questions here do not turn on whether the state or the federal regulations best protect Buzzards Bay and the sensitive waters of Massachusetts from oil spills, given the costs imposed by regulation. Making such determinations is not the role of a federal court." Massachusetts, 593 F.3d at 25. As Congress has determined and, under

its Supremacy Clause, the Constitution commands, the federal judgment on these matters is

supreme.

## CONCLUSION

For the foregoing reasons, the Court should grant the United States' Motion for

Preliminary and Permanent Injunction and enjoin M.G.L. c. 21M, §§ 4 & 6 effective November

28, 2007.

DATED this 29th day of October, 2007.

<div style="margin-left: 50%;">

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

MICHAEL SULLIVAN
United States Attorney
MARK T. QUINLIVAN
Assistant United States Attorney

 __/s/ Steven Y. Bressler_____
ARTHUR R. GOLDBERG D.C.B. 180661
STEVEN Y. BRESSLER D.C.B. 482492
Attorneys, Civil Division
United States Department of Justice
P.O. Box 833
Washington, D.C. 20044
Telephone (202) 514-4781
Facsimile (202) 318-7609
Steven.Bressler@USDOJ.gov

Attorneys for the United States of America

</div>