# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-10112-RCL |
| | ) | |
| COMMONWEALTH OF MASSACHUSETTS *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

# COMMONWEALTH'S OPPOSITION TO
# COAST GUARD'S MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION

During the week of this document's filing, numerous stories have appeared in the media detailing two major oil spills: one in San Francisco Bay and one in the Black Sea.[1] Given the environmental devastation wreaked by those tragedies, it is ironic that the defendant Commonwealth of Massachusetts ("Commonwealth")[2] is simultaneously having to fight to preserve state laws meant to prevent just such events. It is doubly ironic that it is the United States Coast Guard—the ostensible federal protector of our shores—that is seeking to invalidate these legislative protections.

Ironies aside, the Coast Guard's Motion for Preliminary and Permanent Injunction falls far short of the legal showing necessary for a preliminary injunction, let alone a permanent one.

---

[1] *See*, *e.g.*, Carolyn Marshall, *U.S. Prosecutors Start Investigating Oil Spill*, New York Times, Nov. 13, 2007, at A25; Andrew E. Kramer, *Warnings of Long-Term Damage After Russian Oil Spill*, New York Times, Nov. 13, 2007, at A11.

[2] For ease of exposition, references to the "Commonwealth" in this Opposition also include the additional defendants Governor of Massachusetts, Massachusetts Department of Environmental Protection, and Commissioner of the Massachusetts Department of Environmental Protection.

As elaborated on below, the Coast Guard is stymied by one inalterable reality: the First Circuit has already ruled that the agency must satisfy "standard conflict preemption analysis," *U.S. v. Mass.*, 493 F.3d 1, 8 (1st Cir. 2007), and the Coast Guard clearly cannot do so.  It indeed does not even attempt an argument along those lines.  *See* Mem. of Law in Support of the United States' Mot. for Preliminary and Permanent Injunction ("PI Memo.") pp. 14-17.  The agency instead tries to go around the First Circuit's decision, first by shifting to a wholly new theory of *express* preemption, *id*. pp. 9-14, and then by attempting to rewrite what the First Circuit said regarding conflict preemption.  *Id*. pp. 14-17.  Multiple problems plague both efforts, and the Coast Guard's inability to satisfy "standard conflict preemption analysis" by itself refutes the agency's claimed likelihood of success on the merits.  *See infra* Sections IIIA-B and IV.

Moreover, even if one were to assume that the traditional conflict preemption rules are not controlling and that all the Coast Guard need do to preempt is sufficiently express its intent to do so, the new preemption statement that the agency cites, 72 Fed. Reg. 50,052 (Aug. 30, 2007), suffers from a host of infirmities of its own.  *See infra* Sections IIIC-E.  For example, the statement is arbitrary and capricious because it contradicts the very accommodating position the Coast Guard has taken regarding supplemental state regulation in California and Washington.  Even though there is no self-evident reason for having different standards for "East Coast preemption" and "West Coast preemption," the agency fails to provide any explanation at all for its divergent approach.  For this reason and many others, the Commonwealth will be moving shortly to amend its Answer to assert a counterclaim challenging the preemption statement under the Administrative Procedure Act, 5 U.S.C. §§ 551-559, 701-706.  In the interim, the statement's invalidity further demonstrates why the Coast Guard cannot show a likelihood of success.

Finally, the Coast Guard presents a distinctly distorted view of the "balance of the harms." *See* PI Memo. pp. 17-20. For example, the supposed threat that the challenged state laws pose to the nation's ability "'to speak with one voice' in the international community," *see id*. pp. 17-18, is belied by the 18 months that the Coast Guard allowed to elapse—without any motion for interlocutory relief—between the commencement of this action and the Court's original judgment. Although an even greater number of allegedly discordant state laws were on the books during that period, neither foreign relations nor international trade came to a halt, and they will not do so now either. This is particularly true when the Coast Guard itself does not "speak with one voice" on the subject of tug escorts, as the suitability of a state's supplemental requirements apparently depends on whether the state borders the Atlantic or Pacific Ocean. For these reasons and the additional ones set forth both below and in the Opposition Memorandum of the Coalition for Buzzards Bay ("Coalition Opp."), the Court should deny the Motion for Preliminary and Permanent Injunction.[3]

## I.    RELEVANT BACKGROUND

The First Circuit's opinion provides extensive background about this matter, which is not all repeated here. *See U.S. v. Mass*., 493 F.3d at 3-11. The Commonwealth instead describes below (a) the immediately relevant particulars of the present claims and the First Circuit's ruling and (b) certain pertinent additional background not included in the First Circuit's decision.

---

[3] The Court provided the defendants with the right to supplement their memoranda once the Coast Guard had responded to document requests regarding the agency's treatment of state tug-escort requirements and several other specific subjects. Tr. Hr'g at 28 (Oct. 15, 2007) (File Doc. No. 93). The Commonwealth understands that the Coast Guard currently plans to provide its first set of responsive documents during the week of November 19, 2007. Once the Coast Guard has produced its responsive documents and the Commonwealth has had adequate time to review them, the Commonwealth anticipates filing a supplemental memorandum.

## A.     The Claims at Issue in the Current Motion.

The First Circuit remanded this matter for further proceedings on the Coast Guard's challenge to three separate provisions in the Commonwealth's Oil Spill Protection Act: (1) a requirement that certain tank barges (in addition to those already mandated to do so by federal law) take on a "tug escort" when in Buzzards Bay and certain other state waters, Mass. G.L. c. 21M, § 6 ("escort requirement"); (2) a requirement that tank barges and tow vessels in Buzzards Bay comply with several enhanced manning requirements (again in addition to those already imposed by federal law), Mass. G.L. c. 21M, § 4 ("manning requirement"); and (3) statutory exceptions to a rule that some vessels obtain a certificate of financial assurance when traveling in Massachusetts waters, Mass. G.L. c. 21, § 50C ("financial assurance provision").  *U.S. v. Mass*., 493 F.3d at 4-5.  The Coast Guard has currently moved for a preliminary and permanent injunction against the escort and manning requirements.  PI Memo. pp. 1-2.[4]  Although the First Circuit anticipated that the challenges to both laws would receive full factual development on remand, *U.S. v. Mass*., 493 F.3d at 13, 14, 19, the Coast Guard asserts that an intervening regulation and preemption statement it has promulgated, *see* 72 Fed. Reg. 50,052, removes the need for any factual inquiry and entitles it to prevail as a matter of law under Title I of the Ports and Waterways Safety Act of 1972, 33 U.S.C. §§ 1221-32 ("Title I").[5]  PI Memo. pp. 9-17.

---

[4] The Commonwealth has served discovery regarding the remaining claim (the challenge to the financial assurance provision).  Once the plaintiffs have responded to that discovery, the Commonwealth expects to move for partial summary judgment.

[5] The Coast Guard also challenges the manning requirement (but not the escort requirement) under Title *II* of the Ports and Waterways Safety Act, *see* 46 U.S. C. § 3703, but it limits the current Motion to its preemption claim under Title I.  PI Memo. p. 11.  Although the Commonwealth vigorously disputes the Title I claim, it agrees that *if* that claim is successful, there is no need to reach either the Title II challenge or any issues regarding the "overlap" between Titles I and II in the manning context.  *See U.S. v. Mass*., 493 F.3d at 8-14.

**B.     Title I Preemption Analysis Under the First Circuit's Opinion.**

The Supreme Court has discussed at length the requirements for preemption under both Title I and the companion Title II of the PWSA, *see* 46 U.S. C. § 3703 ("Title II").  *U.S. v. Locke*, 529 U.S. 89 (2000); *Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978).  The First Circuit has in turn reviewed *Ray* and *Locke* carefully, *U.S. v. Mass.*, 493 F.3d at 6-11, and its reading of those cases necessarily controls here.  Only one segment of the First Circuit's discussion is pertinent to the current Motion: the analysis of preemption claims under Title I.[6]

The First Circuit discussed Title I preemption against the terminological backdrop of the three familiar types of preemption—express, field, and conflict.  *See, e.g., U.S. v. Mass.*, 493 F.3d at 7-8.  As a general matter, express preemption occurs when a federal statute's preemptive effect is "explicitly stated in the statute's language."  *Cipollone v. Ligget Group, Inc.*, 505 U.S. 504, 516 (1992).  It differs from implied preemption, which arises in certain limited instances where Congress's preemptive intent is not expressly set forth in the statute itself.  *See id.*  Field preemption is one of the two principal types of implied preemption, and it occurs where "the scope of [the] statute indicates that Congress intended federal law to occupy a field exclusively." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002).  Conflict preemption is the other form of implied preemption, arising when the state law actually conflicts with federal law.  The Supreme Court has defined this "actual conflict" as occurring on two occasions: "when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress."  *Locke*, 529 U.S. at 109 (quoting *California v. ARC America Corp.*, 490 U.S. 93, 100-01 (1989)).

---

[6] Because the Coast Guard restricts its Motion to Title I, PI Memo. p. 11, the Motion does not implicate the First Circuit's extensive additional discussion regarding either Title II preemption analysis or "overlap analysis," which can apply when both Title I *and* Title II may provide a basis for preemption.  *See U.S. v. Mass.*, 493 F.3d at 7-11.

Examining Title I in light of these classifications, the First Circuit ruled that "conflict preemption applies to state regulations within the scope of Title I." *U.S. v. Mass.*, 493 F.3d at 8. It then elaborated that "state laws in areas within the province of Title I are subject to *standard conflict preemption analysis*, primarily the model which the [Supreme] Court has utilized in Commerce Clause cases." *Id.* (emphasis added). Leaving no doubt as to what that "standard conflict preemption analysis" is, the First Circuit quoted the *Locke* language reproduced above: a plaintiff must show either that "compliance with both state and federal law is impossible" (hereafter the "physical impossibility" test), or that "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (hereafter the "obstacle to purpose" test). *Id.* (quoting *Locke*, 529 U.S. at 109).

The First Circuit then elaborated that in addition to this "standard" analysis, "*Locke*'s conflict preemption analysis involves an *initial* inquiry into whether federal authority has been exercised through a regulation intended to displace state law, or by a federal decision of the Coast Guard that there should be no regulation of the subject in question." *U.S. v. Mass.*, 493 F.3d at 8 (emphasis added). While the First Circuit later conducted just such an inquiry into the Coast Guard's preemptive intent based on the then-existing record, *id.* at 18-19, it prefaced its discussion by again making clear that this was only the "initial question" to be considered. *Id.* at 18. Similarly, when the First Circuit ultimately determined that the record was inconclusive on the question of intent and that a remand was necessary, it specified that "[t]he parties should have the opportunity to address, *among other issues*, the questions of whether the Coast Guard sufficiently expressed a clear intent to preempt . . . and whether, if so, the Coast Guard's position is clearly inconsistent with congressional intent." *Id.* at 19 (emphasis added). Those "other

issues" include, of course, the traditional tests of "standard conflict preemption analysis" that the First Circuit previously had made clear must be met. *Id*. at 8.[7]

In short, the First Circuit has ruled that preemption claims under Title I are to be resolved by the rules of conflict preemption, and it has prescribed a multi-step analysis for doing so. *U.S. v. Mass*., 493 F.3d at 8. The "initial question" is "whether the Coast Guard has expressed an intent to preempt." *Id*. at 18. If the answer to that "initial inquiry" is in the affirmative, then the Coast Guard *also* needs to satisfy one of the two traditional tests of "standard conflict preemption analysis:" physical impossibility or obstacle to purpose. *Id.* at 8. It is not sufficient to show only an intent to preempt, as the Coast Guard seems to believe, PI Memo. p. 9; the "standard" requirements must also be met.

C.     **The Coast Guard's Final Rule Regarding Navigation in Buzzards Bay and Its Regulatory Decision-Making Past.**

On August 30, 2007, the Coast Guard promulgated final regulations concerning Buzzards Bay. Regulated Navigation Area; Buzzards Bay, MA; Navigable Waterways within the First Coast Guard District, 72 Fed. Reg. 50,052 (Aug. 30, 2007) (to be codified at 33 C.F.R. § 165.100) ("Final Rule"). The Final Rule mandates tug escorts for single hull tank barges carrying 5,000 or more barrels of oil through Buzzards Bay, requires a federally licensed pilot on a tug towing a single hull tank barge of 5,000 or more barrels of oil through Buzzards Bay, and establishes a Vessel Monitoring System. *Id.* at 50,059. The Coast Guard rejected the Commonwealth's reasonable request to issue a final rule that mirrored the Commonwealth's

---

[7] Although the First Circuit did not also do the full "standard analysis" itself (no doubt because a remand was already required where the "initial inquiry" of agency intent was inconclusive), it did find it to be "[s]ignificant[ ]" that the Coast Guard "had *not* argued on appeal that it would literally be impossible for ships to comply with both the state statute and federal regulations." *Id*. at 17 (emphasis in original). There would have been no reason for the First Circuit to have found this to be "significant" had the only issue been agency intent.

additional escort and manning requirements. *Id.* at 50,054-55; Mass. G.L. c. 21, §§ 4(a)-(b), 6. Consistent with its traditionally *reactive* approach to oil spills, *see* Coalition Opp. pp. 3-5, the Coast Guard concluded that an escort for double hull tankers is unnecessary, "at this time," because "there has never been a major oil spill from a double hull tank barge grounding in Buzzards Bay." 72 Fed. Reg. at 50,054. The agency went further, however, and took the unprecedented step of purporting to expressly preempt the Commonwealth's rules, stating "this rule is intended to, and does, preempt those provisions of . . . [OSPA] regarding enhanced manning requirements for tank barges and tow vessels in Buzzards Bay." *Id.* 50,058; *see also* PI Memo. p. 9 (arguing that this statement obviates the need to examine whether there is an actual conflict); Mass. G.L. c. 21, §§ 4(a)-(b), 6.

In stark contrast, in 1982, the Coast Guard decided not to make final a proposed rule that would have required tug escorts for all tank vessels transiting Puget Sound, because the rule would have been "essentially the equivalent of existing [Washington] State law." 47 Fed. Reg. 17,968, 17,971 (Apr. 26, 1982).[8] Ten years later, the Coast Guard promulgated a tug escort rule for single hull tankers transiting Puget Sound and stated that it did *not* "intend to preempt" Washington's tug escort requirements for "double hull tankers or single hull tankers under 5,000 GT." 57 Fed. Reg. 30,058, 30,064 (Jul. 7, 1992); Wash. Rev. Code § 88.16.190. The agency indeed stated that "there does not appear to be any substantial conflict." 57 Fed. Reg. at 30,064. And today, even though the Coast Guard has promulgated navigational rules for certain California waters, *e.g.*, 33 C.F.R. § 165.1181 (2006) (regulated navigation area for San Francisco Bay), the State of California requires, *inter alia*, tug escorts for all tank barges carrying 5,000 or more long tons of oil in specified waters, including San Francisco Bay. *See* Cal. Gov't Code

---

[8] At the time, the Coast Guard noted that the State of Washington's Tanker Law required tug escorts for "most existing tank vessels." 47 Fed. Reg. at 17,971.

§ 8670.17.2; Cal. Code Regs. tit. 14, §§ 851.2–851.4.  There is nothing in the record that

indicates the Coast Guard has ever objected to the California laws.  Thus, the agency's position

regarding Buzzards Bay is a sharp, unexplained departure from its past approach to this issue.

## II.     THE PRELIMINARY INJUNCTION STANDARD.

The requirements for obtaining a preliminary injunction are well-settled.  "The district

court . . . weigh[s] four factors: '(1) the likelihood of success on the merits; (2) the potential for

irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the

hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no

injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.'"  *Bl(a)ck*

*Tea Soc'y v. Boston*, 378 F.3d 8, 11 (1st Cir. 2004) (quotation omitted).  "The sine qua non of

this four-part inquiry is likelihood of success on the merits: if the moving party cannot

demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle

curiosity."  *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)

(citing *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)).  "Additionally, to the degree that

an injunction 'will alter, rather than maintain the status quo, or will provide the movant with . . .

relief [that] cannot be undone even if the defendant prevails at a trial," both of which would be

the case here, "the moving party must show a *clear or substantial* likelihood of success."  *Fair*

*Hous. in Huntington v. Huntington*, 316 F.3d 357, 365 (2d Cir. 2003) (quoting *Beal v. Stern*, 184

F.3d 117, 122-23 (2d Cir. 1999) (emphasis added)).

The Coast Guard has also demanded a *permanent* injunction in its Motion.  However, it

limits its actual argument as to why it should receive such extraordinary relief to a single

sentence.  *See* PI Memo. p.7.  As a result, the agency makes no attempt to explain how it satisfies

the standards of either Fed. R. Civ. P. 12(c) or 56, which provide the usual routes to permanent

relief without trial.  The Coalition Opposition details why a permanent injunction would be inappropriate even if one were to assume that the Coast Guard is entitled to preliminary relief, and the Commonwealth incorporates those arguments in full here.

## III.    THE COAST GUARD CANNOT SHOW A LIKELIHOOD OF SUCCESS ON ITS NEWFOUND EXPRESS PREEMPTION CLAIM.

The Coast Guard has faced a persistent difficulty with its Title I claims: they are conflict-preemption claims, but it cannot satisfy either of the two traditional conflict-preemption standards (physical impossibility or obstacle to purpose).  To circumvent this problem, the agency previously asserted that *Ray* and *Locke* established a special variant of conflict preemption in the maritime context that did not turn on the traditional test and instead required only that the Coast Guard have regulated (or decided not to regulate) in an area.  *See*, *e.g.*, *U.S. v. Mass.*, 493 F.3d at 15-16.  The First Circuit flatly rejected this claim.  *Id.* at 8, 15-16.  As a result, the Coast Guard has now shifted gears and de-emphasized conflict preemption as the basis for its Title I claims, relying instead on a newly conceived theory of *express* preemption as its primary ground.  PI Memo. pp. 9-14.  Perhaps not surprisingly given its belated emergence, this new argument has numerous defects.

### A.    The Supreme Court and the First Circuit Have Made It Clear That Conflict Preemption Is the Preemption Standard That Governs Claims Under Title I.

The most basic error in the Coast Guard's express preemption claim is that it turns the *Ray*/*Locke* analytical framework for preemption claims on its head.  The First Circuit specified that under the Supreme Court's construction of PWSA (including both Titles I and II), there is a "*two-category approach* to preemption: either field preemption or conflict preemption is to be used."  *U.S. v. Mass.*, 493 F.3d at 7 (emphasis added).  There is no "third category" involving express preemption.  Moreover, as to Title I in particular, the First Circuit also plainly stated that

"state law in areas within the province of Title I are subject to standard conflict preemption analysis" and that the "analysis involves an *initial* inquiry into whether federal authority has been exercised through a regulation intended to displace state law." *U.S. v. Mass.*, 493 F.3d at 8 (quoting *Locke*, 529 U.S. at 109) (other citations omitted) (emphasis added). The First Circuit later reiterated that "whether the Coast Guard has expressed an intent to preempt" is only "[t]he initial question" in the Title I calculus. *Id*. at 18.

Despite these unequivocal statements five months ago by the First Circuit, the Coast Guard maintains that whether it has adequately expressed an intent to preempt is not the "initial" question, but instead the *only* question. PI Memo. pp. 9-14. To achieve this transformation, the agency now contends that it is really express preemption that is at issue. *Id*. However, legal analysis is not a shell game, and the Coast Guard cannot eviscerate the effect of an appellate ruling by the formalism of changing preemption labels. This is particularly true when the First Circuit's "two-category approach" to PWSA preemption allows for only two such labels, and express preemption is not one of them. Indeed, the extended discussion about Coast Guard intent and conflict preemption in *Ray*, *Locke*, and the First Circuit opinion would have been completely unnecessary if the Coast Guard could just expressly preempt by administrative fiat whenever it chose to.

The Supreme Court is instead clear that "[t]he analysis under Title I . . . is one of conflict preemption." *Locke*, 529 U.S. at 109. The First Circuit is similarly clear that an examination of Coast Guard intent is the "initial" inquiry under this analysis, *U.S. v. Mass.*, 493 F.3d at 8, 18, with "standard conflict preemption analysis" then to follow. *Id*. at 8. This Court should adhere to this carefully constructed framework and restrict the Coast Guard to ordinary conflict preemption claims.

**B.    Even If Express Preemption Were an Available Theory Under Title I, the Coast Guard Lacks Statutory Authority to Engage in It.**

The Coast Guard's attempt at express preemption has another fundamental defect: the agency has no authority to engage in it.  Unlike other Congressional schemes, Congress did not empower the Coast Guard to preempt state laws on an express-preemption basis in PWSA. Rather, in PWSA, Congress granted the Coast Guard the much more common authority to issue regulations, which implicate the familiar regulatory approach of conflict preemption.  *Compare* 30 U.S.C. § 1254(g) (authorizing Secretary of Interior to preempt expressly in certain contexts); 47 U.S.C. § 253(d) (same for Federal Communications Commission), *with* 33 U.S.C. §1231(authorizing, but not requiring, the Coast Guard to issue regulations under Title I) *and* 46 U.S.C. § 3703(a) (authorizing the Coast Guard to issue regulations under Title II).  According agencies the broad power to engage in express preemption (i.e., without the constraints of the traditional rules of conflict preemption) is an exceptional result, from the perspective of both federalism and separation of powers,[9] and it runs directly contrary to the Supreme Court's current trend of limiting administrative authority where clear Congressional approval is lacking. *See*, *e.g*., *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) (restricting agencies' authority to create private rights of action).  In *Sandoval*'s apt metaphor, "[a]gencies may play the sorcerer's apprentice but not the sorcerer himself."  *Id*.[10]  Congress has not deputized the Coast Guard here.

---

[9] The Coast's Guard's assumed unfettered power to engage in express preemption runs head on into the non-delegation doctrine.  *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537-38, 539 (1935).

[10] Earlier this year, the Chief Justice and two other Justices (Stevens and Scalia, J.J.) discussed this principle in the specific context of express preemption, opining that federal agencies may *not* engage in it without Congressional approval.  *Watters v. Wachovia Bank, N.A.*, 127 S. Ct. 1559, 1582-83 (2007) (Stevens, J., dissenting).  The five-Justice majority in the case declined to reach the issue, holding instead that a Congressional statute itself effected preemption.  *Id*. at 1572 n. 13; *see also id*. at 1573 (Justice Thomas did not participate).  The

An Executive Order applicable to most administrative agencies (including the Coast Guard) reinforces the conclusion that agencies may not engage in express preemption absent clear-cut Congressional authorization.  Exec. Order No. 13,132, 64 Fed. Reg. 43,255 (Aug. 4, 1999).  Entitled "Federalism," the Order specifies:

> Where a Federal statute does not preempt State law . . . , agencies shall construe any authorization for the issuance of regulations as authorizing preemption of State law by rulemaking only when the exercise of State authority *directly conflicts* with the exercise of Federal authority under the Federal statute or there is *clear evidence* to conclude that the Congress intended the agency to have the authority to preempt State law.

*Id.* § 4(b), 64 Fed. Reg. at 43,257 (emphasis added).  An agency's ability to self-assume broad powers of express preemption thus lacks support within the Executive Branch itself.[11]

Even if one were to assume that agencies could engage in express preemption absent specific Congressional authorization, the 1978 amendments to Title I specifically *negated* any otherwise extant Coast Guard authority here.  Port and Tanker Safety Act of 1978, Pub. L. No. 95-474, § 2, 92 Stat. 1471, 1471-79.  Prior to those amendments, *Ray* had relied on the following language in Title I's original version as evidencing Congressional intent that Coast Guard decisions would be potentially conflict preemptive: "Nothing contained in this *title* . . . prevent[s]

---

Chief Justice and Justices Stevens and Scalia distinguished the decisions that the Coast Guard relies upon at pp. 10-11 of its Memorandum on the ground that they allow *conflict* preemption without specific authorization, rather than express preemption.  *Id.* at 1583 n. 24 (Stevens, J., dissenting) (distinguishing *New York v. FCC*, 486 U.S. 57 (1988) and *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982)).

[11] The Commonwealth cites the Executive Order not to "create any right or benefit . . . enforceable at law," Exec. Order No. 13,132 § 11 (disavowing such formal use), but instead to show that the Executive Branch itself is in accord with applying, to the preemption context, *Sandoval*'s reminder about the limits of agency authority.  In the least, the stark contrast between the Coast Guard's newfound sweeping express-preemption arguments and the terms of an Executive Order that is meant to govern its actions should divest the agency of the "deference" to which it seems to insist it is entitled (assuming *arguendo* it is entitled to some in the first instance).  *See* PI Memo. p. 10 n.4; *see also infra* at p. 19 & n.16 (providing additional grounds for affording minimal if any deference to the Coast Guard).

a State . . . from prescribing for structures only higher safety equipment requirements or safety standards than those which may be prescribed pursuant to this *title*." Ports and Waters Safety Act of 1972, Pub. L. No. 92-340, tit. I, §102(b), 86 Stat. 424 (emphasis added). The Supreme Court ruled that this language, "by permitting the State to impose higher equipment or safety standards 'for structures only,' impliedly forbids higher state standards for vessels." *Ray*, 435 U.S. at 174. However, as the First Circuit has noted in this case, *U.S. v. Mass.*, 493 F.3d at 15-16 n.21, Congress thereafter deleted the cited passage and replaced it with a far narrower "structures" provision that is limited to one specific section of Title I that is not at issue in this case: "Nothing contained in this *section*, with respect to structures, prohibits a State . . . from prescribing higher safety equipment requirements or safety standards than those which may be prescribed by regulations *hereunder*." 33 U.S.C. § 1225(b) (addressing the particular topic of "waterfront safety") (emphasis added).[12]

These amendments withdraw any general authority the Coast Guard previously might have had to engage in express preemption.[13] Courts generally "presume that when Congress amends a statute, it is knowledgeable about judicial decisions interpreting the prior legislation." *Porter v. Bd. of Tr. of Manhattan Beach*, 307 F.3d 1064, 1072 (9th Cir. 2002); *accord Stringer v. St. James B-1 Sch. Dist.*, 446 F.3d 799, 804 (8th Cir. 2006). As a result, "an amendment substituting a new term or phrase for one previously construed indicates that the judicial . . . construction of the former term or phrase did not correspond with the legislative intent and a

---

[12] *Ray* also cited language in former Section 1222(e) of Title I as providing secondary support for its conclusion, *Ray*, 435 U.S. at 179, but the 1978 amendments deleted that passage as well. Pub. L. No. 95-474, § 2, 92 Stat. at 1471, 1477-78 (replacing former Section 1222(e) with current 33 U.S.C. § 1231(b), which omits language cited at p. 179 of *Ray*).

[13] Of course, this is not intended to concede that the Coast Guard ever had such authority. *See supra* Section III.B.

different interpretation should be given the new term or phrase." 1A Norman J. Singer, *Statutes and Statutory Construction* § 22:30, at 366 (6th ed. 2002); *accord M. Fortunoff of Westbury Corp. v. Peerless Ins.*, 269 F. Supp. 2d 524, 528 (E.D.N.Y. 2003); *see also Bausch & Lomb, Inc. v. U.S.*, 148 F.3d 1363, 1367 (Fed. Cir. 1998) ("a change in the language of a statute is generally construed to import a change in meaning"); *DirectTV, Inc. v. Brown*, 371 F.3d 814, 817 (11th Cir. 2003) (same). Here *Ray* had cited the relevant passages in Title I as "impl[ying]" authority to conflict preempt just months before the 1978 amendments deleted them, and that deletion should be presumed to be purposeful in removing any implied preemption power that might have rested on the excised provisions. *See*, *e.g.*, *Stringer*, 446 F.3d at 804-05; *Meltzer v. Zoller*, 520 F. Supp. 847, 855 (D.N.J. 1981). Whatever the implications of the 1978 amendments may be for the Coast Guard's authority to effect conflict preemption, *see infra* Argument Section IV, they clearly divest the agency of any power it otherwise had to prescribe an express preemption.[14]

### C.    The Coast Guard's Purported Express Preemption Statement is Arbitrary and Capricious Because the Coast Guard Failed to Provide a Reasoned Explanation of its Departure from Past Precedent.

Assuming *arguendo* that that the Coast Guard has the authority to expressly preempt state laws in the absence of an actual conflict, the agency must not have acted arbitrarily in making its express preemption determination. *Fidelity Fed. Savings & Loan Assoc. v. De La Cuesta*, 458 U.S. 141, 154-55 (1982); *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005). A

---

[14] While the Coast Guard appears to rely on *Locke* to rebut the effect of the 1978 amendments on its power to effect conflict preemption, PI Memo. p. 15 n. 7; *see* Commonwealth's response in Section IV below, it wisely makes no similar argument regarding express preemption. *See* PI Memo. pp. 9-14. *Locke* is again clear that "[t]he analysis under Title I . . . is one of conflict preemption," *Locke*, 529 U.S. at 109, and the decision accordingly does not address any particular aspect of express preemption in the Title I context, whether with respect to the effect of the 1978 amendments or otherwise. If anything, *Locke* is perhaps itself the strongest argument *against* finding any express preemption power in the Coast Guard, because its limitation of the Title I analysis to conflict preemption, *see id.*, necessarily implies the lack of any alternative authority to engage in express preemption.

fundamental principle of administrative decision making requires agencies to articulate a rational explanation for their actions. *Citizens Awareness Network v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 289 (1st Cir. 1995). While an agency may depart from a prior policy, when it decides to do so "it must confront the issue squarely and explain why the departure is reasonable." *Id.* (quotation omitted). An agency's failure to explain an inconsistency is a basis for finding its action arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 57, 57 (1983). The Coast Guard's statement to the contrary is simply incorrect. PI Memo. p. 13 ("Nor is it relevant that the Coast Guard could have made a different choice, or that it has done so concerning other waters in other regions; that is the nature of administrative discretion . . . .").

The Final Rule reflects just this type of arbitrary decision-making. In the Final Rule, the Coast Guard stated, "this rule is intended to, and does, preempt those provisions of . . . [OSPA] regarding enhanced manning requirements for tank barges and tow vessels in Buzzards Bay [] and tugboat escorts for certain waters." 72 Fed. Reg. at 500,58. In doing so, the Coast Guard purported to expressly preempt Massachusetts law in the absence of an actual conflict. However, the Coast Guard's prior actions dramatically conflict with this newly minted policy. First, in 1982, the Coast Guard decided to withdraw a proposed federal rule regarding tug escorts in Puget Sound because it was "essentially the equivalent of existing [Washington] State law." 47 Fed. Reg. at 17,971. Second, in 1992, the Coast Guard promulgated a rule that required tug escorts for certain single hull tankers in Puget Sound. 57 Fed. Reg. at 30,064. In this rule, the Coast Guard stated that it did *not* "intend to preempt" Washington's tug escort law because "there does not appear to be any substantial conflict." *Id.*; *see also* 59 Fed. Reg. 42,962, 42,968 (Aug. 19, 1994). Yet, in the present rule—promulgated under circumstances virtually identical

to those present in 1982, *see* 47 Fed. Reg. at 17,971—the Coast Guard failed to explain either why it promulgated the rule in the first instance, or, more importantly, why it decided to preempt portions of Massachusetts law that are not "in direct conflict" with it.

The Coast Guard's failure to provide a reasoned explanation for its departure from its prior policy in the Final Rule makes its determination arbitrary and ineffective.  It merits emphasis that in this situation "[t]he reviewing court should not attempt itself to make up for such deficiencies; [a Court] may not supply a reasoned basis for the agency's action that the agency itself has not given." *Penobscot Air Servs., Ltd. v. Fed. Aviation Admin.*, 164 F.3d 713, 720 (1st Cir. 1999) (quoting *State Farm*, 463 U.S. at 43) (citation omitted).  Moreover, *post hoc* rationalizations "developed for the first time during the litigation," which is the case here, "do not serve as adequate substitutes" for the reasoned decision-making the Coast Guard failed to undertake when it promulgated the Final Rule. *Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006).

**D.     The Coast Guard's Purported Express Preemption Statement Does Not Reflect a Reasonable Accommodation of Conflicting Policies.**

In addition to being non-arbitrary, an agency's decision to preempt must constitute "a reasonable accommodation of conflicting policies . . . committed to [its] care," *U.S. v. Mass.*, 439 F.3d at 18 (quoting *City of New York v. FCC*, 486 U.S. 57, 64 (1987)), and that accommodation must be one that Congress would have sanctioned. *See id.*  While the First Circuit articulated this standard as a constituent part of the "initial inquiry" for Title I conflict preemption, it necessarily must apply to any claim of express preemption that is otherwise allowed.  This test sensibly requires an agency to explain *how* it accommodated any conflicting set of policies when it purports to expressly preempt state law. *Penobscot Air Servs., Ltd.*, 164 F.3d at 720.  Here, the

Coast Guard's Final Rule fails to reflect this critical step, and therefore its preemption statement

is not one Congress would have sanctioned.

The purpose of Title I of PWSA is clear and unambiguous.  Congress enacted Title I to

authorize the Coast Guard to promote vessel safety, protect the marine environment, and prevent

damage to structures in or adjacent to navigable waters in local ports.  33 U.S.C. § 1221(a)-(d);

H. Rep. No. 95-1384, pt. 1, at 2 (1978), *reprinted in* 1978 U.S.C.C.A.N 3270, 3270; *accord* 39

Fed. Reg. 24157, 21457 (Jun. 28, 1974) (Coast Guard states that the purpose of PWSA "is to

promote the safety and protect the environmental quality of ports, waterfront areas, and the

navigable waters of the United States" (citing S. Rep. No. 92-724 (1972), *reprinted in* 1972

U.S.C.C.A.N 2766, 2766)).  Moreover, Congress expressed a clear intent for proactive measures

to promote these purposes, and it expressly conditioned any exercise of administrative discretion

by setting forth the factors the Coast Guard must consider in deciding whether federal rules are

necessary.  33 U.S.C. §§ 1223, 1224, *see also Ray*, 435 U.S. at 170; *Massachusetts*, 439 F.3d at 9

(Coast Guard's discretion is limited by factors in 33 U.S.C. § 1224).[15]

Here, the Coast Guard has decided not to require the tug escorts for double hull tank

barges or additional manning requirements that current Massachusetts law requires.  Mass. G.L.

c. 21M, §§ 4, 6.  The Coast Guard then purported to preempt these same provisions, without any

showing that the state law provisions actually conflict with Congress's expressed purposes or

any Coast Guard policy.  72 Fed. Reg. at 50,054, 50,057.  The sum total of the Coast Guard's

reasoning was that "[d]ouble hulls provide sufficient protection against this type of casualty, and

there has never been a major oil spill from a double hull tank barge grounding in Buzzards Bay."

---

[15] The Coast Guard appears to agree: "[a]s it is unusual for more than 10 to 15 percent of spilled oil to be recovered from a large marine spill, the best method of protection of the environment is the prevention of tanker groundings and collisions."  57 Fed. Reg. at 30,058.

72 Fed. Reg. at 50054 col. 3. In reaching this conclusion, the Coast Guard did *not* state that the Massachusetts laws would undermine any Congressional or Coast Guard policy. *Compare City of New York*, 486 U.S. at 65 (noting that in adopting regulations to preempt state technical standards for cable television standards the agency found, *inter alia*, "technical standards that vary from community to community create potentially serious negative consequences for cable systems operators.").

In the absence of a conflict with expressed Congressional or Coast Guard policy, the Coast Guard's purported preemption statement is not one that Congress would have sanctioned. Indeed, the state law provisions the Coast Guard claims to preempt actually *advance*, rather than *impede*, Congress's recognized purpose of vessel safety and protection of the marine environment. 39 Fed. Reg. at 21,457. With no finding to the contrary at the agency level, the record lacks anything to suggest that the Coast Guard's conclusion is a *reasonable* accommodation of conflicting policies. And, the Coast Guard's cryptic appeal for deference is unwarranted. *Compare* PI Memo. p. 10 n.4, *with Massachusetts v. Blackstone Valley Elec. Co.*, 67 F.3d 981, 991 (1st Cir. 1995) (stating that agency positions "tailored to and articulated specifically for purposes of this litigation" are not entitled to deference).[16]

---

[16] Even assuming *arguendo* that ordinary deference principles might apply, it is not clear that deference is warranted here or, if it is, what type of deference would be due. *Amer. Auto. Mfrs. Assoc. v. Mass. Dep't of Envtl. Protection*, 163 F.3d 74, 86 n.14 (1st Cir. 1998), *modified after stay sub. nom.*, *Int'l Auto. Mfrs. v. Mass. Dep't of Envtl. Protection*, 208 F.3d 1, 6 (1st Cir. 2000) (finding that EPA was not in a position to determine the question of federal preemption as it was a question of law "for the courts alone to decide"); *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 883 (2000) ("We place *some weight* upon [the agency's] interpretation of FMVSS 208's objectives and its conclusion . . .that a tort suit would 'stand as an obstacle to the accomplishment and executing' of those objectives." (emphasis added) (citation omitted)).

**E.     The Coast Guard's Purported Express Preemption Statement Relies on an Arbitrary and Capricious Decision Not to Issue a Final Rule that Requires Tug Escorts for Single *and* Double Hull Tank Barges.**

The Coast Guard's express preemption statement is fatally flawed for another reason—it is premised on the Coast Guard's equally arbitrary and capricious decision not to require, at a minimum, tug escorts for double hull tankers.  Pursuant to the Administrative Procedure Act, a Court may "hold unlawful and set aside agency action, findings, and conclusions" it finds to be "arbitrary, capricious, and abuse of discretion, or not otherwise in accordance with law."  5 U.S.C. § 706(2) & (2)(A).  "The requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result and respond to 'relevant' and 'significant' comments."  *Penobscot Air Servs., Ltd.*, 164 F.3d at 719 n.3 (internal citations omitted).  While this standard is not "particularly demanding," *id.* (citation omitted), it is one that the Coast Guard must satisfy, and the agency has utterly failed to do so here.

Among other errors, the Coast Guard failed to respond to a relevant and significant comment in the Final Rule.  "Significant" comments are those "which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule."  *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35 n.58 (D.C. Cir. 1977).  During the comment period, the Coalition described the release of approximately 3 million gallons of heavy fuel oil from a double hull tank barge that had traveled outside an established vessel traffic lane and struck a submerged oil platform in the Gulf of Mexico.[17]  This comment is obviously relevant to the question of the risk of oil spills from double hull barges.  It is also significant in that it supports the conclusion that spills from double hull tankers can and do occur, despite the

---

[17] Cmts. of the Coalition for Buzzards Bay to the United States Coast Guard in Response to the March 29, 2006 Notice of Proposed Rulemaking, at 5 (Jun. 27, 2006), *available at* http://www.savebuzzardsbay.org/bayinfo/publications/documents/06-27-06-USCG-NPRM.pdf

added benefit of a double hull. While the Coast Guard attempts to narrow the focus whether

spills have previously occurred in Buzzards Bay itself, this misdirected focus ignores Congress's

expressed intent to prevent oil spills *before* they occur. *See* 72 Fed. Reg. at 50054.[18] The Coast

Guard's failure to respond or even acknowledge this comment infects its conclusion not to

require escorts for double hull tankers. 72 Fed. Reg. 50054. "[T]he opportunity to comment is

meaningless unless the agency responds to significant points raised by the public." *Home Box*

*Office, Inc. v. FCC*, 567 F.2d at 35-36.

        The Coast Guard also failed to consider statutorily mandated factors in "carrying out [its]

duties and responsibilities under section 1223 [of Title I of PWSA]." 33 U.S.C. § 1224(a). The

Supreme Court previously held that local requirements, such as requirements for tug escorts, are

operating requirements now authorized by section 1223(a)(4). *Ray*, 435 U.S. at 171 (citing 33

---

[18] The fact that there has not been an oil spill from a double hull tank barge in Buzzards Bay
is unsurprising given that an estimated 80% of the barges transiting Buzzards Bay are single
hulled. 72 Fed. Reg. at 50053. This trend will change over time, as federal law requires
conversion to a double hull fleet by 2010. 46 U.S.C. § 3703a(c)(4). Under the new federal rule,
this means that all barges transiting Buzzards Bay will soon be unescorted. The Coast Guard
also arbitrarily limited its conclusion to the risk from "groundings," 72 Fed. Reg. 50054,
contradicting its earlier statement that "[g]roundings, allisions, *or collisions* of tank barges or
other laden vessels could lead to a discharge . . . of oil." 71 Fed. Reg. 15649, 15650 (Mar. 29,
2006) (emphasis added). This is troubling given modeling that found that "[f]or collision[s],
there were cases in which the double-hull design had a spill, but damage to the single-hull design
occurred . . . and resulted in no spill." TRANSPORTATION BOARD, NAT'L ACADEMIES,
ENVIRONMENTAL PERFORMANCE OF TANKER DESIGNS IN COLLISION AND GROUNDING 80 (2001),
*available at* http://onlinepubs.trb.org/onlinepubs/sr/sr259.pdf. The Coast Guard did provide an
additional rationale, which is that, taken together, the vessel movement reporting system, a
federally licensed pilot, and escorts for single hull barges provide a "sufficient measure of safety
for tank vessels transiting Buzzards Bay." 72 Fed. Reg. at 50054-55. This reasoning is similarly
specious, however, because (1) the latter two requirements only apply to single hull tankers, and
(2) the reasoning appears to conflict with the Coast Guard's earlier conclusion that other
regulatory measures cannot "substitute for the immediate, on-site assistance that an escort vessel
can provide." *See* 59 Fed. Reg. 42962, 42966 (Aug. 19, 1994) (regarding a Vessel Traffic
System in Puget Sound). *See also Importance of Maintaining the Prince William Sound Escort*
*System for Double-Hulled Tankers* (2004) (recognizing benefits of the use of escorts for double
hull vessels in Prince William Sound), *available at* http://www.pwsrcac.org/docs/d0003800.pdf.

U.S.C. § 1221(3)(iii) & (iv) (re-codified at 33 U.S.C. § 1223(a)(4)); *see also U.S. v. Mass.*, 493

F.3d at 9 (discussing 33 U.S.C. § 1223(a)).  The Final Rule does not reflect the Coast Guard's

consideration of the factors set forth in 33 U.S.C. § 1224(a), which include consideration of local

practices and customs.  33 U.S.C. § 1224(a)(8)-(9); s*ee also* 57 Fed. Reg. 12257, 12257 (Mar.

23, 1978) ("Under Title I of the [PWSA], the Secretary of Transportation and his delegees are

required to consider the existence of state and local practices and customs in determining

whether it is necessary or desirable to exercise authority under the Act.").[19]  The Coast Guard's

failure to consider the mandatory factors set forth 33 U.S.C. § 1224 also renders its action

arbitrary and capricious and in violation of PWSA itself.  *See Penobscot Air Servs., Ltd.*, 164

F.3d at 719 (noting that the task for the Court is to determine, *inter alia*, "whether the agency has

. . . considered the relevant factors") (citation omitted).  With the underlying decision not to

require tug escorts for double hull tankers thus invalid, the Coast Guard's related express

preemption statement collapses on itself; thus making it deficient for yet another reason.

## IV.    THE COAST GUARD ALSO CANNOT SHOW A LIKELIHOOD OF SUCCESS ON ITS NOW-SUBORDINATED CONFLICT PREEMPTION CLAIM.

The Coast Guard still makes a conflict preemption claim, but now relegates it to a

truncated, "fallback" status.  PI Memo. pp. 14-17.  While never acknowledged by the agency, the

reason for this de-emphasis is again clear: the First Circuit has specified that any successful

conflict preemption claim must include satisfaction of one of the two traditional tests (physical

impossibility or obstacle to purpose), *U.S. v. Mass.*, 493 F.3d at 8, 18, and the Coast Guard

simply cannot do that.  The agency may not like the First Circuit's formulation of the Title I

---

[19] Indeed, these local factors were arguably the reason why the Coast Guard withdrew its proposed federal tug escort rule for Puget Sound in 1982.  *See* 47 Fed. Reg. at 17,971.

conflict preemption standard, but that formulation is the controlling law here, and it dooms the Coast Guard's half-hearted conflict preemption claim.

The Coast Guard thus presents no actual argument as to how it satisfies either prong of the traditional standard. *See* PI Memo. pp. 14-17. It instead contends that it can effect a conflict preemption simply by stating that it has or has not chosen to regulate in a certain area. *Id*. at 14-16. That is the same conflict-preemption argument that the agency made to the First Circuit, and it is the same argument that the Circuit Court unequivocally rejected. *U.S. v. Mass*., 493 F.3d at 8, 18; *see also id.* at 15-16. As the First Circuit twice specified, whether the Coast Guard has spoken is only the "initial" part of the Title I inquiry, *id*. at 8, 18; the agency also must satisfy "standard conflict preemption analysis." *Id*. at 8.[20] The Coast Guard's failure to provide any explanation as to how it can satisfy the "standard analysis" is a tacit acknowledgment that it has no colorable conflict-preemption argument, let alone one with a likelihood of success.[21]

The Coast Guard's avoidance of the traditional test is understandable, because any argument under it would plainly fail. As to the "physical impossibility" prong of the traditional standard, nothing prevents a shipping company from complying with both the federal and state requirements at the same time. In the tug escort context, for example, certain vessels have to take on an escort under the federal rule, 33 C.F.R. § 165.100(d)(5), and certain additional ones have to take on an escort under the state requirement, Mass. G.L. c. 21M, § 6. Because the federal rule serves only to require some vessels to take on an escort and does nothing to *prohibit*

---

[20] The Coast Guard does not in fact satisfy that "initial inquiry," for all of the reasons set forth in Sections IIIC-E above, which the Commonwealth adopts by reference here. The arguments in this Section IV provide additional reasons for rejecting the conflict-preemption claim even if one were to assume that the agency has adequately expressed its preemptive intent.

[21] The same inference also can be drawn from the very subordination of its conflict-preemption argument to the newly conceived express preemption claim. *Compare* PI Memo. pp. 9-14 *with id.* pp. 14-17.

others from engaging one voluntarily, compliance with the state rule does not violate the federal

rule. *See*, *e.g*., *LCM Enterprises, v. Dartmouth*, 14 F.3d 675, 684 (1st Cir. 1994). It is

accordingly easy, rather than "impossible," to comply with both rules at the same time. *See U.S.*

*v. Mass*., 493 F.3d at 17 & n. 23 (noting Coast Guard's failure to defend District Court's earlier

finding of impossibility).

      The Coast Guard also has good reason not to argue the alternative, "obstacle to purpose"

prong of conflict preemption analysis. There again is no doubt about what Congress's purpose in

enacting Title I was, because it states its intent in the statute itself: "The Congress finds and

declares -- (a) that *navigation and vessel safety and protection of the marine environment* are

matters of major national importance . . . ." 33 U.S.C. § 1221(a) (emphasis added). Here the

Commonwealth's supplemental escort and manning requirements do not pose an "obstacle" to

the accomplishment of these goals of vessel safety and environmental protection; they instead

further reduce the possibility of oil spills and hence directly *advance* those goals. Tellingly, the

Coast Guard again makes no argument that either supplemental requirement would increase the

risk of spills or interfere with safety, and it similarly does not contest that the state provisions

could provide some additional level of protection above and beyond that afforded by the federal

rule. See PI Memo. pp. 14-17.[22] If that be the case, then how can those provisions pose an

---

[22] While the Coast Guard indicates that another state requirement that is not at issue here (mandatory ship routes) might create an actual hazard, *see* 72 Fed. Reg. at 50,057 (such routes could potentially restrict mariner discretion where specific conditions would make an alternative route appropriate), all that the agency stated with respect to the escort requirement was that it believed that its own new rule would be "sufficient" for the future. *Id*. at 50,054-55, 50,057. At most, that constitutes a prediction that the supplemental state requirement will not end up reducing future spills; like all predictions, the possibility is still left open that the further state requirement could end up preventing spills in specific situations not covered by the federal rule. If that possibility were to come to pass, the supplemental state rule would clearly help rather than hinder the goals of vessel safety and environmental protection. In any event, the Coast Guard's "sufficiency" opinion certainly does not provide a basis for concluding that the state rules would

"obstacle" to the accomplishment of the statute's environmental-protection and vessel-safety goals?[23]

Significantly, neither the Coast Guard's Memorandum nor the new regulation itself identifies "uniformity" as an additional possible goal of Title I whose accomplishment might be frustrated by the separate state rule. This is undoubtedly because the Coast Guard seems to be perfectly happy with widely diverse state escort rules on the West Coast and indeed has stated that "there does not appear to be any substantial conflict" with respect to the escort regulation for Puget Sound. 57 Fed. Reg. at 30,064. An asserted goal of "uniformity" would thus be illusory in the present case, and the claim of conflict preemption is plainly inadequate.[24]

---

actually make matters *worse* in terms of vessel safety and environmental protection. As a result, they by definition do not and cannot pose an "obstacle" to the accomplishment of those goals.

[23] Perhaps anticipating the difficulty in answering this question, the Coast Guard at one point in its Memorandum characterizes its preemption statement as including the "affirmative decision that no such [supplemental state escort] requirement is appropriate." PI Memo. p. 16. But, the Coast Guard actually said no such thing in the quoted Federal Register provision that immediately precedes the Memorandum's characterization. The language in the rule-making document itself is that "the Coast Guard does not feel it is *necessary* to require tug escorts for double hull tank barges at this time." *Id.* (quoting 72 Fed. Reg. at 50,054) (emphasis added). An agency's position that supplemental state regulation is currently unnecessary is simply not the same as stating that it would actually make matters worse.

[24] A further reason why conflict preemption does not exist here is that, for all of the reasons set forth in Section IIIB above, the 1978 amendments to Title I eliminated the preemptive role that the Supreme Court had previously accorded Title I in *Ray*. While the Coast Guard presumably will cite *Locke* in response, *see* PI Memo. p. 15 n. 7, that decision did not address the effect of the 1978 amendments on the scope of Title I conflict preemption. *Locke*, 529 U.S. at 103-07 (instead discussing the effect of separate 1990 legislation on Title I). "Stare decisis applies only to legal issues that were actually decided in a prior action," *Beacon Oil Co. v. O'Leary*, 71 F.3d 391, 395 (Fed. Cir. 1995), and "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Rinard v. Luoma*, 440 F.3d 361, 363 (6th Cir. 2006) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)); *accord Sorenson v. Mink*, 239 F.3d 1140, 1149 (9th Cir. 2001) ("unstated assumptions on non-litigated issues are not precedential holdings binding future decisions"); *see also Gately v. Mass.*, 2 F.3d 1221, 1228 (1st Cir. 1993). Moreover, the First Circuit presumably would not have identified the effect of the 1978

III.   **THE BALANCE OF THE HARMS TIPS DECIDEDLY IN FAVOR OF THE COMMONWEALTH.**

    A.    **The United States's Asserted Irreparable Harm Is Unfounded.**

It is axiomatic that "[s]peculative injury does not constitute a showing of irreparable harm." *Pub. Serv. Co. of N.H. v. Town of West Newbury*, 835 F.2d 380, 383 (1st Cir. 1987); 11A Wright, Miller & Kane, *Federal Practice and Procedure* § 2948.1, at 153 (2d. ed. 1995). Yet, here Plaintiff has failed to proffer anything more than mere conjecture. As a result, the Coast Guard cannot demonstrate that the United States is likely to suffer irreparable harm in the absence of a preliminary injunction, and therefore a preliminary injunction is unwarranted.

The Coast Guard argues that sections 4 and 6 of OSPA somehow interfere with its ability to conduct foreign affairs. PI Memo. pp. 17-18 & n.9. This argument is unfounded. First, in *Ray* the U.S. Supreme Court actually held that Washington's tug escort rule did *not* interfere with the United States's ability to conduct foreign affairs because the state law had "insignificant international consequences." *Ray*, 435 U.S. at 180. Second, the Coast Guard itself has taken a position vis-à-vis the international community that Buzzards Bay is not subject to general navigational rules due to its character as inland waters and to the particular characteristics of the Bay. 33 C.F.R. § 80.145; *see also Massachusetts Boundary Case*, 452 U.S. 429 (1981). Third, as was previously noted, *supra* pp. 8-9, the United States has managed to co-exist with state laws regarding tug escorts in at least California and Washington. Therefore, it is difficult to imagine how the Massachusetts laws can actually "embarrass" the United States in the international forum, PI Memo. p. 18, unless the East Coast and the West Coast be somehow different in that regard.

---

amendments as an issue to be explored on remand, *U.S. v. Mass.*, 493 F.3d at 16 n.21, had *Locke* been plainly dispositive of it.

The Coast Guard also argues that the continuation of the Commonwealth's escort requirement beyond the effective date of the Final Rule on November 28 will lead to confusion on the water and "denigrate the authority of the United States." PI Mem. pp. 18-19. This argument is similarly unfounded. First, towing vessels and tank barges simultaneously complied with both state law and existing federal rules between August 4, 2004 (when OSPA was enacted) and July 24, 2006 (when Judge Tauro permanently enjoined many of OSPA's provisions), without any noted consequence. 2004 Mass. Acts. c. 251, at 933; 33 C.F.R. § 165.100(d) (2006); *U.S. v. Mass.*, 440 F. Supp. 2d 24, 48 (D. Mass. 2006). Second, a period of approximately 18 months passed between the time the United States filed its Complaint and the time the District Court permanently enjoined the challenged provisions of OSPA. This period of delay significantly undercuts the Coast Guard's claimed irreparable harm. *Charlesbank Equity Fund II*, 370 F.3d at 162 ("delay between the institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm.") (citation omitted). In light of this delay and no evidence of actual confusion, the Coast Guard's argument remains just that, an argument.

Finally, Intervenor-Plaintiffs' failure to request a preliminary injunction themselves further undermines the United States's claimed irreparable harm. Intervenor-Plaintiffs consist of international and national organizations that represent the interests of the shipping industry.[25] Their silence is particularly notable because they represent the companies that have complied with both state law and the existing federal rule and will operate within a similar regulatory scheme after November 28th. *See* Tr. Hr'g at 18, lines 4-6 (Oct. 15, 2007) (counsel for the United States stating that "operationally, [counsel for Intervenor-Plaintiffs], who represents the

---

[25] Intervenor-Plaintiffs consist of the American Waterways Operators, the International Association of Independent Tank Owners, the Chamber of Shipping of America, and BIMCO.

actual shipping organizations, may be in a better position to explain the harm that [the state rule] will cause to people who are actually piloting boats through Buzzards Bay.").  Since it is entirely possible to comply with both the state and federal rules, the United States and Intervenor-Plaintiffs will not be irreparably harmed in the absence of the requested relief.  *See id.* at 20, lines 19-20 (failing to identify an actual conflict but refusing to concede the point).

### B.    The United States's Requested Relief Will Irreparably Harm the Commonwealth and Leave Its Waters Open to An Increased Risk of Devastating Oil Spills.

In contrast to the Coast Guard's speculative claims of irreparable harm, a preliminary injunction enjoining the effectiveness of a validly enacted state law will plainly harm the Commonwealth and its citizens.  It was for this reason that the First Circuit has stated, in a case where it vacated a preliminary injunction granted in a preemption case, that "should the [state] statute be valid, the public in interest *would obviously be adversely affected* by a preliminary injunction enjoining its enforcement."  *See Agency Rent-A-Car, Inc. v. Connolly*, 686 F.2d 1029, 1035 (1st Cir. 1982) (emphasis added).  Moreover, at the end of the day, this is a case about federalism, the underlying policy of which teaches much in this case.  As Justice Black has noted, the concept of federalism represents

> a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

*Younger v. Harris*, 401 U.S. 37, 44 (1971).  In this context, the Supreme Court has stated that Title I of PWSA "does preserve . . . the historic role of States to regulate local ports and waters" in the absence of an actual conflict with federal law.  *Locke*, 529 U.S. at 108-09.  As developed in more detail in the Coalition Opposition, the Commonwealth here has acted within its historic

role to protect against the disastrous consequences of oil spills in the ecologically critical habitat of Buzzards Bay.  In light of the Coast Guard's strained attempt to demonstrate an actual conflict, the Commonwealth's law should remain in effect.

The public interest also weighs strongly in favor of denying a preliminary injunction. The Commonwealth's Oil Spill Prevention law enjoys broad public support because of the steps it requires to prevent the devastating impacts of oil spills like the one that occurred on April 27, 2003 in Buzzards Bay.[26]  There is simply no adequate legal remedy for the ill effects of a potential spill that might occur in the absence of OSPA.  While the Coast Guard asks this Court to rubber stamp its "judgment," PI Mem. at 19, it is the role of this Court, and not Plaintiff, to determine whether the Coast Guard has acted within its circumscribed authority.  In the absence of any real harm to Plaintiff, balanced against the harm that would necessarily result if the Court enjoined the operation of the state law, Plaintiff has not made the clear showing that might warrant issuance of the extraordinary relief requested here.

## VI.    CONCLUSION

For the foregoing reasons, the Commonwealth respectfully request that the Court deny Plaintiffs' Motion For Preliminary and Permanent Injunction.

---

[26] *See, e.g.*, MA DEP Cmts. on U.S. Coast Guard Advance Notice of Proposed Rulemaking related to Navigation and Waterways Mgmt. Improvements in Buzzards Bay, MA, at 2 (Dec. 23, 2004) (CG Dkt. No. CGD01-04-133, Doc. # 30) ("[OSPA] reflects and responds to the public's concern that current Coast Guard regulation does not go far enough to protect Massachusetts waters from preventable spills of oil . . . ."), *available at* http://www.uscg.mil/d1/units/msoprov/ ARCHIVE/Waterways/Buzzards_Bay/ANPRM_Roster.htm

Respectfully Submitted,

COMMONWEALTH OF MASSACHUSETTS
*et al*.

By their attorneys,

MARTHA COAKLEY
ATTORNEY GENERAL

 /s/ Seth Schofield
Seth Schofield, BBO No. 661210
Pierce O. Cray, BBO No. 104630
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
(617) 727-2200
seth.schofield@state.ma.us
Dated: November 16, 2007          pierce.cray@state.ma.us

## CERTIFICATE OF SERVICE

I, Seth Schofield, certify that the foregoing *Commonwealth's Opposition to Coast Guard's Motion for Preliminary and Permanent Injunction*, which was filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November16, 2007.

/s/ Seth Schofield
 Seth Schofield