UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 05-10112 RCL LTS |
| | ) | |
| v. | ) | |
| | ) | |
| THE COMMONWEALTH OF MASSACHUSETTS, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE UNITED STATES' MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION**

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

MICHAEL SULLIVAN
United States Attorney
MARK T. QUINLIVAN
Assistant U.S. Attorney

ARTHUR R. GOLDBERG D.C.B. 180661
STEVEN Y. BRESSLER D.C.B. 482492
Attorneys, Civil Division
United States Department of Justice
P.O. Box 833
Washington, D.C. 20044
Telephone (202) 514-4781
Facsimile (202) 318-7609
Steven.Bressler@USDOJ.gov

Attorneys for the United States of America

**TABLE OF CONTENTS**

PAGE(S)

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.    There Is No Coast Guard Policy Against Preemption Of State
           Tug Escort Laws. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    II.   The Coast Guard Has Provided Ample Reasons For Its
           Regulatory Choice Concerning Buzzards Bay. . . . . . . . . . . . . . . . . . . . . . . . . 5

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## INTRODUCTION

Pursuant to this Court's Order of March 3, 2008, plaintiff, the United States of America, submits this memorandum to state that the Coast Guard's Puget Sound rulemaking has no relationship to the preemptive effect of the 2007 federal rules for Buzzards Bay. The United States also provides a further discussion of the Coast Guard's choice as to the appropriate level of regulation for Buzzards Bay in 2007 compared to the choices made with respect to Puget Sound.

## BACKGROUND

The Coast Guard's final rule establishing escort vessel requirements for certain tankers in Puget Sound published at 59 Fed. Reg. 42962 on August 19, 1994, was the federal response to a mandate of the Oil Pollution Act of 1990, Pub. L. No. 101-380 ("OPA '90"). OPA '90 required the Coast Guard to issue regulations requiring escort vessels for "single hulled tankers over 5,000 gross tons transporting oil in bulk" in Puget Sound, among other waters (*not* including Buzzards Bay). Id. § 4116(c). Like OPA '90, the Coast Guard's resulting 1994 Puget Sound rule did not require escorts for tank barges of any kind or for double-hulled tankers. Indeed, the Coast Guard stated its view in 1994 "that Congress did not intend" for double hull tankers to be escorted. 59 Fed. Reg. at 42963. See also Declaration of J. M. Sollosi (filed herewith) ¶¶ 4-5. In 1994, and even prior to the enactment of OPA '90, Washington State required escort vessels for larger single-hull tankers, but had no escort requirement for double-hull vessels. Id. ¶ 4.

The Coast Guard's final rule for Buzzards Bay published at 72 Fed. Reg. 50052 on August 30, 2007, represents the Coast Guard's exercise of its discretion under Title I of the PWSA, following years of study and consideration, to set the appropriate level of regulation; it is not the regulatory response to a specific congressional mandate. 72 Fed. Reg. at 50053; Sollosi Decl. ¶ 4. The 2007 rule establishes, *inter alia*, specific escort vessel and manning requirements

for certain vessels in Buzzards Bay. Like the 1994 Puget Sound rule, the 2007 Buzzards Bay rule does not require escorts for double hull vessels. Unlike the 1994 situation in Washington State, however, Massachusetts law (M.G.L. c. 21M, § 6(a) & (b)) does require escorts for double hull vessels, and thus directly conflicts with an affirmative Coast Guard judgment. 72 Fed. Reg. at 50056-67; see also Sollosi Decl. ¶¶ 5, 7, 9. Massachusetts' state vessel manning rule (M.G.L. c. 21M, § 4(a)) also differs from and conflicts with the Coast Guard's affirmative judgment as to the appropriate manning requirement. 72 Fed. Reg. at 50056-67.

## ARGUMENT

The 2007 federal requirements for Buzzards Bay reflect the Coast Guard's "considered determination of the appropriate level of regulation." 72 Fed. Reg. 50052, 50057. Under well-established law, the Commonwealth's conflicting scheme is preempted.[1] In response to this plain application of the Supremacy Clause, the Commonwealth seeks to undermine the legitimacy of the Coast Guard's rule by claiming the Coast Guard "decided to preempt portions of Massachusetts law that are not 'in direct conflict' with" the 2007 rule, thus allegedly acting in "direct[] conflict" with some (alleged) "prior policy." See Commonwealth's Memorandum in Opposition to the U.S. Motion for Preliminary and Permanent Injunction ("Comm. Mem.") 16, 17. It is unclear what this purported policy would be, but regardless, defendants are mistaken: there is no such "prior policy," and there is no conflict.

---

[1] The "relevant inquiry" for preemption under Title I of the PWSA "is whether the Coast Guard has promulgated its own requirement on the subject or has decided that no such requirement should be imposed at all." U.S. v. Locke, 529 U.S. 89, 110 (2000), citing Ray v. Atlantic Richfield Co., 435 U.S. 151, 171-72, 178 (1978). Under PWSA Title I, "Congress . . . preserved state authority to regulate the peculiarities of local waters [only] if there was no conflict with federal regulatory determinations[.]" Locke, 529 U.S. at 110. Where a state regulation is so directed, it is still preempted under Title I when "the Coast Guard has . . . adopted regulations on the subject or determined that regulation is unnecessary or inappropriate." Id. at 109.

I.       **There Is No Coast Guard Policy Against Preemption Of State Tug Escort Laws.**

The Coast Guard has explained that its "affirmative decision[] . . . to require an escort tug in addition to the primary tug, for all single hull tank barges transiting Buzzard's Bay, but not for other vessels . . . represent[s] a considered determination of the appropriate level of regulation to ensure navigation safety and environmental protection." 72 Fed. Reg. at 50056-57. "As such, the Coast Guard has determined that any other non-Coast Guard schemes relating to vessel routing, manning, and tug escort requirements in Buzzards Bay are preempted." Id. at 50057. This is not an expression of preemption "in the absence of an actual conflict," as defendants argue (Comm. Mem. 16), but, rather, a clear expression that the state law *directly conflicts* with the Coast Guard's determination of the appropriate tug escort regulation for Buzzards Bay.[2]

In contrast to the Coast Guard's exercise of its regulatory discretion under Title I of the PWSA in the 2007 regulation, the 1994 Puget Sound rule issued pursuant to OPA '90 left Washington State free to go further than the federal rule without resulting in conflict with an affirmative Coast Guard decision. As the Coast Guard explained at the time, its Puget Sound tug escort rule established "*minimal requirements* for escort of certain tanker traffic through these designated areas," and, therefore, "the Coast Guard d[id] not intend to preempt the states from issuing more stringent requirements provided they are not in direct conflict with Federal law or

---

[2]   Preemptive conflict with federal law occurs not only when compliance with both federal and state law is impossible, but when state law stands as an obstacle to the accomplishment of the full federal purpose. See Hines v. Davidowitz, 312 U.S. 52, 67 (1941); U.S. v. Massachusetts, 493 F.3d 1, 8 (1st Cir. 2007). "Federal regulations have no less preemptive effect than federal statutes." Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 699 (1984); Massachusetts, 493 F.3d at 8 n.9. See also City of New York v. FCC, 486 U.S. 57, 64 (1988) ("the correct focus" of a regulatory preemption inquiry is on the intent of the agency that issued the regulations).

this rulemaking." See 59 Fed. Reg. at 42968 (emphasis added).[3] This was consistent with the Coast Guard's statement two years earlier, in its Notice of Proposed Rulemaking for Puget Sound, that because those rules "are limited to implementing the requirements of section 4116(c) of OPA 90 . . . the[ir] preemptive effect . . . is limited to escort requirements for *single hull tankers*" in specific areas. See 57 Fed. Reg. 30058, 30064 (July 7, 1992) (emphasis added). In Buzzards Bay, the Coast Guard acted not in response to a congressional mandate, but on its own initiative after years of study to set the appropriate level of regulation for protection of the maritime environment.[4] See 52 Fed. Reg. 50052, et seq.

Thus, the 2007 rule reflects the Coast Guard's affirmative decision as to the appropriate (not merely minimum) level of regulation. That was not the case with the Coast Guard's 1994 rule for Puget Sound, and the Coast Guard is not acting in conflict with any prior agency policy.

---

[3] OPA '90 § 4116(c) instructed the Coast Guard to issue regulations under 46 U.S.C. § 3703(a)(c) for tug escorts in Puget Sound, among other places. Pub. L. 101-380 § 4116(c), 104 Stat. 423. Title 46 U.S.C. § 3703(a)(3) is contained in Title II of the PWSA which, as the Supreme Court had held well prior to OPA '90, has a field (not conflict) preemptive effect. Ray, 435 U.S. at 168; see also Locke, 429 U.S. 109. Thus, Congress arguably intended to occupy the field of tug escort regulation in Puget Sound, among other places. The Court need not now reach this question, however, since the United States' pending motion is based on the 2007 Buzzards Bay rule and Title I of the PWSA.

[4] Similarly, these circumstances are not, as defendants argue (Comm. Mem. 16), "virtually identical" to those when the Coast Guard decided *not* to issue a tug escort rule in Puget Sound 25 years ago. At that time, the Coast Guard considered issuing a tug escort rule with preemptive force but decided not to where the "resulting rule would have been essentially the equivalent of the existing State law." See 47 Fed. Reg. 17968, 17971 (April 26, 1982) (cited in Comm. Mem. 16-17). The 2007 rule is not "essentially the equivalent" of the Commonwealth's law: as explained supra, the Commonwealth requires tug escorts for vessels that the Coast Guard has affirmatively decided should not be subject to such a requirement. And any situation where the Coast Guard did not act at all is inapposite. The decision whether to take discretionary regulatory action with preemptive force is akin to a choice whether to take an enforcement action. As the Supreme Court has recognized, such choices are committed to agency discretion. See Heckler v. Chaney, 470 U.S. 821 (1985). In these matters, the Coast Guard is "far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." Id. at 831-32. See also MPIRG v. Nuclear Regulatory Comm'n, 852 F.2d 9 (1st Cir. 1988) (no judicial review of NRC's denial of a request for an enforcement order).

Even if the situations *were* identical, however, a Coast Guard choice to regulate one body of water differently than it did a single other body of water some time ago "hardly constitutes a 'long-standing and well-established practice deviation from which might justify judicial intervention.'" Carter/Mondale Pres. Cmte., Inc. v. FEC, 775 F.2d 1182, 1185-86 (D.C. Cir. 1985) (quoting Vt. Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 543 n. 17 (1978)).[5]

**II.   The Coast Guard Has Provided Ample Reasons For Its Regulatory Choice Concerning Buzzards Bay.**

Contrary to defendants' argument, the Coast Guard need not provide any analysis justifying its "change in policy" because there was no such policy and, therefore, has been no such change.[6] Indeed, to the extent a policy may be discerned it is a consistent one against requiring escorts for vessels with double hulls as the Commonwealth purports to do. Nonetheless, to eliminate any confusion the Coast Guard provides, in the Declaration of J.M. Sollosi filed herewith, a further and ample explanation of how the situation in Buzzards Bay today differs from that in Puget Sound in decades past.[7]

---

[5]   The United States focuses on the tug escort portion of the 2007 rule in this memorandum because defendants have pointed to, and the Court has requested a response regarding, Puget Sound tug escort rules. The same logic applies, however, to the Coast Guard's decision to preempt the state's conflicting manning regulation: the state rules conflict with the affirmative federal determination as to the appropriate requirement. See 72 Fed. Reg. at 50056-57; U.S. Mem. 5-6, 15-16.

[6]   "[A]n agency may change its course so long as it can justify its change with a 'reasoned analysis.'" Horn v. Thoratec Corp., 376 F.3d 163, 179 (3d Cir. 2004) (quoting Motor Vehicle Mfrs. Assoc. v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 42 (1983)). As the First Circuit has noted, "this is not a difficult standard to meet." Citizens Awareness Network, Inc. v. NRC, 59 F.3d 284, 291 (1st Cir. 1995) (holding agency had not met the standard where it provided *no* basis for its action during or prior to the litigation). Cf. Long Island Care at Home, Ltd. v. Coke, 127 S. Ct. 2339, 2349 (2007).

[7]   While defendants may criticize the Sollosi Declaration as a *post hoc* rationalization that would not be entitled to Chevron deference (although, of course, that is not the precise issue at hand), it is entirely proper for the United States to provide "through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary" to

-5-

One significant (and preemptive) difference between the state's tug escort requirement and the federal rule is that the Coast Guard has exempted double-hull tank barges from the requirement. Compare 33 C.F.R. § 165.100(d)(1)(ii) with M.G.L. c. 21M, § 6(a) & (b). As Mr. Sollosi explains, one reason for the Coast Guard's determination that a tug escort requirement for double-hull tank barges is not appropriate is that:

> applying the tug escort requirements to only single-hull tankers provides an important incentive. The Coast Guard seeks to encourage the use of double-hulled tankers . . . . [T]he carriage of oil in bulk by single-hull vessels in Buzzards Bay will decrease as we approach the year 2015, the . . . phase-out date for single-hull tank vessels under OPA '90. The Coast Guard rule, by requiring tug escorts for single-hull tank barges but not double-hull barges, creates an incentive for shippers to switch to double-hulled tank barges prior to the phase-out date, and sooner than they otherwise would.

Sollosi Decl. ¶ 11. The Washington State rule that the Coast Guard did not preempt, unlike the Commonwealth's preempted requirement, did not impose a tug escort requirement on double-hull tank barges. See id. ¶ 5; 59 Fed. Reg. at 42963 ("Congress did not intend for tankers that meet the OPA '90 double hull design requirements to be escorted.").

Similarly, the 1994 rule for Puget Sound responded directly to a congressional mandate for minimum rules in certain waters. "Given the limited nature of th[at] rulemaking, the Coast Guard followed the instructions of Congress precisely, and issued the rule under the authority granted to the Coast Guard pursuant to" OPA '90. Sollosi Decl. ¶ 4.

---

confront new arguments raised by defendants in litigation. See Camp v. Pitts, 411 U.S. 138, 143 (1973) (discussing review in APA case). See also Lewis v. Babbitt, 998 F.2d 880, 882 (10th Cir. 1993); Population Inst. v. McPherson, 797 F.2d 1062, 1072 (D.C. Cir. 1986); Action on Smoking & Health v. CAB, 713 F.2d 795, 799 n.2 (D.C. Cir. 1983) (Camp affidavit not a "*post hoc* rationalization of its earlier action, but merely elaborates, fills in interstices, or takes account of isolated neglected issues"). Indeed, "strict application" of the "general rule" limiting (APA) review to the administrative record is "unwarranted" where new material pertains to matter "not directly at issue in the proceedings below." Edison Elec. Inst. v. OSHA, 849 F.2d 611, 618 (D.C. Cir. 1988). That is certainly the case where, as here, an agency compares a particular rulemaking to a separate, earlier rulemaking that was not "directly at issue" in the more recent proceeding. Cf. Parkview Med. Assocs. v. Shalala, 158 F.3d 146, 149 (D.C. Cir. 1998).

In addition, the Coast Guard's preference for clear, generally uniform regulation is implicated more strongly in Buzzards Bay due to the nature of the water body and its traffic. As Mr. Sollosi explains:

> The majority of maritime accidents are caused by human error, and a confused mariner is an unsafe mariner. Conflicting federal and state regulations can create such confusion. The Coast Guard wants mariners to concentrate on navigating safely, not on whether a state rule or a federal rule applies in a certain waterway.

Id. ¶ 10. In Puget Sound, "the tank vessels requiring escorts as they enter port serve only ports in the State of Washington, whereas in Buzzards Bay they serve several states, including Massachusetts, Rhode Island, Connecticut, New York, New Hampshire and Maine, thus creating a greater need for [federal] uniformity." Id. ¶ 12.

Most importantly, in 1994 (and 1982) the tug escort regime in Washington created no overlaps or conflicts with a federal determination, whereas in Buzzards Bay in 2007 there is a conflict. Under these circumstances, the federal judgment is supreme.

## CONCLUSION

For the foregoing reasons, defendants' argument concerning previous rules for Puget Sound does not undermine any of the reasons set forth in the United States' opening memorandum and at the hearing before this Court that the Commonwealth's tug escort and vessel manning rules are preempted under the Supremacy Clause and, therefore, should be enjoined.

Dated: March 13, 2008

Respectfully Submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General
MICHAEL SULLIVAN
United States Attorney

 /s/ Steven Y. Bressler
ARTHUR R. GOLDBERG D.C.B. 180661
STEVEN Y. BRESSLER D.C.B. 482492
Attorneys, U.S. Department of Justice

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>THE COMMONWEALTH OF<br>MASSACHUSETTS, et al.<br><br>    Defendants. | )<br>)<br>) Civil Action No. 05-10112-RCL<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF J.M. SOLLOSI

I, J. M. Sollosi, declare as follows pursuant to 28 U.S.C. § 1746:

1.   I have served in the United States Coast Guard since 1976 as a commissioned officer and as a civil servant. In my current capacity as Chief of the Office of Navigation Systems in Coast Guard Headquarters, I have responsibility for short range aids to navigation, Electronic Navigation systems, Vessel Traffic Services, routing measures, navigation equipment standards and the Navigation Rules. My office also has policy oversight for the establishment of Regulated Navigation Areas and Limited Access Areas. As such, we serve to advise field commanders in their role as the approving authority for these and other navigation safety regulatory matters. I have served as Head of Delegation or as a delegate to the International Maritime Organization's Safety of Navigation Subcommittee for several years, representing U.S. interests on a variety of subjects. I am an active participant in the work of the International Association of Marine Aids to Navigation and Lighthouse Authorities and presently serve as the Chairman of the Association's VTS Committee. I make this declaration based on my personal

knowledge and knowledge gained in my official capacity.

2.      I understand that defendants in the above-captioned case assert that the Coast Guard was arbitrary and capricious in the position it took on preemption in the final rule published August 30, 2007, 72 F.R. 50052, 50056-57, because the Coast Guard took a different position on preemption in a different rulemaking published thirteen years earlier on August 19, 1994, 59 F.R. 42962, 42968.  By its Order, dated March 3, 2008, the Court directed that the United States address the defendants' argument, and the relationship, if any, between the tanker tug escort rules for Puget Sound and the amendments to the First Coast Guard District Regulated Navigation Area, relating to Buzzards Bay.  From my point of view as program manager for Coast Guard regulations related to waterways management, there is no relationship between the rules relating to Puget Sound and the recent revision of the First Coast Guard District Regulated Navigation Area.  Each rulemaking is a discrete action that is assessed on its own merits.  In addition, differences between the circumstances addressed in each case explain the Coast Guard's statements on preemption.

3.      The rulemaking that led to publication of 33 C.F.R. Part 168 in August 1994 ("the 1994 Puget Sound rulemaking") was the Coast Guard's response to a Congressional mandate in the Oil Pollution Act of 1990, Pub. L. 101-380 ("OPA '90").  Section 4116(c) of OPA '90 required the Coast Guard to publish a rule defining areas, specifically including Puget Sound, where single-hulled tankers over 5,000 gross tons ("GT") transporting oil in bulk must be escorted by at least two tugs.  The Coast Guard limited its 1994 Puget Sound rulemaking to address the specific vessels identified by Section 4116(c) of OPA '90—single-hull tankers over 5,000 GT transporting oil in bulk.  Therefore the 1994 Puget Sound rulemaking, like the statute,

did not address escort requirements for tank barges of any kind or double-hull tankers. Before the Coast Guard was directed to issue this rule, the state of Washington already had a tug escort requirement for larger single-hull tankers—those of 40,000 deadweight tons and larger. Because the Coast Guard rule was issued under OPA '90 and limited to satisfying that statute's mandate, and because it did not address any vessels other than those specifically identified by statute, the Coast Guard made it clear during the rulemaking that it only intended to preempt state law requirements that could not be met in consonance with the rule Congress mandated. The Federalism statement in the Notice of Proposed Rulemaking, 57 F.R. 30063-64 (July 7, 1992), reflects the limited nature of the rulemaking. The Federalism statement in the final rule, 59 F.R. 42968 (August 19, 1994), also reflects this, but without repeating all of the earlier discussion.

4. In the preamble to the final 1994 Puget Sound rule, the Coast Guard stated: "The Coast Guard is of the opinion that Congress did not intend for tankers that meet the OPA 90 double hull design requirements to be escorted." 59 F.R. 42963 (August 19, 1994). Thus the Coast Guard indicated it may have had preemption concerns if the state of Washington had created a tug escort requirement, in conflict with legislative intent, for double hull tankers and/or double-hull barges. The 1994 rulemaking did not address tank barges at all. In contrast, the 2007 tug escort rule for Buzzards Bay deals only with escort requirements for tank barges and differs significantly from Commonwealth of Massachusetts law on the issue of escort requirements for double hull tank barges.

5. Unlike the 1994 rulemaking, the 2007 rulemaking was not a limited response to meet a Congressional mandate, but was the result of a Coast Guard-sponsored Ports and Waterways Safety Assessment. In the 2007 rulemaking the Coast Guard did not act under its

OPA '90 mandate, but instead chose to exercise its PWSA Title I authority and thoroughly reviewed many options for revising the First District Regulated Navigation Area. The tug escort requirement for tank barges in Buzzard Bay was only one aspect of a rule that made several significant safety improvements, including an affirmative decision by the Coast Guard as to the appropriate requirements for manning of certain vessels. The Coast Guard carefully considered the Federalism issues and concluded that its regulations should preempt state law. Several reasons support that decision.

6. The rulemaking to amend the Puget Sound vessel traffic service regulations at 33 C.F.R. § 161.143 and culminating in the final rule published at 47 F.R. 17968 on April 26, 1982, ("the 1982 Puget Sound rulemaking"), began in March 1978 with the publication of an advanced notice of proposed rulemaking, and was not completed until April 1982. The Coast Guard was considering seven requirements, one of which was a tug escort requirement. With respect to tug escorts, the Coast Guard determined that it would not want to require anything more or less than the tug escort requirements already required by Washington state law. As the Coast Guard stated in the preamble to the 1982 rule, 47 F.R. at 17971, it understood that the Washington state tug escort requirements would be preempted if the Coast Guard either issued tug escort requirements for Puget Sound or if the Coast Guard determined that there should be no tug escort requirements. If the Coast Guard chose not to promulgate tug escort requirements for Puget Sound, and did not determine that there should be no tug escort requirements, the Washington state tug escort requirements would not be preempted. Accordingly, because the Coast Guard did not find that there was a need to act at all with respect to tug escorts in view of the existing state tug escort requirements, at that time the Coast Guard chose not to promulgate any tug escort

requirements for Puget Sound in the 1982 rulemaking. When the Coast Guard decided on tug escort requirements for Buzzards Bay, however, the Coast Guard determination as to the appropriate requirement was different than the State's determination, and the Coast Guard determined that differing federal and state rules would benefit neither the mariner nor the marine environment. The Coast Guard decided to promulgate federal tug escort requirements for Buzzards Bay and considered them to be preemptive, consistent with its understanding in 1982.

7. As stated in the preamble to the 2007 final rule for Buzzards Bay, 72 F.R. 50054, the Coast Guard believes that double-hulls provide a sufficient margin of safety for tank barges transiting Buzzards Bay. This is consistent with findings of the 1998 National Research Council report on *Double-Hull Tanker Legislation, An Assessment of the Oil Pollution Act of 1990*. That report found that double-hulled tankers perform significantly better than single-hull tankers in the prevention of oil spills and mitigating oil outflow in the event of a collision or grounding. Moreover, the majority of tank barge casualties in Buzzards Bay have been caused by groundings. The bottom characteristics of the Bay are primarily rocky—a condition double-hulls are designed to protect against. The defendants have cited a situation in the Gulf of Mexico where a double-hulled tanker was involved in a spill. That situation presented a unique set of facts—a tanker struck a submerged, uncharted oil platform that sank during Hurricane Rita, piercing both hulls. These facts are unlikely to be repeated in Buzzards Bay and a tug escort would not prevent a barge from alliding with an uncharted obstruction, hidden by the water, such as the storm damaged oil platform.

8. Consistent, uniform national and international regulation under the PWSA is the most effective method to ensure navigation safety and protection of the marine environment. The

majority of maritime accidents are caused by human error, and a confused mariner is an unsafe mariner. Conflicting federal and state regulations can create such confusion. The Coast Guard wants mariners to concentrate on navigating safely, not on whether a state rule or a federal rule applies in a certain waterway.

9. Moreover, applying the tug escort requirements to only single-hull tankers provides an important incentive. The Coast Guard seeks to encourage the use of double-hulled tankers, and one method to accomplish that goal is through appropriate regulatory actions. As the Coast Guard regulatory assessment indicates, the carriage of oil in bulk by single-hull vessels in Buzzards Bay will decrease as we approach the year 2015, the statutorily mandated phase-out date for single-hull tank vessels under OPA '90. The Coast Guard rule, by requiring tug escorts for single-hull tank barges but not double-hull barges, creates an incentive for shippers to switch to double-hulled tank barges prior to the phase-out date, and sooner than they otherwise would. The Coast Guard's rule for Puget Sound also does not require tug escorts for double-hull tank vessels. And no Washington State law requires tug escorts for double-hull tank vessles.

10. As for tug escort requirements elsewhere, as is noted above, each Coast Guard rulemaking project is discrete and is assessed on its own merits. The Coast Guard considers each area of the country individually when deciding whether to impose tug escort requirements on tank vessels and, if so, what those requirements should be. San Francisco Bay and Puget Sound are the only other places I know of where there are local laws requiring tug escorts for tank vessels. The conditions in those places, as well as the statutory and regulatory history for their creation, are distinct from those in Buzzards Bay. For example, in San Francisco there are no federal tug escort rules with which the state rule might conflict. In Puget Sound, the tank vessels

requiring escorts as they enter port primarily serve only ports in the State of Washington, whereas in Buzzards Bay they serve several states, including Massachusetts, Rhode Island, Connecticut, New York, New Hampshire and Maine, thus creating a greater need for uniformity. I am not aware of an Alaska law requiring tug escorts for tank vessels, although the state may have bilateral agreements with certain shipping companies concerning tug escorts.

11. Our nation, as described in the Federalist Papers and in numerous Congressional and Supreme Court actions, has long recognized the need to speak with one voice on maritime matters. Coast Guard actions throughout this rulemaking process have been consistent with those objectives, while always keeping in mind the value and importance of input from all stakeholders. The Coast Guard worked hard and with transparency to create a combination of federal requirements to reduce the risk of oil spills in Buzzards Bay. These requirements work in harmony with each other and seek to balance all Federal, local and commercial interests, while maintaining uniform navigational standards and ensuring navigational safety and environmental protection.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 13th day of March, 2008 at Washington, D.C.

_____
J.M. Sollosi
Chief, Office of Navigation Systems, USCG