# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-10112-RCL |
| | ) | |
| COMMONWEALTH OF MASSACHUSETTS *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

## COMMONWEALTH'S SURREPLY MEMORANDUM

MARTHA COAKLEY
ATTORNEY GENERAL

Seth Schofield, BBO No. 661210
Pierce O. Cray, BBO No. 104630
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
(617) 727-2200
seth.schofield@state.ma.us
pierce.cray@state.ma.us

Attorneys for the Defendant
Dated: March 20, 2008                    Commonwealth of Massachusetts

Far from supporting the requested preliminary injunction, the Coast Guard's Reply Memorandum ("Reply") provides further reason why such relief should *not* be granted.

1.    The agency's main argument is that its Puget Sound rulemaking is distinguishable from its current one on two grounds:  (a) the single-hull escort rule for Puget Sound was a "regulatory response to a specific congressional mandate"; and (b) "Washington State . . . had no escort requirement for double-hulled vessels."  Reply p. 1; *accord id.* pp. 2, 3-4, 6.  As a result, the agency contends, "the tug escort regime in Washington created no . . . conflicts with a federal determination, whereas in Buzzards Bay . . . there is a conflict."  *Id.* p. 9.[1]  Neither of the two cited reasons for this supposed dichotomy can withstand scrutiny.

a.    Most immediately, the Coast Guard is simply mistaken in asserting that "Washington State . . . had no escort requirement for double-hulled vessels."  Reply p. 1.  Its own 1992 Notice of Proposed Rulemaking states both that "Washington State requires an escort for double bottom tankers that do not have twin screws" and that, because of the agency's decision not to preempt Washington laws, "*double hull tankers with only a single screw will still have to comply with the Washington State escort requirements*."  57 Fed. Reg. 30058, 30059 (emphasis added).[2]  The NPR is indeed explicit that "[t]he Coast Guard does not intend this rulemaking to preempt escort requirements for double hull tankers," because "there does not appear to be any substantial conflict."  *Id.* at 30064.[3]  As a result, the divergence between Puget

---

[1]    *Accord id.* p. 2 ("Unlike . . . Washington State, . . . Massachusetts . . . does require escorts for double hull vessels and thus directly conflicts with an affirmative Coast Guard judgment").

[2]    Washington has had this double-hull/single-screw requirement from 1975 through the present day.  *Compare Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 160, 169, 172-73 & n. 25 (1978) (describing 1975 Washington law) *with* Wash. Rev. Code § 88.16.190(2) (2008).

[3]    The 1992 NPR thus directly refutes the Coast Guard's assertion that it has had "a consistent [policy] against requiring escorts for vessels with double hulls."  *See* Reply p. 5.  For

Sound and Buzzards Bay is not in the nature of the underlying state laws – both subject certain types of double-hulled vessels to escort requirements – but instead in the Coast Guard's diametrically opposed reactions to them.  The agency's variant responses should require at least a modicum of explanation, but the 2007 rulemaking is wholly silent on the point.

b.    The Coast Guard does not gain any ground by pointing to the Congressional mandate for a single-hull escort requirement in Puget Sound.  *See* Reply pp. 1, 4, 6 (citing Pub. L. No. 101-380 § 4116 (1990)).  To the contrary, the fact that Congress was very specific as to what federal escort requirements were to be in Puget Sound (single-hull vessels only) would seem to make those waters a *stronger* candidate for preemption, rather than a weaker one.  Nevertheless, the agency still opined in 1992 that the simultaneous state mandate for certain double-hull vessels did not create "any substantial conflict."  57 Fed. Reg. at 30064.  If that is the case, then *a fortiori* no conflict can exist when a specific Congressional directive is lacking.[4]

2.    With the two main premises of the Coast Guard's position thus off the mark, the agency is left with its oft-repeated contention that Buzzards Bay and Puget Sound are different for no other reason than that it decided to preempt in one place but not the other.  *See*, *e.g*., Reply pp. 3-4.  This continued mantra of "we win because we get to choose" has two basic flaws.

---

its part, the discussion accompanying the 1994 *final* rule largely responds to unrelated comments on the NPR and does not further address Washington's double-hull requirement, other than reiterating that "the Coast Guard does not intend to preempt [Washington] from issuing more stringent requirements" if there is no "direct conflict."  59 Fed. Reg. 42962, 42968.

[4]    The Commonwealth certainly agrees with the Coast Guard's 1992 position of no "substantial conflict" for Puget Sound, and it *disagrees* with the agency's more recent suggestion that "Congress arguably intended to occupy the field of tug escort regulation in Puget Sound." *See* Reply p. 4 n. 3.  Ironically, the latter statement reinforces the Commonwealth's point regarding the effect of the Puget Sound mandate on the present case – if the Coast Guard did not find "any substantial conflict" in a state double-hull escort rule for waters that it now says were "arguably" field-preempted by specific Congressional action, how can it possibly assert a conflict for waters that Congress is silent about?  The existence of the statutory mandate for Puget Sound thus undermines, rather than strengthens, any preemption claim here.

a.    First, and as previously argued, the First Circuit's decision in this case is clear that the Coast Guard does *not* have the general power to preempt in the escort context – it instead can do so only if it also satisfies "standard conflict preemption analysis."  *See* Commonwealth PI Opp. pp. 2, 6-7, 10-11, 22-23 (discussing *U.S. v. Mass.*, 493 F.3d 1, 8, 18-19 (1st Cir. 2007)).[5] While the agency initially tried to avoid this conflict-preemption ruling by minting a new *express*-preemption argument, *see* PI Memo. pp. 9-14, it now appears to have abandoned express preemption, *see* Reply p. 3, and to have returned to emphasizing the equally specious conflict-preemption claim that it can create a "conflict" just by saying that it wants to preempt.  S*ee id*. pp. 2 n. 1, 3 & n. 2; PI Memo pp. 14-17.  *But see* Commonwealth PI Opp. pp. 5-7, 22-23.  These doctrinal wanderings cannot obscure the Coast Guard's core problem:  the First Circuit has dictated that "standard conflict preemption analysis" must be met, and the agency cannot in fact satisfy either prong of that traditional standard.  *See* Commonwealth PI Opp. pp. 23-25.[6]

b.    Second, even if one were to assume that the Coast Guard has the general discretionary authority to preempt in the escort area, without any obligation to meet traditional conflict-preemption rules, the agency still "must cogently explain why it has exercised its discretion in a given manner."  *Motor Vehicles Mfrs. Ass'n v. State Farm Mut Ins. Co*., 463 U.S. 29, 48 (1983).  In particular, "[agency action] must be consistent with prior [action] or offer a

[5]    Significantly, the Reply provides no response to this aspect of the First Circuit's decision, instead recycling the same snippets from *Ray* and *Locke* that the agency previously – and quite unsuccessfully – cited to the First Circuit.  *See* Reply p. 2 n. 1. While the Coast Guard can try to revisit the point in a subsequent appeal, the First Circuit's reading of *Ray* and *Locke* as requiring a showing of "standard conflict preemption" is controlling at the District Court level.

[6]    Although the agency makes a cursory reference to the "obstacle to federal purpose" prong, *see* Reply p. 3 n. 2, it provides no response to the argument that (1) Title I itself identifies the relevant "federal purposes" as vessel safety and environmental protection and (2) the state's supplemental escort rule advances rather than undercuts those two goals.  *See* Commonwealth PI Opp. pp. 18-19, 24-25.  The agency's prior recognition of the lack of "any substantial conflict" in Puget Sound, *see* 57 Fed. Reg. at 30064, further belies its claimed conflict here.

reasoned basis for its departure from precedent." *Williams Gas Processing v. F.E.R.C.*, 475 F.3d 319, 326 (D.C. Cir. 2006) (brackets in original); *accord Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 290 (1st Cir. 1995). A "reasoned basis" for the disparate treatment of Puget Sound and Buzzards Bay, however, is precisely what the Coast Guard's 2007 rulemaking record lacks.

      3.      No doubt recognizing the deficiencies in the 2007 record, the Coast Guard tries to rectify matters by attaching a 2008 Declaration by a Coast Guard official to its Reply. *See* Sollosi Decl. Given the obvious tension between this newly created litigation document and the familiar rule that "agency rationales developed for the first time during litigation do not serve as adequate substitutes" for contemporaneous explanation, *Williams*, 475 F.3d at 326, the Coast Guard argues that the usual post hoc rule does not apply because it is having to "confront new arguments raised by [the] defendants in litigation." Reply pp. 5-6 n. 7. However, the existence of the Washington (and California) escort requirements *was* brought to the agency's attention by comments made during the course of its Buzzards Bay rulemaking. *See* Venezia Decl. (attached as Exh. A) ¶¶ 2-3; *see also id.* ¶ 4.[7] As a result, and because "[i]t is axiomatic that [a court] may uphold agency [rules] based only on reasoning that is fairly stated by the agency in the [rulemaking] under review," *Williams*, 475 F.3d at 326, the Court should disregard the Sollosi

---

[7]      In any event, the agency should hardly have to be reminded of its prior rulemaking history, as recorded in the Federal Register – the duty to explain a departure from past actions is an independent one, not contingent on whether some commenter "catches" the variance. The Coast Guard's additional argument that *Camp v. Pitts*, 411 U.S. 138 (1973) allows it to supplement the record, *see* Reply p. 6 n. 7, is also erroneous. First, *Camp* is often cited for excluding post hoc rationalizations, rather than admitting them. *See*, *e.g.*, *Edison Elec. Inst. v. O.S.H.A.*, 849 F.2d 611, 617-18 (D.C. Cir. 1988). Second, one of the Coast Guard's other cited decisions reads *Camp* as applying only to an adjudication, as opposed to the rulemaking at issue here. *Action on Smoking v. C.A.R.*, 713 F.2d 795, 798 n. 2 (D.C. Cir. 1983). Third, the agency's wildly different treatment of "West Coast" and "East Coast" preemption is simply not the type of "isolated neglected issue[ ]" that it claims *Camp* will let it address post hoc. *See* Reply p. 6 n. 7.

Declaration.  *Accord Schiller v. Tower Semiconductor Ltd*., 449 F.3d 286, 302 (2nd Cir. 2006)

("post hoc rationalizations are never permitted").[8]

      4.       Finally, the Reply is amiss in asserting that an agency's attempt to preempt "is

akin to a choice whether to take an enforcement action" and thereby "committed to agency

discretion."  Reply p. 4 n. 4.  This attempted analogy pays no heed to "the underlying federalism

concerns" that preemption does violence to.  *See South Port Marine, LLC v. Gulf Oil Ltd*., 234

F.3d 58, 65 (1st Cir. 2000).  A main justification for the deferential review of "no-action"

decisions is indeed that "when an agency refuses to act it generally does not exercise its *coercive*

power."  *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (emphasis in original).  Agency actions to

preempt, however, are just such an exercise of "coercive" federal power, as they attempt to

reduce the "important role for States . . . in the regulation of the Nation's waterways."  *Locke v.

U.S*., 529 U.S. 89, 109 (2000).  The Court should deny the requested injunction.

                  Respectfully submitted,

                  /s/ Seth Schofield
                  Pierce O. Cray, BBO # 104630
                  Seth Schofield, BBO # 661210
Dated:  March 20, 2008         Assistant Attorneys General

---

[8]      Post hoc rationalizations are thus not just bereft of *Chevron* deference, as the Coast Guard seems to assert – they instead should receive no review at all.  *Compare* Reply pp. 5-6 n. 7 *with Schiller*, 449 F.3d at 302.  In the event that the Court does decide to consider the Sollosi Declaration, it also should review ¶ 5 of the attached Venezia Declaration.  Many of Chief Sollisi's assertions are indeed unpersuasive on their face.  For example, his claim that "[t]he Coast Guard [single-hull] rule . . . creates an incentive . . . to switch to double-hull[s]," Sollosi Decl. ¶ 9, would apply equally to the agency's single-hull rule for Puget Sound, but no attempt was made to preempt Washington's double-hull requirement there.  Similarly, his attempted factual distinguishing of the double-hull spill in the Gulf of Mexico, *see id.* ¶ 7, misses the point.  The Gulf spill simply serves as a useful illustration that all oil-laden vessels are vulnerable to spills, whether they be single-hulled, double-hulled, or the Titanic, and that a supplemental state escort rule is a useful means of further reducing that ever-present risk.  The 2007 rulemaking should have addressed this point given the Gulf-spill comment, but it did not.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     Civil Action No. 05-10112-RCL |
| | ) |
| COMMONWEALTH OF MASSACHUSETTS *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF JENNIFER VENEZIA

I, Jennifer Venezia, declare and state as follows:

1.    I am a paralegal in the Environmental Protection Division of the Massachusetts Attorney General's Office.  I am familiar with the underlying litigation and I have reviewed the Coast Guard's Reply Memorandum dated March 13, 2008, the attached Sollosi Declaration, and some of the documents produced by the United States Coast Guard (Coast Guard) as part of ongoing discovery in this matter.  I make this declaration based on my personal knowledge and knowledge gained in my official capacity.

2.    In the text of footnote 7 that appears on page 6 of the Coast Guard's Reply Brief, the Coast Guard asserts that "'strict application' of the 'general rule' limiting (APA) review to the administrative record is 'unwarranted' where new material pertains to matter 'not directly at issue in the proceedings below.'"  During the course of discovery in this matter the Coast Guard produced the following comments submitted on the Buzzards Bay Rulemaking by the Massachusetts Department of Environmental Protection (Department) and the Coalition for Buzzards Bay, among others, which are part of the administrative record for the Buzzards Bay

DEFENDANT'S
EXHIBIT
A

Rulemaking.  A true and accurate copy of the relevant pages from these comments is attached as Exhibits 1, 2, and 3 to this Declaration.

    (a)   In comments submitted on December 23, 2004 in response to the advanced notice of proposed rulemaking for Buzzards Bay, the Department states: "Consistent with the [Ports and Waterways Safety Assessment] Report, Massachusetts' Oil Spill Act provides that, effective January 1, 2005, tug escorts are required for non-self propelled tank vessels (barges) carrying 6,000 or more barrels of oil transiting in designated 'areas of special interest' in Massachusetts waters (i.e., Buzzards Bay, Vineyard Sound and Mount Hope Bay).  This requirement is *modeled on other states' regulations* (*such as California and Washington*), which require tug escorts to address the 'local peculiarities' of specific waterways." Ex. 1, at 3 (emphasis added).

    (b)   In comments submitted on December 23, 2004 in response to the advanced notice of proposed rulemaking for Buzzards Bay, the Coalition for Buzzards Bay states, "[t]his latter requirement [(preventing docking of certain vessels in Massachusetts)] is identical to regulations adopted by other states, including California." Ex. 2, at 8 & n.5. These comments further state: "Escort tugs have also been recognized by certain states – including California and Massachusetts – as a viable safety measure for barges transporting oil . . . and are required by state law." *Id.* at 11.  These comments further state that while they may not be practical for Massachusetts waters, "California [] has implemented tug escort regulations that establish a matrix of tug escort performance requirements that correspond to the characteristics of the tank vessels." *Id.* at 12 n.8.

    (c)   In additional comments submitted on June 27, 2006 in response to the notice of proposed rulemaking for Buzzards Bay but before the Final Rule was issued on August

30, 2007, the Coalition referred the Coast Guard "to [its] December 23, 2004,

comments [attached hereto as Exhibit 2] for a more extensive discussion." Ex. 3, at 2.

3.    During the administrative notice and comment period for the proposed rule in the

Buzzards Bay Rulemaking but before the Final Rule was issued on August 30, 2007, the

Department on November 13, 2006 submitted comments to the Coast Guard on the proposed rule

for Buzzards Bay.  It does not appear that the Coast Guard has yet produced these comments by

the Department as part of discovery.  A true and accurate copy of the Department's comments is

attached as Exhibit 4.  The Department's comments state: "The use of tug escorts for double-

hulled tank barges is required in other environmentally sensitive waters including Los

Angeles/Long Beach, San Francisco Bay, Prince William Sound and Puget Sound.  Buzzards

Bay, designated as an estuary of national significance, deserves no less protection." Ex. 4, at 1.

4.    After this matter was argued before the United States Court of Appeals for the First

Circuit by the Commonwealth and the Coast Guard, but while the Buzzards Bay Rulemaking

was still pending before the Coast Guard, the Commonwealth on May 16, 2007 submitted a letter

to the First Circuit, copied to counsel for the Coast Guard, that specifically identified the conflict

between the Coast Guard's action in Puget Sound and its approach to Buzzards Bay.  A true and

accurate copy of this letter is attached as Exhibit 5.  This letter states, among other things, "given

the Coast Guard's explicit acceptance of supplemental localized regulation for portions of the

West Coast in 1994, one reasonably would have expected some textual notice and explanation

that it was adopting a diametrically opposed position in 1998 regarding supplemental local

regulation for portions of the East Coast. *See Motor Vehicles Mfrs. Ass'n v. St. Farm Mut.*

*Automobile Ins. Co.*, 463 U.S. 29, 57 (1983) ("an agency changing its course must supply a

reasoned analysis")." Ex. 5, at 3.

5.    Finally, in his Declaration, Chief Sollosi asserts that "[t]he Coast Guard worked hard and with transparency to create a combination of federal requirements to reduce the risk of oil spills in Buzzards Bay." Sollosi Decl. ¶ 11.  During the course of discovery in this matter, however, the Coast Guard produced a document that purports to support its decision that the Buzzards Bay Rulemaking was categorically excluded from National Environmental Policy Act (NEPA) review.  A true and accurate copy of the relevant portion of this document is attached as Exhibit 6.  This document states that, "the undersigned have determined this action to be categorically excluded from further environmental documentation . . . since implementation of this action will not result in any . . . 3. [i]nconsistencies with any Federal, State, or local laws or administrative determinations relating to the environment." Ex. 6, at 1.

6.    I, Jennifer Venezia, have read the above statement consisting of 4 pages, and I certify under penalty of perjury that the foregoing is true and correct.  Executed on March 20, 2008.


Jennifer Venezia, Paralegal
Environmental Protection Division
Office of the Attorney General

# VENEZIA DECLARATION

# EXHIBIT 1



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION
ONE WINTER STREET, BOSTON, MA 02108  617-292-5500

*#030 Nov 04 letter
(with 16 page letter
from Gov. Romney
Attached)*

MITT ROMNEY
Governor

KERRY HEALEY
Lieutenant Governor

ELLEN ROY HERZFELDER
Secretary

ROBERT W. GOLLEDGE, Jr.
Commissioner

December 23, 2004

BY FAX AND CERTIFIED MAIL

Edward G. LeBlanc
c/o Commanding Officer
U.S. Coast Guard Marine Safety Office Providence
20 Risho Avenue
East Providence, RI 02914-1208

Re:    MA DEP comments on U.S. Coast Guard Advance Notice of Proposed Rulemaking
       related to Navigation and Waterways Management Improvements in Buzzards Bay,
       MA

Dear Mr. LeBlanc:

On behalf of the Massachusetts Department of Environmental Protection ("DEP"), I am
submitting written comments on the Coast Guard's *Advanced Notice of Proposed Rulemaking*
*("ANPRM")*. These comments are a follow-up to the oral testimony that I gave at the two public
hearings conducted by the Coast Guard on the ANPRM on November 16th and 17th 2004. At the
second hearing, I also submitted a copy of a November 16, 2004 letter from Governor Romney to
Admiral Thomas H. Collins, Commandant of the Coast Guard, which affirms the Commonwealth's
commitment to implement and enforce *Chapter 251, Acts of 2004, the MA Oil Spill Act (or "Act")*.

These comments repeat and supplement my earlier oral testimony at the above public
hearings. As organized below, my comments providing the context and background for both the
Massachusetts Oil Spill Act and the Coast Guard's ANPRM, and then respond more specifically to
matters covered under the ANPRM.

I. Background

The Coast Guard's ANPRM highlights both the commercial importance and environmental
sensitivity of Buzzards Bay. Buzzards Bay is only one of 5 Estuaries of National Significance
designated by Congress in the United States. The Bay interacts with the Atlantic Ocean to the south,
Vineyard Sound to the east, and Cape Cod Bay to the north. From an ecosystem standpoint,
Buzzards Bay has a diverse marine environment and is a sanctuary for endangered species such as
the roseate tern and piping plover and contains some of Massachusetts' most productive shellfish

This information is available in alternate formats. Call Donald M. Gomes, ADA Coordinator at 617-556-1057. TDD Service - 1-800-298-2207.

DEP on the World Wide Web: http://www.mass.gov/dep
Printed on Recycled Paper



DEFENDANT'S
EXHIBIT
1

3

be sufficiently manned and were not, prior to the Massachusetts Oil Spill Act, required to employ local pilots.

Of particular relevance to the Coast Guard's ANPRM, the Oil Spill Act provides for escort tugs and the use of the recommended vessel route through Buzzards Bay previously identified by the Coast Guard. Moreover, the Act comprehensively addresses a range of other areas that enhance navigational safety and reduce the risk of oil spills – financial assurances, alcohol and drug testing, watch and crew requirements and a vessel traffic service system ("VTS").

### Specific Comments on the ANPRM

A.   Tug Escorts

Current Coast Guard regulations require the use of a tug escort in Buzzards Bay only when a single hull vessel is *not* being towed by a primary towing vessel with twin-screw propulsion and with a separate system for power to each screw. The ANPRM acknowledges that the vast majority of tugs and barges transiting Buzzards Bay (of which most barges are single hulled) employ tugs with twin screws and twin engines and, consequently, are not required to use a tug escort.

Tug escorts clearly reduce the risk of maritime incidents and oil spills by providing assistance to a tug-barge in an emergency and by monitoring the transit of a tug-barge for signs of hazards or damage. Indeed, the April 2003 oil spill in Buzzards Bay could have been prevented or minimized had the Bouchard barge been accompanied by a tug escort. It is DEP's understanding that the Bouchard barge traveled outside the safe navigational channel into shallow reefs, and had gone almost 12 miles before the crew noticed that it was trailing an oil slick.

It is not surprising, therefore, that the PAWSA Report, in evaluating navigational risks in response to the Bouchard oil spill, states that both the Coast Guard and the tug and barge industry support a tug escort requirement for Buzzards Bay (p. 12).

Consistent with the PAWSA Report, Massachusetts' Oil Spill Act provides that, effective January 1, 2005, tug escorts are required for non-self propelled tank vessels (barges) carrying 6,000 or more barrels of oil transiting in designated "areas of special interest" in Massachusetts waters (i.e., Buzzards Bay, Vineyard Sound and Mount Hope Bay). This requirement is modeled on other states' regulations (such as California and Washington), which require tug escorts to address the "local peculiarities" of specific waterways.

The Act incorporates industry design and equipment standards for tug escorts. In summary, tug escorts must either be:

(1)     a tug with twin screws and a separate system for power to each screw, with an aggregate shaft horsepower equivalent to 4,000 horsepower or greater and a minimum bollard pull of 50 tons; or

(2)     a tug meeting the same horsepower and bollard pull specifications above, which is propelled by blades or screws capable of a propulsive thrust to any part of a 360 degree arc. In addition, as of January 1, 2006, tug escorts must be equipped with fire fighting equipment meeting specified American Bureau of Shipping ("ABS") classifications.

# VENEZIA DECLARATION

## EXHIBIT 2

 **THE COALITION FOR BUZZARDS BAY** $\cancel{X}034$

<u>By Hand Delivery</u>

**Commanding Officer**
**U.S. Coast Guard Marine Safety Office Providence**
**20 Risho Avenue**
**East Providence, RI, 02914-1208**                    December 23, 2004

**Dear Sir,**

Enclosed are comments from The Coalition for Buzzards Bay regarding the **advance notice of proposed rulemaking for Navigation and Waterways Management Improvements, Buzzards Bay, MA, docket number CGD01-04-133.**

We thank you for your efforts to keep our waterways safe. Buzzards Bay is an estuary of great value and worthy of our best measures to protect this sensitive waterway.

Please let us know if there is any further support that we can provide.

Sincerely Yours,

Captain Benjamin F. Bryant
Marine Policy Specialist
The Coalition for Buzzards Bay

*Working to improve the health of Buzzards Bay through education, conservation, research, and advocacy.*

620 Belleville Avenue, New Bedford, Massachusetts 02745 • tel: (508) 999-6363 • fax (508-984-7913 •
www.savebuzzardsbay.org


DEFENDANT'S
EXHIBIT
2
tabbies



# THE COALITION FOR BUZZARDS BAY

**December 23, 2004**

### Written Testimony of The Coalition for Buzzards Bay to the United States Coast Guard in Response to the October 14, 2004 Advanced Notice of Proposed Rulemaking:  Navigation and Waterways Management Improvements, Buzzards Bay, MA Docket No. CGD01-04-133

The Coalition for Buzzards Bay is a nonprofit membership organization dedicated to the restoration & protection of Buzzards Bay.  In 2001, the Coalition was officially designated by the Commonwealth of Massachusetts as the Volunteer Coordinator in the event of a significant oil spill in Buzzards Bay, and as such, we took a central role in responding to the April 27, 2003 Bouchard-120 Buzzards Bay oil spill.  We understand now more than ever before how much more sense it makes to prevent oil spills from happening rather than accepting the significant negative effects when a spill does occur.

Beyond the environmental devastation, the economic damage, and the challenges of the cleanup operation, the Bouchard-120 Oil Spill has reminded everyone who lives near, derives their living from, and cares about Buzzards Bay how threatened this national treasure is by oil transport in the Bay.

The Coalition for Buzzards Bay possesses unique knowledge and expertise with respect to the geographic, navigational, natural resource, economic and other characteristics of Buzzards Bay, including oil spill response training. In the aftermath of the Bouchard-120 spill, we undertook to expand our base of knowledge specifically with respect to all aspects of oil transport through the Bay.  This endeavor entailed a review of the history of spills in the Bay, substantial research regarding oil tug/barge safety measures that have proven successful elsewhere, and active communication with individuals and companies who are involved in, or affected by, the transport of oil through Buzzards Bay.  Among other things, our staff interviewed Vessel Traffic Service Systems (VTS) operators all over the country, conferred with

*Working to improve the health of Buzzards Bay through education, conservation, research and advocacy.*

620 Belleville Avenue, New Bedford, Massachusetts 02745 • tel: (508) 999-6363 • fax: (508) 984-7913 • www.savebuzzardsbay.org

*Printed on process chlorine free, recycled paper with soy-based inks.*

requirements, the Oil Spill Prevention and Response Fund, enhanced penalties, and the prohibition on docking vessels in Massachusetts if they are not in compliance with the Oil Pollution Act of 1990.[5]

Additionally, the U.S. Supreme Court has repeatedly acknowledged the right of states to regulate vessels to protect their shores from oil spills, especially where safety measures are warranted based on particular local conditions. See, e.g., U.S. v. Locke, 529 U.S. 89, 109 (2000). In U.S. v. Locke, the Supreme Court pointed with approval to one of its own prior decisions acknowledging the right of states to regulate vessels under certain conditions, noting that its earlier decision

> confirmed the important proposition that the subject and scope of Title I of the [Ports and Waterways Safety Act] allows a State to regulate its ports and waterways, so long as the regulation is based on 'the peculiarities of local waters that call for special precautionary measures.'

529 U.S. at 109, citing Ray v. Atlantic Richfield, 435 U.S. 151 (1978) (holding, *inter alia,* that a Washington State law requiring tug escorts was not preempted by federal law).

Thus, contrary to what has been urged by the AWO and the International Association of Independent Tanker Owners (INTERTANKO), the subject matter of the federal Ports and Waterways Safety Act (PWSA) is *not* exclusive to the federal government; states may regulate vessel safety within certain parameters. Indeed, Title I of the PWSA, 33 U.S.C. § 1223(a), authorizes – but does not require – the Coast Guard to enact measures related to vessel traffic control, navigation and the marine environment. For the areas encompassed in PWSA Title I, conflict preemption principles apply and, as noted with respect to the Supreme Court's Locke decision discussed above, *states may regulate in these areas so long as the state regulation does not actually conflict with federal law.*[6]

---

[5]  This latter requirement is identical to regulations adopted by other states, including California. See Cal. Gov. Code § 8670.22.

[6]  Actual conflict would exist "where compliance with both federal and state regulations is a physical impossibility . . . or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Ray, 435 U.S. at 158 (internal citations omitted).

overnight," The Standard Times, December 23, 2003 at p. A3 (Attachment 5). Had this occurred in stormy weather, near one of the ledges in the Bay, or in the Cape Cod Canal, we easily could have had a second oil spill last year because there was no escort tug to assist.

Escort tugs have long been recognized for providing significant safety benefits for the barges they accompany. For this reason, federal law requires escort tugs to be used in certain areas, and the Coast Guard is authorized to require them in other areas. See 33 U.S.C. 4116(c); 33 CFR 168.01 et seq. In fact, *two* escort tugs are required, for example, in particularly sensitive waterways such as Puget Sound, Washington and Prince William Sound, Alaska. Escort tugs have also been recognized by certain states – including California and Massachusetts – as a viable safety measure for barges transporting oil in bulk as cargo, and are required by state law. See, e.g., Cal. Gov. Code § 8670.17.2; 14 CCR 851.20 – 851.32; Mass. Gen. L. c. 21M, § 6. In addition, many oil transporters – but not all of them – recognize the safety benefits provided by tug escorts and voluntarily utilize them in areas such as Buzzards Bay.

Given the navigational risks in Buzzards Bay, the extraordinary sensitivity of the Bay's natural resources, and the Bay's history of oil spills and near-misses, there is a compelling need for escort tugs to accompany every vessel transporting oil in bulk as cargo through the Bay – including both single and double hulled barges. Although double-hulled vessels minimize the risk of a release of cargo in the event of an incident, they do not provide absolute protection, and their effectiveness as a safety precaution is reduced where the local geography is as unforgiving as the rocky shoals of Buzzards Bay. Moreover, the double-hulls themselves do nothing to minimize the risk of a collision, allision or grounding in the first place; an equipment failure, health emergency or on-board fire is just as likely to occur with a double-hulled vessel as with a single-hull. Further, once the hull has been breached, an equivalent amount of cargo would be expected to be released whether from a single-hulled vessel or a double-hull. Thus, while the greatest safety benefits of an escort tug requirement may occur when they are used with single-hulled vessels, there is still substantial justification for employing tug escorts with double-hulled vessels as well.

The Coalition further supports performance standards for all tug escorts to best ensure that these tugs will be capable of preventing, or mitigating the consequences of, any serious marine incidents that might entail a release of

oil. Thus, we support a requirement that escort tugs have at least 4,000 horsepower and a minimum bollard pull of 50 tons – characteristics that are generally recognized by industry as adequate for tug escort work.[8] We believe that there is sufficient local availability of tugs meeting these performance standards so that there should not be any issue with respect to the ability of oil transporters to comply with the requirements. It would also be preferable that escort tugs in Buzzards Bay be required to meet basic structural and firefighting requirements, namely ABS classifications for Fire Fighting Vessel Class 1 and Maltese Cross A1 Towing Vessel.

### The Existing Supply of Escort Tugs in Buzzards Bay Is Sufficient to Support an Escort Tug Requirement

Currently, sufficient tugs are available to meet the demand for escort service for typical barge traffic through the Bay. Canal Towing, Inc. has two tugs stationed at the Cape Cod Canal end of the Bay, and has committed to deploy a third tug to meet the anticipated demand in Buzzards Bay as of January 1, 2005. See Canal Towing & Assist Service brochure (Attachment 6). It is our understanding that each of these tugs exceed 4,000 horsepower and 50 tons Bollard pull. In addition, Foss Tugs and Constellation Towing have expressed interest in locating tugs in Buzzards Bay in the event a sole-source contract opportunity should become available for the supply of escort tug services in the Bay. Clearly, the resources are available to implement this important safety measure.

### Responses to Specific Tug Escort Questions in the ANPRM:

1.  **What would constitute an effective "tug escort"? Does the definition in this ANPRM suffice?**

    The definition of "tug escort" as set forth in the ANPRM is a good starting point, but is not sufficiently specific in providing guidance to those who will need to meet the requirement. The definition should specifically state minimum performance standards, which our research shows should include a requirement for 4,000 horsepower or greater and a minimum Bollard pull of 50 tons. Preferably, tug escorts should also

---

[8] California notably has implemented tug escort regulations that establish a matrix of tug escort performance requirements that correspond to the characteristics of the tank vessels. See CCR 851.27. Such a scheme appears to be impractical for Buzzards Bay, given the comparatively smaller volume of oil barge transit here which would, in turn, diminish the economies of scale for hosting a wide range of available escort tugs (with varying performance requirements).

# VENEZIA DECLARATION

# EXHIBIT 3

THE COALITION FOR
BUZZARDS BAY

Nashawena Mills          tel: (508)999-6363
620 Belleville Avenue    fax: (508)984-7913
New Bedford, MA 02745

www.savebuzzardsbay.org

#064

June 27, 2006

Commanding Officer
U.S. Coast Guard Sector Southeastern New England
20 Risho Avenue
East Providence, RI 02914-1208

Re:     **Comments of The Coalition for Buzzards Bay to the United States
        Coast Guard in Response to the March 29, 2006 Notice of Proposed
        Rulemaking:  Regulated Navigation Area; Buzzards Bay, MA;
        Navigable Waterways with the First Coast Guard District Docket No.
        CGD01-04-133**

Please accept the following as The Coalition for Buzzards Bay's ("Coalition's")
comments to the United States Coast Guard's ("Coast Guard's") Notice of Proposed
Rulemaking in Buzzards Bay.  Named the official volunteer coordinator for oil spill
response in 2001 by the Commonwealth of Massachusetts, the Coalition became
intimately familiar with the requirements and responsibility of that role on April 27, 2003,
when the Bouchard-120 emptied an estimated 98,000 gallons of No. 6 oil into Buzzards
Bay.  It is in the wake of this environmental and economic damage that the Coalition
comments in consternation at the Coast Guard's failed attempt to provide further
protections to this vulnerable Bay.  It is our view that the Coast Guard must reconsider
their proposal and formulate strong and meaningful protections which will actually
reduce the risk of oil spills in the future.

The Coalition for Buzzards Bay is a nonprofit membership organization dedicated to the
restoration and protection of Buzzards Bay. We represent more than 4,700 individuals,
families, organizations, and businesses in Southeastern Massachusetts.  The Coalition
possesses unique knowledge and expertise with respect to the geographic,
navigational, natural resource, economic and other characteristics of Buzzards Bay,
including oil spill response training.  Unfortunately, after April 27, 2003, we understand
now more than ever the necessity of oil spill prevention rather than accepting the
significant negative effects after a spill occurs. Beyond the environmental devastation,
the economic damage, and the challenges of the cleanup operation, which are ongoing
more than three years later, the Bouchard-120 Oil Spill has clarified how threatened this

Working to improve the health of the Buzzards Bay ecosystem for all through education, conservation, research and advocacy

*Waterkeeper Alliance Member*

DEFENDANT'S
EXHIBIT
3

Congressionally-designated Estuary of National Significance is by oil transport in the Bay.

As discussed in our comments to you on December 23, 2004 in response to the Advanced Notice of Proposed Rulemaking, in the aftermath of the Bouchard-120 spill, the Coalition successfully undertook to expand our base of knowledge with respect to all aspects of oil transport through the Bay. This included a review of the history of spills in the Bay, substantial research regarding oil tug/barge safety measures that have proven successful elsewhere, and active communication with individuals and companies who are involved in, or affected by, the transport of oil through Buzzards Bay. Among other things, our staff conferred with government officials and environmental groups in other states to better understand state-level vessel safety requirements (including escort tug requirements for certain waterways), and we met with local marine pilots, tug operators, local first-responders, government officials, shellfishermen, maritime law specialists and scientists. We also extensively reviewed scientific papers regarding the persistence of oil compounds in the environment, federal and state laws and regulations pertaining to vessel safety, and papers pertaining to vessel safety statistics and regulation. The Coalition refers you to our December 23, 2004, comments for a more extensive discussion of those findings.

It is against this qualified background that we offer the following comments in response to the above-referenced Notice of Proposed Rulemaking (NPRM). Meaningful rulemaking in Buzzards Bay will adopt the following safety requirements: (1) an escort tug requirement for **all** barges carrying oil in bulk as cargo (including both single and double hull barges); (2) a formally-designated mandatory vessel route; (3) pilotage requirements, conforming to the standards adopted by Massachusetts state pilots; and (4) increased manning requirements for all vessels. Both historical and current events have proven that special protections are needed for Buzzards Bay.

**Redundant Layers of Special Protections Are Required For Buzzards Bay.**

Only redundant layers of safety and protection will reduce the likelihood of another accident resulting in the discharge or release of oil or hazardous material into Buzzards Bay. No one safety measure exists to provide significant risk reduction for the Bay.

If any area of our nation's waters has demonstrated that it needs multiple special protections, it is Buzzards Bay. Buzzards Bay was designated by the United States Congress in 1985 as an "Estuary of National Significance". The Bay was further designated by the United States Environmental Protection Agency as a "No Discharge Area" in 2000, and is a state-designated Ocean Sanctuary as well as an Area of Special Interest.

The Bay's shoreline is characterized by a diverse variety of estuarine environments, including ecologically sensitive salt marshes, tidal flats, sandy recreational beaches, and rocky shoals with high-energy wave action. The Bay is also home to a diverse community of wildlife, including approximately half of the remaining global population of

2

with specific duties for which they are experienced and competent. For instance, the pilot's duties should be focused on directing and safely controlling the tug and barge (single and double) unit through the dangers of Buzzards Bay and not treated as crew supplement. The proposed rule should also incorporate a designated navigational watch; a person that has no other duties or responsibilities other than that of a lookout.

Clearly, if more personnel had been on board the Evening Star, more hands and eyes would have been available to help avert the Bouchard-120 tragedy. The Coalition requests that the Coast Guard consider mandating additional qualified crew members on the towing vessel while transiting Buzzards Bay.

### Vessel Movement Reporting System Must Have Regulatory Penalties for Non-Compliance.

The Coalition supports the Coast Guard's efforts to establish a Vessel Movement Reporting System ("VMRS") within Buzzards Bay to monitor the movement of vessels. However, in order for this system to operate as intended, the Coast Guard must insure that these systems are turned on in each vessel, and make available penalties for those vessels which turn their systems off. The effectiveness of the VMRS will be greatly compromised if vessels capable of transmitting AIS data are not required to do so. In addition, the proposed rule indicates that the Coast Guard and U.S. Army Corps of Engineers will enter into a Memorandum of Understanding to delineate the functions and responsibilities of each agency operating the VMRS. The Coalition suggests that the Coast Guard include the Commonwealth of Massachusetts in this Memorandum, as the State will act as an important partner in implementing and insuring compliance.

### Conclusion

To conclude, only redundant layers of safety for both double and single hull tug/barge units provide meaningful reductions in the risk of future oil spills and anything less leaves Buzzards Bay and the surrounding communities open to harm. It is essential to reiterate here, as discussed above, that double hulls be included in all improved safety regulations as they are indeed subject to breach and should not be considered as a complete solution to preventing the discharge of oil or hazardous materials. Buzzards Bay reaches that level of significance and sensitivity to justify enhanced provisions like escort tugs for all barges (single and double hulled), a mandatory vessel route, enhanced pilotage requirements, and better crew requirements. No one safety measure exists to provide significant risk reduction for the Bay but together adequate protections can be had. In addition, the Coalition is not asking for a novel level of protection, as these particular measures discussed above have been employed and proven effective in other areas of the country.

We thank you for the opportunity to comment on these proposed rules, and encourage the Coast Guard to reconsider their proposed rules in light of these comments. We also encourage the Coast Guard to continue to cooperate with the Commonwealth of

# VENEZIA DECLARATION

# EXHIBIT 4

Fax:

Nov 15 2007 10:28am P002/003



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION
ONE WINTER STREET, BOSTON, MA 02108  617-292-5500

MITT ROMNEY
Governor

KERRY HEALEY
Lieutenant Governor

ROBERT W. GOLLEDGE, Jr.
Secretary

ARLEEN O'DONNELL
Commissioner

November 13, 2006

Rear Admiral Timothy S. Sullivan
Commander, First Coast Guard District
Coast Guard Sector Boston
408 Atlantic Avenue
Boston, Massachusetts 02110

Re: U.S.Coast Guard Proposed Regulations

Dear Rear Admiral Sullivan:

I am writing with regard to the U.S. Coast Guard's proposed regulations on vessel
tracking and tug escorts for the Massachusetts coast. The federal regulatory process requires
consultation with States. Please consider this letter, along with the attached detailed comments,
as the Commonwealth's formal response to the proposed Coast Guard regulations.

Given the recent court ruling under appeal United States of America v. Commonwealth
of Massachusetts, et. al., First Circuit, No. 06-2361, the Commonwealth is increasingly
concerned about the adequacy of federal protections to prevent catastrophic accidents such as the
Bouchard oil spill. Although your proposed regulations contain some significant improvements,
such as the upgraded vessel tracking system, I am very concerned about two major weaknesses.
The narrowness of the tug escort proposal and the geographic scope of the proposal must be
remedied to assure the citizens of the Commonwealth that all reasonable steps are being taken to
prevent future disasters.

Tug escorts should be required for double-hull vessels as well as single-hull vessels. Tug
escorts provide for safer vessel transit at a reasonable cost. There is evidence to suggest that a
double-hull would not have prevented the 2003 Bouchard oil spill in Buzzards Bay. A tug
escort, however, would most certainly have prevented the 98,000 gallon spill. The use of tug
escorts for double-hulled tank barges is required in other environmentally sensitive waters
including Los Angeles/Long Beach, San Francisco Bay, Prince William Sound and Puget Sound.
Buzzards Bay, designated as an estuary of national significance, deserves no less protection.

This information is available in alternate format. Call Donald M. Gomes, ADA Coordinator at 617-556-1057. TDD Service - 1-800-2

MassDEP on the World Wide Web: http://www.mass.gov/dep
♻ Printed on Recycled Paper



DEFENDANT'S
EXHIBIT
4

Secondly, these regulations are limited in geographic scope to include only Buzzards Bay, leaving the rest of the Massachusetts coast vulnerable. At a minimum, the protections should extend to other particularly sensitive areas such as Vineyard Sound, Nantucket Sound, Mount Hope Bay and Boston Harbor. Millions of dollars have been spent cleaning up Boston Harbor and establishing a world-class Boston Harbor Island park system. These areas cannot be left vulnerable to oil spills when a relatively inexpensive tool is available to protect them. The Argo Merchant spill of 1976 is a stark reminder of the need to extend protection to other vulnerable areas. These regulations would not apply to the waters off Nantucket, the area where the Argo Merchant ran aground, spilling seven gallons of oil. That spill degraded the Cape Cod shoreline's sensitive resource areas for more than a decade.

I look forward to working together to make progress on our mutual goals improve maritime safety in the Commonwealth of Massachusetts and appreciate your willingness to engage Massachusetts in these discussions. Please take these comments fully into account before rendering a final decision on this very important matter.

Sincerely,

Arleen O'Donnell
Acting Commissioner

Cc:   Secretary Golledge, Environmental Affairs
      Robert Varney, Regional Adminstrator, EPA New England
      Margaret Stolfa, DEP General Counsel
      James Milkey, Attorney General's Office

# VENEZIA DECLARATION

## EXHIBIT 5



THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE ATTORNEY GENERAL
ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108-1598

MARTHA COAKLEY
ATTORNEY GENERAL

May 16, 2007

(617) 727-2200
www.ago.state.ma.us

**BY HAND**

Richard Cushing Donovan, Clerk
United States Court of Appeals for the First Circuit
John Joseph Moakley Federal Courthouse
One Courthouse Way, Suite 2500
Boston, Massachusetts 02110

Re:  United States of America. v. Commonwealth of Massachusetts, et al.,
First Circuit Nos. 06-2361 and 06-2362

Dear Mr. Donovan:

I am writing on behalf of all appellants in the above-referenced consolidated appeals to respond to Mr. Stern's letter of May 14, 2007 regarding the Puget Sound tug-escort issue. At argument, the Court allowed for such a response to be filed within two days of the filing of Mr. Stern's letter. This letter completes the set of post-argument submissions contemplated by the Court.

The appellants write to supplement Mr. Stern's letter with additional information regarding the materials he cited. Some of this additional information can be found in *In Re Bluewater Network*, 234 F.3d 1305 (D.C. Cir. 2000). While the appellant Commonwealth of Massachusetts cited a separate part of *Bluewater Network* in its principal Brief, *see* Commonwealth Brief pp. 10-11, the District of Columbia Circuit's decision also directly relates to the Puget Sound tug-escort issue. *Bluewater Network*, 234 F.3d at 1307, 1308, 1309-10, 1314-15.

1.    Mr. Stern reports that the Coast Guard promulgated an escort regulation for Puget Sound in 1994, which was 16 years after the Supreme Court noted the possibility of such a regulation in *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 171-72 (1978). Stern Letter p. 1. In the interim, and in response to the catastrophic Exxon Valdez oil spill, *see U.S. v. Locke*, 529 U.S. 89, 101 (2000), Congress enacted the Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 484 ("OPA"). As noted in *Bluewater Network*, there is a direct relationship between that statute and the Puget Sound regulation:

Section 4116(c) [of the OPA] . . . requires that, not later than 6 months after the enactment of the OPA, "the [Coast Guard] shall initiate issuance of regulations . . . to define those areas, *including* Prince William Sound, Alaska, and Rosario Strait



DEFENDANT'S
EXHIBIT
5

and Puget Sound, Washington . . . , on which single hulled tankers over 5,000 gross tons transporting oil in bulk shall be escorted by at least two towing vessels."

234 F.3d at 1308 (emphasis in original).  The specific purpose of the regulation was indeed to implement the requirements for Puget and Prince William Sounds dictated by Congress.  *See* 57 Fed. Reg. 30058, 30064 (July 7, 1992) (Coast Guard states in Notice of Proposed Rulemaking that "the proposed rules are limited to implementing the requirements of section 4116(c) of OPA 90, only for Prince William Sound . . . and Rosario Strait and Puget Sound").  In short, the Coast Guard enacted a Puget Sound regulation only when ordered by Congress to do so, after more than a decade of inaction (and an intervening Alaska oil spill that was the worst in the nation's history).  As also noted by the District of Columbia Circuit, even the agency's initiation of the regulatory proceedings itself was untimely, coming "[n]early two years after passage of the OPA," well beyond the Congressional deadline of "not later than 6 months after . . . enactment." *Bluewater Network*, 234 F.3d at 1308-09; *see also* Commonwealth Brief pp. 7-8, 10-11 (describing similar Coast Guard delays in complying with other Congressional mandates).

2.    The draft and final Puget Sound rulemakings cited in Mr. Stern's letter also specifically address the issue of preemption.  57 Fed. Reg. at 30064; 59 Fed. Reg. 42962, 42968 (Aug. 19, 1994).  At the time each was published, the same Executive Order regarding "Federalism Assessments" that governed the 1998 Northeast regional tug-escort rulemaking (and that the Commonwealth discussed without rebuttal in its Briefs) was in effect.  Exec. Order No. 12612, 52 Fed. Reg. 41685 (Oct. 26, 1987); *see* Commonwealth Brief pp. 56-57; Commonwealth Reply Brief pp. 24-25.  Against this backdrop, the "Federalism" section of the 1992 Puget Sound proposed rulemaking quotes some of the language in *Ray* that is at issue in this appeal and then states in relevant part:

> The proposed rule implements the two escort vessel requirements for single hull tankers in the areas mandated by Congress.  Because the proposed rules are limited to implementing the requirements of section 4116(c) of OPA 90, only for Prince William Sound . . . and Rosario Strait and Puget Sound . . . , the preemptive effect of this rulemaking is limited to escort requirements for single hull tankers in these areas. *The Coast Guard does not intend this rulemaking to preempt escort requirements for double hull tankers or single hull tankers under 5,000 GT.* Alaska and Washington may not, of course, have any escort rules that are in direct conflict with Federal law or any final rules adopted as a result of this rulemaking. As noted previously, *there does not appear to be any substantial conflict.*

57 Fed. Reg. at 30064 (emphasis added); *accord id.* at 57 Fed. Reg. at 30059 ("double hull tankers with only a single screw will still have to comply with the Washington State escort requirements").  The Coast Guard thus did not even view its proposed regulation as preempting supplemental state requirements for additional categories of vessels within Puget and Prince

William Sounds themselves, let alone state escort requirements regarding other West Coast waters. The agency's 1994 final rulemaking is to the same effect:

> The Coast Guard has analyzed this rule under the principles and criteria contained in Executive Order 12612 and has determined that this rule does not have sufficient federalism implications to warrant the preparation of a Federalism Assessment. . . .
>
> While these regulations establish *minimal* requirements for escort tanker traffic through these designated areas, *the Coast Guard does not intend to preempt the states from issuing more stringent requirements* provided they are not in direct conflict with Federal law or this rulemaking.

59 Fed. Reg. at 42968 (emphasis added). The quoted passages in the Puget Sound rulemakings are directly relevant here, in four respects. First, they clearly reflect the Coast Guard's understanding that a federal regulation that in fact preempts localized state rules would have prompted a Federalism Assessment under Executive Order 12612. This further demonstrates that the agency's later determination under the same Executive Order that a Federalism Assessment for the 1998 Northeast regional escort regulation was *not* necessary, 63 Fed. Reg. 71764, 71770 (Dec. 10, 1998), means that it did not then intend for the Northeast regulation to preempt all localized state escort regulations. *See* Commonwealth Brief pp. 56-57; Commonwealth Reply Brief pp. 24-25. Second, the Coast Guard's recognition that there would not be a conflict between a federal single-hull regulation for Puget Sound and subsequent state regulation of additional vessels in that water body, 57 Fed. Reg. at 30064, confirms the appellants' position that the Commonwealth's Buzzards Bay escort regulation does not conflict with the federal single-hull regulation for the Northeast. *See, e.g.,* Coalition Brief pp. 46-53. Third, the Coast Guard's apparent endorsement of at least some supplemental state regulation in Puget Sound provides further proof that the appellees' claimed need for federally dictated "uniformity" in the escort area is illusory. *See, e.g.,* Commonwealth Reply Brief pp. 15-16. Fourth, given the Coast Guard's explicit acceptance of supplemental localized regulation for portions of the West Coast in 1994, one reasonably would have expected some textual notice and explanation that it was adopting a diametrically opposed position in 1998 regarding supplemental local regulation for portions of the East Coast. *See Motor Vehicle Mfrs. Ass'n v. St. Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 57 (1983) ("an agency changing its course must supply a reasoned analysis"). The lack of such 1998 text confirms that it was not in fact doing so.

    3.    Mr. Stern's letter also cites a 1993 Coast Guard advance notice of proposed rulemaking ("ANPR") that sought comments about whether the agency should adopt escort requirements for waters other than Puget and Prince William Sounds. *See* 58 Fed. Reg. 25,766 (Apr. 27, 1993). As noted in *Bluewater Network,* "the Coast Guard ha[d] not promulgated final 'other waters' escort requirements" as of the date of that 2000 decision, *Bluewater Network,* 234 F.3d at 1310, and the agency has provided no citation that it has ever followed up on its now 14-year-old ANPR (except to the extent that the 1998 Northeast regulation itself is viewed as a followup -- a view that the subsequent *Bluewater Network* decision did not express). *See also id.*

-3-

at 1315 (declining to order mandamus for agency to proceed with the 1993 "other waters" rulemaking). In addition, the "Federalism" section of the 1993 ANPR provides:

> The Coast Guard has analyzed this ANPRM under the principles and criteria contained in Executive Order No. 12612. It does not have enough information to determine whether this proposal has sufficient federalism implications to warrant the preparation of a Federalism Assessment.

58 Fed. Reg. at 25768. If the Coast Guard were intending the drastic result that all localized escort regulation other than that specifically provided in any final rulemaking would be preempted, one reasonably would have expected it to have said so. This is particularly true when one year earlier it had indicated that its then-contemplated Puget Sound regulations would not have substantial preemptive effect. 57 Fed. Reg. at 30064. Its 1992 Puget Sound proposed rulemaking indeed expressed a special solicitude for state interests in the preemption context:

> [T]he Coast Guard clearly has the authority under PWSA/PTSA to preempt state law . . . . Nevertheless, when and if there is another [*i.e.*, "other waters"] rulemaking, the Coast Guard will solicit advice from the States that may be affected by the rule. Recognizing States have a profound interest in protecting their citizens, industry, and environment from pollution, the Coast Guard intends to follow its policy of close cooperation with State governments in matters pertaining to environmental protection.

*Id.* at 30060. Consistent with its articulated respect for "States['] . . . profound interest" in this area, the fact that the agency did not then warn of impending preemption in 1993 indicates that as of that time it did not view escort provisions as generally preemptive of localized state regulation. This in turn further supports the conclusion that its silence regarding preemption of localized provisions in its 1998 rulemaking similarly signifies a lack of preemptive intent. *See* Commonwealth Brief pp. 55-56; Commonwealth Reply Brief pp. 21-25. All of the varied Coast Guard actions and inactions reviewed in this letter only serve to underscore the need for discovery and fact development on this issue and the plain inappropriateness of a judgment on the pleadings.

Thank you for your assistance in this matter.

Very truly yours,

Pierce O. Cray
Assistant Attorney General
(617) 727-2200, ext. 2084

cc:    Mark B. Stern, Esq., US Department of Justice **(BY FAX AND MAIL)**
       C. Jonathan Benner, Esq. **(BY FAX AND MAIL)**
       Jonathan M. Ettinger, Esq. **(BY FAX AND MAIL)**

-4-

# VENEZIA DECLARATION


# EXHIBIT 6

USCG CATEGORICAL EXCLUSION DETERMINATION
Establishment of Regulated Navigation Area, Navigation and Waterways Management
Improvements, Buzzards Bay, Massachusetts

The U.S. Coast Guard (USCG) is amending a currently existing Regulated Navigation Area within the navigable waters of Buzzards Bay in the First Coast Guard District. The amendment intends to increase the operational safety requirements for towing vessels and tank barges. The express purpose of the amendment is to prevent oil spills within the navigable waters of Buzzards Bay, Massachusetts and reduce the risk of environmental damage to marine and coastal environment. The amendment establishes three new requirements (escort tugs, Federal pilots, and a Vessel Movement Reporting System [VMRS]). The combination of requirements is expected to reduce the risks of future oil spills due to grounding.

This amendment is not expected to result in any significant adverse environmental impacts as described in the National Environmental Policy Act of 1969 (NEPA). The action has been thoroughly reviewed by the USCG, and the undersigned have determined this action to be categorically excluded from further environmental documentation under USCG CE(s) #6.a. as published in the *Federal Register, Vol. 67, No. 141, Tuesday July 23, 2002, page 48243 and #34.g.* (promulgation of regulation establishing, disestablishing, or changing Regulated Navigation Areas and security and safety zones), and 34.i. (regulations in aid of navigation) as published in Figures 2-1 (2), National Environmental Policy Act Implementing Procedures and Policy for Considering Environmental Impacts, COMDTINST M16475.1D, since implementation of this action will not result in any:

1. Significant cumulative impacts on the human environment;
2. Substantial controversy or substantial change to existing environmental conditions;
3. Inconsistencies with any Federal, State, or local laws or administrative determinations relating to the environment.

| | | |
|---|---|---|
| 2 Apr 2007 | Ms. Susan Hathaway | Env Protection Specialist |
| Date | Preparer/Environmental Project Manager | Title/Position |

| | | |
|---|---|---|
| 3 APRIL 07 | Mr. Edward Wandelt | CHIEF, CG-443 |
| Date | Environmental Reviewer | Chief, Environmental Mgt |
| | | Title/Position |

In reaching my decision/recommendation on the USCG's action, I have considered the information contained in this CED (and in any attached environmental checklists or other supplemental environmental analyses) on the potential for environmental impacts.

| | | |
|---|---|---|
| Date | T.S. Sullivan, Rear Admiral, | U.S. Coast Guard, |
| | Responsible Official | First District |
| | | Title/Position |

Buzzards Bay, MA RNA 2007

DEFENDANT'S
EXHIBIT
6