# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA, *et al.*, ) | |
| ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 05-10112-RCL |
| ) | |
| v. ) | |
| ) | |
| THE COMMONWEALTH OF ) | |
| MASSACHUSETTS, *et al.*, ) | |
| ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## MEMORANDUM IN SUPPORT OF INTERVENOR PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Andrew J. Hachey, BBO No. 567183
Nixon Peabody LLP
100 Summer Street
Boston, MA 02110
617-345-1034
ahachey@nixonpeabody.com

Jonathan Benner
Jeffrey Orenstein
Troutman Sanders LLP
401 9th Street, N.W.
Washington, D.C. 20004-2134
202- 274-2880
jonathan.benner@troutmansanders.com
jeffrey.orenstein@troutmansanders.com

*Counsel for Intervenors-Plaintiffs, American Waterways Operators, et al.*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................ii

INTRODUCTION..............................................................................................1

STATEMENT OF THE CASE.............................................................................2

ARGUMENT....................................................................................................6

THE COURT SHOULD ENTER SUMMARY JUDGMENT IN FAVOR OF THE
UNITED STATES AND INTERVENOR-PLAINTIFFS

I.      STANDARD OF SUMMARY JUDGMENT .................................................6

        A.      Rule 56(c)...........................................................................6

        B.      There Are No Material Facts in Dispute .................................7

II.     FEDERAL LAW EXPRESSLY PREEMPTS THE COMMONWEALTH'S
        MANNING AND TUG ESCORT RULES....................................................7

        A.      The Coast Guard's Express Preemption Statement Triggers a Shift in
                the Applicable Preemption Analysis.......................................8

                1.      The *Ray-Locke* Framework of Implied Preemption....................9

                2.      Express Preemption Principles ...................................12

                3.      The Revised RNA ...................................................13

        B.      The U.S. Coast Guard Position is Consistent with Congressional Intent..............15

III.    IF THE COURT CONCLUDES THAT THE UNITED STATES HAS NOT
        EXPRESSLY PREEMPTED THE MOSPA MANNING AND TUG ESCORT
        RULES,THEY ARE NONETHELESS CONFLICT PREEMPTED AND SUBJECT
        TO INVALIDATION UNDER THE PROCEDURES OF RULE 56..............18

CONCLUSION................................................................................................26

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) .................................................................................................6

*Capital Cities Cable, Inc. v. Crisp,*
467 U.S. 691 (1984) ...............................................................................................12

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) .................................................................................................6

*Chevron U.S.A., Inc. v. Hammond,*
726 F.2d 483 (9th Cir. 1984) .................................................................................11

*City of New York v. F.C.C.,*
486 U.S. 57 (1988) ............................................................................................11, 12

*Fidelity Fed. Savings. & Loan Ass'n v. De La Cuesta,*
458 U.S. 141 (1982) ......................................................................................... passim

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*
505 U.S. 88 (1992) ...................................................................................................9

*Geier v. America Honda Motor Co.,*
529 U.S. 861 (U.S. 2000) ...................................................................................24, 25

*General Motors Corp. v. Abrams,*
897 F.2d 34 (2d Cir. 1990).....................................................................................23

*Hillsborough County v. Automated Med. Labs., Inc.,*
471  U.S. 707 (1985) ....................................................................................... passim

*La. Pub. Serv. Comm'n v. F.C.C.,*
476 U.S. 355 (1986) ...............................................................................................12

*Nebraska v. Wyoming,*
507 U.S. 584 (1993) .................................................................................................6

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Development Comm'n,*
461 U.S. 190 (1983) .................................................................................................8

*Ray v. Atlantic Richfield. Co.*,
  435 U.S. 151 (1978) ........................................................................................... passim

*United States v. Locke*,
  529 U.S. 89 (2000) ............................................................................................. passim

*United States v. Massachusetts*,
  440 F. Supp. 2d 24 (D. Mass. 2006) ................................................................. passim

*United States v. Massachusetts*,
  493 F.3d 1 (1st Cir. 2007) ................................................................................. passim

*United States v. R.I. Insurers' Insolvency Fund*,
  80 F.3d 616 (1st Cir. 1996) .......................................................................................7

*United States v. Shimer*,
  367 U.S. 374 (1961) ...................................................................................................12

## STATUTES

33 U.S.C. § 1223(a)(1) ...............................................................................................10

33 U.S.C. 1223(a)(4) (emphasis added) ....................................................................18

46 U.S.C. § 3703(a) ............................................................................................10, 22

2004 Mass. Acts ch. 251 § 11 .....................................................................................2

2004 Mass. Acts ch. 251 §§ 16 and 17 .......................................................................2

2004 Mass. Acts ch. 251 § 2 ........................................................................................2

2004 Mass. Acts ch. 457 § 1 ........................................................................................2

Fed. R. Civ. P. 56(c) ....................................................................................................6

Mass. Gen. Laws ch. 21, § 50 .....................................................................................2

Mass. Gen. Laws ch. 21M, §§ 1 ..................................................................................2

Mass. Gen. Laws ch. 21M, § 3 ....................................................................................2

Mass. Gen. Laws ch. 21M § 4....................................................................................14

Mass. Gen. Laws ch. 21M, § 4(a) .................................................................2

Mass. Gen. Laws ch. 21M, § 5 ...................................................................2

Mass. Gen. Laws ch. 21M, § 7 ...................................................................2

Mass. Gen. Laws ch. 103, §§ 21 .................................................................2

## RULES AND REGULATIONS

33 C.F.R. § 164.13(c)...............................................................................17

33 C.F.R. § 165.100 .................................................................................9

63 Fed. Reg. 71,764 .................................................................................9

69 Fed. Reg. at 62,429 .............................................................................9

71 Fed. Reg. 15,649 .................................................................................9

72 Fed. Reg. 50,052 .............................................................................4, 14

72 Fed. Reg. 50,057 ...........................................................................22, 23

72 Fed. Reg. at 50,059 .......................................................................13, 22

# INTRODUCTION

The issue presented by this motion for summary judgment is a purely legal one: Under the Supremacy Clause, do federal manning and tug escort regulations for tank vessels in Buzzards Bay preempt regulations issued by the Commonwealth of Massachusetts on the same subjects when the federal rules expressly displace state action in an effort to establish the appropriate level of regulation? The answer to this question, as set forth below, is yes.

On August 30, 2007, the federal government of the United States of America—through the U.S. Coast Guard—revised the Regulated Navigation Area ("RNA") for the First Coast Guard District to include safeguards specifically for Buzzards Bay. In doing so, it expressly preempted all non-federal regulations on the same subjects. The Coast Guard's express preemption statements trigger a shift in the applicable constitutional analysis that has thus far governed this litigation from the "implied preemption" principles employed in past PWSA cases (*i.e.*, field and conflict preemption) to express preemption principles, used in cases, like this one, where preemptive intent is clearly stated by federal authorities. Under the applicable express preemption analysis, the only question before this Court is whether the revised RNA's express preemption statement is consistent with congressional intent. The answer is clear: The RNA is in complete accord with the authority Congress delegated to the U.S. Coast Guard in the Ports and Waterways Safety Act, as amended ("PWSA") and related federal statutes governing vessel safety and marine environmental protection. The lawful exercise of this authority cannot be superseded by the Commonwealth's attempt to impose its own standards for manning and tug escorts in Buzzards Bay. Under the Supremacy Clause, therefore, the Commonwealth's assertions of controlling authority must yield to the plenary authority of the United States.

## STATEMENT OF THE CASE

The United States and Intervenor-Plaintiffs brought this suit in 2005 to challenge seven provisions of the Massachusetts Oil Spill Prevention Act ("MOSPA")[1] as constitutionally preempted by the PWSA and its implementing Coast Guard regulations.  In July 2006, this Court ruled in Plaintiffs' favor, finding all the challenged MOSPA provisions invalid under the Supremacy Clause, and permanently enjoining their enforcement.  *United States v. Massachusetts*, 440 F.Supp. 2d 24 (D. Mass. 2006).  The Commonwealth appealed, but only with regard to three MOSPA provisions—those purporting to regulate tanker manning, tug escorts and financial assurance.  No appeal was taken from this Court's invalidation of the MOSPA provisions related to pilotage, reporting, drug and alcohol testing, routing and prohibitions on single hull tank vessels.

The U.S. Court of Appeals for the First Circuit reversed and remanded without deciding whether the MOSPA manning, tug escort and financial assurance provisions were valid under the Supremacy Clause.  *See United States v. Massachusett*s, 493 F.3d 1 (1st Cir. 2007).  The basis for reversal, rather, was that further analysis was required based on the record before the court at that time.

With regard to the MOSPA manning requirement, the Court of Appeals found that additional analysis was required to determine whether such state action is covered by PWSA

---

[1] 2004 Mass. Acts ch. 251 §§ 16 and 17, amending MASS. GEN. LAWS ch. 103, §§ 21 and 28 (pilotage requirements); 2004 Mass. Acts ch. 251 § 11, establishing new MASS. GEN. LAWS ch. 21M, § 3 (drug and alcohol testing requirements); 2004 Mass. Acts ch. 251 § 11, establishing new MASS. GEN. LAWS ch. 21M, § 7 (single hull vessel prohibition); 2004 Mass. Acts ch. 457 § 1, amending MASS. GEN. LAWS ch. 21M, § 5 (vessel routing requirements); 2004 Mass. Acts ch. 251 § 11, establishing new MASS. GEN. LAWS ch. 21M, § 4(a), (b) and (c) (manning requirements); 2004 Mass. Acts ch. 251 § 2, establishing new MASS. GEN. LAWS ch. 21, § 50 C (financial assurance requirements); 2004 Mass. Acts ch. 251 § 11, establishing new MASS. GEN. LAWS ch. 21M, §§ 1 and 6 (tug escort requirements).

Title II, and thus field preempted, or by PWSA Title I, in which case conflict preemption

principles apply pursuant to the Circuit Court's reading of *United States v. Locke*, 529 U.S. 89,

104 (2000). In the alternative, the Court of Appeals invited the United States and Intervenor-

Plaintiffs to argue on remand that even if Title I conflict preemption is the appropriate analysis,

the Commonwealth's manning requirements are nevertheless preempted because they conflict

with Coast Guard regulations promulgated under Title I. 493 F.3d at 13.

      With regard to the MOSPA tug escort requirement, the applicability of Title I conflict

preemption principles was settled by Supreme Court case law, *see, e.g.*, *Ray v. Atlantic Richfield*

*Co.*, 435 U.S. 151 (1978), but the Court of Appeals found further analysis was required to

determine whether the Coast Guard intended its regional tug escort rule to displace the local

MOSPA rule, thereby creating a conflict. The court remanded for a determination of the Coast

Guard's intent on that point. 493 F.3d at 18-19.

      With regard to the MOSPA financial assurance provisions, the Court of Appeals

remanded certain questions, however, the United States and Intervenor-Plaintiffs voluntarily

dismissed their challenge to this provision on November 28, 2007, rendering those questions

moot. *Complaint Stipulation of Partial Dismissal Without Prejudice of Plaintiff's and*

*Intervenor-Plaintiffs' Claims for Injunctive and Declaratory Relief Against Operation of M.G.L.*

*c. 21 § 50C(d) (Concerning Financial Assurance Requirements for Certain Vessels) Only* (Nov.

28, 2007).

      During the pendency of this matter before the Court of Appeals, the Coast Guard had

been conducting additional rulemaking proceedings addressing navigation requirements for

Buzzards Bay and other waterways in New England. Subsequent to the Court of Appeals

decision, the U.S. Coast Guard issued a final rule, revising its Regulated Navigation Area ("RNA") for the First Coast Guard District. *Regulated Navigation Area; Buzzards Bay, MA; Navigable Waterways Within the First Coast Guard District*, 72 Fed. Reg. 50,052-50,059 (Aug. 30, 2007).  This final rule is the culmination of a full notice and comment rulemaking that commenced almost a year and a half prior to the Court of Appeals ruling.  *See Notice of Proposed Rulemaking*, 71 Fed. Reg. 15,649-15,656 (Mar. 29, 2006).  The purpose of the rulemaking was to review existing federal rules for the First Coast Guard District and to propose and to solicit comment on added safeguards designed to reduce the likelihood of tanker-related accidents in Buzzards Bay.  After careful consideration of all comments received, and after close consultation with the Massachusetts Department of Environmental Protection and municipalities bordering Buzzards Bay, the Coast Guard revised its RNA to require, *inter alia*, single hull tank vessels and tug/barge combinations to employ a tug escort and a federally-licensed pilot while transiting Buzzards Bay.  72 Fed. Reg. 50,052.  The revised RNA states that its manning and tug escort requirements are intended as exclusive requirements, displacing "any other non-Coast Guard schemes" and unequivocally specifying that "those provisions of . . . MOSPA regarding enhanced manning requirements for tank and tow vessels in Buzzards Bay . . . and tugboat escorts" are preempted. *Id.* at 50,057.

Notwithstanding these expressly preemptive federal enactments and language in the Court of Appeals ruling urging the parties to agree on a stay of the state rules pending resolution of the remanded issues,[2] the Commonwealth has declined to stay the effectiveness of its rules and indicated its intent to enforce them.  This situation prompted the United States, supported by

---

[2] 493 F.3d at 25 ("On remand, the parties should address the question of an interim agreement to stay MOSPA's

Intervenor-Plaintiffs, to move for a preliminary injunction on October 29, 2007. U.S. Mot.

Prelim. Inj. (Oct. 29, 2007). The United States also moved this court pursuant to FED. R. CIV.

PROC. 65(a)(2) to consolidate its preliminary injunction decision with the merits because the

Coast Guard's revised RNA clearly resolved all outstanding questions of law in favor of

Plaintiffs. *Id.* At this writing, Plaintiffs' request for the issuance of a preliminary injunction

remains pending before this Court.

     The Commonwealth and its intervenor supporters have opposed the United States'

Motion for Preliminary and Permanent Injunction and demanded extensive discovery of

documents, though they have not raised any factual disputes material to the preemptive nature of

the federal government's actions. *See* Commw. Opp. (Nov. 16, 2007); and Commw. Supp. Opp.

(Dec. 18, 2007). The Commonwealth has also brought counterclaims under the Administrative

Procedure Act ("APA") and the National Environmental Policy Act ("NEPA"). *See* Commw.

Opp. and Commw.'s Second Am. Answer and Countercl. (Nov. 30, 2007) (claiming the RNA is

invalid because the APA requires the Coast Guard to adopt standards identical to those adopted

by the Commonwealth); Commw.'s Third Am. Answer and Countercl. (Jan. 30, 2007) (claiming

the RNA is invalid because the Coast Guard was required to conduct a NEPA Environmental

Assessment even though "regulations . . . changing Regulated Navigation Areas" are

categorically excluded from such requirements). Timely responses to these claims were filed by

the United States. Resp. Def.'s Supp. Opp. (Dec. 19, 2007); Answer Def.'s Third Am.

Countercl. (Apr. 15, 2008).

     Most recently, this Court asked the United States to file a Reply to the Commonwealth's

---

provisions pendente lite.").

argument—made in its Opposition to the Motion for Preliminary and Permanent Injunction—that

the Coast Guard's preemption of the MOSPA manning and tug escort provisions was arbitrary

under the APA given the Coast Guard's prior decision not to preempt a Washington State tug

escort rule for Puget Sound. Order (March 3, 2008). The United States replied, explaining that

the Coast Guard frequently tailors federal maritime safety and environmental rules to distinct

circumstances in differing bodies of water in and around the United States, and to differences in

underlying Congressional directives.

Intervenor-Plaintiffs now move this court for summary judgment on the grounds that this

dispute is ripe for disposition as a matter of law.

## ARGUMENT

THE COURT SHOULD ENTER SUMMARY JUDGMENT IN FAVOR OF INTERVENOR-PLAINTIFFS

## I.     STANDARD FOR SUMMARY JUDGMENT

### A.     Rule 56(c)

Pursuant to Rule 56(c) of the FED. R. CIV. P., courts should grant summary judgment if

the record shows "there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Nebraska v. Wyoming*, 507

U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-324 (1986). "By its terms,

this standard provides that the mere existence of some alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment: the requirement

is that there is no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-248 (1986). Consequently, "[o]nly disputes over the facts that might affect the outcome of

6

the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. In this action, the only matters in dispute are questions of law.

### B.  There Are No Material Facts in Dispute

The question of federal preemption before this Court is a pure question of law. *See United States v. R.I. Insurers' Insolvency Fund*, 80 F.3d 616, 619 (1st Cir. 1996) ("[A] federal preemption ruling presents a pure question of law subject to plenary review."). Material to the disposition of this case is the fact that the United States and the Commonwealth of Massachusetts have promulgated disparate regulations on the subjects of manning and tug escorts for tank vessels in Buzzards Bay. The question of whether the Commonwealth's regulations must yield under the Supremacy Clause requires no factual development, only analysis of certain provisions in the U.S. Code, the Code of Federal Regulations, the Federal Register, and the Massachusetts General Laws. Despite this Court's generous permission of the Commonwealth's search for other relevant documents, no new factual disputes have arisen to the best of Intervenor-Plaintiff's knowledge. There certainly are fundamental legal disputes between the parties regarding the proper application of preemption principles to the relevant statutes and regulations. However, there are no questions for which a fact-finder is required.

## II.    FEDERAL LAW EXPRESSLY PREEMPTS THE COMMONWEALTH'S MANNING AND TUG ESCORT RULES

After seventeen months of considered notice and comment rulemaking, the U.S. Coast Guard revised its RNA for the First Coast Guard District on August 30, 2007 to establish, *inter alia*, the exclusive manning and tug escort standards for tank vessels traversing Buzzards Bay. Express preemption provisions in the RNA's federalism statement make it unequivocally clear

that the new federal manning and tug escort standards for Buzzards Bay are intended by the United States to displace all state schemes—including those advanced by the Commonwealth in the Massachusetts Oil Spill Prevention Act ("MOSPA"). The legal consequence of this federal enactment is two-fold: First, the Coast Guard's express preemption statement triggers a shift in the applicable preemption analysis from that which has heretofore governed argument and briefing by the parties. Because the Coast Guard's express preemption statements are dispositive on the question of preemptive intent, it is no longer necessary to employ "implied preemption" principles (*i.e.*, field and conflict preemption) to infer the intent of federal authorities to supplant state action under the Supremacy Clause. The relevant inquiry under express preemption principles is whether the revised RNA is clearly inconsistent with Congressional intent. Second, because the revised RNA *is* consistent with congressional intent, as evidenced by the text of the PWSA and Supreme Court precedents interpreting it, the Commonwealth's manning and tug escort standards are expressly preempted by federal law.

**A.      The Coast Guard's Express Preemption Statement Triggers a Shift in the Applicable Preemption Analysis**

The fact that the revised RNA triggers a shift in the applicable preemption analysis is best understood in light of how the different preemption models fit together. Federal preemption of state and local law comes in two forms, express and implied. Express preemption is straightforward: where Congress or a federal agency acting within its delegated authority explicitly preempts state law on a given subject, states are barred from adopting and enforcing their own regulations. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983) ("It is well established that within Constitutional limits Congress may

preempt state authority by so stating in express terms."). When federal authorities have not conveyed in express terms their intent to preempt state action, preemption may be implied "where the scheme of federal regulation is 'so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it,'" so-called "field preemption." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (quoting *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 153 (1982)). Preemption may also be implicit where compliance with both state and federal law would be impossible or where state action stands as an obstacle to the purpose of federal enactments, so-called "conflict preemption." *Id.*

### 1.     The *Ray-Locke* Framework of Implied Preemption

The preemptive effect of the PWSA and its implementing Coast Guard regulations was first examined by the Supreme Court in *Ray v. Atlantic Richfield. Co.*, 435 U.S. 151 (1978). *Ray* involved the validity of a Washington State regulatory scheme that sought to govern the design, equipping, staffing, personnel qualifications, and operations of oil tankers—all subjects covered by the PWSA. Like many federal statutes, the PWSA does not contain an express preemption clause and many of the Coast Guard regulations implementing the PWSA did not include express preemption statements.[3] The Court in *Ray* concluded, however, that preemption is implied under the PWSA in two ways: (1) state regulations that fall within the subjects of PWSA Title II (the "design, construction, alteration, repair, maintenance, operation, equipping, personnel

_____

[3] The Coast Guard had made several statements prior to the revised RNA, both as part of the original RNA and in the Federal Register, that the United States and Intervenor-Plaintiffs believe convey the Coast Guard's intent to preempt state actions like the MOSPA manning and tug escort requirements. *See* 33 C.F.R. § 165.100; 63 Fed. Reg. 71,764; 69 Fed. Reg. at 62,429; 71 Fed. Reg. 15,649. The Court of Appeals, however, found these statements insufficiently clear to infer the Coast Guard's intent. 493 F.3d at 18-19. Intervenor-Plaintiffs continue to regard the earlier federalism statements as clear statements of preemption and, should the occasion arise, will argue that the Circuit erred in failing to give them substantial weight. However, whatever the merits of this position, the court now has unequivocal indications of federal preemptive intent before it.

qualification, and manning of vessels . . ." 46 U.S.C. § 3703(a)) are ousted under field preemption principles because Congress mandated federal regulation of these fields; and (2) state regulations governing subjects addressed by Coast Guard rules promulgated under PWSA Title I[4] are preempted under conflict preemption principles because Congress authorized, but did not require, Coast Guard regulation of these subjects. Accordingly, the *Ray* Court held that the states may regulate a Title I subject matter where the Coast Guard has not exercised its discretionary authority on the same subject, but when the Coast Guard adopts regulatory requirements governing a particular Title I subject (or concludes that no such requirements should be adopted at all), conflicting state rules are preempted. *Id.* at 171-172; *see also id.* at 173-178 (invalidating Washington statute excluding from Puget Sound all tankers in excess of 125,000 deadweight tons because it conflicted with a Coast Guard rule). As the *Ray* Court explained, Title I exhibits a desire on the part of Congress for federal officials with an overview of all possible ramifications to promulgate tanker vessel regulations after "balancing all the competing interests." *Id.* at 177; *see also id.* at 165 ("The Supremacy Clause dictates that the federal judgment that a vessel is safe to navigate United States waters prevail over a contrary state judgment.").

The *Ray* framework for implied PWSA preemption remains valid today, having been affirmed most recently by the Supreme Court in *United States v. Locke*, 529 U.S. 89, 104 (2000) ("The *Ray* Court's interpretation of the PWSA is correct" and "of continuing force, neither having been superseded by subsequent authority relevant to these cases.").[5] A unanimous Court

---

[4] Title I authorizes the Coast Guard to issue regulations for controlling vessel traffic and protecting the marine environment. 33 U.S.C. § 1223(a)(1).

[5] The *Locke* Court's unanimous reaffirmation of *Ray's* Title I analysis belies the Commonwealth's suggestion that

in *Locke* applied *Ray's* implied preemption principles to invalidate a second wave of Washington

State intrusions into the pervasive and comprehensive federal regime governing tank vessel

safety and marine environmental protection.

Notwithstanding the obvious and continuing validity and import of the *Ray-Locke*

framework as an implied preemption model, its context arises in circumstances where the

preemptive intent of federal authorities is not expressly stated and must be inferred.  *See Chevron*

*U.S.A., Inc. v. Hammond*, 726 F.2d 483, 486 (9th Cir. 1984) ("In the absence of *express*

preemption language," the court "addresses . . . whether Congress in passing the PWSA/PTSA

*implicitly* intended to occupy the field. . .") (emphasis added).  The Court of Appeals in this

matter has reminded the parties that implicit preemptive analysis is unnecessary where the Coast

Guard states its intent to preempt state law expressly, quoting the Supreme Court in *Hillsborough*

*County v. Automated Med. Labs., Inc.*: "[a]n agency's preemption judgment is 'dispositive on the

question of implicit intent to pre-empt . . .'" 493 F.3d at 16 (citing 471 U.S. 707, 714-15 (1985)).

Therefore, when federal agencies issue express preemption statements, federal courts review

them under a distinct, express preemption analysis established by the Supreme Court to

effectuate congressional intent.  *See, e.g., City of New York v. F.C.C.*, 486 U.S. 57 (1988).  As

such, the Court of Appeals noted that courts would review "Coast Guard Title I regulations" that

expressly preempt state law "under a different model"—the express preemption model.  *See* 493

---

amendments to Title I passed in the interval between the Supreme Court's decisions in *Ray* and *Locke*, have
"implications . . . for the Coast Guard's authority to effect conflict preemption."  Commw.'s Opp. at 13-15.  Such a
suggestion is, in fact, completely inconsistent with the Commonwealth's assertion that the Coast Guard's revised
RNA is subject to the "standard conflict preemption analysis" established in *Ray* and reaffirmed without qualification
in *Locke*. It is equally at odds with the Commonwealth's concession in the Court of Appeals that "there is no dispute
that *Ray* and *Locke* establish the relevant standards for analyzing any preemption claim under [the PWSA]." Def.'s
Br. at 20.  Nor has the Commonwealth supported its entirely conclusory claim that the 1978 amendments negate the
Coast Guard's authority to expressly preempt state action. *See* Commw.'s Opp. at 14.

F.3d at 16 (highlighting the Supreme Court's express preemption precedents and providing guidance on the review of express preemption statements).[6]

## 2.     Express Preemption Principles

Under express preemption principles, "federal regulations have no less preemptive effect than federal statutes." *Fidelity Fed. Savings. & Loan Ass'n. v. De la Cuesta*, 458 U.S. 141, 153 (1982); *see also Capital Cities Cable, Inc. v. Crisp*, 467 U. S. 691, 699 (1984); *United States v. Shimer*, 367 U. S. 374, 381-383 (1961); *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 714-15 (1985) ("We have held repeatedly that state laws can be preempted by federal regulations as well as by federal statutes"); *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 369 (1986) ("[preemption] may result not only from action taken by Congress itself; a federal agency within the scope of its congressionally delegated authority may pre-empt state regulation."). Federal agencies may expressly preempt state action without explicit congressional authority to do so. As the Court explained in *City of New York v. FCC* ,

> . . . where state law is claimed to be pre-empted by federal regulation, a "narrow focus on Congress' intent to supersede state law [is] misdirected," for [a] "pre-emptive regulation's force does not depend on express congressional authorization to displace state law." *Fidelity Federal Savings & Loan Ass'n. v. De la Cuesta*, 458 U.S. 141, 154 (1982). Instead, the correct focus is on the federal agency that seeks to displace state law and on the proper bounds of its lawful authority to undertake such action.

---

[6] The fact that the Court of Appeals gave guidance on express preemption principles, but did not have occasion to apply them on the record before it, appears to be a source of confusion for the Commonwealth. In its Opposition to Plaintiff's request for preliminary injunction, the Commonwealth accurately observes that "The First Circuit discussed Title I preemption against the terminological background of the three familiar types of preemption— express, field and conflict." Commw.'s Opp. at 5. But subsequently, the Commonwealth makes the incongruous claim that "[t]here is no 'third category' involving express preemption." *Id.* at 10. In short, the express preemption principles to which the Court of Appeals alluded, but did not have occasion to apply, are now applicable because, as the Commonwealth states, the Coast Guard "took the unprecedented step . . . to expressly preempt the Commonwealth's rules." Commw.'s Opp. at 8.

486 U.S. at 64 (citing *Fidelity*, 458 U.S. at 154; and *Crisp*, 467 U.S. at 700).[7] In other words, if a federal agency is authorized to regulate a given subject, it may do so preemptively unless such action is otherwise "inconsistent with clearly expressed congressional intent." *Hillsborough County*, 471 U.S. at 714-15. The Court of Appeals related this rather straightforward test to the current dispute when it addressed the prospect of expressly preemptive Coast Guard regulations: If "the Coast Guard [has] sufficiently expressed a clear intent to preempt, . . . the Coast Guard's position" is valid unless it "is clearly inconsistent with congressional intent." 493 F.3d at 19. As discussed below, the prospect of expressly preemptive Coast Guard regulations has been realized, triggering the need for express preemption analysis.

### 3.    The Revised RNA

The revised RNA provides, *inter alia*, the following: All single hull tank barges carrying 5,000 or more barrels of oil or other hazardous materials and being towed through Buzzards Bay must (1) be accompanied by an escort tug, in addition to its primary tug, between the west entrance to Buzzards Bay and the east end of the Cape Cod Canal; and (2) be accompanied by a federally licensed pilot on the primary tug, apart from the tug's master and crew, to monitor the navigation of the tug/barge, and to advise the master of the tug/barge accordingly. 72 Fed. Reg. at 50,059.

Although the intended preemptive scope of these Coast Guard rules is readily inferred, the Coast Guard chose to make its preemptive intent unmistakably clear in the following express

---

[7] This well-established principle completely disarms the Commonwealth's unusual suggestion that the Coast Guard has no authority to expressly preempt state action because "Congress did not empower the Coast Guard to preempt state laws on an express-preemption basis in PWSA." Commw.'s Opp. at 12. This theory is not only contrary to the Supreme Court's holdings in *Fidelity* and *City of New York v. FCC*, but is contrary to logic because it presupposes the Coast Guard cannot do expressly what Congress has authorized it to do implicitly.

preemption provision:

> The Coast Guard's affirmative decisions . . . (2) to require a federally licensed
> pilot in addition to the normal crew aboard a tug towing a *single hull* tank barge
> through Buzzard's Bay, *but not to require any other modifications* to the
> applicable manning requirements; and (3) to require an escort tug in addition to
> the primary tug, for all *single hull* tank barges transiting Buzzard's Bay, *but not
> for other vessels*; each represent a considered determination of the appropriate
> level of regulation to ensure navigation safety and environmental protection. As
> such, the Coast Guard has determined that any other Coast Guard schemes
> relating to vessel routing, manning, and tug escort requirements in Buzzards Bay
> are preempted.

72 Fed. Reg. at 50,052 (emphasis added).  The RNA further specifies the following:

> To the extent not otherwise already preempted, this rule is intended to, and does,
> preempt those provisions of . . . MOSPA regarding enhanced manning
> requirements for tank barges and tow vessels in Buzzards Bay, *see* Mass. Gen.
> Laws ch. 21M § 4, and tugboat escorts for certain waters, *see id* § 6.

*Id.*  These provisions clearly implicate the express preemption analysis outlined above.  Indeed,

the Court of Appeals anticipated this shift in the applicable analysis.  The opinion of the court

focuses primarily on questions of conflict preemption because the Coast Guard had not yet issued

the revised RNA.  However, because the Circuit was aware of the Coast Guard's pending

rulemaking, and expected future Coast Guard action, it provided guidance on express

preemption. *See* 493 F.3d at 16 and 19 (citing the Supreme Court's express preemption

precedents and explaining that if the "Coast Guard sufficiently expressed a clear intent to

preempt," "courts would view the matter under a different model.").  Now that the Coast Guard

has promulgated rules that expressly preempt the Commonwealth's manning and tug escort

regulations, the question of preemptive intent has been settled, and the remanded questions of

implied preemption have been rendered secondary, if not altogether moot.  The operative inquiry

now, as the Court of Appeals framed it, is whether "the Coast Guard position is clearly

inconsistent with congressional intent."  493 F.3d at 19 (citing *Hillsborough County*, 471 U.S. at

714-15; *Cal. Coastal comm'n*, 480 U.S. 572, 583 (1987)).

### B.     The U.S. Coast Guard Position is Consistent with Congressional Intent

The Coast Guard's decision to preempt all state modification of its manning and tug

escort standards for Buzzards Bay is certainly not "clearly inconsistent with congressional

intent."  It is, rather, in perfect agreement with the PWSA as interpreted by the Court of Appeals

and by the Supreme Court in *Ray* and *Locke*.

The holding of *Ray*, which was reaffirmed in *Locke* and followed by the Court of

Appeals, clearly validates the Coast Guard's authority to preempt state regulation on subjects

governed by the PWSA: Under Title II, Congress gave the Coast Guard exclusive authority to

regulate the "design, construction, alteration, repair, maintenance, operation, equipping,

personnel qualification, and manning' of tanker vessels," preempting state action in these fields

by definition. *See Ray*, 435 U.S. at 160, 168, 177; *Locke*, 529 U.S. at 110-111.  Under Title I,

Congress gave the Coast Guard discretionary authority to regulate subject matters related to

vessel traffic systems, permitting states to regulate Title I subjects, "*unless* they run counter to an

exercise of federal authority."  *Locke*, 529 U.S. at 109-10 (emphasis added) ("In this context,

Coast Guard regulations are to be given pre-emptive effect over conflicting state laws.").  In

other words, Congress has the authority to act preemptively under Title I.  To do so, it need only

exercise its Title I authority "through a regulation intended to displace state law, or by [deciding]

. . . that there should be no regulation of the subject in question."  493 F.3d at 8 (citing *Locke*,

529 U.S. at 109); 529 U.S. at 110.

A salient example of the Coast Guard's preemptive authority under Title I is provided by

*Ray's* invalidation of a Washington State law excluding all tankers over 125,000 deadweight tons from Puget Sound. The Court "beg[an] with the premise that the Secretary has the authority [under Title I] to establish 'vessel size and speed limitations' . . . and that local Coast Guard officers have been authorized to exercise this power on his behalf." 435 U.S. at 174. The Court then framed the "pertinent inquiry" as being "whether the Secretary, through his delegate, has addressed and acted upon the question of size limitations." *Id.* Because "federal authorities [had] indeed dealt with the issue of size" and determined that more "limited" size restrictions were necessary, the judgment of the Coast Guard took precedence over the contrary state judgment. *Id* at 175.

The Supreme Court has also confirmed the Coast Guard's authority to preempt state tug escort regulations. In *Ray*, the Court upheld a Washington State tug escort rule for Puget Sound on the basis that the Coast Guard had not yet invoked its Title I authority to promulgate a tug escort rule for Puget Sound. 435 U. S. at 172. "A tug-escort provision," the Court said, "is . . . a safety measure clearly within the reach of the Secretary's authority," therefore, "[t]he relevant inquiry under Title I with respect to the State's power to impose a tug escort rule is . . . whether the Secretary has either promulgated his own tug requirement for Puget Sound tanker navigation or has decided that no such requirement should be imposed at all." In light of a then-recent proposed rulemaking, the Court forewarned Washington State that "[i]t may be that rules will be forthcoming that will pre-empt the State's present tug-escort rule . . ." 435 U.S. at 172. The Court of Appeals cited this very passage for the proposition that the Coast Guard could exercise its Title I authority preemptively with regard to tug escorts in Buzzards Bay. *See* 493 F.3d at 19.

Similarly, there is no doubt at the Supreme Court and, *per force*, no doubt in this Circuit,

that the Coast Guard has the authority to act preemptively with regard to manning. The Court of Appeals, for example, took for granted the Coast Guard's authority to preempt state manning requirements and simply addressed "the source of the potential preemption"—namely, the question of whether the Commonwealth's manning requirements might be field preempted by Title II (which covers "the manning of vessels") or conflict preempted under Title I by Coast Guard manning regulations like those published at 33 C.F.R. § 164.13(c). *See* 493 F.3d at 11-13.

The Coast Guard's authority to regulate manning and tug escorts in Buzzards Bay with preemptive effect is in no way subject to substantive dispute. The decision of the Court of Appeals recognizes this authority, and the Commonwealth effectively conceded the point in the Court of Appeals. *See* Def.'s Br. at 17.[8] The Commonwealth, therefore, must either take the seemingly untenable position that the Coast Guard may not do expressly what it has been authorized by Congress to do implicitly, or it must rescue from obscurity some "clearly expressed" statement of "congressional intent" that is "inconsistent" with the Coast Guard's "position." 493 F.3d at 16 and 19. In the absence of such a statement, Intervenor-Plaintiffs seek summary judgment on the basis that the Commonwealth's manning and tug escort regulations are expressly preempted by federal law.

---

[8] In the proceedings above, the Commonwealth conceded that the Coast Guard has authority to preempt state action under PWSA Title I on several occasions, one of which is when it recognized the propriety of this Court's finding that Coast Guard regulations promulgated under Title I preempted the MOSPA vessel routing requirement. Def.'s Brief 17 ("The Commonwealth recognizes that . . . applicable preemption standards do provide that agency [*i.e.*, the U.S. Coast Guard] with some leeway as a matter of law, and the arguments for affirmance under those standards are relatively strong for four of the seven challenged statutes." [*i.e.*, the MOSPA vessel routing requirement and three other requirements invalidated on other grounds]). *See also id* at 39, 41 n.28 (noting that "the District Court was correct that Title I authorizes discretionary federal regulation of 'vessel traffic,'" but arguing that it is unclear whether the MOSPA "tank-barge manning requirement could be encompassed within the scope of Title II" or "fairly falls within the coverage of Title I..." (citing *U.S. v. Mass.*, 440 F. Supp. 2d at 36")).

III.   **IF THE COURT CONCLUDES THAT THE UNITED STATES HAS NOT
       EXPRESSLY PREEMPTED THE MOSPA MANNING AND TUG ESCORT
       RULES, THEY ARE NONETHELESS CONFLICT PREEMPTED AND SUBJECT
       TO INVALIDATION UNDER THE PROCEDURES OF RULE 56**

Even if the Coast Guard's revised RNA had not triggered a shift in the applicable analysis

from implied to express preemption, the MOSPA manning and tug escort requirements are still

preempted because they clearly conflict with the Coast Guard's revised RNA and are nonetheless

subject to invalidation by this Court pursuant to Rule 56.

Congress vested the Coast Guard with authority under PWSA Title I to, *inter alia*,

"*control* vessel traffic in areas subject to the jurisdiction of the United States which the Secretary

determines to be hazardous . . ." 33 U.S.C. § 1223(a)(4) (emphasis added).  The structure

Congress devised in enacting the PWSA gives federal authorities discretion to "control" the level

of regulation for Title I subject matters.  As the Court said in *Locke*, when the question is raised

as to which level of government decides what standards are adequate, "[t]he issue is not adequate

regulation but political responsibility; and it is, in large measure, for Congress and the Coast

Guard to confront whether their regulatory scheme, which demands a high degree of uniformity,

is adequate."  529 U.S. at 117.  Therefore, when the Coast Guard affirmatively determines that a

certain level of regulation is adequate and issues rules intended to limit regulation on the subject

accordingly, contrary state action creates a conflict subject to federal preemption under the

Supremacy Clause.

The Court of Appeals outlined the relevant test for conflict preemption as follows:

*Locke's* conflict preemption analysis involves an initial inquiry into whether
federal authority has been exercised through a regulation intended to displace state
law, or by a federal decision of the Coast Guard that there should be no regulation
on the subject in question.  A conflict arises "when compliance with both state

and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." "In this context, Coast Guard regulations are to be given pre-emptive effect over conflicting state laws."

493 F.3d at 8. (citations omitted). When this test is applied to the Coast Guard's revised RNA, the conflicts stand out in bold relief.

The Commonwealth's attempt to establish the manning and tug escort standards for tank vessels in Buzzards Bay creates a conflict because it stands as an obstacle to the stated objectives of federal authorities. Specifically, it stands as an obstacle to the Coast Guard's lawful, stated goal of establishing the exclusive manning and tug escort standards for tank vessels in Buzzards Bay. It also stands as an obstacle to the aim of Congress in giving the U.S. Coast Guard discretionary authority to make affirmative regulatory choices for what constitutes the appropriate level of regulation on Title I subject matters. If such affirmative choices are subject to unilateral displacement by differing state choices, the authority Congress delegated to the Coast Guard is effectively usurped and made subservient to the power of state governments. The controlling precedents make clear that the Supremacy Clause requires just the opposite.

It is essential to distinguish the "obstacle-conflict" asserted here from the view of conflict preemption rejected by the First Circuit as "something resembling a field preemption analysis." 493 F.3d at 16. Under the Circuit's view, a state regulation on a Title I subject matter is not conflict preempted simply because federal authorities have also regulated the same subject.[9] 493 F.3d at 15. The federal and state regulations must actually conflict. *Id.* The "obstacle conflict" asserted here is perfectly consistent with this view. The Commonwealth's manning and tug

---

[9] Although Intervenor-Plaintiffs do not rely for immediate purposes on the broader view of Title I conflict preemption rejected by the First Circuit, we maintain that the broader view is supported by a fair reading of *Ray* and

escort regulations do not create a conflict simply by virtue of their coexistence with federal regulations on the same subject, but rather because they undermine the Coast Guard's affirmative choice to limit regulation to the level specified in its own, manning and tug escort standards. If, for example, the Coast Guard were to issue regulations under Title I that do not embody an affirmative choice in favor of exclusive or uniform rules, or that encourage local derivation at the discretion of states, a state regulation on the same subject—even one that does not mirror federal regulation—could be valid under the circumstances.

The primacy of federal decisions as to the appropriate level of regulation was roundly affirmed by the Supreme Court in *Ray* and *Locke*, as well as by the Court of Appeals. *Locke* informs us, for example, that "[a] federal agency's *choice* in favor of national or regional regulation is a ground for conflict preemption." 529 U.S. at 109-110, cited at 493 F.3d at 17 (emphasis added). The Court of Appeals cited this passage from *Locke* for the proposition that if the Coast Guard had made the affirmative choice to displace local tug escort rules with a uniform, regional rule for the whole Northeast, the Commonwealth's local rule for Buzzards Bay would be preempted. *See* 493 F.3d at 17.[10]

The power of the United States to determine the appropriate level of regulation on Title I subject matters was also affirmed in *Ray* when the Court held that "[t]he relevant inquiry under Title I with respect to the State's power to impose a tug-escort rule is . . . whether the Secretary has either promulgated his own tug requirement . . . *or has decided that no such requirement should be imposed at all.*"). 435 U.S. at 171-172 (*aff'd by Locke*, 529 U.S. at 110) (emphasis

---

*Locke*, and note our intent to challenge the Circuit's interpretation at the appropriate juncture.

[10] The Court of Appeals was unsure whether the Coast Guard actually intended its regional rule to displace local rules like that of the Commonwealth. *Id.* at 18-19. There can be no such uncertainty with regard to the Coast's

added).  The Coast Guard, therefore, may decide that the appropriate level of regulation is no

regulation.  The clear inference, however, is that the Coast Guard may affirmatively choose to

limit regulation on a Title I subject to any given level without concern that its considered, expert

judgment will be undone by discordant state action.  By the same token, the *Ray* Court indicated

that Coast Guard choices in favor of uniform regulation carried preemptive force when it noted

federal tug escort rules being proposed at that time might preempt Washington's escort rules, in-

part, because the Coast Guard rules are "intended to provided uniform guidance."  *See id.* at 172.

   Even in the limited areas where Congress "preserved state authority to regulate the

peculiarities of local waters" under Title I, the preemptive force of Coast Guard determinations

persists. *Locke*, 529 U.S. at 110.  As *Ray* informs, such state regulation survives only "if there

[is] no conflict with federal regulatory *determinations.*"  *Locke*, 529 U.S. at 110 (emphasis

added).  The Coast Guard's judgment takes precedence "even in the context of a regulation

related to local waters," because Congress recognized that "a federal official with an overview of

all possible ramifications of a particular requirement might be in the best position to balance all

the competing interests."  *Id.* (citing *Ray*, 435 U.S. at 177).

   In this case, the Coast Guard has made several carefully measured decisions as to the

appropriate level of regulation for tank vessels traversing the sensitive waters of Buzzards Bay.

As the revised RNA clearly states, its manning and tug escort rules "represent a considered

determination of the appropriate level of regulation to ensure navigation safety and

environmental protection."  72 Fed Reg. at 50,056-50,057.  As such, the Coast Guard determined

that "any other non-Coast Guard schemes relating to vessel routing, manning, and tug escort

---

Guard's intent in the revised RNA.

requirements in Buzzards Bay are preempted." 72 Fed. Reg. 50,057. The Commonwealth seeks to advance just such a scheme.

The Commonwealth's rules frustrate the Coast Guard's purpose in establishing the exclusive tug escort requirements for tank vessels in Buzzards Bay for the obvious reason that they introduce divergent requirements that undermine the Coast Guard's lawful and purposeful regulatory choices. The MOSPA tug escort rule purports to require escorts for both single and double hull tank vessels. Mass. Gen. Laws 21M, § 6 ("no tank vessel carrying 6,000 or more barrels of oil shall enter or transit any area of special interest within the waters of the commonwealth unless the tank vessel is accompanied by a tugboat escort."). However, the Coast Guard expressly exempted double hull tank barges in its revised RNA. 72 Fed. Reg. 50,059 (requiring "each single hull tank barge carrying 5,000 or more barrels of oil or other hazardous material" to be "accompanied by an escort tug," in "addition to its primary tug," as it transits Buzzards Bay."). 72 Fed. Reg. 50,059. As the Coast Guard explains, it has made the "affirmative decision . . . to require an escort tug . . . for all single hull tank barges . . . *but not other vessels*" because "the Coast Guard does not feel it is necessary to require tug escorts for double hull tank barges" given that "[d]ouble hull tank barges provide sufficient protection." *Id.* at 50,057 (emphasis added).

Similarly, the MOSPA manning rules impermissibly conflict with federal regulations. [11]

---

[11] The court did not address in the proceedings above whether the Commonwealth's *manning* rule was conflict preempted because the United States and Intervenor-Plaintiff's focused their argument on the premise that state manning requirements are covered by Title II, and thus field preempted, given that the "manning of vessels" is listed in Title II. See 46 U.S.C. § 3703(a)(4). According to the Court of Appeals, "[t]he United States did not seriously present argument to the district court that if Title I applied, federal regulations preempted the vessel manning requirements," therefore, it suggested the argument should be "made on remand." 493 F.3d at 13/33. Intervenor-Plaintiffs do not recede from their initial position that "manning" is a subject matter expressly and definitively subject to Title II, PWSA, and hence, field preempted under the rationale of *Ray* and *Locke*. Nonetheless, given the

The revised RNA requires "a federally licensed pilot in addition to the normal crew aboard a tug towing a single hull tank barge through Buzzards Bay," and the rule lists among its "affirmative decisions," the judgment "not to require any other modifications to the applicable manning requirements." 72 Fed. Reg. 50,057. The MOSPA manning rule, however, undermines these standards: Like the MOSPA escort rule, it applies to both single and double hull vessels, but furthermore, it calls for "*three* licensed officers or tow vessel operators . . . on a tow vessel whenever the vessel is towing . . . a tank barge carrying 6,000 or more barrels of oil in Buzzards Bay." MASS. GEN. LAWS 21M, § 4 (emphasis added). These and other substantive differences between the federal and state rules make the existence of a conflict unmistakable. Under the conflict analysis outlined by the Court of Appeals, the revised RNA represents a "federal . . . regulation intended to displace state law," and the Commonwealth's divergent rules for manning and tug escorts create an obstacle to the stated purpose of federal authorities to set the exclusive, minimum requirements for tank vessels in Buzzards Bay. Where the state rule applies, the federal rule has been displaced. Under the Supremacy Clause, the federal judgment must prevail.

The Commonwealth urges this Court to adopt a reductive view of conflict preemption in which a state law does not create an "obstacle conflict" so long as the state law arguably promotes the overarching goal of a congressional act—in this case, the PWSA's object of improved vessel safety and environmental protection. *See* Commw.'s Opp. at 24. This is a gross misstatement of the law which, if adopted, would hold federal judgments on how best to implement the PWSA hostage to state judgments, effectively standing the Supremacy Clause on

---

instructions from the Court of Appeals on remand, we argue in this motion that the Commonwealth's manning rules are expressly preempted by the RNA and, alternatively, that the Commonwealth's assertion of manning regulations that depart from federal standards present a fatally defective conflict that invalidates the state action by operation of

its head.  Clearly, if this were a correct statement of the law, the Court of Appeals would have upheld the MOSPA tug escort rule rather than remand the question of whether the Coast Guard intended to displace it.

The Commonwealth's theory also fails for at least two fundamental reasons:  First, the Commonwealth ignores the fact that state action is preempted not only when it obstructs the stated purpose of Congress, but also when it obstructs the purpose of a federal agency in carrying out its delegated duties. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (U.S. 2000) (confirming that state law may "actually conflict" with either "the statute or federal standards promulgated thereunder[.]" citing *Fidelity*, 458 U.S. at 153); *General Motors Corp. v. Abrams*, 897 F.2d 34, 40 (2d Cir. 1990) (holding that "state law is preempted when . . . state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress [*or the federal agency*].'" citing  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (emphasis added).  Congress delegated its authority to regulate the subject matters enumerated in Title I to the Coast Guard, making the intent and purpose of the Coast Guard in regulating Title I subjects a proxy for congressional intent and purpose.  That is why "federal regulations have no less preemptive effect than federal statutes." *Fidelity*, 458 U.S. at 153.

Second, even within the four corners of a congressional act, the ultimate goal is not the only potential basis for obstacle conflict.  State action can also conflict with the purpose of each individual provision in a statute that provides a proximate means to the ultimate end.  For example, in *Geier v. American Honda Motor Co.*, the Supreme Court found that state tort liability for auto manufactures that fail to install air bags created an "obstacle conflict" with

---

the Supremacy Clause.

federal regulations that required some automobiles, but not all, to be equipped with air bags. 529 U.S. 861, 886 (2000). Congress had authorized the Department of Transportation to promulgate minimum auto safety standards for the overarching purpose of reducing injuries and deaths resulting from traffic accidents. 49 U.S.C. 30101. The challenged state causes of action had the same purpose. *See* 529 U.S. at 886. Nevertheless, the Supreme Court found that there was an "obstacle conflict" because state liability frustrated the Department of Transportation's objective in gradually phasing in airbags. *Id.* In other words, states are constitutionally barred from interfering with the specific means a federal agency chooses to reach the ultimate goals of Congress.

In this case, Congress has authorized the Coast Guard to promulgate rules to further the "twin goals" of "vessel safety and protecting the marine environmental." 435 U.S. at 161. The path chosen by the Coast Guard towards the accomplishment of these goals cannot be blocked or diverted by the Commonwealth. Nor can the Commonwealth obstruct the aim of Congress in giving the Coast Guard certain powers vis-à-vis the states to decide the appropriate level of regulation for vessel safety and environmental protection. As argued above, the substantive enactments and overall structure of the PWSA, as interpreted by the Supreme Court repeatedly, manifest a choice on behalf of Congress to give federal judgment priority over contrary state judgment. Therefore, even if the federal government had not expressly preempted the Commonwealth's manning and tug escort regulations for tank vessels in Buzzards Bay, these regulations are clearly conflict preempted because they undermine the lawful, stated objectives of federal authorities.

## CONCLUSION

For the foregoing reasons, the Court should grant Intervenor-Plaintiff's Motion for Summary Judgment, declare the disputed provisions of MOSPA null and void, and permanently enjoin the Commonwealth, Governor Deval L. Patrick, the Massachusetts Department of Environmental Protection, and Commissioner Laurie Burt from enforcing them.

Respectfully Submitted,

C. Jonathan Benner
Jeffrey Orenstein
Troutman Sanders LLP
401 9th Street, N.W. Suite 1000
Washington, D.C. 20004-2134
202-274-2880
jonathan.benner@troutmansanders.com
jeffrey.orenstein@troutmansanders.com

*Of Counsel*

/s/ **Andrew J. Hachey**
Andrew J. Hachey, BBO No. 567183
Nixon Peabody LLP
100 Summer Street
Boston, MA 02110
617-345-1034
ahachey@nixonpeabody.com

*Attorneys for The American Waterways Operators, International Association of Independent Tanker Owners, Chamber of Shipping of America, and BIMCO*

Dated: May 14, 2008.

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non registered participants on May 14, 2008.


Respectfully Submitted,

Jonathan Benner                          **/s/ Andrew J. Hachey**
Jeffrey Orenstein                        Andrew J. Hachey, BBO No. 567183
Troutman Sanders LLP                     Nixon Peabody LLP
401 9th Street, N.W. Suite 1000          100 Summer Street
Washington, D.C. 20004-2134              Boston, MA 02110
202-274-2880                             617-345-1034
jonathan.benner@troutmansanders.com      ahachey@nixonpeabody.com
jeffrey.orenstein@troutmansanders.com

*Of Counsel*

                                         *Attorneys for The American Waterways*
                                         *Operators, International Association of*
                                         *Independent Tanker Owners, Chamber of*
                                         *Shipping of America, and BIMCO*


                                         Dated: May 14, 2008.