UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                              )
THE UNITED STATES OF                          )
AMERICA, et al.,                              )
                                              )
        Plaintiffs,                           )
                                              )
        v.                                    )        Civil Action No.  05-10112-RCL
                                              )
THE COMMONWEALTH OF                           )
MASSACHUSETTS, et al.,                        )
                                              )
        Defendants.                           )
_____)

REPORT AND RECOMMENDATION ON
MOTION FOR A PRELIMINARY AND PERMANENT INJUNCTION

June 6, 2008

SOROKIN, M.J.

        In response to an Order of Reference dated November 27, 2007 (Docket #97), I

recommend that the Plaintiff's Motion for a Preliminary and Permanent Injunction (Docket #91)

be ALLOWED in part and DENIED in part, and that the Court enter a Preliminary Injunction.

I.      INTRODUCTION AND PROCEDURAL HISTORY

        In the wake of an April 27, 2003, oil spill into the waters of Buzzards Bay, the legislature

of the Commonwealth of Massachusetts enacted legislation entitled, "An Act Relative to Oil

Spill Prevention and Response in Buzzards Bay and Other Harbors and Bays of the

Commonwealth" (MOSPA).  M.G.L. c. 21M.  On January 18, 2005, the United States of

America (United States) filed suit, alleging that certain provisions of MOSPA are preempted by

federal law and are therefore unconstitutional.[1]  Docket #1.  The United States and the

Intervenor Plaintiffs (several trade organizations) subsequently moved for judgment on the

pleadings.  Docket #s 22, 29.  On July 24, 2006, this Court allowed that motion, and the

Commonwealth was thereby enjoined from enforcing each of the MOSPA provisions which the

United States had challenged.  Docket #s 74-75; United States v. Massachusetts, 440 F. Supp. 2d

24 (D. Mass.2006) (Tauro, J.).  The Commonwealth appealed as to only three of the MOSPA

provisions enjoined by the District Court's order, and on June 22, 2007, the United States Court

of Appeals for the First Circuit vacated that order as to the three provisions which were the

subject of the appeal, and remanded the case to the District Court for further development of the

record and of the Parties' arguments.  Docket #87; United States v. Massachusetts, 493 F.3d 1

(1st Cir.2007).

Two significant developments have altered the landscape of this litigation since the First

Circuit remanded the case on June 22, 2007 for further analysis.  First, the parties have resolved

their differences as to one of the three provisions which were the subject of the appeal.  As a

result, only two MOSPA provisions remain at issue upon remand: (1) manning regulations for

tank vessels set forth in M.G.L. c. 21M, §§ 4(a) and (b); and (2) tugboat escort requirements for

certain vessels set forth in M.G.L. c. 21M, §§ 6(a) and 6(b).  Second, on August 30, 2007, just

over two months after the First Circuit issued its decision, the Coast Guard promulgated revised

regulations governing certain tank vessels and tug/barge combinations transiting Buzzards Bay.

---

[1]  Although MOSPA applies to waters of the Commonwealth designated as "areas of special interest," a designation which also presently includes Vineyard Sound and Mount Hope Bay (see M.G.L. c. 21M, § 1), the United States seeks to preempt its provisions only as they relate to Buzzards Bay.

<u>See</u> "Final Rule: Regulated Navigation Area; Buzzards Bay, MA; Navigable Waterways Within

the First Coast Guard District," 72 Fed. Reg. 50052 (August 30, 2007) (Final Rule). The Final

Rule was promulgated following the requisite notice and comment period lasting for more than

one year.  It is this Final Rule, rather than the Coast Guard regulations that were previously

reviewed by the First Circuit, that is the subject of the instant motion.  As a result, the issues that

this Court must resolve are somewhat different than those the First Circuit anticipated.  This is so

because the Final Rule: (1) expressly states that it preempts the MOSPA provisions at issue; and

(2) establishes revised tug escort and manning provisions only with respect to Buzzards Bay (the

First Circuit having had before it only a more general Northeast Region regulation that remains

in effect).

     The United States now moves, pursuant to the Supremacy Clause of United States

Constitution and Fed. R. Civ. P. 12 and 65, for a preliminary and permanent injunction enjoining

the Commonwealth's enforcement of MOSPA's tug escort and vessel manning provisions as

applied to Buzzards Bay. Docket #91. The Court heard arguments on December 20, 2007, and

received supplemental post-argument briefs.  The Defendants have opposed the motion on the

merits.[2]

---

[2]Although each Defendant suggests in its written filings that further development of the
factual record is necessary prior to proceeding to judgment on the merits, the Court (Lindsay, J.)
indicated at the October 15, 2007, status conference that during the pendency of the United
States' motion, the Defendants would be permitted "a parallel course to do whatever discovery
you think is appropriate, and if it's necessary to supplement whatever papers you have filed with
whatever you discover with respect to Puget Sound."  Docket #93, at 25.  To date no further
evidence has been made a part of the record (except as attached to the Parties' supplemental
memoranda).

II.    FACTUAL BACKGROUND AND STATUTORY FRAMEWORK

A.    The MOSPA Provisions and Coast Guard Regulations At Issue

1.    Tug Escort Requirements For Tank Vessels

MOSPA requires a tugboat escort for all tank barges transiting Buzzards Bay carrying

more than 6,000 barrels of oil.  The statute provides:

> [N]o tank vessel carrying 6,000 or more barrels of oil shall enter or transit any
> area of special interest within the waters of the commonwealth unless the tank
> vessel is accompanied by a tugboat escort  . . . This section shall not apply to a
> self-propelled tank vessel.

M.G.L. c. 21M, § 6(a) & (b).  The Coast Guard's Final Rule provides that each single hull tank

barge transiting Buzzards Bay carrying 5,000 or more barrels of oil or other hazardous material

must, in addition to its primary tug, be accompanied by an escort tug of sufficient capability to

promptly push or tow the tank barge away from danger in the event of certain described

emergency conditions (e.g., collision or grounding).  72 Fed. Reg. 50052 (August 30, 2007).  All

double hull tank barges remain exempt from the escort requirement.  Id. [3]

The MOSPA tug escort provisions are broader than the Coast Guard's corresponding

regulations in two respects: (1) the federal regulations exempt double-hulled tank barges from

any escort requirements while the MOSPA provisions do not; and (2) the federal regulations are

limited to "tank barges" while MOSPA applies to these barges and to self-propelled vessels less

than 130 feet in length.  Cf. 33 C.F.R. § 165.100 (incorporating the definitions at 157.03) with

---

[3]  In describing the revised regulation, the Government states in its brief that "a double-
hull tank barge transiting Buzzards Bay is exempt from the tugboat escort requirement if it is
being towed by a primary towing vessel with twin-screw propulsion and with a separate system
of power to each screw." Docket # 92, at 7 (citing 72 Fed. Reg. at 50052, 50059).  Such a barge
is exempt, however, simply because it has a double hull.  The Coast Guard regulation, for double
hull barges, imposes no propulsion requirements on the towing vessel.  Id., at 50056.

M.G.L. c. 21M, §1, defining the terms "tank barge" and "tank vessel.")  The revised Coast Guard regulations are broader than MOSPA's provisions in three respects: (1) the federal regulation applies to hazardous materials in addition to oil; (2) the federal regulations require a tug escort for single-hulled tank barges carrying more than 5,000 barrels, while MOSPA applies only to vessels carrying 6,000 or more barrels of oil; and (3) the federal regulations specify certain minimum power requirements for the escort tug.

      2. <u>Vessel Manning Requirements</u>

MOSPA requires that "[t]he navigation watch on all tow vessels transiting Buzzards Bay and carrying 6,000 or more barrels of oil shall consist of at least 1 licensed deck officer or tow vessel operator."  M.G.L. c. 21M, § 4(a).  In addition, for the vessel towing the barge, MOSPA requires: (1) at least one licensed deck officer or tow vessel operator serving exclusively as a lookout with no other concurrent duties; and (2) three licensed officers or tow vessel operators on the vessel whenever it is towing a tank barge.  <u>Id.</u>  The operator must log the lookout's name and duty hours and maintain a record of the crew on board during towing.  <u>Id.</u>  For the tank barge, MOSPA requires two personnel, one of whom must be a "certified tanker-man under 46 C.F.R. subpart 12.20" who shall be on the tank barge at all times when the barge is in Buzzards Bay unless the barge cannot accommodate personnel on board.  <u>Id.</u>, §4 (b). Under the Coast Guard's regulation, a single hull tank barge transiting Buzzards Bay with 5,000 or more barrels of oil or another hazardous material must be under the "direction and control" of a federally licensed pilot, in addition to the vessel's standard crew.  The pilot is required to "embark, direct and control from the primary tug."  72 Fed. Reg. 50052, 50059.

The federal regulations cast a wider net in that they apply to hazardous materials in

addition to oil, and apply at a lower cargo threshold (5,000 barrels versus 6,000 barrels).  72 Fed.

Reg. at 50059, amending 33 C.F.R. § 165.100.  On the other hand, the MOSPA provisions apply

not only to tank barges, but also to self-propelled tank vessels of less than 130 feet.  Id.  Neither

sovereign's law applies to double hull tank barges. Id.; See in particular, M.G.L. ch. 21M,

§ 4(c)(stating failure to comply with manning requirements is a violation of this chapter "unless

such tank barge has a double hull.").

### 3.  Statement of Preemption

After setting forth the revised regulations, the Coast Guard in its Final Rule the following

preemption language:

> The Coast Guard believes that by operation of law and our Agency determination,
> State law is preempted on the subjects covered by this rulemaking. The Coast
> Guard's affirmative decisions: (1) Not to institute mandatory ship routes, but to
> monitor use of the existing recommend [sic] routes via the Vessel Movement
> Reporting System created by this rule; (2) to require a federally licensed pilot in
> addition to the normal crew aboard a tug towing a single hull tank barge thorough
> [sic] Buzzards Bay, but not to require any other modifications to the applicable
> manning requirements; and (3) to require an escort tug in addition to the primary
> tug, for all single hull tank barges transiting Buzzards Bay, but not for other
> vessels; each represent a considered determination of the appropriate level of
> regulation to ensure navigation safety and environmental protection. As such, the
> Coast Guard has determined that any other non-Coast Guard schemes relating to
> vessel routing, manning, and tug escort requirements in Buzzards Bay are
> preempted.
>
> To the extent not otherwise already preempted, this rule is intended to, and does,
> preempt those provisions of Massachusetts' "Act Relative to Oil Spill Prevention
> and Response in Buzzards Bay and Other Harbors and Bays of the
> Commonwealth," ("MOSPA") regarding enhanced manning requirements for tank
> barges and tow vessels in Buzzards Bay, see Mass. Gen. Laws ch. 21M § 4, and
> tugboat escorts for certain waters, see id. § 6. Further, it is the Coast Guard's view
> that, by Operation of Law, MOSPA's provisions regarding mandatory vessel
> routes in Massachusetts waters, see id. § 5; and compulsory State pilotage, see
> Mass. Gen. Laws ch. 103 § 21, are likewise preempted. See U.S. v.
> Massachusetts, 440 F.Supp.2d 24 (D.Mass., 2006), remanded on other

6

grounds--F.3d--, 2007 WL 1775913 (1st Cir., June 21, 2007) (NO. 06-2361, 06-2362).

72 Fed. Reg. 50052-50057.

The earlier iteration of the Coast Guard regulations that were reviewed by the First Circuit did not contain this preemption language.

III.    DISCUSSION

   A.  Standard of Review

To obtain a preliminary injunction against enforcement of the contested MOSPA provisions, the United States must show: (1) that it has a substantial likelihood of success on the merits of its preemption claims; (2) that it faces a significant potential for irreparable harm in the absence of immediate relief; (3) that the balance of possible hardships are in its favor (i.e., that the issuance of an injunction will not impose more of a burden upon the Commonwealth than its absence will impose upon the United States); and (4) that the granting of prompt injunctive relief will promote (or, at least, not denigrate) the public interest. McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir.2001).  The standard for obtaining permanent injunctive relief is virtually identical to that for obtaining preliminary injunctive relief, except that the movant must show actual success on the merits of the claim, rather than a mere likelihood of such success.  Largess v. Supreme Judicial Court, 373 F.3d 219, 223 n.2 (1st Cir.2004).

   B.    Likelihood of Success on the Merits

The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the

supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  United States Constitution, Art. VI, Cl. 2.  The Supremacy Clause gave rise to the doctrine of federal preemption more than one hundred and seventy-five years ago.  See Chicago and N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317 (1981) (citing Gibbons v. Ogden, 9 Wheat. 1, 211, 6 L.Ed. 23 (1824)).

Such federal preemption may occur in several different ways.  State regulation may be foreclosed by express language in a congressional enactment.  Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 541 (2001) (citing Cipollone v. Liggett Group, Inc., 505 U.S. 504, 517 (1992)).  In the absence of such express preemption language in statutory or regulatory schemes, the Congress' intent to preempt all state law in a particular area may nevertheless be implied in one of two ways.  First, it may be implied by "the depth and breadth of a congressional scheme that occupies the legislative field" (field preemption).[4]  Lorillard, 533 U.S. at 541 (citing Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta, 458 U.S. 141, 153 (1982)).  Second, such an intent may also be implied because of a conflict with a congressional enactment (conflict preemption).  Lorillard, 533 U.S. at 541 (citing Geier v. American Honda Motor Co., 529 U.S. 861, 869-874 (2000)).

### 1. Express Preemption

In its June, 2007, decision, the First Circuit anticipated that "[i]t may be that [federal] rules will be forthcoming that will pre-empt the State's present tug-escort rule."  Massachusetts, 493 F.3d at 19 (quoting Ray v. Atlantic Richfield Co., 435 U.S. 151, 172 (1978)).  The Coast

---

[4]  Although the United States has previously advanced field preemption theories in the course of this litigation, its counsel stated at oral argument that it is not (at least for the purposes of the instant motion) arguing that either of the MOSPA provisions at issue are subject to field preemption.

Guard argues that the revised regulations and the express preemption statement obviate the need for a standard conflict preemption analysis because they expressly preempt MOSPA.

As a preliminary matter, it must be noted that federal regulations have no less preemptive effect than federal statutes, and agency regulations may preempt state regulation expressly or by implication. Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 699 (1984). See also Hillsborough County v. Automated Med. Labs, Inc., 471 U.S. 707, 713 (1985) ("We have held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes."). Accordingly, the fact that the Coast Guard's preemption statement is found in its own regulation, rather than an Act of Congress such as the Port and Waterways Safety Act, 33 U.S.C. § 1221 et seq. (PWSA), is of no consequence so long as the Coast Guard has been granted the authority to preempt state provisions. The first issue for the Court to resolve is whether Congress has bestowed upon the Coast Guard the authority to preempt in this manner. A court's inquiry concerning such an exercise of authority by an agency administrator is limited. "If [h]is choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." Fidelity, 458 U.S. at 153-154 (citing United States v. Shimer, 367 U.S. 374, 383 (1961)).

The Coast Guard relies for its authority to engage in express preemption on the Supreme Court's decision in City of New York v. F.C.C., 486 U.S. 57 (1988). The Coast Guard thereby claims not only the authority to displace state laws conflicting with validly-enacted federal regulations, but also to preempt any state efforts to regulate in the same area and thus "render unenforceable state or local laws that are otherwise not inconsistent with federal law." See Id. at

9

64.  The Supreme Court stated that "in proper circumstances [a federal] agency may determine that its authority is exclusive and preempts any state efforts to regulate in the forbidden area."  Id. The federal agency must, however, have a statutory basis of authority because "an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it."  Id. at 66.  Federal statutes may impliedly grant an agency authority to expressly preempt state laws.  The "best way of determining whether Congress intended the regulations of an administrative agency to displace state law is to examine the nature and scope of the authority granted by Congress to the agency." Id.

Congress has granted to the Coast Guard broad authority to promulgate regulations to control vessel traffic, to enhance vessel safety and to decrease environmental hazards.  Title I of the PWSA, which generally addresses matters of local concern, specifically authorizes the Coast Guard to promulgate regulations.  It provides, in pertinent part,

Subject to the requirements of section 1224 of this title, the Secretary--

(1) in any port or place under the jurisdiction of the United States, in the navigable waters of the United States, or in any area covered by an international agreement negotiated pursuant to section 1230 of this title, may construct, operate, maintain, improve, or expand vessel traffic services, consisting of measures for controlling or supervising vessel traffic or **for protecting navigation and the marine environment** and may include, but need not be limited to one or more of the following: reporting and operating requirements, surveillance and communications systems, routing systems, and fairways;

* * * *

(4) may control vessel traffic in areas subject to the jurisdiction of the United States which the Secretary determines to be hazardous, or under conditions of reduced visibility, adverse weather, vessel congestion, or other hazardous

10

circumstances by--

* * * *

(C) establishing vessel size, speed, draft limitations and **vessel operating conditions**; and

(D) **restricting operation, in any hazardous area or under hazardous conditions, to vessels which have particular operating characteristics or capabilities which he considers necessary for safe operation under the circumstances**;

33 U.S.C. § 1223 (emphases added).  In addition, as the First Circuit noted, Title I's Statement of Policy provides: "The Congress finds and declares . . . that increased supervision of *vessel . . . operations* is necessary in order to . . . insure that vessels operating in the navigable waters of the United States shall comply with all applicable standards and requirements for vessel construction, equipment, *manning*, and operational procedures."  <u>Massachusetts</u>, 493 F. 3d at 12, (quoting 33 U.S.C. § 1221(c)(3))(emphasis in original).

Congress amended the PWSA via the Port and Tanker Safety Act of 1978 (Pub. L. 95-474).  The legislative history of this amendment indicates that the Congress sought thereby to improve "the supervision and control over all types of vessels . . . operating in the navigable waters of the United States; and . . . the safety of all tank vessels . . . which transport and transfer oil or other hazardous cargoes in ports or places subject to the jurisdiction of the United States."  H.R. Rep. No. 1384(I), 95th Cong., 2nd Sess. 1978, at 3270.  Particular reference was made by Congress to the need for improvement in "realistic manning standards."  <u>Id</u>.  In implementing the statute's goal, Congress saw fit to "provide the Secretary of the Department in which the Coast Guard is operating with broader and more extensive authority, stated more explicitly."  <u>Id</u>. at 3271.  Finally, the Congress subsequently enacted the Coast Guard Authorization Act of 1998

(PL 105-383), which <u>inter</u> <u>alia</u> directed that by the end of 1998, the Secretary was to promulgate regulations for towing vessel and barge safety for the waters of the Northeast. PL 105-383, § 311(b)(1)(a).[5]

With regard to whether the Coast Guard's extensive authority to promulgate regulations includes the authority to preempt state law, the Supreme Court's rulings in <u>Ray</u> and <u>U.S. v. Locke</u>, 528 U.S. 89 (2000) are instructive. Although both cases dealt with conflict preemption, they nonetheless contain discussions of the authority granted to the Coast Guard by Congress that are highly instructive for purposes of express preemption analysis. The Supreme Court has explained that "[t]he focus of Title I [of the PWSA]. . . is traffic control at local ports." <u>Ray</u>, 435 U.S. at 161. It aims at "prevent[ing] damage to vessels, structures, and shore areas, as well as environmental harm to navigable waters and the resources therein." <u>Id</u>. at 169. In reviewing a State law mandating tug escorts for certain tankers in Puget Sound, the Court opined that the "relevant inquiry" was "whether the [Coast Guard] has either promulgated his own tug requirement for Puget Sound tanker navigation or has decided that no such requirement should be imposed at all." <u>Id</u>. at 171. Because the Coast Guard had, at that time, taken no action, the State law stood. The Supreme Court struck a different Washington state law barring tankers over a certain size from entering Puget Sound because the Coast Guard had addressed the issue. Not only did the Supreme Court rely upon the § 1222(b) analysis applied to the tug escort provision,

---

[5] The Secretary was directed to enact regulations giving effect to recommendations contained in the February 6, 1997, "Regional Risk Assessment of Petroleum Transportation in the Waters of the Northeast United States" issued by the Regional Risk Assessment Team for the First Coast Guard District (or, if any recommendation was not adopted, to provide a detailed explanation).

but it also read the legislative history to indicate that Congress had desired a "single

decisionmaker, rather than a different one in each state" resolving the appropriate size limitations

on vessels, even in particular local waters.  Id. at 177.

The principles applied by the Supreme Court in Ray (i.e.,  that where the Coast Guard

regulates under Title I, so-called higher state safety regulation poses an obstacle to the purposes

of federal law, even absent impossibility of compliance with both, when the Coast Guard intends

to preempt) were reaffirmed in  Locke:[6]

> The Ray Court's interpretation of the PWSA is correct and controlling.  Its basic analytic
> structure explains why federal pre-emption analysis applies to the challenged regulations
> and allows scope and due recognition for the traditional authority of the States and
> localities to regulate some matters of local concern.

Locke, 529 U.S. at 104.

The Locke Court thus made clear that Title I "preserve[s] . . . the historic role of the

States to regulate local ports and waters under appropriate circumstances."  Id. at 108-09.  "There

is no preemption by operation of Title I itself if the state regulation is so directed [at local waters]

and if the Coast Guard has not adopted regulations on the subject or determined that regulation is

unnecessary or inappropriate."  Id., at 109 (emphasis added).  The Locke Court further ruled that

"[t]itle II of the PWSA covers . . . operation, equipping, personnel qualification, and manning of

tanker vessels.  Congress has left no room for state regulation of these matters."  Id. at 111.

(internal citation and quotation marks omitted).

---

[6] Locke reaffirmed Ray even though, in revising the PWSA, Congress had deleted from
the statute the provision of § 1222 that the Court in Ray had relied upon.  A discussion of the
significance of this change appears in Part B(3).  The change does not alter either the express or
conflict preemption analysis as neither turns on implied preemption arising out of either the
statute or the mere existence of a federal regulation.

Plainly, the Congress has bestowed broad authority, including the authority to preempt state law, upon the Coast Guard. A review of the regulations discussed <u>supra</u> leads to the conclusion that the "power delegated to the [Coast Guard] plainly comprises authority to regulate" vessels navigating in United States waterways. See <u>Capital Cities Cable, Inc.</u>, 467 U.S. at 699. The Coast Guard Authorization Act specifically orders the Coast guard to "promulgate regulations for towing vessel and barge safety for the waters of the Northeast" with particular attention to vessels engaged in the transport of petroleum. PL 105-383 § 311(b)(1)(a) (January 27, 1998).

When the First Circuit remanded this matter, it noted that the parties would have the occasion to address, inter alia, "the questions of whether the Coast Guard sufficiently expressed a clear intent to preempt the state tug escort provisions . . . and whether, if so, the Coast Guard's position is clearly inconsistent with congressional intent." <u>Massachusetts</u>, 493 F.3d at 19. The answer to the first question is simply beyond dispute: the Coast Guard's statement of preemption clearly and unequivocally states the Coast Guard's intent that its revised regulations preempt the two MOSPA provisions at issue here. Nor is the Coast Guard's position clearly inconsistent with Congressional intent. In the case of an express preemption claim, the Court also "review[s] whether the agency's decision to preempt constitutes 'a reasonable accommodation of conflicting policies . . . committed to [its] care' and whether 'it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.'" <u>Id.</u> at 16 (quoting <u>Shimer</u>, 367 U.S. at 383). The Coast Guard's accommodation is a reasonable one. Its regulations are broader and more-stringent in some respects than the Commonwealth's, while

less stringent in other respects.  The Coast Guard explained the choices it made and, in particular,

explained its decision not to require tug escorts for double hull tankers in light of the conditions

in Buzzards Bay, the type of protection offered by a double hull and other statutory policies.[7]  For

these reasons, as well as the terms of the statute and legislative history, this is an accommodation

that Congress would have sanctioned.  Accordingly, the United States is entitled to an injunction

because the Final Rule expressly preempts the MOSPA provisions at issue.[8]

---

[7]As the First Circuit noted, the Coast Guard need not demonstrate that the federal regulations best protect Buzzards Bay from oil spills.  See, e.g., Massachusetts, 493 F.3d at 25.

[8]Nonetheless, the Commonwealth challenges the Coast Guard's authority to engage in express preemption arguing this is a specific type of authority Congress did not delegate to the Coast Guard. The record is clear that Coast Guard does not have an express delegation of authority to engage in express preemption.  The Commonwealth contends that the continuing vitality of implied agency authority to engage in express preemption is in doubt (see Docket # 96, at 12- 14) because the legal landscape has shifted since 1998, when City of New York issued.  It asserts that, in more recent decisions, the Supreme Court has taken a more restrictive view of federal administrative authority exercised in the absence of clear statutory delegation.  See Alexander v. Sandoval, 532 U.S. 275, 291 (2001)(restricting agencies' authority to create private rights of action).  Indeed, just last year, Justice Stevens joined by the Chief Justice and Justice Scalia suggested that federal agencies may not engage in express preemption absent Congressional approval or at least that the agencies' judgment on its authority to do so is not entitled to Chevron deference.  Watters v. Wachovia Bank, N.A., 127 S.Ct. 1559, 1582-83 (2007) (Stevens, J. dissenting).  These three Justices parenthetically described City of New York as a conflict, rather than express, preemption decision.  Id., at 1583, n. 24. (The justices in the majority did not reach these issues). The latter point is notable because City of New York is the primary authority the Coast Guard relies upon for its assertion of authority to engage in express preemption.  For purposes of the remand, however, the language of Fidelity Federal (albeit a conflict preemption ruling) and the decision of the First Circuit appear to have settled the question.  The express preemption analysis can also be viewed as a form of conflict preemption, i.e., the preemption of a state statute after a determination that no regulation is appropriate.  In any event, conflict preemption suffices to sustain all the preemption sought.

2.  Conflict Preemption

The Court also finds that MOSPA is conflict preempted.  This determination stands

independently of the Coast Guard's authority to engage in express preemption.  Conflict

preemption operates where (1) "compliance with both federal and state regulations is a physical

impossibility," or (2) where state law  "stands as an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress."  Gade v. National Solid Wastes

Management Ass'n,  505 U.S. 88, 98 (1992) (internal citations omitted). Conflict preemption

analysis involves an initial inquiry into whether federal authority has been exercised through a

regulation intended to displace state law, or by a federal decision of the Coast Guard that there

should be no regulation of the subject in question. Massachusetts, 493 F.3d at 8 (citing Locke,

529 U.S. at 109-110).

Even assuming arguendo that compliance with both the MOSPA provisions at issue and

the Coast Guard regulations issued via the Final Rule is possible (a point upon which the parties

agree), the MOSPA provisions are conflict preempted because they stand as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress.

The Supreme Court has twice decided that Congress granted the Coast Guard the

authority under Title I to establish the proper (as opposed to merely the minimum) level of

regulation under Title I of the PWSA.  In Ray the Court opined that when federal officials'

exercise of regulatory authority "takes on the character of a ruling that no such regulation is

appropriate or approved pursuant to the policy of the statute," state law is preempted.  Ray, 435

U.S. at 178.  Years later, in Locke, the Supreme Court reiterated this holding.  Locke, 529 U.S. at

109-110; see also Massachusetts, 493 F.3d at 8 & n. 9 (recognizing that the Coast Guard may set the appropriate level of regulation or determine that "no regulation at either the state or federal level is appropriate").  That is what the Coast Guard has done in this case.

After a regulatory process that lasted over one year, the Coast Guard recently issued the regulations establishing rules governing tug escorts and vessel manning specifically in Buzzards Bay.  See Notice of Proposed Rulemaking, 71 Fed. Reg. 15,649- 15,656 (Mar. 29, 2006).  As already noted, the Coast Guard possesses the power to make such a judgment – that its regulations shall displace state regulations regarding areas subject to regulation under Title I.  In this case it did.  The Coast Guard's final rulemaking publication states that the tug escort and manning regulations for Buzzards Bay "each represent a considered determination of the appropriate level of regulation to ensure navigation safety and environmental protection.  As such, the Coast Guard has determined that any other non-Coast Guard schemes relating to vessel routing, manning, and tug escort requirements in Buzzards Bay are preempted."  72 Fed. Reg. 50052, 50057.  In the next paragraph, the statement identifies specifically the two MOSPA provisions at issue as preempted.  Thus, the Coast Guard  has made clear its determination that no other rules, specifically the MOSPA provisions at issue in this litigation, may apply –  i.e., that it has set the proper level of regulation.

The MOSPA provisions at issue are an obstacle to the accomplishment and execution of the full purposes and objective of the Congress in enacting the PWSA.  First, the decision of the Coast Guard not to exercise its authority to require tug escorts for double hull tank barges and not to impose the manning requirements set out in MOSPA, in light of the findings accompanying its

Final Rules, has the "character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute." Ray, 435 U.S. at 178. In drafting the regulations, Congress has directed that in carrying out the duties assigned to it under the PWSA, the Coast Guard "shall . . . take into account all relevant factors concerning navigation and vessel safety, protection of the marine environment, and the safety and security of United States ports and waterways, including but not limited to" nine delineated factors. 33 U.S.C. §1224(a) (emphasis added).[9]

The Coast Guard's most recent regulation is more specific to Buzzards Bay (as opposed to a regulation of general application in the Northeast region) and stricter than the earlier, more-general regulation (still in force) which the First Circuit considered. In some respects, it imposes a stricter or higher level of regulation than does MOSPA. For example, it applies not just to oil but other hazardous materials as well. While it does not require tug escorts for double-hulled vessels (something MOSPA does require), the Coast Guard's regulatory statement explained its resolution of this issue. According to the Coast Guard, exempting double hull tankers from the escort requirements adds an incentive to a speedier phase out of the more-dangerous single-hull tankers – a phase out that Congress has mandated by statute. See Docket # 108, at 6. Balancing

---

[9] Those factors are: (1) the scope and degree of the risk or hazard involved; (2) vessel traffic characteristics and trends, including traffic volume, the sizes and types of vessels involved, potential interference with the flow of commercial traffic, the presence of any unusual cargoes, and other similar factors; (3) port and waterway configurations and variations in local conditions of geography, climate, and other similar factors; (4) the need for granting exemptions for the installation and use of equipment or devices for use with vessel traffic services for certain classes of small vessels, such as self-propelled fishing vessels and recreational vessels; (5) the proximity of fishing grounds, oil and gas drilling and production operations, or any other potential or actual conflicting activity; (6) environmental factors; (7) economic impact and effects; (8) existing vessel traffic services; and (9) local practices and customs, including voluntary arrangements and agreements within the maritime community. 33 U.S.C. § 1224(a)(1)-(9).

the potential added safety benefit of escorts for the double hull tankers ("the scope and degree of the risk or hazard involved," 33 U.S.C. § 1224(a)(1)) against the "potential interference with the flow of commercial traffic," 33 U.S.C. § 1223(a)(2), and the "economic impact and effects," Id., at § 1224(a)(7) in light of "vessel characteristics and trends" and "local conditions of geography," Id. at 1224(a)(2) & (3), the Coast Guard concluded that double-hull tankers should pass through Buzzards Bay free of any legal requirement to obtain a tug escort. In particular, the Coast Guard noted that groundings pose one of the primary and unique hazards in Buzzards Bay and that the double-hull construction provides protection from that hazard. Congress delegated to the Coast Guard the authority to engage in the balancing of these and other considerations. Allowing the Commonwealth to override the Coast Guard's judgment in such an instance poses an obstacle to the accomplishments of Congress' purposes in enacting the statute.

Second, the "purpose of Congress is the ultimate touchstone" in every preemption case. Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) (quoting Retail Clerks, 375 U.S. at 103). Title I of the PWSA provides for regulation of vessel traffic, navigation and the marine environment, and communication and navigation equipment. 33 U.S.C., § 1223(a).[10] The PWSA "has as one of its objectives a uniformity of regulation for maritime commerce" but it also preserves, in Title I of that Act, the historic role of the States to "regulate local ports and waters under appropriate circumstances." Locke, 529 U.S. at 108-109. The single regulatory scheme governing Buzzards Bay accomplished by the Coast Guard's preemption of the MOSPA provisions promotes the

---

[10]Originally, Congress authorized but did not require the Coast Guard to act under Title I. Later, Congress directed that by the end of 1998, the Coast Guard was required to promulgate regulations for towing vessel and barge safety for the waters of the Northeast. PL 105-383, § 311(b)(1)(a).

19

statutory uniformity objective of the PWSA.  While the MOSPA provisions at issue govern only

Buzzards Bay (which certainly are "local waters"),  the Supreme Court has noted that "Ray also

recognized that, even in the context of a regulation related to local waters, a federal official with

an overview of all possible ramifications of a particular requirement might be in the best position

to balance all the competing interests."  Locke, 529 U.S. at 110.  Moreover, the vessel traffic

subject to the Coast Guard's regulation – tank barges and tank vessels carrying oil or other

hazardous waste –  is not quintessentially local in nature.  According to the Coast Guard findings

accompanying its most recent regulation, the "vast majority of tug/barge combinations that transit

Buzzards Bay are either traveling from or to New York."  72 Fed. Reg. 50052, 50053**.**

Nonetheless, the Commonwealth argues that the MOSPA provisions at issue advance,

rather than impede, Congress's stated goals of vessel safety and protection of the marine

environment.  Docket #96, at 18-19.  It argues that the only relevant objectives of the PWSA – at

least for purposes of conducting the preemption analysis – are safety and protection of the

environment.  Under this theory, MOSPA, by imposing regulation beyond that imposed by the

federal scheme, "furthers" the protection of the environment and promotes safety. Thus, in the

Commonwealth's view, MOSPA cannot pose an obstacle to the accomplishment and execution

of the full purposes and objective of Congress in enacting the PWSA.

The Court does not accept this theory for several reasons.  Congress did not limit its

objectives to vessel safety and protection of the environment.  As noted, uniformity and

supervision of vessel traffic are also purposes of the statute.  Locke, 529 U.S. at 108-109.

Furthermore, Congress directed that the Coast Guard consider and balance a number of

statutory factors in crafting regulations under Title I of the PWSA, including the degree of risk

and economic harm, and the Coast Guard has done so.  A different balancing of these factors by

the Commonwealth conflicts with the accomplishment of Congress' Title I goals, at least when

the Coast Guard establishes the appropriate (as opposed to minimum) level of regulation.

Finally, the Commonwealth's argument proves too much.  It suggests that the Commonwealth

can always add "further" or "enhanced" regulation.  The Supreme Court rejected this view in

recognizing the authority of the Coast Guard to set the appropriate level of regulation or

determine that no regulation at all is appropriate. Locke, 529 U.S. at 109.

### 3.  1978 Amendments to the PWSA

The First Circuit directed this Court to address on remand the impact, if any, of Congress'

1978 amendments to § 1222 of Title I of the PWSA upon the holding of Ray that because §

1222(b) permitted states to impose higher safety standards only for ''structures,'' this impliedly

forbade higher state standards for vessels. See Ray, 435 U.S. at 174; Massachusetts, 493 F.3d at

15, n. 21.  At the time of the Ray decision, 33 U.S.C. § 1222(b) provided: ''Nothing contained in

this chapter [i.e. Title I of the PWSA] . . . prevent[s] a State or political subdivision thereof from

prescribing for structures only higher safety equipment requirements or safety standards than

those which may be prescribed pursuant to this chapter.'' 33 U.S.C. § 1222(b) (1976).  Relying

upon this language, the Ray court held that since § 1222(b) permitted states to impose higher

safety standards only for structures, this "impliedly forb[ade] higher state standards for vessels."

Ray, 435 U.S. at 174.  Several months later, in 1978, the Congress deleted references to state

safety standards from § 1222, and added a different provision to § 1225 that provides: ''Nothing

contained in this section, with respect to structures, prohibits a State or political subdivision thereof from prescribing higher safety equipment requirements or safety standards than those which may be prescribed by [federal] regulations."  Port and Tanker Safety Act of 1978, § 2, 92 Stat. at 1471–75 codified at 33 U.S.C. § 1225(b).

The First Circuit noted the statutory change and left its significance for consideration upon remand.  <u>Massachusetts</u>, 493 F.3d at 15 n. 21.  The Commonwealth contends that the statutory change repealed or eliminated any previously existing authority the Coast Guard had to engage in express preemption.  Docket #96,  at 13.  The Commonwealth also contends that the legislative change signifies an intent to delete the implied preemption authority found by the Supreme Court in the repealed section.  <u>Id.</u> at 15.  At a later point, the Commonwealth takes the far broader position that the 1978 Amendments "eliminated the preemptive role" that the Supreme Court had accorded Title I in <u>Ray</u>.  <u>Id.</u> at 25 n. 24.

The statutory change in 1978 did not eliminate the preemptive effect, in proper circumstances, of Coast Guard regulations issued pursuant to Title I.  Plainly, <u>Ray</u> relied upon the now deleted language and that portion of the decision must be reconsidered in light of the subsequent statutory changes.  However, <u>Ray</u> did not rely solely on that language.  The Court determined that federal regulations issued under the authority of Title I preempt conflicting state laws even without consideration of the now repealed language of § 1222.

The Supreme Court stated: "even without § 1222(b) we [the Supreme Court] would be reluctant to sustain the Tanker Law's absolute ban on tankers larger than 125,000 DWT" because the federal regulation permitting larger tankers in certain conditions had the "character of a

22

[implied federal] ruling that no such [banning] regulation is appropriate or approved pursuant to the policy of the statute," Ray, 435 U.S. at 178.  Thus, it said "States are not permitted to use their police power to enact such a [banning] regulation."  Id. Tempering the qualification that the word reluctant in the above-quoted language might suggest, the Court concluded its analysis by ruling that "[t]his being the case [that the federal regulation is a judgment as to the proper regulatory balance], we conclude that Washington is precluded from enforcing the size limitation contained in the Tanker Law."  Id.

Several months after Ray, Congress repealed the language in § 1222 and replaced it with the language of § 1225(b).  The new text, perhaps, does not impliedly forbid higher state safety standards for Title I topics as Ray held the old text did.  Notably, however, the Ninth Circuit suggested otherwise.  It stated that Ray's construction of the old text supported the conclusion that the new text also "impliedly forbids localities to regulate *with regard to vessels*."  Beveridge v. Lewis, 939 F.2d 859, 864 (9th Cir.1991)(emphasis in original).[11]  Whether or not the implied statutory prohibition on higher regulation survived the statutory change is not material to the pending Motion (as the Motion does not turn on a statutory prohibition of higher state regulation).  The plain language of the new text does not, by its terms, eliminate the preemptive effect of duly enacted regulations issued under Title I.  It simply does not speak to that issue.

 Congress, in § 1225(b), specifically permitted higher state regulation of structures and, in defining the agency's obligations, instructed it to prescribe "minimum" safety requirements for

---

[11]  Neither party cited to the Court any decisions referencing the new language, other than the First Circuit's notation of the issue in note 21 of its opinion.  Beveridge is the only case the Court located citing § 1225(b).

structures.  33 U.S.C. § 1225(a)(2)(b) & (b).  In the other provisions of Title I, Congress did not contemplate "minimum" federal standards, rather it directed the issuance of "reasonable rules and regulations" without any specific authorization for higher state standards. 33 U.S.C. § 1223(c)(5)(A).  Although the Supreme Court did not reference the 1978 change resulting in the enactment of § 1225 in Locke, the Supreme Court refined and reaffirmed Ray without relying upon the implied prohibition emanating from the repealed § 1222.  In Locke the Supreme Court recognized the important "role for States and localities in the regulation of the Nation's waterways and ports."  Locke, 529 U.S. at 109.  In holding that there "is no preemption by operation of Title I itself" of state laws directed to local circumstances and problems, the Locke court eschewed any reliance on notions of implied statutory prohibition. It defined the analysis under Title I as "one of conflict pre-emption."  Id.  The Court went on to quote and cite the alternative (i.e., unrelated to repealed text in §1222) reasoning of conflict preemption set out in Ray and cited above.  Id. at 109-110.  Plainly, the Supreme Court appreciated the statutory change even though it did not reference it expressly.

       Whatever the implications of the statutory change on other issues, this conclusion is clear: despite the 1978 replacement of § 1222 with § 1225, duly-enacted Coast Guard regulations issued under Title I of the PWSA preempt conflicting state laws. See United States v. Massachusetts, 493 F.3d. at 8.[12]

_____

       [12]  Moreover, the First Circuit noted the potential significance of the statutory change regarding the Coast Guard's argument that a State's regulatory authority does not ever survive the promulgation of regulations under Title I.  Massachusetts, 493 F.3d at 15 & n. 21.  The First Circuit's opinion does not suggest that the statutory change affects Locke's conflict preemption framework which it stated established the governing framework for conflict preemption analysis.

4. <u>Are the Coast Guard Regulations Arbitrary or Capricious?</u>

The Commonwealth asserts that the United States cannot demonstrate a likelihood of success on the merits because even if the Coast Guard has preempted the MOSPA provisions at issue through its own regulations (no matter what preemption model is utilized to analyze that action), those regulations are nevertheless invalid because they constitute arbitrary and capricious action of the Coast Guard.  Docket #96, at 15-16.[13]

A court reviews the validity of administrative agency actions and decisions with substantial deference, and sets them aside only if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." <u>Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n</u>, 59 F.3d 284, 290 (1st Cir.1995) (quoting 5 U.S.C. § 706(2)(A)).  Agency decisions must be "rational" and when an agency departs significantly from its own precedent, "it must confront the issue squarely and explain why the departure is reasonable."  <u>Citizens</u>, 59 F.3d at 290 (quoting <u>Dávila- Bardales v. INS</u>, 27 F.3d 1, 5 (1st Cir.1994)).  Agencies may "refine, reformulate and even reverse their precedents in the light of new insights and changed circumstances," but in changing its course, an agency must supply a reasoned analysis for such change.  <u>Citizens</u>, 59 F.3d at 290 (quoting <u>Dávila</u>, 27 F.3d at 5).

The Commonwealth objects that the Coast Guard has deviated from its past precedent without explanation in that the Coast Guard has previously declined to preempt state law in

---

[13]  This attack upon the facial validity of the regulations presents a slightly different issue than that presented by the Commonwealth's argument that even if the Coast Guard may expressly preempt the MOSPA provisions, that decision must nevertheless be a reasonable accommodation of conflicting policies and must be one which the Congress would have sanctioned (see discussion at pp. 9-15, <u>supra</u>).

similar circumstances, but does not explain within the Final Rule its departure from past practice. The Commonwealth refers first to the Coast Guard's 1982 withdrawal of a proposed federal rule regarding tug escorts in Puget Sound which the Coast Guard had determined was "essentially the equivalent of existing [Washington] State law."  Docket #96, at 16 (quoting 47 Fed. Reg. at 17,971 (April 26, 1982)).  It also points to a 1992 rulemaking requiring tug escorts for certain single hull tankers in Puget Sound in which the Coast Guard stated that it did not "intend to preempt" Washington's tug escort law because "there does not appear to be any substantial conflict." Id. (quoting  57 Fed. Reg. at 30,064 (July 7, 1992) and 59 Fed. Reg. at 42,962, 42,968 (Aug. 19, 1994)).

    The United States points out that unlike the 1994 rulemaking it conducted for Puget Sound, its Buzzards Bay rulemaking was not carried out in response to a congressional mandate. Docket #108, at 3.  The 1994 Puget Sound rulemaking had been mandated by the OPA, which required the Coast Guard to issue regulations requiring escort vessels for single-hulled tankers over 5,000 gross tons transporting oil in bulk in Puget Sound and other waters (but not including Buzzards Bay).  Id. (citing Pub.L. 101-380, Title IV, § 4116(c) (Aug. 18, 1990)).  The 1994 Final Rule indicated that the rule was intended to establish "minimal requirements for escort," and that "the Coast Guard does not intend to preempt the states from issuing more stringent requirements provided they are not in direct conflict with Federal law or this rulemaking."  59 Fed. Reg. at 42,968.  The Coast Guard did not address escort requirements for tank barges or double-hulled tankers in the 1994 Puget Sound rulemaking because its intent therein was limited to addressing the OPA statutory mandate, which did not concern such vessels.  Docket #108-2, at ¶ 3.  In contrast, the United States argues, the 2007 rulemaking concerning Buzzards Bay was an

exercise of the discretion committed to the Coast Guard by Title I of the PWSA, in which it

determined the proper level of regulation via its own Ports and Waterways Safety Assessment

and by which it intended to preempt state regulation of the same subject matter.  72 Fed. Reg. at

50,056 - 50,057.

The history of the Coast Guard's rulemaking in this case reveals extensive consultation

with governmental and other representatives of affected constituencies and reflects consideration

of the views expressed in that consultation process, as set forth below.  In the Final Rule, the

Coast Guard described a "Ports and Waterways Safety Assessment (PAWSA), which was

conducted by a cross-section of key Buzzards Bay waterways users and stakeholders."  Id.  A

group of such waterway users/stakeholders was convened at a two-day structured workshop

designed inter alia to identify major safety hazards, estimate risk levels, evaluate potential

mitigation measures, and to set the stage for implementation of regulations.  Id.  One suggestion

contained in the PAWSA report was the establishment of requirements for escort tugs.  Id.

On October 26, 2004, the Coast Guard published an Advanced Notice of Proposed

Rulemaking (ANPRM), stating that it was considering amending the existing RNA for the First

Coast Guard District to require tug escorts and use of recommended routes within Buzzards Bay,

and seeking comments on the proposal.  69 Fed. Reg. 62,427 (October 26, 2004).  Forty written

comments were received, and two public meetings were held at which one hundred and twenty-

seven speakers offered comments.  71 Fed. Reg. at 15,651.  The Coast Guard also discussed the

proposed rules with representatives of the ten Massachusetts municipalities who responded to the

Coast Guard's solicitation of comments, as well as from the Commonwealth's Department of

Environmental Protection.  72 Fed. Reg. at 50,057.

Concerning the proposed tug escort requirement, the Coast Guard received comments expressing concerns about both the cost and availability of escort tugs of sufficient capability. Id. It interviewed representatives of the maritime industry and conducted a Regulatory Evaluation, concluding thereafter that escort tug capacity was sufficient to meet the projected demand, especially because that the demand for escort tugs will decrease over time as progressively fewer transits of Buzzards Bay are made with single hull-tank barges. Id.; 46 U.S.C. § 3703a.

Other comments responding to the ANRRM expressed concern that the proposed escort tug requirement could exacerbate the danger by requiring additional vessels in the constrained channels of Buzzards Bay and the Cape Cod Canal. Id. The Coast Guard found that the proposed regulation would not increase the danger, citing primarily the fact that the proposed regulations also instituted a Vessel Movement Reporting System (VMRS) "that would provide for monitoring of all tug and tank vessel traffic in the Bay, and would provide an opportunity for the Coast Guard to issue advisories should traffic be congested to a point that adversely affects navigation safety." Id. at 15,651-15,652.

The Coast Guard also considered and rejected a comment's proposal that "rescue tugs" be strategically stationed as an alternative to escort tugs, noting that an evaluations of the potential benefit of rescue tugs in Puget Sound had described them as "a high-cost, low-benefit alternative as they have little or no capability to prevent collisions, allisions, or groundings, which is a primary goal of this proposed rule." Id. at 15,652.

Comments submitted in response to the ANPRM also argued that the "crewing requirements" for tugs towing barges were inadequate. Id. The Coast Guard concurred, and in response to those comments proposed in its March 29, 2006, Notice of Proposed Rule Making

(NPRM) an additional requirement that a federally-licensed pilot, in addition to the crew, advise the master and assist in the navigation of the vessel.  Id.  It also proposed therein amending the First Coast Guard District's RNA to require that all single-hull tank barges carrying 5,000 or more barrels of oil or other hazardous material and being towed through Buzzards Bay be accompanied by an escort tug between the west entrance to Buzzards Bay and the east end of the Cape Cod Canal.  Id.  The Coast Guard also evaluated anticipated costs associated with escort tugs and federally licensed pilots and found those costs to be reasonable when balanced against "the benefits realized by the avoidance of vessel casualties and oil spills." 71 Fed. Reg. at 15,651.

In explaining its decision to require escort tugs for single-hulled tank vessels, but not to extend that requirement to double-hulled tank vessels (as is done by the MOSPA provisions at issue), the Coast Guard noted that it had received both written comments and a request from the Commonwealth urging that the requirement for escort tugs should apply to double hull tanks vessels in addition to single hull tank vessels.  72 Fed. Reg. at 50,054.  It then reasoned that (1) an extension of the regulation to double hulls was "not necessary" because double hulls provide sufficient protection against the dangers presented by local conditions (i.e., by groundings and a rocky bottom) and because no double-hull tank barge grounding in Buzzards Bay had ever produced a major oil spill.  Id.  It added that the manning and escort provisions when combined with mandated participation in a newly-created Vessel Movement Reporting System (VMRS) constituted "a redundant vessel accident and pollution prevention system." Id., at 50,055.

Specifically with regard to the manning requirements, the Coast Guard noted that three members of the Massachusetts congressional delegation requested that the federal regulations contemplated provide for provisions similar to those of MOSPA with regard to, inter alia, the

manning provisions.  Id.  It found that the regulation was sufficient to address the

representatives' concerns, emphasizing that other federal regulations "comprehensively regulate

manning and watchstanding on tank vessels and tugs" and noting that federal regulations also

specifically require tankers to have at least two licensed deck officers on watch on the bridge.  72

Fed. Reg. at 50,055 (citing 46 C.F.R. 15 and 33 C.F.R. 164.13(c).  Given the extensive

consultation with affected constituencies and the consideration given to competing policies and

interests, the Court finds that the Coast Guard's actions in enacting its regulations were not

arbitrary or capricious.

> The Commonwealth's assertion that the Coast Guard has the failed to explain why it

promulgated the rule is unsupported.  Unlike the situation presented by the MOSPA provisions at

issue, the 1992 federal rule applying to Puget Sound was actually more stringent than the existing

Washington state law in that the federal rule lowered the minimum size of tankers required to be

escorted.  57 Fed. Reg. at 30,059.  Moreover, the decision to establish only minimum level of

regulation in Puget Sound in the early 1990s followed by a decision in 2007 (after a different

regulatory process) to establish the appropriate level of regulation in Buzzards Bay "hardly

constitutes a 'long-standing and well-established practice deviation from which might justify

judicial intervention.'"  Carter/Mondale Pres. Comte., Inc. v. FEC, 775 F.2d 1182, 1185-86 (D.C.

Cir. 1985) (quoting Vt. Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 543 n. 17 (1978)).

> B. Remaining Factors Supporting Injunctive Relief

> For the reasons already delineated, the Court finds that in the absence of injunctive relief

precluding the enforcement of the MOSPA provisions at issue, the United States will suffer

irreparable harm in that the Congress' purpose in enacting the PWSA and in entrusting to the

Coast Guard judgments concerning the proper level of regulation to advance that statute's goals will be thwarted.  The same rationale supports a finding that the balance of possible hardships is in the United States' favor, and that allowance of the United States' motion will promote the public interest.

At this time, this Court recommends that the District Court enter a preliminary injunction rather than a permanent junction because the final administrative record has not been filed.  If the Court accepts this recommendation and after the record is filed,  the United States may file a motion to convert the preliminary relief to a permanent injunction and the Commonwealth may oppose such a motion.

<u>CONCLUSION</u>

For the foregoing reasons, I recommend that the Plaintiff United States of America's

Motion for Preliminary and Permanent Injunction (Docket #91) be <u>ALLOWED</u> in part and

<u>DENIED</u> in part.  The Motion should be <u>ALLOWED</u> insofar as it seeks a preliminary

injunction.[14]

    ____/s / Leo T. Sorokin_____
    UNITED STATES MAGISTRATE JUDGE

---

[14]The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. <u>See</u> <u>Keating v. Secretary of Health and Human Services</u>, 848 F.2d 271 (1st Cir.1988); <u>United States v. Emiliano Valencia-Copete</u>, 792 F.2d 4 (1st Cir.1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603 (1st Cir.1980); <u>United States v. Vega</u>, 678 F.2d 376, 378-379 (1st Cir.1982); <u>Scott v. Schweiker</u>, 702 F.2d 13, 14 (1st Cir.1983); <u>see</u> <u>also</u>, <u>Thomas v. Arn</u>, 474 U.S. 140, 106 S.Ct. 466 (1985).