# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, et al .CIVIL ACTION NO. 05-10112-RCL
      Plaintiffs          .
                             .
      V.                    .BOSTON, MASSACHUSETTS
                             .DECEMBER 20, 2007
THE COMMONWEALTH OF MASS., et al.
      Defendants          .
      . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LEO T. SOROKIN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Intervenor plaintiffs:    Andrew J. Hachey, Esq.
                            Nixon Peabody, LLP
                            100 Summer Street
                            Boston, MA  02110
                            617-345-1034
                            ahachey@nixonpeabody.com

                            C. Jonathan Benner,Esq.
                            Troutman Sanders, LLP
                            Suite 1000
                            401 9th Street, NW
                            Washington, DC  20004
                            202-274-2880

 For the USA:                Steven Y. Bressler, Esquire
                            U.S. Department of Justice
                            Civil Division
                            P.O. Box 833
                            Washington, DC  20044
                            202-514-4781
                            Steven.bressler@usdoj.gov

***MARYANN V. YOUNG***
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

```
For the Commonwealth:              Pierce O. Cray, Esq.
                                   Seth Schofield, Esq.
                                   Attorney General's Office
                                   Room 2019
                                   One Ashburton Place
                                   Boston, MA  02108-1698
                                   Pierce.cray@state.ma.us
                                   Seth.schofield@ma.us
For the Coalition for Buzzards
  Bay:                             Jonathan Ettinger, Esq.
                                   Elisabeth DeLisle, Esq.
                                   Foley Hoag
                                   155 Seaport Boulevard
                                   Boston, MA  02210
                                   617-832-1000
                                   jettinger@foleyhoag.com
```

Court Reporter:

Proceedings recorded by digital sound recording, transcript produced by transcription service.



3

1                          **I N D E X**

2    Proceedings                                                3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                      **P R O C E E D I N G S**

2          COURT CALLED INTO SESSION

3              THE CLERK:  Today is December 20th.  The case of

4    United States v. the Commonwealth of Massachusetts, Civil

5    Action 05-10112 will now be heard before this Court.  Counsels,

6    please identify themselves for the record.

7              MR. BRESSLER:  Steven Bressler with the U.S.

8    Department of Justice Civil Division on behalf of the United

9    States, the plaintiff.  With me at counsel table is Captain

10   Fred Kenney, K-E-N-N-E-Y, First District Legal Officer for the

11   Coast Guard.

12             THE COURT:  Okay.  Good afternoon, Mr. Bressler, and

13   Mr. Kenney.

14             MR. HACHEY:  Andrew Hachey, Nixon Peabody, on behalf

15   of the intervener plaintiffs.  With me is Jonathan Benner from

16   Troutman Sanders, also for the intervenor plaintiffs.

17             THE COURT:  Okay.  Benner or Brenner?

18             MR. BENNER:  Benner, Your Honor.

19             THE COURT:  Benner.  Okay.  Good afternoon.

20             MR. BENNER:  Good afternoon.

21             MR. CRAY:  Good afternoon, Your Honor, Pierce Cray,

22   Assistant Attorney General for the Commonwealth.  With me is

23   Seth Schofield, also an Assistant Attorney General in the

24   Environmental Protection Division.

25             THE COURT:  All right.  Good afternoon, Mr. Cray and

5

1    Mr. Schofield.

2           MR. ETTINGER:  Good afternoon, Your Honor, Jonathan

3    Ettinger from Foley Hoag for the Coalition for Buzzards Bay.

4    With me is Elisabeth DeLisle also from Foley Hoag.

5           THE COURT:  Okay.  Good afternoon.  Well, Mr.

6    Bressler, it's your motion so I'll hear you first.  I've read

7    your papers – two I have from you, right, memo and a

8    supplemental memo?

9           MR. BRESSLER:  Yes.

10          THE COURT:  And I have from Mr. Cray an opposition

11   and a supplemental opposition.  And them from the intervenor

12   coalition I have a memorandum.  There isn't a memorandum I

13   missed that's from Mr. Benner or Mr. Hachey of from you, is

14   there?

15          MR. BRESSLER:  No, there is not.

16          THE COURT:  Okay.  All right.  So, go ahead.  Let me

17   actually, now that I told you to go ahead, start with my first

18   question.  I want to see if I understand the issues correctly.

19   You're proceeding under Title, at this moment, not in the

20   litigation generally but at this moment on this motion under

21   Title I, right?

22          MR. BRESSLER:  That's right, Your Honor.  The parties

23   agree that - there are two provisions at issue--

24          THE COURT:  Yep.

25          MR. BRESSLER:  --now remaining in the litigation, the

6

1   tug escort provision that the state put forth which all

2   parties agree is governed under Title I and the Manning

3   provision.  The United States believes that Title II applies

4   there but there's no need to get to that.  If it was Title II

5   we all agree it would be field preempted.  Assuming Title I

6   applied as the Commonwealth argues, we are now arguing that it

7   is preempted under the most recent rule as well.

8           THE COURT:  So for these purposes it's simply a

9   decision on Title I preemption.

10          MR. BRESSLER:  That's correct.

11          THE COURT:  And if you lose you might come back on as

12  to the Manning on Title II or overlap for something but you say

13  Title I now only.

14          MR. BRESSLER:  That's right, Your Honor.

15          THE COURT:  Okay.  Now--

16          MR. BRESSLER:  Title I on both.

17          THE COURT:  --the First Circuit, one question I have,

18  as the First Circuit said, they use a word that - I take notice

19  so, must, as in the district court must engage in overlap

20  analysis when it comes back, and is that - they say, this is on

21  page 13 of the published opinion if you have that copy, with

22  regard to the Manning requirement before us, however, the

23  district court must undertake an overlap inquiry including a

24  full consideration of the various lock factors.  Further,

25  development of the record is an order resolve this point.  Is

7

1   it your view that the Title I analysis is sufficient there

2   because, I mean, I guess the question is is the overlap

3   analysis sort of inapplicable now because you're only

4   proceeding on Title I for the moment?

5          MR. BRESSLER:  Yes, Your Honor.  I think, I mean in

6   context must means because we say Title II and they say Title I

7   therefore its not enough to just as Judge Tauro did and we

8   believe properly of course, but as Judge Tauro did, to say,

9   yes, Title II that there needed to be further development and

10  therefore that had to happen.  But because we're saying it's

11  preempted either way--

12         THE COURT:  So is overlap analysis just something to

13  employ to determine whether to engage in Title II, field

14  preemption analysis or Title I conflict preemption analysis?

15         MR. BRESSLER:  Yes, Your Honor.

16         THE COURT:  Okay.  All right.  Okay, so what do you

17  think as a general matter you have to show to prevail under

18  Title I?

19         MR. BRESSLER:  I think to prevail under Title I--

20         THE COURT:  Simply that you said preemption so that

21  your intent is clear and that it's not inconsistent with

22  clearly expressed congressional intent?

23         MR. BRESSLER:  Yes, Your Honor, that the Coast Guard

24  has either issued a regulation or decided that there shouldn't

25  be a regulation like the Commonwealth has.  That it's clearly

8

1   the First Circuit said you haven't given us enough on conflict

2   preemption or for us to know your intent here based on the

3   earlier portions of the administrative record so we need more,

4   we need a clearer statement.

5           THE COURT:  To know whether the Coast Guard – in

6   other words they said you haven't clearly expressed your intent

7   to preempt.

8           MR. BRESSLER:  Correct.

9           THE COURT:  All right.  And now you say we've done

10  it, we said we intend to preempt, we do preempt in the federal

11  register.

12          MR. BRESSLER:  Yes.  And they've done it through

13  notice and comment rule making that is clearly authorized under

14  Federal I of PWSA and the extensive authority that Congress had

15  vested the executive branch, the secretary and the Coast Guard

16  under that title.

17          THE COURT:  And then second you just have to show

18  that it's not the inconsistent but clearly expressed

19  congressional intent and then you're done?

20          MR. BRESSLER:  Yes.

21          THE COURT:  What about what they say about the Court

22  would review whether the decision to preempt constitutes a

23  reasonable accommodation to conflict in policies.  Are you

24  familiar with that section of the opinion?

25          MR. BRESSLER:  Yes.  I would think that that is

9

1   essentially dovetails with a rational basis test under the APA

2   and arbitrary and capricious review and that in light of the

3   clearly expressed congressional intent has the United States

4   done something that has a rational basis and that isn't in

5   conflict with clearly expressed congressional intent?

6          THE COURT:  Do you really think they're the same?  I

7   mean here's the reason I ask the question.  I'll just tell you

8   what I'm thinking.  It seems, I'll wait to hear from Mr. Cray

9   too, but it seems like you've pretty clearly said you intend to

10  preempt.  I'm not sure how much clearer you can say it than

11  expressly saying it as you did, but, and is it inconsistent

12  with clearly expressed congressional intent?  That's a pretty

13  deferential standard to you.  But then whether it constitutes a

14  reasonable accommodation of conflicting policies that seems to

15  me to be a certainly more rigorous analysis then clearly, than

16  inconsistent but clearly expressed congressional intent.  And

17  it seems to suggest looking at something different than merely

18  statutes, which is what the first part would suggest an

19  analysis of.  So that's what I'm wondering about.  I mean and

20  I'm not sure you addressed that particularly in your papers.

21         MR. BRESSLER:  Yes, but we did not, we didn't file a

22  reply because we, none was allowed under the local rules and

23  did not see the need to file a reply.  So we didn't really

24  respond to the arguments raised in their oppositions.

25         THE COURT:  You can respond now if you want.

10

1          MR. BRESSLER:  I would like to.  I think a

2    reasonable accommodation of conflicting policies in those cases

3    it does mean, you know, is this the better, originally better

4    than what they're doing?

5          THE COURT:  Sure.

6          MR. BRESSLER:  The First Circuit explicitly says--

7          THE COURT:  Right.  I understand that.

8          MR. BRESSLER:  --let's not deal with that.  I think

9    it dovetails with the APA arbitrary and capricious standard

10   Title 5, U.S. Code Section 706, is it arbitrary and capricious

11   and the use of discretion otherwise not in accordance with the

12   law.  And as the First Circuit has held and the Supreme Court

13   has held that standard of review is a narrow one where, again,

14   the Court doesn't substitute its judgment.  It says is this, is

15   what the agency has done rational and has it provided a

16   rational explanation for what it's done?

17          Here, in terms of taking first the tug escorts, the

18   United States has said we're going to go this far but no

19   farther.  We think that is the appropriate balance.  The reason

20   that we're going to go this far is because Buzzards Bay is kind

21   of shallow and rocky.  There have been groundings due to human

22   error.  That has been the cause of the oil spills that we've

23   had there before therefore a tug escort on a single hulled

24   vessel will help prevent that and prevent the human error that

25   would cause that.

11

1          On a double hulled vessel there's never been an oil

2    spill from a double hulled vessel in this water.  The double

3    hull itself in combination with the other things we're doing

4    provides enough protection and for that matter if you look

5    through the administrative record you can see that there – I

6    mean and when I say that we haven't filed the administrative

7    record yet but if you look just at Federal Register notices its

8    clear there's also a concern of not crowding up the bay, not

9    having too many vessels there so that the helpers become a

10   hindrance.  The Commonwealth may not agree with all that.

11          THE COURT:  Second part of the escort requirement

12   implies that their regulation required even in a little lower

13   threshold of size barge that required an escort as well.  One

14   difference is the double hull.

15          MR. BRESSLER:  Yes.

16          THE COURT:  They require it with a double hull and

17   you don't.

18          MR. BRESSLER:  Yes.

19          THE COURT:  And you start at 10,000 and they start at

20   6,000 and so the six to 10,000 is a difference too?

21          MR. BRESSLER:  I think we start at six and they start

22   at five.

23          THE COURT:  Oh, so it's just the difference between

24   five and 6,000.

25          MR. BRESSLER:  Yes.

12

1          THE COURT:  Okay.  All right.  Yeah, Mr. Cray, is

2     there--

3          MR. CRAY:  Actually, I think it is five and six but

4     they're actually five and we're actually six.  We're actually a

5     little higher.

6          THE COURT:  Oh.

7          MR. BRESSLER:  Okay.

8          THE COURT:  Okay.

9          MR. BRESSLER:  Yes.

10          THE COURT:  So the only difference there is the

11     double hull?

12          MR. BRESSLER:  Right.  The only difference is the

13     double hull.  As the Coast Guard has expressed, they're also

14     trying – there's a federal law that's phasing out single hulled

15     barges by 2015.  The Coast Guard doesn't have the authority to

16     just do that by FIAT sooner than Congress said.  But here in

17     Buzzards Bay what's the Coast Guards doing also provides an

18     incentive for ship owners to move more quickly to double hulled

19     vessels cause then they don't need to higher a tug escort.  And

20     what the Commonwealth has done obliterates that incentive.  But

21     the primary reason is simply that what the U.S. is doing is the

22     appropriate amount of regulation.  The Coast Guard has decided

23     to go this far and no farther.  Congress has clearly over the

24     last seventy some years, and really since the founding of the

25     Republic, given a great deal of deference to the United States

13

1   in setting Maritime rules.  There's certainly no presumption

2   against preemption as the First Circuit held and that therefore

3   what the United States has done is reasonable, is not contrary

4   to any clearly expressed congressional intent and it's

5   preempted.

6           THE COURT:  What about these differing, well it's

7   different positions or regulations in different parts of the

8   country that sound substantially similar to the Commonwealth's

9   regulation which mesh with what sounds like substantially

10  similar other regional regulations of the Coast Guard but which

11  the Coast Guard did not elect to preempt.

12          MR. BRESSLER:  Well, I wouldn't say there are really

13  many in different parts of the country.  There is--

14          THE COURT:  It sounds like, from what I understand

15  swirling about, there's four, San Francisco, L.A., Puget Sound,

16  three I guess or in San Diego, made in four.

17          MR. BRESSLER:  Under Title I a state can do what it

18  wants and it's not preempted unless there is some affirmative

19  decision by the federal government.  Here the federal

20  government has made an affirmative decision.  For whatever

21  reason it didn't make, it never made that decision in San

22  Francisco or LA.  I think the Commonwealth is trying to argue

23  that there was a decision that there is no conflict between the

24  Puget Sound tug escort rule and the federal one.  So that's the

25  only one--

14

1      THE COURT:  This rule here is applicable only in

2   what amounts to the New England region.  It's the Coast Guard

3   region but it's roughly New England waters.

4      MR. BRESSLER:  Yes.  Well there's a New England

5   regional rule the First Coast Guard district regulated

6   navigation therein.

7      THE COURT:  That's 165 100.

8      MR. BRESSLER:  Exactly.  And the most recent rule

9   modifies that essentially as to Buzzards Bay.  So it is

10  narrower.

11     THE COURT:  Okay.  So the Buzzards Bay Rule that

12  preempts, that states the Coast Guard's clear intention to

13  preempt is applicable only in Buzzards Bay.

14     MR. BRESSLER:  Right.

15     THE COURT:  Are there other special interest waters

16  as defined under state law.  Is that a state law term, Mr.

17  Cray, special interest waters?

18     MR. CRAY:  Yes, Your Honor, with respect to the tug

19  escort.  And there are two other ones the statute defines,

20  Vineyard Sound and Mount Hope Bay.  And I should note that the

21  federal, the new federal regulation that Mr. Bressler's relying

22  upon only addresses Buzzards Bay.  It doesn't--

23     THE COURT:  Right.

24     MR. CRAY:  --address the other two.  So we would be

25  subsequently arguing that certainly even if one accept

15

1   everything Mr. Bressler is saying about his new, their new

2   regulation, vis-a-vis Buzzards Bay provides no basis for

3   striking the state statute vis-a-vis Vineyard Sound--

4          THE COURT:  And Mount Hope.

5          MR. CRAY:  --and Mount Hope Bay.  That should remain

6   open for further proceedings.

7          THE COURT:  So that's right as to right now; is it

8   not?  The motion you have is premised for so far just on, not

9   so far - the motion that you filed is premised only on the new

10  regulation and the new regulation is applicable only in

11  Buzzards Bay, right?  I mean, I guess what I'm really saying is

12  wouldn't that mean as to the Commonwealth's regulation and to

13  those two other spots that would have to proceed for now under

14  normal - it wouldn't be resolved by the Court's ruling on this

15  motion since this regulation, you've only moved under this new

16  regulation and that's only applicable in Buzzards Bay.

17         MR. BRESSLER:  Could I have one minute--

18         THE COURT:  Sure.

19         MR. BRESSLER:  --Your Honor?

20     PAUSE

21         MR. BRESSLER:  Essentially that's correct, Your

22  Honor.  I would just add that in 1998 when the Coast Guard

23  promulgated the entire First--

24         THE COURT:  First Coast Guard district?

25         MR. BRESSLER:  --District RNA, regulated navigational

16

1   area, at that time they considered tug escorts for Buzzards

2   Bay and decided not to require them then.  They've now amended

3   that to require them.  So they're amended the regional rule to

4   add a new requirement for Buzzards Bay but the bottom line in

5   answering Your Honor's question is, no, this wouldn't preempt

6   the states rules, tug escort rules in the sound.

7          THE COURT:  That would await either further

8   litigation in this case that sort of following up on what the

9   First Circuit said or if the Coast Guard's contemplating some

10  new regulation they impose some new regulation then the

11  application of that new regulation and how it affects the state

12  statute regulations or not.

13         MR. BRESSLER:  That's right.

14         THE COURT:  Okay.  All right.

15         MR. BRESSLER:  If I may--

16         THE COURT:  Go ahead.

17         MR. BRESSLER:  --Your Honor had asked about, what

18  about these other--

19         THE COURT:  Yes.

20         MR. BRESSLER:  --laws and my first point was even

21  arguably there's only one because there's only one where the

22  Commonwealth is saying that there has been an affirmative

23  decision.  They've asked for I guess discovery on what the

24  Coast Guard did 15, 20 years ago, but looking at the public

25  record does not reflect any affirmative decision except

17

1    arguably in Puget Sound as to whether or not there was a

2    conflict.  The Coast Guard just did not act.  And I don't

3    think, I mean it's like a decision whether or not to prosecute.

4    I think that's committed to the United States discretion.

5         THE COURT:  Is this kind of issue susceptible for the

6    following analogy that, tell me if I'm correct as I go along,

7    you, Coast Guard takes the position, has the authority to I'm

8    going to call it speed limits but tug escort requirements.

9    They have the authority to impose the tug escort requirement if

10   they want to.  If they don't, it's Title I.  For now we're only

11   in the Title I world.  So if they don't impose the tug escort

12   requirement under Title I, then the state is free within

13   whatever authority it has to act or not act as it chooses and

14   it wouldn't run into a preemption vis-a-vis your regulations

15   cause you haven't acted.

16        If you choose to act, you could choose to act and

17   impose a tug escort requirement that said tug escorts are

18   required essentially for anything over what you said, anything

19   over 5,000, is it tons, and 5,000 tons provided it's not a

20   double hull.  All right.  And you could, whether – you could

21   expressly disclaim any preemptive effect absent, I mean clearly

22   you would preempt in the case of a physical impossibility

23   conflict.  But other than that as to imposing a higher standard

24   of regulation, you could expressly disclaim regulation

25   preemptive effect of your regulation or you could not address

18

1  that.  And they could act in that area and if ultimately the

2  Court determines that whatever your position you took that

3  there wasn't a preemptive effect outside, preemptive effect of

4  the, of a higher standard then they could regulate it and it

5  could coexist and or you could elect to exercise authority you

6  say you have to affirmatively preempt saying not only do we say

7  this much is required but we say anything more would conflict

8  with the obstacles of our regulation.  And that's essentially

9  what your position is today that that's what you've done in the

10 latest regulation?

11        MR. BRESSLER:  Yes, that's our position and I think

12 obviously the United States and the Coast Guard is a good

13 source for learning what its purposes are and what would be an

14 obstacle to these purposes.

15        THE COURT:  And so then you're saying these would be

16 the other places — are you saying that to the extent that the

17 record is silent, the rule making record in those other places

18 as to whether or not you affirmatively intended to preempt, are

19 you saying it's not inconsistent in San Diego if this is the

20 case in San Diego to have a similar Coast Guard regulation to

21 this one but not to have it preempt.  It's not a statutory

22 preemption.  It's a decision to be made in each instance when

23 you regulate it?

24        MR. BRESSLER:  Yes, that's right.  And it is a

25 decision that — there has been no about face.  I mean well

19

1    there has been an about face in that.  As I said in 1998 the

2    United States said tug escort rules are not appropriate for

3    Buzzards Bay and now in 2007 they've said they are appropriate

4    and they've explained that in notice and comment rule making.

5    Now, if tomorrow they turned around and said no they're not,

6    and didn't provide any information, I think that would be a

7    problem because they've just done an about face.  But when

8    you're talking about another situation, another body of water

9    on the other side of the country and something that happened 15

10   years ago it's not the kind of about face that poses an

11   administrative law.

12           THE COURT:  Well is there – does it suggest an issue

13   if what, I don't know exactly what they're arguing but if this

14   is what they're arguing that there's been a history for a long,

15   15 years, a long period of time, of recognizing, deferring to,

16   allowing, what have you, local state regulation of particular

17   water areas and allowing them to impose this kind of tug escort

18   requirement provide it doesn't affect tanker operations

19   elsewhere and doesn't reach beyond the particulars of local

20   waters and there is some basis in the local orders to do it

21   that there's been a long standing policy of the Coast Guard to

22   permit that kind of regulation and then to reverse field by

23   affirmatively in one situation a preempting as opposed to a

24   uniform across the board decision where it might be a

25   government agency responding to national uniformity or new

20

1  executive considerations, that that would be suggestive of a

2  problem.

3          MR. BRESSLER:  Well--

4          THE COURT:  That's essentially what they're arguing I

5  think.

6          MR. BRESSLER:  That's what they're arguing and I

7  would say that that is akin to saying that if Your Honor goes a

8  week, I don't know if you do, you know, bail hearings, but if

9  Your Honor does a week conducting bail hearings and gives

10  everyone bail, came in on, you know, a certain charge and then

11  somebody comes in on a similar charge and Your Honor finds a

12  reason to deny bail that's not arbitrary and capricious.  It's

13  a case by case analysis effect.

14          THE COURT:  No, but you know what they'll say to me.

15  They'll tell me, Judge, Monday, Tuesday and Wednesday you

16  allowed bail on these cases.  The charges were the same, they

17  were substantially similar.  It's not fair.  It's not right.

18  You know, these people stand in the same shoes and you should

19  apply to them uniformly and if that was the law and that's the

20  determination, it ought to be the same determination here.  And

21  I think it would put it to me of one of two things; either I

22  would need to sort of being able to explain though why there's

23  something different about those that therefore they're not

24  meaningfully similar or they would appeal to a higher

25  authority, which there are many, and that higher authority

1   would ask me that question and it would engage in that kind of

2   analysis.

3           So I guess that's sort of the question, right?  I

4   mean just because you did it doesn't mean that it controls, but

5   does it invite the question of is there something meaningfully

6   different that warrants different treatment or is this rubric

7   of analysis, you know, incorrect?

8           MR. BRESSLER:  Well, there's a process for bringing

9   up that kind of complaint in notice and comment rule making.

10  It's making comments, making--

11          THE COURT:  Right.

12          MR. BRESSLER:  --it a part of the record.

13          THE COURT:  Right.

14          MR. BRESSLER:  And then if that's a significant

15  issue, then the agency will explain itself.  I'm not aware of

16  comments that said, you know, this isn't fair because it's too

17  much like, you know, it's like somewhere else this way, this

18  way and this way.  I'm not saying it would be dispositive if

19  there were, but--

20          THE COURT:  Right.

21          MR. BRESSLER:  --basically it's too late to say that

22  now.  They can file a petition for rule making and say, you

23  know, this is unfair because of what you did there.

24          THE COURRT:  Can they say it's arbitrary and, could

25  they say here it's arbitrary and capricious on this theory as

22

1    evidenced by positions the rules taken there even if they

2    didn't participate to that extent in the rule making?

3        MR. BRESSLER:  Well, they can say that.  They have

4    said that--

5        THE COURT:  Well--

6        MR. BRESSLER:  --but I think we would, you know--

7        THE COURT:  --we wouldn't say anything but you know

8    what I mean.  Can they say it with merit?  What's their

9    response to that, that's what I mean?  I mean, is that you

10   didn't bring it up in the administrative proceedings so, as my

11   law school professor has said to me, too bad, so sad or is it,

12   is there some other answer to it?

13       MR. BRESSLER:  Well, I think if it was so closely

14   related that it was obvious then that might be the case.  If we

15   were talking about, again, Buzzards Bay and what they've been

16   doing in Buzzards Bay for some time and there was an

17   unexplained about face but there's no policy here.  There was

18   no nationwide policy of tug escort requirements are okay.

19       THE COURT:  Okay.

20       MR. BRESSLER:  To the contrary, that was obviously at

21   issue in I think both in the *Ray* and also the *Locke* cases in

22   1972 or whenever and--

23       THE COURT:  Right.

24       MR. BRESSLER:  --2000 involving Washington state.

25   And this is a fact intensive process looking at what is

23

1  appropriate regulation.  The facts may change but it's just,

2  it's not a continued line where there is an about face.  It's

3  two separate lines.  If the Coast Guard issued a rule tomorrow

4  changing things in Puget Sound, then I think it would have to

5  explain itself.  If there was a body of water absolutely

6  identical in every way to Puget Sound where they were doing

7  something different, maybe that would be a closer question but

8  this is not a body of water identical in every way to Puget

9  Sound.

10        THE COURT:  How does the regulatory decision here

11 turn on the peculiarities of Buzzards Bay?

12        MR. BRESSLER:  Well again, Buzzards Bay is, it's

13 shallow, it's rocky as the Coast Guard expressed in the Rule.

14 Human error and groundings have been the cause of problems in

15 the past.  That is solved by a double hull particularly along

16 with a federally licensed pilot and the movement reporting

17 systems so that the Coast Guard can be watching where vessels

18 are and what they're doing to help avoid collisions.  And in

19 terms of groundings, that is a much more serious threat to a

20 single hull vessel because there's not another layer of

21 protection there and that's why there are tug escorts there.

22 But again, to require them for everything would remove the

23 incentive to move toward double hulls and to require them for

24 everything would crowd the bay more and it would just not be

25 necessary as the Coast Guard found.

24

1          THE COURT:  Okay.  What about the statutory change

2  that happened between the time of the Supreme Court's decision

3  in *Ray* and now, the one that the First Circuit noted in their,

4  this is on in footnote 21 which begins on page 15 but they--

5          MR. BRESSLER:  Yes.

6          THE COURT:  --actually note it on page 16.

7          MR. BRESSLER:  Yes, I recall that.  I would say two

8  things to that.  One we said in our papers, which is *Locke* came

9  after *Ray* and *Locke* reaffirmed Ray.  So for this Court or the

10  First Circuit that should be, for anyone with the Supreme Court

11  that should be the end of the matter but it's not just *Locke.*

12  Locke also recognized that in the Oil Pollution Act of 1990

13  Congress reaffirmed *Ray* and the preemptive scope of the Coast

14  Guard's authority.

15          I would also say that something not addressed in

16  either of our papers but the legislative history to those 1978

17  amendments belie what the Commonwealth is claiming.

18          THE COURT:  Do you think Justice Scalia would think

19  it would be okay for me to read that?

20          MR. BRESSLER:  Justice Scalia, given what he said,

21  may not, but you're not Justice Scalia so I'm going to argue it

22  regardless.  Two things, first, the general purpose of the

23  legislation in 1978, and this is at, it's a House Report that

24  at the 1978 volume of the U.S. Code and Congressional

25  Annotative News, pages 3270 through 71, "that the purpose of

25

1    the legislation was to provide the Coast Guard with broader

2    and more extensive authority stated more explicitly to address

3    problems such as the safety of all 10 vessels foreign and

4    domestic."  So it increased the Coast Guard's authority.

5            As to the specific claim that the change to the

6    section talking about waterfront structures versus vessels was

7    significant, the legislative history there is in I think the

8    same House Report 1978 USCCAN page 3283, makes it clear that

9    the waterfront safety provision in the new section 1225 that

10   the Commonwealth relies on is a specific recognition with

11   respect to structures and only with respect to structures

12   quoting again, that states, "employable subdivisions thereof IN

13   cases within their jurisdiction they prescribed higher safety

14   and equipment requirements and those prescribed by the

15   secretary."  So it still is dealing only with structures not

16   with the vessels and that's what the Supreme Court said in Ray,

17   states have more authority with respect to their regulation on

18   things to protect the safety of waterfront structures and

19   vessels and that is just what Congress said in the report in

20   1978.  And again, it makes sense that they weren't contracting

21   the Coast Guard's power because the overall purpose of the Act

22   is to increase the Coast Guard's power.

23           THE COURT:  Okay.  One last question I have for you,

24   there was a lot of questions, is there anything else that you

25   wanted to address before I turn to Mr. Cray that I didn't give

26

1   you the chance to because I was asking – you don't have to

2   have anything else, but I just want to give you the chance

3   since I didn't give you the chance to even say anything before

4   I started asking you questions.

5           MR. BRESSLER:  Sure, I think I would just say again

6   what the First Circuit said was, you know, there may be a

7   conflict here.  You haven't argued it sufficiently.  You

8   haven't expressed it enough.  There may be a regulation that

9   comes out that preempts this stuff and that is exactly what

10  happened.  Under *Locke* and *Ray* the Coast Guard can act.

11  Congress reaffirmed Ray with the Oil Pollution Act of 1990

12  except in the context not relevant here.  The Coast Guard has

13  acted pursuant to not clearly and consistent with that

14  authority and just on the face of the record what it has done

15  is reasonable.  Factual findings with respect to things that

16  the Coast Guard did 15, 20, 25 years ago or more to the point

17  things it didn't do are not going to change the fact that what

18  it did here is reasonable and consistent with, certainly not

19  clearly inconsistent with congressional intent.

20          THE COURT:  Okay.  Mr. Cray?

21          MR. CRAY:  Thank you, Your Honor.  Obviously from our

22  papers we take a broader view of what the standard is than what

23  Mr. Bressler has articulated.  It's fair to say his papers, the

24  bulk of their attention is a new theory of expressed preemption

25  that had not previously been advanced in the case and indeed I

27

1    don't believe the Coast Guard had advanced even as far back as

2    *Ray.*  So for 29 years the law had been conflict preemption and

3    that's the rubric that the First Circuit addressed it in.

4              They also address--

5              THE COURT:  But suppose it's conflict preemption--

6              MR. CRAY:  Yes, Your Honor.

7              THE COURT:  What would they need to show in order –

8    they need to show basically that the obstacles of their

9    regulation are impeded in some material way by your regulation

10   in order to have yours be conflict preempted, right?

11             MR. CRAY:  I'm not sure that's what they would

12   argue--

13             THE COURT:  Is that what you would argue though?

14             MR. CRAY:  --but that's part of it.  What - we would

15   argue the various questions you asked Mr. Bressler as to what

16   the First Circuit said we would agree those are things they

17   need to show.  We also feel--

18             THE COURT:  That is, one, that – well you agree

19   they've clearly expressed in this new regulation as to Buzzards

20   Bay their intents a preempt?

21             MR. CRAY:  Yes, but we don't say validly for the

22   reasons in our counterclaim but--

23             THE COURT:  But--

24             MR. CRAY:  --I would agree that they're certainly

25   trying to say that.

28

1           THE COURT:  Okay.  And so do you think it's

2    inconsistent with clearly expressed – you think they have to

3    then show it's not inconsistent with clearly expressed

4    congressional intent.

5           MR. CRAY:  Yes, Your Honor.

6           THE COURT:  And then that it's a reasonable

7    accommodation of the conflicting policies and that it's not a

8    position that Congress, one that Congress would have

9    prohibited.

10          MR. CRAY:  All of that, Your Honor, plus, and I would

11   direct specifically the Court to page eight of the First

12   Circuit's position, all that plus what Judge Lynch referred to

13   as standard conflict preemption analysis.  And that's the usual

14   standard of either physical impossibility or obstacle to, as

15   stating as an obstacle to purpose, effectuation of purpose.

16   And it specifically would be in the F.3d version--

17          THE COURT:  Yep.

18          MR. CRAY:  --in the second full paragraph the third

19   sentence of that.

20          THE COURT:  What does the sentence begin with?

21          MR. CRAY:  It says, "rather state law in areas within

22   the province"--

23          THE COURT:  Well--

24          MR. CRAY:  --"of Title I"--

25          THE COURT:  Right.

29

1      MR. CRAY:  --"are subject to standard conflict

2  preemption analysis ordinarily"--

3      THE COURT:  All right, so they said that your state

4  law and regulation as to Buzzards Bay stands as an obstacle to

5  the accomplishment and execution of the full purposes and

6  objective of Congress or in this case the Coast Guard

7  effectuating what Congress delegated to them in that among

8  other things they have made a determination that double hulls

9  don't require, and that's what we're talking about in the tug

10  escort, double hulls are fine.  That there's already single

11  hulls are going to be eliminated in 2015, this is an incentive

12  that creating barges, having tugs for all these people is going

13  to clog up an already busy waterway and therefore create more

14  hazard then needed especially given these other safety

15  provisions they put in place and that on balance that this

16  appropriate and this is one where they think the balance should

17  be struck here and no more.  Why wouldn't that be sufficient to

18  say that therefore requiring more will be an obstacle?

19      MR. CRAY:  Okay, well let's first start both with

20  what the statutes, it's purposes are.

21      THE COURT:  All right.

22      MR. CRAY:  Title I's purposes are set out in 33

23  U.S.C. Section 1221 and they are annunciated as vessel safety

24  and environmental protection.  They are not national

25  uniformity.  That does not appear in the statute.

30

1        THE COURT:  Right.

2        MR. CRAY:  Similarly in this 2007 rule making that's

3   at issue in this motion, the Coast Guard again relied upon

4   those two basic purposes, navigational vessel safety and

5   environmental protection.  It did not say a reason for imposing

6   this was for preemption or anything else was uniformity.  So

7   our basic position has been that our, and this is that our law

8   further advances both of those goals.  Their judgment is, and I

9   think this is a fair reading of what their actual, what appears

10  in the Federal Register, their judgment is, is this much and no

11  farther, we don't think this is sufficient, the words in the

12  Federal Register were sufficient.  I don't believe I read

13  anything about it being affirmatively dangerous or creating an

14  affirmative hazard which I agree would be a horse of an

15  entirely different color.  Instead it's basically that, Judge,

16  we feel this is enough.  At most, that's simply a prediction of

17  what future risk might or might not be.  It's not inconsistent

18  with either the goal behind the regulation or certainly the

19  statutory goal for the state to say we'd like to give a little

20  extra protection.  That indeed was what the Coast Guard

21  originally itself contemplated in its 2004--

22        THE COURT:  But in 1224, 33 U.S.C. 1224 it says,

23  "that in carrying out its duties and responsibilities the

24  secretary shall consider various factors."  I have a copy if

25  you want to look at it if you don't have it.  And it lists the

31

1    scope and the degree of risk or hazard involved, but among

2    other things it lists that economic impact and effects, this is

3    1224(a)(7).

4              MR. CRAY:  Yes, Your Honor.

5              THE COURT:  So why isn't that, I mean – and number

6    one, the scope and degree of the risk or hazard involved

7    sufficient, that's a word that suggests that at some point the

8    scope and degree of the risk or hazard involved is diminished

9    sufficiently to be resolved and economics.  I mean, why isn't

10   that a consideration then that they can take into account and

11   therefore say even though your statute perhaps promotes more

12   vessel safety and perhaps promotes more environmental

13   protection that they're entitled to balance it that way and

14   preempt?

15             MR. CRAY:  My response, Your Honor, would be that all

16   of those nine listed factors have to be construed in

17   conjunction with the prefatory language in A, "which all

18   relevant factors concerning navigation vessel safety and

19   protection of the marine environment."  So for example, 7, I

20   don't view that economic impacts and affects given that

21   prefatory language that economic impact and effects is recently

22   construed as cost to the industry.  I view it as what would be

23   the economic impact of the damage of an oil spill or the damage

24   to a vessel.  So I think that all of that laundry list has to

25   be read in conjunction with the prefatory language in 1224(a)

32

1   which is also what is specifically stated right at the start

2   of Title I in 1221 as the purposes.

3           THE COURT:  Do you think they can ever say, absent

4   them saying requiring the trade off of benefit for tug escort

5   for a double hull verse the clogging the waterways is – that

6   trade off isn't worth it because the clogging the waterway

7   poses a greater risk than the safety benefit, that would be

8   reasonably something they could fairly weigh.  Putting that

9   aside cause if you say they didn't put it in the register and I

10  take it what you're saying is therefore they can't rely on it

11  now, that's your theory?

12          MR. CRAY:  That's my best recollection of the

13  register.  It doesn't – this theory--

14          THE COURT:  And if it's not in there you're saying

15  then I can't, its not one of those things that the lawyers can

16  develop now.

17          MR. CRAY:  Absolutely, Your Honor.

18          THE COURT:  So it's not like rational basis analysis?

19          MR. CRAY:  No, we would call that post talk

20  litigation rationalization.

21          THE COURT:  Okay.

22          MR. CRAY:  It's not adequate.

23          THE COURT:  All right.  So even if I accept that –

24  are you saying then that in the zone of just trade offs that

25  they can't ever preempt by saying it's sufficient.  That if

33

1  you--

2          MR. CRAY:  That's--

3          THE COURT:  --if you want to go further, they've got

4  99.9% of the risk eliminated by there's a .1% risk if you will.

5  I'm not saying this is that, this case is that--

6          MR. CRAY:  I understand, Your Honor.

7          THE COURT:  --but that you could do that and they

8  can't say it's 99.9 is sufficient and preempt you out of that

9  .1?

10          MR. CRAY:  Under Title I that would be our--

11          THE COURT:  Under Title I.

12          MR. CRAY:  That would be, yes, that – that what

13  Congress has said what the purposes are, it's to protect.  And

14  all the state's trying to do is to protect.  And it's not, it's

15  inconsistent with the basic congressional purpose for the Coast

16  Guard--

17          THE COURT:  You could never be an obstacle if all

18  you're doing is protecting more?

19          MR. CRAY:  Correct, you're protecting – exactly.

20  That's our core position and it's directly grounded in both the

21  statutory language and on the reasoning as to why they say that

22  they are doing this the 2007 rule which I would there

23  specifically cite the court to the Federal Register, 72 Federal

24  Register page 50,053 as to where I, that's where I read that as

25  the purpose.

34

1      So, but now still stepping back just to make clear

2  why we feel because the Coast Guard Act perhaps because they

3  anticipated the difficulty in making this obstacle the purpose

4  argument, their papers actually don't advance that contention.

5  Their claim instead is we don't have to deal with it.  All we

6  have to show is an adequate statement of intent that meets the

7  additional standards that Your Honor in your colloquy with Mr.

8  Bressler set out.

9      THE COURT:  You mean the reasonable accommodation

10  of--

11      MR. CRAY:  Right, all of that.  They don't have to

12  deal with the traditional conflict preemption test.  That's

13  been their problem throughout this case.  They can't satisfy

14  the traditional conflict preemption test.  They ordinarily, as

15  here, haven't even argued it.  Their basic goal has been to

16  find a way around it.  They argued at length before the First

17  Circuit that all they had to say were the things that your

18  colloquy with Mr. Bressler said.  But the First Circuit in our

19  view didn't accept it.  And there were four specific pages I'd

20  like to direct the Court's attention to that support that.

21  First and foremost would be what we said on page eight, the

22  sentence that I first referenced to where they talk about

23  standard conflict preemption analysis.  And then if you go to

24  the other, the second right hand column on page eight it spells

25  out the traditional test, physical impossibility.

35

1          Now also on page eight, and to us even equally

2   important, is if you go back to the First column, the carry

3   over paragraph from the first to second column is where the

4   First Circuit first starts to get into the idea of an adequate

5   expression of intent.  And if you note it says in the second

6   line there, an initial inquiry.

7          THE COURT:  I'm sorry, I'm missing where you're--

8          MR. CRAY:  I'm sorry.  So if you go, if this is on

9   page eight of the F.3d version--

10         THE COURT:  Yep.

11         MR. CRAY:  --the paragraph that starts up in the

12  right, I'm sorry, the left hand column at the bottom, starts

13  Locke's conflict--

14         THE COURT:  Yes.

15         MR. CRAY:  --preemption analysis--

16         THE COURT:  I see that.

17         MR. CRAY:  --involves an initial inquiry.  That is a

18  very carefully chosen adjective because Judge Lynch repeats it

19  later on at page 18 of the decision where again she was

20  discussing at length these additional inquiries.  But at page

21  18 this would be the first left hand column, first full

22  paragraph, starting more generally--

23         THE COURT:  The initial question is whether the Coast

24  Guard has expressed an intent to preempt.

25         MR. CRAY:  Right, where he says initial question.

36

1   So, and then, fine.  Additionally, if the Court turns to page

2   19 the right hand column, the first full paragraph there saying

3   under these circumstances where it talks about the remand, and

4   there it certainly does talk about the sufficient clear intent,

5   but it says, and this is in the context of the Title I tug

6   escort challenge, in the second sentence, the parties should

7   have the opportunity to address among other issues.  So the

8   whole premise of the Coast Guard's conflict – let me--

9             MR. BRESSLER:  I think you missed a word.

10            MR. CRAY:  I'm sorry.  Other issues.

11            MR. BRESSLER:  Among any other issues.

12            MR. CRAY:  Any other issues.  So the whole premise of

13   the Coast Guard's position is that the only question is has it

14   adequately and sufficiently expressed its intent?  Our view is

15   the First Circuit's very clear, that is only the initial

16   question.

17            THE COURT:  So what are the questions you think have

18   to be addressed.

19            MR. CRAY:  All--

20            THE COURT:  One, whether they've – the initial

21   question, right, of expressing intent.

22            MR. CRAY:  As the Court developed with Mr. Bressler.

23            THE COURT:  Right.  Then what?

24            MR. CRAY:  Either physical impossibility or obstacle

25   to purpose.

37

1          THE COURT:  All right.

2          MR. CRAY:  Those are the two prongs of the

3   traditional conflict.  So they have to both satisfy what the

4   Court went through with Mr. Bressler and one of the two

5   traditional prongs of the standard conflict preemption

6   analysis.  I mean, Judge Lynch used the phrase standard

7   conflict preemption analysis.  Physical impossibility is

8   something that they've never argued the First Circuit itself

9   made light of at page 19.  I don't think that's there before.

10  I think the real focal point under the traditional analysis--

11         THE COURT:  Was obstacle.

12         MR. CRAY:  --would be the obstacle part.

13         THE COURT:  So you say if they can show intent and

14  obstacle they win and if they can't, they lose.  And you say

15  they lose because yours is only to promote the environment and

16  the vessel safety and those are the only purposes that,

17  permissible purposes as a general matter for them to regulate

18  and the only bases in fact stated for the regulation and the

19  rule making and therefore all you're doing is more and you're

20  not an obstacle to accomplishing those goals.  And that the

21  countervailing balancing considerations aren't ones that they

22  might – they're not ones that are obstacles within the meaning

23  of the statute.

24         MR. CRAY:  Yes, Your Honor.  We also have additional

25  arguments that if the Court were to accept that standard

38

1  conflict preemption analysis was still applicable and simply

2  was did they adequately address it?  Did they adequately say

3  they really wanted to preempt?  We also have arguments in the

4  brief as to why--

5          THE COURT:  Why didn't they adequately say they

6  wanted to preempt?

7          MR. CRAY:  I mean that – again, we concede they are

8  trying to say that.  We have claimed on the counterclaim that

9  it's not a valid statement of intent for a variety of reasons.

10 First, they don't satisfy either under the Court, Your Honor's

11 formulation with Mr. Bressler the, for example take the

12 inconsistent but clearly expressed congressional intent.  Our

13 view is congressional intent is clearly expressed in Section

14 1221.  The purposes are vessel safety or environmental

15 protection.  For the same reasons we argued under the obstacle

16 prong of conflict because standard analysis our right advances

17 those purposes so therefore to preempt them and strike it down

18 would be inconsistent with what is specifically laid out in

19 Section 1221 as clear intent.  For the same reason when they

20 talk about an accommodation of conflicting purposes, I've read

21 several of the cases.  I believe what the Court's referring to

22 in that formulation is conflicting state and federal

23 objectives.  Here, again we feel even under that standard there

24 is no conflict because the federal goal is protection.  That's

25 ours as well.  They're both going in the same direction.

39

1          Finally, the additional grounds that are the basis

2     of our counterclaim is aside from those we feel that the state

3     both the statement in the regs preamble and the reg itself,

4     it's a statement necessarily is sort of built upon, both

5     violate the APA because each are arbitrary and capricious.  In

6     a nutshell our challenge to the statement of preemption being

7     arbitrary and capricious is because it provides no explanation,

8     our main argument is it provides no explanation for the

9     inconsistent treatment of all of the tug escort rules, state

10    supplemental tug escort rules on the West Coast.

11          There are some, again, Mr. Bressler is now at counsel

12    table advancing explanations they don't appear in the

13    regulation itself.

14          THE COURT:  What do I have before me as to what those

15    rules are and what the state of the--

16          MR. CRAY:  We'll give you various citations to

17    judicially noticeable state statutes--

18          THE COURT:  All right.

19          MR. CRAY:  --or Federal Register sections.  I'm

20    sorry--

21          THE COURT:  Go ahead.

22          MR. CRAY:  But specifically with respect to Puget

23    Sound the one in particular I want to pay the most attention to

24    is its 1992 statement.  And there it would be 57 Federal

25    Register at 30,064.  There again as I read it, the description

40

1  there, my recollection is that you have, again, a federal rule

2  of single hull, of tug escorts for single hulls and then a

3  state requirement of tug escorts also for double hulls,

4  basically the same structure that's laid out here.

5        If Your Honor refers to that specific page it says it

6  doesn't intend to preempt.  Even though it's putting in a

7  single hull escort rule, it doesn't intend to preempt the

8  supplemental state requirement because it says, here I do have

9  the quote, "there does not appear to be any substantial

10  conflict."  Well, I don't know what the difference is between

11  the East Coast and the West Coast.  Is it some difference in

12  the salinity of the sea water?  I don't know what it is and no

13  one does.  The Coast Guard hasn't provided any explanation and

14  it simply isn't rational for it to have stated that with

15  respect to Puget Sound.  I believe the Puget Sound regulation

16  is still in effect and indeed you do have these additional

17  variant escort requirements up and down the West Coast in

18  various harbors and while they maybe haven't specifically

19  blessed them like they did the Puget Sound one they still are

20  allowing them to exist.  And I don't think it takes a, I don't

21  know if the Court's question is was there a specific comment

22  addressing this in the proceeding.  I can't answer that right

23  now.  I can say that in this litigation before the federal rule

24  came out before the First Circuit there was extensive back and

25  forth letter writing between the parties on this very point.

41

1   It didn't, had not come to the Attorney General's attention.

2   We hadn't discovered these variant West Coast practice until

3   after the First Circuit argument spun and we brought it to the

4   Court's attention then.  They responded.  So certainly the

5   Coast Guard was on notice of this as a major point of concern.

6           We don't think there needed to be a comment, that

7   this - of such a basic 180 degree turn in practice was enough

8   for them to need to address as to why.  But, so that's one

9   argument why the preemption statement is arbitrary and

10  capricious.  It's in our counterclaim it'll be teased out.  I'm

11  sure they'll have a dispositive motion coming.  They're talking

12  about--

13          THE COURT:  Do you think the failure to raise that in

14  the notice and comment period part of the rule in some way

15  affects the merits of that claim?

16          MR. CRAY:  I'm not sure.  First of all, I'm not sure

17  factually if it was or wasn't raised.  I can't respond

18  definitively one way or the other.

19          THE COURT:  Okay.

20          MR. CRAY:  Secondly, we certainly would be arguing

21  that this basic 180 degree turn in practice doesn't need to be

22  a comment.  They have an obligation to the citizens of

23  Massachusetts - (inaudible - #4:01:47) - to explain why they're

24  doing things so differently in one place vis-a-vis another.

25  But that will be, I'm sure that will be the subject of they're

42

1  going to be filing, responding and I'm sure will be

2  dispositive motions on February 15th.  I'm sure that'll be drawn

3  out then.  But certainly at this stage we would urge the Court

4  not to, above all, grant an interlocutory relief when there is

5  in the least a very open question as to the validity--

6          THE COURT:  What's the February 15th date?

7          MR. CRAY:  When we filed the counterclaim it was an

8  assented motion as I recall to simply get the counterclaim on

9  file--

10         THE COURT:  Right.

11         MR. CRAY:  Part of that agreement was that they would

12 have a perfectly adequate period of time until February 15th to

13 file their--

14         THE COURT:  And to file responsive pleading.

15         MR. CRAY:  --their Rule 12 response, correct, Your

16 Honor.

17         THE COURT:  I see.  So February 15th is the deadline

18 for their answer or their motion to dismiss.

19         MR. CRAY:  Correct.

20         THE COURT:  I see.  Okay.

21         MR. CRAY:  And so that will be.  Now the counterclaim

22 also brings into question the legitimacy of the underlying reg

23 itself.  What I previously was going at was the, we think the

24 preemption statement which is in the preamble, not the reg

25 itself--

43

1          THE COURT:  Right.

2          MR. CRAY:  --but in the preamble part of the Federal

3   Register, we're saying that's arbitrary and capricious.  We're

4   also saying, we're also challenging the regulation itself as

5   arbitrary and capricious and therefore any preemptive statement

6   based upon it would collapse on itself because it's built upon

7   a regulation that itself is not valid.  In our, we have several

8   arguments I believe for the challenge to the regulation as

9   arbitrary and capricious but the biggest one is that there's

10  not an adequate explanation of why they didn't extend the

11  protection, the double hulls which is what they had allowed the

12  state of Washington to do by itself, what they were initially

13  thinking of doing in 2004 even as regards Buzzards Bay.  The

14  2004 advance notice, the first thing they put out vis-a-vis

15  Buzzards Bay talked about all laden barges.  I believe perhaps

16  about a certain weight but basically didn't have the single

17  hull, double hull distinction.  That went away in the actual

18  proposed rule and stayed away in the final one.  There were

19  comments brought to the Coast Guard's attention during the rule

20  making and Mr. Ettinger can address them more fully about a

21  very serious oil spill in the Gulf Of Mexico involving a double

22  hulled vessel that I believe was 30 million gallons or a very

23  large amount.  The Coast Guards response or they didn't address

24  what had happened in the Gulf of Mexico.  They simply said,

25  relied on the fact there hadn't yet been a spill in Buzzards

44

1  Bay.  With respect, we think that harkens back to the old and

2  often criticized common law tort rule that if you had a dog

3  that bit someone else you couldn't be sued unless you had

4  already been aware the dog was dangerous because it had bitten

5  before.  It was kind of colloquially referred to as the

6  adoption of one free bite.  It's essentially what they're

7  trying to do here.  They're saying they have the right to one

8  free spill before.  We think that rationale is utterly

9  incompatible with a statute where regs being promulgated under

10  a statute with specific purpose of protecting the environment.

11  So those in the least there should be a clearer sense of the

12  validity of the basic regulation and the statement before we

13  even get to the idea of using it as a vehicle to preempt state

14  law.

15      Now perhaps anticipating again some of their problems

16  with conflict preemption that plague them throughout the case,

17  again I do want to address what was the major centerpiece of

18  their papers which was this new theory of expressed preemption.

19  Now, this is a very significant argument because there is the

20  whole difference between conflict preemption and expressed

21  preemption is they don't have to show an actual conflict to

22  expressly preempt.  It gives the agency much more power.

23  Obviously that's very significant for both the federalism and

24  even a separation of power.

25      THE COURT:  You're essentially, as I understand your

45

1  argument, saying they can't expressly preempt here for two

2  reasons.  One, that they don't have an authorization from

3  Congress to engage in express preemption.  And two, because

4  the, and it's sort of the other side of the coin of your

5  obstacle argument, that anything that's merely advancing,

6  anything that's solely advancing vessel safety and

7  environmental protection is consistent with the purposes of

8  Congress and can't be, and sort of by definition can't be

9  preempted under conflict analysis cause it can't stand as an

10 obstacle to something that also can only engage in the purpose

11 of advancing safety and, vessel safety and environmental

12 protection.  That's basically--

13        MR. CRAY:  Yeah, I think as to why they don't – we do

14 stated orally, sir, they don't have the authority to engage in-

15 -

16        THE COURT:  Right.

17        MR. CRAY:  --express preemption.  We have actually

18 three separate reasons for that.  The first is that we view the

19 Supreme Court as having already ruled on what type of

20 preemption rubric you're looking at.

21        THE COURT:  I got that, right.

22        MR. CRAY:  All right.  And that will be page 109 of

23 the *Locke* decision.

24        THE COURT:  Yep.

25        MR. CRAY:  It says the analysis under Title I is one

46

1  of conflict preemption.  Our basic point is what was the need

2  for all of the extended discussion in first *Ray*, then *Locke* in

3  all this 29 years of law development under conflict and field

4  preemption if all they can do is they can just waive a magic

5  wand and expressly preempt.  So we don't, we think the reason

6  why they never – I'm not aware they had previously argued it

7  until mid way through this case, is because it's clear they

8  don't have that authority.  But additionally, in addition to

9  the – I think they would concede there's no specific statement

10  in Title I or even anywhere in the PWSA saying they have the

11  authority to engage in express preemption.  Their theory more

12  is one of implied.  We think that cuts against the grain of the

13  recent Supreme Court trend at narrowing some particularly

14  expansive agency power, particularly the *Alexander v. Standavol*

15  *(ph)* case, we started to read, which says they can't, "agency

16  on its own without statutory authorization can't create a

17  private right of action cause of the extraordinary nature of

18  that action."  Justice Scalia had a fairly memorable quote,

19  "They can play the sorcerer's apprentice but not the sorcerer

20  himself."  Same thing we would claim applied to what's an even

21  more intrusive act expressly preempted duly enacted state law.

22  We're not alone in this view.  Just in 2000, you know, earlier

23  this year--

24          THE COURT:  I read that--

25          MR. CRAY:  Okay.

47

1          THE COURT:  --with - (inaudible - #4:08:41).

2          MR. CRAY:  And we also view those three justices who

3   are not rebutted by the five Judge Rigardi (ph) there.  They

4   just didn't address it, didn't reach it, but those three

5   justices also read the various cases that appear, the major

6   cases that appear in the Commonwealth's original memorandum as

7   the basis for their right to engage in express preemption.

8   They read them as more in the nature of conflict preemption

9   case in that there was the federal regulation, the effect of

10  the federal regulation created a conflict with state law.  And

11  so, I'm sorry, Your Honor--

12         THE COURT:  I'm just - I understand that.  Anything

13  you want to say about the above memo of this?  If there's

14  something specific like a minute or two about the tug Manning,

15  I mean that might, that is materially different?  I'm just -

16  the only reason I'm saying it is I want to give Mr. Bressler, I

17  don't know if he wants a chance to respond, I imagine he does,

18  a couple minutes and I sort of need to wrap up at three and so-

19  -

20         MR. CRAY:  Certainly, Your Honor.

21         THE COURT:  And I don't know if Mr. Ettinger wants to

22  say anything or not.

23         MR. CRAY:  I believe he does but--

24         THE COURT:  All right.  So that's why I just wanted

25  to - is there something--

48

1          MR. CRAY:  Sure.

2          THE COURT:  --like in a minute you want to say with

3    respect to the Manning?

4          MR. CRAY:  No.  Most of the arguments that we're

5    putting out here--

6          THE COURT:  Carry over to one or the other.

7          MR. CRAY:  --would apply to that.  There are some

8    additional, some specific arguments that are unique to the

9    escort provision but most of them would also directly apply to-

10   -

11         THE COURT:  Okay.

12         MR. CRAY:  There's nothing, put it this way, there's

13   nothing Congress has, there's nothing that's unique to Manning.

14         THE COURT:  Okay.  Mr. Ettinger--

15         MR. ETTINGER:  I'll make it very--

16         THE COURT:  --maybe Mr. Ettinger can respond to both.

17         MR. ETTINGER:  I will make it very brief, Your Honor,

18   because I understand you're--

19         THE COURRT:  Okay.

20         MR. ETTINGER:  --limited time.  I would like Mr.

21   Bressler to have the opportunity to respond if he wants it.  I

22   just want to address one point that--

23         THE COURT:  Yep.

24         MR. ETTINGER:  --in addition to what's in our papers

25   which I understand you've already read about the irreparable

49

1  harm--

2         THE COURT:  Right.

3         MR. ETTINGER:  --and the significant risk to harm to,

4  risk of harm to Buzzards Bay and its wildlife.  And I just want

5  to highlight the relationship between what's gone on in Puget

6  Sound and what's gone on here.  As Mr. Cray just pointed out in

7  deciding that there was no preemption of the law at Puget Sound

8  the Coast Guard made a determination there was no substantial

9  conflict.  And yesterday I received from the Coast Guard as

10  part of its supplemental discovery, which is still ongoing by

11  the way, a document I'd like to hand up to the Court if I may.

12         THE COURT:  All right.  Does the government have a

13  copy or do you have a copy for them?

14         MR. ETTINGER:  I'll hand them a copy.

15         THE COURT:  All right.

16         MR. ETTINGER:  And I honestly haven't gone through

17  everything in the documents that were produced just yesterday,

18  Your Honor.

19         THE COURT:  This is a document that came from the

20  government?

21         MR. ETTINGER:  This came from the government.  They

22  sent of a CD of--

23         THE COURT:  Right.

24         MR. ETTINGER:  --their documents--

25         THE COURT:  Yep.

50

1      MR. ETTINGER:  --yesterday, just some additional

2  documents.  This is a U.S. Coast Guard categorical exclusion

3  determination with respect to this regulation that we're now

4  talking about.  And it is from April 3rd of `07.  And there is a

5  determination here that this regulation, if you look at the end

6  of the second paragraph, they're saying there's no reason for a

7  NEPA review--

8      THE COURT:  Uh-huh.

9      MR. ETTINGER:  --National Environmental Policy Act

10  Review.  And it says the reason for it is since implementation

11  of this action will not result in any, and if you skip down to

12  point three, it will not result in any inconsistencies with

13  federal, state or local laws or administrative determinations

14  relating to the environment.  That is just what they said in

15  Puget Sound as to why there was no preemption.  And with that

16  I'll sit down, Your Honor, and pass it over to Mr. Bressler.

17      THE COURT:  All right.

18      MR. BRESSLER:  Your Honor, I just said that in April,

19  in April there was a permanent injunction in place barring

20  every provision of this law that we have challenged.  So there

21  was no inconsistency with any law bending effect.  I will try

22  to be as quick as I can because there's a lot I would take

23  issue with from what Mr. Cray said.  First, I would say the

24  conflict with purposes test, the Supreme Court made it clear in

25  *Fidelity Federal Savings v. De LaCuesta*, which we cite in our

51

1    papers and also *City of New York v. FCC*, that the in *De*

2    *LaCuesta,* the Supreme Court criticized the Court of Appeals

3    below for focusing too much on the congressional intent when it

4    was regulatory preemption.  So what the Court should have been

5    looking at was the agency's intent.  Here there is a very broad

6    delegation and commitment of authority to the executives, to

7    the Coast Guard.  That's the authority being exercised.  The

8    obstacle to the purpose is is the obstacle to the purposes of

9    the Coast Guard.  I would say it's also an obstacle to the

10   purposes of the Congress because in light of what I read you

11   before one of the points of the most recent amendment or this

12   1978 amendment to the Ports and Waterway Safety Act of `72 was

13   to give the Coast Guard greater authority.

14         The reason that there is, I mean this whole express

15   conflict preemption alleged dichotomy I think is a false

16   dichotomy because what the Coast Guard has done here with its

17   expressed statement is made it crystal clear, expressly clear

18   that there is a conflict between the state law and the agency's

19   intent, the agency's purposes to set the regulation here, no

20   less and no further.  In terms of whether the agency is

21   empowered to engage in some other sort of express preemptions,

22   we cited in our papers there is no need for an expressed

23   congressional delegation of the right to preempt in--

24         THE COURT:  But that kind of conflict is really an

25   obstacle conflict; isn't it?

52

1          MR. BRESSLER:  Yes.

2          THE COURT:  I mean that's really what it--

3          MR. BRESSLER:  Yes.

4          THE COURT:  It either is an obstacle or it isn't, but

5    that's the kind of--

6          MR. BRESSLER:  Yes.

7          THE COURT:  Okay.

8          MR. BRESSLER:  As to this kind of the cost benefit

9    question that Your Honor raised, first of all, it's in the

10   statute, I mean, yes, the cost of the environment of an oil

11   spill is certainly and to the people of whatever state,

12   whatever community we're talking about is a great cost.  But

13   the cost of measures to prevent that there's a cost there also.

14   There needs to be a cost benefit analysis.  By the

15   Commonwealth's logic they're acting arbitrary and capriciously

16   for not banning all tank vessel traffic whatsoever from

17   Buzzards Bay and all of its waters.  In fact only sailboats

18   because, you know, anything could leak fuel.  Obviously that

19   was not Congress' point.  There's going to be some cost benefit

20   here and that's what the Coast Guard was engaged in.  They're

21   required to engage in that by executive orders as well as the

22   PWSA.

23          The question of the rationale of not wanting too many

24   vessels so that the helpers become an hinderer, I think it is

25   not – what the final rule says in terms of response to comments

53

1   is we don't think that will be too much of a problem here

2   because single hulled vessels are being fazed out so by 2015 it

3   won't be an issue.  In the earlier iterations of this rule

4   making the advance notice of proposed rule making and the

5   notice of proposed ruling as well as the public hearings and

6   other statements--

7          THE COURT:  For the one that just got enacted we're

8   talking about?

9          MR. BRESSLER:  Yes.  I mean there was an advance

10  notice of proposed rule making in 2004.

11         THE COURT:  Oh, I see.  Okay.

12         MR. BRESSLER:  There was a notice of proposed rule

13  making in 2006.

14         THE COURT:  Yep.

15         MR. BRESSLER:  And then there was the final rule in

16  August that took effect November 28th.  Clear in those documents

17  is the concern that there not be crowding.  It's not explicitly

18  said, you know, we think we'll avoid it but it's obviously a

19  logically outgrowth of what the Coast Guard did say.

20         As to the APA question, I mean first of all I would,

21  again, it's not irrational to not bar all vessels from

22  Massachusetts waters which is where Mr. Cray's argument ends

23  up.  In terms of the comment from the coalition about the

24  vessel, the Coast Guard is not required to respond to every

25  comment it receives, just significant ones.  It did respond to

54

1   that comment.  It responded to three comments, one of which I

2   believe was the coalitions that said you should apply this to

3   double hulls.  And it said well we don't think that's necessary

4   because this is sufficient.  It didn't respond to the point

5   about the accident in the Gulf of Mexico.  The accident in the

6   Gulf of Mexico was caused by human error.  A barge drove into a

7   submerged oil platform.  There are no submerged oil platforms

8   sunk by Hurricane Rita in Buzzards Bay.  The problem there is

9   rocky and uneven, shallow ground.  And that's what they talked

10  about and why that problem did not require tug escorts for

11  double hulled vessels.

12          And finally, in terms of this there needs to be an

13  explanation for inconsistent treatment, the Ports and Waterway

14  Safety Act includes an extremely broad commitment of authority

15  to the Coast Guard to issue regulations on this basis,

16  sometimes on an emergency basis.  The captain of the port may

17  do something just for a day.  It happens all the time.  The

18  Coast Guard cannot be required to explain how what's it doing

19  here is different from what it did somewhere else 25 years ago

20  every single time it does that.  There was no nationwide policy

21  ever promulgated by the Coast Guard or Department of

22  Transportation or Homeland Security or anyone else that state

23  tug escort rules are fine.  To the contrary, they were at issue

24  with *Locke*.  They were at issue with *Ray* and they're at issue

25  here.

55

1          THE COURT:  What about the question though of it

2    appears that detente was reached so to speak on tug escort

3    rules in West Coast ports as applied to certain bigger ports.

4    That's – I haven't gone, I've read all the papers but I haven't

5    read all the state regulations and Coast Guard regulations yet

6    out in the West Coast that were cited.  But the sense I'm

7    getting is that out there sometimes defacto, sometimes dejure,

8    those state regulations in local ports were permitted by the

9    Coast Guard and continue to be permitted.  And some form of

10   détente, if you will, was reached on that and here not so.

11   What's the, I mean what's really going on?

12          MR. BRESSLER:  Well, first I would say I don't think

13   I can address what you refer to as the defacto détente because,

14   again, this Title I analysis of conflict doesn't come into play

15   until there's an affirmative decision.  There were no

16   affirmative decisions anywhere except arguably Puget Sound and

17   here, at least in terms of the rules that they're citing--

18          THE COURT:  Yeah.

19          MR. BRESSLER:  --Puget Sound and Massachusetts

20   regarding tug escorts.  In terms of why is this different from

21   what happened there, all that I can--

22          THE COURT:  I'm asking this in the practical not the

23   legal question.

24          MR. BRESSLER:  Well, I think the Coast Guard in terms

25   of its preemption statement, I don't know if it would say the

56

1   same thing today about Puget Sound that it did in 1994.  I

2   don't think it's amended in that respect recently.  All I can

3   really say is that they are different--

4           THE COURT:  Okay.

5           MR. BRESSLER:  --bodies of water in different places.

6           THE COURT:  Okay.  Fair enough.

7           MR. BRESSLER:  And these are, you know, political

8   bodies and regulatory bodies coming to agreements.  Beyond that

9   I don't know--

10          THE COURT:  Okay.

11          MR. BRESSLER:  --who was the congressman for that.  I

12  know Mr. Benner wanted, Your Honor, if you had time--

13          THE COURT:  Do you have something you want to say

14  quickly?

15          MR. BENNER:  Well, Your Honor, I'll try not to impose

16  on your time.  I know you're at the end of it.  I would just

17  say that the clients are represent are the people who operate

18  under this regime.  The case is really about who decides.  The

19  way it's been presented here--

20          THE COURT:  Yep.

21          MR. BENNER:  --either the federal government has the

22  authority to make these decisions or the state has authority

23  pretty much on its own say so to pull out from that federal

24  system and interpose something different.  Now--

25          THE COURT:  Something more.

57

1        MR. BENNER:  Well, something more is the easier

2   argument for them.  I'm not conceptually why it wouldn't be

3   something less.  But it puts the Court, what we look for--

4        THE COURT:  I don't think even Mr. Cray would argue

5   that they could impose--

6        MR. BENNER:  But how do you quantify – excuse me for

7   interrupting, Your Honor,--

8        THE COURT:  That's all right.

9        MR. BENNER:  --but I mean how does one make that

10  quantification?  You get into very subjective judgments about

11  what's better and what's worse.  What we as industry look to is

12  there's an expert agency acting nationally that could make

13  differentiations because of – it's a fairly flexible system in

14  other words because when we argue these kinds of cases and it's

15  been my unhappy history that I've argued a number of them, but

16  when we argue these kinds of cases generally what we hear from-

17  -

18        THE COURT:  Must be good for your billings.

19        MR. BENNER:  I can't comment.

20        THE COURT:  That's okay; you don't have to comment on

21  that.

22        MR. BENNER:  Your Honor, generally what we encounter

23  is we're arguing for national uniformity and we hear as a

24  counter argument oh, no, no, you have to be sensitive to

25  conditions of local waters.  In fact what the federal system is

58

1    and when you look at 33 CFR 165 and see how it's structured,

2    the Coast Guard makes adjustments and modulations for different

3    bodies of water when it sees fit but still there's an entity

4    there that has that national overview that can make some – it

5    may not always be right but it certainly has the authority and

6    the expertise to make judgments about how far it can deviate

7    from one body to another without upsetting a generally

8    commercially and environmentally acceptable regime of a

9    national system for transportation, just like you want a

10    national system for aviation.  So that's our concern in this.

11    Our interest, we did not file papers in this because our

12    ultimate interest are subsumed in the federal interest that's

13    being asserted here.  But we very much have a stake in this not

14    having to be a matter of minute entrail examination of every

15    part of every rule that comes up in conflicts between states

16    and the federal government.  We think that what the Supreme

17    Court has established and will ultimately be prudent as this

18    case evolves is that there is a very clear guideline here.

19    We're dealing with Title I issues and the government acts, the

20    federal government act that pushes aside any state rule.  To

21    the contrary, if it hasn't acted and it's not decided

22    affirmatively not to act, then there may be some room for the

23    state to act in these discretionary areas but that's our

24    interest here.  And we'd like to get this process going in a

25    direction where it could be decided quickly.  It will be three

59

1  years next month I think since this has been filed.  It should

2  be easier than this.  Thank you, Your Honor.

3          THE COURT:  I'll give you the best promise, which is

4  not judicially enforceable, which is that I will do my best to

5  resolve it as fast as I can in light of both the obviously

6  significance of the issue and the amount of time and effort

7  that all of you have put into it which I know is great and so

8  that I can deliver something that, whether you like it or not

9  at least is complete, careful and thorough.

10          MR. BENNER:  Your Honor, may I ask a question--

11          THE COURT:  Yep.

12          MR. BENNER:  --procedurally.  You have before you a

13  motion from the government seeking leave--

14          THE COURT:  Preliminary and permanent.

15          MR. BENNER:  --preliminary injunction.  It strikes me

16  that all the issues that are before you now are issues of law

17  that are susceptible of summary disposition.  Is there a point

18  now or by submissions to suggest to the Court some process for

19  getting this new--

20          THE COURT:  Well, let me tell you how I understood

21  that issue as it percolated in the papers.  You've moved, Mr.

22  Bressler, for preliminary and permanent injunctive relief.  And

23  Mr. Cray you've opposed it across the board.  To the extent

24  that, and ultimately this is really a question for Judge

25  Lindsay cause this is just here to me on a referral and I'm

60

1  sure whatever I say it's going to be subject to at least

2  objections from half of you if not all of you, but if, as a

3  practical matter, if I recommend for permanent injunctive

4  relief, that amounts to I think, and if Judge Lindsay accepts

5  that, that as a practical matter I think that amounts to a

6  final determination that I - I mean, step back.  There's one

7  theory the plaintiff, that's the government, has which is a

8  narrower theory in terms of all the issues that it raises in

9  terms of discovery and the like.  Everybody agrees upon that

10 and agreed to proceed at least for briefing purposes on that or

11 at least once Judge Lindsay laid out how he wanted to go, that

12 issue gets resolved.  If it gets involved against the

13 government, then you reach all those other issues and whatever

14 further development of the record is required.  If you don't,

15 and they prevail on that then I guess the question becomes

16 whether or not you want judgment to enter on that issue, and if

17 people are going to appeal, go up on that issue or not or

18 whether - but I mean I think, I'm not sure what - now if they

19 get a preliminary injunction, Mr. Cray, you have your

20 objections, but what's really left as to that issue for prelim,

21 you know, between the preliminary and permanent relief?

22         MR. CRAY:  I think the premise of what Mr. Benner is

23 requesting here we would disagree with which is that it's

24 purely a matter of law.  We feel very strongly we want

25 discovery.  I purposely have not gotten into the discovery

61

1  dispute between the parties that was the subject for the last

2  papers.  And we feel actually the Court itself doesn't need to,

3  the arguments we previously set forth should be sufficient to

4  deny this interlocutory motion and certainly a motion for

5  permanent relief and let the matter just go forward with

6  discovery being resolved with the usual consultation among

7  counsel, Rule 37--

8          THE COURT:  Right.

9          MR. CRAY:  --if necessary et cetera.  But I certainly

10  don't want to make it sound like the Commonwealth is

11  acquiescing at any assertion by any of the plaintiffs that this

12  is purely a matter of law.  We strongly believe--

13          THE COURT:  No, I understand that.

14          MR. CRAY:  And obviously just the fact that this is

15  not just in our view a matter of law, but it is something where

16  discovery is appropriate and we feel a fair reading of the

17  transcript of the status conference before Judge Lindsay is

18  that he also at least seems intent of allowing us to get

19  discovery at least at that point agreed there were matters that

20  needed to be explored factually.  We're not saying he down the

21  road--

22          THE COURT:  Let me ask you both, do either of you

23  wish to file a reply or a sur-reply?  You don't have to.  I'm

24  not telling you to, but I'm just asking if that is something

25  that you want to do.  If you don't want to do any more briefing

62

1  I'm not telling you – this is not an implied suggestion to say

2  yes.  I'm just asking if you want to or not.  If you don't, I'm

3  content to proceed now.  If you want to, I'd be prepared to let

4  you file three to five pages and then an equivalent sur-reply.

5  If you don't want to, you don't have to.

6          MR. BRESSLER:  I would say, Your Honor, we are – we

7  haven't talked about irreparable harm.  One of the sovereign

8  entities here is going to be harmed by the Court's decision,

9  either the U.S. or the Commonwealth.  We would argue that the

10  supremacy clause does the balancing for the Court, but that

11  aside we are very interested, like Mr. Benner, in a prompt

12  resolution so having discussed everything as we have today, if

13  Your Honor wants more certainly we would be happy to provide

14  it--

15          THE COURT:  Okay.

16          MR. BRESSLER:  --and same with Judge Lindsay but I

17  would not say--

18          THE COURT:  Fine.

19          MR. BRESSLER:  --I'm eager to--

20          THE COURT:  I'm content to leave it the way it is and

21  if in reviewing it and writing it up I see something that

22  requires something then I'll issue a little order that says

23  brief just this question.

24          MR. CRAY:  To the extent to which there's the further

25  question of permanent relief, which I know is in the title of

63

1  the motion but it's only a single sentence of actual

2  development, there again, just to be clear, we strongly

3  believe--

4          THE COURT:  I understand that.

5          MR. CRAY:  Okay.

6          THE COURT:  Yep.  Thank you very much.

7          COUNSEL:  Thank you, Your Honor.

8          THE COURT:  Very helpful, very interesting issue.

9          COUNSEL:  Thank you, Your Honor.

10         THE COURT:  All rise, this matter's adjourned.

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

64

1                          CERTIFICATION

2        I, Maryann V. Young, court approved transcriber, certify

3   that the foregoing is a correct transcript from the official

4   digital sound recording of the proceedings in the

5   above-entitled matter.

6

7   /s/ Maryann V. Young                    June 9, 2008

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**