UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
THE UNITED STATES OF                     )
AMERICA, et al.,                                )
                                                    )
        Plaintiffs,                               )
                                                    )
        v.                                           )         Civil Action No.  05-10112-RCL
                                                    )
THE COMMONWEALTH OF               )
MASSACHUSETTS, et al.,                   )
                                                    )
        Defendants.                             )
_____)

REPORT AND RECOMMENDATION ON
MOTIONS FOR SUMMARY JUDGMENT

July 29, 2009

SOROKIN, M.J.

        Currently pending are the Commonwealth of Massachusetts' Motion for Partial Summary

Judgment (Docket #134)[1] and the United States of America's Cross Motion for Summary

Judgment (Docket #139).

        For the reasons set forth below, I recommend that the Court DENY the Commonwealth's

Motion and ALLOW the United States' Cross Motion.

I.      FACTUAL AND PROCEDURAL BACKGROUND

        On August 27, 2008, the Court (Young, J.), approved the undersigned magistrate judge's

_____

        [1]  Intervenor-Defendant Coalition for Buzzards Bay joins in the Commonwealth's motion.
See Docket #136.

recommendation that it allow the United States' Motion for a Preliminary and Permanent

Injunction insofar as it sought a Preliminary Injunction.  See Electronic Order of August 27, 2008

(adopting Docket #116).  Preliminary, rather than permanent, injunctive relief was recommended

for the sole reason that the final administrative record had yet to be filed, rendering permanent

judgment on the legality of the rulemaking premature.  Docket #116 at 31.  On July 31, 2008

(subsequent to issuance of the Report and Recommendation), the United States filed the

Administrative Record.  See Docket # 125.

The factual and procedural background of this litigation are set forth in the Report and

Recommendation of June 6, 2008, and are incorporated herein.  Docket #116 at 1-7.  In response

to the filing of the Administrative Record, the Commonwealth advances two new arguments

challenging the sufficiency of the Coast Guard's rulemaking process.  These arguments are

addressed below, giving consideration to any new and relevant material from the administrative

record.  In addition, the Commonwealth has renewed arguments advanced previously in

opposition to the United States' Motion for Injunctive Relief, arguments which the Court

resolved by its decision on that Motion.  The Court's Order on the Motion for Injunctive Relief

(and the Report and Recommendation adopted by that Order) are incorporated herein.  To the

extent further discussion of these arguments is warranted, it is set forth below.  In all other

respects, I rely upon the June 6, 2008, Report and Recommendation (and the August 27, 2008,

Order adopting same) incorporated herein.

II.     DISCUSSION

Background

By its August 27, 2008, Order adopting the June 6, 2008, Report and Recommendation,

the Court found that the United States was entitled to preliminary relief enjoining enforcement of certain provisions of Massachusetts enacted legislation entitled, "An Act Relative to Oil Spill Prevention and Response in Buzzards Bay and Other Harbors and Bays of the Commonwealth" (MOSPA). M.G.L. c. 21M.  The Court determined that the Coast Guard had promulgated a regulation which expressly preempted the MOSPA provisions at issue (and that its position was not clearly inconsistent with Congressional intent), and that the MOSPA provisions at issue were in any event conflict preempted (because they stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress).  The Court also found that the Coast Guard regulation establishes the appropriate (as opposed to minimum) level of regulation.

The first of the MOSPA provisions at issue requires a tugboat escort for all tank barges transiting Buzzards Bay carrying more than 6,000 barrels of oil. M.G.L. c. 21M, § 6(a) & (b).  The second challenged provision provides that "[t]he navigation watch on all tow vessels transiting Buzzards Bay and carrying 6,000 or more barrels of oil shall consist of at least 1 licensed deck officer or tow vessel operator." M.G.L. c. 21M, § 4(a).  In addition, for the vessel towing the barge, MOSPA requires: (1) at least one licensed deck officer or tow vessel operator serving exclusively as a lookout with no other concurrent duties; and (2) three licensed officers or tow vessel operators on the vessel whenever it is towing a tank barge. Id. The operator must log the lookout's name and duty hours and maintain a record of the crew on board during towing. Id. For the tank barge, MOSPA requires two personnel, one of whom must be a "certified tanker-man under 46 C.F.R. subpart 12.20 " who shall be on the tank barge at all times when the barge is in Buzzards Bay unless the barge cannot accommodate personnel on board. Id., §4 (b).

Among the differences between MOSPA and the Coast Guard's regulation, the most

significant for purposes of this discussion is the fact that the federal regulations exempt double-hulled tank barges from any escort requirements, while the MOSPA provisions do not.[2]

### Issues Not Previously Raised by the Commonwealth

The Commonwealth advances in its pending motion two arguments not advanced prior to the filing of the administrative record: (1) that the Coast Guard failed to complete a mandated environmental impact statement (EIS) (or, alternatively, an environmental assessment); and, (2) that the Coast Guard failed to provide adequate notice and an opportunity to comment on its decision to preempt MOSPA expressly.  The essence of the argument is that the Coast Guard failed to consider, in deciding whether an EIS was necessary, the environmental effect of eliminating the state law provisions regarding tug escorts for double-hulled tank barges.

### 1. Environmental Impact Statement/Assessment

The Commonwealth argues that the Coast Guard violated the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4347 (NEPA) by failing to assess properly the environmental consequences of its Final Regulation, including its intent to preempt two "more protective" aspects of MOSPA.

### A.     The Coast Guard's NEPA Implementing Regulation

NEPA  has two primary goals: the first is requiring government agencies "to consider every significant aspect of the environmental impact of a proposed action." Fund For Animals v. Mainella, 283 F.Supp.2d 418, 426 (D.Mass.2003)(Saris, J.)(quoting Vermont Yankee Nuclear

---

[2] In its briefing, the Commonwealth suggests a clarification to the Court's comparison of MOSPA with the Federal rule in several respects which do not bear upon the present analysis. See Docket #135, at 7, n. 7.

Power Corp. v. Natural Resources Def. Council, Inc., 435 U.S. 519, 553 (1978)).  The second is ensuring that an agency will "inform the public that it has indeed considered environmental concerns in its decisionmaking process." Id. (quoting Baltimore Gas and Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97 (1983)).  "NEPA is not designed to prevent all possible harm to the environment; it foresees that decision makers may choose to inflict such harm, for perfectly good reasons."  Sierra Club v. Marsh, 872 F.2d 497, 500 (1st Cir.1989).  "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).

NEPA created the Council on Environmental Quality (CEQ) to administer NEPA and to promulgate NEPA-related regulations binding upon federal agencies. 40 C.F.R. §§ 1501-08. Federal agencies also draft their own administrative regulations in order to implement and supplement the CEQ's regulations. 40 C.F.R. § 1507.3.  The Coast Guard's operative NEPA-implementing regulation is Commandant Instruction M16475.1D, adopted on November 29, 2000.

"NEPA requires that 'every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment' include a statement addressing, inter alia, 'the environmental impact of the proposed action' and 'any adverse environmental effects.'" Town of Marshfield v. F.A.A., 552 F.3d 1, 3 (1st Cir.2008)(citing 42 U.S.C. § 4332(c)(I), (ii)).  The EIS, usually entailing substantial efforts and a detailed analysis, is not required if the agency supportably determines that no such "significantly affecting" impact will result. Id.  Agency regulations may identify "categorical exclusions," that

5

is, classes of actions that do not threaten environmental damage and thus do not require the preparation of an EA or EIS. Id. (citing 40 C.F.R. § 1508.4 (2003)).

The Coast Guard's implementing regulations provide for categorical exclusions ("CE") delineated at Ch. 2.B.2 of COMDINST M16475.1D.  Figure 2-1 therein lists thirty-five categories of actions that are categorically excluded from further analysis and documentation requirements under NEPA (unless the consideration of factors delineated in Section 2.B.2.b "trigger[s] the need to conduct further analysis").  One of the thirty-five categorical exclusions concerns the promulgation of certain types of regulations, including, in relevant part:

> "(g)    Regulations establishing, disestablishing, or changing Regulated Navigation Areas and security or safety zones
>
> .   .   .
>
> (I)    Regulations in aid of navigation such as those concerning rules of the road, International Regulations for the Prevention of Collisions at Sea (COLREGS), bridge-to-bridge communications, vessel traffic services, and marking of navigation systems."

COMDINST M16475.1D, Fig. 2-1, ¶ 34.[3]

The Coast Guard determined that the Final Rule fell within the exclusions of Figure 2-1, 34 (g) and (I), quoted supra.  Unquestionably, the Final Rule is a regulation changing a Regulated Navigation Area and is also a regulation in aid of navigation.  The Commonwealth

---

[3]  The Coast Guard revised the list of CEs contained in section 2.B.2, figure 2-1, of COMDINST M16475.1D on July 23, 2002.  67 Fed. Reg. 48243-02.  The CEs were grouped categorically, with the result that the CEs identified in Figure 2-1 as ¶ 34 (g) and (I) are also cited to as being within ¶ 6 of  67 Fed. Reg. 48243-02. No substantive changes to definitions of the relevant CEs were made. See A.R. at 477.  The only relevant substantive change was an expansion of the circumstances under which a written CE determination was required, and such a written determination was made with regard to the Final Rule.  See A.R. at 0473.

asserts first that the rulemaking at issue here does not fall within the claimed categories of CE because "the Coast Guard's final action went well beyond the promulgation of a regulation adjusting the Regulated Navigation area."  Docket #135, at 20.  This objection is unconvincing because the Coast Guard's enabling regulations themselves recognize that actions falling within a CE might nevertheless be excluded because of other considerations.  Specifically, section 2.B.2.b notes that some actions which would normally be categorically excluded under Figure 2-1 might nevertheless require additional environmental review.  COMDINST M16475.1D, Sec. 2.B.2.b. Thus, for example, the promulgation of a regulation adjusting a Regulated Navigation Area, while within a categorical exclusion, nevertheless would require further analysis if it involved species or habitats protected by the Endangered Species Act, or a site listed as a National Historic Place.  Id., at (7)-(8).  Thus, the Coast Guard's determination that the CEs provided for by Figure 2-1, 34 (g) and (I) were applicable is reasonable, so long as it also conducted a supportable analysis of the Sec. 2.B.2.b. factors, as required.

Enclosure 2 to COMDINST M16475.1D is intended to assist Coast Guard personnel in identifying the presence of any Sec. 2.B.2.b. extraordinary circumstances warranting additional review.  Id.  Section 2.B.2.b states that the "determination of whether an action that is normally excluded requires additional review must focus on the significance of the potential environmental consequences" which "must be evaluated in their context (whether local, state, regional, tribal, national or international) and in their intensity by considering whether the action is likely to involve" one or more of ten delineated circumstances.  Id.

B.      The Coast Guard's Analysis Of  COMDINST M16475.1D Section 2.B.2.b
        Factors Relevant to the Final Rule

Four of the circumstances listed by Section 2.B.2.b are potentially relevant to the Coast

Guard's Final Rule: (1) Section 2.B.2.b(1), whether the action involves public health or safety;

(2) Section 2.B.2.b(2), whether the action involves a site that includes or is near a unique

characteristic of the geographic area (in this case because Buzzards Bay is an Estuary of National

Significance); (3) Section 2.B.2.b(3),  whether the action involves "the quality of the human

environment that is likely to be highly controversial in terms of scientific validity or public

opinion;" and, (4) Section 2.B.2.b.(9), whether the action involves a "potential or threatened

violation of a Federal, state, or local law or requirement imposed for the protection of the

environment."

        The mere existence of any of these circumstances does not necessarily require the

preparation of an EIS or EA.  COMDINST M16475.1D, Sec. 2.B.2.b.  Likewise, the list "should

not be considered exhaustive by any means."  Id., Enc. 2, at 4.   COMDINST M16475.1D

Enclosure 2 provides specific guidance for Coast Guard personnel's consideration of each of the

Section 2.B.2.b inquiries.

        In completing the checklists and analysis required by COMDINST M16475.1D, the Coast

Guard conceded that its Final Rule involves a Section 2.B.2.b(2) site that "includes or is near a

unique characteristic of the geographic area," but concluded that "the rule is projected to produce

negligible adverse impacts on the environment from increased air and water emissions from the

additional tugs" and noted that the tugs would be temporary due to the phase out of single-hull

barges.  A.R. at 476.  Thus, the comparison made by the Coast Guard in its Rule 2.B.2.b(2)

analysis was one between its own rulemaking and no regulation (rather than a comparison between its own rulemaking and the MOSPA provisions its rulemaking purports to preempt). While Enclosure 2 generally instructs Coast Guard personnel assessing the application of Section 2.B.2.b(2) to consider the likely <u>effects</u> of agency action upon various delineated and potentially sensitive ecosystems (<u>e.g.</u>, upon a coral reef ecosystem, water supplies, wetlands), the mere presence of agency action in certain locations potentially warrants further review.  For example, Enclosure 2 advises Coast Guard personnel to "[t]hink about whether your action is likely to . . . be located on or near any other environmentally critical area" and to "[f]ind out whether there is some possible effect of your action that, while improbable, would be so serious IF it occurred that further review is appropriate."  COMDINST M16475.1D, Enc. 2 at 5-6 (emphasis in original).

Enclosure 2 instructs Coast Guard personnel determining whether a rulemaking involves public health or safety within the meaning of Section 2.B.2.b(1), to consider, <u>inter alia</u>, whether a contemplated action is likely to have a significant possibility of accidental spills of oil or other hazardous materials.  <u>Id</u> at 5.  Despite language in Section 2.B.2.b suggesting that the action must merely "involve" public health or safety to trigger environmental analysis, Enclosure 2 clarifies that the relevant inquiry for Coast Guard personnel is whether there is "likely to be a significant effect upon public health or safety."  <u>Id.</u>  The Coast Guard concluded that the Final Rule would have an indirect and beneficial impact upon public safety because it required actions designed to reduce the incidence of oil spills.  A.R. at 476.  This analysis again has as its underpinning a comparison of the Coast Guard's rulemaking with an absence of regulation (rather than comparison of the situation created by the rulemaking with the situation presented by the

MOSPA provisions purportedly preempted thereby).

Enclosure 2  also instructs that personnel assessing the applicability of Section 2.B.2.b(3),

i.e., whether a proposed action involves "the quality of the human environment that is likely to be

highly controversial in terms of scientific validity or public opinion," should consider first

"whether [the] action is likely to be controversial in any way," and if so, whether the controversy

has an environmental component.  COMDINST M16475.1D, Enc. 2, at 7.  Personnel are

admonished not to interpret the term "environmental" too narrowly in determining whether a

controversy is of an environmental or, for example, economic nature.  Id.  They are also advised

to consider Executive Order No. 12372 (concerning Intergovernmental Review of Federal

Programs).  Id.  The Coast Guard concluded, without elaboration, that its Final Rule did not have

"a potential for effects on the quality of the environment that are likely to be highly controversial

in terms of scientific validity or public opinion."  A.R. at 475.

Finally, the Coast Guard also concluded, without elaboration, that its rulemaking would

not result in any Section 2.B.2.b(9) inconsistencies with any Federal, State or local laws or

administrative determinations relating to the environment.  A.R. at 473, 475.   Thus, the Coast

Guard did not undertake an EA or an EIS.

C.      Standard of Review Of Agency Actions

The Commonwealth bears the burden of proof in challenging the Coast Guard's action

under NEPA. See Fund For Animals, 283 F.Supp.2d at 429 (D.Mass.2003)(citing Sierra Club v.

Marita, 46 F.3d 606, 619 (7th Cir.1995)).  Judicial review of a federal agency's compliance with

NEPA is governed by section 10 of the Administrative Procedure Act (the "APA"), 5 U.S.C. §

706(2)(A). See Airport Impact Relief, Inc. v. Wykle, 192 F.3d 197, 202 (1st Cir.1999).

10

"[A]gency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414 (1971) (quoting APA, 5 U.S.C. § 706).   Under the arbitrary and capricious standard, the reviewing court's inquiry is limited to "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. at 416. "While this is a highly deferential standard of review, it is not a rubber stamp. The reviewing court must undertake a 'thorough, probing, in-depth review' and a 'searching and careful' inquiry into the record." Airport Impact Relief, 192 F.3d at 203 (citations omitted). Agencies are nevertheless entitled to some latitude in interpreting their own regulations.  See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994).

The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result.  Penobscot Air Services, Ltd. v. F.A.A., 164 F.3d 713, 719, n.3 (1st Cir.1999)(citing Federal Election Comm'n v. Rose, 806 F.2d 1081, 1088 (D.C.Cir.1986).  An adequate explanation includes responses to "relevant" and "significant" public comments. Id. (citing Home Box Office, Inc. v. F.C.C., 567 F.2d 9, 35 & n. 58 (D.C.Cir.1977)).  Neither requirement is "particularly demanding."  Id. (citing Public Citizen, Inc. v. F.A.A., 988 F.2d 186, 197 (D.C.Cir. 1993)).  Courts will uphold agency decisions if the agency's path may reasonably be discerned and where the agency has stated the main reasons for its decision and indicated that it has considered the most important objections.  Public Citizen, Inc., 988 F.2d at 197.  "[T]he agency's response to public comments need only 'enable us to see what major issues of policy were ventilated  .  .  .  and why the agency reacted to them as it did.'"

 Id. (quoting <u>Automotive Parts & Accessories Ass'n v. Boyd</u>, 407 F.2d 330, 335 (D.C.Cir.1968)).


    D.  <u>Adequacy of the Coast Guard's CE Determination</u>.

   The conclusion that the Final Rule would not result in any inconsistencies with any

Federal, State or local laws or administrative determinations relating to the environment (A.R. at

473) is reasonable in light of the guidelines for application of Section 2.B.2.b in Enclosure 2 to

COMDINST M16475.1D.  The Commonwealth objects that this conclusion is inconsistent with

the Coast Guard's express preemption declaration, which cites the conflict between the Final

Rule and MOSPA among its bases.  Although an inconsistency indeed appears to exist on the

plain language of Section 2.B.2.b(9), Enclosure 2 nevertheless makes clear that Section

2.B.2.b(9) is animated not by concerns such as federalism and preemption, but rather by the

potential for Coast Guard action constituting literal violations of state environmental laws (such

as failures to obtain necessary permits, or agency actions which result directly in toxic or unusual

air emissions, or unusual noise).  COMDINST M16475.1D, Enc. 2, at 9.

   The Commonwealth first objects that the Coast Guard is bound by COMDINST

M16475.1D to follow the provisions of the Department of Transportation's Order 5610.1C, to

which the introduction to COMDINST M16475.1D refers.  See COMDINST M16475.1D at 1-4,

2-5 ("a CE may not be used if the proposed action is likely to involve any of the circumstances

set forth in section 20.b.(2) of DOT Order 5610.1 series (Enclosure 1)").  The Commonwealth

notes that the DOT Order requires an EIS or EA wherever a CE applies, but a proposed

regulation creates "inconsistencies with any Federal, State, or local law or administrative

determination relating to the environment" rather than a determination as to whether the

proposed action would  result in "a potential or threatened <u>violation</u> of Federal, State, or local

law or requirement imposed for the protection of the environment" as is required by COMDINST

M16475.1D Section 2.B.2.b(9).  See Docket # 140 at 53; A.R. at 475.  However, subsequent to

the November 29, 2000,  issuance of COMDINST M16475.1D, the Coast Guard was one of the

agencies transferred from the DOT to the authority of the newly-created Department of

Homeland Security. <u>See</u> 6 U.S.C. § 542.  Accordingly, the Coast Guard reasonably followed its

own CE as explained by its own guidance rather than a regulation from an agency of which it

was no longer part.

The Commonwealth objects that this conclusion is inconsistent with the Coast Guard's

express preemption declaration, which cites the conflict between the Final Rule and MOSPA

among its bases.  Preemption and the CE, however present different issues; Section 2.B.2.b(9) is

animated not by concerns such as federalism and preemption, but rather by the potential for

Coast Guard action constituting literal violations of state environmental laws (such as failures to

obtain necessary permits, or agency actions which result directly in toxic or unusual air

emissions, or unusual noise).  COMDINST M16475.1D, Enc. 2, at 9.

Less convincing, however, is the Coast Guard's conclusion that the Final Rule would not

result in any environmental controversy within the meaning of Section 2.B.2.b(3).  Although it is

true that at the time the CE determination was made in April, 2007, the enforcement of MOSPA

had been enjoined by this Court, the matter was nevertheless on appeal and the Coast Guard

recognized that it remained in active litigation concerning the MOSPA provisions. See Docket

#77 (Notice of Appeal, September 7, 2006).  The administrative record is replete with examples

of expressions of opposition to the Final Rule from elected officials in the Commonwealth. (See

inter alia, AR at 65-69; 121-126; 207-222; 264; 458-459; 466, 470-471).[4]  The level of

controversy suggested by those statements from legislators is more significant than that of the so-

called "heckler's veto" (i.e., the mere presence of vocal opposition).  See Save Our Heritage, Inc.

v. F.A.A., 269 F.3d 49, 61 (1st Cir.2001).   Rather, it suggests a reasonable disagreement over the

project's risk of environmental harm.  Although it provided explanations for its application of

several of the other Section 2.B.2.b factors (See, e.g., A.R. at 476-477), the Coast Guard has not

done so with regard to its conclusion that its rulemaking is not controversial within the meaning

of Section 2.B.2.b(9).  A.R. at 475.

Similarly, the Coast Guard's determination that Sections 2.B.2.b(1)-(2)(i.e., whether the

rulemaking involves public health or safety, and whether it involves a site including or near a

unique geographic characteristic, respectively) are inapplicable is inadequately explained.  First,

Enclosure 2 suggests that in interpreting Sections 2.B.2.b(2), even an improbable environmental

consequence may warrant more elaborate review if it is sufficiently serious.  An oil spill in an

Estuary of National Significance--- even if improbable in the Coast Guard's view -- arguably

presents such a circumstance.  The adequacy of the Coast Guard's explanation otherwise (namely

that "the rule is projected to produce negligible adverse impacts on the environment from

increased air and water emissions from the additional tugs") is undermined by the fact that it did

not consider the preemption of the MOSPA provisions to be an event which itself presented

---

<sup>4</sup> Although the Commonwealth cites to North Carolina v. F.A.A., 957 F.2d 1125, 1133
(4th Cir.1992), for the proposition that such opposition itself is indicative of "controversy"
within the meaning of nearly-identical enabling regulation of the F.A.A. (See, Docket # 135, at
19 ff.), the Fourth Circuit found that in the totality of circumstances present in that case, the
F.A.A.'s decision not to prepare an EIS was not arbitrary or capricious.

potential environmental costs, but rather contrasts the agency's intended action with a completely hypothetical Buzzards Bay, free of any regulation at all.[5]  The analysis of whether the Final Rule would have a significant effect upon public safety (namely, that it would "have an indirect and beneficial impact upon public safety because it required actions designed to reduce the incidence of oil spills") suffers from the same defect, because it again does not consider the potential impact of preemption of MOSPA.

Thus, the Coast Guard's determination with regard to the applicability of Sections 2.B.2.b(1)-(2) was arbitrary and capricious because it was not based upon a consideration of the relevant factors.

E.      Harmless Error Under the APA

However, even if the Commonwealth is correct that the Coast Guard should have conducted an EIS or an EA, the failure to make that assessment was harmless error because (1) the Coast Guard conducted via the rulemaking process the very analysis (i.e., whether protection of the environment and/or vessel safety required escorts for double hull tank vessels) which would have been made via ES or EIS should it have determined that one was required, and (2) the Commonwealth has not identified substantial defects in that analysis.  See Save Our Heritage, 269 F.3d at 61 (remand for environmental assessment not necessary where agency has already made a reasoned finding that environmental effects are de minimis).  See also Illinois Commerce

---

[5]  The question here presented (whether the potential environmental effects of preemption need be accounted for in the Coast Guard's analysis) presents a separate question from that of whether the preemption was an extraordinary circumstance within the meaning of Section 2.B.2.b(9).  See supra, at 7-10.

Com'n v. I.C.C., 848 F.2d 1246, 1258 (D.C.Cir. 1988)(despite having been obligated by its own regulations to prepare an EA, remand would be a "meaningless gesture" as the agency did not ignore environmental consequences during its rulemaking); Nevada v. Department of Energy, 457 F.3d 78, 90-91 (D.C.Cir.2006).

The APA provides that, in reviewing agency action, the court "shall" take account of "the rule of prejudicial error," whether the error caused prejudice.  5 U.S.C. § 706.   There would be no benefit to remanding for environmental assessment where the Coast Guard has conducted a reasoned analysis of the environmental affects of its rulemaking.  See Docket #116 at 27-30. This is especially so where the Commonwealth's assertion that the Final Rule's failure to require escorts for double-hulled tankers poses significant environmental risks is unsupported by anything substantial in the record.  It is up to the Commonwealth in the course of assailing the Coast Guard's findings to identify the defects in evidence and the faults in reasoning.  See Town of Marshfield v. F.A.A., 552 F.3d 1, 4 (1st Cir.2008)("In this case, the FAA's assessment of minimal impact is not implausible.  If there is a stronger argument for insisting that the FAA use NIRS or some other computer modeling program in cases like this, it can await an instance in which a more powerful argument is presented.")(citing Save Our Heritage,, 269 F.3d at 60).

The Commonwealth objects that the Coast Guard did not analyze the degree to which preemption of MOSPA increased the risk of spills (other than to state that double hulls provide sufficient protection against groundings in Buzzards Bay).  It asserts that the Coast Guard's conclusion that double hulls provide sufficient protection against groundings is insufficient because it ignores the risk of accidents arising from collision or allision (despite the fact that the stated purpose of the Final Rule was to reduce the likelihood of an incident that might result in a

collision, allision, or grounding).  Yet the Commonwealth has not adduced any evidence suggesting that a double hull tanker is more vulnerable to a spill resulting from collision or allision than it would be to one resulting from grounding (and the record contains evidence to the contrary, see infra).  The Coast Guard's focus upon grounding accidents is reasonable in light of its description of "bottom characteristics" of the relevant geographic area as rocky, and its having determined that groundings have historically presented the greatest risk in Buzzards Bay.   See 72 Fed. Reg. 50,054 - 50,055

It also objects that the administrative record does not contain evidence that the Coast Guard engaged in the types of modeling it has completed for other bodies of water to assess similar types of risk.  Only one such study has been identified, a 1999 study concerning Puget Sound.  While the Commonwealth states that the Puget Sound analysis "assumed that the risk of a serious oil spill from a double hulled vessel is significant" (Docket #135 at 25, (citing A.R. at 286)), that analysis notably concluded that tug escorts for single hull tankers were the most cost-effective of the escort options and added that an extension of escort requirements to double-hull tankers was less cost effective (both because double hulls reduce the risk of spills from grounding and collision accidents and because of the significant compliance costs of slowing down higher speed vessels to match the speed of the escort tugs).  A.R. at 287.  Thus, both of the Commonwealth's principal objections to the Coast Guard's analysis are undermined by the only environmental assessment in the record.

The Coast Guard described within the Final Rule its receipt, and consideration of, interested parties' comments concerning, inter alia, the hazards presented by single-hull barges vis-a-vis double-hulled barges.  See  72 Fed. Reg. at 50,053 - 50,057.  In particular, the Coast

Guard noted that:

> Three written comments stated that the requirement for escort tugs should apply to double hull tanks vessels in addition to single hull tank vessels. At the consultative meeting discussed elsewhere in this preamble, the Massachusetts Department of Environmental Protection also urged that all tank vessels transiting Buzzards Bay, both single and double hull, be required to have an escort tug.
>
> The majority of tank barge casualties in Buzzards Bay have been caused by groundings, and the bottom characteristics of the area are generally rocky. Double hulls provide sufficient protection against this type of casualty, and there has never been a major oil spill from a double hull tank barge grounding in Buzzards Bay. Therefore, the Coast Guard does not feel it is necessary to require tug escorts for double hull tank barges at this time. Additionally, the Coast Guard considers that, as adopted in this rule, its three-pronged approach to navigation safety ((1) Mandatory participation in a Vessel Movement Reporting System (VMRS); (2) a federally licensed pilot and (3) a tug escort for single hull tank barges) constitutes a redundant vessel accident and pollution prevention system that will provide a sufficient measure of safety for tank vessels transiting Buzzards Bay.

Id. at 50,054 - 50,055.

Further indicative of the fact that the Coast Guard did give consideration to the relative merits of requiring tugs for both single and double-hull tankers is the fact that in its Advanced Notice of Proposed Rulemaking, the Coast Guard indicated that it was considering requiring tug escorts for all tank barges, and solicited comments from interested parties on that basis. See 69 Fed. Reg. at 62429.  The evolution in its position (toward the conclusion that tug escorts were necessary only for single-hulled barges) suggests due consideration, rather than arbitrary and capricious refusal to consider opposing positions.

The Commonwealth also objects that the Coast Guard failed to respond to its comments concerning spills involving double hull vessels in the Gulf of Mexico.  The Coast Guard argues convincingly that the situation presented by the Gulf of Mexico spill (a submerged and uncharted

oil platform sunk by a hurricane) is unlikely to occur in Buzzards Bay, and that the presence of an escort tug would not in any event prevent a collision with such an object.[6]  The Commonwealth also objects that the record contains no evidence that a double-hulled vessel could have avoided previous spills.  Docket #135, at 25-26.  The Coast Guard concluded, however, in its Regulatory Evaluation that had the measures contained in the Final Rule been previously implemented, each of the prior documented spills in Buzzards Bay "may well have been avoided."  A.R. at 489.

2.  Lack of Notice Of Intent To Engage In Express Preemption

A related argument now advanced by the Commonwealth, but not advanced prior to the filing of the administrative record, is its contention that the Coast Guard's preemption statement was itself not properly noticed so as to provide the requisite opportunity for public comment.  The APA requires that notice of proposed rulemaking shall be published in the Federal Register, including inter alia,  reference to the legal authority under which the rule is proposed and either the terms or substance of the proposed rule or a description of the subjects and issues involved.  5 U.S.C. § 553(b).  To insure meaningful public participation in a rulemaking endeavor, the "final rule must be a lineal descendant of, and in character with, the earlier proposed rule."  O'Connell v. Shalala, 79 F.3d 170, 180 (1st Cir.1996).  "Put another way, changes must flow logically from the prescribed notice and comment."  Id. (citing Natural Resources Defense

---

[6]  Although the Coast Guard's response to the Commonwealth's concern about the Gulf of Mexico incident does not appear in the A.R., but is advanced by affidavit, the Court may relay upon agency declarations which explain agency views held at the time of its action and which are supported by the administrative record.  Sierra Club v. Marsh, 976 F.2d 763, 772-773 (1st Cir.1992).

Council, Inc. v. United States EPA, 824 F.2d 1258, 1283 (1st Cir.1987)).

From the outset, the Coast Guard has expressed the opinion that federal law (that is the PWSA as interpreted in Ray v. Atlantic Richfield Co., 435 U.S. 151 (1978) and United States v. Locke, 529 U.S. 89 (2006)) rendered MOSPA a legal nullity upon enactment, and that its intended rulemaking might also preempt MOSPA.  See, e.g., Advanced Notice of Proposed Rulemaking, 69 Fed. Reg. at 62430 (stating in October, 2004, that certain provisions of MOSPA were preempted in the Coast Guard's view and that "it is likely that any regulation promulgated as a result of this advance notice of proposed rulemaking would likewise touch categories of regulation reserved to the Federal Government"); Notice of Proposed Rulemaking, 71 Fed. Reg. 15,653- 15,654 (analyzing the federalism implications of the proposed rulemaking, describing various notice and consultation efforts undertaken to date in compliance with Executive Order 13132, and inviting further consultation requests).[7]  The Final Rule details the comment and consultation process as it ultimately played out with concerned local government officials, a process which clearly reflects that the Coast Guard's intention to preempt was well understood. See  72 Fed. Reg. at 50,056 - 50,057.  Thus, from the outset, the public generally, and the Commonwealth specifically, received notice that the contemplated regulation could have preemptive effect.

While it is true that the Coast Guard's particular theory of preemption evolved during the course of this litigation (from a field preemption and conflict preemption theory in the ANPR to

---

[7]  In fact, the Coast Guard's expression of its position that MOSPA was preempted dates from earlier still.  See A.R. 127 (referencing the Coast Guard's September, 2004, request to the Massachusetts governor that execution and enforcement of MOPSA be withheld because its provisions extend into areas regulated by the federal government).

an express and conflict preemption theory by Final Rule), such an evolution was suggested by the course of the litigation itself, and there is no evidence that the Coast Guard attempted thereby to evade public comment concerning the preemptive effect of the proposed rules.  Moreover, the provisions of the Final Rule itself remained lineal descendants of the proposed rule, no matter the legal preemption theories the Coast Guard might have advanced in support of it during litigation. The Commonwealth has not adduced any authority for the proposition that an agency must identify not only the terms and substance of regulatory language and relevant issues, but also all of the legal and policy arguments it will make in support of its regulation.

**Other Issues**

1.      Primary vs. Subsidiary Statutory Objectives

The Commonwealth urges the Court to reconsider its rejection of its previous argument that MOSPA cannot frustrate Congressional purpose when it advances, rather than impairs, the explicity-stated primary goals of Title I (i.e., protection of the environment and vessel safety). The Court rejected this argument by adopting the June 6, 2008, Report and Recommendation, finding that Congress directed the Coast Guard to consider and balance numerous factors in crafting regulations under Title I, and noting that the Supreme Court had authorized the Coast Guard to set the appropriate level of regulation or to determine that no regulation at all is appropriate.  Docket #116 at 20-21 (citing Locke, 529 U.S. at 109).  The Commonwealth presses the argument that when subsidiary statutory goals form the basis for conflict preemption, the primary federal goals are subverted.  The Commonwealth concedes, however, that the Supreme Court and First Circuit have nevertheless approved conflict-preemptive regulations which

21

embody the agency's policy judgment as to how best to advance the statute's primary goals.  See

Docket #135 at 48, n. 41.  This is just such a case.  The Locke framework makes clear that the

Coast Guard is empowered to make a policy determination, balancing all of the statutory factors,

as to what level of regulation best advances the primary statutory purposes.  Locke, 529 U.S. at

109.  See also Id. at 110 ("a federal official with an overview of all possible ramifications of a

particular requirement might be in the best position to balance all the competing

interests.")(citing Ray, 435 U.S. at 177).

   The Commonwealth also objects that the Administrative Record, now before the Court,

does not bear out the Court's previous conclusion (See Docket #116, at 18-19) that the Coast

Guard had balanced the statutory factors by, e.g., considering economic impacts and effects, local

practices and customs, or various other factors delineated at 33 U.S.C. § 1224(a)(1)-(9).  Clearly,

the Coast Guard considered these factors.  For example, it conducted a Ports and Waterways

Safety Assessment Workshop for Buzzards Bay on September 9-10, 2003, which included

consideration of these factors.   See A.R. at 32-64.  The Regulatory Evaluation conducted by the

Coast Guard also included a cost-benefit analysis.  A.R. at 406-407.


   2.    Wyeth v. Levine

   On March 4, 2009, (i.e., subsequent to briefing on the pending motions), the United

States Supreme Court issued its decision in Wyeth v. Levine, 129 S.Ct. 1187, __ U.S. ____

(2009), which contains significant preemption analysis.  Accordingly, the Court permitted

supplemental briefing to consider whether the Wyeth decision necessitates reconsideration of the

Court's adoption of the Report and Recommendation of June 6, 2008**.**

The Commonwealth sees a twofold significance to the Wyeth case: first, it asserts that the decision settles that the Coast Guard may not engage in express preemption, as it is lacking specific statutory authority to do so; and second, it asserts that Wyeth fatally undermines the conflict preemption arguments of the Coast Guard.[8]   Docket #148 at 1.

The Commonwealth's assertion that Wyeth forecloses the possibility of an agency engaging in express preemption on the basis of implied authority reaches too far.  In adopting the Report and Recommendation of June 8, 2008, the Court found that although the Coast Guard does not have an express delegation by the Congress of authority to engage in express preemption, its power to do so was nevertheless implied by the scope of powers Congress delegated to it via the PWSA as explained by the holdings of Locke and Ray.   The Court also noted, but rejected, therein the Commonwealth's objection that the continuing vitality of implied agency authority to engage in express preemption was in doubt, concluding that although an emerging trend toward limiting agency rights to engage in express preemption might be discerned, it had not thus far advanced beyond dicta and that implied authority to engage in express preemption remained valid under binding precedent.  See Id. at 15, n. 8.

Wyeth concerns the weight to be afforded to an agency's views about the impact of state tort law on federal objectives.  At issue in Wyeth was not a claim of express preemption by the FDA, but rather the FDA's assertion, made in support of its conflict preemption claim, that state tort law was an obstacle to achieving its statutory objectives.  Id., at 20.  The Commonwealth

---

[8]  Additionally, the Commonwealth argues that Wyeth forecloses any argument that the Coast Guard's preemption statement in the Final Rule may be the source of preemption.  The Coast Guard has disclaimed any argument that the preamble to the Final Rule is a source of preemptive authority, and so the Court need not consider the relevance of Wyeth to that proposition.  See Docket #151, at 8.

acknowledges this distinction, but asserts in conclusory fashion that the argument necessarily applies with even greater force to effectively bar claims of express preemption by implied authority.  <u>See</u> Docket #148 at 4, n. 2.  The United States Supreme Court, however, has previously described implied agency authority to engage in express preemption, and that precedent remains binding.  <u>See</u> <u>City of New York v. F.C.C.</u>, 486 U.S. 57, 64 (1988)(citing <u>Capital Cities Cable, Inc. v. Crisp</u>, 467 U.S. 691, 700 (1984)); <u>Fidelity Federal Savings & Loan Assn. v. De la Cuesta</u>, 458 U.S. 141, 152-154 (1982)("The statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof. <u>Beyond that</u>, however, in proper circumstances the agency may determine that its authority is exclusive and pre-empts any state efforts to regulate in the forbidden area")(emphasis added).

The Commonwealth argues that <u>Wyeth</u> limits the weight to be afforded to agency positions on preemption in a manner that forecloses a finding of conflict preemption in this case. It argues that the Coast Guard may not engage (and the Court may not defer to) a "preemption balancing" i.e., a determination that State laws are pre-empted based upon the Coast Guard's balancing of the § 1224(a) factors, "without regard for whether any existing State requirements may actually undermine Title I's stated goals of 'vessel safety and protection of the marine environment.'" Docket #148 at 6-7.  This is a variation of the argument that the Court has rejected, <u>supra</u>, concerning primary versus subsidiary goals of the PWSA.  Moreover, even accepting the Commonwealth's position that <u>Wyeth</u> stands for the proposition that the Court may not defer to an agency's conclusion that state law is pre-empted, but rather must merely attend to the agency's explanation of how state law affects the regulatory scheme as it examines the

24

substance of state and federal law, this is precisely the analysis in which the Court has previously engaged.  The Commonwealth is not persuaded by the Coast Guard's analysis, because it has as its underpinning the view that the Coast Guard is required to demonstrate that "the State laws would pose an increased danger to safety or environmental protection." See Docket #148 at 10. The Court has rejected this view, however, in light of the holding of Locke that the relevant inquiry for PWSA Title I conflict pre-emption is whether the Coast Guard has promulgated its own requirement on the subject or has decided that no such requirement should be imposed at all. Locke, 529 U.S. at 110 (citing Ray, 435 U.S. at 171-172, 178 ("[W]here failure of  . . .  federal officials affirmatively to exercise their full authority takes on the character of a ruling that  no such regulation is appropriate or approved pursuant to the policy of the statute, States are not permitted to use their police power to enact such a regulation.")).

Finally, the Court is not persuaded that the Wyeth decision in any way undermines the Supreme Court's holding in Locke that the Coast Guard is empowered under the PWSA to set the appropriate level of regulation or to determine that no regulation at all is appropriate. Locke, 529 U.S. at 109.  Coast Guard regulation under the PWSA is on a different footing than the agency action in review under Wyeth, where a presumption against preemption applied. Compare Locke at 108 ("[t]he state laws now in question bear upon national and international maritime commerce, and in this area there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers.") with Wyeth, 129 S.Ct. 1187 at 8 (applying a presumption against preemption in the presence of the historic presence of state law).

3.      Significance of Revisions to 33 U.S.C. §1222

The Commonwealth also argues that the Court has underestimated the significance of

post-Ray Congressional revisions to the PWSA, and that the revisions in fact eliminate the entire

textual basis for Title I preemption upon which Ray, Locke, and this Court's analysis depended.

The Commonwealth points out that while the First Circuit directed this Court to consider

on remand the significance of the deletion by Congress of the former 33 U.S.C. § 1222(b)(See,

United States v. Massachusetts, 493 F.3d 1, 15-16, n. 21 (1st Cir. 2007)), the Congress also

removed the language of former Section 1222(e), upon which the Commonwealth asserts the

Supreme Court also relied in Ray (and upon which, in turn, this Court relied upon in adopting the

Report and Recommendation of June 6, 2008).

In Ray, the Court noted the pre-emptive impact of the subsequently-deleted § 1222(b),

but added that "even without § 1222(b), we would be reluctant to sustain the Tanker Law's

absolute ban on tankers larger than 125,000 DWT" because the Court had previously recognized

that "'where failure of  .  .  .  federal officials affirmatively to exercise their full authority takes on

the character of a ruling that no such regulation is appropriate or approved pursuant to the policy

of the statute,'[s]tates are not permitted to use their police power to enact such a regulation."

Ray, 435 U.S. at 178 (quoting Bethlehem Steel Co. v. New York Labor Relations Board, 330

U.S. 767, 774 (1947)).  The Ray court concluded that on the facts of that case, the regulation took

on such a character in part because of the also-deleted §1222(e)'s admonition that the Secretary

shall consider the wide variety of interests affecting the exercise of his authority.  Id.  However,

the subsequent deletion of a statutory section which was germane on the facts of that case to

assessing the character of a different regulation does not bear upon the issue of whether in this

case, the Coast Guard's regulation took on "the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute." Here, there is no ambiguity as to whether the Coast Guard's failure to exercise its full authority took on the character of such a ruling because (unlike the facts presented in Ray), the Coast Guard has explicitly made such a statement. Moreover, after the statutory revisions, the Supreme Court in Locke held that the Coast Guard has the authority to determine the appropriate level of regulation. Locke 529 U.S. at 109-110. This Court relied upon Locke, rather than the repealed statutory sections in its analysis. See Docket # 116 at 24 (noting that the Locke court reaffirmed the essential framework of Ray despite the statutory changes). Id. (citing Locke at 109-110).


## CONCLUSION

For the foregoing reasons, I recommend that Commonwealth of Massachusetts' Motion for Partial Summary Judgment (Docket #134) be DENIED, and that the United States of America's Cross Motion for Summary Judgment (Docket #139) be ALLOWED. I further recommend that the Court DENY the Coalition for Buzzard Bay's Motion for Summary Judgment (Docket #136).[9]

---

[9] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within thirty days of the party's receipt of this Report and Recommendation. At the joint request of the Parties, I have enlarged the time within which the Parties may file written objections to these proposed findings and recommendations from ten to thirty days. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano

In addition, at the joint request of the Parties, I have enlarged the time within which the Parties may file written objections to these proposed findings and recommendations from ten to thirty days._____

_____/s / Leo T. Sorokin_____
UNITED STATES MAGISTRATE JUDGE

Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also, Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).