UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| THE AMERICAN WATERWAYS | ) | CIVIL ACTION NO. |
| OPERATORS, ET AL | ) | 05-10112-DPW |
| | ) | |
| Intervenor-Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COMMONWEALTH OF | ) | |
| MASSACHUSETTS, ET AL | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| COALITION FOR BUZZARDS BAY | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |

MEMORANDUM AND ORDER
March 31, 2010

This case, arising from a catastrophic oil spill in Buzzards
Bay in 2003, concerns whether aspects of the Commonwealth of
Massachusetts Oil Spill Prevention Act ("MOSPA") must give way to
the federal Ports and Waterways Safety Act of 1972, as amended
("PWSA").  Throughout the travel of the case, the Commonwealth's
fortunes in this litigation - by which the United States seeks to
establish that MOSPA is preempted by PWSA - have ebbed and flowed
as the matter passed from judicial officer to judicial officer.

Judge Tauro, to whom this case was initially assigned,
enjoined the Commonwealth from enforcing certain challenged

provisions on preemption grounds.  *United States v. Massachusetts*, 440 F. Supp. 2d 24 (Mass. 2006).  That decision was vacated on appeal by a three judge panel of the First Circuit and remanded for further development of the record. *United States v. Massachusetts*, 493 F.3d 1 (1st Cir. 2007).

Shortly after the Court of Appeals decision, the United States Coast Guard, which has primary federal responsibility for implementing PWSA, issued a Final Rule containing a provision - not before the First Circuit during its review of Judge Tauro's decision - purporting to preempt MOSPA expressly.  When Judge Tauro recused himself on remand, the case was reassigned to the late Judge Lindsay, who referred a motion for a renewed injunction against certain MOSPA provisions remaining in dispute to Magistrate Judge Sorokin for a Report and Recommendation.  In a thoughtful opinion (#116) dated June 6, 2008 ("*RR I*"), which I attach to this Memorandum and Order to assure publication in F. Supp. 2d, Magistrate Judge Sorokin recommended that a preliminary injunction against enforcement of the disputed provisions of MOSPA enter pending the filing of the administrative record for the final rulemaking.  Judge Young, who assumed responsibility for this case and other of Judge Lindsay's cases during Judge Lindsay's prolonged illness prior to his death, adopted the Report and Recommendation on August 27, 2008.

After the final administrative record was filed, the parties filed cross motions for summary judgment. In another thoughtful opinion apparently filed duplicatively as (#154 and #156) containing his Report and Recommendations dated July 29, 2009 (collectively "*RR II*"), which I also attach in the form filed as docket #154 to this Memorandum and Order to assure publication in F. Supp. 2d, Magistrate Judge Sorokin recommended that summary judgment enter for the United States and be denied to the Commonwealth because the Final Rule had effectively preempted the MOSPA provisions at issue. When the parties and intervenors filed objections to *RR II* (and, through those objections, to the incorporated dimensions of *RR I*),[1] Judge Young directed that the case be reassigned. After it was redrawn, the matter came up on the shores of my docket.

Upon review of the parties' extensive underlying motion submissions and their submissions regarding objections to the substance of the two Reports and Recommendations - including a hearing regarding the objections - I find, after an extended drafting effort, that I can at best do little more than

---

[1] Because *RR I* recommended an interlocutory order, there was no immediate obligation for the Commonwealth to appeal or otherwise object to *RR I*. Rather, the Commonwealth awaited the dispositive recommendation of *RR II* to press an objection upon the assigned District Judge. In this objection to *RR II*, the Commonwealth is free to attack the reasoning of *RR I*, since the two Reports and Recommendations together provide the complete explication of the Magistrate Judge's reasons why summary judgement should be awarded to the United States.

paraphrase Magistrate Judge Sorokin's analysis.  Accordingly, to avoid the supererogatory, I will simply adopt the attached Reports and Recommendations provided in his opinions of June 6, 2008 and July 29, 2009.  I add only a few brief comments.

The decisive change in the tides controlling this litigation - and thereby the fortunes of the Commonwealth's position - was the enactment of the Final Rule by the Coast Guard, leaving no ambiguity regarding the intention to preempt MOSPA.  No doubt recognizing that this definitive statement would effectively govern this litigation, the Commonwealth in a Third Amended Complaint chose to take a procedural tack in an effort to forestall being overwhelmed by the position of the United States after adoption of the Final Rule.  In particular, the Commonwealth introduced the contention that the rulemaking violated the National Environmental Policy Act ("NEPA").  In surfacing this contention, the Commonwealth was given assistance by the Coast Guard which, in what can only be described as an act of procedural hubris, chose not to prepare an environmental impact statement.  The Coast Guard gave no meaningful explanation for choosing not to do so, but rather merely inserted the word "No" in a box next to the checklist question: "Is there a potential for effects on the quality of the environment that are likely to be highly controversial in terms of scientific validity or public opinion?"

-4-

The proper way to treat navigation in Buzzard's Bay
following the oil spill was highly controversial, both as a
specific matter and as a matter of public opinion.  Yet, in an
exercise of hair splitting to support a dubious objection to *RR
II*,[2] the Coast Guard advances the position that the term
"'controversial' is not synonymous with 'opposition'" and
moreover that the concerns expressed by various state and federal
officials, legislators and constitutional officers were
"political."  This supercilious denigration and dismissal of
thoughtful environmental concerns expressing opposition to the
Coast Guard's controversial action has created an issue in this
litigation where none was necessary.

As it happens, the substance of the Coast Guard's actual
rulemaking analysis was the functional equivalent of what an
environmental impact statement would have generated.  The
Commonwealth, when pressed at the hearing before me on the

---

[2] Because the United States prevailed in its effort to
obtain summary judgment, it had no meaningful objection as to the
outcome.  In regular appeals, for example, while a party is free
to contest an adverse judgment, it may not cross-appeal because
it is unhappy with the language or approach that leads to a
favorable judgment.  *Neverson v. Farquharson*, 366 F.3d 32, 39
(1st Cir. 2004) (holding that where all of the relief a party
seeks is granted a cross-appeal is improper).  "However, on
appeal [an appellee] may argue for affirming the summary judgment
based on arguments that the [lower] court rejected." *Alberty-
Vélez v. Corporación de P.R. Para La Difusión Pública*, 361 F.3d
1, 5 n.4 (1st Cir. 2004).  Having raised an objection to the
Magistrate Judge's reasoning to a favorable recommendation, the
United States invites my own observations regarding the
circumstances addressed by the Magistrate Judge's reasoning.

objections, could not articulate any material environmental issue left unaddressed in the rulemaking process.  The procedural error of not following NEPA formalities was essentially harmless. Under the common sense approach adopted by the First Circuit, when "the failure to make a more formal assessment was harmless error," the act of "[r]emanding for a differently named assessment [would be] a waste of time." *Save Our Heritage, Inc. v. F.A.A.*, 269 F.3d 49, 61-62 (1st Cir. 2001).  Thus, despite the Coast Guard's best efforts dismissively to hand an issue to the Commonwealth, I find no reason to prolong these proceedings while administrative formalities are more punctiliously observed.

In the final analysis, the law of preemption - well charted by the Magistrate Judge in his successive Reports and Recommendations - leaves the last word under Federal law regarding the formulation of regulations to control vessel traffic, to enhance vessel safety and to decrease environmental hazards in Buzzards Bay to the Coast Guard.  Congress has explicitly authorized the Coast Guard to do so through its rule making process.  Consequently, I hereby ADOPT the June 6, 2008 and the July 29, 2009 Reports and Recommendations, ALLOW the motions of the United States (#139) and the Intervenor Plaintiffs (#112 and 131)[3] for summary judgment and DENY the motions for

---

[3] The Intervenor Plaintiffs have objected that the Magistrate Judge failed to recognize their own motion for summary judgment in *RR II* and consequently failed to act upon it.  This appears to be the result of some confusion created in docket reporting which does not show the Intervenor Plaintiffs' original

partial summary judgment of the Commonwealth (#134) and the

Intervenor Defendants (#136).   I will accordingly enter judgment

for the United States with a permanent injunction.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

motion for summary judgment (#112) as pending because it was
administratively terminated on March 31, 2010, and did not
recognize Intervenor Plaintiffs' notice (#131) regarding summary
judgment as a separate motion.  In any event, to clarify the
record that the Intervenor Plaintiffs have also prevailed on
summary judgment, I expressly allow #112 and #131 as motions for
summary judgment.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
THE UNITED STATES OF                    )
AMERICA, et al.,                        )
                                        )
        Plaintiffs,                     )
                                        )
        v.                              )        Civil Action No.  05-10112-RCL
                                        )
THE COMMONWEALTH OF                     )
MASSACHUSETTS, et al.,                  )
                                        )
        Defendants.                     )
_____)

REPORT AND RECOMMENDATION ON
MOTION FOR A PRELIMINARY AND PERMANENT INJUNCTION

June 6, 2008

SOROKIN, M.J.

        In response to an Order of Reference dated November 27, 2007 (Docket #97), I

recommend that the Plaintiff's Motion for a Preliminary and Permanent Injunction (Docket #91)

be ALLOWED in part and DENIED in part, and that the Court enter a Preliminary Injunction.

I.      INTRODUCTION AND PROCEDURAL HISTORY

        In the wake of an April 27, 2003, oil spill into the waters of Buzzards Bay, the legislature

of the Commonwealth of Massachusetts enacted legislation entitled, "An Act Relative to Oil

Spill Prevention and Response in Buzzards Bay and Other Harbors and Bays of the

Commonwealth" (MOSPA).  M.G.L. c. 21M.  On January 18, 2005, the United States of

America (United States) filed suit, alleging that certain provisions of MOSPA are preempted by

1

federal law and are therefore unconstitutional.[1]   Docket #1.  The United States and the

Intervenor Plaintiffs (several trade organizations) subsequently moved for judgment on the

pleadings.   Docket #s 22, 29.  On July 24, 2006, this Court allowed that motion, and the

Commonwealth was thereby enjoined from enforcing each of the MOSPA provisions which the

United States had challenged.  Docket #s 74-75; <u>United States v. Massachusetts</u>, 440 F. Supp. 2d

24 (D. Mass.2006) (Tauro, J.).  The Commonwealth appealed as to only three of the MOSPA

provisions enjoined by the District Court's order, and on June 22, 2007, the United States Court

of Appeals for the First Circuit vacated that order as to the three provisions which were the

subject of the appeal, and remanded the case to the District Court for further development of the

record and of the Parties' arguments.  Docket  #87; <u>United States v. Massachusetts</u>, 493 F.3d 1

(1st Cir.2007).

Two significant developments have altered the landscape of this litigation since the First

Circuit remanded the case on June 22, 2007 for further analysis.  First, the parties have resolved

their differences as to one of the three provisions which were the subject of the appeal.  As a

result, only two MOSPA provisions remain at issue upon remand: (1) manning regulations for

tank vessels set forth in M.G.L. c. 21M, §§ 4(a) and (b); and (2) tugboat escort requirements for

certain vessels set forth in M.G.L. c. 21M, §§ 6(a) and 6(b).  Second, on August 30, 2007, just

over two months after the First Circuit issued its decision, the Coast Guard promulgated revised

regulations governing certain tank vessels and tug/barge combinations transiting Buzzards Bay.

---

[1]   Although MOSPA applies to waters of the Commonwealth designated as "areas of
special interest," a designation which also presently includes Vineyard Sound and Mount Hope
Bay (<u>see</u> M.G.L. c. 21M, § 1), the United States seeks to preempt its provisions only as they
relate to Buzzards Bay.

See "Final Rule: Regulated Navigation Area; Buzzards Bay, MA; Navigable Waterways Within

the First Coast Guard District," 72 Fed. Reg. 50052 (August 30, 2007) (Final Rule). The Final

Rule was promulgated following the requisite notice and comment period lasting for more than

one year.  It is this Final Rule, rather than the Coast Guard regulations that were previously

reviewed by the First Circuit, that is the subject of the instant motion.  As a result, the issues that

this Court must resolve are somewhat different than those the First Circuit anticipated.  This is so

because the Final Rule: (1) expressly states that it preempts the MOSPA provisions at issue; and

(2) establishes revised tug escort and manning provisions only with respect to Buzzards Bay (the

First Circuit having had before it only a more general Northeast Region regulation that remains

in effect).

The United States now moves, pursuant to the Supremacy Clause of United States

Constitution and Fed. R. Civ. P. 12 and 65, for a preliminary and permanent injunction enjoining

the Commonwealth's enforcement of MOSPA's tug escort and vessel manning provisions as

applied to Buzzards Bay. Docket #91. The Court heard arguments on December 20, 2007, and

received supplemental post-argument briefs.  The Defendants have opposed the motion on the

merits.[2]

---

[2]Although each Defendant suggests in its written filings that further development of the
factual record is necessary prior to proceeding to judgment on the merits, the Court (Lindsay, J.)
indicated at the October 15, 2007, status conference that during the pendency of the United
States' motion, the Defendants would be permitted "a parallel course to do whatever discovery
you think is appropriate, and if it's necessary to supplement whatever papers you have filed with
whatever you discover with respect to Puget Sound."  Docket #93, at 25.  To date no further
evidence has been made a part of the record (except as attached to the Parties' supplemental
memoranda).

3

II.   FACTUAL BACKGROUND AND STATUTORY FRAMEWORK

A.   The MOSPA Provisions and Coast Guard Regulations At Issue

1.   Tug Escort Requirements For Tank Vessels

MOSPA requires a tugboat escort for all tank barges transiting Buzzards Bay carrying

more than 6,000 barrels of oil.  The statute provides:

> [N]o tank vessel carrying 6,000 or more barrels of oil shall enter or transit any
> area of special interest within the waters of the commonwealth unless the tank
> vessel is accompanied by a tugboat escort  . . . This section shall not apply to a
> self-propelled tank vessel.

M.G.L. c. 21M, § 6(a) & (b).  The Coast Guard's Final Rule provides that each single hull tank

barge transiting Buzzards Bay carrying 5,000 or more barrels of oil or other hazardous material

must, in addition to its primary tug, be accompanied by an escort tug of sufficient capability to

promptly push or tow the tank barge away from danger in the event of certain described

emergency conditions (e.g., collision or grounding).  72 Fed. Reg. 50052 (August 30, 2007).  All

double hull tank barges remain exempt from the escort requirement. Id. [3]

The MOSPA tug escort provisions are broader than the Coast Guard's corresponding

regulations in two respects: (1) the federal regulations exempt double-hulled tank barges from

any escort requirements while the MOSPA provisions do not; and (2) the federal regulations are

limited to "tank barges" while MOSPA applies to these barges and to self-propelled vessels less

than 130 feet in length.  Cf. 33 C.F.R. § 165.100 (incorporating the definitions at 157.03) with

---

[3]  In describing the revised regulation, the Government states in its brief that "a double-
hull tank barge transiting Buzzards Bay is exempt from the tugboat escort requirement if it is
being towed by a primary towing vessel with twin-screw propulsion and with a separate system
of power to each screw." Docket # 92, at 7 (citing 72 Fed. Reg. at 50052, 50059).  Such a barge
is exempt, however, simply because it has a double hull.  The Coast Guard regulation, for double
hull barges, imposes no propulsion requirements on the towing vessel. Id., at 50056.

4

M.G.L. c. 21M, §1, defining the terms "tank barge" and "tank vessel.")  The revised Coast Guard

regulations are broader than MOSPA's provisions in three respects: (1) the federal regulation

applies to hazardous materials in addition to oil; (2) the federal regulations require a tug escort

for single-hulled tank barges carrying more than 5,000 barrels, while MOSPA applies only to

vessels carrying 6,000 or more barrels of oil; and (3) the federal regulations specify certain

minimum power requirements for the escort tug.

### 2.  Vessel Manning Requirements

MOSPA requires that "[t]he navigation watch on all tow vessels transiting Buzzards Bay

and carrying 6,000 or more barrels of oil shall consist of at least 1 licensed deck officer or tow

vessel operator."  M.G.L. c. 21M, § 4(a).  In addition, for the vessel towing the barge, MOSPA

requires: (1) at least one licensed deck officer or tow vessel operator serving exclusively as a

lookout with no other concurrent duties; and (2) three licensed officers or tow vessel operators on

the vessel whenever it is towing a tank barge.  Id.  The operator must log the lookout's name and

duty hours and maintain a record of the crew on board during towing.  Id.  For the tank barge,

MOSPA requires two personnel, one of whom must be a "certified tanker-man under 46 C.F.R.

subpart 12.20" who shall be on the tank barge at all times when the barge is in Buzzards Bay

unless the barge cannot accommodate personnel on board.  Id., §4 (b). Under the Coast Guard's

regulation, a single hull tank barge transiting Buzzards Bay with 5,000 or more barrels of oil or

another hazardous material must be under the "direction and control" of a federally licensed

pilot, in addition to the vessel's standard crew.  The pilot is required to "embark, direct and

control from the primary tug."  72 Fed. Reg. 50052, 50059.

The federal regulations cast a wider net in that they apply to hazardous materials in

addition to oil, and apply at a lower cargo threshold  (5,000 barrels versus 6,000 barrels).  72 Fed.

Reg. at 50059, amending 33 C.F.R. § 165.100.  On the other hand, the MOSPA provisions apply

not only to tank barges, but also to self-propelled tank vessels of less than 130 feet.  Id.  Neither

sovereign's law applies to double hull tank barges. Id.; See in particular, M.G.L. ch. 21M,

§ 4(c)(stating failure to comply with manning requirements is a violation of this chapter "unless

such tank barge has a double hull.").

### 3.  Statement of Preemption

After setting forth the revised regulations, the Coast Guard in its Final Rule the following

preemption language:

> The Coast Guard believes that by operation of law and our Agency determination,
> State law is preempted on the subjects covered by this rulemaking. The Coast
> Guard's affirmative decisions: (1) Not to institute mandatory ship routes, but to
> monitor use of the existing recommend [sic] routes via the Vessel Movement
> Reporting System created by this rule; (2) to require a federally licensed pilot in
> addition to the normal crew aboard a tug towing a single hull tank barge thorough
> [sic] Buzzards Bay, but not to require any other modifications to the applicable
> manning requirements; and (3) to require an escort tug in addition to the primary
> tug, for all single hull tank barges transiting Buzzards Bay, but not for other
> vessels; each represent a considered determination of the appropriate level of
> regulation to ensure navigation safety and environmental protection. As such, the
> Coast Guard has determined that any other non-Coast Guard schemes relating to
> vessel routing, manning, and tug escort requirements in Buzzards Bay are
> preempted.
>
> To the extent not otherwise already preempted, this rule is intended to, and does,
> preempt those provisions of Massachusetts' "Act Relative to Oil Spill Prevention
> and Response in Buzzards Bay and Other Harbors and Bays of the
> Commonwealth," ("MOSPA") regarding enhanced manning requirements for tank
> barges and tow vessels in Buzzards Bay, see Mass. Gen. Laws ch. 21M § 4, and
> tugboat escorts for certain waters, see id. § 6. Further, it is the Coast Guard's view
> that, by Operation of Law, MOSPA's provisions regarding mandatory vessel
> routes in Massachusetts waters, see id. § 5; and compulsory State pilotage, see
> Mass. Gen. Laws ch. 103 § 21, are likewise preempted. See U.S. v.
> Massachusetts, 440 F.Supp.2d 24 (D.Mass., 2006), remanded on other

6

grounds--F.3d--, 2007 WL 1775913 (1st Cir., June 21, 2007) (NO. 06-2361, 06-2362).

72 Fed. Reg. 50052-50057.

The earlier iteration of the Coast Guard regulations that were reviewed by the First Circuit did not contain this preemption language.

III.    DISCUSSION

A.  Standard of Review

To obtain a preliminary injunction against enforcement of the contested MOSPA provisions, the United States must show: (1) that it has a substantial likelihood of success on the merits of its preemption claims; (2) that it faces a significant potential for irreparable harm in the absence of immediate relief; (3) that the balance of possible hardships are in its favor (i.e., that the issuance of an injunction will not impose more of a burden upon the Commonwealth than its absence will impose upon the United States); and (4) that the granting of prompt injunctive relief will promote (or, at least, not denigrate) the public interest. McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir.2001).  The standard for obtaining permanent injunctive relief is virtually identical to that for obtaining preliminary injunctive relief, except that the movant must show actual success on the merits of the claim, rather than a mere likelihood of such success.  Largess v. Supreme Judicial Court, 373 F.3d 219, 223 n.2 (1st Cir.2004).

B.    Likelihood of Success on the Merits

The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the

7

supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the

Constitution or Laws of any State to the Contrary notwithstanding."   United States Constitution,

Art. VI, Cl. 2.   The Supremacy Clause gave rise to the doctrine of federal preemption more than

one hundred and seventy-five years ago.  See Chicago and N.W. Transp. Co. v. Kalo Brick & Tile

Co., 450 U.S. 311, 317 (1981) (citing Gibbons v. Ogden, 9 Wheat. 1, 211, 6 L.Ed. 23 (1824)).

Such federal preemption may occur in several different ways.  State regulation may be

foreclosed by express language in a congressional enactment.  Lorillard Tobacco Co. v. Reilly,

533 U.S. 525, 541 (2001) (citing Cipollone v. Liggett Group, Inc., 505 U.S. 504, 517 (1992)).  In

the absence of such express preemption language in statutory or regulatory schemes, the

Congress' intent to preempt all state law in a particular area may nevertheless be implied in one

of two ways.  First, it may be implied by "the depth and breadth of a congressional scheme that

occupies the legislative field" (field preemption).[4]  Lorillard, 533 U.S. at 541 (citing Fidelity Fed.

Sav. & Loan Assn. v. De la Cuesta, 458 U.S. 141, 153 (1982)).  Second, such an intent may also

be implied because of a conflict with a congressional enactment (conflict preemption).  Lorillard,

533 U.S. at 541 (citing Geier v. American Honda Motor Co., 529 U.S. 861, 869-874 (2000)).

### 1.  Express Preemption

In its June, 2007, decision, the First Circuit anticipated that "[i]t may be that [federal]

rules will be forthcoming that will pre-empt the State's present tug-escort rule."  Massachusetts,

493 F.3d at 19 (quoting Ray v. Atlantic Richfield Co., 435 U.S. 151, 172 (1978)).  The Coast

---

[4] Although the United States has previously advanced field preemption theories in the course of this litigation, its counsel stated at oral argument that it is not (at least for the purposes of the instant motion) arguing that either of the MOSPA provisions at issue are subject to field preemption.

Guard argues that the revised regulations and the express preemption statement obviate the need for a standard conflict preemption analysis because they expressly preempt MOSPA.

As a preliminary matter, it must be noted that federal regulations have no less preemptive effect than federal statutes, and agency regulations may preempt state regulation expressly or by implication. Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 699 (1984). See also Hillsborough County v. Automated Med. Labs, Inc., 471 U.S. 707, 713 (1985) ("We have held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes."). Accordingly, the fact that the Coast Guard's preemption statement is found in its own regulation, rather than an Act of Congress such as the Port and Waterways Safety Act, 33 U.S.C. § 1221 *et seq.* (PWSA), is of no consequence so long as the Coast Guard has been granted the authority to preempt state provisions. The first issue for the Court to resolve is whether Congress has bestowed upon the Coast Guard the authority to preempt in this manner. A court's inquiry concerning such an exercise of authority by an agency administrator is limited. "If [h]is choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." Fidelity, 458 U.S. at 153-154 (citing United States v. Shimer, 367 U.S. 374, 383 (1961)).

The Coast Guard relies for its authority to engage in express preemption on the Supreme Court's decision in City of New York v. F.C.C., 486 U.S. 57 (1988). The Coast Guard thereby claims not only the authority to displace state laws conflicting with validly-enacted federal regulations, but also to preempt any state efforts to regulate in the same area and thus "render unenforceable state or local laws that are otherwise not inconsistent with federal law." See Id. at

9

64.  The Supreme Court stated that "in proper circumstances [a federal] agency may determine that its authority is exclusive and preempts any state efforts to regulate in the forbidden area."  Id. The federal agency must, however, have a statutory basis of authority because "an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it."  Id. at 66.  Federal statutes may impliedly grant an agency authority to expressly preempt state laws.  The "best way of determining whether Congress intended the regulations of an administrative agency to displace state law is to examine the nature and scope of the authority granted by Congress to the agency." Id.

Congress has granted to the Coast Guard broad authority to promulgate regulations to control vessel traffic, to enhance vessel safety and to decrease environmental hazards.  Title I of the PWSA, which generally addresses matters of local concern, specifically authorizes the Coast Guard to promulgate regulations.  It provides, in pertinent part,

Subject to the requirements of section 1224 of this title, the Secretary--

(1) in any port or place under the jurisdiction of the United States, in the navigable waters of the United States, or in any area covered by an international agreement negotiated pursuant to section 1230 of this title, may construct, operate, maintain, improve, or expand vessel traffic services, consisting of measures for controlling or supervising vessel traffic or **for protecting navigation and the marine environment** and may include, but need not be limited to one or more of the following: reporting and operating requirements, surveillance and communications systems, routing systems, and fairways;

* * * *

(4) may control vessel traffic in areas subject to the jurisdiction of the United States which the Secretary determines to be hazardous, or under conditions of reduced visibility, adverse weather, vessel congestion, or other hazardous

10

circumstances by--

\* \* \* \*

(C) establishing vessel size, speed, draft limitations and **vessel operating conditions**; and

(D) **restricting operation, in any hazardous area or under hazardous conditions, to vessels which have particular operating characteristics or capabilities which he considers necessary for safe operation under the circumstances**;

33 U.S.C. § 1223 (emphases added).  In addition, as the First Circuit noted, Title I's Statement of Policy provides: "The Congress finds and declares . . . that increased supervision of *vessel . . . operations* is necessary in order to . . . insure that vessels operating in the navigable waters of the United States shall comply with all applicable standards and requirements for vessel construction, equipment, *manning*, and operational procedures."  Massachusetts, 493 F. 3d at 12, (quoting 33 U.S.C. § 1221(c)(3))(emphasis in original).

Congress amended the PWSA via the Port and Tanker Safety Act of 1978 (Pub. L. 95-474).  The legislative history of this amendment indicates that the Congress sought thereby to improve "the supervision and control over all types of vessels . . . operating in the navigable waters of the United States; and . . . the safety of all tank vessels . . . which transport and transfer oil or other hazardous cargoes in ports or places subject to the jurisdiction of the United States."  H.R. Rep. No. 1384(I), 95th Cong., 2nd Sess. 1978, at 3270.  Particular reference was made by Congress to the need for improvement in "realistic manning standards." Id.  In implementing the statute's goal, Congress saw fit to "provide the Secretary of the Department in which the Coast Guard is operating with broader and more extensive authority, stated more explicitly." Id. at 3271.  Finally, the Congress subsequently enacted the Coast Guard Authorization Act of 1998

11

(PL 105-383), which <u>inter alia</u> directed that by the end of 1998, the Secretary was to promulgate

regulations for towing vessel and barge safety for the waters of the Northeast.  PL 105-383, §

311(b)(1)(a).[5]

With regard to whether the Coast Guard's extensive authority to promulgate regulations

includes the authority to preempt state law, the Supreme Court's rulings in <u>Ray</u> and <u>U.S. v.</u>

<u>Locke</u>, 528 U.S. 89 (2000) are instructive.  Although both cases dealt with conflict preemption,

they nonetheless contain discussions of the authority granted to the Coast Guard by Congress that

are highly instructive for purposes of express preemption analysis.  The Supreme Court has

explained that "[t]he focus of Title I [of the PWSA]. . . is traffic control at local ports."  <u>Ray</u>, 435

U.S. at 161.  It aims at "prevent[ing] damage to vessels, structures, and shore areas, as well as

environmental harm to navigable waters and the resources therein."  <u>Id</u>. at 169.  In reviewing a

State law mandating tug escorts for certain tankers in Puget Sound, the Court opined that the

"relevant inquiry" was "whether the [Coast Guard] has either promulgated his own tug

requirement for Puget Sound tanker navigation or has decided that no such requirement should

be imposed at all."  <u>Id</u>. at 171.  Because the Coast Guard had, at that time, taken no action, the

State law stood.  The Supreme Court struck a different Washington state law barring tankers over

a certain size from entering Puget Sound because the Coast Guard had addressed the issue.  Not

only did the Supreme Court rely upon the § 1222(b) analysis applied to the tug escort provision,

_____

[5]  The Secretary was directed to enact regulations giving effect to recommendations
contained in the February 6, 1997, "Regional Risk Assessment of Petroleum Transportation in
the Waters of the Northeast United States" issued by the Regional Risk Assessment Team for the
First Coast Guard District (or, if any recommendation was not adopted, to provide a detailed
explanation).

but it also read the legislative history to indicate that Congress had desired a "single

decisionmaker, rather than a different one in each state" resolving the appropriate size limitations

on vessels, even in particular local waters.  Id. at 177.

The principles applied by the Supreme Court in Ray (i.e.,  that where the Coast Guard

regulates under Title I, so-called higher state safety regulation poses an obstacle to the purposes

of federal law, even absent impossibility of compliance with both, when the Coast Guard intends

to preempt) were reaffirmed in  Locke:[6]

> The Ray Court's interpretation of the PWSA is correct and controlling.  Its basic analytic
> structure explains why federal pre-emption analysis applies to the challenged regulations
> and allows scope and due recognition for the traditional authority of the States and
> localities to regulate some matters of local concern.

Locke, 529 U.S. at 104.

The Locke Court thus made clear that Title I "preserve[s] . . . the historic role of the

States to regulate local ports and waters under appropriate circumstances."  Id. at 108-09.  "There

is no preemption by operation of Title I itself if the state regulation is so directed [at local waters]

and if the Coast Guard has not adopted regulations on the subject or determined that regulation is

unnecessary or inappropriate."  Id., at 109 (emphasis added).  The Locke Court further ruled that

"[t]itle II of the PWSA covers . . . operation, equipping, personnel qualification, and manning of

tanker vessels.  Congress has left no room for state regulation of these matters."  Id. at 111.

(internal citation and quotation marks omitted).

_____

[6] Locke reaffirmed Ray even though, in revising the PWSA, Congress had deleted from
the statute the provision of § 1222 that the Court in Ray had relied upon.  A discussion of the
significance of this change appears in Part B(3).  The change does not alter either the express or
conflict preemption analysis as neither turns on implied preemption arising out of either the
statute or the mere existence of a federal regulation.

13

Plainly, the Congress has bestowed broad authority, including the authority to preempt

state law, upon the Coast Guard.  A review of the regulations discussed supra leads to the

conclusion that the "power delegated to the [Coast Guard] plainly comprises authority to

regulate" vessels navigating in United States waterways. See Capital Cities Cable, Inc., 467 U.S.

at 699.  The Coast Guard Authorization Act specifically orders the Coast guard to "promulgate

regulations for towing vessel and barge safety for the waters of the Northeast" with particular

attention to vessels engaged in the transport of petroleum.  PL 105-383 § 311(b)(1)(a) (January

27, 1998).

When the First Circuit remanded this matter, it noted that the parties would have the

occasion to address, inter alia, "the questions of whether the Coast Guard sufficiently expressed a

clear intent to preempt the state tug escort provisions . . . and whether, if so, the Coast Guard's

position is clearly inconsistent with congressional intent." Massachusetts, 493 F.3d at 19.  The

answer to the first question is simply beyond dispute: the Coast Guard's statement of preemption

clearly and unequivocally states the Coast Guard's intent that its revised regulations preempt the

two MOSPA provisions at issue here.  Nor is the Coast Guard's position clearly inconsistent with

Congressional intent.  In the case of an express preemption claim, the Court also "review[s]

whether the agency's decision to preempt constitutes 'a reasonable accommodation of conflicting

policies . . . committed to [its] care' and whether 'it appears from the statute or its legislative

history that the accommodation is not one that Congress would have sanctioned.'" Id. at 16

(quoting Shimer, 367 U.S. at 383).  The Coast Guard's accommodation is a reasonable one.  Its

regulations are broader and more-stringent in some respects than the Commonwealth's, while

less stringent in other respects.  The Coast Guard explained the choices it made and, in particular,

explained its decision not to require tug escorts for double hull tankers in light of the conditions

in Buzzards Bay, the type of protection offered by a double hull and other statutory policies.[7]  For

these reasons, as well as the terms of the statute and legislative history, this is an accommodation

that Congress would have sanctioned.  Accordingly, the United States is entitled to an injunction

because the Final Rule expressly preempts the MOSPA provisions at issue.[8]

---

[7]As the First Circuit noted, the Coast Guard need not demonstrate that the federal regulations best protect Buzzards Bay from oil spills.  See, e.g., Massachusetts, 493 F.3d at 25.

[8]Nonetheless, the Commonwealth challenges the Coast Guard's authority to engage in express preemption arguing this is a specific type of authority Congress did not delegate to the Coast Guard. The record is clear that Coast Guard does not have an express delegation of authority to engage in express preemption.  The Commonwealth contends that the continuing vitality of implied agency authority to engage in express preemption is in doubt (see Docket # 96, at 12- 14) because the legal landscape has shifted since 1998, when City of New York issued.  It asserts that, in more recent decisions, the Supreme Court has taken a more restrictive view of federal administrative authority exercised in the absence of clear statutory delegation.  See Alexander v. Sandoval, 532 U.S. 275, 291 (2001)(restricting agencies' authority to create private rights of action).  Indeed, just last year, Justice Stevens joined by the Chief Justice and Justice Scalia suggested that federal agencies may not engage in express preemption absent Congressional approval or at least that the agencies' judgment on its authority to do so is not entitled to Chevron deference.  Watters v. Wachovia Bank, N.A., 127 S.Ct. 1559, 1582-83 (2007) (Stevens, J. dissenting).  These three Justices parenthetically described City of New York as a conflict, rather than express, preemption decision.  Id., at 1583, n. 24. (The justices in the majority did not reach these issues). The latter point is notable because City of New York is the primary authority the Coast Guard relies upon for its assertion of authority to engage in express preemption.  For purposes of the remand, however, the language of Fidelity Federal (albeit a conflict preemption ruling) and the decision of the First Circuit appear to have settled the question.  The express preemption analysis can also be viewed as a form of conflict preemption, i.e., the preemption of a state statute after a determination that no regulation is appropriate.  In any event, conflict preemption suffices to sustain all the preemption sought.

15

2. Conflict Preemption

The Court also finds that MOSPA is conflict preempted. This determination stands independently of the Coast Guard's authority to engage in express preemption. Conflict preemption operates where (1) "compliance with both federal and state regulations is a physical impossibility," or (2) where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Gade v. National Solid Wastes Management Ass'n, 505 U.S. 88, 98 (1992) (internal citations omitted). Conflict preemption analysis involves an initial inquiry into whether federal authority has been exercised through a regulation intended to displace state law, or by a federal decision of the Coast Guard that there should be no regulation of the subject in question. Massachusetts, 493 F.3d at 8 (citing Locke, 529 U.S. at 109-110).

Even assuming arguendo that compliance with both the MOSPA provisions at issue and the Coast Guard regulations issued via the Final Rule is possible (a point upon which the parties agree), the MOSPA provisions are conflict preempted because they stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

The Supreme Court has twice decided that Congress granted the Coast Guard the authority under Title I to establish the proper (as opposed to merely the minimum) level of regulation under Title I of the PWSA. In Ray the Court opined that when federal officials' exercise of regulatory authority "takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute," state law is preempted. Ray, 435 U.S. at 178. Years later, in Locke, the Supreme Court reiterated this holding. Locke, 529 U.S. at

16

109-110; see also Massachusetts, 493 F.3d at 8 & n. 9 (recognizing that the Coast Guard may set

the appropriate level of regulation or determine that "no regulation at either the state or federal

level is appropriate"). That is what the Coast Guard has done in this case.

After a regulatory process that lasted over one year, the Coast Guard recently issued the

regulations establishing rules governing tug escorts and vessel manning specifically in Buzzards

Bay. See Notice of Proposed Rulemaking, 71 Fed. Reg. 15,649- 15,656 (Mar. 29, 2006). As

already noted, the Coast Guard possesses the power to make such a judgment – that its

regulations shall displace state regulations regarding areas subject to regulation under Title I. In

this case it did. The Coast Guard's final rulemaking publication states that the tug escort and

manning regulations for Buzzards Bay "each represent a considered determination of the

appropriate level of regulation to ensure navigation safety and environmental protection. As

such, the Coast Guard has determined that any other non-Coast Guard schemes relating to vessel

routing, manning, and tug escort requirements in Buzzards Bay are preempted." 72 Fed. Reg.

50052, 50057. In the next paragraph, the statement identifies specifically the two MOSPA

provisions at issue as preempted. Thus, the Coast Guard has made clear its determination that

no other rules, specifically the MOSPA provisions at issue in this litigation, may apply – i.e.,

that it has set the proper level of regulation.

The MOSPA provisions at issue are an obstacle to the accomplishment and execution of

the full purposes and objective of the Congress in enacting the PWSA. First, the decision of the

Coast Guard not to exercise its authority to require tug escorts for double hull tank barges and not

to impose the manning requirements set out in MOSPA, in light of the findings accompanying its

17

Final Rules, has the "character of a ruling that no such regulation is appropriate or approved

pursuant to the policy of the statute." Ray, 435 U.S. at 178. In drafting the regulations, Congress

has directed that in carrying out the duties assigned to it under the PWSA, the Coast Guard "shall

. . . take into account all relevant factors concerning navigation and vessel safety, protection of

the marine environment, and the safety and security of United States ports and waterways,

including but not limited to" nine delineated factors. 33 U.S.C. §1224(a) (emphasis added).[9]

The Coast Guard's most recent regulation is more specific to Buzzards Bay (as opposed

to a regulation of general application in the Northeast region) and stricter than the earlier, more-

general regulation (still in force) which the First Circuit considered. In some respects, it imposes

a stricter or higher level of regulation than does MOSPA. For example, it applies not just to oil

but other hazardous materials as well. While it does not require tug escorts for double-hulled

vessels (something MOSPA does require), the Coast Guard's regulatory statement explained its

resolution of this issue. According to the Coast Guard, exempting double hull tankers from the

escort requirements adds an incentive to a speedier phase out of the more-dangerous single-hull

tankers – a phase out that Congress has mandated by statute. See Docket # 108, at 6. Balancing

---

[9] Those factors are: (1) the scope and degree of the risk or hazard involved;
(2) vessel traffic characteristics and trends, including traffic volume, the sizes and types of
vessels involved, potential interference with the flow of commercial traffic, the presence of any
unusual cargoes, and other similar factors; (3) port and waterway configurations and variations in
local conditions of geography, climate, and other similar factors; (4) the need for granting
exemptions for the installation and use of equipment or devices for use with vessel traffic
services for certain classes of small vessels, such as self-propelled fishing vessels and
recreational vessels; (5) the proximity of fishing grounds, oil and gas drilling and production
operations, or any other potential or actual conflicting activity; (6) environmental factors; (7)
economic impact and effects; (8) existing vessel traffic services; and (9) local practices and
customs, including voluntary arrangements and agreements within the maritime community.
33 U.S.C. § 1224(a)(1)-(9).

18

the potential added safety benefit of escorts for the double hull tankers ("the scope and degree of

the risk or hazard involved," 33 U.S.C. § 1224(a)(1)) against the "potential interference with the

flow of commercial traffic," 33 U.S.C. § 1223(a)(2), and the "economic impact and effects," Id.,

at § 1224(a)(7)  in light of "vessel characteristics and trends" and "local conditions of

geography," Id. at 1224(a)(2) & (3), the Coast Guard concluded that double-hull tankers should

pass through Buzzards Bay free of any legal requirement to obtain a tug escort.  In particular, the

Coast Guard noted that groundings pose one of the primary and unique hazards in Buzzards Bay

and that the double-hull construction provides protection from that hazard.  Congress delegated

to the Coast Guard the authority to engage in the balancing of these and other considerations.

Allowing the Commonwealth to override the Coast Guard's judgment in such an instance poses

an obstacle to the accomplishments of Congress' purposes in enacting the statute.

Second, the "purpose of Congress is the ultimate touchstone" in every preemption case.

Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) (quoting Retail Clerks, 375 U.S. at 103).  Title

I of the PWSA provides for regulation of vessel traffic,  navigation and the marine environment,

and communication and navigation equipment.  33 U.S.C., § 1223(a).[10]  The PWSA "has as one

of its objectives a uniformity of regulation for maritime commerce" but it also preserves, in Title

I of that Act, the historic role of the States to "regulate local ports and waters under appropriate

circumstances." Locke, 529 U.S. at 108-109.  The single regulatory scheme governing Buzzards

Bay accomplished by the Coast Guard's preemption of the MOSPA provisions promotes the

---

[10]Originally, Congress authorized but did not require the Coast Guard to act under Title I.
Later, Congress directed that by the end of 1998, the Coast Guard was required to promulgate
regulations for towing vessel and barge safety for the waters of the Northeast.  PL 105-383, §
311(b)(1)(a).

19

statutory uniformity objective of the PWSA.  While the MOSPA provisions at issue govern only

Buzzards Bay (which certainly are "local waters"),  the Supreme Court has noted that "Ray also

recognized that, even in the context of a regulation related to local waters, a federal official with

an overview of all possible ramifications of a particular requirement might be in the best position

to balance all the competing interests."  Locke, 529 U.S. at 110.  Moreover, the vessel traffic

subject to the Coast Guard's regulation – tank barges and tank vessels carrying oil or other

hazardous waste –  is not quintessentially local in nature.  According to the Coast Guard findings

accompanying its most recent regulation, the "vast majority of tug/barge combinations that transit

Buzzards Bay are either traveling from or to New York."  72 Fed. Reg. 50052, 50053**.**

Nonetheless, the Commonwealth argues that the MOSPA provisions at issue advance,

rather than impede, Congress's stated goals of vessel safety and protection of the marine

environment.  Docket #96, at 18-19.  It argues that the only relevant objectives of the PWSA – at

least for purposes of conducting the preemption analysis – are safety and protection of the

environment.  Under this theory, MOSPA, by imposing regulation beyond that imposed by the

federal scheme, "furthers" the protection of the environment and promotes safety. Thus, in the

Commonwealth's view, MOSPA cannot pose an obstacle to the accomplishment and execution

of the full purposes and objective of Congress in enacting the PWSA.

The Court does not accept this theory for several reasons.  Congress did not limit its

objectives to vessel safety and protection of the environment.  As noted, uniformity and

supervision of vessel traffic are also purposes of the statute.  Locke, 529 U.S. at 108-109.

Furthermore, Congress directed that the Coast Guard consider and balance a number of

20

statutory factors in crafting regulations under Title I of the PWSA, including the degree of risk

and economic harm, and the Coast Guard has done so.  A different balancing of these factors by

the Commonwealth conflicts with the accomplishment of Congress' Title I goals, at least when

the Coast Guard establishes the appropriate (as opposed to minimum) level of regulation.

Finally, the Commonwealth's argument proves too much.  It suggests that the Commonwealth

can always add "further" or "enhanced" regulation.  The Supreme Court rejected this view in

recognizing the authority of the Coast Guard to set the appropriate level of regulation or

determine that no regulation at all is appropriate. Locke, 529 U.S. at 109.

> 3.  1978 Amendments to the PWSA

The First Circuit directed this Court to address on remand the impact, if any, of Congress'

1978 amendments to § 1222 of Title I of the PWSA upon the holding of Ray that because §

1222(b) permitted states to impose higher safety standards only for ''structures,'' this impliedly

forbade higher state standards for vessels. See Ray, 435 U.S. at 174; Massachusetts, 493 F.3d at

15, n. 21.  At the time of the Ray decision, 33 U.S.C. § 1222(b) provided: ''Nothing contained in

this chapter [i.e. Title I of the PWSA] . . . prevent[s] a State or political subdivision thereof from

prescribing for structures only higher safety equipment requirements or safety standards than

those which may be prescribed pursuant to this chapter.'' 33 U.S.C. § 1222(b) (1976).  Relying

upon this language, the Ray court held that since § 1222(b) permitted states to impose higher

safety standards only for structures, this "impliedly forb[ade] higher state standards for vessels."

Ray, 435 U.S. at 174.  Several months later, in 1978, the Congress deleted references to state

safety standards from § 1222, and added a different provision to § 1225 that provides: ''Nothing

contained in this section, with respect to structures, prohibits a State or political subdivision thereof from prescribing higher safety equipment requirements or safety standards than those which may be prescribed by [federal] regulations."  Port and Tanker Safety Act of 1978, § 2, 92 Stat. at 1471–75 codified at 33 U.S.C. § 1225(b).

The First Circuit noted the statutory change and left its significance for consideration upon remand.  Massachusetts, 493 F.3d at 15 n. 21.  The Commonwealth contends that the statutory change repealed or eliminated any previously existing authority the Coast Guard had to engage in express preemption.  Docket #96,  at 13.  The Commonwealth also contends that the legislative change signifies an intent to delete the implied preemption authority found by the Supreme Court in the repealed section.  Id. at 15.  At a later point, the Commonwealth takes the far broader position that the 1978 Amendments "eliminated the preemptive role" that the Supreme Court had accorded Title I in Ray.  Id. at 25 n. 24.

The statutory change in 1978 did not eliminate the preemptive effect, in proper circumstances, of Coast Guard regulations issued pursuant to Title I.  Plainly, Ray relied upon the now deleted language and that portion of the decision must be reconsidered in light of the subsequent statutory changes.  However, Ray did not rely solely on that language.  The Court determined that federal regulations issued under the authority of Title I preempt conflicting state laws even without consideration of the now repealed language of § 1222.

The Supreme Court stated: "even without § 1222(b) we [the Supreme Court] would be reluctant to sustain the Tanker Law's absolute ban on tankers larger than 125,000 DWT" because the federal regulation permitting larger tankers in certain conditions had the "character of a

[implied federal] ruling that no such [banning] regulation is appropriate or approved pursuant to the policy of the statute," <u>Ray</u>, 435 U.S. at 178.  Thus, it said "States are not permitted to use their police power to enact such a [banning] regulation." <u>Id</u>. Tempering the qualification that the word reluctant in the above-quoted language might suggest, the Court concluded its analysis by ruling that "[t]his being the case [that the federal regulation is a judgment as to the proper regulatory balance], we conclude that Washington is precluded from enforcing the size limitation contained in the Tanker Law." <u>Id</u>.

Several months after <u>Ray</u>, Congress repealed the language in § 1222 and replaced it with the language of § 1225(b).  The new text, perhaps, does not impliedly forbid higher state safety standards for Title I topics as <u>Ray</u> held the old text did.  Notably, however, the Ninth Circuit suggested otherwise.  It stated that <u>Ray's</u> construction of the old text supported the conclusion that the new text also "impliedly forbids localities to regulate *with regard to vessels*." <u>Beveridge v. Lewis</u>, 939 F.2d 859, 864 (9th Cir.1991)(emphasis in original).[11]  Whether or not the implied statutory prohibition on higher regulation survived the statutory change is not material to the pending Motion (as the Motion does not turn on a statutory prohibition of higher state regulation).  The plain language of the new text does not, by its terms, eliminate the preemptive effect of duly enacted regulations issued under Title I.  It simply does not speak to that issue.

Congress, in § 1225(b), specifically permitted higher state regulation of structures and, in defining the agency's obligations, instructed it to prescribe "minimum" safety requirements for

---

[11]  Neither party cited to the Court any decisions referencing the new language, other than the First Circuit's notation of the issue in note 21 of its opinion.  <u>Beveridge</u> is the only case the Court located citing § 1225(b).

structures. 33 U.S.C. § 1225(a)(2)(b) & (b). In the other provisions of Title I, Congress did not contemplate "minimum" federal standards, rather it directed the issuance of "reasonable rules and regulations" without any specific authorization for higher state standards. 33 U.S.C. § 1223(c)(5)(A). Although the Supreme Court did not reference the 1978 change resulting in the enactment of § 1225 in Locke, the Supreme Court refined and reaffirmed Ray without relying upon the implied prohibition emanating from the repealed § 1222. In Locke the Supreme Court recognized the important "role for States and localities in the regulation of the Nation's waterways and ports." Locke, 529 U.S. at 109. In holding that there "is no preemption by operation of Title I itself" of state laws directed to local circumstances and problems, the Locke court eschewed any reliance on notions of implied statutory prohibition. It defined the analysis under Title I as "one of conflict pre-emption." Id. The Court went on to quote and cite the alternative (i.e., unrelated to repealed text in §1222) reasoning of conflict preemption set out in Ray and cited above. Id. at 109-110. Plainly, the Supreme Court appreciated the statutory change even though it did not reference it expressly.

Whatever the implications of the statutory change on other issues, this conclusion is clear: despite the 1978 replacement of § 1222 with § 1225, duly-enacted Coast Guard regulations issued under Title I of the PWSA preempt conflicting state laws. See United States v. Massachusetts, 493 F.3d. at 8.[12]

---

[12] Moreover, the First Circuit noted the potential significance of the statutory change regarding the Coast Guard's argument that a State's regulatory authority does not ever survive the promulgation of regulations under Title I. Massachusetts, 493 F.3d at 15 & n. 21. The First Circuit's opinion does not suggest that the statutory change affects Locke's conflict preemption framework which it stated established the governing framework for conflict preemption analysis.

4. <u>Are the Coast Guard Regulations Arbitrary or Capricious?</u>

The Commonwealth asserts that the United States cannot demonstrate a likelihood of success on the merits because even if the Coast Guard has preempted the MOSPA provisions at issue through its own regulations (no matter what preemption model is utilized to analyze that action), those regulations are nevertheless invalid because they constitute arbitrary and capricious action of the Coast Guard.  Docket #96, at 15-16.[13]

A court reviews the validity of administrative agency actions and decisions with substantial deference, and sets them aside only if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." <u>Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n</u>, 59 F.3d 284, 290 (1st Cir.1995) (quoting 5 U.S.C. § 706(2)(A)).  Agency decisions must be "rational" and when an agency departs significantly from its own precedent, "it must confront the issue squarely and explain why the departure is reasonable."  <u>Citizens</u>, 59 F.3d at 290 (quoting <u>Dávila- Bardales v. INS</u>, 27 F.3d 1, 5 (1st Cir.1994)).  Agencies may "refine, reformulate and even reverse their precedents in the light of new insights and changed circumstances," but in changing its course, an agency must supply a reasoned analysis for such change.  <u>Citizens</u>, 59 F.3d at 290 (quoting <u>Dávila</u>, 27 F.3d at 5).

The Commonwealth objects that the Coast Guard has deviated from its past precedent without explanation in that the Coast Guard has previously declined to preempt state law in

---

[13]  This attack upon the facial validity of the regulations presents a slightly different issue than that presented by the Commonwealth's argument that even if the Coast Guard may expressly preempt the MOSPA provisions, that decision must nevertheless be a reasonable accommodation of conflicting policies and must be one which the Congress would have sanctioned (see discussion at pp. 9-15, <u>supra</u>).

similar circumstances, but does not explain within the Final Rule its departure from past practice.
The Commonwealth refers first to the Coast Guard's 1982 withdrawal of a proposed federal rule
regarding tug escorts in Puget Sound which the Coast Guard had determined was "essentially the
equivalent of existing [Washington] State law."  Docket #96, at 16 (quoting 47 Fed. Reg. at
17,971 (April 26, 1982)).  It also points to a 1992 rulemaking requiring tug escorts for certain
single hull tankers in Puget Sound in which the Coast Guard stated that it did not "intend to
preempt" Washington's tug escort law because "there does not appear to be any substantial
conflict." Id. (quoting  57 Fed. Reg. at 30,064 (July 7, 1992) and 59 Fed. Reg. at 42,962, 42,968
(Aug. 19, 1994)).

     The United States points out that unlike the 1994 rulemaking it conducted for Puget
Sound, its Buzzards Bay rulemaking was not carried out in response to a congressional mandate.
Docket #108, at 3.  The 1994 Puget Sound rulemaking had been mandated by the OPA, which
required the Coast Guard to issue regulations requiring escort vessels for single-hulled tankers
over 5,000 gross tons transporting oil in bulk in Puget Sound and other waters (but not including
Buzzards Bay).  Id. (citing Pub.L. 101-380, Title IV, § 4116(c) (Aug. 18, 1990)).  The 1994 Final
Rule indicated that the rule was intended to establish "minimal requirements for escort," and that
"the Coast Guard does not intend to preempt the states from issuing more stringent requirements
provided they are not in direct conflict with Federal law or this rulemaking."  59 Fed. Reg. at
42,968.  The Coast Guard did not address escort requirements for tank barges or double-hulled
tankers in the 1994 Puget Sound rulemaking because its intent therein was limited to addressing
the OPA statutory mandate, which did not concern such vessels.  Docket #108-2, at ¶ 3.  In
contrast, the United States argues, the 2007 rulemaking concerning Buzzards Bay was an

exercise of the discretion committed to the Coast Guard by Title I of the PWSA, in which it

determined the proper level of regulation via its own Ports and Waterways Safety Assessment

and by which it intended to preempt state regulation of the same subject matter. 72 Fed. Reg. at

50,056 - 50,057.

The history of the Coast Guard's rulemaking in this case reveals extensive consultation

with governmental and other representatives of affected constituencies and reflects consideration

of the views expressed in that consultation process, as set forth below. In the Final Rule, the

Coast Guard described a "Ports and Waterways Safety Assessment (PAWSA), which was

conducted by a cross-section of key Buzzards Bay waterways users and stakeholders." Id. A

group of such waterway users/stakeholders was convened at a two-day structured workshop

designed inter alia to identify major safety hazards, estimate risk levels, evaluate potential

mitigation measures, and to set the stage for implementation of regulations. Id. One suggestion

contained in the PAWSA report was the establishment of requirements for escort tugs. Id.

On October 26, 2004, the Coast Guard published an Advanced Notice of Proposed

Rulemaking (ANPRM), stating that it was considering amending the existing RNA for the First

Coast Guard District to require tug escorts and use of recommended routes within Buzzards Bay,

and seeking comments on the proposal. 69 Fed. Reg. 62,427 (October 26, 2004). Forty written

comments were received, and two public meetings were held at which one hundred and twenty-

seven speakers offered comments. 71 Fed. Reg. at 15,651. The Coast Guard also discussed the

proposed rules with representatives of the ten Massachusetts municipalities who responded to the

Coast Guard's solicitation of comments, as well as from the Commonwealth's Department of

Environmental Protection. 72 Fed. Reg. at 50,057.

Concerning the proposed tug escort requirement, the Coast Guard received comments expressing concerns about both the cost and availability of escort tugs of sufficient capability.  Id. It interviewed representatives of the maritime industry and conducted a Regulatory Evaluation, concluding thereafter that escort tug capacity was sufficient to meet the projected demand, especially because that the demand for escort tugs will decrease over time as progressively fewer transits of Buzzards Bay are made with single hull-tank barges. Id.; 46 U.S.C. § 3703a.

Other comments responding to the ANRRM expressed concern that the proposed escort tug requirement could exacerbate the danger by requiring additional vessels in the constrained channels of Buzzards Bay and the Cape Cod Canal.  Id.  The Coast Guard found that the proposed regulation would not increase the danger, citing primarily the fact that the proposed regulations also instituted a Vessel Movement Reporting System (VMRS) "that would provide for monitoring of all tug and tank vessel traffic in the Bay, and would provide an opportunity for the Coast Guard to issue advisories should traffic be congested to a point that adversely affects navigation safety." Id. at 15,651-15,652.

The Coast Guard also considered and rejected a comment's proposal that "rescue tugs" be strategically stationed as an alternative to escort tugs, noting that an evaluations of the potential benefit of rescue tugs in Puget Sound had described them as "a high-cost, low-benefit alternative as they have little or no capability to prevent collisions, allisions, or groundings, which is a primary goal of this proposed rule." Id. at 15,652.

Comments submitted in response to the ANPRM also argued that the "crewing requirements" for tugs towing barges were inadequate.  Id.  The Coast Guard concurred, and in response to those comments proposed in its March 29, 2006,  Notice of Proposed Rule Making

(NPRM) an additional requirement that a federally-licensed pilot, in addition to the crew, advise the master and assist in the navigation of the vessel.  Id.  It also proposed therein amending the First Coast Guard District's RNA to require that all single-hull tank barges carrying 5,000 or more barrels of oil or other hazardous material and being towed through Buzzards Bay be accompanied by an escort tug between the west entrance to Buzzards Bay and the east end of the Cape Cod Canal.  Id.  The Coast Guard also evaluated anticipated costs associated with escort tugs and federally licensed pilots and found those costs to be reasonable when balanced against "the benefits realized by the avoidance of vessel casualties and oil spills." 71 Fed. Reg. at 15,651.

In explaining its decision to require escort tugs for single-hulled tank vessels, but not to extend that requirement to double-hulled tank vessels (as is done by the MOSPA provisions at issue), the Coast Guard noted that it had received both written comments and a request from the Commonwealth urging that the requirement for escort tugs should apply to double hull tanks vessels in addition to single hull tank vessels.  72 Fed. Reg. at 50,054.  It then reasoned that (1) an extension of the regulation to double hulls was "not necessary" because double hulls provide sufficient protection against the dangers presented by local conditions (i.e., by groundings and a rocky bottom) and because no double-hull tank barge grounding in Buzzards Bay had ever produced a major oil spill.  Id.  It added that the manning and escort provisions when combined with mandated participation in a newly-created Vessel Movement Reporting System (VMRS) constituted "a redundant vessel accident and pollution prevention system."  Id., at 50,055.

Specifically with regard to the manning requirements, the Coast Guard noted that three members of the Massachusetts congressional delegation requested that the federal regulations contemplated provide for provisions similar to those of MOSPA with regard to, inter alia, the

manning provisions.  Id.  It found that the regulation was sufficient to address the

representatives' concerns, emphasizing that other federal regulations "comprehensively regulate

manning and watchstanding on tank vessels and tugs" and noting that federal regulations also

specifically require tankers to have at least two licensed deck officers on watch on the bridge.  72

Fed. Reg. at 50,055 (citing 46 C.F.R. 15 and 33 C.F.R. 164.13(c).  Given the extensive

consultation with affected constituencies and the consideration given to competing policies and

interests, the Court finds that the Coast Guard's actions in enacting its regulations were not

arbitrary or capricious.

The Commonwealth's assertion that the Coast Guard has the failed to explain why it

promulgated the rule is unsupported.  Unlike the situation presented by the MOSPA provisions at

issue, the 1992 federal rule applying to Puget Sound was actually more stringent than the existing

Washington state law in that the federal rule lowered the minimum size of tankers required to be

escorted.  57 Fed. Reg. at 30,059.  Moreover, the decision to establish only minimum level of

regulation in Puget Sound in the early 1990s followed by a decision in 2007 (after a different

regulatory process) to establish the appropriate level of regulation in Buzzards Bay "hardly

constitutes a 'long-standing and well-established practice deviation from which might justify

judicial intervention.'"  Carter/Mondale Pres. Comte., Inc. v. FEC, 775 F.2d 1182, 1185-86 (D.C.

Cir. 1985) (quoting Vt. Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 543 n. 17 (1978)).

    B.  Remaining Factors Supporting Injunctive Relief

For the reasons already delineated, the Court finds that in the absence of injunctive relief

precluding the enforcement of the MOSPA provisions at issue, the United States will suffer

irreparable harm in that the Congress' purpose in enacting the PWSA and in entrusting to the

Coast Guard judgments concerning the proper level of regulation to advance that statute's goals will be thwarted.  The same rationale supports a finding that the balance of possible hardships is in the United States' favor, and that allowance of the United States' motion will promote the public interest.

At this time, this Court recommends that the District Court enter a preliminary injunction rather than a permanent junction because the final administrative record has not been filed.  If the Court accepts this recommendation and after the record is filed,  the United States may file a motion to convert the preliminary relief to a permanent injunction and the Commonwealth may oppose such a motion.

<u>CONCLUSION</u>

For the foregoing reasons, I recommend that the Plaintiff United States of America's

Motion for Preliminary and Permanent Injunction (Docket #91) be <u>ALLOWED</u> in part and

<u>DENIED</u> in part.  The Motion should be <u>ALLOWED</u> insofar as it seeks a preliminary

injunction.[14]

      <u>/s / Leo T. Sorokin</u>
      UNITED STATES MAGISTRATE JUDGE

---

[14]The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. <u>See</u> <u>Keating v. Secretary of Health and Human Services</u>, 848 F.2d 271 (1st Cir.1988); <u>United States v. Emiliano Valencia-Copete</u>, 792 F.2d 4 (1st Cir.1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603 (1st Cir.1980); <u>United States v. Vega</u>, 678 F.2d 376, 378-379 (1st Cir.1982); <u>Scott v. Schweiker</u>, 702 F.2d 13, 14 (1st Cir.1983); <u>see</u> <u>also</u>, <u>Thomas v. Arn</u>, 474 U.S. 140, 106 S.Ct. 466 (1985).

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
THE UNITED STATES OF            )
AMERICA, et al.,                )
                                )
        Plaintiffs,             )
                                )
        v.                      )        Civil Action No.  05-10112-RCL
                                )
THE COMMONWEALTH OF             )
MASSACHUSETTS, et al.,          )
                                )
        Defendants.             )
_____ )
```

REPORT AND RECOMMENDATION ON
MOTIONS FOR SUMMARY JUDGMENT

July 29, 2009

SOROKIN, M.J.

　　　Currently pending are the Commonwealth of Massachusetts' Motion for Partial Summary

Judgment (Docket #134)[1] and the United States of America's Cross Motion for Summary

Judgment (Docket #139).

　　　For the reasons set forth below, I recommend that the Court DENY the Commonwealth's

Motion and ALLOW the United States' Cross Motion.

I.　　　FACTUAL AND PROCEDURAL BACKGROUND

　　　On August 27, 2008, the Court (Young, J.), approved the undersigned magistrate judge's

---

[1] Intervenor-Defendant Coalition for Buzzards Bay joins in the Commonwealth's motion.
See Docket #136.

1

recommendation that it allow the United States' Motion for a Preliminary and Permanent

Injunction insofar as it sought a Preliminary Injunction.  See Electronic Order of August 27, 2008

(adopting Docket #116).  Preliminary, rather than permanent, injunctive relief was recommended

for the sole reason that the final administrative record had yet to be filed, rendering permanent

judgment on the legality of the rulemaking premature.  Docket #116 at 31.  On July 31, 2008

(subsequent to issuance of the Report and Recommendation), the United States filed the

Administrative Record.  See Docket # 125.

The factual and procedural background of this litigation are set forth in the Report and

Recommendation of June 6, 2008, and are incorporated herein.  Docket #116 at 1-7.  In response

to the filing of the Administrative Record, the Commonwealth advances two new arguments

challenging the sufficiency of the Coast Guard's rulemaking process.  These arguments are

addressed below, giving consideration to any new and relevant material from the administrative

record.  In addition, the Commonwealth has renewed arguments advanced previously in

opposition to the United States' Motion for Injunctive Relief, arguments which the Court

resolved by its decision on that Motion.  The Court's Order on the Motion for Injunctive Relief

(and the Report and Recommendation adopted by that Order) are incorporated herein.  To the

extent further discussion of these arguments is warranted, it is set forth below.  In all other

respects, I rely upon the June 6, 2008, Report and Recommendation (and the August 27, 2008,

Order adopting same) incorporated herein.

II.     DISCUSSION

        Background

        By its August 27, 2008, Order adopting the June 6, 2008, Report and Recommendation,

2

the Court found that the United States was entitled to preliminary relief enjoining enforcement of

certain provisions of Massachusetts enacted legislation entitled, "An Act Relative to Oil Spill

Prevention and Response in Buzzards Bay and Other Harbors and Bays of the Commonwealth"

(MOSPA). M.G.L. c. 21M.  The Court determined that the Coast Guard had promulgated a

regulation which expressly preempted the MOSPA provisions at issue (and that its position was

not clearly inconsistent with Congressional intent), and that the MOSPA provisions at issue were

in any event conflict preempted (because they stand as an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress).  The Court also found that the Coast

Guard regulation establishes the appropriate (as opposed to minimum) level of regulation.

        The first of the MOSPA provisions at issue requires a tugboat escort for all tank barges

transiting Buzzards Bay carrying more than 6,000 barrels of oil. M.G.L. c. 21M, § 6(a) & (b).

The second challenged provision provides that "[t]he navigation watch on all tow vessels

transiting Buzzards Bay and carrying 6,000 or more barrels of oil shall consist of at least 1

licensed deck officer or tow vessel operator." M.G.L. c. 21M, § 4(a).  In addition, for the vessel

towing the barge, MOSPA requires: (1) at least one licensed deck officer or tow vessel operator

serving exclusively as a lookout with no other concurrent duties; and (2) three licensed officers

or tow vessel operators on the vessel whenever it is towing a tank barge. Id. The operator must

log the lookout's name and duty hours and maintain a record of the crew on board during towing.

Id. For the tank barge, MOSPA requires two personnel, one of whom must be a "certified

tanker-man under 46 C.F.R. subpart 12.20 " who shall be on the tank barge at all times when the

barge is in Buzzards Bay unless the barge cannot accommodate personnel on board. Id., §4 (b).

        Among the differences between MOSPA and the Coast Guard's regulation, the most

significant for purposes of this discussion is the fact that the federal regulations exempt double-

hulled tank barges from any escort requirements, while the MOSPA provisions do not.[2]

### Issues Not Previously Raised by the Commonwealth

The Commonwealth advances in its pending motion two arguments not advanced prior to

the filing of the administrative record: (1) that the Coast Guard failed to complete a mandated

environmental impact statement (EIS) (or, alternatively, an environmental assessment); and, (2)

that the Coast Guard failed to provide adequate notice and an opportunity to comment on its

decision to preempt MOSPA expressly.  The essence of the argument is that the Coast Guard

failed to consider, in deciding whether an EIS was necessary, the environmental effect of

eliminating the state law provisions regarding tug escorts for double-hulled tank barges.

### 1. Environmental Impact Statement/Assessment

The Commonwealth argues that the Coast Guard violated the National Environmental

Policy Act of 1969, 42 U.S.C. §§ 4321-4347 (NEPA) by failing to assess properly the

environmental consequences of its Final Regulation, including its intent to preempt two "more

protective" aspects of MOSPA.

### A.     The Coast Guard's NEPA Implementing Regulation

NEPA  has two primary goals: the first is requiring government agencies "to consider

every significant aspect of the environmental impact of a proposed action." Fund For Animals v.

Mainella, 283 F.Supp.2d 418, 426 (D.Mass.2003)(Saris, J.)(quoting Vermont Yankee Nuclear

---

[2]  In its briefing, the Commonwealth suggests a clarification to the Court's comparison of
MOSPA with the Federal rule in several respects which do not bear upon the present analysis.
See Docket #135, at 7, n. 7.

4

Power Corp. v. Natural Resources Def. Council, Inc., 435 U.S. 519, 553 (1978)).  The second is

ensuring that an agency will "inform the public that it has indeed considered environmental

concerns in its decisionmaking process." Id. (quoting Baltimore Gas and Elec. Co. v. Natural

Resources Defense Council, Inc., 462 U.S. 87, 97 (1983)).  "NEPA is not designed to prevent all

possible harm to the environment; it foresees that decision makers may choose to inflict such

harm, for perfectly good reasons."  Sierra Club v. Marsh, 872 F.2d 497, 500 (1st Cir.1989).  "If

the adverse environmental effects of the proposed action are adequately identified and evaluated,

the agency is not constrained by NEPA from deciding that other values outweigh the

environmental costs." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).

NEPA created the Council on Environmental Quality (CEQ) to administer NEPA and to

promulgate NEPA-related regulations binding upon federal agencies. 40 C.F.R. §§ 1501-08.

Federal agencies also draft their own administrative regulations in order to implement and

supplement the CEQ's regulations. 40 C.F.R. § 1507.3.  The Coast Guard's operative NEPA-

implementing regulation is Commandant Instruction M16475.1D, adopted on November 29,

2000.

"NEPA requires that 'every recommendation or report on proposals for legislation and

other major Federal actions significantly affecting the quality of the human environment' include

a statement addressing, inter alia, 'the environmental impact of the proposed action' and 'any

adverse environmental effects.'" Town of Marshfield v. F.A.A., 552 F.3d 1, 3 (1st

Cir.2008)(citing 42 U.S.C. § 4332(c)(I), (ii)).  The EIS, usually entailing substantial efforts and a

detailed analysis, is not required if the agency supportably determines that no such "significantly

affecting" impact will result. Id.  Agency regulations may identify "categorical exclusions," that

5

is, classes of actions that do not threaten environmental damage and thus do not require the

preparation of an EA or EIS. <u>Id.</u> (citing 40 C.F.R. § 1508.4 (2003)).

The Coast Guard's implementing regulations provide for categorical exclusions ("CE")

delineated at Ch. 2.B.2 of COMDINST M16475.1D.  Figure 2-1 therein lists thirty-five

categories of actions that are categorically excluded from further analysis and documentation

requirements under NEPA (unless the consideration of factors delineated in Section 2.B.2.b

"trigger[s] the need to conduct further analysis").  One of the thirty-five categorical exclusions

concerns the promulgation of certain types of regulations, including, in relevant part:

> "(g)    Regulations establishing, disestablishing, or changing Regulated
>         Navigation Areas and security or safety zones
>
> .    .    .
>
> (I)     Regulations in aid of navigation such as those concerning rules of the
>         road, International Regulations for the Prevention of Collisions at Sea
>         (COLREGS), bridge-to-bridge communications, vessel traffic
>         services, and marking of navigation systems."

COMDINST M16475.1D, Fig. 2-1, ¶ 34.[3]

The Coast Guard determined that the Final Rule fell within the exclusions of Figure 2-1,

34 (g) and (I), quoted <u>supra</u>.   Unquestionably, the Final Rule is a regulation changing a

Regulated Navigation Area and is also a regulation in aid of navigation.  The Commonwealth

---

[3] The Coast Guard revised the list of CEs contained in section 2.B.2, figure 2-1, of
COMDINST M16475.1D on July 23, 2002.  67 Fed. Reg. 48243-02.  The CEs were grouped
categorically, with the result that the CEs identified in Figure 2-1 as ¶ 34 (g) and (I) are also cited
to as being within ¶ 6 of  67 Fed. Reg. 48243-02. No substantive changes to definitions of the
relevant CEs were made. <u>See</u> A.R. at 477.  The only relevant substantive change was an
expansion of the circumstances under which a written CE determination was required, and such a
written determination was made with regard to the Final Rule.  <u>See</u> A.R. at 0473.

asserts first that the rulemaking at issue here does not fall within the claimed categories of CE because "the Coast Guard's final action went well beyond the promulgation of a regulation adjusting the Regulated Navigation area." Docket #135, at 20. This objection is unconvincing because the Coast Guard's enabling regulations themselves recognize that actions falling within a CE might nevertheless be excluded because of other considerations. Specifically, section 2.B.2.b notes that some actions which would normally be categorically excluded under Figure 2-1 might nevertheless require additional environmental review. COMDINST M16475.1D, Sec. 2.B.2.b. Thus, for example, the promulgation of a regulation adjusting a Regulated Navigation Area, while within a categorical exclusion, nevertheless would require further analysis if it involved species or habitats protected by the Endangered Species Act, or a site listed as a National Historic Place. Id., at (7)-(8). Thus, the Coast Guard's determination that the CEs provided for by Figure 2-1, 34 (g) and (I) were applicable is reasonable, so long as it also conducted a supportable analysis of the Sec. 2.B.2.b. factors, as required.

Enclosure 2 to COMDINST M16475.1D is intended to assist Coast Guard personnel in identifying the presence of any Sec. 2.B.2.b. extraordinary circumstances warranting additional review. Id. Section 2.B.2.b states that the "determination of whether an action that is normally excluded requires additional review must focus on the significance of the potential environmental consequences" which "must be evaluated in their context (whether local, state, regional, tribal, national or international) and in their intensity by considering whether the action is likely to involve" one or more of ten delineated circumstances. Id.

B.    The Coast Guard's Analysis Of  COMDINST M16475.1D Section 2.B.2.b
      Factors Relevant to the Final Rule

Four of the circumstances listed by Section 2.B.2.b are potentially relevant to the Coast

Guard's Final Rule: (1) Section 2.B.2.b(1), whether the action involves public health or safety;

(2) Section 2.B.2.b(2), whether the action involves a site that includes or is near a unique

characteristic of the geographic area (in this case because Buzzards Bay is an Estuary of National

Significance); (3) Section 2.B.2.b(3),  whether the action involves "the quality of the human

environment that is likely to be highly controversial in terms of scientific validity or public

opinion;" and, (4) Section 2.B.2.b.(9), whether the action involves a "potential or threatened

violation of a Federal, state, or local law or requirement imposed for the protection of the

environment."

The mere existence of any of these circumstances does not necessarily require the

preparation of an EIS or EA.  COMDINST M16475.1D, Sec. 2.B.2.b.  Likewise, the list "should

not be considered exhaustive by any means."  Id., Enc. 2, at 4.   COMDINST M16475.1D

Enclosure 2 provides specific guidance for Coast Guard personnel's consideration of each of the

Section 2.B.2.b inquiries.

In completing the checklists and analysis required by COMDINST M16475.1D, the Coast

Guard conceded that its Final Rule involves a Section 2.B.2.b(2) site that "includes or is near a

unique characteristic of the geographic area," but concluded that "the rule is projected to produce

negligible adverse impacts on the environment from increased air and water emissions from the

additional tugs" and noted that the tugs would be temporary due to the phase out of single-hull

barges.  A.R. at 476.  Thus, the comparison made by the Coast Guard in its Rule 2.B.2.b(2)

8

analysis was one between its own rulemaking and no regulation (rather than a comparison

between its own rulemaking and the MOSPA provisions its rulemaking purports to preempt).

While Enclosure 2 generally instructs Coast Guard personnel assessing the application of Section

2.B.2.b(2) to consider the likely <u>effects</u> of agency action upon various delineated and potentially

sensitive ecosystems (<u>e.g.</u>, upon a coral reef ecosystem, water supplies, wetlands), the mere

presence of agency action in certain locations potentially warrants further review.  For example,

Enclosure 2 advises Coast Guard personnel to "[t]hink about whether your action is likely

to . . . be located on or near any other environmentally critical area" and to "[f]ind out whether

there is some possible effect of your action that, while improbable, would be so serious IF it

occurred that further review is appropriate."  COMDINST M16475.1D, Enc. 2 at 5-6 (emphasis

in original).

Enclosure 2 instructs Coast Guard personnel determining whether a rulemaking involves

public health or safety within the meaning of Section 2.B.2.b(1), to consider, <u>inter alia</u>, whether a

contemplated action is likely to have a significant possibility of accidental spills of oil or other

hazardous materials.  <u>Id</u> at 5.  Despite language in Section 2.B.2.b suggesting that the action must

merely "involve" public health or safety to trigger environmental analysis, Enclosure 2 clarifies

that the relevant inquiry for Coast Guard personnel is whether there is "likely to be a significant

effect upon public health or safety."  <u>Id.</u>  The Coast Guard concluded that the Final Rule would

have an indirect and beneficial impact upon public safety because it required actions designed to

reduce the incidence of oil spills.  A.R. at 476.  This analysis again has as its underpinning a

comparison of the Coast Guard's rulemaking with an absence of regulation (rather than

comparison of the situation created by the rulemaking with the situation presented by the

9

MOSPA provisions purportedly preempted thereby).

Enclosure 2 also instructs that personnel assessing the applicability of Section 2.B.2.b(3), i.e., whether a proposed action involves "the quality of the human environment that is likely to be highly controversial in terms of scientific validity or public opinion," should consider first "whether [the] action is likely to be controversial in any way," and if so, whether the controversy has an environmental component. COMDINST M16475.1D, Enc. 2, at 7. Personnel are admonished not to interpret the term "environmental" too narrowly in determining whether a controversy is of an environmental or, for example, economic nature. Id. They are also advised to consider Executive Order No. 12372 (concerning Intergovernmental Review of Federal Programs). Id. The Coast Guard concluded, without elaboration, that its Final Rule did not have "a potential for effects on the quality of the environment that are likely to be highly controversial in terms of scientific validity or public opinion." A.R. at 475.

Finally, the Coast Guard also concluded, without elaboration, that its rulemaking would not result in any Section 2.B.2.b(9) inconsistencies with any Federal, State or local laws or administrative determinations relating to the environment. A.R. at 473, 475. Thus, the Coast Guard did not undertake an EA or an EIS.

C.      Standard of Review Of Agency Actions

The Commonwealth bears the burden of proof in challenging the Coast Guard's action under NEPA. See Fund For Animals, 283 F.Supp.2d at 429 (D.Mass.2003)(citing Sierra Club v. Marita, 46 F.3d 606, 619 (7th Cir.1995)). Judicial review of a federal agency's compliance with NEPA is governed by section 10 of the Administrative Procedure Act (the "APA"), 5 U.S.C. § 706(2)(A). See Airport Impact Relief, Inc. v. Wykle, 192 F.3d 197, 202 (1st Cir.1999).

10

"[A]gency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414 (1971) (quoting APA, 5 U.S.C. § 706).   Under the arbitrary and capricious standard, the reviewing court's inquiry is limited to "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. at 416. "While this is a highly deferential standard of review, it is not a rubber stamp. The reviewing court must undertake a 'thorough, probing, in-depth review' and a 'searching and careful' inquiry into the record." Airport Impact Relief, 192 F.3d at 203 (citations omitted). Agencies are nevertheless entitled to some latitude in interpreting their own regulations.  See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994).

The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result.  Penobscot Air Services, Ltd. v. F.A.A., 164 F.3d 713, 719, n.3 (1st Cir.1999)(citing Federal Election Comm'n v. Rose, 806 F.2d 1081, 1088 (D.C.Cir.1986).  An adequate explanation includes responses to "relevant" and "significant" public comments. Id. (citing Home Box Office, Inc. v. F.C.C., 567 F.2d 9, 35 & n. 58 (D.C.Cir.1977)).  Neither requirement is "particularly demanding."  Id. (citing Public Citizen, Inc. v. F.A.A., 988 F.2d 186, 197 (D.C.Cir. 1993)).  Courts will uphold agency decisions if the agency's path may reasonably be discerned and where the agency has stated the main reasons for its decision and indicated that it has considered the most important objections.  Public Citizen, Inc., 988 F.2d at 197.  "[T]he agency's response to public comments need only 'enable us to see what major issues of policy were ventilated  .  .  .  and why the agency reacted to them as it did.'"

11

 Id. (quoting <u>Automotive Parts & Accessories Ass'n v. Boyd</u>, 407 F.2d 330, 335 (D.C.Cir.1968)).

 

 

### D.     Adequacy of the Coast Guard's CE Determination.

The conclusion that the Final Rule would not result in any inconsistencies with any Federal, State or local laws or administrative determinations relating to the environment (A.R. at 473) is reasonable in light of the guidelines for application of Section 2.B.2.b in Enclosure 2 to COMDINST M16475.1D.  The Commonwealth objects that this conclusion is inconsistent with the Coast Guard's express preemption declaration, which cites the conflict between the Final Rule and MOSPA among its bases.  Although an inconsistency indeed appears to exist on the plain language of Section 2.B.2.b(9), Enclosure 2 nevertheless makes clear that Section 2.B.2.b(9) is animated not by concerns such as federalism and preemption, but rather by the potential for Coast Guard action constituting literal violations of state environmental laws (such as failures to obtain necessary permits, or agency actions which result directly in toxic or unusual air emissions, or unusual noise).  COMDINST M16475.1D, Enc. 2, at 9.

The Commonwealth first objects that the Coast Guard is bound by COMDINST M16475.1D to follow the provisions of the Department of Transportation's Order 5610.1C, to which the introduction to COMDINST M16475.1D refers.  See COMDINST M16475.1D at 1-4, 2-5 ("a CE may not be used if the proposed action is likely to involve any of the circumstances set forth in section 20.b.(2) of DOT Order 5610.1 series (Enclosure 1)").  The Commonwealth notes that the DOT Order requires an EIS or EA wherever a CE applies, but a proposed regulation creates "inconsistencies with any Federal, State, or local law or administrative determination relating to the environment" rather than a determination as to whether the

proposed action would  result in "a potential or threatened <u>violation</u> of Federal, State, or local

law or requirement imposed for the protection of the environment" as is required by COMDINST

M16475.1D Section 2.B.2.b(9).  See Docket # 140 at 53; A.R. at 475.  However, subsequent to

the November 29, 2000,  issuance of COMDINST M16475.1D, the Coast Guard was one of the

agencies transferred from the DOT to the authority of the newly-created Department of

Homeland Security. <u>See</u> 6 U.S.C. § 542.  Accordingly, the Coast Guard reasonably followed its

own CE as explained by its own guidance rather than a regulation from an agency of which it

was no longer part.

     The Commonwealth objects that this conclusion is inconsistent with the Coast Guard's

express preemption declaration, which cites the conflict between the Final Rule and MOSPA

among its bases.  Preemption and the CE, however present different issues; Section 2.B.2.b(9) is

animated not by concerns such as federalism and preemption, but rather by the potential for

Coast Guard action constituting literal violations of state environmental laws (such as failures to

obtain necessary permits, or agency actions which result directly in toxic or unusual air

emissions, or unusual noise).  COMDINST M16475.1D, Enc. 2, at 9.

     Less convincing, however, is the Coast Guard's conclusion that the Final Rule would not

result in any environmental controversy within the meaning of Section 2.B.2.b(3).  Although it is

true that at the time the CE determination was made in April, 2007, the enforcement of MOSPA

had been enjoined by this Court, the matter was nevertheless on appeal and the Coast Guard

recognized that it remained in active litigation concerning the MOSPA provisions. See Docket

#77 (Notice of Appeal, September 7, 2006).  The administrative record is replete with examples

of expressions of opposition to the Final Rule from elected officials in the Commonwealth. (See

13

inter alia, AR at 65-69; 121-126; 207-222; 264; 458-459; 466, 470-471).[4]  The level of

controversy suggested by those statements from legislators is more significant than that of the so-

called "heckler's veto" (i.e., the mere presence of vocal opposition).  See Save Our Heritage, Inc.

v. F.A.A., 269 F.3d 49, 61 (1st Cir.2001).   Rather, it suggests a reasonable disagreement over the

project's risk of environmental harm.  Although it provided explanations for its application of

several of the other Section 2.B.2.b factors (See, e.g., A.R. at 476-477), the Coast Guard has not

done so with regard to its conclusion that its rulemaking is not controversial within the meaning

of Section 2.B.2.b(9).  A.R. at 475.

Similarly, the Coast Guard's determination that Sections 2.B.2.b(1)-(2)(i.e., whether the

rulemaking involves public health or safety, and whether it involves a site including or near a

unique geographic characteristic, respectively) are inapplicable is inadequately explained.  First,

Enclosure 2 suggests that in interpreting Sections 2.B.2.b(2), even an improbable environmental

consequence may warrant more elaborate review if it is sufficiently serious.  An oil spill in an

Estuary of National Significance--- even if improbable in the Coast Guard's view -- arguably

presents such a circumstance.  The adequacy of the Coast Guard's explanation otherwise (namely

that "the rule is projected to produce negligible adverse impacts on the environment from

increased air and water emissions from the additional tugs") is undermined by the fact that it did

not consider the preemption of the MOSPA provisions to be an event which itself presented

---

[4] Although the Commonwealth cites to North Carolina v. F.A.A., 957 F.2d 1125, 1133 (4th Cir.1992), for the proposition that such opposition itself is indicative of "controversy" within the meaning of nearly-identical enabling regulation of the F.A.A. (See, Docket # 135, at 19 ff.), the Fourth Circuit found that in the totality of circumstances present in that case, the F.A.A.'s decision not to prepare an EIS was not arbitrary or capricious.

14

potential environmental costs, but rather contrasts the agency's intended action with a completely hypothetical Buzzards Bay, free of any regulation at all.[5]  The analysis of whether the Final Rule would have a significant effect upon public safety (namely, that it would "have an indirect and beneficial impact upon public safety because it required actions designed to reduce the incidence of oil spills") suffers from the same defect, because it again does not consider the potential impact of preemption of MOSPA.

Thus, the Coast Guard's determination with regard to the applicability of Sections 2.B.2.b(1)-(2) was arbitrary and capricious because it was not based upon a consideration of the relevant factors.

E.      Harmless Error Under the APA

However, even if the Commonwealth is correct that the Coast Guard should have conducted an EIS or an EA, the failure to make that assessment was harmless error because (1) the Coast Guard conducted via the rulemaking process the very analysis (i.e., whether protection of the environment and/or vessel safety required escorts for double hull tank vessels) which would have been made via ES or EIS should it have determined that one was required, and (2) the Commonwealth has not identified substantial defects in that analysis.  See Save Our Heritage, 269 F.3d at 61 (remand for environmental assessment not necessary where agency has already made a reasoned finding that environmental effects are de minimis).  See also Illinois Commerce

---

[5]  The question here presented (whether the potential environmental effects of preemption need be accounted for in the Coast Guard's analysis) presents a separate question from that of whether the preemption was an extraordinary circumstance within the meaning of Section 2.B.2.b(9).  See supra, at 7-10.

Com'n v. I.C.C., 848 F.2d 1246, 1258 (D.C.Cir. 1988)(despite having been obligated by its own

regulations to prepare an EA, remand would be a "meaningless gesture" as the agency did not

ignore environmental consequences during its rulemaking); Nevada v. Department of Energy,

457 F.3d 78, 90-91 (D.C.Cir.2006).

        The APA provides that, in reviewing agency action, the court "shall" take account of "the

rule of prejudicial error," whether the error caused prejudice.  5 U.S.C. § 706.   There would be

no benefit to remanding for environmental assessment where the Coast Guard has conducted a

reasoned analysis of the environmental affects of its rulemaking.  See Docket #116 at 27-30.

This is especially so where the Commonwealth's assertion that the Final Rule's failure to require

escorts for double-hulled tankers poses significant environmental risks is unsupported by

anything substantial in the record.  It is up to the Commonwealth in the course of assailing the

Coast Guard's findings to identify the defects in evidence and the faults in reasoning.  See Town

of Marshfield v. F.A.A., 552 F.3d 1, 4 (1st Cir.2008)("In this case, the FAA's assessment of

minimal impact is not implausible.  If there is a stronger argument for insisting that the FAA use

NIRS or some other computer modeling program in cases like this, it can await an instance in

which a more powerful argument is presented.")(citing Save Our Heritage,, 269 F.3d at 60).

        The Commonwealth objects that the Coast Guard did not analyze the degree to which

preemption of MOSPA increased the risk of spills (other than to state that double hulls provide

sufficient protection against groundings in Buzzards Bay).  It asserts that the Coast Guard's

conclusion that double hulls provide sufficient protection against groundings is insufficient

because it ignores the risk of accidents arising from collision or allision (despite the fact that the

stated purpose of the Final Rule was to reduce the likelihood of an incident that might result in a

collision, allision, or grounding).  Yet the Commonwealth has not adduced any evidence

suggesting that a double hull tanker is more vulnerable to a spill resulting from collision or

allision than it would be to one resulting from grounding (and the record contains evidence to the

contrary, see infra).  The Coast Guard's focus upon grounding accidents is reasonable in light of

its description of "bottom characteristics" of the relevant geographic area as rocky, and its having

determined that groundings have historically presented the greatest risk in Buzzards Bay.   See 72

Fed. Reg. 50,054 - 50,055

It also objects that the administrative record does not contain evidence that the Coast

Guard engaged in the types of modeling it has completed for other bodies of water to assess

similar types of risk.  Only one such study has been identified, a 1999 study concerning Puget

Sound.  While the Commonwealth states that the Puget Sound analysis "assumed that the risk of

a serious oil spill from a double hulled vessel is significant" (Docket #135 at 25, (citing A.R. at

286)), that analysis notably concluded that tug escorts for single hull tankers were the most cost-

effective of the escort options and added that an extension of escort requirements to double-hull

tankers was less cost effective (both because double hulls reduce the risk of spills from

grounding and collision accidents and because of the significant compliance costs of slowing

down higher speed vessels to match the speed of the escort tugs).  A.R. at 287.  Thus, both of the

Commonwealth's principal objections to the Coast Guard's analysis are undermined by the only

environmental assessment in the record.

The Coast Guard described within the Final Rule its receipt, and consideration of,

interested parties' comments concerning, inter alia, the hazards presented by single-hull barges

vis-a-vis double-hulled barges.  See  72 Fed. Reg. at 50,053 - 50,057.  In particular, the Coast

17

Guard noted that:

> Three written comments stated that the requirement for escort tugs should apply to double hull tanks vessels in addition to single hull tank vessels. At the consultative meeting discussed elsewhere in this preamble, the Massachusetts Department of Environmental Protection also urged that all tank vessels transiting Buzzards Bay, both single and double hull, be required to have an escort tug.
>
> The majority of tank barge casualties in Buzzards Bay have been caused by groundings, and the bottom characteristics of the area are generally rocky. Double hulls provide sufficient protection against this type of casualty, and there has never been a major oil spill from a double hull tank barge grounding in Buzzards Bay. Therefore, the Coast Guard does not feel it is necessary to require tug escorts for double hull tank barges at this time. Additionally, the Coast Guard considers that, as adopted in this rule, its three-pronged approach to navigation safety ((1) Mandatory participation in a Vessel Movement Reporting System (VMRS); (2) a federally licensed pilot and (3) a tug escort for single hull tank barges) constitutes a redundant vessel accident and pollution prevention system that will provide a sufficient measure of safety for tank vessels transiting Buzzards Bay.

Id. at 50,054 - 50,055.

Further indicative of the fact that the Coast Guard did give consideration to the relative merits of requiring tugs for both single and double-hull tankers is the fact that in its Advanced Notice of Proposed Rulemaking, the Coast Guard indicated that it was considering requiring tug escorts for all tank barges, and solicited comments from interested parties on that basis. See 69 Fed. Reg. at 62429. The evolution in its position (toward the conclusion that tug escorts were necessary only for single-hulled barges) suggests due consideration, rather than arbitrary and capricious refusal to consider opposing positions.

The Commonwealth also objects that the Coast Guard failed to respond to its comments concerning spills involving double hull vessels in the Gulf of Mexico. The Coast Guard argues convincingly that the situation presented by the Gulf of Mexico spill (a submerged and uncharted

18

oil platform sunk by a hurricane) is unlikely to occur in Buzzards Bay, and that the presence of

an escort tug would not in any event prevent a collision with such an object.[6]  The

Commonwealth also objects that the record contains no evidence that a double-hulled vessel

could have avoided previous spills.  Docket #135, at 25-26.  The Coast Guard concluded,

however, in its Regulatory Evaluation that had the measures contained in the Final Rule been

previously implemented, each of the prior documented spills in Buzzards Bay "may well have

been avoided."  A.R. at 489.

      2.  <u>Lack of Notice Of Intent To Engage In Express Preemption</u>

     A related argument now advanced by the Commonwealth, but not advanced prior to the

filing of the administrative record, is its contention that the Coast Guard's preemption statement

was itself not properly noticed so as to provide the requisite opportunity for public comment.

The APA requires that notice of proposed rulemaking shall be published in the Federal Register,

including <u>inter alia</u>,  reference to the legal authority under which the rule is proposed and either

the terms or substance of the proposed rule or a description of the subjects and issues involved.

5 U.S.C. § 553(b).  To insure meaningful public participation in a rulemaking endeavor, the

"final rule must be a lineal descendant of, and in character with, the earlier proposed rule."

<u>O'Connell v. Shalala</u>, 79 F.3d 170, 180 (1st Cir.1996).  "Put another way, changes must flow

logically from the prescribed notice and comment."  <u>Id.</u> (citing <u>Natural Resources Defense</u>

---

[6]  Although the Coast Guard's response to the Commonwealth's concern about the Gulf
of Mexico incident does not appear in the A.R., but is advanced by affidavit, the Court may relay
upon agency declarations which explain agency views held at the time of its action and which are
supported by the administrative record**.**  <u>Sierra Club v. Marsh</u>, 976 F.2d 763, 772-773 (1st
Cir.1992).

Council, Inc. v. United States EPA, 824 F.2d 1258, 1283 (1st Cir.1987)).

From the outset, the Coast Guard has expressed the opinion that federal law (that is the PWSA as interpreted in Ray v. Atlantic Richfield Co., 435 U.S. 151 (1978) and United States v. Locke, 529 U.S. 89 (2006)) rendered MOSPA a legal nullity upon enactment, and that its intended rulemaking might also preempt MOSPA.  See, e.g., Advanced Notice of Proposed Rulemaking, 69 Fed. Reg. at 62430 (stating in October, 2004, that certain provisions of MOSPA were preempted in the Coast Guard's view and that "it is likely that any regulation promulgated as a result of this advance notice of proposed rulemaking would likewise touch categories of regulation reserved to the Federal Government"); Notice of Proposed Rulemaking, 71 Fed. Reg. 15,653- 15,654 (analyzing the federalism implications of the proposed rulemaking, describing various notice and consultation efforts undertaken to date in compliance with Executive Order 13132, and inviting further consultation requests).[7]  The Final Rule details the comment and consultation process as it ultimately played out with concerned local government officials, a process which clearly reflects that the Coast Guard's intention to preempt was well understood. See  72 Fed. Reg. at 50,056 - 50,057.  Thus, from the outset, the public generally, and the Commonwealth specifically, received notice that the contemplated regulation could have preemptive effect.

While it is true that the Coast Guard's particular theory of preemption evolved during the course of this litigation (from a field preemption and conflict preemption theory in the ANPR to

---

[7]  In fact, the Coast Guard's expression of its position that MOSPA was preempted dates from earlier still.  See A.R. 127 (referencing the Coast Guard's September, 2004, request to the Massachusetts governor that execution and enforcement of MOPSA be withheld because its provisions extend into areas regulated by the federal government).

20

an express and conflict preemption theory by Final Rule), such an evolution was suggested by the

course of the litigation itself, and there is no evidence that the Coast Guard attempted thereby to

evade public comment concerning the preemptive effect of the proposed rules.  Moreover, the

provisions of the Final Rule itself remained lineal descendants of the proposed rule, no matter the

legal preemption theories the Coast Guard might have advanced in support of it during litigation.

The Commonwealth has not adduced any authority for the proposition that an agency must

identify not only the terms and substance of regulatory language and relevant issues, but also all

of the legal and policy arguments it will make in support of its regulation.

**Other Issues**

1.      Primary vs. Subsidiary Statutory Objectives

The Commonwealth urges the Court to reconsider its rejection of its previous argument

that MOSPA cannot frustrate Congressional purpose when it advances, rather than impairs, the

explicity-stated primary goals of Title I (i.e., protection of the environment and vessel safety).

The Court rejected this argument by adopting the June 6, 2008, Report and Recommendation,

finding that Congress directed the Coast Guard to consider and balance numerous factors in

crafting regulations under Title I, and noting that the Supreme Court had authorized the Coast

Guard to set the appropriate level of regulation or to determine that no regulation at all is

appropriate.  Docket #116 at 20-21 (citing Locke, 529 U.S. at 109).  The Commonwealth presses

the argument that when subsidiary statutory goals form the basis for conflict preemption, the

primary federal goals are subverted.  The Commonwealth concedes, however, that the Supreme

Court and First Circuit have nevertheless approved conflict-preemptive regulations which

21

embody the agency's policy judgment as to how best to advance the statute's primary goals.  <u>See</u>

Docket #135 at 48, n. 41.  This is just such a case.  The <u>Locke</u> framework makes clear that the

Coast Guard is empowered to make a policy determination, balancing all of the statutory factors,

as to what level of regulation best advances the primary statutory purposes.  <u>Locke</u>, 529 U.S. at

109.  <u>See</u> <u>also</u> <u>Id.</u> at 110 ("a federal official with an overview of all possible ramifications of a

particular requirement might be in the best position to balance all the competing

interests.")(citing <u>Ray</u>, 435 U.S. at 177).

     The Commonwealth also objects that the Administrative Record, now before the Court,

does not bear out the Court's previous conclusion (<u>See</u> Docket #116, at 18-19) that the Coast

Guard had balanced the statutory factors by, <u>e.g.</u>, considering economic impacts and effects, local

practices and customs, or various other factors delineated at 33 U.S.C. § 1224(a)(1)-(9).  Clearly,

the Coast Guard considered these factors.  For example, it conducted a Ports and Waterways

Safety Assessment Workshop for Buzzards Bay on September 9-10, 2003, which included

consideration of these factors.   See A.R. at 32-64.  The Regulatory Evaluation conducted by the

Coast Guard also included a cost-benefit analysis.  A.R. at 406-407.

     2.     <u>Wyeth v. Levine</u>

     On March 4, 2009, (<u>i.e.</u>, subsequent to briefing on the pending motions), the United

States Supreme Court issued its decision in <u>Wyeth v. Levine</u>, 129 S.Ct. 1187, __ U.S. ____

(2009), which contains significant preemption analysis.  Accordingly, the Court permitted

supplemental briefing to consider whether the <u>Wyeth</u> decision necessitates reconsideration of the

Court's adoption of the Report and Recommendation of June 6, 2008**.**

22

The Commonwealth sees a twofold significance to the <u>Wyeth</u> case: first, it asserts that the decision settles that the Coast Guard may not engage in express preemption, as it is lacking specific statutory authority to do so; and second, it asserts that <u>Wyeth</u> fatally undermines the conflict preemption arguments of the Coast Guard.[8]   Docket #148 at 1.

The Commonwealth's assertion that Wyeth forecloses the possibility of an agency engaging in express preemption on the basis of implied authority reaches too far.  In adopting the Report and Recommendation of June 8, 2008, the Court found that although the Coast Guard does not have an express delegation by the Congress of authority to engage in express preemption, its power to do so was nevertheless implied by the scope of powers Congress delegated to it via the PWSA as explained by the holdings of <u>Locke</u> and <u>Ray</u>.   The Court also noted, but rejected, therein the Commonwealth's objection that the continuing vitality of implied agency authority to engage in express preemption was in doubt, concluding that although an emerging trend toward limiting agency rights to engage in express preemption might be discerned, it had not thus far advanced beyond dicta and that implied authority to engage in express preemption remained valid under binding precedent.  <u>See</u> <u>Id.</u> at 15, n. 8.

<u>Wyeth</u> concerns the weight to be afforded to an agency's views about the impact of state tort law on federal objectives.  At issue in <u>Wyeth</u> was not a claim of express preemption by the FDA, but rather the FDA's assertion, made in support of its conflict preemption claim, that state tort law was an obstacle to achieving its statutory objectives.  <u>Id.</u>, at 20.  The Commonwealth

---

[8]  Additionally, the Commonwealth argues that <u>Wyeth</u> forecloses any argument that the Coast Guard's preemption statement in the Final Rule may be the source of preemption.  The Coast Guard has disclaimed any argument that the preamble to the Final Rule is a source of preemptive authority, and so the Court need not consider the relevance of <u>Wyeth</u> to that proposition.  <u>See</u> Docket #151, at 8.

acknowledges this distinction, but asserts in conclusory fashion that the argument necessarily applies with even greater force to effectively bar claims of express preemption by implied authority.  See Docket #148 at 4, n. 2.  The United States Supreme Court, however, has previously described implied agency authority to engage in express preemption, and that precedent remains binding.  See City of New York v. F.C.C., 486 U.S. 57, 64 (1988)(citing Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 700 (1984)); Fidelity Federal Savings & Loan Assn. v. De la Cuesta, 458 U.S. 141, 152-154 (1982)("The statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof. Beyond that, however, in proper circumstances the agency may determine that its authority is exclusive and pre-empts any state efforts to regulate in the forbidden area")(emphasis added).

The Commonwealth argues that Wyeth limits the weight to be afforded to agency positions on preemption in a manner that forecloses a finding of conflict preemption in this case. It argues that the Coast Guard may not engage (and the Court may not defer to) a "preemption balancing" i.e., a determination that State laws are pre-empted based upon the Coast Guard's balancing of the § 1224(a) factors, "without regard for whether any existing State requirements may actually undermine Title I's stated goals of 'vessel safety and protection of the marine environment.'" Docket #148 at 6-7.  This is a variation of the argument that the Court has rejected, supra, concerning primary versus subsidiary goals of the PWSA.  Moreover, even accepting the Commonwealth's position that Wyeth stands for the proposition that the Court may not defer to an agency's conclusion that state law is pre-empted, but rather must merely attend to the agency's explanation of how state law affects the regulatory scheme as it examines the

24

substance of state and federal law, this is precisely the analysis in which the Court has previously

engaged.  The Commonwealth is not persuaded by the Coast Guard's analysis, because it has as

its underpinning the view that the Coast Guard is required to demonstrate that "the State laws

would pose an increased danger to safety or environmental protection." See Docket #148 at 10.

The Court has rejected this view, however, in light of the holding of Locke that the relevant

inquiry for PWSA Title I conflict pre-emption is whether the Coast Guard has promulgated its

own requirement on the subject or has decided that no such requirement should be imposed at all.

Locke, 529 U.S. at 110 (citing Ray, 435 U.S. at 171-172, 178 ("[W]here failure of  .  .  .  federal

officials affirmatively to exercise their full authority takes on the character of a ruling that  no

such regulation is appropriate or approved pursuant to the policy of the statute, States are not

permitted to use their police power to enact such a regulation.")).

      Finally, the Court is not persuaded that the Wyeth decision in any way undermines the

Supreme Court's holding in Locke that the Coast Guard is empowered under the PWSA to set

the appropriate level of regulation or to determine that no regulation at all is appropriate. Locke,

529 U.S. at 109.  Coast Guard regulation under the PWSA is on a different footing than the

agency action in review under Wyeth, where a presumption against preemption applied.

Compare Locke at 108 ("[t]he state laws now in question bear upon national and international

maritime commerce, and in this area there is no beginning assumption that concurrent regulation

by the State is a valid exercise of its police powers.") with Wyeth, 129 S.Ct. 1187 at 8 (applying

a presumption against preemption in the presence of the historic presence of state law).

25

3.      Significance of Revisions to 33 U.S.C. §1222

The Commonwealth also argues that the Court has underestimated the significance of

post-Ray Congressional revisions to the PWSA, and that the revisions in fact eliminate the entire

textual basis for Title I preemption upon which Ray, Locke, and this Court's analysis depended.

The Commonwealth points out that while the First Circuit directed this Court to consider

on remand the significance of the deletion by Congress of the former 33 U.S.C. § 1222(b)(See,

United States v. Massachusetts, 493 F.3d 1, 15-16, n. 21 (1st Cir. 2007)), the Congress also

removed the language of former Section 1222(e), upon which the Commonwealth asserts the

Supreme Court also relied in Ray (and upon which, in turn, this Court relied upon in adopting the

Report and Recommendation of June 6, 2008).

In Ray, the Court noted the pre-emptive impact of the subsequently-deleted § 1222(b),

but added that "even without § 1222(b), we would be reluctant to sustain the Tanker Law's

absolute ban on tankers larger than 125,000 DWT" because the Court had previously recognized

that "'where failure of  .  .  . federal officials affirmatively to exercise their full authority takes on

the character of a ruling that no such regulation is appropriate or approved pursuant to the policy

of the statute,'[s]tates are not permitted to use their police power to enact such a regulation."

Ray, 435 U.S. at 178 (quoting Bethlehem Steel Co. v. New York Labor Relations Board, 330

U.S. 767, 774 (1947)).  The Ray court concluded that on the facts of that case, the regulation took

on such a character in part because of the also-deleted §1222(e)'s admonition that the Secretary

shall consider the wide variety of interests affecting the exercise of his authority.  Id.  However,

the subsequent deletion of a statutory section which was germane on the facts of that case to

assessing the character of a different regulation does not bear upon the issue of whether in this

26

case, the Coast Guard's regulation took on "the character of a ruling that no such regulation is

appropriate or approved pursuant to the policy of the statute."  Here, there is no ambiguity as to

whether the Coast Guard's failure to exercise its full authority took on the character of such a

ruling because (unlike the facts presented in Ray), the Coast Guard has explicitly made such a

statement.  Moreover, after the statutory revisions, the Supreme Court in Locke held that the

Coast Guard has the authority to determine the appropriate level of regulation.  Locke 529 U.S. at

109-110.  This Court relied upon Locke, rather than the repealed statutory sections in its analysis.

See Docket # 116 at 24 (noting that the Locke court reaffirmed the essential framework of Ray

despite the statutory changes).  Id. (citing Locke at 109-110).


CONCLUSION

For the foregoing reasons, I recommend that Commonwealth of Massachusetts' Motion

for Partial Summary Judgment (Docket #134) be DENIED, and that the United States of

America's Cross Motion for Summary Judgment (Docket #139) be ALLOWED.  I further

recommend that the Court DENY the Coalition for Buzzard Bay's Motion for Summary

Judgment (Docket #136).[9]

---

[9]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72, any party
who objects to these proposed findings and recommendations must file specific written
objections thereto with the Clerk of this Court within thirty days of the party's receipt of this
Report and Recommendation. At the joint request of the Parties, I have enlarged the time within
which the Parties may file written objections to these proposed findings and recommendations
from ten to thirty days.  The written objections must specifically identify the portion of the
proposed findings, recommendations, or report to which objection is made and the basis for such
objections. The parties are further advised that the United States Court of Appeals for this Circuit
has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate
review of the District Court's order based on this Report and Recommendation. See Keating v.
Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano

In addition, at the joint request of the Parties, I have enlarged the time within which the

Parties may file written objections to these proposed findings and recommendations from ten to

thirty days._____


           _____/s / Leo T. Sorokin_____
           UNITED STATES MAGISTRATE JUDGE

---

Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d
603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v.
Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also, Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466
(1985).